**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

A.M., through her Guardian ad Litem,
JOLEEN YOUNGERS,

       Plaintiff,

vs.                                  No. CIV 13-0692 JB/WPL

NEW MEXICO DEPARTMENT OF HEALTH;
LOS LUNAS CENTER FOR PERSONS WITH
DEVELOPMENT DISABILITIES;
ROGER ADAMS, individually and in his capacity
as an agent for the New Mexico Department of Health;
BETH SCHAEFER, individually and in her capacity
as an agent for the New Mexico Department of Health;
DAN SANDOVAL, individually and in his capacity
as an agent for the New Mexico Department of Health;
JOSEPH MATEJU, individually and in his capacity
as an agent for the New Mexico Department of Health;
NEW MEXICO AGING AND LONG-TERM SERVICES
DEPARTMENT; and THE ADULT PROTECTIVE
SERVICES DIVISION OF NEW MEXICO AGING
AND LONG-TERM SERVICES DEPARTMENT,

       Defendants.

**<u>MEMORANDUM OPINION AND ORDER</u>**

**THIS MATTER** comes before the Court on the Individual DOH Defendants' Motion to

Dismiss Plaintiff's Substantive Due Process Claim on the Basis of Qualified Immunity, filed

March 6, 2014 (Doc. 22)("MTD"). The Court held a hearing on October 23, 2014. The primary

issues are whether Defendants Dan Sandoval, Roger Adams, Joseph Mateju, and Beth Schaefer

(collectively "Individual DOH Defendants") violated Plaintiff A.M.'s substantive due-process

rights under the Fourteenth Amendment to the Constitution of the United States of America

when they failed to ensure her health and safety after she was involuntarily committed to state

custody due to her developmental disabilities. The Court will deny the MTD in part and grant it

in part.  The Court concludes that: (i) assuming the truth of the facts in the Complaint, the Individual DOH Defendants violated A.M.'s substantive due-process rights; (ii) such rights were clearly established when the Supreme Court of the United States decided Youngberg v. Romeo, 457 U.S. 307, 322 (1982), on June 18, 1982; and (iii) the extraordinary circumstances exception to the qualified-immunity analysis does not apply.  Consequently, the Court grants the MTD as to the Individual DOH Defendants' conduct that occurred before June 18, 1982, and denies the MTD as to the Individual DOH Defendants' conduct that occurred after June 18, 1982.

**FACTUAL BACKGROUND**

The Court takes its facts from the Complaint, as it must when considering a motion to dismiss for failure to state a claim under rule 12(b)(6) of the Federal Rules of Civil Procedure. The Court has reorganized the factual material in the Complaint, however, to explain the facts more clearly.

1.      **The Parties.**

Plaintiff A.M. is a sixty-six year old woman who has been diagnosed with various developmental disabilities.  See Complaint ¶ 66, at 18.  A.M. was involuntarily committed to the New Mexico Department of Health ("DOH") by court order on May 8, 1963, when she was sixteen years old, because her developmental disabilities rendered her unable to care for herself. See Complaint ¶¶ 67-69, at 18-19.  Because of her disabilities, A.M. brings this action through her guardian ad litem, Joleen Youngers.  See Complaint ¶ 66, at 18.

The DOH operates all of the facilities that house and treat people with developmental disabilities in the State of New Mexico.  See Complaint ¶ 8, at 4.  One of these facilities is the Los Lunas Center for Persons with Developmental Disabilities -- formerly known as the Los Lunas Hospital and Training School ("Los Lunas Hospital").  Complaint ¶ 8, at 4.  The Fort

Stanton Hospital and Training School ("Fort Stanton") was another DOH facility for individuals with developmental disabilities, and was a subsidiary of the Los Lunas Hospital.   Complaint ¶¶ 8-9, at 4.   Because the Complaint refers to the Los Lunas Hospital and Fort Stanton collectively as the "Training School," the Court will do so throughout this Memorandum Opinion and Order ("MOO").   Complaint ¶ 1, at 1-2; id. ¶ 11, at 4-5.   Moreover, because the Complaint refers to the DOH and the Training School collectively as "the DOH Defendants," the Court will do so throughout this MOO.   Complaint ¶ 11, at 4

Before 1992, the New Mexico Human Services Department ("HSD") was responsible for operating Adult Protective Services ("APS")[1] in New Mexico.   Complaint ¶ 22, at 8.   APS is responsible for protecting adults with developmental disabilities from exploitation, abuse and neglect.   See Complaint ¶ 22, at 8.   APS must also ensure that those adults receive the treatment and social services that they need.   See Complaint ¶ 22, at 8.   From 1992 to 2005, the New Mexico Children Youth and Families Department ("CYFD") inherited HSD's responsibilities for all protective services in the state, including APS.   Complaint ¶ 23, at 8.   CYFD was responsible for the continuing coordination and supervision of APS; for adopting rules and regulations necessary to implement and operate APS; and for evaluating APS' effectiveness.   See Complaint ¶ 23, at 8.   In 2005, the New Mexico Aging and Long-Term Services Department ("ALTSD") inherited APS from CYFD and has since then operated APS.   Complaint ¶ 24, at 8-9.   Similar to its predecessors, the ALTSD is responsible for the continuing coordination and supervision of APS; for adopting rules and regulations necessary to implement and operate APS; and for

---

[1]Because the Complaint refers to the Adult Protective Services Division of New Mexico Aging and Long-Term Services Department, the Adult Protective Services Division of the New Mexico Children Youth and Families Department, and the Adult Protective Services of the New Mexico Human Services Department, collectively as "APS," the Court will do so throughout this MOO.   Complaint ¶ 26, at 9.

evaluating APS' effectiveness.  See Complaint ¶ 25, at 9.  Because the Complaint refers to the ALTSD, APS, and the DOH Defendants as the "State Agency Defendants," the Court will do so throughout this MOO.  Complaint ¶ 27, at 9.

Schaefer was an attorney for the DOH and the Training School from September 13, 1976, to December 31, 2001.  See Complaint ¶ 14, at 5.  Sandoval was the Director of Resident Living for the Training School between 1979 and 1985.  See Complaint ¶ 16, at 5.  As Director of Resident Living, Sandoval was in charge of social services and the Training School's social workers.  See Complaint ¶ 45, at 12.  Sandoval was also a member of the Training School's Screening Committee on Admissions and Releases ("SCAR") and, at times, its chairman.  Complaint ¶ 16, at 6.

Defendant Roger Adams was the Training School's Deputy Administrator or Acting Administrator "during the relevant time period."[2]  Complaint ¶ 18, at 6.  Adams made hundreds of decisions regarding the placement and treatment of Training School residents -- including the Training School's placement and discharge decisions relating to A.M.  See Complaint ¶ 18, at 6.  Adams chaired SCAR, attended most SCAR meetings, and approved A.M.'s discharge from aftercare without taking any steps to ascertain whether she would be safe or have her medical and other needs met.  See Complaint ¶ 18, at 6.

Defendant Joseph Mateju was the Training School Administrator "during the relevant time period."  Complaint ¶ 20, at 7.  As Administrator, he made the final decisions regarding the placement and treatment of Training School residents, and all placement and discharge decisions relating to A.M.  See Complaint ¶ 20, at 7.  He also had the authority to unilaterally accept and remove individuals from the Training School.  See Complaint ¶ 20, at 7.  Mateju was responsible

---

[2]The Complaint does explain in any further detail when either Adams or Mateju served in their respective positions at the Training School.

for the placement of many residents -- including A.M. -- into third-party homes, boarding homes, and other outside facilities.  See Complaint ¶ 20, at 7.  Mateju personally attended SCAR meetings during which A.M. was discussed, and he personally approved decisions regarding her discharge, including "from aftercare," without taking any steps to ascertain whether she would be safe or have serious medical and other needs addressed.  See Complaint ¶ 20, at 7.  Mateju had responsibility for ensuring that appropriate measures were taken to: (i) provide for A.M.'s health, safety, and well-being; (ii) ensure that she received appropriate services; and (iii) ensure that A.M. continued to receive those services in any third-party placements.  See Complaint ¶ 20, at 7-8.

> 2.    **The Aftercare Program.**

Over a period of two decades -- through the 1970s and 1980s -- the DOH Defendants systematically transferred hundreds of developmentally disabled individuals from state institutions to various private third parties throughout New Mexico.  See Complaint ¶ 2, at 2; id. ¶ 37, at 10.  These private third parties ranged from boarding homes to private residences and commercial enterprises.  See Complaint ¶ 2, at 2.  The Defendants called this program "aftercare"; the developmentally disabled individuals placed with third parties through the aftercare program were called "aftercare residents."  Complaint ¶ 2, at 2; id. ¶ 38, at 11.

The Defendants placed aftercare residents with private third parties "without anyone's informed consent, without the appointment of guardians or any other legally-authorized surrogate decision-makers, without permission from the courts that committed them to the state institutions . . . , and without due process of law . . . ."  Complaint ¶ 3, at 2.  In some cases, the Defendants contacted ex parte the judicial authorities that had committed aftercare residents to the Training School and "provided misleading information to them concerning the status of

individuals discharged from the Training School."  Complaint ¶ 3, at 2-3.  In other cases, the Defendants did not communicate with the judicial authorities that committed individuals to the Training School at all before transferring those individuals to private third parties.  See Complaint ¶ 3, at 2-3.

After transferring aftercare residents to their third-party placements, the DOH and the Individual DOH Defendants "abandoned" them.  Complaint ¶ 3, at 2.  The DOH and the Individual DOH Defendants neither provided them with the services that they needed, nor protected them from abuse, neglect, or exploitation.  See Complaint ¶ 3, at 2.  When the events alleged in the Complaint occurred, approximately eight social workers at the Training School oversaw 431 aftercare residents, "while also performing social work duties for hundreds of people still residing" at the Training School.  Complaint ¶ 48, at 13.  Although Training School policies required Training School personnel to oversee and conduct periodic visits of aftercare residents, the DOH Defendants "did not use any system to ensure that residents in aftercare would be safe or that they would receive minimally adequate services."  Complaint ¶ 43, at 12.

Sandoval, despite being charged with overseeing the Training School's social workers, "did not know of any guidelines on how residents in aftercare placements would be cared for, did not know of a system to follow up with those residents, and did not know of a system . . . to know how many residents were placed in private third-party placements . . . ."  Complaint ¶ 49, at 13.  Sandoval did not know "what the conditions of the residents was," or "what services they needed."  Complaint ¶ 49, at 13.

Training School administrators -- including the Individual DOH Defendants -- were aware that the social workers assigned to oversee aftercare placements often did not visit aftercare residents in their third-party placements.  See Complaint ¶ 47, at 12.  They were aware

- 6 -

that the social workers -- when they checked on the aftercare residents at all -- usually relied on telephone calls to the private third parties who administered the placements rather than an in-person contact.  See Complaint ¶ 47, at 12-13.  Training School administrators -- including Adams, Mateju, and Shaefer -- had frequent conversations about the problem of social workers' failure to make their required visits or to contact aftercare residents.  See Complaint ¶ 51, at 13-14.  The DOH Defendants and the Individual DOH Defendants were "well aware of the dangers residents faced due to the way in which the aftercare program was operated, but they proceeded anyway."  Complaint ¶ 52, at 14.

The "well-known failure" of the Training School's social workers to provide oversight for aftercare residents drove the DOH Defendants and the Individual DOH Defendants to "discharge"[3] Training School residents from aftercare "whenever and however possible."  Complaint ¶ 53, at 14.  Schaefer was in charge of changes to the Training School's discharge

---

[3]The Complaint never explicitly defines "discharge."  The Complaint uses "discharge" to describe: (i) the process of transferring a Training School resident to a private third party; and (ii) the process of removing an aftercare resident -- i.e., a former Training School resident who has already been placed with a private third party -- from "the rolls of Training School clients." Complaint ¶ 65, at 18.  Moreover, the Complaint does not clarify what it means for an aftercare resident to be removed from "the rolls of Training School clients."  Complaint ¶ 65, at 18.  The Complaint implies that the Defendants believed the Training School had no legal responsibility to oversee aftercare residents who had been removed from the Training School's rolls or to provide them with any services or therapy.  See, e.g., Complaint ¶ 61, at 17 ("Once there was a piece of paper in the file, residents could be . . . 'cut loose' from the Training School, without consideration of extant judicial orders, the health and safety of former residents, or the residents' need for services."); Complaint ¶ 63, at 17 ("Defendant Sandoval has admitted that he wouldn't know whether somebody was going to be taken care of after discharge from aftercare.")(internal quotation marks omitted).  The Complaint also states, however, that "discharge from aftercare was not a complete separation of responsibility for residents . . . .  Even after residents were discharged from aftercare, the Training School at times took action to respond to allegations of abuse then they came to their attention."  Complaint ¶¶ 63-64, at 17-18 (internal quotation marks omitted).  Consequently, where it is clear in the Complaint how A.M. is using the word "discharge," the Court will explain which form of "discharge" A.M. is using.  Where it is unclear, the Court will quote directly from the Complaint to ensure that it is accurately portraying the facts as the Complaint is alleging them.  Where it is necessary to the Court's resolution of the motions to dismiss, the Court will resolve these ambiguities in its analysis.

procedures in the late 1970s and early 1980s.  <u>See</u> Complaint ¶ 55, at 14.  Specifically, Schaefer told Training School administrators that "there were too many residents on aftercare" and recommended that the Training School discharge residents from aftercare.  Complaint ¶ 54, at 14.  Sometime between September 1978 and the end of 1980, Schaefer began advising that all aftercare residents should be discharged from the Training School "without judicial review and without any due process protections whatsoever."  Complaint ¶ 57, at 15.

Schaefer told Training School administrators that "the state institutions' custody of people committed to the institution by court order automatically lapsed" on the New Mexico Mental Health Code's effective date of July 1, 1977, despite judicial orders of commitment for an indeterminate period.  Complaint ¶ 56, at 15.  Shaefer advised Training School administrators that a change in the Mental Health Code meant that the court orders committing aftercare residents to State custody were void -- regardless whether the residents' original placements with private third parties had been judicially reviewed.  <u>See</u> Complaint ¶ 56, at 15.  Schaefer explained to Training School administrators and staff that "it's different now and you don't need a discharge order signed by a judge."  Complaint ¶ 61, at 17 (internal quotation marks omitted).

According to Schaefer, Training School administrators were "reluctant to proceed without a paper trail, so [she] instructed Defendant Adams to 'just put a note in . . . the file that says . . . [that the aftercare resident] was discharged.'"  Complaint ¶ 61, at 17 (alterations in Complaint).  Once there was a "piece of paper in the file," residents could be, in Schaefer's words, "cut loose" from the Training School without consideration of judicial orders, the residents' health and safety, or the residents' need for services.  Complaint ¶ 61, at 17.  Schaefer neither conducted legal research nor consulted legal experts in developing these new discharge policies.  <u>See</u> Complaint ¶ 56, at 15.

Schaefer acknowledged that former Training School residents were particularly vulnerable and in danger of abuse and exploitation once they were no longer under the Training School's supervision.  See Complaint ¶ 60, at 16-17.  Schaefer was aware when she designed and directed the new aftercare discharge policy that Training School personnel had not done any discharge planning for aftercare residents, and had failed to make contact with residents before or after their discharge, to assure their health and safety, and to assure that they were not being abused or exploited.  See Complaint ¶ 59, at 16.  Schaefer considered the fallout from the danger that such a policy posed to aftercare residents "to be merely a public relations issue, not a legal obstacle."  Complaint ¶ 61, at 17 (internal quotation marks omitted).

Under Schaefer's direction, Training School administrators "deliberately decided not to appoint surrogate decision-makers for its residents or to otherwise provide procedural due process" before removing residents' names from the Training School's rolls.  Complaint ¶ 57, at 15.  "Training School residents were not even informed that they were no longer clients of the Training School."  Complaint ¶ 57, at 15.  Aftercare residents "were routinely removed from the rolls of Training School clients" based solely on letters that Mateju sent to the district attorney in the county where each resident was originally committed.  Complaint ¶ 65, at 18.  These letters did not "supply[] the background information necessary for discharge, including the circumstances of residents and whether the resident or a responsible adult consented to discharge."  Complaint ¶ 65, at 18.  Instead, judicial authorities were "misled into believing that residents consented to and were happy in their placements."  Complaint ¶ 65, at 18.

In Sandoval's view, "discharge from aftercare was not a complete separation of the Training School's responsibility for residents."  Complaint ¶ 63, at 17-18.  "Even after residents were discharged from aftercare, the Training School at times took action to respond to

allegations of abuse when they came to their attention. . . ."  Complaint ¶ 64, at 18.  DOH Defendants and Individual DOH Defendants, however, "failed to establish any system permitting residents to complain about their treatment, or any system permitting the Training School to provide oversight at third-party placements."  Complaint ¶ 64, at 18.  The DOH Defendants and Individual DOH Defendants decided that discharging residents from aftercare eliminated the need for social worker visits.  See Complaint ¶ 51, at 13-14.  Sandoval has admitted that he "wouldn't know whether somebody was going to be taken care of after discharge from aftercare, and it never crossed his mind to be concerned that residents discharged from aftercare might be abused or neglected."  Complaint ¶ 63, at 17 (internal quotation marks omitted)(brackets omitted).

     **3.**     <u>**A.M.**</u>

A court order committed A.M. to Fort Stanton or to another state institution on May 8, 1963, when she was sixteen years old.  See Complaint ¶ 66, at 18.  By 1967, either through transfer or continuing placement, A.M. was a Fort Stanton resident.  See Complaint ¶ 66, at 18.  On November 12, 1979, the Defendants transferred A.M. to the Homestead House and "abandoned" her there as part of the aftercare program.  Complaint ¶ 73, at 20.  The DOH Defendants' and the Individual DOH Defendants' transfer of A.M. from Fort Stanton to the Homestead House "was without legal authority." Complaint ¶ 78, at 20.  A.M. was still in the DOH Defendants' and Individual DOH Defendants' legal custody after she was placed with M. Evans.  See Complaint ¶ 12, at 5.

The Defendants allege, however, that A.M. was transferred to the Homestead House "pursuant to State District Court Order No. 1/387-388 filed on October 17, 1979 in Case No.

CV-SQ-0095-79, Twelfth Judicial District, County of Lincoln" ("Oct. 17, 1979, Order").  MTD

1 at 2.  The Oct. 17, 1979, Order reads, in pertinent part:

1.    Respondent has a developmental disability which is so greatly disabling that residential habilitation is in her best interest;

2.    Respondent's habilitation at Fort Stanton Hospital and Training School is not consistent with the least drastic means principle as respondent could benefit from a less restrictive setting such as a community based group home;

3.    Placement in a community based program for persons with developmental disabilities is not presently available for respondent.

IT IS ORDERED

That respondent be and hereby is committed to Fort Stanton Hospital and Training School for residential habilitation for a period not to exceed six months;

IT IS FURTHER ORDERED

That during the period of extended residential habilitation petitioner shall make application to less restrictive programs on behalf of respondent and shall make every effort to transfer respondent to a less restrictive setting.   At the expiration of this order petitioner shall report to this Court concerning its progress toward releasing respondent if further confinement at Fort Stanton Hospital is sought.

Oct. 17, 1979, Order. [4]

---

[4]The Court will consider the Oct. 17, 1979, Order in analyzing the MTD.  The United States Court of Appeals for the Tenth Circuit has explained that a district court's "function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  Sutton v. Utah State Sch. for the Deaf & Blind, 173 F.3d 1226, 1236 (10th Cir. 1999).  There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322.  Because the Complaint does not refer to the Oct. 17, 1979, Order, neither of the first two exceptions apply.  The Court must, therefore, determine whether the third exception -- permitting courts to consider "matters of which a court may take judicial notice" -- applies.  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322.

The Homestead House is a private, unlicensed group shelter for elderly people that Mary Evans owned.  See Complaint ¶ 73, at 20.  A.M. did not know M. Evans before being transferred to the Homestead House.  See Complaint ¶ 73, at 20.  Neither the Homestead House nor M. Evans was a licensed service provider for people with developmental disabilities.  See Complaint ¶ 73, at 20.  Neither M. Evans nor any Homestead House employee had the necessary training or experience to properly care for A.M., and M. Evans had no legal right to hold A.M.  See Complaint ¶¶ 76, 78, at 20.

A.M. lived with M. Evans for over thirty years.  See Complaint ¶ 85, at 23.  Although the Defendants retained legal control over A.M. after placing her at the Homestead House, neither the Defendants nor any of their agents checked on A.M. in any fashion.  See Complaint ¶¶ 77, at 21; id. ¶ 80, at 22.  Instead, the Defendants "cloak[ed] the Homestead House and Mary Evans with untoward authority and absolute control over Plaintiff, who was entirely dependent on this third-party placement for her day-to-day existence."  Complaint ¶ 77, at 21.

At the Homestead House, A.M. was "put to work."  Complaint ¶ 93, at 24-25 (internal quotation marks omitted).  Although A.M. performed housekeeping and other services at the Homestead House, M. Evans never compensated her for her work.  See Complaint ¶ 93, at

_____

A court may take judicial notice of an adjudicative fact that is both "not subject to reasonable dispute" and either: (i) "generally known within the territorial jurisdiction of the trial court"; or (ii) "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  Courts have taken judicial notice of state court orders' contents. See Gary Alan Green & Broadway Sound & Video, Inc. v. Jackson, 36 F. App'x 663, 669-70 (2d Cir. 2002)(taking judicial notice of New York state court orders in an appeal from dismissal of claims pursuant to Rule 12(b)(6)).  The Court determines that the accuracy of orders from the Twelfth Judicial District for the County of Lincoln "cannot reasonably be questioned" and the contents of the Oct. 17, 1979, Order are "not subject to reasonable dispute." Fed. R. Evid. 201(b).  Consequently, the Court will take judicial notice only of the Oct. 17, 1979, Order's contents without determining whether the Order authorized A.M.'s transfer to the Homestead House -- a point upon which the parties disagree.  In taking judicial notice of this fact, the Court notes that it does not affect the Court's resolution of the MTD.

24-25.  M. Evans threatened A.M. if she did not work, emotionally abused A.M., and neglected her medical needs.  See Complaint ¶ 91, at 24; id. ¶ 96, at 25.  While in M. Evans' custody, A.M. did not receive social services; Medicaid and social security benefits; adequate medical, dental and psychological care; rehabilitative, educational and vocational services; day habilitation[5] and therapy.  See Complaint ¶ 85, at 23.  M. Evans stole A.M.'s social security checks for her own use and did not spend the funds for A.M.'s benefit.  See Complaint ¶ 94, at 25.  The Defendants facilitated the transfer of A.M.'s social security checks to M. Evans with deliberate indifference to whether M. Evans was using or intended to use the social security funds for A.M.'s benefit. See Complaint ¶ 83, at 22.  While at the Homestead House, A.M. was socially isolated and was rarely allowed to leave.  See Complaint ¶ 87, at 23.

The DOH transferred J.P., another developmentally disabled woman, to the Homestead House on the same day as A.M.'s transfer.  See Complaint ¶ 88, at 24.  While at the Homestead House, J.P. attempted to leave to find her children, from whom she had been separated.  See id. J.P. climbed over the wall and wandered the streets calling out for her children and eventually either returned or was brought back to the Homestead House.  See Complaint ¶ 88, at 24.  After this incident, Evans took J.P.'s shoes and planted cacti at the place where J.P. had climbed the wall to prevent her from escaping.  See id.  J.P. continued to try to escape.  See id.  At one point, J.P. jumped over the wall and landed in the cactus.  See id.  Through punishing J.P. for escaping,

---

[5]In Youngberg v. Romeo, the Honorable Lewis F. Powell, Jr., then-Associate Justice of the Supreme Court of the United States, noted that the American Psychiatric Association defines "habilitation" as "programs for the mentally-retarded because mental retardation is . . . a learning disability and training impairment rather than an illness.  [T]he principal focus of habilitation is upon training and development of needed skills."  457 U.S. 309 n.1 (alterations in Youngberg. v. Romeo)(citations omitted)(internal quotation marks omitted).

M. Evans made it clear to A.M. that she could prevent A.M. from leaving the Homestead House. See id.

The State eventually shut down the Homestead House.  See Complaint ¶ 97, at 24.  When that occurred, A.M. was transferred to M. Evans' private residence -- also an unlicensed group shelter.  See Complaint ¶ 98, at 25.  A.M.'s transfer from the Homestead House was without either A.M.'s consent or judicial authority.  See Complaint ¶ 98, at 25-26.  If judicial authority was obtained for A.M.'s transfer, "the presiding judge was misled by DOH Defendants and the individual Defendants concerning the circumstances of Plaintiff's removal to Mary Evans' private residence."  Complaint ¶ 98, at 26.

In October, 1999, APS investigated allegations that M. Evans was physically neglecting A.M.  See Complaint ¶ 99, at 26.  APS found the allegations unsubstantiated.  See Complaint ¶ 99, at 26.  APS did not determine, however, whether M. Evans was paying A.M. for her labor, whether M. Evans was properly accounting for A.M.'s federal benefits, why A.M. was not receiving any therapeutic services or medical or dental care, or why A.M. was kept isolated without any opportunity to socialize with others.  See Complaint ¶ 99, at 26.  APS' investigation consisted solely of interviews with M. Evans and/or other non-disabled persons, "rather than engaging in any meaningful conversation with [A.M.] concerning her condition or circumstances . . . ."  Complaint ¶ 99, at 26.

In or about October, 2004, APS received allegations that the M. Evans and John Evans -- M. Evans' husband -- were physically abusing and exploiting A.M.  See Complaint ¶ 100, at 26.  APS received a report that M. Evans and J. Evans "were taking Plaintiff's social security money but were not caring for her, and that Plaintiff was emotionally abused."  Complaint ¶ 100, at 26.  The allegations also included abuse against J.P.  See Complaint ¶ 100, at 26.  APS concluded

that M. Evans and J. Evans had emotionally abused A.M., and stated that its report would be forwarded to the DOH and to law enforcement.  See Complaint ¶ 100, at 26.  The case remained open for eighteen months, but was ultimately closed as unsubstantiated, because APS found the report to be "malicious."   Complaint ¶ 101, at 26-27.   Again, APS did not engage in any meaningful conversation with A.M. before it closed its investigation.  See Complaint ¶ 101, at 27.

In 2006 or 2007, "the Governor's investigation identified AM and JP as two of the former Training School resident [sic] who had been illegally discharged from the Training School." Complaint ¶ 102, at 27.  In March, 2008, "more than four years after DOH learned of the plight of former Training School residents, the DOH investigated Plaintiff's circumstances" as part of the Governor's investigation.   Complaint ¶ 106, at 28.   The DOH limited its investigation, however, to an interview of M. Evans -- it did not take into account the prior allegations of abuse, interview A.M., or conduct an independent investigation of A.M.'s circumstances.  See Complaint ¶ 106, at 28.   That same month, Adult Protective Services in Grant County, New Mexico, also investigated A.M.'s circumstances after a caseworker at Fort Baynard reported that M. Evans was physically and emotionally abusing A.M.  See Complaint ¶ 106, at 28.   APS acknowledged that: (i) A.M. was developmentally disabled; (ii) A.M. had expressed fear of M. Evans; (iii) a psychiatrist had recommended that a guardian be appointed for A.M.; (iv) M. Evans' residence was an unlicensed facility; (v) A.M. had not seen a primary care physician in at least five years; and (vi) M. Evans never applied for disability benefits for A.M.  See Complaint ¶ 108, at 28.   Nonetheless, APS found the report unsubstantiated, declined to pursue a guardianship for A.M., and closed the report.  See Complaint ¶ 108, at 28.  The DOH did not, as

- 15 -

part of its investigation, engage in meaningful conversation with A.M. concerning her condition or circumstances.  See Complaint ¶ 108, at 28.

In December, 2008, the DOH began a new investigation or re-opened its prior investigation into A.M.'s circumstances.  See Complaint ¶ 110, at 29.  The DOH referred to M. Evans as A.M.'s "guardian," despite clear indications in A.M.'s file that M. Evans was never appointed her guardian.  Complaint ¶ 110, at 29.  The DOH continued to "interact exclusively or primarily with Mary Evans" during its investigation.  Complaint ¶ 110, at 29.  The DOH did not consider the prior allegations of abuse, interview A.M., or independently investigate A.M.'s circumstances.  See Complaint ¶ 110, at 29.  The DOH's policy and practice of deferring to caregivers rather than interacting with the disabled individuals themselves or otherwise independently investigating aftercare residents' circumstances continued into 2009.  See Complaint ¶ 110, at 29.

In June, 2009, Tom Roach, an ALTSD employee, prepared a report for the ALTSD and the DOH regarding A.M. and J.P.  See Complaint ¶ 111, at 29.  Roach stated that M. Evans was managing A.M.'s and J.P.'s care in exchange for payments for room and board.  See Complaint ¶ 111, at 29-30.  Roach stated that M. Evans had legal authority to make decisions for A.M.  See Complaint ¶ 111, at 30.  Roach reported that A.M. was "happy in her home" and was "getting all the care she needs from Ms. Evans."  Complaint ¶ 111, at 30 (internal quotation marks omitted).  He also noted that "one recent APS referral for exploitation (04/06) was found to be malicious and unsubstantiated."  Complaint ¶ 111, at 30 (internal quotation marks omitted).  Roach limited his investigation to an interview of M. Evans -- he did not take into account prior allegations of abuse, interview A.M. or J.P., or independently investigate J.P.'s or A.M.'s circumstances.  See Complaint ¶ 112, at 30.  The State Agency Defendants "did nothing to assist AM or JP."

Complaint ¶ 113, at 30.  The State Agency Defendants never sought a guardian, conservator, or representative payee for A.M., nor arranged for her to receive therapeutic services.   See Complaint ¶ 113, at 30.

## PROCEDURAL BACKGROUND

A.M. alleges seven claims in her Complaint: (i) a Fourteenth Amendment claim against the Individual DOH Defendants for violating her substantive and procedural due process rights, see Complaint ¶¶ 126-40, at 32-36; (ii) a First Amendment claim against the Individual DOH Defendants for violating her rights to freedom of association and court access, see Complaint ¶¶ 141-48, at 36-37; (iii) a Fourth Amendment claim against the Individual DOH Defendants for violating her right to be free from unlawful seizures, see Complaint ¶¶ 149-155, at 37-38; (iv) a Thirteenth Amendment claim against the Individual DOH Defendants for violating her right to be free from involuntary servitude, see Complaint ¶¶ 156-64, at 38-39; (v) a claim against the DOH Defendants for violating § 504 of the Rehabilitation Act, 29 U.S.C. § 794, see Complaint ¶¶165-71, at 39-40; (vi) a claim against the DOH Defendants for violating the Medicaid Act, 42 U.S.C. § 1396 et seq., see Complaint ¶¶ 172-80, at 41-43; and (vii) claims against the ALTSD and the APS for violating § 504 of the Rehabilitation Act and Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-34 ("ADA"), and the regulations promulgated thereunder, 28 C.F.R. Ch. 1, pt. 35, see Complaint ¶¶ 181-87, at 43-45.

Regarding A.M.'s claim that the Individual DOH Defendants violated her Fourteenth Amendment rights to substantive due-process, A.M. alleges that she has a constitutionally protected liberty interest in her safety, adequate food, clothing, shelter, treatment, and freedom from undue restraint -- including the right to receive treatment and services in the least restrictive appropriate placement.  See Complaint ¶ 128, at 32-33.  A.M. asserts that the Individual DOH

Defendants had a duty -- enforceable under the Fourteenth Amendment -- to ensure the safe and proper disposition of adults with developmental disabilities within their custody and control.  See Complaint ¶ 132, at 34.  According to A.M., this duty includes: (i) not placing such persons in situations of greater danger, neglect, abuse, or exploitation than those from which the Individual DOH Defendants removed them in the first place; (ii) not enhancing the special dangers to which such persons were already subject; and (iii) monitoring and rescuing such persons from any special dangers to which the Individual DOH Defendants' actions subject them.  See Complaint ¶ 132, at 34.

A.M. contends that the Individual DOH Defendants knowingly, recklessly, or with deliberate indifference and callous disregard of A.M.'s rights, breached their affirmative duty to provide protection and supervision to A.M. by placing her with M. Evans, where she was subject to "neglect, abuse, and exploitation."  Complaint ¶¶ 131, 133, at 33.  A.M. argues that the Individual DOH Defendants substantially departed from accepted professional judgment, practice, or standards in their decisions regarding A.M.'s placement, monitoring, supervision, and protection while A.M. was with M. Evans.  See Complaint ¶ 131, at 34.  In A.M.'s view, the Individual DOH Defendants' conduct shocks a federal judge's conscience.  See Complaint ¶ 131, at 34.

1.    **The MTD.**

The Individual DOH Defendants filed the MTD on March 6, 2014.  See MTD at 1.  In the MTD, the Individual DOH Defendants ask the Court to dismiss A.M.'s substantive due-process claims.  See MTD 1 at 2.  The Individual DOH Defendants explain that state actors generally cannot be held liable for third parties' acts.  See MTD at 7 (citations omitted).  The Individual DOH Defendants state that there are two exceptions to this rule: (i) the special-relationship

exception; and (ii) the state-created danger exception.  See MTD at 7.  The Individual DOH Defendants argue that they are entitled to qualified immunity, because neither of these exceptions were clearly established in 1979.  See MTD at 7-12.

First, the Individual DOH Defendants contend that the special-relationship exception was not clearly established in 1979.  See MTD at 8-10.  The Individual DOH Defendants point out that, in Schwartz v. Booker, 702 F.3d 573 (10th Cir. 2012), the United States Court of Appeals for the Tenth Circuit recognized that the special-relationship doctrine originated in the Supreme Court of the United States' decision in DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189 (1989)("DeShaney").  MTD at 8 (citing Schwartz v. Booker, 702 F.3d at 580).  In DeShaney, the Individual DOH Defendants explain, the Honorable William H. Rehnquist, then-Chief Justice of the Supreme Court, stated that, "when the State takes a person into its custody and holds him there against his will, the Constitution imposed upon it a corresponding duty to assume some responsibility for his safety and general well-being."  MTD at 8 (citing DeShaney, 489 U.S. at 189).  The Individual DOH Defendants say that the Tenth Circuit has acknowledged that, although the Supreme Court indicated in DeShaney that foster care children might have substantive due-process rights, the earliest case from either the Tenth Circuit or the Supreme Court that explicitly recognized such rights is Yvonne L. ex rel. v. New Mexico Department of Human Services, 959 F.2d 883 (10th Cir. 1992).  See MTD at 8 (citing Schwartz v. Booker, 702 F.3d at 573).  The Individual DOH Defendants assert that, moreover, Hilliard v. City & County of Denver, 930 F.2d 1516 (10th Cir. 1991), indicates that, the "law regarding abandoning a person who is not physically in state custody was not clearly established even by the late 1980s."  MTD at 9.  The Individual DOH Defendants explain:

> In Hilliard, the plaintiff was a passenger in a car.  The drive of the car was arrested and taken into custody.  Because the passenger was too intoxicated to

> drive, the care in which she was riding was impounded and she was left in a high
> crime area where she was subsequently raped.  The Tenth Circuit held that "it was
> not clearly established in 1988 that someone whose person was not under some
> degree of physical control by the state . . . would have a clearly established,
> constitutionally protected liberty interest."

MTD at 9.   The Individual DOH Defendants say that, accordingly, A.M.'s substantive

due-process rights were not clearly established when she was discharged from Fort Stanton and

placed at the Homestead House in 1979.  See MTD at 9.

Second, the Individual DOH Defendants argue that, in Uhlrig v. Harder, 64 F.3d 567

(10th Cir. 1995), the Tenth Circuit explained that "the seed for the 'danger creation' theory was

not even planted until the Supreme Court issued its decision in DeShaney . . . ."  MTD at 10-11

(citing Uhlrig v. Harder, 64 F.3d at 573 n.7).   The Individual DOH Defendants assert that,

consequently, the danger-creation exception was not clearly established in 1979.  See MTD at

11.

The Individual DOH Defendants argue that, even if either the special-relationship

exception or the danger-creation exception was clearly established in 1979, they are still entitled

to qualified immunity, because they relied on a state district court order that, in their view,

authorized them to transfer A.M. from Fort Stanton to the Homestead House.  See MTD at

11-12.  The Individual DOH Defendants contend that the Court may apply qualified immunity

based on "extraordinary circumstances" -- such as "reliance on the advice of counsel or on a

court order that prevented the official from knowing that his/her actions were unconstitutional

such that he/she should not be imputed with knowledge of a clearly established right."  MTD at

11 (citing Gomes v. Wood, 451 F.3d 1122, 1134 (10th Cir. 2006)(internal quotation marks

omitted).  The Individual DOH Defendants point out that A.M. was discharged to the Homestead

House pursuant to "State District Court Order No. 1/387-388 filed on October 17, 1979 in Case

No. CV-SQ-00095-79, Twelfth Judicial District, County of Lincoln."   MTD at 11.   The Individual DOH Defendants urge that, if a state district court judge authorized A.M.'s transfer to the Homestead House, the Individual DOH Defendants "could not possibly be imputed with knowledge that they were violating a constitutional right."   MTD at 12.   In the Individual DOH Defendants' view, therefore, qualified immunity should apply.   See MTD at 12.

       **2.**     **The Response.**

      A.M. responded to the MTD on May 9, 2014.   See Plaintiff's Response to DOH Defendants' Motion to Dismiss Plaintiff's Substantive Due Process Claims on the Basis of Qualified Immunity, filed May 9, 2014 (Doc. 38)("Response").   In the Response, A.M. asks the Court to deny the MTD for five reasons.   See Response passim.   First, A.M. contends that, in a similar case, the Defendants "previously litigated and lost the question whether they are entitled to the affirmative defense of qualified immunity from Plaintiff's Substantive Due Process claims."  Response at 7.   According to A.M., in J.M. v. New Mexico Department of Health, No. CIV 07-0604 RB/ACT, the Honorable Robert C. Brack, United States District Judge for the District of New Mexico, denied the Defendants' motion to dismiss the plaintiff's substantive due-process claims on the basis of qualified immunity.   See Response at 7-9 (citing J.M. v. N.M. Dep't of Health, No. CIV 07-0604 RB/ACT, Memorandum Opinion and Order, filed Jan. 7, 2009 (Doc. 198)("Jan. 7, 2009, MOO")).   A.M. states that Judge Brack wrote:

>     Substantive due process arises from the Fourteenth Amendment's protections against governmental deprivations "without due process of law."  U.S. Const. amend. XIV, § 1.  The Supreme Court has emphasized that "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." County of Sacramento v. Lewis, 523 U.S. 833, 840 (1998)(quotations omitted). The constitutional protections of substantive due process only apply to transgressions above and beyond those covered by the ordinary civil tort system; the two are not coterminous.  Williams v. Berney, 519 F.3d 1216, 1220 (10th Cir. 2008) . . . .

State officials are generally not required to provide care and protection to individuals.  DeShaney v. Winnebago County Dept. of Social Servs., 489 U.S. 189, 201 (1989).  However, when the state assumes control over an individual, a special relationship is triggered that creates an affirmative duty to provide protection to the individual.  Id. at 199-200.  In this case, JM and JE were placed in state custody by Court Order, which created a special relationship that required Defendants, state officials with responsibility for JM and JE, to affirmatively protect them from harm.  Id.  Furthermore, because JM and JE have developmental disabilities, the Defendants, as state officials with responsibility for JM and JE, had a greater duty to provide affirmative care to them.  See Youngberg v. Romeo, 457 U.S. 307, 322 (1982).

The Supreme Court has instructed that a "professional judgment" standard is to be applied to the substantive due process claims of mentally disabled individuals in state custody.  Indeed, state officials are shielded from liability unless a mentally disabled plaintiff can demonstrate that the state official failed to exercise professional judgment and that a failure to satisfy the normal professional standards is not justified by budgetary constraints.  Id. at 323. Failure to exercise professional judgment requires more than mere negligence; instead, it requires an abdication of professional responsibility.  Yvonne L. v. New Mexico Dept. of Human Services, 959 F.2d 883, 894 (1992).  Additionally, such an abdication of responsibility must be sufficient to "shock the conscience." County of Sacramento, 523 U.S. at 846.  In relation to the placement of developmentally disabled individuals in state custody into third party settings, the standard is similar to that of the placement of children into a foster care setting. See Yvonne L., 959 F.2d at 893-94.  Only if state officials place a mentally disabled individual in a setting they know to be dangerous or otherwise unfit, without justification based either on financial constraints or on considerations of professional judgment, do they expose themselves to liability in damages.  See Youngberg, 457 U.S. at 322-23; Yvonne L., 959 F.2d at 893-94.

Plaintiffs' substantive due process claims are based on allegations that Defendants were recklessly indifferent in their failure to protect and care for JM and JE.  Plaintiffs also allege that Defendants' failure to provide JM and JE with the care and services they required as developmentally disabled individuals constituted an unjustified abdication of professional responsibility.  Plaintiffs further allege that Defendants placed JM and JE in settings that were dangerous and otherwise unfit by committing them to the custody of private third party business [sic], without judicial authorization, knowing that JM and JE would be exploited economically and deprived of the care and protection they required. Finally, Plaintiffs allege that Defendants, with reckless indifference, abdicated their professional responsibility by conspiring to deceive the state court regarding JM and JE's welfare and capacity to function outside of state custody, eventually leaving JM and JE to be exploited without anyone to care for them or protect their legal rights.  The Court finds that these allegations, which the Court must accept as true, shock the conscience and are sufficient to state a claim against Defendants

Sandoval, Adams, Mateju, and Does 1-10, in their individual capacities, pursuant to § 1983, for violation of JM and JE's substantive due process rights.  County of Sacramento, 523 U.S. at 846.

. . . .

Part of the Court's task, in determining whether Defendants are entitled to qualified immunity in this case, is to identify the legal contours of the doctrine of substantive due process as applied to mentally disabled individuals in state custody during the 1970s.  Harlow, 457 U.S. at 818.  The Supreme Court first articulated the legal contours of the substantive due process rights of mentally disabled individuals in state custody in 1982 in its landmark opinion in the Youngberg v. Romeo case.  457 U.S. at 307.  Prior to 1982, the legal contours of the substantive due process rights of mentally disabled individuals in state custody included the right to reasonable safety, adequate food, shelter, clothing and medical care.  See Estelle v. Gamble, 429 U.S. 97, 104-05 (1976)(noting that failure to provide medical care can be a violation of a prisoner's constitutional rights); Youngberg, 457 U.S. at 324 (noting that the state conceded a duty to provide adequate food, shelter, clothing and medical care and that the Supreme Court found an unquestionable duty to provide reasonable safety).

Defendants' alleged conduct allegedly deprived Plaintiffs JM and JE of their substantive due process rights to reasonable safety and essential medical care.  See Youngberg, 457 U.S. at 324; Estelle, 429 U.S. at 104-05.  The legal contours of the doctrine of substantive due process were sufficiently clear in the 1970s to give state officials a fair warning that it violated federal law to recklessly endanger unlicensed third party businesses, where they would be economically exploited and deprived of essential medical care.  See Harlow, 457 U.S. at 818; Youngberg, 457 U.S. at 342; Estelle, 428 U.S. at 104-05.  Indeed, based on Plaintiffs' allegations, which the Court must accept as true, Defendants would have had fair warning that their alleged actions constituted violations of federal law.  See David, 101 F.3d at 1352; County of Sacramento, 523 U.S. at 846; Youngberg, 457 U.S. at 324; Estelle, 429 U.S. at 104-05.  Defendants Sandoval, Adams, Mateju, and Does 1-10, therefore, are not entitled to qualified immunity to Plaintiffs' substantive due process claims.

Response at 8-10 (quoting Jan. 7, 2009, MOO at 4-8)(alterations in Response not in Jan. 7, 2009, MOO)(internal quotation marks omitted).  A.M. asserts: "While Defendants did not appeal Judge Brack's ruling and therefore there is no collateral estoppel effect,[6] Plaintiff submits that Judge Brack's opinion, based on a similar set of facts, is persuasive authority."  Response at 10.

---

[6]"Non-mutual offensive issue preclusion occurs where a plaintiff seeks to foreclose a defendant from relitigating an issue the defendant has previously litigated unsuccessfully in

Second, A.M. contends that the Defendants' legal custody of her gave rise to a special relationship that entitled A.M. to substantive due-process protections.  See Response at 10-19. A.M. says that there is no evidence of a judicial order rescinding her commitment to the State's legal and physical custody.  See Response at 10.  A.M. asserts that the Training School continued to exercise oversight over her during her placement on aftercare, and that the Defendants then "unilaterally" decided that she was no longer the State's responsibility and discharged her from their care with only a "note to the file."  Response at 10 (internal quotation marks omitted). While A.M. acknowledges that there was a judicial order, she argues that the order did not discharge her from the Training School's legal custody and gave the Training School narrow authority to transfer her physical custody to "a community placement for developmentally

---

another action against a different party."  Fulsom Const. Co. Inc. v. U.S. Fid. & Guar. Co., No. 04-6087, 2005 WL 2542860, at *4 (10th Cir. Oct. 12, 2005).  The four elements of offensive collateral estoppel are: (i) the issue decided in the prior adjudication was identical with the one presented in the action in question; (ii) there was a final judgment on the merits; (iii) the party against whom estoppel is asserted is a party or in privity with a party to the prior adjudication; and (iv) the issue in the first case was competently, fully, and fairly litigated.  See In re Lombard, 739 F.2d 499, 502 (10th Cir. 1984).  Typically, an issue does not need to be appealed for a party to assert collateral estoppel.  See 18A Federal Practice & Procedure Jurisprudence § 4432 (2d ed.)("Preclusion seems warranted so long as the court clearly intended to terminate all proceedings as to the claims or parties involved and no attempt to appeal was thwarted by a ruling that judgment had been entered improperly.").

Courts have held, however, that a party waives offensive issue preclusion unless he or she raises it timely.  Cf. Blankenbaker ex rel. Harvey v. United Transp. Union, 878 F.2d 1235, 1243 (10th Cir. 1989)( "We hold that plaintiffs waived this issue preclusion claim by failing to invoke it timely.").  Because the function of issue preclusion is to avoid relitigation of an issue, this ordinarily means that a party seeking to use issue preclusion offensively must raise it at the first reasonable opportunity after the decision having preclusive effect has been rendered.  See Gilbert v. Ferry, 413 F.3d 578, 580 (6th Cir. 2005)(explaining that, if the parties relitigate the previously decided issue, "then the party who failed to raise collateral estoppel should be deemed to have waived it since the purpose served by collateral estoppel (to prevent re-litigation of issues) has been fatally compromised").  As neither party has argued that the collateral estoppel applies to A.M.'s claims, the Court will not address the issue sua sponte.

disabled persons."  Response at 10 (internal quotation marks omitted).  A.M. points out that she is still the state's ward.  See Response at 11.  In A.M.'s view, therefore, she was and remains entitled to Youngberg v. Romeo's substantive due-process protections.  See Response at 11.

A.M. says that, in Youngberg v. Romeo, the Supreme Court held that developmentally disabled individuals involuntarily committed to state institutions have substantive due-process rights to safety and security.  See Response at 13 (citing Youngberg v. Romeo, 457 U.S. at 315).  According to A.M., the Honorable Lewis F. Powell, then-Associate Justice of the Supreme Court, explained in Youngberg v. Romeo that the Supreme Court's decisions in the 1970s had recognized the right to reasonable safety -- one of which, Estelle v. Gamble, 429 U.S. 97 (1976), clearly established that right with respect to prison inmates in 1976.  See Response at 13 (citing Estelle v. Gamble, 429 U.S. at 104-05).  A.M. states that Justice Powell wrote: "'If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, . . . it must be unconstitutional to confine the involuntarily committed -- who may not be punished at all -- in unsafe conditions.'"  Response at 14 (quoting Youngberg v. Romeo, 457 U.S. at 315).  A.M. argues that "institutionalization thus creates the quintessential 'special relationship.'"  Response at 14.

A.M. contends that, in Milonas v. Williams, 691 F.2d 931 (10th Cir. 1982), the Honorable Robert H. McWilliams, United States Circuit Judge for the Tenth Circuit, "spelled out the substantive due process rights of children who had been remitted by the state to a private reform school -- including the right of paramount importance, to be reasonably safe from harm."  Response at 14 (citation omitted)(internal quotation marks omitted).  A.M. stated that, more recently, in Johnson v. Holmes, 455 F.3d 1133 (10th Cir. 2006), the Tenth Circuit reversed the Court's award of qualified immunity to a social worker who had allegedly failed "'to properly

discharge her custodial obligations of investigation and oversight[] . . . during the period between placement [of the abused child] for adoption and the time [the] adoptive decree was entered.'" Response at 14 (quoting Johnson v. Holmes, 455 F.3d at 1135, 1138)(alterations in Response but not in source).  According to A.M., in an opinion that the Honorable Carlos F. Lucero, United States Circuit Judge for the Tenth Circuit, authored, and Judges Baldock and McConnell joined, the Tenth Circuit held that, although the State had only legal custody of the child, under the special-relationship exception, the jury "should have been permitted to consider whether the social worker had done enough to protect the child."  Response at 15 (Johnson v. Holmes, 455 F.3d at 1144-45)(internal quotation marks omitted).

A.M. also points out that other United States Courts of Appeals have found that a special relationship arises between the state and persons subject to its legal custody even in the absence of physical custody.  See Response at 14 (citing Smith v. District of Columbia, 413 F.3d 86, 89-91, 94-97 (D.C. Cir. 2005)(Tatel, J., joined by Edwards, J.)(ruling that state had duty to protect juvenile committed to state's legal custody but living in private housing, "[b]ecause the [state], rather than [the boy's] family, had primary legal control over him, [and therefore] had legal responsibility for his daily care")(alterations in original)(internal quotation marks omitted); Camp v. Gregory, 67 F.3d 1286, 1295 (7th Cir. 1995)(Rovner, J., joined by Coffey and Foreman, JJ.)("[T]o the extent [that] . . . the [state] bore a duty for Anthony's safety when it was appointed [as his] guardian, that duty did not terminate when Anthony was place again with [his aunt].")(alterations in original)(internal quotation marks omitted); Thomas S. v. Morrow, 781 F.2d 367, 374 (4th Cir. 1986)(Butzner, J., joined by Hall and Winter, JJ.)(rejecting the argument that "Youngberg is inapplicable because [the plaintiff] . . . lives in the community and is not subject to the control of the state[]")(alterations in original)(internal quotation marks omitted).

- 26 -

In support of this argument, A.M. also cites Thomas S. v. Morrow, 601 F. Supp. 1055 (D.N.C.

1984)(McMillan, J.).  See Response at 11.  According to A.M., Thomas S. was discharged from

a state institution, but was never discharged from the State's custody.  See Response at 11

(citation omitted).  A.M. says that the Honorable James B. McMillan, United States District

Judge for the District of North Carolina, concluded that Thomas S. was entitled to substantive

due-process protections, because he was subject to restrictions similar to the institutionalized

residents in Youngberg v. Romeo.  See Response at 11 (citation omitted).  A.M. states:

> As the Fourth Circuit held on appeal in Thomas S., the district court's reasoning was in keeping with the framework of Youngberg.  See Thomas S. v. Morrow, 781 F.2d 367, 374 (4th Cir. 1986).  Specifically, Youngberg does not stand for the proposition that institutionalized persons are entitled to habilitation; nor does it stand for the converse -- that non-institutionalized persons are not entitled to habilitation.  Thus "the liberty interests protected in Youngberg did not arise because of the institutional confinement.  Rather, the Court's premise in Youngberg was that involuntary commitment and other lawful conferment 'do not extinguish' pre-existing liberty interests in safety and freedom from bodily restraint." Id., quoting Youngberg, 457 U.S. at 315 (emphasis added).  Thus the institution could not extinguish Thomas S.'s liberty interest by moving him from one restraining facility to another, just as Defendants here could not wash their hands of Plaintiff by the simple device of stranding her with a third party.

> Although during the course of this litigation, plaintiff's lodging has changed from a state hospital to a night care unit at a detoxification center, his status has not changed.  He remains a legally incompetent adult who is a ward of a guardian appointed by the state.  He did not choose to live at the detoxification center, and he is neither an alcoholic nor a drug addict.  Youngberg does not suggest that an incompetent person sheds the basic liberty interests that the Court identified when state officials and his guardian move him from one facility to another.  Id. at 374.

Response at 11-12.

In A.M.'s view, these cases demonstrate that "physical custody is not essential to the

existence of a special relationship."  Response at 15.  Instead, A.M. notes, such a relationship is

established whenever "the state assumes control over an individual sufficient to trigger an

affirmative duty to provide protection to that individual."  Response at 15 (quoting Uhlrig v. Harder, 64 F.3d at 572)(internal quotation marks omitted).  A.M. says that, therefore, "it should have been obvious from the day Youngberg was decided that a state could not avoid the responsibilities which that decision had placed on it merely by delegating custodial responsibility to irresponsible private persons."  Response at 15 (citing Yvonne L. ex rel. Lewis v. N.M. Dep't of Human Servs., 959 F.2d at 892)(internal quotation marks omitted).

A.M. argues that the Defendants' responsibilities to individuals in state custody should have been obvious much earlier than Youngberg v. Romeo.  See Response at 15.  According to A.M., "Youngberg traced its lineage to cases holding that prisoners are entitled to reasonable safety" -- cases that date back at least to the 1950s.  See Response at 15 (citing Youngberg v. Romeo, 457 U.S. at 315-16).  According to A.M., in Youngberg v. Romeo, Justice Powell thought that extending substantive due-process protections from prisoners to involuntarily committed developmentally disabled individuals was "a matter of simple logic and justice," because "if convicted criminals enjoyed a constitutional right to safe and humane conditions, no thinking person could believe that innocent persons with developmental disabilities . . . deserve anything less."  Response 15 (citing Youngberg v. Romeo, 457 U.S. at 315-16).  A.M. asserts: "Nor was the Supreme Court the first federal court to make that connection."  Response at 15-16 (citing Spence v. Staras, 507 F.2d 554, 556 n.1 (7th Cir. 1974)(Pell, J., joined by Fairchild and Cummings, JJ.)(holding that a mental patient at a state hospital who was beaten to death by his fellow patients had a substantive due-process right to safety).

Third, A.M. argues that M. Evans was acting under color of state law when she violated A.M.'s rights.  See Response at 19-21.  A.M. points out that New Mexico recognizes private group homes under state contract to provide services to developmental disabled persons as state

actors for § 1983 purposes.  See Response at 20 (citing La Balbo v. Hymes, 1993-NMCA-010, 850 P.2d 1017 (Ct. App. 1993)).  According to A.M., the Defendants' acts in facilitating M. Evans' abuse and neglect of A.M. should, therefore, be judged by the standards in Monell v. Department of Social Services, 436 U.S. 658 (1978).  A.M. says that, in Monell v. Department of Social Services, the Supreme Court stated that "Congress did not specifically provide [in § 1983] that A's tort became B's liability if B caused A to subject another to a tort."  Response at 20 (citing Monell v. Department of Social Services, 436 U.S. at 692)(alterations in Response but not in source)(internal quotation marks omitted).  A.M. cites Stoneking v. Bradford Area School District, 882 F.2d 720 (3d Cir. 1988), in which the Third Circuit contrasted the defendants' failure to protect a public school student from a teacher with a social worker's failure to protect a child from his father.  See Response at 21-22 (citing Stoneking v. Bradford Area Sch. Dist., 882 F.2d at 734).  According to A.M., in an opinion that the Honorable Dolores K. Sloviter, United States Circuit Judge for the Third Circuit, authored, and Judge Mansmann joined, the Third Circuit said:

> The principal distinction between DeShaney's situation and that of Stoneking is that DeShaney's injuries resulted at the hands of a private actor, whereas Stoneking's resulted from the actions of a state employee.  The significance of the status of the perpetrator is referred to on numerous occasions in the DeShaney opinion.  Not only is the Court's statement of the holding in terms of the actor ("a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause," 109 S. Ct. at 1004), but the analytic steps taken by the Court to reach that holding continuously take note of the status of the person responsible for the injuries.

Response at 21 (citing Stoneking v. Bradford Area Sch. Dist., 882 F.2d at 734)(emphasis in original).

Fourth, A.M. argues that, even if she was effectively discharged from the State's legal custody and M. Evans is a private third party, the Defendants are liable under the danger-creation

- 29 -

exception, because their "reckless actions directly caused or certainly increased the danger to Plaintiff."  Response at 21.  According to A.M., to succeed under the danger-creation exception, a plaintiff must show: (i) that he or she was a member of a limited and specifically definable group; (ii) that the group was subject to an obvious or known risk of serious, immediate, and proximate harm; (iii) that the defendant's conduct increased the risk; (iv) that the defendant acted recklessly in conscious disregard of that risk; and (v) that such conduct, when viewed in total, is conscious shocking.  See Response at 21 (citing Armijo ex rel. Armijo v. Wagon Mound Pub. Sch., 159 F.3d 1253, 1262-63 (10th Cir. 1998)).

A.M. argues that the Defendants designed a plan to force Training School residents into third-party placements without any plan how their needs would be met or their bodily integrity would be protected once they were "in the hands of strangers."  Response at 21.  In A.M.'s view, these allegations and the reasonable inferences drawn therefrom support the first element of a danger-creation claim.  See Response at 21.  A.M. contends that the Tenth Circuit has explicitly rejected the view that "reckless conduct must be directed at a particular victim for it to be deliberate."  Response at 21 (quoting Medina v. City & Cnty. Of Denver, 960 F.2d 1493, 1495 (10th Cir. 1992))(emphasis in original)(internal quotation marks omitted).  Instead, according to A.M., "the defendant's reckless conduct may be considered to be directed toward the plaintiff if the plaintiff is closely and immediately tied to the perceived substantial risk."  Response at 21-22 (quoting Medina v. City & Cnty. of Denver, 960 F.2d at 1495)(internal quotation marks omitted).

A.M. asserts that A.M. and similarly situated Training School residents were subject to an obvious or known risk of serious, immediate, and proximate harm.  See Response at 22.  A.M. contends that the obvious risk of harm was that M. Evans would exploit her rather than provide

necessary services to treat her developmental disabilities.  See Response at 22.  According to A.M., common sense dictated that, "by designing a plan to give Plaintiff to anyone who would accept her, in a locale far from Fort Stanton and without any oversight by the court or by . . . the Training School, Defendants were inviting the physical neglect and financial exploitation of Plaintiff."  Response at 22.

A.M. argues that the Defendants also increased the risk of harm to A.M. when they "change[d] the status quo."  Response at 22.  A.M. explains that she was a patient at a State-run training hospital with licensed professionals providing therapeutic services, subject to mandatory periodic judicial reviews of her welfare and best interests.  See Response at 22.  A.M. notes that she was then moved to a location where she was denied basic services, financially exploited, and "left largely to fend for herself."  Response at 22 (citing Medina v. City & Cnty. of Denver, 960 F.2d at 1495 (holding that an increased risk of harm depends on whether the individual defendant changed the status quo)).  A.M. states that there are two ways that a defendant might change the status quo sufficiently to satisfy the third element of the danger-creation exception.  See Response at 22.  According to A.M., the first way is by cutting off aid, discouraging others from rendering aid, or "removing what would otherwise be safety valves."  Response at 23 (quoting Currier v. Doran, 242 F.3d 905, 922 (10th Cir. 2001))(internal quotation marks omitted).  A.M. asserts that, like in Currier v. Doran, the Defendants' plan to transfer A.M.'s custody to M. Evans was designed to avoid mandatory safety valves.  See Response at 23.  A.M. explains that the second way is by lulling the private actor into believing that he or she is immune from any consequences, or by giving him or her trappings of authority that he or she would not otherwise possess.  See Response at 23 (citing Nishiyama v. Dickson Cnty., 814 F.2d 277 (6th Cir. 1987); Gremo v. Karlin, 363 F. Supp. 2d 771 (E.D. Pa. 2005)(Brody, J.)0).  A.M. argues that M. Evans

did not have "merely the trappings of authority; she exercised all control over Plaintiff's life."
Response at 23.

A.M. also asserts that the Defendants acted recklessly in conscious disregard of the
increased risk which to which they subjected A.M.  See Response at 25.  A.M. explains that the
Defendants not only failed to ensure her safety, they designed and directed a plan that guaranteed
she would be given to a stranger to "use however she saw fit."  Response at 24.  According to
A.M., these facts indicate that the Defendants were either actually or constructively aware of the
gravity of the risk to A.M. -- which is sufficient to prove that they acted recklessly in conscious
disregard of the increased risk to which they subjected A.M.  See Response at 25.

A.M. also contends that the following facts indicate that the Defendants' actions are
conscience shocking:

> In this case, Plaintiff was a vulnerable citizen, who needed consistent professional
> attention to avoid permanent damage to her developmental capacity and progress;
> instead, she was shipped off to an isolated third party placement in an unknown
> community far from her home without explanation or even any notice.  Just
> imagine the first day of Plaintiff's arrival at her future home -- taken suddenly
> from familiar surroundings and friends and stranded with a custodian who
> socially isolated her, kept her benefits checks, and turned her into cheap labor to
> line the coffers of the Homestead House.

Response at 25.

Fifth, A.M. contends that the Defendants' "attempt to characterize a state actor's liability
solely as an exception to a general rule that state actors are only liable for their 'own acts'
misconstrues the entire history of civil rights in this country."  Response at 26.  A.M. says that
the Defendants' acts "are paradigmatic of what Congress clearly intended to prohibit through the
passage of the Fourteenth Amendment and 42 U.S.C. § 1983."  Response at 27.  A.M. says:

> Purposely throwing a citizen into the clutches of malevolent strangers was
> clearly actionable over one hundred years ago.  Defendants' acts in purposely
> seeking out private businesses who would take Plaintiff and others like her into

- 32 -

their physical custody and control to use as unpaid labor were thus clear violations of Plaintiff's civil rights well before any incidents occurred in the 1970's, whether the "danger creation" theory of substantive Due Process existed by that decade or not.

Response at 28.

### 3.    The Reply.

The Individual DOH Defendants replied to the Response on May 23, 2014.  See Reply Supporting Individual DOH Defendants' Motion to Dismiss Plaintiff's Substantive Due Process Claims on the Basis of Qualified Immunity [Doc. 23], filed May 23, 2014 (Doc. 43)("Reply"). The Individual DOH Defendants contend that DeShaney, Youngberg v. Romeo, and Yvonne L. ex rel. Lewis v. New Mexico Department of Human Services are inapplicable to this case, because none of them were decided before A.M. was transferred to the Homestead House.  See Reply at 2.  The Individual DOH Defendants assert that Judge Brack's decision in J.M. v. New Mexico Department of Health is similarly inapposite, because Judge Brack did not cite a case establishing substantive due-process rights for individuals not in the State's physical custody. See Reply at 3.  The Individual DOH Defendants reiterate their argument from the MTD that neither the special-relationship exception nor the danger-creation exception were clearly established in 1979.  See Reply at 3-7.  In the Individual DOH Defendants' view, those exceptions were not clearly established until the Supreme Court's decision in DeShaney  in 1989.  See Reply at 3-7.  The Individual DOH Defendants assert that A.M.'s "attempt to analogize the Individual DOH Defendants' alleged conduct to throwing her 'into the clutches of malevolent strangers' akin to the Ku Klux Klan is hyperbole, and not 'well-plead' facts . . . ." Reply at 8.  The Individual DOH Defendants add that A.M. has "altogether failed to allege that the Individual DOH Defendants themselves exploited Plaintiff."   Reply at 8 (emphasis in original).

- 33 -

4.      **The October 23, 2014 Hearing.**

The Court held a hearing on the MTD on October 23, 2014. <u>See</u> Transcript of Hearing (taken Oct. 23, 2014)("Tr.").[7]  At the hearing, both parties largely repeated the arguments from their briefing.  <u>See</u> Tr. at 49:2-82:13 (Constanteras, Court, Simmons).  The Individual DOH Defendants -- in support of their argument that a special relationship arises only where the state has both physical and legal custody over an individual -- cited three new cases.  <u>See</u> Tr. at 49:9-24 (Court, Constanteras).  First, the Individual DOH Defendants point to <u>DeAnzona v. City & County of Denver</u>, 222 F.3d 1229 (10th Cir. 2000), in which, according to the Individual DOH Defendants, the Tenth Circuit stated: "A plaintiff must show involuntary restraint by the Government to have a claim under [the] special relationship theory.  If there is no custodial relationship, again, there can be no constitutional duty." Tr. at 49:10-14 (Constanteras)(quoting <u>DeAnzona v. City & Cnty. of Denver</u>, 222 F.3d at 1234)(internal quotation marks omitted).  Second, the Individual DOH Defendants cite <u>Briggs v. Oklahoma ex rel. Oklahoma Department of Social Services</u>, 472 F. Supp. 2d 1294 (W.D. Okla. 2007)("<u>Briggs</u>"), in which, the Individual DOH Defendants represent, the Honorable Victoria Miles-Lagrange, United States District Judge for the Western District of Oklahoma, stated that "legal custody without physical custody is insufficient to create a special relationship." Tr. at 49:19-20 (Constanteras)(citing <u>Briggs</u>, 472 F. Supp. 2d at 1301-02).  Finally, the Individual DOH Defendants point to <u>Armijo ex rel. Chavez v. Wagon Mound Public Schools</u>, without further explanation.  <u>See</u> Tr. at 49:22-24 (Constanteras).

The Court then asked the Individual DOH Defendants what constitutes physical custody, and the following exchange ensued:

---

[7]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final version may contain slightly different page and/or line numbers.

CONSTANTERAS: Well, the cases state where the person is actually in the physical care of the individual that is you know taking care of that person.

  . . . .

COURT: Your definition requires A.M. to be at the Fort Stanton hospital and once she's not there, she's not in the physical control of DOH?

CONSTANTERAS: Well, that's how the Tenth Circuit cases have construed that, because in several of these cases, the individual was indeed in the physical, was physically in the state so in the state institution if you will.

COURT: And if she leaves for a day on a field trip even with Mary Evans she's not in the physical control [of the state]?

CONSTANTERAS: Well if it's like a day and something happens, then the analysis of course changes but it depends also too if you're doing it under the dangerous condition.   Because there actually is a case that . . . involved somebody who had gone off and they had said well there weren't the requisite state protections . . . .   And even in that case the Court found that qualified immunity still applied . . . .

  . . . .

CONSTANTERAS: I think a distinction can be made in terms of somebody who goes out on an errand one day and somebody who is, you know, where the state truly no longer has physical or legal custody of the individual.

Tr. at 55:2-56:12 (Constanteras, Court).  The Court also inquired whether, even if the law was not clearly established in 1979 that A.M. had substantive due-process rights as a developmentally disabled individual in the State's legal custody, it became clearly established in 1990 or 1995.  See Tr. at 59:4-16 (Court).  The Individual DOH Defendants responded that a special relationship never arose between A.M. and the Individual DOH Defendants after 1979, because A.M. was no longer in their physical custody.  See Tr. at 60:1-11 (Constanteras).  The Individual DOH Defendants contended that the state-created danger exception also did not apply

- 35 -

at any point after 1979, because the Individual DOH Defendants' conduct with regard to A.M. is not conscience-shocking.  See Tr. at 60:1-11 (Constanteras); id. at 42:1-8 (Constanteras).

A.M. responded that physical custody is irrelevant to the special-relationship analysis. See Tr. at 63:21-64:2 (Simmons).  A.M. analogized her transfer to M. Evans' home to the CYFD placing a child with a child molester.  See Tr. at 64:2-9 (Simmons).  A.M. argues that, in such a situation, the CYFD could not say that they were not responsible for the child, because he or she was not in their physical custody.  See Tr. at 64:2-9 (Simmons).  A.M. said:

> [D]efense counsel has admitted as much in saying that if they sent [A.M.] to Mary Evans house for a day or so without checking it out and she were emotionally abused and forced to clean up after old people and not paid that that would be a problem because they would still have custody.  But somehow, the argument goes that if you wait a long time and leave [A.M.] to her own devices in this house of horrors for year after year . . . at some point the state's responsibility terminates even though [A.M.]'s liberty remains constrained to being in the custody to the State of New Mexico that was never . . . rescinded by any court.

Tr. at 64:9-22 (Simmons).  The Court asked A.M. whether it mattered for § 1983 purposes if a jail obtained a court order to release prisoners, or merely opened the doors and let the prisoners out.  See Tr. at 68:7-10 (Court).  A.M. responded that, in either situation, the jail would likely not be liable.  See Tr. at 69:2 (Simmons).  A.M. said that her situation is distinguishable from the Court's hypothetical, because, unlike a released prison inmate -- who has the mental capacity to object to his or her placement and take care of himself or herself -- A.M. was a vulnerable person who did not have the capacity to consent to her placement.  See Tr. at 69:3-25 (Simmons).  A.M. reiterated that, because she was involuntarily committed to state custody, the Individual DOH Defendants could dictate where and with whom she stayed at all times.  See Tr. at 70:10-71:9 (Simmons).  A.M. argues that, because the Individual DOH Defendants had this exclusive authority over her, they were legally responsible for her care and well-being regardless of her physical placement.  See Tr. at 71:10-16 (Simmons).

- 36 -

The Court asked A.M. whether the Individual DOH Defendants' conduct that was allegedly conscience shocking is that she was in the Homestead House working without compensation.  See Tr. at 72:5-7 (Court).  A.M. responded that, although being forced to work without compensation was the most shocking aspect of the Individual DOH Defendants' conduct, the social isolation and lack of medical care also shocked the conscience.  See Tr. at 72:10-22 (Simmons).  The Court asked A.M. whether, if the Court found that it was not clearly established in 1979 that the Individual DOH Defendants' actions were unconstitutional, there is some theory that the Individual DOH Defendants had an obligation "to come in and undo what it had done" when the law became clearly established.  Tr. at 76:14-22 (Court).  A.M. responded that, because she was in the State's legal custody, the Individual DOH Defendants had a continuing obligation to check on her.  See Tr. at 77:2-4 (Simmons).  A.M. further argued that, as the law evolved, and "certainly" by the time the Supreme Court decided Youngberg v. Romeo in 1982, the Individual DOH Defendants had to realize that they were obligated to ensure that individuals in their legal custody were safe.  Tr. at 77:5 (Simmons).  In A.M.'s view, at that point, the Individual DOH Defendants should have either brought A.M. and other aftercare residents back to Fort Stanton, or at least sent a social worker to their placements to check on them.  See Tr. at 78:9-16 (Simmons).

The Court discussed the opinion that the Honorable Neil M. Gorsuch, United States Circuit Judge for the Tenth Circuit, wrote in Kerns v. Bader, 663 F.3d 1173 (10th Cir. 2011), in which Judge Gorsuch stated that, "if any fact could have constitutional significance, then the law is not clearly established."  Tr. at 78:23-24 (Court)(internal quotation marks omitted).  The Court expressed concern that prisoner and adoption cases could not provide clearly established law for a case involving a developmentally disabled individual committed to state custody.  See Tr. at

79:2-9 (Court); id. at 79:2-20 (Court).   A.M. responded that analogizing cases involving prisoners and foster children to developmentally disabled adults

> is not so much of a stretch that Judge Gorsuch would be offended by that. Basically, I think I would say that that fact doesn't have constitutional significance in this instance, because the reasoning would be the same that if the state takes legal custody and a person becomes a ward because they are developmentally disabled so that they cannot make their own decisions or they're a minor child so they cannot make their own decision . . . .   [T]hat's a distinction without a difference . . . .   [T]he defendants in this case had every reason to know that their legal responsibility for a vulnerable developmentally disabled adult did not cease simply because they changed her physical location to across the state somewhere.   If anything, their obligation increased, because they knew that she was being sent to somewhere that was unsafe.

Tr. at 80:6-24 (Simmons).

## LAW REGARDING RULE(12)(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).  The sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(quoting Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."   Ashcroft v. Iqbal, 556 U.S. at 678.  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp. v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face.  See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010)("To determine whether a motion to dismiss was properly granted, we apply a plausibility standard to ascertain whether the complaint includes enough facts that, if assumed to be true, state a claim to relief that is plausible on its face.").  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556).  "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."  Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007).

The Tenth Circuit has held that "Iqbal establishes the importance of context to a plausibility determination."  Gee v. Pacheco, 627 F.3d 1178, 1185 (10th Cir. 2010).

"[P]lausibility" in th[e general pleading] context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide

swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible."  The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(citations omitted).

## LAW REGARDING LIABILITY FOR CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988).  Individual, non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)("The requisite causal connection is satisfied if [the defendants] set in motion a series of events that [the defendants] knew or reasonably should have known would cause others to deprive [the plaintiffs] of [their] constitutional rights.")(quoting Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006)).  The

Supreme Court has made clear that there is no respondeat superior liability under 42 U.S.C. § 1983.  See Ashcroft v. Iqbal, 556 U.S. at 675 ("Because vicarious liability is inapplicable to Bivens[8] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  "An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor."  Garcia v. Casaus, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 689 (1978)).  Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts.  See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

### 1.    Color of State Law.

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'" Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995).  The under-color-of-state-law requirement is a "jurisdictional requisite for a § 1983 action, which . . . furthers the fundamental goals of preserving an area of individual freedom by limiting the reach of federal law . . . and avoiding imposing on the state, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed."  Jojola v. Chavez, 55 F.3d 488, 492 (10th Cir. 1995).  "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  West v. Atkins, 487 U.S. at 49 (quoting United States v. Classic, 313 U.S. 299, 326 (1941)).  "The authority with which the

---

[8]In Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), the Supreme Court held that a violation of the Fourth Amendment "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct."  403 U.S. at 389.

defendant is allegedly 'clothed' may be either actual or apparent." Jojola v. Chavez, 55 F.3d at 493. Accordingly, at a base level, to find that an action was taken under color of state law, the court must find that "'the conduct allegedly causing the deprivation of a federal right' must be 'fairly attributable to the State.'" Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447 (quoting Lugar v. Edmonson Oil Co., 457 U.S. 922, 937 (1982)).

In the context of a public employee, the Tenth Circuit has directed that, while "'state employment is generally sufficient to render the defendant a state actor . . . [,]' at the same time, it is 'well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state.'" Jojola v. Chavez, 55 F.3d at 493 (quoting Lugar v. Edmonson Oil Co., 457 U.S. at 935-36 n.18; Mark v. Borough of Hatboro, 51 F.3d 1137, 1150 (3d Cir. 1995)). Thus, "before conduct may be fairly attributed to the state because it constitutes action 'under color of state law,' there must be 'a real nexus' between the employee's use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant." Jojola v. Chavez, 55 F.3d at 493. What constitutes the required real nexus, however, is not completely clear. As the Tenth Circuit has stated, whether there is a real nexus in a particular case depends on the circumstances:

> The under color of law determination rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or not the officer acts in accordance with his or her duty. Instead one must examine "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties."

David v. City & Cnty. of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996)(citations omitted)(quoting Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995)).

2.     __Individual Liability__.

Government actors may be liable for the constitutional violations that another committed, if the actors "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights," thus establishing the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations.  Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006).  The Tenth Circuit has explained that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'"  Martinez v. Carson, 697 F.3d at 1255 (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961), overruled in part by Monell v. Dep't of Soc. Servs., 436 U.S. at 663).  "Thus, Defendants are liable for the harm proximately caused by their conduct."  Martinez v. Carson, 697 F.3d at 1255 (citing Trask v. Franco, 446 F.3d at 1046).  As the Court has previously concluded, "a plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations. The recovery should be guided by common-law tort principles -- including principles of causation . . . ."  Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009)(Browning, J.).

The Tenth Circuit has found liability for those defendants who proximately caused an injury alleged under § 1983 and stated that the fact that the "conduct of other people may have concurrently caused the harm does not change the outcome as to [the defendant]," so long as there was not a superseding-intervening cause of a plaintiff's harm.  Lippoldt v. Cole, 468 F.3d 1204, 1220 (10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the officers only "would be liable for the harm 'proximately' or 'legally' caused by

their tortious conduct."   Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995).
"They would not, however, necessarily be liable for all of the harm caused in the
'philosophic' or but-for sense by the illegal entry."   Id.   In civil rights cases, a
superseding cause, as we traditionally understand it in tort law, relieves a
defendant of liability.   See, e.g., Warner v. Orange Cnty. Dep't of Prob., 115 F.3d
1068, 1071 (2d Cir. 1997); Springer v. Seaman, 821 F.2d 871, 877 (1st Cir. 1987),
abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 . . .
(1989).

Trask v. Franco, 446 F.3d at 1046.  Thus, in the context of a claim under the Fourth Amendment,

the Tenth Circuit has held that government actors "may be held liable if the further unlawful

detention and arrest would not have occurred but for their conduct and if there were no

unforeseeable intervening acts superseding their liability."  Martinez v. Carson, 697 F.3d at 1255.

The Tenth Circuit gave an example of a superseding-intervening cause, quoting the Honorable

Samuel J. Alito, then-United States Circuit Judge for the United States Court of Appeals for the

Third Circuit, now-Associate Justice for the Supreme Court:

Suppose that three police officers go to a suspect's house to execute an arrest
warrant and that they improperly enter without knocking and announcing their
presence.  Once inside, they encounter the suspect, identify themselves, show him
the warrant, and tell him that they are placing him under arrest.  The suspect,
however, breaks away, shoots and kills two of the officers, and is preparing to
shoot the third officer when that officer disarms the suspect and in the process
injures him.  Is the third officer necessarily liable for the harm caused to the
suspect on the theory that the illegal entry without knocking and announcing
rendered any subsequent use of force unlawful?  The obvious answer is "no."  The
suspect's conduct would constitute a "superseding" cause, see Restatement
(Second) of Torts § 442 (1965), that would limit the officer's liability.  See id.
§ 440.

Trask v. Franco, 446 F.3d at 1046 (quoting Bodine v. Warwick, 72 F.3d at 400).  Additionally,

"[f]oreseeable intervening forces are within the scope of the original risk, and . . . will not

supersede the defendant's responsibility."  Trask v. Franco, 446 F.3d at 1047 (quoting William

Lloyd Prosser et al., Prosser and Keeton on Torts § 44, at 303-04 (5th ed. 1984)).  If

the reasonable foreseeability of an intervening act's occurrence is a factor in
determining whether the intervening act relieves the actor from liability for his

antecedent wrongful act, and under the undisputed facts there is room for reasonable difference of opinion as to whether such act was wrongful or foreseeable, the question should be left for the jury.

Trask v. Franco, 446 F.3d at 1047 (citing Restatement (Second) of Torts § 453 cmt. b (1965)).

### 3.    Supervisory Liability.

The Tenth Circuit has held that supervisors are not liable under 42 U.S.C. § 1983 unless there is "'an affirmative link . . . between the constitutional deprivation and either the supervisor's personal participation, . . . exercise of control or direction, or . . . failure to supervise.'"   Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009)(quoting Green v. Branson, 108 F.3d 1296, 1302 (10th Cir. 1997))(alterations omitted).  Because supervisors can be held liable only for their own constitutional or illegal policies, and not for the torts that their employees commit, supervisory liability requires a showing that such policies were a "deliberate or conscious choice."   Barney v. Pulsipher, 143 F.3d at 1307-08 (citations omitted)(internal quotation marks omitted).  Cf. Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404 ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged."  (emphasis in original)).

The Tenth Circuit has recognized that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations.  See Garcia v. Casaus, 2011 WL 7444745, at *25-26 (citing Dodds v. Richardson, 614 F.3d 1185 (10th Cir. 2010)).  The language that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is as follows: "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official

- 45 -

defendant, through the official's own individual actions, has violated the Constitution." <u>Ashcroft</u>

<u>v. Iqbal</u>, 556 U.S. at 676.  The Tenth Circuit in <u>Dodds v. Richardson</u> held:

> Whatever else can be said about <u>Iqbal</u>, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

614 F.3d at 1199.  The Tenth Circuit noted that <u>Ashcroft v. Iqbal</u> "does not purport to overrule

existing Supreme Court precedent," but stated that "<u>Iqbal</u> may very well have abrogated § 1983

supervisory liability as we previously understood it in this circuit in ways we do not need to

address to resolve this case." <u>Dodds v. Richardson</u>, 614 F.3d at 1200.  It concluded that <u>Ashcroft</u>

<u>v. Iqbal</u> did not alter "the Supreme Court's previously enunciated § 1983 causation and personal

involvement analysis." <u>Dodds v. Richardson</u>, 614 F.3d at 1200.  The Tenth Circuit, based on this

conclusion, set forth a test for supervisory liability under § 1983 after <u>Ashcroft v. Iqbal</u>:

> A plaintiff may . . . succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.

<u>Dodds v. Richardson</u>, 614 F.3d at 1199-1200 (citing <u>Summum v. City of Ogden</u>, 297 F.3d 995,

1000 (10th Cir. 2002)).  The Tenth Circuit noted, however: "We do not mean to imply that these

are distinct analytical prongs, never to be intertwined." <u>Dodds v. Richardson</u>, 614 F.3d at 1200

n.8.  Relying on the Supreme Court's opinion in <u>Board of County Commissioners v. Brown</u>, the

Tenth Circuit reasoned that two of the prongs often, if not always, are sufficient proof that the

third prong has been met also:

> Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward.   Section 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right. In any § 1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation.   Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably.   Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

Dodds v. Richardson, 614 F.3d at 1200 n.8 (quoting Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404-05)(internal quotation marks omitted).   The Tenth Circuit noted that "[w]e think the same logic applies when the plaintiff sues a defendant-supervisor who promulgated, created, implemented or possessed responsibility for the continued operation of a policy that itself violates federal law."   Dodds v. Richardson, 614 F.3d at 1200 n.8.   Thus, the Tenth Circuit reduced the test to what can be seen as a two-part test for supervisor liability, requiring the plaintiff to prove "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'"   Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

### 4.    Municipal Liability.

A municipality will not be held liable under § 1983 solely because its officers inflicted injury.   See Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006).   Rather, to establish municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link between the policy or custom, and the injury alleged.   See Graves v. Thomas, 450 F.3d at 1218.   When a claim is brought against a municipality for failing to train its

officers adequately, the plaintiff must show that the municipality's inaction was the result of deliberate indifference to the rights of its inhabitants.  See Graves v. Thomas, 450 F.3d at 1218.

## LAW REGARDING SUBSTANTIVE DUE-PROCESS CLAIMS

The Fourteenth Amendment's Due Process Clause provides that "no State shall . . . deprive any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, § 1.  In general, state actors may be held liable under § 1983 only for their own affirmative acts that violate a plaintiff's due process rights and not for third parties' acts.  See Robbins v. Oklahoma, 519 F.3d at 1251 (citing DeShaney, 489 U.S. at 197).  "[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty and property of its citizens against invasion by private actors."  DeShaney, 489 U.S. at 195.  The Due Process Clause is not a guarantee of a minimal level of safety and security.  See DeShaney, 489 U.S. at 195.

### 1.    Exceptions to the General Rule.

There are, however, two exceptions to this general rule.  The first exception -- the special-relationship doctrine -- arises when the state has a custodial relationship with the victim, which triggers an affirmative duty to provide protection to that individual.  See Christiansen v. City of Tulsa, 332 F.3d 1270, 1280 (10th Cir. 2003); Graham v. Indep. Sch. Dist. No. 1-89, 22 F.3d 991, 994-95 (10th Cir. 1994).  The second exception -- the danger-creation theory -- provides that a state may also be liable for an individual's safety "only when 'a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence.'"  Robbins v. Oklahoma, 519 F.3d at 1251 (quoting Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001)).  "If either the special-relationship or danger-creation exception applies, the conduct of the state actor must go beyond negligence to the point of 'shocking the

conscience.'"   Glover v. Gartman, 899 F. Supp. 2d 1115, 1135 (D.N.M. 2012)(Browning,

J.)(citing Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133, 1142 (10th Cir. 2006)("The

shocks the conscience standard applies to both types of suits.")).

**2.      Special-Relationship Doctrine.**

The first exception to the general principle that a state's negligent failure to protect an

individual cannot trigger liability under the due-process clause is the special-relationship

doctrine.   A plaintiff must show that they were involuntarily committed to state custody to

establish a duty to protect under the special-relationship doctrine.  See Liebson v. N.M. Corr.

Dep't, 73 F.3d 274, 276 (10th Cir. 1996).  "A special relationship exists when the state assumes

control over an individual sufficient to trigger an affirmative duty to provide protection to that

individual (e.g. when the individual is a prisoner or involuntarily committed mental patient)."

Uhlrig v. Harder, 64 F.3d 567, 572 (10th Cir. 1995).

**3.      Danger-Creation Exception.**

The Due Process Clause protects against "deliberately wrongful government decisions

rather than merely negligent government conduct."   Uhlrig v. Harder, 64 F.3d at 573.   The

danger-creation exception to this rule applies only when "a state actor affirmatively acts to

create, or increases a plaintiff's vulnerability to, or danger from private violence." Currier v.

Doran, 242 F.3d 905, 923 (10th Cir. 2001).  See Estate of B.I.C. v. Gillen, 702 F.3d 1182, 1187

(10th Cir. 2012)("[S]tate officials can be liable for the acts of private parties where those

officials created the very danger that caused the harm.").   Under a danger-creation theory, there

is no § 1983 liability absent "an intent to harm" or "an intent to place a person unreasonably at

risk of harm."  Uhlrig v. Harder, 64 F.3d at 573.  A plaintiff must show "sufficient[] 'affirmative

conduct on the part of the state in placing the plaintiff in danger.'"  Estate of B.I.C. v. Gillen, 702

F.3d at 1187 (quoting Gray v. Univ. Colo. Hosp. Auth., 672 F.3d 909, 916 (10th Cir. 2012)).  To state a prima-facie case, the plaintiff must show that his or her danger-creation claim for due-process violations meets a six-part test: (i) the state and individual actors must have created the danger or increased plaintiff's vulnerability to the danger in some way; (ii) the plaintiff must be a member of a limited and specifically definable group; (iii) the defendant's conduct must put the plaintiff at substantial risk of serious, immediate, and proximate harm; (iv) the risk must be obvious and known; (v) and the defendant must have acted recklessly in conscious disregard of that risk.  See Pena v. Greffet, 922 F. Supp. 2d 1187, 1227 (D.N.M. 2013)(Browning, J.)(citing Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d 1114, 1126 (10th Cir. 2008)).

In determining whether the danger-creation exception applies, the Tenth Circuit has focused on the deliberateness of the conduct in relation to the caused harm.  See Christiansen v. City of Tulsa, 332 F.3d at 1281.  The defendant must recognize the unreasonableness of the risk of the conduct and act "with an intent to place a person unreasonably at risk."  Medina v. City & Cnty. of Denver, 960 F.2d at 1496.  The intent to place a person unreasonably at risk is present where the defendant "is aware of a known or obvious risk" creating a high probability that serious harm will follow, and the defendant nonetheless proceeds with a "conscious and unreasonable disregard of the consequences."  Medina v. City & Cnty. of Denver, 960 F.2d at 1496.

### 4.      What Shocks the Conscience.

A government actor's official conduct intended to injure in a way that cannot reasonably be justified by any government interest most likely shocks the conscience.  See Cnty. of Sacramento v. Lewis, 523 U.S. 833, 849 (1998)("[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the

conscience-shocking level."). "[A] plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power." Camuglia v. City of Albuquerque, 448 F.3d 1214, 1222 (10th Cir. 2006)(quoting Moore v. Guthrie, 438 F.3d 1036, 1040 (10th Cir. 2006)(internal quotation marks omitted)). "The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." Camuglia v. City of Albuquerque, 448 F.3d at 1222-23 (quoting Uhlrig v. Harder, 64 F.3d 567, 574 (10th Cir. 1995))(internal quotation marks omitted).

> Establishing these limits advances "three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety."

Camuglia v. City of Albuquerque, 448 F.3d at 1223 (quoting Uhlrig v. Harder, 64 F.3d at 574).

"Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge." Pena v. Greffet, 922 F. Supp. 2d at 1227 (citing James v. Chavez, 830 F. Supp. 2d 1208, 1276 (D.N.M. 2011)(Browning, J.), aff'd, 511 F. App'x 742 (10th Cir. 2013)(finding that the use of deadly force did not shock the conscience even if the suspect did not have an intent to harm the officer, because the officer "had sufficient facts before him to conclude that there was a threat of serious physical harm" and the "courts must evaluate a [government actor's] conduct objectively")).

In Martinez v. Uphoff, 265 F.3d 1130 (10th Cir. 2001), the widow of a corrections officer sued the director, deputy director, warden, and deputy wardens of the department of corrections, alleging that the defendants deliberately failed to ensure proper training and supervision of penitentiary personnel, failed to provide safe and adequate staffing, and failed to take corrective

action to protect her husband, all of which resulted in him being killed during the escape of three

inmates.  See 265 F.3d at 1132.  The district court found that the plaintiff failed to state a § 1983

claim for violation of the Due Process Clause under a danger-creation theory because the

defendants' actions were "not of such a magnitude that the Court is able to conclude they shock

the conscience."  265 F.3d at 1134.  The Tenth Circuit agreed with the conclusion of the district

court, stating: "[U]nder the circumstances of this case, inaction in the face of known dangers or

risks [was] not enough to satisfy the danger-creation theory's conscience shocking standard."

265 F.3d at 1135.

In Schaefer v. Las Cruces Public School District, 716 F. Supp. 2d 1052 (D.N.M. Apr. 30,

2010)(Browning, J.), the plaintiffs alleged that the defendants -- the school district,

superintendent, principal, and vice principal of a middle school -- violated the plaintiffs'

substantive due-process rights when they did not take sufficient action to prevent a student at the

school from "racking"[9] the plaintiffs' son.  716 F. Supp. 2d at 1072-73.  The Court concluded

that the defendants' conduct did not shock the conscience.  See 716 F. Supp. 2d at 1074-75.  The

Court explained:

> Assuming the absolute worst from the Schaefers' alleged facts, the
> Defendants were aware of three instances of an unknown eighth-grade student
> racking various sixth-grade students within the span of a month, and failed to
> implement policies to improve hallway monitoring and stop this conduct from
> occurring in time to prevent [the plaintiffs' son] from falling victim to the same
> fate.  Further, the Defendants indicated to the sixth graders that it had policies in
> place to punish individuals that assaulted other students but did not, in fact, have
> such policies.
>
> While such behavior may be worthy of remedy under tort law, and
> perhaps worthy of punishment in the form of punitive damages, the Court's
> conscience is not shocked . . . .

_____

[9]The parties in Schaefer v. Las Cruces Public School District defined being "racked" as
being "kicked and/or punched in the testicles."   716 F. Supp. 2d at 1059 n.2 (citations
omitted)(internal quotation marks omitted).

>Any number of actions by the Defendants might have remedied the problem, but the Court's conscience is not shocked by the Defendants' failure to consider or implement such a policy.  Even if the Defendants knew that students frequently -- more than three times per month -- attacked other students in the halls and declined to implement safety measures to minimize that conduct, the Court is not convinced that it would rise to the level of shocking the conscience.

716 F. Supp. 2d at 1074-75.

## <u>LAW REGARDING QUALIFIED IMMUNITY</u>

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority."  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 807 (1982).  "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'"  <u>Roybal v. City of Albuquerque</u>, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting <u>Siegert v. Gilley</u>, 500 U.S. 226, 232 (1991)).  The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials."  <u>Butz v. Economou</u>, 438 U.S. 478, 504 (1978).  "The qualified immunity analysis is the same whether the claims are brought under <u>Bivens</u> or pursuant to the post-Civil War Civil Rights Acts."  <u>Breidenbach v. Bolish</u>, 126 F.3d 1288, 1291 (10th Cir. 1997), <u>overruled on other grounds as recognized in</u> <u>Currier v. Doran</u>, 242 F.3d 905 (10th Cir. 2001).

>Under § 1983 (invoked in this case) and <u>Bivens v. Six Unknown Fed. Narcotics Agents</u>, 403 U.S. 388 . . . (1971), a plaintiff may seek money damages from government officials who have violated her constitutional or statutory rights.  But to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties," <u>Anderson v. Creighton</u>, 483 U.S. 635, 638 . . . (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, they are shielded from personal liability, <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 . . . (1982).  That means a court can often avoid ruling on the plaintiff's claim that a particular right exists.  If prior case law has not clearly

> settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages.  The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Green, 131 S. Ct. 2020, 2030-31 (2011).

Issues of qualified immunity are best resolved at the "earliest possible stage in litigation."

Pearson v. Callahan, 555 U.S. 223, 232 (2009)(quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)(per curiam)).   "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit."  Lewis v. Tripp, 604 F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818).   Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. at 205.  When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct.  See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

## 1.        Procedural Approach to Qualified Immunity.

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified immunity defense.  In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  555 U.S. at 236.  The Supreme Court also noted that, while no longer

mandatory, the protocl outlined in <u>Saucier v. Katz</u> -- by which a court first decides if the defendant's actions violated the Constitution, and then the court determines if the right violated was clearly established -- will often be beneficial.  <u>See</u> <u>Pearson v. Callahan</u> 555 U.S. at 241.  In rejecting the prior mandatory approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district court and courts of appeals with "what may seem to be an essentially academic exercise."  555 U.S. at 237.  The Supreme Court also recognized that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable."  555 U.S. at 241 (alterations omitted)(internal quotation marks omitted).  <u>See</u> <u>Reichle v. Howards</u>, 132 S. Ct. 2088, 2093 (2012)(affirming <u>Pearson v. Callahan</u>'s procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior case law "comports with our usual reluctance to decide constitutional questions unnecessarily").  Once the plaintiff establishes an inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense generally fails.  <u>See</u> <u>Cannon v. City & Cnty. of Denver</u>, 998 F.2d 867, 870-71 (10th Cir. 1993).

The Supreme Court recognizes seven circumstances where district courts should proceed directly to and "should address only" the clearly established prong of the qualified immunity analysis: when (i) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual

basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(quoting Pearson v. Callahan, 555 U.S. at 236-42)(internal quotation marks omitted). Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely only to face challenges in the qualified immunity context. Camreta v. Greene, 131 S. Ct. at 2031-32.  See Kerns v. Bader, 663 F.3d at 1181.[10]  "Courts

---

[10]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer.  663 F.3d at 1183.  In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question.  And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84.  The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)."  663 F.3d at 1187 n.5.  On remand, the Court stated:

While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations.   A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations.   See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972).  In Mitchum v. Foster, the Supreme Court explained:

> Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." . . .  The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.

407 U.S. at 238-39.  Congress did not say it would remedy only violations of "clearly established" law, but that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (emphasis added).  The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional.  See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010).  The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith."  Wood v. Strickland, 420 U.S. 308, 322 (1975).  In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly-established prong became a part of the qualified immunity test. See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages

should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011)(quoting Pearson v. Callahan, 555 U.S. at 236-37). See Camreta v. Greene, 131 S. Ct. at 2032 ("In general, courts should think

---

insofar as their conduct does not violate clearly established statutory or constitutional rights."). It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983. J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011). Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations. See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . . These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives). In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering. See 547 U.S. at 596-97. Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress. It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights. It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized in Ysasi v. Brown, No. CIV 13-0183 JB/CG, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.).

hard, and then think hard again, before turning small cases into large ones.").[11]   The Tenth

Circuit will remand a case to the district court for further consideration when the district court

_____

[11]In Kerns v. Board of Commissioners, the Court expressed concern with Justice Elena Kagan's comments about "large" and "small" cases:

> While the Court is, of course, obligated to follow faithfully the Supreme Court's decisions and opinions, the Court has always been unenlightened and even troubled by Justice Elena Kagan's comments in Camreta v. Greene about "large" and "small" cases.  131 S. Ct. at 2032.  As a trial judge, the Court has tried assiduously to avoid thinking about or categorizing some cases as "large" and some as "small."  It usually is not mentally healthy for a judge to put all his or her energy into "large" cases and slight "small cases"; to the litigants, their case is the most important case on the Court's docket, and it is usually wise for the judge to treat each case on which he or she is working -- at that moment -- as the most important case at that moment.  Getting the decision "right," i.e. getting the law and facts correct and accurate, is obviously important, but getting it right is only one-half of a judge's task, particularly a trial judge's job.  The other half of dispensing justice is the appearance of justice -- did the Court listen to the litigant's arguments, wrestle with those arguments, and deal with them in an intellectually honest way.  Americans are pretty good about accepting a judicial decision -- even an adverse one -- and cease obsessing over an issue, if they are convinced that an authority figure has dressed up, taken them seriously, listened patiently and politely, wrestled with the arguments, addressed them, and accurately stated the facts.  The Court believes that, if it starts looking at some cases before it as "large" and some as "small," it begins a slippery slope that does not accomplish both halves of the task of dispensing justice.  The justice system depends so much on the nation respecting and accepting the courts' proceedings and decisions, because courts have very little "power" that does not depend on that acceptance.  Thus, Justice Kagan's comments are not only not self-defining, but they are disturbing.

> If, perhaps, a "large" case is a Supreme Court case or one that comes from the East Coast or California, rather than one in a district court in New Mexico, then it helps to look at what cases the Supreme Court has decided for the plaintiff. The three most recent qualified immunity cases, the Supreme Court dealt with are: (i) Reichle v. Howards, 132 S. Ct. 2088 (2012); (ii) Filarksy v. Delia, 132 S. Ct. 1657 (2012); and (iii) Messerschmidt v. Millender, 132 S. Ct. 1235 (2012).  In Reichle v. Howards, the Supreme Court determined that secret service agents were entitled to qualified immunity for arresting a protestor who touched the Vice President and held that it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation.  See 132 S. Ct. at 2092, 2097.  In Filarsky v. Delia, the Supreme Court held that a private individual that the government hires to do its work, an internal affairs review, is entitled to seek qualified immunity for Fourth and Fourteenth Amendment violations. See 132 S. Ct. at 1660, 1668.  In Messerschmidt v. Millender, the Supreme Court

has given cursory treatment to the clearly established prong of the qualified immunity analysis.

See Kerns v. Bader, 663 F.3d at 1182.

### 2.     Clearly Established Rights in the Qualified Immunity Analysis.

To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)[12](quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

---

held that police officers in Los Angeles, California were entitled to qualified immunity when they relied on an invalid warrant to search a home, because a reasonable officer would not have realized the error.  See 132 S. Ct. at 1241, 1250.  The Supreme Court has not denied qualified immunity since 2004 in Groh v. Ramirez, 540 U.S. 551 (2004), where it held that an officer unreasonably relied on a deficient warrant.  See 540 U.S. at 565. The Court does not think those presumably "large" cases (they are Supreme Court cases, after all) are any different -- substantively, legally, or factually -- than this case involving the search of a citizen's home after someone shot down a police helicopter and then detained that suspect for nine months until the United States realized that J. Kerns could not have shot down the helicopter.

On the flip side, treating large cases like they are large cases can create an appearance problem to the public and to the litigants -- that only big cases deserve the Court's attention.  A trial judge can overwork a "large" case.  It is better to treat even "large" cases like every other case; large cases and their litigants need to know and appreciate that they are not the only case on the court's docket, and realize that the scarcity of judicial resources applies to them too.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d at 1222 n.35.

[12]Lobozzo v. Colo. Dep't of Corr is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001).  On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful." Anderson v. Creighton, 483 U.S. 635, 640 (1987).  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202).  A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts."  Pierce v. Gilchrist, 359 F.3d at 1298.

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are

---

10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that Lobozzo v. Colo. Dep't of Corr has persuasive value with respect to material issues and will assist the Court in its preparation of this MOO.

- 61 -

sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 131 S. Ct. at 2083. "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 131 S. Ct. at 2083). "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639. "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 131 S. Ct. at 2084. The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit held in Kerns v. Bader that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference." 663 F.3d at 1188 (emphasis in original). In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification." 663 F.3d at 1183 (emphasis added). Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined, applied a sliding scale to determine when the law is clearly established. See Casey v. City of Fed. Heights, 509 F.3d 1278, 1284 (10th Cir. 2007)("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.").

"[W]hen an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a second decision with greater specificity to clearly establish the law." Casey v. City of Fed. Heights, 509 F.3d at 1284. Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning . . . ." Hope v. Pelzer, 536 U.S. at 741.

In Rivera v. Bates, No. CIV 12-0473 JB/RHS, 2014 WL 3421050 (D.N.M. June 21, 2014)(Browning, J.), the Court used the Kerns v. Bader qualified-immunity framework to determine if it was clearly established that arresting a suspect in his underwear and failing to retrieve his clothing to cover him up while he is transported from his house to a patrol car makes the arrest unreasonable. See 2014 WL 3421050, at *54. The Court stated:

> Even if the Court could, on the record before it, conclude, as a matter of law, that the manner in which Hernandez effectuated the arrest was [un]reasonable, the Court finds that the law was not clearly established such that a reasonable officer in Hernandez' position would have recognized that he needed to retrieve clothing for S. Rivera rather than escort him directly to the police vehicle. As the Tenth Circuit has emphasized, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction *might* make a constitutional difference." Kerns v. Bader, 663 F.3d at 1188 (emphasis in original). In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was *beyond debate* in 2005 that the officers' entry and search lacked legal justification." 663 F.3d at 1183 (emphasis added). Here, S. Rivera has relied on Cortez v. McCauley to establish that his clearly established rights were violated, but the Tenth Circuit in that case stated that it had "little difficulty concluding that a small amount of force, like grabbing Rick Cortez and placing him in the patrol car, is permissible in effecting an arrest under the Fourth Amendment." 663 F.3d at 1128. The Tenth Circuit only made one comment regarding Cortez' clothing during the arrest:
>
> > Although the dignity aspects of this arrest are troubling, specifically hauling Rick Cortez (clad only in his shorts) into the patrol car in the middle of the night without any explanation, the police were investigating a serious felony and claimed a need for quick action to separate the accused from any other children that might be in the home.

478 F.3d at 1128-29.  The Tenth Circuit did not explain what would have to be different about the "dignity aspects" for the arrest to violate the Fourth Amendment.  More importantly, the Court emphasizes that Hernandez did not participate in any of the alleged wrongdoing inside S. Rivera's house, nor did he refuse to allow S. Rivera to get dressed; instead, Hernandez was involved in the arrest only after S. Rivera was outside the house.  S. Rivera has not pointed to, nor has the Court been able to identify, any cases that demand that an officer delay taking the arrestee to a police vehicle so the officer can enter the arrestee's home to search for clothing or otherwise find some covering for an arrestee on the way to the police vehicle.  The Court will thus grant the MSJ on S. Rivera's excessive and unreasonable force claim against Hernandez.

Rivera v. Bates, 2014 WL 3421050, at *54 (emphasis in original).

## ANALYSIS

The Individual DOH Defendants violated A.M.'s substantive due-process rights to reasonable care and safety.  Those rights were clearly established after the Supreme Court's decision Youngberg v. Romeo on June 18, 1982.  Moreover, the "special circumstances" exception to the qualified-immunity analysis does not apply.  Consequently, the Court will grant the MTD as to the Individual DOH Defendants' conduct that occurred before June 18, 1982, and deny the MTD as to the Individual DOH Defendants' conduct that occurred after June 18, 1982.

## I.    THE INDIVIDUAL DOH DEFENDANTS VIOLATED A.M.'S SUBSTANTIVE DUE-PROCESS RIGHTS.

The Individual DOH Defendants violated A.M.'s substantive due-process rights to reasonable care and safety.  The Due Process Clause provides that "no State shall . . . deprive any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, § 1.  In general, state actors may be held liable under § 1983 only for their own affirmative acts that violate a plaintiff's due-process rights and not for third parties' acts.  See Robbins v. Oklahoma, 519 F.3d at 1251 (citing DeShaney, 489 U.S. at 197).  "[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty and property of its citizens against invasion by private actors."  DeShaney, 489 U.S. at 195.  See, e.g., Harris v. McRae, 448

U.S. 297, 317-18 (1980)(holding that the state has no obligation to fund abortions or other medical services); Lindsey v. Normet, 405 U.S. 56, 74 (1972)(concluding that the state has no obligation to provide adequate housing).

There are two exceptions to this general rule.  The first -- the special-relationship exception -- applies when: (i) an individual is involuntarily committed to state custody; and (ii) a state actor fails to provide for that individual's basic human needs -- e.g., food, clothing, shelter, medical care, and reasonable safety.  See, e.g., Estelle v. Gamble, 429 U.S. at 101 (concluding that prisoners have substantive due-process rights); Youngberg v. Romeo, 457 U.S. at 309-14 (holding that developmentally disabled individuals committed to state custody have substantive due-process rights); Yvonne L. ex rel. Lewis v. N.M. Dep't of Human Servs., 959 F.2d at 890-92 (holding that children in foster care have substantive due-process rights).  The second -- the state-created danger exception -- provides that a state may also be liable for an individual's safety "only when 'a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence.'"  Robbins v. Oklahoma, 519 F.3d at 1251 (quoting Currier v. Doran, 242 F.3d at 923).  While the special-relationship exception applies, the state-created danger exception does not.

## A.    THE SPECIAL-RELATIONSHIP EXCEPTION APPLIES.

The special-relationship exception applies only when: (i) an individual is involuntarily committed to state custody; and (ii) a state actor fails to provide for that individual's basic human needs -- e.g., food, clothing, shelter, medical care, and reasonable safety.  See Youngberg v. Romeo, 457 U.S. at 309-14.  A.M.'s allegations meet both prongs of this exception.

1.       **A.M. Was, and Remains, Involuntarily Committed to State Custody.**

First, A.M. was, and remains, involuntarily committed to state custody.  The Supreme Court first recognized that developmentally disabled individuals involuntarily committed to state custody are entitled to substantive due-process protections in Youngberg v. Romeo.  That case involved a thirty-three year old developmentally disabled individual -- Nicholas Romeo -- who was involuntarily committed to a state institution.  See 457 U.S. at 309.  While at that institution, Romeo suffered numerous injuries -- some self-inflicted and some that the other residents caused.  See 457 U.S. at 310.  After objecting multiple times to the state's failure to care for her son properly, Romeo's mother brought a § 1983 action, alleging, among other things, that state officials had violated her son's substantive due-process rights to reasonable care and safety.  See 457 U.S. at 310.

Before the Supreme Court, the defendants conceded that Romeo had "a right to adequate food, shelter, clothing, and medical care," but disputed his right to "safety, freedom of movement, and training."  457 U.S. at 314.  In an opinion that Justice Powell authored, the Supreme Court began its analysis by noting that, "[a]s a general matter, a State is under no constitutional duty to provide substantive services for those within its border."  457 U.S. at 317 (citations omitted).  Justice Powell stated, however, that "[w]hen a person is institutionalized -- and wholly dependent on the State -- . . . a duty to provide certain services and care does exist . . . ."  457 U.S. at 317.  Having previously held that it was cruel and unusual punishment to hold convicted criminals in unsafe conditions, Justice Powell reasoned that it must, therefore, also "be unconstitutional to confine the involuntarily committed -- who may not be punished at all -- in unsafe conditions."  457 U.S. at 316.  Justice Powell concluded that developmentally disabled individuals involuntarily committed to the state have "constitutionally protected interests in

conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests."  457 U.S. at 324.

Seven years later, in DeShaney, the Supreme Court clarified the scope of Youngberg v. Romeo's substantive due-process protections.   DeShaney involved a four-year-old child -- Joshua DeShaney -- who suffered repeated physical abuse from his father.  See 489 U.S. at 191-92.  Even after receiving numerous reports that Joshua's father was abusing him, the Winnebago County Department of Social Services failed to remove him from his father's custody.  See 489 U.S. at 192-93.   At one point, Joshua's father beat him so severely that the child suffered significant brain damage, which rendered him developmentally disabled for the rest of his life.  See 489 U.S. at 193.  Joshua and his mother brought a § 1983 action against state officials, alleging that the state agency's inaction violated Joshua's substantive due-process rights.  See 489 U.S. at 193.

In an opinion that the Honorable William H. Rehnquist, then-Chief Justice of the Supreme Court, authored, the Supreme Court began its analysis by stating that the Due Process Clause "forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law.'"  489 U.S. at 195.  Chief Justice Rehnquist asserted, however, that the purpose of the Due Process Clause "was to protect the people from the State, not to ensure that the State protected them from each other."  489 U.S. at 195.  Consequently, according to Chief Justice Rehnquist, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."  489 U.S. at 195.

Chief Justice Rehnquist acknowledged that, in limited circumstances, the Constitution imposes upon the State "affirmative duties of care and protection with respect to particular individuals."   489 U.S. at 198 (citing Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244

(1983)(holding that the Fourteenth Amendment's Due Process Clause requires the responsible government or government agency to provide medical care to suspects in police custody who were injured while being apprehended by police); Youngberg v. Romeo, 457 U.S. at 314-25 (holding that the Fourteenth Amendment's Due Process clause requires the State to provide involuntarily committed mental patients with such services are necessary to ensure their "reasonable safety" from themselves and others); Estelle v. Gamble, 429 U.S. 97, 103-04 (1976)(recognizing that the Eighth Amendment's prohibition against cruel and unusual punishment requires the State to provide adequate medical care to prisoners)).  Chief Justice Rehnquist said that those cases, however, "stand only for the proposition that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."  489 U.S. at 199-200.  Chief Justice Rehnquist explained:

> The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs -- e.g., food, clothing, shelter, medical care, and reasonable safety -- it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.  The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.  In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf -- through incarceration, institutionalization, or other similar restraint of personal liberty -- which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

489 U.S. at 200 (footnotes omitted)(citations omitted).  Chief Justice Rehnquist concluded:

> The Estelle-Youngberg analysis simply has no applicability in the present case.  Petitioners concede that the harms Joshua suffered occurred not while he was in the State's custody, but while he was in the custody of his natural father, who was in no sense a state actor.  While the State may have been aware of the

dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them.

489 U.S. at 201 (footnote omitted).  Consequently, Chief Justice Rehnquist held that qualified immunity barred Joshua's § 1983 claims.  See 489 U.S. at 202-03.

Based on the Supreme Court's holdings in Youngberg v. Romeo and DeShaney, the Tenth Circuit has concluded that whether an individual is involuntarily committed to the state -- and is, therefore, entitled to substantive due-process protections -- "turn[s] on the dependent and involuntary nature of the custodial relationship between the individual and the State."  Schwartz v. Booker, 702 F.3d 573, 580 (10th Cir. 2012).  Accordingly, the Tenth Circuit has held that, although foster care children are involuntarily committed to state custody, see Yvonne L. v. New Mexico Department of Human Services, 959 F.2d at 885, public school children are not, see Maldonado v. Josey, 975 F.2d 727 (10th Cir. 1992).  In Maldonado v. Josey, for example, the Tenth Circuit determined that Youngberg v. Romeo's protections do not apply to children whom state law mandated to attend school.  See 975 F.2d at 732.  In an opinion that the Honorable Deanelle R. Tacha, United States Circuit Judge for the Tenth Circuit, authored, and Judge Seymour and the Honorable Dee V. Benson, United States District Judge for the District of Utah, sitting by designation, joined, the Tenth Circuit explained:

> Under DeShaney, an affirmative duty to protect arises only when the state "so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs."  DeShaney, 489 U.S. at 200.  This type of restraint simply does not occur under New Mexico compulsory attendance laws.  Although a child may well be in the "custody" of the school authorities during school hours, this custody does not amount to a restraint that prohibits the child and his parents from caring for the basic needs of the child.  Compulsory attendance laws do not alter the fact that parents retain ultimate responsibility for their child's food, shelter, clothing, medical care, and reasonable safety.
>
> Further, the state does not confine school children in the same way that it confines prisoners, the institutionalized, or children in foster homes.  These

individuals depend completely on the state to satisfy their basic human needs; the state restrains their liberty to such an extent that it renders them unable to care for their own basic needs.  School children, on the other hand, can leave school at the end of the day.  The compulsory education laws do not change the fact that the parents are the primary caretakers of the students; those same parents -- and not the state -- must determine and address the basic needs that each child has.  This amount of freedom on the part of the student and the degree of parental involvement and control necessarily dictate that the state does not become the primary caretaker simply by mandating compulsory school attendance.

Thus, we conclude that compulsory attendance laws do not impose the severe restraints on individual liberty that implicate the Due Process Clause of the Fourteenth Amendment.

Maldonado v. Josey, 975 F.2d at 732-33.

Similarly, in  D.R. v. Middle Bucks Area Vocational Technical School, 972 F.2d 1364 (3d Cir. 1992), the Third Circuit, sitting en banc, held that compulsory education laws did not cause children to be involuntarily committed to the state while at school.  See 972 F.2d at 1371-72.  In an opinion that the Judge Sloviter authored, the Third Circuit stated that the incarceration and institutionalization cases involve "full time severe and continuous state restriction of liberty" and render the institutionalized "wholly dependent upon the state . . . to meet their basic needs." 972 F.2d at 1371.  By contrast, Judge Sloviter explained, parents decide where their children will be educated, and public school children "remain resident in their homes [and] may turn to persons unrelated to the state for help on a daily basis."  972 F.2d at 1372.  Judge Sloviter also contrasted the student context with the foster care cases:

A relationship between the state and foster children arises out of the state's affirmative act in finding the children and placing them with state-approved families.  By so doing, the state assumes an important continuing, if not immediate, responsibility for the child's well-being.  In addition, the child's placement renders him or her dependent upon the state, through the foster family, to meet the child's basic needs.  Students, on the other hand, do not depend upon the schools to provide for their basic human needs.

972 F.2d at 1372.   Similarly, in <u>Norfleet ex rel. Norfleet v. Arkansas Department of Human Services</u>, the Honorable Floyd R. Gibson, United States Circuit Judge for the Eighth Circuit, stated:

> In foster care, a child loses his freedom and ability to make decisions about his own welfare, and must rely on the state to take care of his needs.  It cannot be seriously doubted that the state assumed an obligation to provide adequate medical care for Taureen; the reason Taureen was placed in foster care was precisely because he was not able to take care of himself and needed the supervision and attention of an adult caregiver.

989 F.2d at 293.   <u>See</u> <u>Nicini v. Morra</u>, 212 F.3d 798, 808 (3d Cir. 2000)(en banc)(finding that the special-relationship exception applies to foster care children, because "[f]oster children, like the incarcerated or the involuntarily committed, are placed . . . in a custodial environment . . . [and are] unable to seek alternative living arrangements.")(alterations in original)(citation omitted)(internal quotation marks omitted); <u>Taylor ex rel. Walker v. Ledbetter</u>, 818 F.2d 791, 797 (11th Cir. 1987)(en banc)("[A] child involuntarily placed in a foster home is in a situation so analogous to a prisoner in a penal institution and a child confined in a mental health facility that the foster child may bring a § 1983 action for violation of fourteenth amendment rights.").

Many United States Courts of Appeals have similarly determined that the state does not sufficiently control voluntarily committed mental patients to give rise to a special relationship. <u>See, e.g.</u>, <u>Campbell v. WA Dep't of Soc. & Health Servs.</u>, 671 F.3d 837, 843 (9th Cir. 2011)(Bybee, J.)("Mere custody . . . will not support a [due process] claim where a person *voluntarily resides* in a state facility under its custodial rules."(emphasis in original)); <u>Torisky v. Schweiker</u>, 446 F.3d 438, 446, 448 (3d Cir. 2006)(Stapleton, J.)("[A] custodial relationship created merely by an individual's voluntary submission to state custody is not a 'deprivation of liberty' sufficient to trigger the protections of <u>Youngberg</u> . . . ."); <u>Monahan v. Dorchester Counseling Ctr., Inc.</u>, 961 F.2d 987, 991 (1st Cir. 1992)(Campbell, J.)("Because the

state did not commit Monahan involuntarily, it did not take an 'affirmative act' of restraining his liberty, an act which may trigger a corresponding due process duty to assume a special responsibility for his protection."); Higgs v. Latham, No. 91-5273, 1991 WL 216464, at *4 (6th Cir. Oct. 24, 1991)(per curiam)(unpublished)("Mrs. Higgs signed all the necessary papers for a *voluntary* admission . . . . Thus, there was no 'affirmative act' by the hospital to deprive her of liberty, and therefore no triggering of the state's constitutional duty to protect those it renders helpless by confinement.").

A.M. was involuntarily committed to state custody.  Like the plaintiff in Youngberg v. Romeo, who was involuntarily committed to a state institution when he was twenty-two years old because his developmental disabilities rendered him unable to care for himself, see 457 U.S. at 309-10, A.M. was involuntarily committed to a state institution when she was sixteen years old, because her developmental disabilities rendered her unable to care for herself,  see Complaint ¶¶ 67-70, at 18-19.  Even after being transferred to the Homestead House, A.M.'s status was closer to that of a foster child than a child which law mandated to attend public school.  Like foster children, who remain the state's legal custody after being placed in foster homes, A.M. asserts that she was still in the DOH Defendants' and Individual DOH Defendants' legal custody after she was placed at the Homestead House.  See Complaint ¶ 12, at 5. A.M. alleges that, according to Adams, aftercare residents "were still somehow attached to the facility" and the Training School  remained "obligated to provide care for" aftercare residents.  Complaint ¶ 39, at 11 (internal quotation marks omitted).  According to A.M., Adams believed the Training School  had a duty to make sure that aftercare residents "had a healthy array of services that went beyond food, clothing, and shelter, and that the aftercare program was designed in such a way that it would foster the residents' continued development."  Complaint ¶ 40, at 11 (internal

quotation marks omitted)(brackets omitted).  A.M. asserts that, in Sandoval's view, "discharge from aftercare was not a complete separation of the Training School's responsibility for residents."  Complaint ¶ 63, at 17-18.  A.M. states: "Even after residents were discharged from aftercare, the Training School at times took action to respond to allegations of abuse when they came to their attention . . . ."  Complaint ¶ 64, at 18.  According to A.M., Training School administrators continued to exercise both physical and legal authority over aftercare residents like her -- even returning some of them to Fort Stanton.  See Complaint ¶ 39, at 11.

Like foster children, who are placed "in a custodial environment" and cannot "seek alternate living arrangements," Nicini v. Morra, 212 F.3d at 808, A.M. alleges that she could not act on her own behalf, see Complaint ¶ 68, at 19.  A.M. asserts that, when another developmentally disabled individual escaped from the Homestead House, M. Evans took that individual's shoes and planted cacti outside the walls of the Homestead House to prevent her from escaping again.  See Complaint ¶ 88, at 24.  Consequently, it is a reasonable inference from the facts which the Complaint alleges that A.M.'s developmental disabilities and M. Evans' actions prevented her from leaving the Homestead House or obtaining the care that she needed.  These facts, and the reasonable inferences therefrom, indicate that A.M. was involuntarily committed to state custody even after she was placed at the Homestead House.

Judge Brack reached the same conclusion in  J.M. v. New Mexico Department of Health.  In that case, two developmentally disabled individuals -- J.M. and J.E. -- who had been involuntarily committed to Fort Stanton and were subsequently placed with private unlicensed third parties brought claims identical to A.M.'s.  See Jan. 7, 2009, MOO at 1-3.  Judge Brack held that the plaintiffs' involuntary commitment to state custody entitled them to substantive due-process protection.  See Jan. 7, 2009, MOO at 5.  Judge Brack succinctly stated:

> State officials are generally not required to provide care and protection to individuals.  DeShaney v. Winnebago County Dept. of Social Servs., 489 U.S. 189, 201 (1989).  However, when the state assumes control over an individual, a special relationship is triggered that creates an affirmative duty to provide protection to the individual.  Id. at 199-200.  In this case, JM and JE were placed in state custody by Court Order, which created a special relationship that required Defendants, state officials with responsibility for JM and JE, to affirmatively protect them from harm.  Id.  Furthermore, because JM and JE have developmental disabilities, the Defendants, as state officials with responsibility for JM and JE, had a greater duty to provide affirmative care to them.  See Youngberg v. Romeo, 457 U.S. 307, 322 (1982).

Jan. 7, 2009, MOO at 5.

The cases that the Individual DOH Defendants cite do not dictate a different result.  First, in DeAnzona v. City & County of Denver, in an opinion that the Honorable Frank J. Magill, United States Circuit Judge for the Eighth Circuit, sitting by designation, authored, and Judges Tacha and McWilliams, joined, the Tenth Circuit held that there was no custodial relationship giving rise to a special relationship between a City of Denver parks official -- Brooks -- and a five-year-old boy participating in a city day-camp program -- Redd.  See 222 F.3d at 1234-35.  Judge Magill explained:

> A plaintiff must show involuntary restraint by the government to have a claim under a special relationship theory, if there is no custodial relationship there can be no constitutional duty. . . .  In the Tenth Circuit, the classic examples are prisoners, individuals committed against their will to mental institutions, and individuals in state run foster care.  Where the parents are still the primary care givers for the child there is no special relationship and no due process violation.  DeAnzona was still Redd's primary care giver, and Redd was not in the custody of the state.

222 F.3d at 1234 (citations omitted).  As Judge Magill's opinion makes clear, unlike A.M., Redd was never involuntarily committed to the state, but was instead in his mother's legal custody.  See 222 F.3d at 1234 (citations omitted).  Accordingly, DeAnzona v. City & County of Denver is inapposite.

Second, the Individual DOH Defendants assert that, in Briggs, Judge Miles-Lagrange stated that "legal custody without physical custody is insufficient to create a special relationship."   Tr. at 49:19-20 (Constanteras)(citing Briggs, 472 F. Supp. 2d at 1301-02). Quoting this line from Briggs, the Individual DOH Defendants advance a two-part argument: (i) once A.M. was transferred to the Homestead House, they no longer had physical custody over her; and (ii) because they no longer had physical custody over A.M., there was no special relationship between them and A.M. that triggered substantive due-process obligations. Although the Individual DOH Defendants accurately quote Judge Miles-Lagrange's special-relationship test, they misapply it.

Briggs involved nearly the exact same facts as DeShaney.   That case involved Kelsey Smith-Briggs, a child who was physically abused by her biological mother and/or stepfather while she stayed at her mother's home.   See 472 F. Supp. at 1296-98.   Despite being notified of this abuse, multiple Oklahoma state agencies -- one of which was providing court-ordered services to Kelsey -- failed to remove Kelsey from her mother's home or even investigate her situation.   See 472 F. Supp. at 1296-98.   The abuse ultimately caused Kelsey's death.   See 472 F. Supp. at 1296.   Kelsey's father -- Raymond Briggs -- brought a § 1983 action against the Oklahoma Department of  Human Services ("DHS") and its employees, alleging, among other things, that they violated Kelsey's substantive due-process rights to safety and security by failing to properly investigate the claims of abuse.   See 472 F. Supp. at 1296-98, 1301-02.   Briggs alleged that the DHS and its employees had such an obligation because Kelsey was in its legal custody.   472 F. Supp. at 1301.

Finding that there was no special relationship between DHS and Kelsey that gave rise to substantive due-process obligations, Judge Miles-Legrange explained:

- 75 -

In the absence of both legal and physical custody, no special relationship exists, and thus, no attendant affirmative duty to protect exists.  E.g., DeShaney, 489 U.S. at 199-200.  Conversely, in those situations where the state has both legal and physical custody, a special relationship exists that imposes such a duty on the state.  E.g., Yvonne L. v. N.M. Dep't of Human Servs., 959 F.2d 883 (10th Cir. 1992)(state has constitutional duty to protect foster child in its legal and physical custody).

In this case, Briggs has alleged in her second amended complaint that while Smith had physical custody, DHS had legal custody of Kelsey, and Briggs has argued that DHS's continuing legal custodial relationship with Kelsey is sufficient to establish a duty to protect under this theory as against Bonner.  The Court disagrees.

"[L]egal custody without physical custody is insufficient to create a 'special relationship.'"  A.S. v. Tellus, 22 F. Supp. 2d 1217, 1221 (D. Kan. 1998); e.g., Wooten v. Campbell, 49 F.3d 696 (11th Cir. 1995)(no special relationship where state has legal custody, mother has physical custody and child injured by natural father); Clark v. City of Philadelphia, 2006 WL 2321574 (E.D. Pa. Aug. 8, 2006)(absent physical custody, no special relationship exists).  Accordingly, absent persuasive and relevant case law to the contrary, the Court finds under the circumstances of this case that Briggs' third claim for relief to the extent, if any, it is based upon the special relationship doctrine fails to state a claim for which relief may be granted.

472 F. Supp. 2d at 1301-02.  Notably, Judge Miles-Lagrange did not define "physical custody."

By noting that foster children are in the state's legal and physical custody, however, Judge

Miles-Lagrange indicated that physical custody neither turns on physical presence nor day-to-

day control.  Foster parents certainly have the ability to tell children where to go and what to do.

Instead, her standard follows the Supreme Court's analyses in Youngberg v. Romeo and

DeShaney, and the United States Courts of Appeals decisions interpreting those cases.  As

explained previously, those cases focus on which individual or agency society deems most

responsible for a child or individual's well-being.  These cases demonstrate that, although the

state has no substantive due-process obligations to protect children from their biological parents,

such obligations arise when the state assumes the role of guardian -- as with children in foster

care, prisoners, and developmentally disabled individuals.  This reading is reinforced by the fact

that all of the cases that Judge Miles-Lagrange cites -- <u>A.S. v. Tellus</u>; <u>Wooten v. Campbell</u>; and

<u>Clark v. City of Philadelphia</u> -- involved state actors failing to intervene when children suffered

abuse in their biological parents' homes.  Accordingly, <u>Briggs</u> is also inapposite.

 Finally, <u>Armijo ex rel. Chavez v. Wagon Mound Public Schools</u>, also does not help the

Individual DOH Defendants' cause.  That case involved a public school student -- Phidelfio

Armijo -- who committed suicide after the principal suspended him from school and another

school official -- Tom Herrera -- drove Armijo home.  <u>See</u> 159 F.3d at 1255-57.  The Honorable

David M. Ebel, United States Circuit Judge for the Tenth Circuit concluded:

> At most, Armijo was a student in a public school confined in Herrera's car during
> the drive home from school.  Even if such circumstances constituted a custodial
> relationship, that relationship ended once Armijo exited the car and ran to his
> house because at that point he was no longer under any involuntary restraint by a
> school official.  The only "restraint" imposed upon Armijo after his removal from
> school was Schutz' directive that he not return to school that day.  Otherwise,
> Armijo was free to do whatever he wanted, including voluntarily leaving his
> house.  Banning a student from the school grounds does not rise to the same level
> of involuntary restraint as arresting, incarcerating, or institutionalizing an
> individual.  The fact that Armijo ended his life *after* he was "released" by Herrera
> bars any liability under the special relationship doctrine.  Thus, the district court
> erred as a matter of law by denying qualified immunity to the Individual
> Defendants on the special relationship claim.

<u>Armijo ex rel. Chavez v. Wagon Mound Pub. Sch.</u>, 159 F.3d at 1251-52 (emphasis in original).

Unlike A.M., Armijo was never involuntarily committed to state custody.  The school officials,

therefore, had no substantive due-process obligations to provide for his safety and security.

### 2. <u>The Individual DOH Defendants Violated the Professional Judgment Standard.</u>

 The Supreme Court has instructed that courts must use a "professional judgment"

standard to analyze substantive due-process claims brought by developmentally disabled

individuals in state custody.  <u>Youngberg v. Romeo</u>, 457 U.S. at 322.  When <u>Younberg v. Romeo</u>

was before the Third Circuit, the Honorable Arlin M. Adams, United States Circuit Judge for the

Third Circuit, authored, the Third Circuit held that the Due Process Clause, rather than the Eighth Amendment, was the source of the rights afforded developmentally disabled individuals who are involuntarily committed to the State.  See 644 F.2d 147, 158 (3d Cir. 1980).  Judge Adams stated that "the traditional deterrence and retribution underpinnings of the criminal justice system" are "logically inapplicable to the mentally retarded."  644 F.2d at 158.  Judge Adams explained that

> the state has no right to punish an innocent individual, and the concept of deterrence has a minimal effect on a severely retarded person, such as the plaintiff here.  In seeking to explain claimed infringements of fundamental liberty interests, the state is limited to protection and treatment rationales of a compelling or substantial nature.  Involuntary commitment in the civil context, then, quite clearly implicates a constitutional right to treatment and protection.

644 F.2d at 158.  The en banc court did not agree, however, on the relevant standard for determining whether the defendants violated Romeo's rights.  See 644 F.2d at 159-60, 164, 166-67, 173, 178.  The majority of the panel concluded that three different standards applied to the defendants' conduct.  First, the majority held that the defendants must show a "compelling necessity" to justify their physical restraint of Romeo.  544 F.2d at 159-60 (footnote omitted).  Second, the majority determined that only the defendants must show a "substantial necessity" to justify their failure to provide for Romeo's safety.  544 F.2d at 164.  Finally, the majority determined that the defendants can be held liable for inadequate medical treatment only if the treatment is not "acceptable in light of present medical or other scientific knowledge."  544 F.2d at 166.

The Honorable Collins J. Seitz, then-Chief Judge of the Third Circuit, concurring in the judgment, found the majority's substantive due-process framework unnecessarily complex and indistinguishable from the analyses used in medical-malpractice cases.  See 644 F.2d at 174-75. In Chief Judge Seitz' view, the Due Process Clause "only requires that the courts make certain

that professional judgment was in fact exercised." 644 F.2d at 178.  Chief Judge Seitz concluded

that the appropriate standard was, therefore, whether the defendants' conduct was "such a

substantial departure from accepted professional judgment, practice, or standards in the care and

treatment of this plaintiff as to demonstrate that the defendants did not base their conduct on a

professional judgment." 644 F.2d at 178.

The Supreme Court, in an opinion that Justice Powell authored, adopted Chief Judge

Seitz' standard:

> We think the standard articulated by Chief Judge Seitz affords the
> necessary guidance and reflects the proper balance between the legitimate
> interests of the State and the rights of the involuntarily committed to reasonable
> conditions of safety and freedom from unreasonable restraints.  He would have
> held that "the Constitution only requires that the courts make certain that
> professional judgment in fact was exercised.  It is not appropriate for the courts to
> specify which of several professionally acceptable choices should have been
> made." 644 F.2d, at 178.  Persons who have been involuntarily committed are
> entitled to more considerate treatment and conditions of confinement than
> criminals whose conditions of confinement are designed to punish.  At the same
> time, this standard is lower than the "compelling" or "substantial" necessity tests
> the Court of Appeals would require a State to meet to justify use of restraints or
> conditions of less than absolute safety.  We think this requirement would place an
> undue burden on the administration of institutions such as Pennhurst and also
> would restrict unnecessarily the exercise of professional judgment as to the needs
> of residents.

457 U.S. at 322 (citations omitted).

The Court has previously explained that, under the professional judgment standard, "[a]

decision made by a professional is presumptively valid, and liability will be imposed only if the

decision is such a substantial departure from accepted professional judgment, practice, or

standards as to demonstrate that the person responsible actually did not base the decision on such

a judgment." Johnson ex rel. Cano v. Homes, 377 F. Supp. 2d 1039, 1048 (D.N.M.

2004)(Browning, J.) aff'd sub nom. Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133

(10th Cir. 2006)(citing Youngberg v. Romeo, 457 U.S. at 323).  State officials will be held liable

for violating a developmentally disabled individual's substantive due-process rights only if the official "knew of the asserted danger to [the individual] or failed to exercise professional judgment with respect thereto."  Yvonne L. v. N.M. Dep't of Human Servs., 959 F.2d at 890. "Whether the state official failed to exercise professional judgment requires more than mere negligence; the official must have abdicated her professional duty sufficient to shock the conscience."  Schwartz v. Booker, 702 F.3d at 585-86.  Conduct is shocking to the conscience when the "degree of outrageousness and . . . magnitude of potential or actual harm . . . is truly conscience shocking."  Armijo ex rel. Armijo v. Wagon Mound Pub. Sch., 159 F.3d at 126 (internal quotation marks omitted).

Applying the professional judgment standard to identical conduct in J.M. v. New Mexico Department of Health, Judge Brack stated:

> Plaintiffs' substantive due process claims are based on allegations that Defendants were recklessly indifferent in their failure to protect and care for JM and JE.  Plaintiffs also allege that Defendants' failure to provide JM and JE with the care and services they required as developmentally disabled individuals constituted an unjustified abdication of professional responsibility.  Plaintiffs further allege that Defendants placed JM and JE in settings that were dangerous and otherwise unfit by committing them to the custody of private third party business [sic], without judicial authorization, knowing that JM and JE would be exploited economically and deprived of the care and protection they required.  Finally, Plaintiffs allege that Defendants, with reckless indifference, abdicated their professional responsibility by conspiring to deceive the state court regarding JM and JE's welfare and capacity to function outside of state custody, eventually leaving JM and JE to be exploited without anyone to care for them or protect their legal rights.  The Court finds that these allegations, which the Court must accept as true, shock the conscience and are sufficient to state a claim against Defendants Sandoval, Adams, Mateju, and Does 1-10, in their individual capacities, pursuant to § 1983, for violation of JM and JE's substantive due process rights.

Jan. 7, 2009, MOO at 6.

A.M. has plausibly alleged that the Individual DOH Defendants abdicated professional responsibility when they stopped providing her all therapy and services after transferring her to

- 80 -

the Homestead House.  A.M. alleges that, after transferring aftercare residents to their third-party placements, the Individual DOH Defendants "abandoned" them.  Complaint ¶ 3, at 2.  A.M. alleges that the Individual DOH Defendants knew that she was incapable of making fully informed decisions about her own care and welfare without assistance from a legal guardian or guardian ad litem.  See Complaint ¶ 68, at 19.  A.M. contends that the Individual DOH Defendants knew that she could not care for herself, make important decisions for herself, or protect her own rights and interests.  See Complaint ¶ 70, at 19.  A.M. contends that the Individual DOH Defendants neither provided her with the services that she needed nor protected her from abuse, neglect, or exploitation.  See Complaint ¶ 3, at 2.  A.M. maintains that, during the thirty years that she lived with M. Evans, the Individual DOH Defendants did not check on her in any fashion.  See Complaint ¶¶ 77, at 21; id. ¶ 80, at 22; id. ¶ 85, at 23.

A.M. points out that, while in M. Evans' custody, she did not receive: (i) social services, Medicaid benefits, or social security benefits; (ii) adequate medical, dental and psychological care; (iii) rehabilitative, educational, and vocational services; or (iv) day habilitation or therapy.  See Complaint ¶ 85, at 23.  A.M. contends that M. Evans stole A.M.'s social security checks for her own use and did not spend the funds for A.M.'s benefit.  See Complaint ¶ 94, at 25.  A.M. alleges that the Individual DOH Defendants facilitated the transfer of her social security checks to M. Evans with deliberate indifference to whether M. Evans was using or intended to use the social security funds for A.M.'s benefit.  See Complaint ¶ 83, at 22.  A.M. also asserts that she was socially isolated and was rarely allowed to leave the Homestead House.  See Complaint ¶ 87, at 23

A.M. asserts that Sandoval was responsible for ensuring that the appropriate measures were taken to provide for A.M.'s health, safety, and well-being; for ensuring that she received

appropriate services; and for supervising and monitoring A.M. at the Homestead House.  See Complaint ¶ 16, at 6.  A.M. points out that Sandoval, despite being charged with overseeing Training School social workers, "did not know of any guidelines on how residents in aftercare placements would be cared for, did not know of a system to follow up with those residents, and did not know of a system . . . to know how many residents were placed in private third-party placements"  Complaint ¶ 49, at 13.  Moreover, A.M. asserts that Sandoval did not know "what the conditions of the residents was [sic]," or "what services they needed."  Complaint ¶ 49, at 13.  A.M. points out that Sandoval has admitted that he "wouldn't know whether somebody was going to be taken care of after discharge from aftercare, and it never crossed his mind to be concerned that residents discharged from aftercare might be abused or neglected."  Complaint ¶ 63, at 17 (internal quotation marks omitted)(brackets omitted).

A.M. asserts that the Individual DOH Defendants decided that discharging residents from aftercare eliminated the need for social worker visits.  See Complaint ¶ 51, at 13-14.  A.M. alleges that Training School administrators -- including the Individual DOH Defendants -- were aware that the social workers assigned to oversee aftercare placements often did not visit aftercare residents in their third-party placements.  See Complaint ¶ 47, at 12.  A.M. maintains that the Individual DOH Defendants were aware that the social workers -- when they checked on the aftercare residents at all -- usually relied on telephone calls to the private third parties who administered the placements rather than on in-person contact.  See Complaint ¶ 47, at 12-13.  Moreover, A.M. contends that Training School administrators -- including Adams, Mateju, and Shaefer -- had frequent conversations about the problem of social workers' failure to make their required visits or to contact aftercare residents.  See Complaint ¶ 51, at 13-14.  A.M. asserts that the Individual DOH Defendants were "well aware of the dangers residents faced due to the way

in which the aftercare program was operated, but they proceeded anyway."  Complaint ¶ 52, at 14.

A.M. alleges that Adams made hundreds of decisions regarding the placement and treatment of Training School residents -- including the placement and discharge decisions relating to A.M.  See Complaint ¶ 18, at 6.  Adams chaired SCAR, attended most SCAR meetings, and approved A.M.'s discharge from aftercare without taking any steps to ascertain whether she would be safe or have her medical and other needs met.  See Complaint ¶ 18, at 6.

A.M. points out that Schaefer has acknowledged that aftercare residents were particularly vulnerable, and in danger of abuse and exploitation, once they were no longer under the Training School's supervision.  See Complaint ¶ 60, at 16-17.  A.M. alleges that Schaefer was aware, when she was designing and directing a policy to require the discharge of residents from aftercare without due process, that Training School personnel had done no discharge planning for aftercare residents, and had failed to make contact with residents before or after their discharge to assure their health and safety and to assure that they were not being abused or exploited.  See Complaint ¶ 59, at 16.  A.M. contends that Schaefer considered the fallout from the danger that such a policy posed to aftercare residents "to be merely a public relations issue, not a legal obstacle."  Complaint ¶ 61, at 17 (internal quotation marks omitted).  The Court finds that these allegations, which the Court must accept as true, shock the conscience and are sufficient to state a § 1983 claim against the Individual DOH Defendants for violating A.M.'s substantive due-process rights.

### B.    THE STATE-CREATED DANGER EXCEPTION DOES NOT APPLY.

The state-created danger exception does not apply.  The Tenth Circuit first recognized the danger-creation exception in Graham v. Independent School District No. I-89, 22 F.3d 991 (10th

Cir. 1994), by relying on the Supreme Court's statement in DeShaney that, "[w]hile the State may have been aware of the dangers that [the child] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them."  Graham v. Indep. Sch. Dist. No. I-89, 22 F.3d at 995 (quoting DeShaney, 489 U.S. at 201)(internal quotation marks omitted).

In Graham v. Independent School District No. I-89, two mothers alleged that public school officials breached a constitutional duty to protect their sons from other students' violent acts.  See 22 F.3d at 992-93.  The Tenth Circuit, in an opinion that the Honorable John P. Moore, United States Circuit Judge for the Tenth Circuit, authored, and Judges Ebel and the Honorable Kathryn H. Vratil, United States District Judge for the District of Kansas, sitting by designation, joined, explained that,  by negative implication, DeShaney "leaves the door open for liability where the state creates a dangerous situation for citizens in the free world or renders them more vulnerable to danger."  22 F.3d at 995 (internal quotation marks omitted).  After recognizing the danger-creation exception, Judge Moore affirmed the district court's dismissal of the complaint, because it failed to allege "affirmative actions by the defendants that created or increased the danger to the victims."  22 F.3d at 995.  Judge Moore explained that "[t]his state-created danger doctrine necessarily involves affirmative conduct on the part of the state in placing the plaintiff in danger."  22 F.3d at 995 (internal quotation marks omitted).  Judge Moore added: "[I]naction by the state in the face of a known danger is not enough to trigger the obligation" unless the State has "limited in some way the liberty of a citizen to act on his own behalf."  22 F.3d at 995 (internal quotation marks omitted).

The Tenth Circuit has used a six-part test to determine whether the danger-creation exception applies:

When a plaintiff alleges a danger was created by the defendant, the plaintiff must demonstrate that 1) plaintiff was a member of a limited and specifically definable group; 2) defendant's conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; 3) the risk was obvious or known; 4) defendant acted recklessly in conscious disregard of that risk; . . . 5)  such conduct when viewed in total, is conscience shocking[;] and 6) defendant . . .  created the danger or increased the plaintiff's vulnerability to the danger in some way.

Gray v. Univ. of Colo. Hosp. Auth., 672 F.3d 909, 920 (10th Cir. 2012)(Baldock, J., joined by Briscoe and Holmes, JJ.)(alterations in original)(citation omitted)(internal quotation marks omitted).  Moreover, in Schwartz v. Booker, in an opinion that the Honorable Mary B. Briscoe, Chief United States Circuit Judge for the Tenth Circuit, authored, and Judges Gorsuch and Matheson joined, the Tenth Circuit stated that "affirmative conduct by the state actor and a private act of violence are preconditions to application of this exception."  702 F.3d at 580 n.4 (citing Gray v. Univ. of Colo. Hosp. Auth., 672 F.3d at 928).

In Gray v. University of Colorado Hospital Authority, in an opinion that the Honorable Bobby R. Baldock, United States Circuit Judge for the Tenth Circuit authored, and Chief Judge Briscoe and Judge Holmes joined, stated that

a private act must directly cause the victim's harm before we even so much as consider the state-created danger theory.  . . .  But not just any private act will suffice.  The private act must be a violent one.  Black's defines violence as, among other things, "physical force unlawfully exercised with the intent to harm."  Black's Law Dictionary 1705 (9th ed. 2009).

Gray v. Univ. of Colo. Hosp. Auth., 672 F.3d at 928-30 (emphasis in original)(citations omitted).  Judge Baldock further stated that the Tenth Circuit's case law "is entirely consistent with the principle that a private act of violence is a necessary precondition to our application of the state-created danger theory."  Gray v. Univ. of Colo. Hosp. Auth., 672 F.3d at 928 n.16 (citing, e.g., Graham v. Indep. Sch. Dist. No. I-89, 22 F.3d at 993 (stabbing; shooting/murder);  Uhlrig v. Harder, F.3d at 571 (murder);  Liebson v. N.M. Corr. Dept., 73 F.3d 274, 275 (10th Cir.

1996)(kidnapping/sexual assault); <u>Seamons v. Snow</u>, 84 F.3d 1226, 1230 (10th Cir. 1996)(hazing); <u>Radecki v. Barela</u>, 146 F.3d 1227, 1228 (10th Cir. 1998)(murder); <u>Armijo ex rel. Chavez v. Wagon Mound Pub. Sch.</u>, 159 F.3d at 1257 (self-inflicted gunshot/suicide); <u>Martinez v. Uphoff</u>, 265 F.3d 1130, 1132 (10th Cir. 2001)(murder); <u>Johnson ex rel. Estate of Cano v. Holmes</u>, 455 F.3d at 1135 (child abuse/homicide)).

The state-created danger exception does not apply. Although the allegations in the Complaint satisfy the Tenth Circuit's six-part test, and one of the Tenth Circuit's two preconditions to applying the state-created danger exception -- affirmative conduct by the state actor -- the lack of any facts alleging that M. Evans was physically violent towards A.M., however, dooms her state-created danger claim. A.M. was a member of a limited and specifically definable group: developmentally disabled individuals involuntarily committed to state custody. By placing A.M. with a private unlicensed third party who had no training or experience caring for developmentally disabled individuals, and abandoning her there, the Individual DOH Defendants' conduct put A.M. at "substantial risk of serious, immediate, and proximate harm." <u>Gray v. Univ. of Colo. Hosp. Auth.</u>, 672 F.3d at 920. This risk was "obvious or known," <u>Gray v. Univ. of Colo. Hosp. Auth.</u>, 672 F.3d at 920, because the Individual DOH Defendants placed A.M. with an unlicensed, untrained, and inexperienced individual despite knowing that A.M. could not care for herself, make important decisions for herself, or protect her own rights and interests. The Individual DOH Defendants acted "recklessly in conscious disregard of that risk," <u>Gray v. Univ. of Colo. Hosp. Auth.</u>, 672 F.3d at 920, because they not only failed to ensure her safety, but also designed and directed a plan that guaranteed she would be given to an unlicensed, untrained, and inexperienced stranger without ever checking up on her or ensuring or safety or well-being. As explained previously, the facts alleged in the

Complaint -- that the Individual DOH Defendants designed and executed a plan to transfer A.M. and other similarly situated developmentally disabled individuals who the Individual DOH Defendants knew were unable to care for themselves, to unlicensed, untrained, inexperienced, private third parties and abandon them there are conscience shocking.  These facts also indicate that the Individual DOH Defendants actions "created that danger," <u>Gray v. Univ. of Colo. Hosp. Auth.</u>, 672 F.3d at 920, which A.M. experienced and constituted affirmative conduct. Consequently, the Individual DOH Defendants' conduct satisfies the six-part test for the state-created danger exception and one of the Tenth Circuit's two prerequisites for that exception. Because the Complaint fails to allege that M. Evans was physically violent towards A.M., however, the state-created danger exception does not apply.

Even if the exception applied, qualified immunity would bar A.M.'s state-created danger exception claim, because the exception's application in this context has not been clearly established.  To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right.  <u>See</u> <u>Casey v. W. Las Vegas Indep. Sch. Dist.</u>, 473 F.3d at 1327.  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  <u>Lobozzo v. Colo. Dep't of Corr.</u>, 429 F. App'x at 710 (quoting <u>Zweibon v. Mitchell</u>, 720 F.2d at 172-73).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  <u>Currier v. Doran</u>, 242 F.3d at 923.  On the other hand, the Supreme Court has observed that it is generally not necessary to find

a controlling decision declaring the "very action in question . . . unlawful."  Anderson v. Creighton, 483 U.S. at  640.  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202). A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts."  Pierce v. Gilchrist, 359 F.3d at 1298.

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  Ashcroft v. al-Kidd, 131 S. Ct. at 2083.  "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'"  Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 131 S. Ct. at 2083).

The Court has been unable to find either a Supreme Court or Tenth Circuit case applying the state-created danger exception to developmentally disabled individuals, children in foster care, or any individual in state custody.  Accordingly, even if the state-created danger exception applied, qualified immunity would bar A.M.'s claims.

## II.   A.M.'S   SUBSTANTIVE   DUE-PROCESS   RIGHTS   WERE   CLEARLY ESTABLISHED WHEN THE SUPREME COURT DECIDED <u>YOUNGBERG V. ROMEO</u>.

A.M.'s substantive due-process rights to treatment and safety were clearly established in 1982. To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right.  <u>See</u> <u>Casey v. W. Las Vegas Indep. Sch. Dist.</u>, 473 F.3d at 1327.  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  <u>Lobozzo v. Colo. Dep't of Corr.</u>, 429 F. App'x at 710 (quoting <u>Zweibon v. Mitchell</u>, 720 F.2d at 172-73).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  <u>Currier v. Doran</u>, 242 F.3d at 923.  On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful."  <u>Anderson v. Creighton</u>, 483 U.S. at  640.  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  <u>Holland ex rel. Overdorff v. Harrington</u>, 268 F.3d at 1186 (alteration in original)(quoting <u>Saucier v. Katz</u>, 533 U.S. at 202). A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts."  <u>Pierce v. Gilchrist</u>, 359 F.3d at 1298.

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 131 S. Ct. at 2083. "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 131 S. Ct. at 2083). "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639. "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 131 S. Ct. at 2084. The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit held in Kerns v. Bader that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference." 663 F.3d at 1188 (emphasis in original). In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification." 663 F.3d at 1183 (emphasis added).

- 90 -

In 1977, the Supreme Court held that the right to personal security is a "historic liberty interest" that the Due Process Clause substantively protects.  Ingrham v. Wright, 430 U.S. 651, 673 (1977).  Five years later, in 1982, the Supreme Court stated that, "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed -- who may not be punished at all -- in unsafe conditions." Youngberg v. Romeo, 457 U.S. at 316.

In Yvonne L. v. New Mexico Department of Human Services, the Tenth Circuit stated that "in 1982 it was established that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."  959 F.2d at 891.  In that case, the plaintiff alleged § 1983 claims on behalf of two children committed to HSD's legal custody -- Yvonne L. and Demond L.  959 F.2d at 885.  HSD placed the children with Child Haven, Inc., "a not-for-profit corporation which operated a foster care and shelter care facility for children."  959 F.2d at 885.  While Yvonne and Demond were at Child Haven, another minor resident of Child Haven allegedly sodomized and raped Yvonne and verbally threatened Demond.  See 959 F.2d at 885. The plaintiff alleged that HSD and numerous HSD employees violated the children's substantive due-process rights when they placed the children "in a foster shelter home that was unsafe due to inadequate staffing and supervision, and failure to screen and isolate children posing a threat to others."  959 F.2d at 890.  The district court concluded that the defendants were entitled to qualified immunity, because it was not "clearly established in August 1985 that public officials who place a child, who is in State legal custody, in a foster home, in which the child is at risk of violence from private individuals, violates the child's Fourteenth Amendment due process rights."  959 F.2d at 890.  The Tenth Circuit, in an opinion that the Honorable James K. Logan,

United States Circuit judge for the Tenth Circuit, authored, and Judges Moore and Seymour,

joined, disagreed.  See 959 F.2d at 891.

      Judge Logan explained:

> Decisions from at least three circuits explicitly support plaintiffs' assertion of a
> clearly established right to reasonable safety while in foster care.  The leading and
> earliest circuit-level case is Doe v. New York City Dep't of Social Servs., 649
> F.2d 134 (2d Cir. 1981).  In Doe, the Second Circuit squarely held that a child in
> state custody has a constitutional right not to be placed in a foster care setting
> known to be unsafe.  Id. at 141.  Likewise, the Eleventh Circuit, in Taylor ex rel.
> Walker v. Ledbetter, 818 F.2d 791 (11th Cir. 1987)(en banc) . . . held "that a
> child involuntarily placed in a foster home is in a situation so analogous to a
> prisoner in a penal institution and a child confined in a mental health facility that
> the foster child may bring a section 1983 action for violation of fourteenth
> amendment rights."  Id. at 797 (applying the law to a 1982 incident).
>
>       Finally, the Seventh Circuit, in K.H. ex rel. Murphy v. Morgan, 914 F.2d
> 846 (7th Cir. 1990), relying upon Youngberg and Doe, found a constitutional
> "right not to be placed with a foster parent who the state's caseworkers and
> supervisors know or suspect is likely to abuse or neglect the foster child," id. at
> 853, was clearly established in 1986.  In Morgan, the state placed a plaintiff in a
> series of foster homes and failed "to take steps to prevent the child from
> deteriorating physically or psychologically as a result of either mistreatment by
> one or more sets of foster parents or the frequency with which the child is moved
> about within the foster-home system or, as in this case both."  Id. at 851.  The
> court stated: "[i]t should have been obvious from the day Youngberg was decided
> that a state could not avoid the responsibilities which that decision had placed on
> it merely by delegating custodial responsibility to irresponsible private persons."
>
> . . . .
>
>       We believe a juvenile detention case in our circuit decided in 1982,
> Milonas v. Williams, 691 F.2d 931 (10th Cir. 1982), supports a clearly established
> right to protection while in foster care.  In Milonas, we held that juveniles
> involuntarily placed in a private school by state agencies or courts had liberty
> interests protected by the Due Process Clause of the Fourteenth Amendment;
> specifically, "[s]uch [a] person has the right to reasonably safe conditions of
> confinement."  Id. at 942.  The Supreme Court decision in Youngberg, our
> decision in Milonas, and the Second Circuit decision in Doe all were decided
> before August 1985.

Yvonne L. v. N.M. Dep't of Human Servs., 959 F.2d at 891.

The Court agrees with the Honorable Richard J. Posner, United States Circuit Judge for the Seventh Circuit, that "[i]t should have been obvious from the day Youngberg was decided that a state could not avoid the responsibilities which that decision had placed on it merely by delegating custodial responsibility to irresponsible private persons." K.H. ex rel. Murphy v. Morgan, 914 F.2d at 851. If Youngberg v. Romeo clearly established such a right for foster care children in 1982, it certainly clearly established such a right for developmentally disabled individuals, because such individuals provided the basis for the Supreme Court's holding in Youngberg v. Romeo.

In the Court's view, Youngberg v. Romeo clearly established that, when the state involuntarily commits a developmentally disabled individual to state custody, it makes a promise to that individual's family and friends that it will stand in their stead, and take responsibility for his or her health and safety. Indeed, the promise of these protections is the primary justification for the significant infringement of fundamental liberty interests that the involuntary commitment of developmentally disabled individuals entails. Accordingly, on June 18, 1982, Youngberg v. Romeo put the state and its agents on notice that they had to provide substantive due-process protections to all developmentally disabled individuals involuntarily committed to state custody -- regardless of their physical location. The Individual DOH Defendants could not neglect these responsibilities by leaving a developmentally disabled individual with an unlicensed private third party.

The Individual DOH Defendants point out that, in Schwartz v. Booker, in an opinion that Chief Judge Briscoe wrote, and Judges Gorsuch and Matheson joined, the Tenth Circuit recognized that the special-relationship exception originated in the Supreme Court's decision in DeShaney. MTD at 8 (citing Schwartz v. Booker, 702 F.3d at 580). In the Individual DOH

Defendants' view, therefore, A.M.'s substantive due-process rights could not have been clearly established before that point.  The Court disagrees for two reasons.  First, in Schwartz v. Booker itself, Chief Judge Briscoe held that it was clearly established before DeShaney that foster care children are entitled to substantive due-process protections.  See 702 F.3d at 588.  Although the alleged unconstitutional conduct in that case occurred in 2007, Chief Judge Briscoe cited both J.W. v. Utah, 647 F.3d 1006, 1011 (10th Cir. 2011)(McKay, J., joined by Murphy and O'Brien, JJ.), and Yvonne L. ex rel. Lewis v. New Mexico Department of Health and Human Services, 959 F.2d at 885, for the proposition that "the constitutional right of foster children to be kept reasonably safe from harm has been clearly established since at least 1985."  Schwartz v. Booker, 702 F.3d at 587.  Second, in DeShaney, Chief Justice Rehnquist explicitly traced the special-relationship exception to Youngberg v. Romeo and its predecessors.  Chief Justice Rehnquist stated:

> It is true that in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals.  In Estelle v. Gamble, 429 U.S. 97 (1976), we recognized that the Eighth Amendment's prohibition against cruel and unusual punishment, made applicable to the States through the Fourteenth Amendment's Due Process Clause, Robinson v. California, 370 U.S. 660 (1962), requires the State to provide adequate medical care to incarcerated prisoners.  We reasoned that because the prisoner is unable "'by reason of the deprivation of his liberty [to] care for himself," it is only "just" that the State be required to care for him.  Ibid.

> In Youngberg v. Romeo, 457 U.S. 307 (1982), we extended this analysis beyond the Eighth Amendment setting, holding that the substantive component of the Fourteenth Amendment's Due Process Clause requires the State to provide involuntarily committed mental patients with such services as are necessary to ensure their "reasonable safety" from themselves and others.  Id., at 314-325; see id., at 315, 324 (dicta indicating that the State is also obligated to provide such individuals with "adequate food, shelter, clothing, and medical care").  As we explained: "If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional [under the Due Process Clause] to confine the involuntarily committed -- who may not be punished at all -- in unsafe conditions."  Id., at 315-316.

But these cases afford petitioners no help.  Taken together, they stand only for the proposition that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.  See Youngberg v. Romeo, 457 U.S., at 317 ("When a person is institutionalized -- and wholly dependent on the State[,] . . . a duty to provide certain services and care does exist").

DeShaney, 489 U.S. at 198-200 (alterations in DeShaney)(citations omitted).  Consequently, rather than announcing -- or even expanding -- the special-relationship exception, DeShaney indicates that the exception originated with the Supreme Court's decision in Youngberg v. Romeo.  In short, although a cherry-picked line from Chief Judge Briscoe's opinion in Schwartz v. Booker may indicate at first blush that A.M.'s substantive due-process rights were not clearly established until 1989, both the Tenth Circuit's holding in that case and Chief Justice Rehnquist's opinion in DeShaney indicate that the Supreme Court clearly established those rights in 1982 with its decision in Youngberg v. Romeo.

Because A.M. has established that the Individual DOH Defendants violated her substantive due-process rights and those rights were clearly established, the Court will deny the Individual DOH Defendants' motion to dismiss A.M.'s substantive due-process claims for the Individual DOH Defendants' actions after June 18, 1982.  The Court will grant the Individual DOH Defendants' motion to dismiss A.M.'s substantive due-process claims for the Individual DOH Defendants' actions before June 18, 1982.

## III.   THE EXTRAORDINARY CIRCUMSTANCES EXCEPTION DOES NOT APPLY.[13]

Even if a public official's actions violated clearly established law, qualified immunity would still bar suit "if the official [who is] pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard." Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982).  The Tenth Circuit, in an opinion that the Honorable William J. Holloway, Jr., authored, and Judges Anderson and Seymour joined, explained the "extraordinary circumstances" exception as follows:

> As its name suggests, the "extraordinary circumstances" exception to the rule that a qualified immunity defense fails where the defendant violated a clearly established right applies only rarely.  The circumstances must be such that the defendant was so "prevented" from knowing that his actions were unconstitutional that he should not be imputed with knowledge of a clearly established right.  And, proving such a defense is the burden of the defendant relying on it.

Cannon v. City & Cnty. of Denver, 998 F.2d 867, 874 (10th Cir. 1993).

A defendant's reliance upon legal advice may fall within the "extraordinary circumstances" exception.   V-1 Oil Co. v. State of Wyo. Dept. of Envtl.

---

[13]The Court concludes that analyzing the extraordinary circumstances exception's applicability is inappropriate at the motion-to-dismiss stage.  The exception turns on the defendant's subjective knowledge -- i.e., whether the "official [who is] pleading the defense . . . can prove that he neither knew nor should have known of the relevant legal standard." Harlow v. Fitzgerald, 457 U.S. at 818-19.  At a minimum, such a determination would require the Court to go beyond the Complaint's allegations and consider evidence -- e.g., interrogatories, depositions, affidavits -- in which the defendant-official explains how he or she neither knew nor should have known the relevant legal standard.  The Court would also likely have to consider the plaintiff's evidence offered in rebuttal.  Consequently, conducting such an analysis at the motion to dismiss stage would run afoul of the Tenth Circuit's instruction that a district court's "function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." Sutton v. Utah State Sch. for the Deaf & Blind, 173 F.3d at 1236.  Although this rule is subject to three exceptions, none apply here.  Accordingly, the Court holds that such an analysis is inappropriate at the motion-to-dismiss stage.  For the sake of completeness of this substantive due-process analysis, however, the Court will determine whether the exception applies based on the Complaint's allegations and on the Oct. 17, 1979, Order.

Quality, 902 F.2d 1482, 1488 (10th Cir. 1990).  A determination whether legal advice given to a defendant constitutes "extraordinary circumstances" depends upon the circumstances of each case.  Cannon v. City & Cnty. of Denver, 998 F.2d at 874.  The factors relevant to determining when legal advice satisfies the extraordinary circumstances exception include: (i) "how unequivocal, and specifically tailored to the particular facts giving rise to the controversy, the advice was"; (ii) "whether complete information had been provided to the advising attorney[s]"; (iii) the "prominence and competence of the attorney[s]"; and (iv) "how soon after the advice was received the disputed action was taken."  V-1 Oil Co. v. State of Wyo. Dept. of Envtl. Quality, 902 F.2d at 1489.

The Individual DOH Defendants point out that A.M. was discharged to the Homestead House pursuant to "State District Court Order No. 1/387-388 filed on October 17, 1979 in Case No. CV-SQ-00095-79, Twelfth Judicial District, County of Lincoln."  MTD at 11.  The Individual DOH Defendants urge that, if a state district court judge authorized A.M.'s transfer to the Homestead House, the Individual DOH Defendants "could not possibly be imputed with knowledge that they were violating a constitutional right."  MTD at 12.  The Court disagrees for three reasons.

First, although the Court has taken judicial notice of the Oct. 17, 1979, Order -- and its contents -- the Court is otherwise limited to the allegations in the Complaint in deciding the MTD.  See Sutton v. Utah State Sch. for the Deaf & Blind, 173 F.3d at 1236 (explaining that a district court's "function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted").  There is no indication in the Complaint that the Individual DOH Defendants relied on the Oct. 17, 1979, Order in transferring

A.M. to the Homestead House.  To the contrary, the Complaint alleges A.M.'s transfer to the Homestead House "was without legal authority," Complaint ¶ 78, at 20, that the Individual DOH Defendants retained legal custody over A.M. even after her transfer to the Homestead House, see Complaint ¶ 12, at 5, that aftercare residents "were still somehow attached to the facility," and that the Training School remained "obligated to provide care for" aftercare residents, Complaint ¶ 39, at 11 (internal quotation marks omitted).

Second, even if the Court considered evidence in the record in deciding the MTD, there is no evidence that -- far from relying on the Oct. 17, 1979, Order -- the Individual DOH Defendants were even aware of it.  Third, even if the Court considered evidence in the record, and, even if there were evidence indicating that the Individual DOH Defendants relied on the Oct. 17, 1979, Order in transferring A.M., such reliance would not have "so prevented [them] from knowing that [their] actions were unconstitutional that [they] should not be imputed with knowledge of a clearly established right."  Cannon v. City & Cnty. of Denver, 998 F.2d at 874.

The Oct. 17, 1979, Order reads, in pertinent part:

4.    Respondent has a developmental disability which is so greatly disabling that residential habilitation is in her best interest;

5.    Respondent's habilitation at Fort Stanton Hospital and Training School is not consistent with the least drastic means principle as respondent could benefit from a less restrictive setting such as a community based group home;

6.    Placement in a community based program for persons with developmental disabilities is not presently available for respondent.

IT IS ORDERED

That respondent be and hereby is committed to Fort Stanton Hospital and Training School for residential habilitation for a period not to exceed six months;

IT IS FURTHER ORDERED

- 98 -

> That during the period of extended residential habilitation petitioner shall make application to less restrictive programs on behalf of respondent and shall make every effort to transfer respondent to a less restrictive setting. At the expiration of this order petitioner shall report to this Court concerning its progress toward releasing respondent if further confinement at Fort Stanton Hospital is sought.

Oct. 17, 1979, Order.

This order did not authorize the Individual DOH Defendants to transfer A.M. to a private, unlicensed group shelter for elderly people. It did not authorize the Individual DOH Defendants to transfer A.M. to a setting where none of the employees had the necessary training or experience to care properly for A.M. It did not authorize the Individual DOH Defendants to cut off A.M.'s: (i) social services, Medicaid benefits, and social security benefits; (ii) adequate medical, dental and psychological care; (iii) rehabilitative, educational, and vocational services; and (iv) day habilitation or therapy. It did not authorize the Individual DOH Defendants to facilitate transferring A.M.'s social security checks to M. Evans. It did not authorize the Individual DOH Defendants to abandon A.M. in M. Evans' custody -- never conducting home visits or calling to check up on her. Perhaps most significantly, it did not rescind the original court order committing A.M. to state custody. To the contrary, the Oct. 17, 1979, Order indicated that A.M. had "a developmental disability which is so greatly disabling that residential habilitation is in her best interest." Oct. 17, 1979, Order at 1. It ordered the state to apply to less restrictive programs on her behalf and "make every effort to transfer [her] to a less restrictive setting." Oct. 17, 1979, Order at 1. Consequently, even if the Court assumes that the Individual DOH Defendants relied on the Oct. 17, 1979, Order in transferring A.M. to the Homestead House, such reliance does not fall within the extraordinary circumstances exception.

**IT IS ORDERED** that the Individual DOH Defendants' Motion to Dismiss Plaintiff's Substantive Due Process Claim on the Basis of Qualified Immunity, filed March 6, 2014

(Doc. 22)("MTD"), is granted as to the Individual DOH Defendants' conduct before June 18, 1982, and denied as to the Individual DOH Defendants' conduct after June 18, 1982.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

John Ford Hall
Kelly K. Waterfall
Law Offices of Peter Cubra
Albuquerque, New Mexico

--and--

Nancy L. Simmons
Law Offices of Nancy L. Simmons, P.C.
Albuquerque, New Mexico

  *Attorneys for the Plaintiff*

Stephen S. Hamilton
Alexia Constanteras
Montgomery & Andrews, P.A.
Albuquerque, New Mexico

  *Attorneys for Defendants*