# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

A.M., through her Guardian ad Litem,
JOLEEN YOUNGERS,

     Plaintiff,

vs.                                     No. CIV 13-0692 JB/WPL

NEW MEXICO DEPARTMENT OF
HEALTH; LOS LUNAS CENTER FOR
PERSONS WITH DEVELOPMENT
DISABILITIES; ROGER ADAMS,
individually and in his capacity as an
agent for the New Mexico Department of
Health; BETH SCHAEFER, individually
and in her capacity as an agent for the
New Mexico Department of Health; DAN
SANDOVAL, individually and in his
capacity as an agent for the New Mexico
Department of Health; JOSEPH MATEJU,
individually and in his capacity as an
agent for the New Mexico Department of
Health; NEW MEXICO AGING AND
LONG-TERM SERVICES DEPARTMENT;
and THE ADULT PROTECTIVE SERVICES
DIVISION OF NEW MEXICO AGING AND
LONG-TERM SERVICES DEPARTMENT,

     Defendants.

## MEMORANDUM OPINION[1]

**THIS MATTER** comes before the Court on the Individual DOH Defendants' Motion to

Dismiss Plaintiff's Thirteenth Amendment Claim and Supporting Memorandum, filed March 6,

---

[1]On March 12, 2015, the Court entered an order granting the request in the Individual
DOH Defendants' Motion to Dismiss Plaintiff's Thirteenth Amendment Claim and Supporting
Memorandum, filed March 6, 2014 (Doc. 22). See Order, filed March 12, 2015 (Doc.
81)("Order"). In the Order, the Court said that it "will . . . at a later date issue a memorandum
opinion more fully detailing its rationale for this decision." Order at 1. This Memorandum
Opinion is the promised opinion.

2014 (Doc. 22)("MTD").  The Court held a hearing on October 23, 2014.  The primary issues are: (i) whether Defendants Dan Sandoval, Roger Adams, Joseph Mateju, and Beth Schaefer (collectively "Individual DOH Defendants") violated Plaintiff A.M.'s right to be free from involuntary servitude under the Thirteenth Amendment to the Constitution of the United States of America when they transferred Plaintiff A.M. to the Homestead House, a private, unlicensed group shelter for elderly people; and, (ii) whether qualified immunity protects the Individual DOH Defendants.  The Court will grant the MTD because the Individual DOH Defendants are entitled to qualified immunity.  The Court concludes that: (i) the work that M. Evans forced A.M. to perform constituted involuntary servitude in violation of the Thirteenth Amendment to the United States; (ii) the Individual DOH Defendants proximately caused M. Evans' violation of A.M.'s Thirteenth Amendment right to be free from involuntary servitude; and (iii) the Individual DOH Defendants are entitled to qualified immunity, because proximate causation for Thirteenth Amendment violations was not clearly established in 1979.  Consequently, the Court will grant the MTD.

## FACTUAL BACKGROUND

The Court takes its facts from the Complaint, as it must when considering a motion to dismiss for failure to state a claim under rule 12(b)(6) of the Federal Rules of Civil Procedure. The Court has reorganized the factual material in the Complaint, however, to explain the facts more clearly.

### 1.    The Parties.

A.M. is a sixty-six-year-old woman who has been diagnosed with various developmental disabilities.  See Complaint ¶ 66, at 18.  A.M. was involuntarily committed to the New Mexico Department of Health ("DOH") by court order on May 8, 1963, when she was sixteen years old,

because her developmental disabilities rendered her unable to care for herself.  See Complaint ¶¶ 67-69, at 18-19.  Because of her disabilities, A.M. brings this action through her guardian ad litem, Joleen Youngers.  See Complaint ¶ 66, at 18.

The DOH operates all of the facilities that house and treat people with developmental disabilities in the State of New Mexico.  See Complaint ¶ 8, at 4.  One of these facilities is the Los Lunas Center for Persons with Developmental Disabilities -- formerly known as the Los Lunas Hospital and Training School ("Los Lunas Hospital").  Complaint ¶ 8, at 4.  The Fort Stanton Hospital and Training School ("Fort Stanton") was another DOH facility for individuals with developmental disabilities, and was an affiliate of the Los Lunas Hospital.  Complaint ¶¶ 8-9, at 4.  Because the Complaint refers to the Los Lunas Hospital and Fort Stanton collectively as the "Training School," the Court will do so throughout this Memorandum Opinion ("MO").  Complaint ¶ 1, at 1-2; id. ¶ 11, at 4-5.  Moreover, because the Complaint refers to the DOH and the Training School collectively as "the DOH Defendants," the Court will do so throughout this MO.  Complaint ¶ 11, at 4

Before 1992, the New Mexico Human Services Department ("HSD") was responsible for operating Adult Protective Services ("APS")[2] in New Mexico.  Complaint ¶ 22, at 8.  APS is responsible for protecting adults with developmental disabilities from exploitation, abuse, and neglect.  See Complaint ¶ 22, at 8.  APS must also ensure that those adults receive the treatment and social services that they need.  See Complaint ¶ 22, at 8.  From 1992 to 2005, the New Mexico Children Youth and Families Department ("CYFD") inherited HSD's responsibilities for

---

[2]Because the Complaint refers to the Adult Protective Services Division of New Mexico Aging and Long-Term Services Department, the Adult Protective Services Division of the New Mexico Children Youth and Families Department, and the Adult Protective Services of the New Mexico Human Services Department, collectively, as "APS," the Court will do so throughout this MO.  Complaint ¶ 26, at 9.

all protective services in the state, including APS.  Complaint ¶ 23, at 8.  CYFD was responsible for the continuing coordination and supervision of APS, for adopting rules and regulations necessary to implement and operate APS, and for evaluating APS' effectiveness.  See Complaint ¶ 23, at 8.  In 2005, the New Mexico Aging and Long-Term Services Department ("ALTSD") inherited APS from CYFD, and has since then operated APS.  Complaint ¶ 24, at 8-9.  Similar to its predecessors, the ALTSD is responsible for the continuing coordination and supervision of APS, for adopting rules and regulations necessary to implement and operate APS, and for evaluating APS' effectiveness.  See Complaint ¶ 25, at 9.  Because the Complaint refers to the ALTSD, APS, and the DOH Defendants as the "State Agency Defendants," the Court will do so throughout this MO.  Complaint ¶ 27, at 9.

Schaefer was an attorney for the DOH and the Training School from September 13, 1976, to December 31, 2001.  See Complaint ¶ 14, at 5.  Sandoval was the Director of Resident Living for the Training School between 1979 and 1985.  See Complaint ¶ 16, at 5.  As Director of Resident Living, Sandoval was in charge of social services and the Training School's social workers.  See Complaint ¶ 45, at 12.  Sandoval was also a member of the Training School's Screening Committee on Admissions and Releases ("SCAR") and, at times, its chairman.  Complaint ¶ 16, at 6.

Defendant Roger Adams was the Training School's Deputy Administrator or Acting Administrator "during the relevant time period."[3]  Complaint ¶ 18, at 6.  Adams made hundreds of decisions regarding the placement and treatment of Training School residents -- including the Training School's placement and discharge decisions relating to A.M.  See Complaint ¶ 18, at 6.  Adams chaired SCAR, attended most SCAR meetings, and approved A.M.'s discharge from

_____

[3]The Complaint does explain in any further detail when Adams served in his position at the Training School.

- 4 -

aftercare without taking any steps to ascertain whether she would be safe or have her medical and other needs met.  See Complaint ¶ 18, at 6.

Defendant Joseph Mateju was the Training School Administrator "during the relevant time period."[4]  Complaint ¶ 20, at 7.  As Administrator, he made the final decisions regarding the placement and treatment of Training School residents, and all placement and discharge decisions relating to A.M.  See Complaint ¶ 20, at 7.  He also had the authority to unilaterally accept and remove individuals from the Training School.  See Complaint ¶ 20, at 7.  Mateju was responsible for the placement of many residents -- including A.M. -- into third-party homes, boarding homes, and other outside facilities.  See Complaint ¶ 20, at 7.  Mateju personally attended SCAR meetings during which A.M. was discussed, and he personally approved decisions regarding her discharge from DOH treatment without taking any steps to ascertain whether she would be safe or have serious medical and other needs addressed.  See Complaint ¶ 20, at 7.  Mateju had responsibility for ensuring that appropriate measures were taken to: (i) provide for A.M.'s health, safety, and well-being; (ii) ensure that she received appropriate services; and (iii) ensure that A.M. continued to receive those services in any third-party placements.  See Complaint ¶ 20, at 7-8.

## 2.    **The Aftercare Program.**

Over a period of two decades -- through the 1970s and 1980s -- the DOH Defendants systematically transferred hundreds of developmentally disabled individuals from state institutions to various private third parties throughout New Mexico.  See Complaint ¶ 2, at 2; id. ¶ 37, at 10.  These private third parties ranged from boarding homes to private residences and commercial enterprises.  See Complaint ¶ 2, at 2.  The Defendants called this program

---

[4]The Complaint does explain in any further detail when Mateju served in his position at the Training School.

"aftercare"; the developmentally disabled individuals placed with third parties through the aftercare program were called "aftercare residents."  Complaint ¶ 2, at 2; id. ¶ 38, at 11.

The Defendants placed aftercare residents with private third parties "without anyone's informed consent, without the appointment of guardians or any other legally-authorized surrogate decision-makers, without permission from the courts that committed them to the state institutions . . . , and without due process of law. "  Complaint ¶ 3, at 2.  In some cases, the Defendants contacted ex parte the judicial authorities that had committed aftercare residents to the Training School and "provided misleading information to them concerning the status of individuals discharged from the Training School."  Complaint ¶ 3, at 2-3.  In other cases, the Defendants did not communicate with the judicial authorities that committed individuals to the Training School before transferring those individuals to private third parties.  See Complaint ¶ 3, at 2-3.

After transferring aftercare residents to their third-party placements, the DOH and the Individual DOH Defendants "abandoned" them.  Complaint ¶ 3, at 2.  The DOH and the Individual DOH Defendants neither provided them with the services that they needed, nor protected them from abuse, neglect, or exploitation.  See Complaint ¶ 3, at 2.  When the events alleged in the Complaint occurred, approximately eight social workers at the Training School oversaw 431 aftercare residents, "while also performing social work duties for hundreds of people still residing" at the Training School.  Complaint ¶ 48, at 13.  Although Training School policies required Training School personnel to oversee and conduct periodic visits of aftercare residents, the DOH Defendants "did not use any system to ensure that residents in aftercare would be safe or that they would receive minimally adequate services."  Complaint ¶ 43, at 12.

Sandoval, despite being charged with overseeing the Training School's social workers, "did not know of any guidelines on how residents in aftercare placements would be cared for, did not know of a system to follow up with those residents, and did not know of a system . . . to know how many residents were placed in private third-party placements."  Complaint ¶ 49, at 13. Sandoval did not know "what the conditions of the residents was" or "what services they needed."  Complaint ¶ 49, at 13.

Training School administrators -- including the Individual DOH Defendants -- were aware that the social workers assigned to oversee aftercare placements often did not visit aftercare residents in their third-party placements.  See Complaint ¶ 47, at 12.  They were aware that the social workers -- when they checked on the aftercare residents at all -- usually relied on telephone calls to the private third parties who administered the placements rather than an in-person contact.  See Complaint ¶ 47, at 12-13.  Training School administrators -- including Adams, Mateju, and Schaefer -- had frequent conversations about the problem of social workers' failure to make their required visits or to contact aftercare residents.  See Complaint ¶ 51, at 13-14.  The DOH Defendants and the Individual DOH Defendants were "well aware of the dangers residents faced due to the way in which the aftercare program was operated, but they proceeded anyway."  Complaint ¶ 52, at 14.

The "well-known failure" of the Training School's social workers to provide oversight for aftercare residents drove the DOH Defendants and the Individual DOH Defendants to "discharge"[5] Training School residents from aftercare "whenever and however possible."

---

[5]The Complaint does not explicitly define "discharge," but uses the word to describe: (i) the process of transferring a Training School resident to a private third party; and (ii) the process of removing an aftercare resident -- i.e., a former Training School resident who has already been placed with a private third party -- from "the rolls of Training School clients." Complaint ¶ 65, at 18.  Moreover, the Complaint does not clarify what it means for an aftercare

Complaint ¶ 53, at 14. Schaefer supervised changes to the Training School's discharge procedures in the late 1970s and early 1980s. See Complaint ¶ 55, at 14. Specifically, Schaefer told Training School administrators that "there were too many residents on aftercare" and recommended that the Training School discharge residents from aftercare. Complaint ¶ 54, at 14. Sometime between September 1978 and the end of 1980, Schaefer began advising that all aftercare residents should be discharged from the Training School "without judicial review and without any due process protections whatsoever." Complaint ¶ 57, at 15.

Schaefer told Training School administrators that "the state institutions' custody of people committed to the institution by court order automatically lapsed" on the New Mexico Mental Health Code's effective date of July 1, 1977, despite judicial orders of commitment for an indeterminate period. Complaint ¶ 56, at 15. Schaefer advised Training School administrators that a change in the Mental Health Code meant that the court orders committing aftercare residents to State custody were void -- regardless whether the residents' original placements with private third parties had been judicially reviewed. See Complaint ¶ 56, at 15.

---

resident to be removed from "the rolls of Training School clients." Complaint ¶ 65, at 18. The Complaint implies that the Defendants believed the Training School had no legal responsibility to oversee aftercare residents who had been removed from the Training School's rolls, or to provide them with any services or therapy. See, e.g., Complaint ¶ 61, at 17 ("Once there was a piece of paper in the file, residents could be . . . 'cut loose' from the Training School, without consideration of extant judicial orders, the health and safety of former residents, or the residents' need for services."); Complaint ¶ 63, at 17 ("Defendant Sandoval has admitted that he wouldn't know whether somebody was going to be taken care of after discharge from aftercare.")(internal quotation marks omitted). The Complaint also states, however, that "discharge from aftercare was not a complete separation of responsibility for residents . . . . Even after residents were discharged from aftercare, the Training School at times took action to respond to allegations of abuse then they came to their attention." Complaint ¶¶ 63-64, at 17-18 (internal quotation marks omitted). Consequently, where it is clear in the Complaint how A.M. is using the word "discharge," the Court will explain which form of "discharge" A.M. is using. Where it is unclear, the Court will quote directly from the Complaint to ensure that it is accurately portraying the facts as the Complaint alleges them. Where it is necessary to the Court's resolution of the MTD, the Court will resolve these ambiguities in its analysis.

Schaefer explained to Training School administrators and staff that "it's different now and you don't need a discharge order signed by a judge."  Complaint ¶ 61, at 17 (internal quotation marks omitted).

According to Schaefer, Training School administrators were "reluctant to proceed without a paper trail, so [she] instructed Defendant Adams to 'just put a note in . . . the file that says . . . [that the aftercare resident] was discharged.'"  Complaint ¶ 61, at 17 (alterations in Complaint).  Once there was a "piece of paper in the file," residents could be, in Schaefer's words, "cut loose" from the Training School without consideration of judicial orders, the residents' health and safety, or the residents' need for services.  Complaint ¶ 61, at 17.  Schaefer neither conducted legal research nor consulted legal experts in developing these new discharge policies.  See Complaint ¶ 56, at 15.

Schaefer acknowledged that former Training School residents were particularly vulnerable, and in danger of abuse and exploitation, once they were no longer under the Training School's supervision.  See Complaint ¶ 60, at 16-17.  Schaefer was aware when she designed and directed the new aftercare discharge policy that Training School personnel had not done any discharge planning for aftercare residents, and had failed to make contact with residents before or after their discharge, to assure their health and safety, and to assure that they were not being abused or exploited.  See Complaint ¶ 59, at 16.  Schaefer considered the fallout from the danger that such a policy posed to aftercare residents "to be merely a public relations issue, not a legal obstacle."  Complaint ¶ 61, at 17 (internal quotation marks omitted).

Under Schaefer's direction, Training School administrators "deliberately decided not to appoint surrogate decision-makers for its residents or to otherwise provide procedural due process" before removing residents' names from the Training School's rolls.  Complaint ¶ 57,

at 15.  "Training School residents were not even informed that they were no longer clients of the Training School."  Complaint ¶ 57, at 15.  Aftercare residents "were routinely removed from the rolls of Training School clients" based solely on letters that Mateju sent to the district attorney in the county where each resident was originally committed.  Complaint ¶ 65, at 18.  These letters did not "supply[] the background information necessary for discharge, including the circumstances of residents and whether the resident or a responsible adult consented to discharge."  Complaint ¶ 65, at 18.  Instead, judicial authorities were "misled into believing that residents consented to and were happy in their placements."  Complaint ¶ 65, at 18.

In Sandoval's view, "discharge from aftercare was not a complete separation of the Training School's responsibility for residents."  Complaint ¶ 63, at 17-18.  "Even after residents were discharged from aftercare, the Training School at times took action to respond to allegations of abuse when they came to their attention."  Complaint ¶ 64, at 18.  DOH Defendants and Individual DOH Defendants, however, "failed to establish any system permitting residents to complain about their treatment, or any system permitting the Training School to provide oversight at third-party placements."  Complaint ¶ 64, at 18.  The DOH Defendants and Individual DOH Defendants decided that discharging residents from aftercare eliminated the need for social worker visits.  See Complaint ¶ 51, at 13-14.  Sandoval has admitted that he "wouldn't know whether somebody was going to be taken care of after discharge from aftercare, and it never crossed his mind to be concerned that residents discharged from aftercare might be abused or neglected."  Complaint ¶ 63, at 17 (internal quotation marks omitted)(brackets omitted).

3.    **A.M.**

A court order committed A.M. to Fort Stanton or to another state institution on May 8, 1963, when she was sixteen years old.  See Complaint ¶ 66, at 18.  By 1967, either through transfer or continuing placement, A.M. was a Fort Stanton resident.  See Complaint ¶ 66, at 18. On November 12, 1979, the Defendants transferred A.M. to the Homestead House and "abandoned" her there as part of the aftercare program.  Complaint ¶ 73, at 20.  The Homestead House was a private, unlicensed group shelter for elderly people that M. Evans owned.  See Complaint ¶ 73, at 20.   A.M. did not know M. Evans before she was transferred to the Homestead House.  See Complaint ¶ 73, at 20.  The DOH Defendants' and the Individual DOH Defendants' transfer of A.M. from Fort Stanton to the Homestead House "was without legal authority."  Complaint ¶ 78, at 20.  A.M. was still in the DOH Defendants' and Individual DOH Defendants' legal custody after she was placed with M. Evans at the Homestead House.  See Complaint ¶ 12, at 5.

The Defendants allege, however, that A.M. was transferred to the Homestead House "pursuant to State District Court Order No. 1/387-388 filed on October 17, 1979 in Case No. CV-SQ-0095-79, Twelfth Judicial District, County of Lincoln" ("Oct. 17, 1979, Order").  MTD 1 at 2.  The Oct. 17, 1979, Order reads, in pertinent part:

1.    Respondent has a developmental disability which is so greatly disabling that residential habilitation is in her best interest;

2.    Respondent's habilitation at Fort Stanton Hospital and Training School is not consistent with the least drastic means principle as respondent could benefit from a less restrictive setting such as a community based group home;

3.    Placement in a community based program for persons with developmental disabilities is not presently available for respondent.

IT IS ORDERED

That respondent be and hereby is committed to Fort Stanton Hospital and Training School for residential habilitation for a period not to exceed six months;

IT IS FURTHER ORDERED

That during the period of extended residential habilitation petitioner shall make application to less restrictive programs on behalf of respondent and shall make every effort to transfer respondent to a less restrictive setting.   At the expiration of this order petitioner shall report to this Court concerning its progress toward releasing respondent if further confinement at Fort Stanton Hospital is sought.

Oct. 17, 1979, Order. [6]

---

[6]The Court will consider the Oct. 17, 1979, Order in analyzing the MTD.  The United States Court of Appeals for the Tenth Circuit has explained that a district court's "function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  Sutton v. Utah State Sch. for the Deaf & Blind, 173 F.3d 1226, 1236 (10th Cir. 1999).  There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322.  Because the Complaint does not refer to the Oct. 17, 1979, Order, neither of the first two exceptions apply.  The Court must, therefore, determine whether the third exception -- permitting courts to consider "matters of which a court may take judicial notice" -- applies.  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322.

A court may take judicial notice of an adjudicative fact that is both "not subject to reasonable dispute" and either: (i) "generally known within the territorial jurisdiction of the trial court"; or (ii) "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  Courts have taken judicial notice of state court orders' contents.  See Gary Alan Green & Broadway Sound & Video, Inc. v. Jackson, 36 F. App'x 663, 669-70 (2d Cir. 2002)(taking judicial notice of New York state court orders in an appeal from dismissal of claims pursuant to rule 12(b)(6)).  The Court determines that the accuracy of orders from the Twelfth Judicial District for the County of Lincoln "cannot reasonably be questioned" and the contents of the Oct. 17, 1979, Order are "not subject to reasonable dispute." Fed. R. Evid. 201(b).  Consequently, the Court will take judicial notice only of the Oct. 17, 1979, Order's contents without determining whether the Order authorized A.M.'s transfer to the Homestead House -- a point upon which the parties disagree.  In taking judicial notice of this fact, the Court notes that it does not affect the Court's resolution of the MTD.

Neither the Homestead House nor M. Evans was a licensed service provider for people with developmental disabilities.  See Complaint ¶ 73, at 20.  Neither M. Evans nor any Homestead House employee had the necessary training or experience to properly care for A.M., and M. Evans had no legal right to hold A.M.  See Complaint ¶¶ 76, 78, at 20.

A.M. lived with M. Evans for over thirty years.  See Complaint ¶ 85, at 23.  Although the Defendants retained legal control over A.M. after placing her at the Homestead House, neither the Defendants nor any of their agents checked on A.M. in any fashion.  See Complaint ¶¶ 77, at 21; id. ¶ 80, at 22.  Instead, the Defendants "cloak[ed] the Homestead House and Mary Evans with untoward authority and absolute control over Plaintiff, who was entirely dependent on this third-party placement for her day-to-day existence."  Complaint ¶ 77, at 21.

At the Homestead House, A.M. was "put to work."  Complaint ¶ 93, at 24-25 (internal quotation marks omitted).  Although A.M. performed housekeeping and other services at the Homestead House, M. Evans never compensated her for her work.  See Complaint ¶ 93, at 24-25.  M. Evans threatened A.M. if she did not work, emotionally abused A.M., and neglected her medical needs.  See Complaint ¶ 91, at 24; id. ¶ 96, at 25.  While in M. Evans' custody, A.M. did not receive social services; Medicaid and social security benefits; adequate medical, dental and psychological care; rehabilitative, educational and vocational services; or day habilitation and therapy.  See Complaint ¶ 85, at 23.  M. Evans stole A.M.'s social security checks for her own use and did not spend the funds for A.M.'s benefit.  See Complaint ¶ 94, at 25.  The Defendants facilitated the transfer of A.M.'s social security checks to M. Evans with deliberate indifference to whether M. Evans was using or intended to use the social security funds for A.M.'s benefit.  See Complaint ¶ 83, at 22.  The Individual DOH Defendants "were aware that Mary Evans intended to keep" A.M.'s federal benefits, "and force her to work in

return for a place to live, and approved the arrangement."  Complaint ¶ 95, at 25.  While at the Homestead House, A.M. was socially isolated and rarely allowed to leave.  <u>See</u> Complaint ¶ 87, at 23.

       The DOH transferred J.P., another developmentally disabled woman, to the Homestead House on the same day as A.M.'s transfer.  <u>See</u> Complaint ¶ 88, at 24.  While at the Homestead House, J.P. attempted to leave to find her children, from whom she had been separated.  <u>See</u> Complaint ¶ 88, at 24.  J.P. climbed over the wall and wandered the streets calling out for her children, and eventually either returned or was brought back to the Homestead House. <u>See</u> <u>id.</u> After this incident, Evans took J.P.'s shoes and planted cacti at the place where J.P. had climbed the wall to prevent her from escaping.  <u>See</u> <u>id.</u>  J.P. continued to try to escape.  <u>See</u> <u>id.</u>  At one point, J.P. jumped over the wall and landed in the cactus.  <u>See</u> <u>id.</u>  Through punishing J.P. for escaping, M. Evans made it clear to A.M. that she could prevent A.M. from leaving the Homestead House.  <u>See</u> Complaint ¶ 88, at 24.

       The State eventually shut down the Homestead House.  <u>See</u> Complaint ¶ 97, at 24.  When that occurred, A.M. was transferred to M. Evans' private residence -- also an unlicensed group shelter.  <u>See</u> Complaint ¶ 98, at 25.  A.M.'s transfer from the Homestead House was without either A.M.'s consent or, most likely, judicial authority.  <u>See</u> Complaint ¶ 98, at 25-26.  If judicial authority was obtained for A.M.'s transfer, "the presiding judge was misled by DOH Defendants and the individual Defendants concerning the circumstances of Plaintiff's removal to Mary Evans' private residence."  Complaint ¶ 98, at 26.

       In October, 1999, APS investigated allegations that M. Evans was physically neglecting A.M.  <u>See</u> Complaint ¶ 99, at 26.  APS found the allegations unsubstantiated.  <u>See</u> Complaint ¶ 99, at 26.  APS did not determine, however, whether M. Evans was paying A.M. for her labor,

whether M. Evans was properly accounting for A.M.'s federal benefits, why A.M. was not receiving any therapeutic services or medical or dental care, or why A.M. was kept isolated without any opportunity to socialize with others.  See Complaint ¶ 99, at 26.  APS' investigation consisted solely of interviews with M. Evans and/or other non-disabled persons, "rather than engaging in any meaningful conversation with [A.M.] concerning her condition or circumstances."  Complaint ¶ 99, at 26.

In or about October, 2004, APS received allegations that M. Evans and John Evans -- M. Evans' husband -- were physically abusing and exploiting A.M.  See Complaint ¶ 100, at 26.  APS received a report that M. Evans and J. Evans "were taking Plaintiff's social security money but were not caring for her, and that Plaintiff was emotionally abused."  Complaint ¶ 100, at 26.  The reports also alleged that the Evanses were abusing J.P.  See Complaint ¶ 100, at 26.  APS concluded that the Evanses had emotionally abused A.M., and stated that its report would be forwarded to the DOH and to law enforcement.  See Complaint ¶ 100, at 26.  The case remained open for eighteen months, but was ultimately closed as unsubstantiated, because APS found the report to be "malicious."  Complaint ¶ 101, at 26-27.  Again, APS did not engage in any meaningful conversation with A.M. before it closed its investigation.  See Complaint ¶ 101, at 27.

In 2006 or 2007, "the Governor's investigation identified AM and JP as two of the former Training School resident [sic] who had been illegally discharged from the Training School."  Complaint ¶ 102, at 27.  In March, 2008, "more than four years after DOH learned of the plight of former Training School residents, the DOH investigated Plaintiff's circumstances" as part of the Governor's investigation.  Complaint ¶ 106, at 28.  The DOH limited its investigation, however, to an interview of M. Evans -- it did not take into account the prior allegations of

abuse, interview A.M., or conduct an independent investigation of A.M.'s circumstances.  See Complaint ¶ 106, at 28.  That same month, APS in Grant County, New Mexico, also investigated A.M.'s circumstances after a caseworker at Fort Baynard reported that M. Evans was physically and emotionally abusing A.M.  See Complaint ¶ 106, at 28.  APS acknowledged that: (i) A.M. was developmentally disabled; (ii) A.M. had expressed fear of M. Evans; (iii) a psychiatrist had recommended that a guardian be appointed for A.M.; (iv) M. Evans' residence was an unlicensed facility; (v) A.M. had not seen a primary care physician in at least five years; and (vi) M. Evans never applied for disability benefits for A.M.  See Complaint ¶ 108, at 28.  Nonetheless, APS found the report unsubstantiated, declined to pursue a guardianship for A.M., and closed the report.  See Complaint ¶ 108, at 28.  The DOH did not, as part of its investigation, engage in meaningful conversation with A.M. concerning her condition or circumstances.  See Complaint ¶ 108, at 28.

In December, 2008, the DOH began a new investigation or re-opened its prior investigation into A.M.'s circumstances.  See Complaint ¶ 110, at 29.  The DOH referred to M. Evans as A.M.'s "guardian," despite clear indications in A.M.'s file that M. Evans was never appointed her guardian.  Complaint ¶ 110, at 29.  The DOH continued to "interact exclusively or primarily with Mary Evans" during its investigation.  Complaint ¶ 110, at 29.  The DOH did not consider the prior allegations of abuse, interview A.M., or independently investigate A.M.'s circumstances.  See Complaint ¶ 110, at 29.  The DOH's policy and practice of deferring to caregivers rather than interacting with the disabled individuals themselves or otherwise independently investigating aftercare residents' circumstances continued into 2009.  See Complaint ¶ 110, at 29.

In June, 2009, Tom Roach, an ALTSD employee, prepared a report for the ALTSD and the DOH regarding A.M. and J.P.  See Complaint ¶ 111, at 29.  Roach stated that M. Evans was managing A.M.'s and J.P.'s care in exchange for payments for room and board.  See Complaint ¶ 111, at 29-30.  Roach stated that M. Evans had legal authority to make decisions for A.M.  See Complaint ¶ 111, at 30.  Roach reported that A.M. was "happy in her home" and was "getting all the care she needs from Ms. Evans."  Complaint ¶ 111, at 30 (internal quotation marks omitted).  He also noted that "one recent APS referral for exploitation (04/06) was found to be malicious and unsubstantiated."  Complaint ¶ 111, at 30 (internal quotation marks omitted).  Roach limited his investigation to an interview of M. Evans -- he did not take into account prior allegations of abuse, interview A.M. or J.P., or independently investigate J.P.'s or A.M.'s circumstances.  See Complaint ¶ 112, at 30.  The State Agency Defendants "did nothing to assist AM or JP."  Complaint ¶ 113, at 30.  The State Agency Defendants never sought a guardian, conservator, or representative payee for A.M., nor arranged for her to receive therapeutic services.  See Complaint ¶ 113, at 30.

## PROCEDURAL BACKGROUND

A.M. alleges, among other things, that the Individual DOH Defendants violated her Thirteenth Amendment right to be free from involuntary servitude.  See Complaint ¶¶ 156-64, at 38-39.  A.M. contends that the Individual DOH Defendants, acting under color of state law, gave physical custody of A.M. to a third party "who then used her as a servant" without compensation.  Complaint ¶¶ 158-159, at 38.  A.M. argues that the Individual DOH Defendants "conspired" with M. Evans or other third parties to facilitate A.M.'s involuntary servitude, or alternatively "acted with deliberate indifference to the probability that Plaintiff would be put to work without compensation."  Complaint ¶ 160, at 38.  According to A.M., the proximate result

of the Individual DOH Defendants' arrangement with third parties to force A.M. into involuntary servitude "deprived [A.M.] of the value of her labor for at least thirty years," in addition to causing other damages that A.M. seeks to recover from the Individual DOH Defendants in their individual capacity.  Complaint ¶¶ 161-162, at 38.  A.M. asserts that she is entitled to punitive damages sufficient to punish the Defendants for their conduct, because the Individual DOH Defendants "knowingly, intentionally, deliberately, recklessly, maliciously and wrongfully" violated her Thirteenth Amendment right to be free from involuntary servitude.  Complaint ¶ 163, at 38-39.  A.M. maintains that she is entitled to have the Individual DOH Defendants pay the attorney's fees and costs that she incurred while bringing her Thirteenth Amendment claim. See Complaint ¶ 164, at 39.

> **1.      The MTD.**

The Individual DOH Defendants filed the MTD on March 6, 2014.  See Individual DOH Defendants' Motion to Dismiss Plaintiff's Thirteenth Amendment Claim and Supporting Memorandum (Doc. 22)("MTD").  In the MTD, the Individual DOH Defendants ask the Court to dismiss A.M.'s Thirteenth Amendment claim for three reasons.

First, the Individual DOH Defendants argue that they are entitled to qualified immunity. The Individual DOH Defendants point out that qualified immunity shields state officials from liability for civil damages if they violate a plaintiff's federally protected right, "so long as the state officials did not violate clearly established law."  MTD at 3 (citations omitted).  The Individual DOH Defendants cite the United States Court of Appeals for the Tenth Circuit's holding in Gomes v. Wood, 451 F.3d 1112 (10th Cir. 2006), to support their qualified immunity argument.  See MTD at 4.  The Individual DOH Defendants quote Gomes v. Wood: "The law is clearly established if a reasonable official in the defendant's circumstances would understand

that her conduct violated the plaintiff's constitutional right. . . .   If the law is not clearly established, we do not require officials to anticipate its future developments."   MTD at 4 (quoting Gomes v. Wood, 451 F.3d at 1134)(internal quotation marks omitted).  The Individual DOH Defendants argue that a law is clearly established if there is a Supreme Court of the United States of America or Tenth Circuit decision on point, "or if the clearly established weight of authority from other courts sufficiently defines the right."  MTD at 5 (citing Farmer v. Perrill, 288 F.3d 1254, 1259 (10th Cir. 2002)).  The Individual DOH Defendants also argue that the burden is on A.M. to point to Supreme Court or Tenth Circuit precedent to establish that the Individual DOH Defendants violated clearly established law that is "indisputable" and "unquestioned."   MTD at 5 (quoting Zweibon v. Mitchell, 720 F.2d 162, 172 (D.C. Cir. 1983))(internal quotation marks excluded)(citing Pearson v. Callahan, 555 U.S. 223, 236 (2009)).

The Individual DOH Defendants argue that it was not clearly established in 1979 that requiring a developmentally disabled individual to perform "common household chores or housework, such as sweeping floors, constituted involuntary servitude."  MTD at 8.  The Individual DOH Defendants note that the United States Court of Appeals for the Second Circuit is the only Court of Appeals to address what work developmentally disabled individuals can be expected to perform without infringing on their Thirteenth Amendment rights.  See MTD at 8 (citing Jobson v. Henne, 355 F.2d 129 (2d Cir. 1966)).  The Individual DOH Defendants say that, in Jobson v. Henne, the Second Circuit held that "the Thirteenth Amendment may be violated if a mental institution requires inmates to perform chores which have no therapeutic purpose or are not personally related, but are required to be performed solely in order to assist in

defraying of institutional costs."   MTD at 8 (quoting <u>Jobson v. Henne</u>, 355 F.2d at 132 n.3)(internal quotation marks omitted).

Second, the Individual DOH Defendants allege that the Homestead House -- where A.M. alleged she involuntarily worked for M. Evans -- was not a state institution.  <u>See</u> MTD at 7.  "In other words, the alleged coercive behavior was allegedly committed by a non-state actor, Mary Evans, at a non-state facility, the Homestead House."   MTD at 7.   The Individual DOH Defendants argue that, under § 1983, "liability attached only to conduct occurring 'under color of state law.'"   <u>MTD</u> at 7 (quoting <u>Pena v. Greffet</u>. 922 F. Supp. 2d 1187, 1218 (D.N.M. 2013)). The Individual DOH Defendants contend that A.M. must plead that each government-official defendant violated the Constitution through his or her individual actions.  <u>See</u> MTD at 7 (citing <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 676 (2009)).  The Individual DOH Defendants argue that A.M. has failed to allege that any of them "used [A.M.] as a servant without compensation."   <u>MTD</u> at 7.

Third, the Individual DOH Defendants argue that A.M. failed to allege that the work which she was required to perform was "not therapeutic" -- the standard that the Second Circuit created in <u>Jobson v. Henne</u> to determine what work can be required of developmentally disabled individuals without infringing on their Thirteenth Amendment rights.  MTD at 6.  The Individual DOH Defendants point to <u>Weidenfeller v. Kidulis</u>, 380 F. Supp. 447 (E.D. Wis. 1974), in which the Honorable John W. Reynolds, Jr., then-Chief United States District Judge for the Eastern District of Wisconsin, relied upon <u>Jobson v. Henne</u> to establish a two-prong test for similar Thirteenth Amendment claims.  <u>See</u> MTD at 6.  The Individual DOH Defendants argue that, under <u>Weidenfeller v. Kidulis</u>, A.M. must allege: (i) that she performed work involuntarily; and (ii) that the work that she performed was not therapeutic.  <u>See</u> MTD at 6 (citing <u>Weidenfeller v.</u>

Kidulis, 380 F. Supp. at 451).  The Individual DOH Defendants conclude: "While Plaintiff has overcome the first hurdle by alleging that her labor was performed involuntarily . . . nowhere in her Amended Complaint has Plaintiff also alleged that the work she performed at the Homestead House was not therapeutic."  MTD at 6-7.

      **2.**      **The Response.**

A.M. responded to the MTD on May 7, 2014.  <u>See</u> Plaintiff's Response to Individual DOH Defendants' Motion to Dismiss Plaintiff's Thirteenth Amendment Claim (Doc. 35)("Response").  In her Response, A.M. argues that the Individual DOH Defendants are liable for M. Evans' conduct -- regardless of the fact that it occurred at the Homestead House rather than a state-operated facility -- because A.M. "remained in the legal custody of Defendants."  Response at 6.  A.M. argues that her placement in M. Evans' custody "was supposedly overseen by Defendants" for six months after A.M.'s physical discharge from Fort Stanton.  Response at 6.

A.M. contends that qualified immunity should not apply to the Individual DOH Defendants, because the law prohibiting involuntary servitude under the Thirteenth Amendment was clearly established before 1979, when A.M. was transferred to M. Evans' physical custody.  <u>See</u> Response <i>passim</i>.  A.M. submits that the law prohibiting involuntary servitude has been clearly established since the late-1800s.  <u>See</u> Response at 6, 11 (citing <u>The Civil Rights Cases</u>, 109 U.S. 3 (1883)).  A.M. argues that the Honorable Robert C. Brack, United States District Judge for the District of New Mexico, held that Thirteenth Amendment protections were established since the late-1800s in <u>J.M. v. New Mexico Department of Health</u>, No. CIV 07-0604 ("March 4, 2009, MOO").  A.M. says that, in that case, Judge Brack noted that "the legal contours of the Thirteenth Amendment right to be free from involuntary servitude were well

established prior to the 1970s."  Response at 11 (quoting J.M. v. N.M. Dep't of Health, March 4, 2009, MOO)(internal quotation marks omitted)(citing Slaughter-House Cases, 83 U.S. 36 (1872)).

A.M. further points to Stone v. City of Paducah, 86 S.W. 531 (Ky. Ct. App. 1905), as effectively putting the Individual DOH Defendants on notice of clearly established Thirteenth Amendment protections.  See Response at 7.  A.M. says that Stone v. City of Paducah said, in dicta, that the Thirteenth Amendment prohibits a government actor "from requiring persons confined as idiots or insane persons to perform" compulsory manual labor.  Response at 7 (citing Stone v. City of Paducah, 86 S.W. at 533).  A.M. quotes the Kentucky Court of Appeals, saying: "[A]s these persons are in jail not because of their conviction of any offense, they cannot be compelled to labor, for such would be involuntary servitude, and in violation of . . . the constitution of the United States."  Response at 7 (quoting Stone v. City of Paducah, 86 S.W. at 533)(internal quotation marks omitted).  A.M. contends that the United States Court of Appeals for the Fourth Circuit echoed Stone v. City of Paducah's holding in United States v. Solomon, 563 F.2d 1121 (4th Cir. 1977), when it said that "[i]t is too late in the day to deny that in a proper case the protections of the Eighth, Thirteenth and Fourteenth Amendments extend to the mentally retarded who are involuntarily confined."  Response at 7 (quoting United States v. Solomon, 563 F.2d at 1124)(internal quotation marks included)(emphasis omitted).

A.M. says that Thirteenth Amendment protections for developmentally disabled individuals were further established in 1966 in Jobson v. Henne.  See Response at 7.  A.M. contends that Jobson v. Henne held state defendants liable for work that was required of the developmentally disabled plaintiff in state custody.  See Response at 7-8.  A.M. quotes Jobson v. Henne's holding that the state defendants in that case "had the power to alter this program; in a

- 22 -

real sense they can be said to have 'caused' the conditions under which the appellant labored." Response at 8 (quoting Jobson v. Henne, 355 F.2d at 131-132)(emphasis omitted). A.M. argues that the United States District Court for the Eastern District of Wisconsin further extended the application of the Thirteenth Amendment in Weidenfeller v. Kidulis. See Response at 8. In A.M.'s view, that case maintained protections for developmentally disabled in state custody receiving care through a privately operated facility. See Response at 8.

Next, A.M. responds to the Individual DOH Defendants' assertion that the Homestead House was not a state institution. See Response at 5. She states: "The Thirteenth Amendment prohibited Defendants from arranging to give Plaintiff to a private business to perform free labor." Response at 6. A.M. argues that she remained in the state's legal custody when she was transferred to the Homestead House in 1979. See Response at 5. A.M. argues that her transfer from a state facility to the Homestead House makes the Individual DOH Defendants liable for A.M.'s living conditions at the privately operated facility. See Response at 6. A.M. contends: "The violation of the Thirteenth Amendment was complete when the State forcibly transferred A.M. to a third party for the purpose of performing involuntary labor, regardless whether the involuntary labor occurred in a public institution or at a for-profit business." Response at 6.

A.M. also argues that her Complaint properly alleges that the work M. Evans forced her to perform served no therapeutic purpose. See Response *passim*. She asserts: "Neither was the work even minimally therapeutic; instead, it was menial and repetitious and not associated with any vocational program." Response at 6. A.M. acknowledges that Jobson v. Henne and Weidenfeller v. Kidulis establish that plaintiffs must show that the work required of developmentally disabled individuals participating in treatment programs was not minimally therapeutic. See Response 8-10. She argues, however, that "the entire tenor of the First

Amended Complaint is that A.M. received no services after her exile to Homestead House, and in various paragraphs throughout her First Amended Complaint, she explicitly states that she received no therapeutic services." Response at 10.  A.M. argues that her allegations that no therapeutic care was provided at the Homestead House demonstrate that the uncompensated labor which she performed there lacked therapeutic value.  See Response at 10.

Finally, A.M. argues that the work she performed at the Homestead House was coerced. See Response at 10.  A.M. cites United States v. Kozminski, 487 U.S. 931 (1988), a criminal case where, according to A.M., the Supreme Court held that a person's vulnerable mental condition warrants special consideration when determining whether legal or physical coercion occurred.  See Response at 10.  A.M. quotes United States v. Kozminski:

> [A] victim's age or special vulnerability may be relevant in determining whether a particular type or certain degree of physical or legal coercion is sufficient to hold that person to involuntary servitude. . . . [I]t is possible that threatening an incompetent with institutionalization or an immigrant with deportation could constitute the threat of legal coercion that induces involuntary servitude.

Response at 10 (quoting United States v. Kozminski, 487 U.S. at 948).

### 3. **The Reply.**

The Individual DOH Defendants replied to the Response on May 20, 2014.  See Reply Supporting Individual DOH Defendants' Motion to Dismiss Plaintiff's Thirteenth Amendment Claim [Doc. 22], filed May 20, 2014 (Doc. 41)("Reply").  The Individual DOH Defendants contend that the work which A.M. performed, as alleged in the Complaint, amounted to housekeeping and personal chores.  See Reply at 1.  In the Individual DOH Defendants' view, that routine work is not clearly established as a violation of the Thirteenth Amendment.  See Reply at 1-2.

The Individual DOH Defendants argue that Stone v. City of Paducah, Jobson v. Henne, and Weidenfeller v. Kidulis fail to clearly establish Thirteenth Amendment law related to developmentally disabled individuals in treatment programs in New Mexico, because neither the Supreme Court nor the Tenth Circuit decided them.  See Reply at 2.  The Individual DOH Defendants argue that, moreover, those cases are factually distinguishable from this case.  See Reply at 2.  They said the holding in Stone v. City of Paducah cited by A.M. is dicta, see Reply at 2 (citing 86 S.W. at 533); the work required in Jobson v. Henne, working night shifts in a boiler room, was more intense than it was for A.M., see Reply at 2 (citing 355 F.2d at 131-32); and Weidenfeller v. Kidulis stood for the proposition that a plaintiff must allege that required work was not therapeutic, see Reply at 2 (citing 380 F. Supp. at 451).

The Individual DOH Defendants reiterate their argument that A.M. fails to allege in her Complaint that the Homestead House was a "state institution" or that any of the Individual DOH Defendants compelled A.M. to perform uncompensated labor.  Reply at 3.  The Individual DOH Defendants reiterate their argument that Pena v. Greffet and Ashcroft v. Iqbal limit defendants' liability to instances where the officials' own individual actions, under color of state law, violate the Constitution.  See Reply at 3.  The Individual DOH Defendants assert: "Here, the Plaintiff has not alleged that any of the individual DOH Defendants themselves violated the Thirteenth Amendment."  Reply at 3.

The Individual DOH Defendants also reiterate their MTD argument that A.M. failed to allege that the work she performed at Homestead House was not therapeutic.  See Reply at 3. The Individual DOH Defendants argue that A.M.'s contention that she received no therapeutic services is alleged "in the context of her ADA and Rehabilitation Act claims," and should not be extended to her Thirteenth Amendment claim.  Reply at 3. The Individual DOH Defendants

conclude: "A close examination of Plaintiff's Amended Complaint reveals that Plaintiff has failed to allege that the 'housekeeping' work she performed at M. Evan's Homestead House was not therapeutic." Reply at 3 (citations omitted).

### 4.      The October 23, 2014 Hearing.

The Court held a hearing on the MTD on October 23, 2014. See Transcript of Hearing (taken Oct. 23, 2014)("Tr.").[7]  At the hearing, both sides largely repeated the arguments from their briefing. See Tr. at 1:1-48:19 (Court, Constantaras, Simmons).  Neither side introduced new cases regarding the Thirteenth Amendment.  The Individual DOH Defendants argued that A.M.'s claims should be evaluated using a two-part analysis to determine whether: (i) the Individual DOH Defendants "had the requisite physical and legal custody" of A.M. to establish liability as state actors; and (ii) the law supporting A.M.'s claims was clearly established in 1979, when A.M. was transferred to the Homestead House.  Tr. at 4:14-20 (Constantaras).

The Court inquired whether the Individual DOH Defendants contend that they had no responsibility for A.M. after she was discharged from Fort Stanton in 1979.  See Tr. at 4:21-25 (Court).  The Individual DOH Defendants confirmed that they believed their lack of physical custody limited their liability to A.M.  See Tr. at 5:1 (Constantaras).  The Individual DOH Defendants argued that A.M. has not disputed the fact that she was in M. Evan's physical custody, and not in the Individual DOH Defendants' physical custody, when the alleged abuses occurred.  See Tr. at 5:2-13 (Constantaras).  The Individual DOH Defendants said that there was a court order filed in a New Mexico District Court in Lincoln County, after a hearing for which A.M. was represented by an attorney, that discharged A.M. from the state's physical custody. See Tr. at 5:18-6:16 (Constantaras, Court).   The Court asked whether A.M.'s Thirteenth

---

[7]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final version may contain slightly different page and/or line numbers.

Amendment claim is going to turn on whether the Individual DOH Defendants or a state court discharged A.M. from the state's physical custody.  See Tr. at 8:9-13 (Court).  The Individual DOH Defendants responded, without elaboration, that establishing that a state court rather than a state agency discharged A.M. means that "one of the requisite elements is missing."  Tr. at 8:14-17(Constantaras).

The Individual DOH Defendants argued that A.M. fails to allege that the work she performed for M. Evans -- such as sweeping floors -- was not therapeutic or, alternatively, that those limited work requirements constituted involuntary servitude.  See Tr. at 8:18-23.  The Individual DOH Defendants' argument that the work A.M. was required to perform did not establish involuntary servitude preceded the following exchange:

> CONSTANTARAS:  [I]t's not clear what type of regulations, if you will, it is that they're claiming violated the Thirteenth Amendment. If it's sweeping the floor in the private home[] . . . in which she resides, then, Your Honor, I would state that in 1979 I could sue my mother for making me sweep, you know, the floor.
>
> COURT:  Well, but don't they have a little bit more?  I mean, they have that this is not somebody's home.  They have this, the Homestead House, with Mary Evans is a commercial enterprise, is it not?  I mean, it's a facility that takes care of the elderly.  So don't I have to kind of put in the word business establishment in there, not that it was just room and board, doesn't that change then the whole character of their complaint and allow some inferences that maybe a room and board place would not?
>
> CONSTANTARAS:  Well, Your Honor, it is, it was a boarding house, but to what extent that boarding house was a legally commercial enterprise, I don't think they've alleged those facts. . . . [A]nd again, that doesn't change the fact that this is private.

Tr. at 8:24-10:1 (Constantaras, Court).

The Court then asked whether the Homestead House warrants different consideration in the Thirteenth Amendment analysis because it was not an entirely private residence.  See Tr. at 10:2-7 (Court).  The Individual DOH Defendants responded that, while she operated the Homestead House, M. Evans was acting as a private individual despite that other people, in addition to A.M., resided at the home.  See Tr. at 10:8-25 (Constantaras).  The Individual DOH Defendants said that A.M. was transferred to the Homestead House after the state identified it as a less-restrictive location to provide care for A.M. than the state facilities available at the time.  See Tr. at 11:1-8 (Constantaras).  The Individual DOH Defendants said that, for a Thirteenth Amendment analysis, the "less restrictive means" determination to place A.M. at the Homestead House is not analogous to transferring A.M. to a private corporation like Wal-Mart, a hypothetical example that the Court provided.  See Tr. at 10:16-19, 11:8-9 (Constantaras, Court).

The Individual DOH Defendants repeated the argument from their briefing that A.M. failed to allege that the work that she performed for M. Evans was "not therapeutic."  Tr. at 11:12-16 (Constantaras).  The Court asked whether the therapeutic-work standard came from the Second Circuit's decision in Jobson v. Henne.  See Tr. at 11:17-19 (Court).  The Individual DOH Defendants responded, saying the standard "actually came" from Weidenfeller v. Kidulis.[8]  Tr. at 11:20-23 (Constantaras).  The Court asked why it should apply a standard on which the District Court for the Eastern District of Wisconsin relied, prompting the Individual DOH Defendants to say that Weidenfeller v. Kidulis should apply, because A.M. relied upon that case for her Thirteenth Amendment claim.  See Tr. at 12:1-18 (Court, Constantaras).

---

[8]The Second Circuit first established the therapeutic work standard in Jobson v. Henne in 1966, and the Eastern District of Wisconsin later cited that standard in Weidenfeller v. Kidulis in 1974.  See Weidenfeller v. Kidulis, 380 F. Supp. at 450 (citing Jobson v. Henne, 355 F.2d 129).

The Individual DOH Defendants argued that their MTD is dispositive, because none of the defendants "used plaintiff as a servant without compensation."   Tr. at 13:11-16 (Constantaras).   The Court asked whether the legal analyses used in substantive due-process claims to establish state actors' liability for the acts of non-governmental third parties -- the special-relationship doctrine and the danger-creation exception -- should also be applied to Thirteenth Amendment claims.   See Tr. at 13:17-21 (Court).   The Individual DOH Defendants argued that the Court should grant their MTD even if the substantive due-process tests are applied to A.M.'s Thirteenth Amendment claim:

> [T]hat's what they need to do, because otherwise they don't get there.  But they still don't get there; not only because the law wasn't clearly established in 1979 with those two exceptions, but also because even if they were clearly established at the time . . . for the special relationship, you've got to have both physical and legal custody.  And they've already admitted that it was Mary Evans that had physical custody of A.M., so how do they get around that hurdle?  They don't.

Tr. at 13:22-14:7 (Constantaras).  Addressing the danger-creation exception, the Individual DOH Defendants said that the dangerous condition must shock the conscience of the Court.  See Tr. at 14:7-11 (Constantaras).  To support that standard, the Individual DOH Defendants pointed to Ulrig v. Harder, 64 F.3d 567 (10th Cir. 1995), and to Collin v. City of Harker Heights, Texas, 503 U.S. 115 (1992).  See Tr. at 15:17-16:9 (Constantaras).

Finally, the Individual DOH Defendants argued that the Court should dismiss A.M.'s Thirteenth Amendment claim, because it falls short of the pleading standards that the Supreme Court recognized in Bell Atlantic Corp. v. Twombly and Ashcroft v. Iqbal.  See Tr. at 17:13-24. The Individual DOH Defendants said that A.M.'s allegations of forced housekeeping "are merely recitations of the very types of conclusory types of allegations that Twombly doesn't allow for anymore."  Tr. at 17:16-22 (Constantaras).  The argument prompted the following exchange:

- 29 -

COURT:           But if I have a picture in my mind of one of these [B]eehive [H]omes[9] in the communities, and it's taking care of elderly people, and A.M. is there for 16 years providing housekeeping to this commercial -- let's even say it's a non-profit establishment -- what do I do with that?  That doesn't sound good.

CONSTANTARAS:  Well, Your Honor, just because she's mentally disabled doesn't mean she can't perform some simple task which may . . .

COURT:           But it sounds a whole lot like work to me rather than just . . .

CONSTANTARAS:  Which may indeed be therapeutic for her.

COURT:           But the Department of Health can't farm out its people to work at Wal-Mart, even if it's therapeutic.

CONSTANTARAS:  No, Your Honor, but that's not the case here.

Tr. at 17:25-18:18 (Court, Constantaras).

A.M. then took the podium and immediately responded to the Court's question about her current living situation, saying that she was transferred from M. Evans' custody to a group home in Las Cruces, New Mexico, about five years earlier.  See Tr. at 19:5-16 (Simmons).  A.M. said that she was in M. Evans' care "for many, many years until [A.M.] showed up on the radar of adult protective services."  Tr. at 19:22-24 (Simmons).  A.M. said that her case was discovered after a series of other cases of former Fort Stanton residents "placed all over the state with no oversight" were identified after "a series of scandals."  Tr. at 19:25-20:9 (Simmons).  A.M.'s discussion of other individuals who are not parties in A.M.'s claim drew an objection from the Individual DOH Defendants, but the Court overruled it, saying that the information on other

---

[9]Beehive Homes are small assisted-living centers designed to house senior citizens in a communal, residential setting.  Beehive Homes refers to a company that franchises its business model to private home owners who operate the for-profit assisted-care facilities.  See Beehive Homes, http://beehivehomesfranchising.com (last visited May 11, 2015).

cases was "just background for me. . . . I'm trying to get the setting here."  Tr. at 10-20 (Constantaras, Court).  A.M. continued, saying: "There were two women who were farmed out, one to a hotel to do housekeeping consideration and another to a similar type of boarding house for the elderly to do housekeeping and cleanup after the elderly folks, somewhat similar" to A.M. Tr. at 21:1-6 (Simmons).  A.M. said that some of those other cases led to other lawsuits, including the case that Judge Brack decided.  See Tr. at 22:3-9 (Simmons).

The Court asked whether Judge Brack, or any other court, "focused on the discharge and found that the discharge is of constitutional significance if it is something that the federal courts ought to be concerned about."  Tr. at 22:10-18 (Court).  A.M. said that the question is significant, because A.M. never was discharged from the state's custody.  See Tr. at 22:19-23:2 (Simmons); id. at 23:19-24-6 (Simmons).  The Individual DOH Defendants objected that A.M.'s argument was attempting to introduce new evidence that she did not include in the Complaint.  See Tr. at 23:6-11 (Constantaras).  The Court overruled the objection and said that it would rely on the Complaint's allegations in deciding the MTD.  See Tr. at 23:12-15 (Court).  A.M. said that the order that made her a ward of the State of New Mexico never has been rescinded and remains valid.  See Tr. at 23:19-24:5 (Simmons).  A.M. said: "She was not discharged by a court, period, ever."  Tr. at 24:5-6 (Simmons).

The Court asked the Individual DOH Defendants to clarify their position on A.M.'s legal discharge from state custody, prompting the Individual DOH Defendants to say that A.M. was not discharged from state custody, but rather that a state court gave the state permission to transfer her to the Homestead House.  See Tr. at 24:7-22 (Court, Constantaras).  A.M. disputed the Individual DOH Defendants' statement and argued that A.M. remained in the state's physical custody despite being moved to the Homestead House.  See Tr. at 24:23-25:3 (Simmons).

- 31 -

The Court asked A.M. if there were additional facts that she could add to the Complaint to develop a plausible claim for relief if the Court determined that the pleaded facts fell short of the <u>Bell Atlantic Corp. v. Twombly</u> and <u>Ashcroft v. Iqbal</u> pleading standard.  <u>See</u> Tr. at 25:4-12 (Court).  A.M. said that additional facts omitted from the Complaint include that a representative of the New Mexico Fifth Judicial District court where A.M. originally was committed to state custody argued at the time of A.M.'s transfer hearing in the New Mexico Twelfth Judicial District that A.M. should not be transferred out of the state's Fort Stanton facility "because she was not able to look after herself."  Tr. at 25:13-22, 32:1-4 (Simmons).  A.M. said that, moreover, she would show that the work M. Evans required her to perform included "cleaning up [after elderly residents] when they have accidents."  Tr. at 26:16-21 (Simmons).  A.M. said:

> If I had to do [the Complaint] over, Your Honor, I would allege that she was forced to do menial regulations, day after day with no therapeutic value.  Because once you learn how to clean up after an old person who has had an accident, about a week of that and you know how to do it, you're not learning a skill, you're not doing something therapeutic for yourself.  You're providing free labor for a lady who didn't want to have to pay someone to do work that's tough work.

Tr. at 27:4-12 (Simmons).

The Court asked whether A.M. agrees with the Individual DOH Defendants that the substantive due-process law, allowing a state actor's liability to extend to the acts of third parties only in cases where the special relationship doctrine or the danger creation exception exists, applies to a Thirteenth Amendment claim.  <u>See</u> Tr. at 28:6-9 (Court).  A.M. said no and argued that the standard for the Thirteenth Amendment claim should be different than a due-process violation:  "What happens is that the state or any party, for that matter, who turns someone over to perform free labor is guilty of violating the Thirteenth Amendment."  Tr. at 28:14-17 (Simmons).

A.M. argued that she did not need to demonstrate that the Individual DOH Defendants personally forced A.M. to perform labor to be liable for a Thirteenth Amendment claim. See Tr. at 27:21-28:5 (Simmons). A.M. said: "There is no need that the state be involved in continuing to force you to commit that labor if they've turned you over to a private party, the violation is complete then." Tr. at 27:25-28:3 (Simmons). A.M. said that the law was clearly established in 1979 that turning A.M. over to a third party to perform labor was a violation of the Thirteenth Amendment. See Tr. at 28:3-5 (Simmons). A.M. argued:

> It's been illegal since the Civil War for people, for the state to give people in state custody to someone else. And the fact that the physical custody may change, that's the whole point. Of course it does. If the state takes me and gives me to Wal-Mart and says Wal-Mart, you can have her and whatever you want her to do, she'll do. Well, of course the physical custody changes, but that's a substantive due process paradigm that you're trying to impose on the Thirteenth Amendment such that the Thirteenth Amendment would disappear if that were the test.

Tr. at 30:10-22 (Simmons). A.M. argued that the state retains full custody over her, regardless whether she is in the care of a third party, and presented the following hypothetical: "If [A.M.] were just shoved out the door . . . and wanders off, can the state come back later and say she wasn't in our physical custody because we shoved her out the door? No. They can't, most especially when you have taken custody." Tr. at 31:5-15 (Simmons). A.M. said her "special relationship" with the state extended beyond 1979, because she remained in their legal custody as a ward of the state. Tr. at 32:9-12 (Simmons). A.M. cited New Mexico ex rel. Kershner v. Equitable Life Assurance Society of the United States, 447 F.2d 620, 622 (10th Cir. 1971), in which the Tenth Circuit held that a developmentally disabled individual committed to state custody "remains an inmate" of the state facility where first committed. Tr. at 32:13-20 (Simmons)(quoting 447 F.2d at 622). A.M. argued that, like New Mexico ex rel. Kershner v.

Equitable Life Assurance Society of the United States, A.M. "was a ward of the state; they were responsible for her and truly kept physical custody of her."  Tr. at 33:1-3 (Simmons).

The Court asked if A.M.'s Thirteenth Amendment claim turns on the state-law question whether A.M. was properly discharged from the Individual DOH Defendants' custody: "A lot of your argument depends upon whether I agree with you there was no discharge. . . .  [A] Court order would have been nice, but as far as the State of New Mexico is concerned, she was discharged; they let her go."  Tr. at 33:20-34:3 (Court).  A.M. responded that the question of the discharge should not alter the Thirteenth Amendment claim, because a Thirteenth Amendment claim against a state actor need not establish the special relationship doctrine required for a substantive due-process claim, but maintained that a special relationship nonetheless existed. See Tr. at 34:6-10 (Simmons, Court).  A.M. said that, had she been fully discharged from physical custody, A.M. would have had some input into her working and living conditions.  See Tr. at 34:20-25 (Simmons).  A.M. argued that, instead, the Individual DOH Defendants "told Mary Evans . . .  she could keep [A.M.], and told [A.M.], you have to stay here."  Tr. at 34:25-35:1 (Simmons).  A.M. said:

> [I]t's important to keep in mind that the Thirteenth Amendment claim does not
> depend on whether there was a discharge or not.  I think it helps us in the
> Thirteenth Amendment claim that there was not, in fact, a discharge, that she
> remained in their custody, but I don't think it's dispositive at all.

Tr. at 35:10-16 (Simmons).  A.M. stated that the Individual DOH Defendants remained responsible for supervising A.M.'s care at the Homestead House.  See Tr. at 35:20-23 (Simmons).  A.M. argued that the state's responsibility for developmentally disabled adults committed to state custody is the same as the state's obligation to ensure the safety of children in state custody placed in foster homes.  See Tr. at 36:3-13 (Simmons).  A.M. said that "sometimes" social workers checked on the placements of the developmentally disabled

individuals who previously resided in state facilities, a system of oversight similar to New Mexico Children, Youth and Families Department officials checking on the living conditions of children placed in foster care.  Tr. at 36:3-7 (Simmons).  A.M. said: "The fact they found community placement for her [A.M.] that happened to be a house of horrors does not mean that the special relationship that was created when she was made a ward of the State of New Mexico ceased to exist."  Tr. at 36:23-37:2 (Simmons).

A.M. said that, alternatively, if the Court relies upon the substantive due-process law requiring a special relationship doctrine to apply the Thirteenth Amendment, the Court could find that the case meets the required threshold that A.M.'s living conditions with M. Evans -- including routine work cleaning up after elderly residents, physical abuse and medical neglect -- shocked the conscience.  See Tr. at 37:8-11 (Simmons); id. at 37:14-21 (Simmons).  The Court asked if physical abuse was among the facts that A.M. pled in the Complaint.  See Tr. at 37:22-23 (Court).  A.M. responded that "there may not be an allegation of physical abuse," but said that, instead, the Complaint alleged "severe neglect."  Tr. at 38:2-7 (Simmons).

Finally, A.M. argued that she did not need to establish that the work she was required to perform was non-therapeutic to establish a Thirteenth Amendment claim.  See Tr. at 38:18-20 (Simmons).  The Court asked whether it should be bound by Weidenfeller v. Kidulis, and A.M. responded that the case provides "very good guidance" for Thirteenth Amendment claims.  Tr. at 38:21-39:1 (Court, Simmons).  A.M. said that, in her current living situation in a Las Cruces group home, she routinely is required to perform personal chores that would meet the therapeutic standard for the work required of developmentally disabled individuals.  See Tr. at 39:2-6 (Simmons).  A.M. said that those new work requirements are "very different" than the work that she was required to perform for M. Evans.  Tr. at 39:7-12 (Simmons).  A.M. said that the forced

work that the Complaint alleged is "very different than if everybody is living in a group home [and] it's your turn to sweep the porch." Tr. at 39:18-20 (Simmons). Responding to a question about A.M.'s custody in her new group home, A.M. said the state is still her legal guardian. See Tr. at 40:3-17 (Court, Simmons).

On rebuttal, the Individual DOH Defendants said that amending A.M.'s complaint to add additional facts referenced during the oral arguments would be futile, because the new facts do not rise to the level of alleging that the work M. Evans required of A.M. was not therapeutic. See Tr. at 40:24-41:8 (Constantaras). Moreover, the Individual DOH Defendants said that applying Weidenfeller v. Kidulis would preclude A.M.'s Thirteenth Amendment claim against them, because none of them individually forced A.M. to perform labor for M. Evans. See Tr. at 41:13-19 (Constantaras). The Individual DOH Defendants repeated their argument that A.M. should be required to establish the special relationship doctrine or danger creation exception used in substantive due-process claims to hold state actors liable for private third parties' conduct. See Tr. at 41:19-42:3 (Constantaras). The Individual DOH Defendants said: "If there is no custodial relationship, there can be no constitutional duty." Tr. at 42:16-17 (Constantaras)(citing DeAnzona v. City and Cnty. of Denver, 222 F.3d 1229 (10th Cir. 2000)). The Individual DOH Defendants repeated their argument that A.M.'s Thirteenth Amendment claim fails the substantive due-process standard for the danger creation exception. See Tr. at 43:23-47:19 (Constantaras). Finally, the Individual DOH Defendants said that A.M., in her oral argument, conceded that A.M. is performing tasks that amount to "the very same thing she claims are a violation of the Thirteenth Amendment" in her new group home. Tr. at 43:8-17 (Constantaras).

## LAW REGARDING RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion

tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994). The sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." (citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006))).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556).  "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."  Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted).  The Tenth Circuit stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible."  The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(citations omitted).

Although affirmative defenses must generally be pled in the defendant's answer, not argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions where: (i) the defendant asserts an immunity defense -- the courts handle these cases differently than other motions to dismiss, see Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M. 2012)(Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009); Robbins v. Oklahoma, 519 F.3d 1242 (10th Cir. 2008)); and (ii) where the facts establishing the affirmative defense are apparent on the face of the complaint, see Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim.  If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule.").  The defense of limitations is the affirmative defense most likely to be established by the uncontroverted facts in the complaint. See 5 Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus & Adam N.

Steinman, Federal Practice & Procedure: Civil § 1277 (3d ed. 2014).  If the complaint sets forth dates that appear, in the first instance, to fall outside of the statutory limitations period, then the defendant may move for dismissal under rule 12(b)(6).  See Rohner v. Union Pac. R.R. Co., 225 F.2d 272, 273-75 (10th Cir. 1955); Gossard v. Gossard, 149 F.2d 111, 113 (10th Cir. 1945); Andrew v. Schlumberger Tech. Co., 808 F. Supp. 2d 1288, 1292 (D.N.M. 2011)(Browning, J.). The plaintiff may counter this motion with an assertion that a different statute of limitations or an equitable tolling doctrine applies to bring the suit within the statute; the Tenth Circuit has not clarified whether this assertion must be pled with supporting facts in the complaint or may be merely argued in response to the motion.  Cf. Kincheloe v. Farmer, 214 F.2d 604 (7th Cir. 1954)(holding that, once a plaintiff has pled facts in the complaint indicating that the statute of limitations is a complete or partial bar to an action, it is incumbent upon the plaintiff to plead, either in the complaint or in amendments to it, facts establishing an exception to the affirmative defense.  It appears, from case law in several circuits, that the plaintiff may avoid this problem altogether -- at least at the motion-to-dismiss stage -- by simply refraining from pleading specific or identifiable dates, see Goodman v. Praxair, Inc., 494 F.3d 458, 465-66 (4th Cir. 2007); Hollander v. Brown, 457 F.3d 688, 691 n.1 (7th Cir. 2006); Harris v. New York, 186 F.3d 243, 251 (2d Cir. 1999); Honeycutt v. Mitchell, 2008 WL 3833472 (W.D. Okla. Aug. 15, 2008)(West, J.), although the Tenth Circuit has not squarely addressed this practice.

## LAW REGARDING LIABILITY FOR CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983

Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in

> any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988).   Individual, non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)("The requisite causal connection is satisfied if [the defendants] set in motion a series of events that [the defendants] knew or reasonably should have known would cause others to deprive [the plaintiffs] of [their] constitutional rights.")(quoting Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006)).   The Supreme Court has made clear that there is no respondeat superior liability under 42 U.S.C. § 1983.  See Ashcroft v. Iqbal, 556 U.S. at 675 ("Because vicarious liability is inapplicable to Bivens[10] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  "An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor."  Garcia v. Casaus, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 689 (1978)).

---

[10]In Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), the Supreme Court held that a violation of the Fourth Amendment to the Constitution of the United States "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct."  403 U.S. at 389.

Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts.  See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

### 1.      **Color of State Law.**

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'" Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995).   The under-color-of-state-law requirement is a "jurisdictional requisite for a § 1983 action, which . . . furthers the fundamental goals of preserving an area of individual freedom by limiting the reach of federal law . . . and avoiding imposing on the state, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed."   Jojola v. Chavez, 55 F.3d 488, 492 (10th Cir. 1995).   "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"   West v. Atkins, 487 U.S. at 49 (quoting United States v. Classic, 313 U.S. 299, 326 (1941)).   "The authority with which the defendant is allegedly 'clothed' may be either actual or apparent."   Jojola v. Chavez, 55 F.3d at 493.   Accordingly, at a base level, to find that an action was taken under color of state law, the court must find that "'the conduct allegedly causing the deprivation of a federal right' must be 'fairly attributable to the State.'"   Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447 (quoting Lugar v. Edmonson Oil Co., 457 U.S. 922, 937 (1982)).

In the context of a public employee, the Tenth Circuit has directed that, while "'state employment is generally sufficient to render the defendant a state actor . . . [,]' at the same time, it is 'well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state.'"   Jojola v. Chavez, 55 F.3d at 493 (quoting Lugar v. Edmonson Oil Co., 457 U.S. at 935-36 n.18; Mark v. Borough of Hatboro, 51 F.3d

1137, 1150 (3d Cir. 1995)).  Thus, "before conduct may be fairly attributed to the state because it constitutes action 'under color of state law,' there must be 'a real nexus' between the employee's use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant."  Jojola v. Chavez, 55 F.3d at 493.  What constitutes the required real nexus, however, is not completely clear.  As the Tenth Circuit has stated, whether there is a real nexus in a particular case depends on the circumstances:

> The under color of law determination rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or not the officer acts in accordance with his or her duty.  Instead one must examine "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties."

David v. City & Cnty. of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996)(citations omitted)(quoting Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995)).

### 2.    Individual Liability.

Government actors may be liable for the constitutional violations that another committed, if the actors "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights," thus establishing the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations.  Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006).  The Tenth Circuit has explained that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'"  Martinez v. Carson, 697 F.3d at 1255 (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961), overruled in part by Monell v. Dep't of Soc. Servs., 436 U.S. at 663).  "Thus, Defendants are liable for the harm proximately caused by their conduct."  Martinez v. Carson, 697 F.3d at 1255 (citing Trask v. Franco, 446 F.3d at 1046).  As the Court has previously concluded, "a plaintiff who establishes

liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations. The recovery should be guided by common-law tort principles -- including principles of causation . . . ."   Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009)(Browning, J.).[11]

The Tenth Circuit has found liability for those defendants who proximately caused an injury alleged under § 1983 and stated that the fact that the "conduct of other people may have concurrently caused the harm does not change the outcome as to [the defendant]," so long as there was not a superseding-intervening cause of a plaintiff's harm.  Lippoldt v. Cole, 468 F.3d 1204, 1220 (10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the officers only "would be liable for the harm 'proximately' or 'legally' caused by their tortious conduct."  Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995). "They would not, however, necessarily be liable for all of the harm caused in the 'philosophic' or but-for sense by the illegal entry."  Id.  In civil rights cases, a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability.  See, e.g., Warner v. Orange Cnty. Dep't of Prob., 115 F.3d 1068, 1071 (2d Cir. 1997); Springer v. Seaman, 821 F.2d 871, 877 (1st Cir. 1987), abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 . . . (1989).

Trask v. Franco, 446 F.3d at 1046.  Thus, in the context of a claim under the Fourth Amendment, the Tenth Circuit has held that government actors "may be held liable if the further unlawful detention and arrest would not have occurred but for their conduct and if there were no unforeseeable intervening acts superseding their liability."  Martinez v. Carson, 697 F.3d at 1255. The Tenth Circuit gave an example of a superseding intervening cause, quoting the Honorable

---

[11]The Court clarified in Herrera v. Santa Fe Public Schools, 41 F. Supp. 3d 1188 (D.N.M. Aug. 29, 2014)(Browning, J.), that common-law causation standards do not necessarily hold in the municipal-liability context, and, in fact, "the causation standard for municipal liability cases is unclear in the Tenth Circuit."  41 F. Supp. 3d at 1273.

Samuel J. Alito, then-United States Circuit Judge for the United States Court of Appeals for the

Third Circuit, now-Associate Justice for the Supreme Court:

> Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking and announcing their presence.  Once inside, they encounter the suspect, identify themselves, show him the warrant, and tell him that they are placing him under arrest.  The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in the process injures him.  Is the third officer necessarily liable for the harm caused to the suspect on the theory that the illegal entry without knocking and announcing rendered any subsequent use of force unlawful?  The obvious answer is "no."  The suspect's conduct would constitute a "superseding" cause, see Restatement (Second) of Torts § 442 (1965), that would limit the officer's liability.  See id. § 440.

Trask v. Franco, 446 F.3d at 1046 (quoting Bodine v. Warwick, 72 F.3d at 400)(citations in

original).  Additionally, "[f]oreseeable intervening forces are within the scope of the original risk,

and . . . will not supersede the defendant's responsibility."  Trask v. Franco, 446 F.3d at 1047

(quoting William Lloyd Prosser et al., Prosser and Keeton on Torts § 44, at 303-04 (5th ed.

1984)).  If

> the reasonable foreseeability of an intervening act's occurrence is a factor in determining whether the intervening act relieves the actor from liability for his antecedent wrongful act, and under the undisputed facts there is room for reasonable difference of opinion as to whether such act was wrongful or foreseeable, the question should be left for the jury.

Trask v. Franco, 446 F.3d at 1047 (citing Restatement (Second) of Torts § 453 cmt. b (1965)).

### 3.    **Supervisory Liability.**

The Tenth Circuit has held that supervisors are not liable under § 1983 unless there is

"'an affirmative link . . . between the constitutional deprivation and either the supervisor's

personal participation, . . . exercise of control or direction, or . . . failure to supervise.'"

Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009)(quoting Green v. Branson, 108 F.3d

1296, 1302 (10th Cir. 1997))(alterations omitted).  Because supervisors can be held liable only

for their own constitutional or illegal policies, and not for the torts that their employees commit, supervisory liability requires a showing that such policies were a "deliberate or conscious choice."  Barney v. Pulsipher, 143 F.3d at 1307-08 (citations omitted)(internal quotation marks omitted).  Cf. Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404 ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.  The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged."  (emphasis in original)).

The Tenth Circuit has recognized that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations.  See Garcia v. Casaus, 2011 WL 7444745, at *25-26 (citing Dodds v. Richardson, 614 F.3d 1185 (10th Cir. 2010)).  The language that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is as follows: "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  Ashcroft v. Iqbal, 556 U.S. at 676.  The Tenth Circuit in Dodds v. Richardson held:

> Whatever else can be said about Iqbal, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

614 F.3d at 1199.  The Tenth Circuit noted that Ashcroft v. Iqbal "does not purport to overrule existing Supreme Court precedent," but stated that "Iqbal may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case."  Dodds v. Richardson, 614 F.3d at 1200.  It concluded that Ashcroft

- 45 -

v. Iqbal did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis." Dodds v. Richardson, 614 F.3d at 1200.  The Tenth Circuit, based on this conclusion, set forth a test for supervisory liability under § 1983 after Ashcroft v. Iqbal:

> A plaintiff may . . . succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.

Dodds v. Richardson, 614 F.3d at 1199-1200 (citing Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)).  The Tenth Circuit noted, however: "We do not mean to imply that these are distinct analytical prongs, never to be intertwined."  Dodds v. Richardson, 614 F.3d at 1200 n.8.  Relying on the Supreme Court's opinion in Board of County Commissioners v. Brown, 520 U.S. 397 (1997), the Tenth Circuit reasoned that two of the prongs often, if not always, are sufficient proof that the third prong has been met also:

> Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward.  Section 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right. In any § 1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation.  Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably.  Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

Dodds v. Richardson, 614 F.3d at 1200 n.8 (quoting Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404-05)(internal quotation marks omitted).  The Tenth Circuit noted that "[w]e think the same logic applies when the plaintiff sues a defendant-supervisor who promulgated, created, implemented or possessed responsibility for the continued operation of a policy that itself violates federal law."  Dodds v. Richardson, 614 F.3d at 1200 n.8.  Thus, the Tenth Circuit

reduced the test to what can be seen as a two-part test for supervisor liability, requiring the plaintiff to prove "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'" Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

       **4.**     **Municipal Liability.**

A municipality will not be held liable under § 1983 solely because its officers inflicted injury.  See Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006).  Rather, to establish municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link between the policy or custom, and the injury alleged.  See Graves v. Thomas, 450 F.3d at 1218.  When a claim is brought against a municipality for failing to train its officers adequately, the plaintiff must show that the municipality's inaction was the result of deliberate indifference to its inhabitants' rights.  See Graves v. Thomas, 450 F.3d at 1218.

## LAW REGARDING THE THIRTEENTH AMENDMENT'S PROHIBITION OF INVOLUNTARY SERVITUDE

The Thirteenth Amendment mandates that "[n]either slavery nor involuntary servitude, except as punishment for a crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."  U.S. Const. amend.  XIII, § 1.  The Honorable Samuel F. Miller, then-Associate Justice of the Supreme Court, enunciated the Thirteenth Amendment's scope in the Slaughter-House Cases as extending constitutional protections beyond slaves of African descent.  Justice Miller stated:

> Undoubtedly while negro slavery alone was in the mind of the Congress which proposed the thirteenth article, it forbids any other kind of slavery, now or hereafter.  If Mexican peonage or the Chinese coolie labor system shall develop

> slavery of the Mexican or Chinese race within our territory, this amendment may safely be trusted to make it void.  And so if other rights are assailed by the States which properly and necessarily fall within the protection of these articles, that protection will apply, though the party interested may not be of African descent.

Slaughter-House Cases, 83 U.S. at 72.  The Supreme Court reiterated Justice Miller's interpretation of the Thirteenth Amendment eleven years later in the Civil Rights Cases.  The Supreme Court, in an opinion that the Honorable Joseph P. Bradley, then-Associate Justice of the Supreme Court, authored, said that the Thirteenth Amendment is "not a mere prohibition of State laws establishing or upholding slavery, but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States."  Civil Rights Cases, 109 U.S. at 20.

Although the Slaughter-House Cases and the Civil Rights Cases were decided nearly one-hundred and fifty years ago, the Supreme Court more recently reiterated that the Thirteenth Amendment precludes a broad range of compulsory labor beyond the traditional notions of slavery.  Those protections include guarantees for the right of workers to freely perform employment contracts.  See Hodges v. United States, 203 U.S. 1, 17 (1906)("[W]hen these defendants, by intimidation and force, compelled the colored men named in the indictment to desist from performing their contract, they, to that extent, reduced those parties to a condition of slavery, -- that is, of subjection to the will of defendants.").  The Supreme Court also has recognized an explicit prohibition of compulsory service as a means to liquidate a personal debt. See Bailey v. Alabama, 219 U.S. 219, 242 (1911)("The full intent of the constitutional provision could be defeated with obvious facility if, through the guise of contracts under which advances had been made, debtors could be held to compulsory service."); Pollock v. Williams, 322 U.S. 4, 18 (1944)("Whatever of social value there may be, and of course it is great, in enforcing contracts and collection of debts, Congress has put it beyond debate that no indebtedness warrants a suspension of the right to be free from compulsory service.")

The Thirteenth Amendment expressly allows states to compel labor "as a punishment for crime whereof the party shall have been duly convicted."  U.S. Const. amend. XIII, § 1.  See Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1247-48 (D.N.M. 2010)(Browning, J)(citing Tracy v. Keating, 42 F. App'x 113, 116 (10th Cir. 2002)(unpublished)("[B]y its express language, the Thirteenth Amendment's prohibition of slavery does not apply to the imprisonment of a person lawfully convicted of a crime")), aff'd, 499 F. App'x 771 (10th Cir. 2012). Moreover, the state may require involuntary performance of well-established civic duties without compensation, such as jury duty, community roadwork, or military service.  See, e.g., Hurtado v. United States, 410 U.S. 578, 589 n.11 (1973)(holding that  the Thirteenth Amendment does not prohibit mandatory jury service); Butler v. Perry, 240 U.S. 328, 333 (1916)(holding that community service requirements that residents work on public roads is not a violation of the Thirteenth Amendment); Selective Draft Law Cases, 245 U.S. 366, 390 (1918)(concluding that the Thirteenth Amendment does not restrict mandatory military service).

In 1988, the Supreme Court more clearly defined the conduct that constitutes involuntary servitude in United States v. Kozminski.  In that case, the Supreme Court held that average workers must be physically coerced to perform forced labor to support a criminal charge of involuntary servitude under 18 U.S.C. § 1584.[12]  See 487 U.S. 944.  In other words, psychological coercion to compel an individual to complete assigned work was insufficient to establish involuntary servitude for most workers.  See 487 U.S. 944.  The Supreme Court noted,

---

[12]In United States v. Kozminski, the Supreme Court explained that the meaning of "involuntary servitude" in 18 U.S.C. § 1584, and the Thirteenth Amendment are indistinguishable.  487 U.S. 931, 944-45 (1988)("The pivotal phrase, 'involuntary servitude,' clearly was borrowed from the Thirteenth Amendment.  Congress' use of the constitutional language in a statute enacted pursuant to its constitutional authority to enforce the Thirteenth Amendment guarantee makes the conclusion that Congress intended the phrase to have the same meaning in both places logical, if not inevitable.").

however, in an opinion that the Honorable Sandra Day O'Connor, then-Associate Justice of the

Supreme Court, authored, that physical coercion should be considered differently in cases where

the worker has "special vulnerabilities."  487 U.S. at 948.  Justice O'Connor stated:

> [A] victim's age or special vulnerability may be relevant in determining whether a
> particular type or a certain degree of physical or legal coercion is sufficient to
> hold that person to involuntary servitude.  For example, a child who is told he can
> go home late at night in the dark through a strange area may be subject to physical
> coercion that results in his staying, although a competent adult plainly would not
> be.   Similarly,  it  is  possible  that  threatening  an  incompetent  with
> institutionalization or an immigrant with deportation could constitute the threat of
> legal coercion that induces involuntary servitude, even though such a threat made
> to an adult citizen of normal intelligence would be too implausible to produce
> involuntary servitude.

United States v. Kozminski, 487 U.S. at 948.  That case involved two developmentally disabled

plaintiffs -- Robert Fulmer and Louis Molitoris -- who were forced to work on the defendants'

dairy farm without pay while regularly being subjected to physical and verbal abuse, and threats

that one of the plaintiffs would be sent to a state mental institution if he failed to comply with the

defendants' directions.  See 487 U.S. at 935.  The Supreme Court remanded the case for further

proceedings, but, in dicta, said that it believed the defendant's alleged physical threats and

coercion were sufficient to warrant a criminal conviction for involuntary servitude under the

Supreme Court's narrowed standard.  See 487 U.S. at 953.

The Second Circuit has held that developmentally disabled individuals participating in a

treatment program can be compelled to perform work that is either "therapeutic" or amounts to

routine housekeeping chores.   Jobson v. Henne, 355 F.2d at 131-32.   The plaintiff, Warren

Jobson, was confined to the Newark State School, a mental health institution.   See 355 F.2d

at 130.  Jobson brought a § 1983 action against New Jersey state officials, alleging that the

Newark State School violated the Thirteenth Amendment by forcing him to work in the

institution's boiler house eight hours a night, six nights a week, earning one cent per hour, for an

- 50 -

extended period of time.  See 355 F.2d at 132 & n.5.  In addition, the Newark State School

expected Jobson to work eight hours per day performing various assigned jobs in Newark,

earning hourly wages between 37 cents and 50 cents.  See 355 F.2d at 132 & n.5.  In an opinion

that the Honorable Sterry R. Waterman, United States Circuit Judge for the Second Circuit,

authored, and Judge Friendly joined, the Second Circuit held that mentally incompetent

individuals can be compelled to perform work that helps defray the individual's treatment and

living expenses.  See 355 F.2d at 131.  The Second Circuit held, however, that forced work for

mentally deficient individuals in a treatment program must be "reasonably related to a

therapeutic program," or otherwise amount to "chores of a normal housekeeping type and kind,"

to avoid violating the Thirteenth Amendment.  355 F.2d at 131-32.  The Second Circuit added

that some labor required of mentally deficient individuals in a treatment program may overstep

the Thirteenth Amendment: "Nevertheless, there may be some mandatory programs so ruthless

in the amount of work demanded, and in the conditions under which the work must be

performed, and thus so devoid of therapeutic purpose, that a court justifiably could conclude that

the inmate had been subjected to involuntary servitude."  355 F.2d at 133 (footnote omitted).

The Second Circuit stated:

> [I]t would seem that the Thirteenth Amendment may be violated if a mental
> institution requires inmates to perform chores which have no therapeutic purpose
> or are not personally related, but are required to be performed solely in order to
> assist in the defraying of institutional costs, and it would appear that this would be
> so even if the inmates were compensated for their labor, for the mere payment of
> a compensation, unless the receipt of the compensation induces consent to the
> performance of the work, cannot serve to justify forced labor.

Jobson v. Henne, 355 F.2d at 132 n.3.  The Second Circuit ultimately held that Jobson had

sufficiently alleged a claim for Thirteenth Amendment violations and that the state actors named

as defendants were not subject to immunity from the claim.  See Jobson v. Henne, 355 F.2d at

134.

Eight years later, the United States District Court for the Eastern District of Wisconsin adopted the Jobson v. Henne therapeutic labor standard for developmentally disabled individuals in Weidenfeller v. Kidulis. See 380 F. Supp. at 447. The plaintiffs in that case were two developmentally disabled individuals whom the Wisconsin Department of Health permanently discharged to two different private entities -- a group home and a nursing home -- "for custodial care and treatment."[13] 380 F. Supp. at 447. One of the plaintiffs -- Joseph Weidenfeller -- was forced to move grass, clean patients' rooms, and wash dishes without compensation. See 380 F. Supp. at 447. The other -- Edwin Kryszewski -- was forced to unload various materials, clean toilets and sinks, and scrub the kitchen floor without compensation. See 380 F. Supp. at 447. The plaintiffs brought claims against their respective employers, alleging, among other things, that they violated the plaintiffs' Thirteenth Amendment right to be free from involuntary servitude. See 380 F. Supp. at 450-51. Denying the defendants' motion to dismiss, Judge Reynolds held that the burden was on the plaintiff to establish that the work required was not therapeutic. See 380 F. Supp. at 451. Judge Reynolds said that proving work required of developmentally disabled patients will be a "heavy burden" for plaintiffs, but allowed the Thirteenth Amendment claim to go forward because the complaint sufficiently alleged coerced, nontherapeutic treatment. 380 F. Supp. at 451.

J.M. v. New Mexico Department of Health held in 2009 that it was clearly established at the time of the Slaughter-House Cases that developmentally disabled individuals have a Thirteenth Amendment right to be free from involuntary servitude. See March 4, 2009, MOO. In J.M. v. New Mexico Department of Health, the plaintiff was a developmentally disabled individual who was committed the State's custody, who was transferred to a private unlicensed

---

[13]There is no indication in the opinion whether the Wisconsin Department of Health transferred the plaintiffs' legal custody to those private entities.

business in the early 1970s, and who was forced to work without pay.  See March 4, 2009, MOO

at 2-3.  The plaintiff alleged that the defendants -- many of whom are defendants in this case --

violated her Thirteenth Amendment right to be free from involuntary servitude by placing her

with a private business, knowing that she would be forced to work without pay.  See March 4,

2009, MOO at 3-4.    Denying Schaefer's[14] motion to dismiss the plaintiff's Thirteenth

Amendment claim on qualified immunity grounds, Judge Brack said: "The legal contours of the

Thirteenth Amendment right to be free from involuntary servitude were well established prior to

the 1970s."  March 4, 2009, MOO at 14 (citing Slaughter-House Cases, 83 U.S. at 71-72).  Thus,

Judge Brack held state officials had fair warning in the 1970s that it was a violation of federal

law to subject mentally disabled individuals to involuntary servitude by placing them in

third-party settings where they would be forced to work without compensation under the threat

of abuse or re-institutionalization.  See March 4, 2009, MOO at 14.

## LAW REGARDING STATE ACTION AND CIVIL-RIGHTS CLAIMS

The Supreme Court has stated that it is a judicial obligation to not only

> preserve an area of individual freedom by limiting the reach of federal law and
> avoid the imposition of responsibility on a State for conduct it could not control,
> but also to assure that constitutional standards are invoked when it can be said that
> the State is responsible for the specific conduct of which the plaintiff complains.

Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n, 531 U.S. 288, 295 (2001)(internal

quotations omitted)(citations omitted).  Most rights under the Constitution secure protection only

against infringement through state action.  See, e.g., Flagg Bros., Inc. v. Brooks, 436 U.S. 149

(1978)("[M]ost rights secured by the Constitution are protected only against infringement by

governments.").  Under some circumstances, however, private parties' conduct may be deemed

---

[14]The Schaefer in the case before Judge Brack is the same Schaefer in the case before the
Court.

to be state action when the "conduct allegedly causing the deprivation of a federal right may be fairly attributable to the State." Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 937 (1982). Whether the conduct may in fact be "fairly attributed" to the state requires a two-part inquiry. "First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible." Lugar v. Edmondson Oil Co., Inc., 457 U.S. at 937. "Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor." Lugar v. Edmondson Oil Co., Inc., 457 U.S. at 937. See West v. Atkins, 487 U.S. 42, 48 (1988)(explaining that, to state a claim under § 1983, the plaintiff must show: (i) deprivation of a right that the federal Constitution or federal laws secure; and (ii) that a person acting under color of state law caused the deprivation).

The Supreme Court in Lugar v. Edmondson Oil Co., Inc. explained that the two prongs merge when the claim is "directed against a party whose official character is such as to lend the weight of the State to his decisions," whereas they remain distinct when analyzing private parties' conduct. 457 U.S. at 937. The first prong of the test in Lugar v. Edmondson Oil Co., Inc. -- that the deprivation of a right is attributable to the state -- is satisfied when "the authority of state officials . . . put the weight of the State behind [the d]efendant's private decision[.]" 457 U.S. at 940. The Supreme Court in Lugar v. Edmondson Oil Co., Inc. further instructed that the second prong, identification of a defendant as a state actor, is met where the defendant "is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the state." 457 U.S. at 937. In Lugar v. Edmondson Oil Co., Inc., the Supreme Court determined that the plaintiff's allegation that private conduct unlawful under state law deprived the plaintiff of his property without due

process failed to state a claim under § 1983.  See 457 U.S. at 940.  The Supreme Court also held

that the plaintiff's claim, alleging that the private parties had invoked a state statute maliciously

or without valid grounds, did not give rise to state action.  See 457 U.S. at 940.  Instead, that

claim amounted to nothing more than the private misuse or abuse of a state statute.  See 457 U.S.

at 940-41.

For a private individual to be acting under color of state law, the deprivation of a federal

right "must be caused by the exercise of some right or privilege created by the State or by a rule

of conduct imposed by the state or by a person for whom the State is responsible," and the

defendant accused of a constitutional deprivation "must be a person who may fairly be said to be

a state actor . . . because he is a state official, because he has acted together with or has obtained

significant aid from state officials, or because his conduct is otherwise chargeable to the State."

Lugar v. Edmondson Oil Co., 457 U.S. at 937.

> Congress did not, in using the term "under the color of state law," intend to
> subject private citizens, acting as private citizens, to a federal lawsuit whenever
> they seek to initiate a prosecution or seek a remedy involving the judicial system.
> To hold otherwise would significantly disregard one purpose of the state action
> requirement, which is to "preserve[ ] an area of individual freedom by limiting the
> reach of federal law and federal judicial power."  Lugar, 457 U.S. at 936.  Instead,
> in enacting § 1983, Congress intended to provide a federal cause of action
> primarily when the actions of private individuals are undertaken with state
> authority.  See id. at 934.  Thus, absent more, causing the state, or an arm of the
> state, to initiate a prosecution or serve process is insufficient to give rise to state
> action.

How v. City of Baxter Springs, 217 F. App'x 787, 793 (10th Cir. 2007)(unpublished).[15]

---

[15]How v. City of Baxter Springs is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

1.      **Whether There Is State Action by Private Actors is a Legal Determination**.

The Tenth Circuit has described the determination of state action as "particularly fact-sensitive, so the circumstances must be examined in their totality."  Marcus v. McCollum, 394 F.3d 813, 819 (10th Cir. 2004).  According to the Tenth Circuit, "[t]he Supreme Court has counseled us that the state action inquiry, although a legal determination to be made by the court, requires the sifting [of] facts and weighing [of] evidence." Phelps v. Wichita Eagle-Beacon, 886 F.2d 1262, 1271 (10th Cir. 1989)(quoting Burton v. Wilmington Parking Auth., 365 U.S. 715, 722 (1961)).  In Gilmore v. City of Montgomery, 417 U.S. 556, 570 (1974), the Supreme Court said that, although it was the Supreme Court's role to determine whether the use of zoos, museums, parks, and other recreational facilities by private school groups and private non-school organizations "involved government so directly in the actions of those users as to warrant court intervention on constitutional grounds," the factual record before the Supreme Court "[did] not contain sufficient facts upon which to predicate legal judgments of this kind." 417 U.S. at 570.

On the other hand, leaving the determination of state action to the jury has shown to be ill-advised.  The cases in which the acts of private entities have been held to constitute state action or to be under color of law, and cases in which they have not, tend to be distinguished "by fine shadings in the sometimes complex interrelationships that develop between the state and private bodies."    Adams v. Vandemark, 787 F.2d 588, 1986 WL 16606, at *2 (6th

_____

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds How v. City of Baxter Springs and Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707 (10th Cir. 2011)(unpublished), have persuasive value with respect to material issues, and will assist the Court in its disposition of this Memorandum Opinion.

Cir. 1986)(unpublished).   In Adams v. Vandemark, the United States Court of Appeals for the

Sixth Circuit reviewed a jury instruction from the United States District Court for the Eastern

District of Michigan, instructing the jury on when to find state action.  1986 WL 16606, at *1.

The Sixth Circuit in a per curium opinion in which Judges Martin, Jones and Wellford joined,

found that the few words that were given to the jury on when to find state action "gave the jury

little to guide it in making its determination on this crucial element of the claim for relief."  1986

WL 16606, at *2.  The Sixth Circuit noted that the application of the symbiotic-relationship test

and the joint-relationship test are "very difficult and complex questions," and, "[t]o the extent a

jury is to decide upon the proper factual predicates for this essentially legal determination, it

must be given instructions that are clear, precise and informative as to the factors involved and

the factual issues to be determined."  1986 WL 16606, at *2.  The Sixth Circuit found that the

defendants were entitled to a new trial, because the jury was given no direction that could have

enabled it to make the necessary underlying factual determination regarding state action.  1986

WL 16606, at *2-3.  The Court on multiple occasions has ruled on dispositive motions that

required a determination as a matter of law whether a private party was a state actor.  See, e.g.,

Herrera v. Santa Fe Public Schools, 41 F. Supp. 3d 1027 (D. N.M. 2014)(Browning, J.)(holding

that private company providing security for school prom was a state actor); Archuleta v. City of

Roswell, 898 F. Supp. 2d 1240 (D.N.M. 2012)(Browning, J.)(holding that private attorney was

not a state actor engaged in a conspiracy against his client with prosecutors).

      **2.**      **The Tests for Determining State Action by a Private Party.**

      The Supreme Court has articulated four different tests for courts to use in determining

whether conduct by an otherwise private party is state action: (i) the public-function test; (ii) the

nexus test; (iii) the symbiotic-relationship test; and (iv) the joint-action test.  See Johnson v.

Rodrigues (Orozco), 293 F.3d 1196, 1202-03 (10th Cir. 2002)(reviewing the various tests); Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447 (noting that "[a]pplication of the state action doctrine has been characterized as one of the more slippery and troublesome areas of civil rights litigation." (internal quotation marks omitted)).

### a.    The Public-Function Test.

Under the public-function test, a court determines whether a private party has exercised "powers traditionally exclusively reserved to the State." Jackson v. Metro. Edison Co., 419 U.S. 345, 352 (1974). The public-function test is difficult to satisfy, because while many functions may be traditionally governmental, few are "exclusively" governmental functions, as the test requires. Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1456. The courts have found exclusive government functions to include holding elections, performing necessary municipal functions, and running nursing facilities. See Johnson v. Rodrigues (Orozco), 293 F.3d at 1203.

### b.    The Nexus Test.

Under the nexus test, state action is present if the state has ordered the private conduct, or "exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." Blum v. Yaretsky, 457 U.S. 991, 993 (1982). A court determines under the nexus test whether there is a sufficiently close nexus between the state and the challenged conduct, such that the conduct "may be fairly treated as that of the state itself." Jackson v. Metro. Edison Co., 419 U.S. at 351. "Private use of state-sanctioned private remedies or procedures does not rise to the level of state action. . . . But when private parties make use of state procedures with the overt, significant assistance of state officials, state action may be found." Tulsa Prof'l Collection Servs., Inc. v. Pope, 485 U.S. 478, 486 (1988)(citations omitted).

### c.      The Symbiotic-Relationship Test.

Under the symbiotic-relationship test, state action is present if the state "has so far insinuated itself into a position of interdependence" with a private party that "it must be recognized as a joint participant in the challenged activity." Burton v. Wilmington Parking Auth., 365 U.S. 715, 725 (1961). "[E]xtensive regulation, receipt of substantial state funds, and the performance of important public functions do not necessarily establish the kind of symbiotic relationship between the [state] and a private [party] that is required for state action." Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1451.

> The applicable decisions clearly establish no bright-line rule for determining whether a symbiotic relationship exists between a government agency and a private entity. Questions as to how far the state has insinuated itself into the operations of a particular private entity and when, if ever, the operations of a private entity become indispensable to the state are matters of degree.

Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1452.

### d.      The Joint-Action Test.

State action exists under the joint-action test if the private party is a "willful participant in joint action with the State or its agents." Dennis v. Sparks, 449 U.S. 24, 27 (1980). Courts look to "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1453. "[I]f there is a substantial degree of cooperative action between state and private officials . . . or if there is overt and significant state participation, in carrying out the deprivation of the plaintiff's constitutional rights, state action is present." Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1454 (citations omitted)(internal quotation marks omitted). Joint participation can also take the form of a conspiracy between public and private actors; in such cases, the plaintiff must show that the public and private actors shared a common,

unconstitutional goal.  See Sigmon v. CommunityCare HMO, Inc., 234 F.3d 1121, 1126 (10th Cir. 2000).  Even a conspiracy claim requires a sufficient level of state involvement to constitute joint participation in the unconstitutional actions.  See Soldal v. Cook County, 506 U.S. 56, 60 n.6 (1992).  The Tenth Circuit has previously dismissed constitutional claims against a private individual where the plaintiff did not give specific facts showing a conspiracy evidencing state action.  See Martinez v. Winner, 771 F.2d 424, 445 (10th Cir. 1985)("Beyond the bare conclusory allegation that [the defendant], a private citizen, conspired with the other defendants to deprive plaintiff of his constitutional and civil rights, no facts are stated indicating that [the defendant] did anything.").

In Gallagher v. Neil Young Freedom Concert, the Tenth Circuit, in an opinion that the Honorable Robert H. Henry, United States Circuit Judge for the Tenth Circuit, authored, and Judges Seymour and Daugherty joined, surveyed several instances in which courts have found action "under color of state law" where governmental and private parties have acted together in joint-action:

> We have applied the joint action test in several cases involving allegations that private citizens acted in concert with police officers in making arrests.  In both Carey v. Continental Airlines Inc., 823 F.2d 1402 (10th Cir. 1987), and Lee v. Town of Estes Park, 820 F.2d 1112 (10th Cir. 1987), we held that citizens who made complaints to police officers that resulted in arrests were not state actors.  We found nothing in the record in either case from which we could infer that the allegedly unconstitutional arrests "resulted from any concerted action, whether conspiracy, prearranged plan, customary procedure, or policy that substituted the judgment of a private party for that of the police or allowed a private party to exercise state power."  Carey, 823 F.2d at 1404.  In both cases, the record indicated that the police officers had made an independent decision to make the challenged arrest.  In contrast, in Lusby v. T.G. & Y. Stores, Inc., 749 F.2d 1423, 1429 (10th Cir. 1984), cert. denied, 474 U.S. 818 (1985), we concluded that a store security guard who reported a suspected shoplifter to the police was a state actor.  We noted that the officer that made the arrest did not make an independent investigation but relied on the judgment of the security guard.  In Coleman v. Turpen, 697 F.2d 1341 (10th Cir. 1982)(per curiam), we applied the joint action test by focusing on the manner in which the alleged constitutional deprivation was

carried out.  There, the plaintiff challenged the seizure and sale of his property and named as defendants not only state officials but also the wrecking company that towed his truck and subsequently sold it.  We found the company to be a state actor because it had "jointly participated in seizing the truck by towing it away" and because the company's sale of the plaintiff's property was "an integral part of the deprivation."

49 F.3d at 1453-56.  The Tenth Circuit noted that, "just as with the other tests for state action, the mere acquiescence of a state official in the actions of a private party is not sufficient."  49 F.3d at 1453.  The Tenth Circuit found that the joint-action test can be satisfied where police are involved in cooperative action with a private party when "the police have substantially assisted in the allegedly wrongful conduct."  49 F.3d at 1455.  Joint participation typically arises when the authorities agree to facilitate through affirmative action a private party's unconstitutional acts.  See Soldal v. Cook County, 506 U.S. 56, 60 n.4 (1992).

### 3.    The Influence of Police Involvement on Transforming Private Action into State Action.

The Tenth Circuit has found that the involvement of the police does not necessarily convert a defendant's abuse of state law into conduct attributable to the state for purposes of § 1983 liability.  See Yanaki v. Iomed, Inc., 415 F.3d 1204, 1210 (10th Cir. 2005)(citing Winterland Concessions Co. v. Trela, 735 F.2d 257, 262 (7th Cir. 1984); Taylor v. Gilmartin, 686 F.2d 1346, 1348-49, 1355 n.3 (10th Cir. 1982); Torres v. First State Bank of Sierra Co., 588 F.2d 1322, 1327 (10th Cir. 1978)).  In Yanaki v. Iomed, Inc., the plaintiffs argued that the involvement of the police acting in concert with the defendants in the search of the plaintiffs' residence converted the defendants' actions into conduct attributable to the state for the purposes of § 1983 liability.  See 415 F.3d at 1209-10.  The Tenth Circuit held that the plaintiffs "fail[ed] to satisfy the first part of the [Lugar v. Edmondson Oil Co., Inc.] color of law test because the conduct that Plaintiffs complain deprived them of their constitutional rights was caused by and

[could] only be attributed to the private Defendants."  415 F.3d at 1210.  The Tenth Circuit,

therefore, found it unnecessary to address whether the private defendants were state actors.  See

415 F.3d at 1210.  Additionally, merely following a procedure established by state law does not

transform a private party's activity into state action.  See Scott v. Hern, 216 F.3d 897, 906-07

(10th Cir. 2000); Kirksey v. Theilig, 351 F. Supp. 727, 733 (D. Colo. 1972)(holding that

self-help repossession of an automobile by a private party is not action under color of state law).

### LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise

their discretion and the related public interest in encouraging the vigorous exercise of official

authority."  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  "Qualified immunity protects

federal and state officials from liability for discretionary functions, and from 'the unwarranted

demands customarily imposed upon those defending a long drawn-out lawsuit.'"  Roybal v. City

of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. Apr. 28,

2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  The Supreme Court

deems it "untenable to draw a distinction for purposes of immunity law between suits brought

against state officials under § 1983 and suits brought directly under the Constitution against

federal officials."  Butz v. Economou, 438 U.S. 478, 504 (1978).  "The qualified immunity

analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil

War Civil Rights Acts."  Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled

on other grounds as recognized in Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

> Under § 1983 (invoked in this case) and Bivens v. Six Unknown Fed. Narcotics
> Agents, 403 U.S. 388 . . . (1971), a plaintiff may seek money damages from
> government officials who have violated her constitutional or statutory rights.  But
> to ensure that fear of liability will not "unduly inhibit officials in the discharge of
> their duties," Anderson v. Creighton, 483 U.S. 635, 638 . . . (1987), the officials
> may claim qualified immunity; so long as they have not violated a "clearly

established" right, they are shielded from personal liability, <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 . . . (1982).  That means a court can often avoid ruling on the plaintiff's claim that a particular right exists.  If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages.  The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

<u>Camreta v. Green</u>, 131 S. Ct. 2020, 2030-31 (2011).

Issues of qualified immunity are best resolved at the "earliest possible stage in litigation." <u>Pearson v. Callahan</u>, 555 U.S. 223, 232 (2009)(quoting <u>Hunter v. Bryant</u>, 502 U.S. 224, 227 (1991)(per curiam)).   "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit."  <u>Lewis v. Tripp</u>, 604 F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  <u>Pearson v. Callahan</u>, 555 U.S. at 231 (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. at 818).   Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law. <u>Saucier v. Katz</u>, 533 U.S. at 205.  When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct.  <u>See</u> 533 U.S. at 201.

> 1.     **The Procedural Approach to Qualified Immunity.**

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified immunity defense.  In <u>Pearson v. Callahan</u>, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the

particular case at hand."  555 U.S. at 236.  The Supreme Court also noted that, while no longer mandatory, the protocol outlined in Saucier v. Katz -- by which a court first decides if the defendant's actions violated the Constitution, and then the court determines if the right violated was clearly established -- will often be beneficial.  See Pearson v. Callahan 555 U.S. at 241.  In rejecting the prior mandatory approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district courts and courts of appeals with "what may seem to be an essentially academic exercise."  555 U.S. at 237.  The Supreme Court also recognized that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable."  555 U.S. at 241 (alterations omitted)(internal quotation marks omitted).  See Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior case law "comports with our usual reluctance to decide constitutional questions unnecessarily").  Once the plaintiff establishes an inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense generally fails.  See Cannon v. City & Cnty. of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

The Supreme Court recognizes seven circumstances where district courts should proceed directly to and "should address only" the clearly established prong of the qualified immunity analysis: when (i) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation

of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual

basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a

risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks

"bad decisionmaking," because court is firmly convinced the law is not clearly established

and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the

doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional

question when "it is plain that a constitutional right is not clearly established but far from

obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th

Cir. 2011)(quoting Pearson v. Callahan, 555 U.S. at 236-42)(internal quotation marks omitted).[16]

---

[16]As former-Tenth Circuit judge, and now Stanford law school professor, Michael McConnell, has pointed out, much of what lower courts do is read the implicit, unwritten signs that the superior courts send them through their opinions. See Michael W. McConnell, Address at the Oliver Seth American Inn of Court: How Does the Supreme Court Communicate Its Intentions to the Lower Courts: Holdings, Hints and Missed Signals (Dec. 17, 2014). This practice is good for the nation's judicial system to achieve uniformity in a nation of 319 million people. See, e.g., Michigan v. Long, 463 U.S. 1032, 1040 (1983)(stating that "there is an important need for uniformity in federal law"). But see Amanda Frost, Overvaluing Uniformity, 94 Va. L. Rev. 1567 (2008)(criticizing courts' focus on uniformity of the law). If a district court in New Mexico is trying -- as it does diligently and faithfully -- to receive and read the unwritten signals of its superior courts, it would appear that Justice Alito in Pearson v. Callahan and Judge Gorsuch in Kerns v. Bader are trying to suggest that district courts should, whenever possible, decide qualified immunity on the clearly established prong. For example, Justice Alito and Judge Gorsuch gave seven situations when the Court should decide a case solely on the clearly established element, and not "avoid avoidance." Kerns v. Bader, 663 F.3d at 1180-81 (noting the seven situations in which a court should skip step one and decide a case on the clearly established prong). Even the phrase "avoid avoidance" suggests that the district court is to decide, and not avoid, the constitutional issue.

The Court is concerned about this push to not decide constitutional issues, for a number of reasons. The Court set forth some of these in Kerns v. Board of Education, which the Court quotes in note 17. See infra note 17. Additionally, there is a practical problem. Sometimes, for a district court to really know whether a right is clearly established, it has to do the first analysis, and thoroughly explore whether there is a right and whether it has been violated. If it jumps to the mushy, hazy area of clearly established without knowing what the right is, the analysis lacks any precision. However, while appellate courts may think that jumping to the clearly established prong saves district courts a lot of trouble, in the Court's experience, the old rule -- in Saucier v. Katz -- made more sense and, practically, is the way the Court still has to go in many cases.

Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely only to face challenges in the qualified immunity context. Camreta v. Greene, 131 S. Ct. at 2031-32.  See Kerns v. Bader, 663 F.3d at 1181.[17]  "Courts

---

[17]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer.  663 F.3d at 1183.  In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question.  And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84.  The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)."  663 F.3d at 1187 n.5.  On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations.  A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations.  See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972).  In Mitchum v. Foster, the Supreme Court explained:
>
> > Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc[ing] the Provisions of the Fourteenth Amendment." . . .  The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.

- 66 -

_____

407 U.S. at 238-39.  Congress did not say it would remedy only violations of "clearly established" law, but that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (emphasis added).  The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional.  See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010).  The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith."  Wood v. Strickland, 420 U.S. 308, 322 (1975).  In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly-established prong became a part of the qualified immunity test. See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.").  It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983.  J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011).  Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations.  See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363,

should think carefully before expending 'scarce judicial resources' to resolve difficult and novel

questions of constitutional or statutory interpretation that will 'have no effect on the outcome of

the case.'" Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011)(quoting Pearson v. Callahan, 555

U.S. at 236-37). See Camreta v. Greene, 131 S. Ct. at 2032 ("In general, courts should think

hard, and then think hard again, before turning small cases into large ones.").[18]   The Tenth

---

390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . .  These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives).  In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering.  See 547 U.S. at 596-97.   Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress.  It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights.  It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized in Ysasi v. Brown, No. CIV 13-0183 JB/CG, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.).   See Richard E. Myers, Fourth Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations and award monetary judgments).

   [18]In Kerns v. Board of Commissioners, the Court expressed concern with Justice Elena Kagan's comments about "large" and "small" cases:

   While the Court is, of course, obligated to follow faithfully the Supreme Court's decisions and opinions, the Court has always been unenlightened and even troubled by Justice Elena Kagan's comments in Camreta v. Greene about "large" and "small" cases.  131 S. Ct. at 2032.  As a trial judge, the Court has tried assiduously to avoid thinking about or categorizing some cases as "large" and some as "small."  It usually is not mentally healthy for a judge to put all his or her

energy into "large" cases and slight "small cases"; to the litigants, their case is the most important case on the Court's docket, and it is usually wise for the judge to treat each case on which he or she is working -- at that moment -- as the most important case at that moment.  Getting the decision "right," i.e. getting the law and facts correct and accurate, is obviously important, but getting it right is only one-half of a judge's task, particularly a trial judge's job.  The other half of dispensing justice is the appearance of justice -- did the Court listen to the litigant's arguments, wrestle with those arguments, and deal with them in an intellectually honest way.  Americans are pretty good about accepting a judicial decision -- even an adverse one -- and cease obsessing over an issue, if they are convinced that an authority figure has dressed up, taken them seriously, listened patiently and politely, wrestled with the arguments, addressed them, and accurately stated the facts.  The Court believes that, if it starts looking at some cases before it as "large" and some as "small," it begins a slippery slope that does not accomplish both halves of the task of dispensing justice.  The justice system depends so much on the nation respecting and accepting the courts' proceedings and decisions, because courts have very little "power" that does not depend on that acceptance.  Thus, Justice Kagan's comments are not only not self-defining, but they are disturbing.

If, perhaps, a "large" case is a Supreme Court case or one that comes from the East Coast or California, rather than one in a district court in New Mexico, then it helps to look at what cases the Supreme Court has decided for the plaintiff. The three most recent qualified immunity cases, the Supreme Court dealt with are: (i) Reichle v. Howards, 132 S. Ct. 2088 (2012); (ii) Filarksy v. Delia, 132 S. Ct. 1657 (2012); and (iii) Messerschmidt v. Millender, 132 S. Ct. 1235 (2012).  In Reichle v. Howards, the Supreme Court determined that secret service agents were entitled to qualified immunity for arresting a protestor who touched the Vice President and held that it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation.  See 132 S. Ct. at 2092, 2097.  In Filarsky v. Delia, the Supreme Court held that a private individual that the government hires to do its work, an internal affairs review, is entitled to seek qualified immunity for Fourth and Fourteenth Amendment violations. See 132 S. Ct. at 1660, 1668.  In Messerschmidt v. Millender, the Supreme Court held that police officers in Los Angeles, California were entitled to qualified immunity when they relied on an invalid warrant to search a home, because a reasonable officer would not have realized the error.  See 132 S. Ct. at 1241, 1250.  The Supreme Court has not denied qualified immunity since 2004 in Groh v. Ramirez, 540 U.S. 551 (2004), where it held that an officer unreasonably relied on a deficient warrant.  See 540 U.S. at 565. The Court does not think those presumably "large" cases (they are Supreme Court cases, after all) are any different -- substantively, legally, or factually -- than this case involving the search of a citizen's home after someone shot down a police helicopter and then detained that suspect for nine months until the United States realized that J. Kerns could not have shot down the helicopter.

Circuit will remand a case to the district court for further consideration when the district court has given cursory treatment to the clearly established prong of the qualified immunity analysis. See Kerns v. Bader, 663 F.3d at 1182.

## 2.     Clearly Established Rights in the Qualified-Immunity Analysis.

To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right.   See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).   "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"   Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."   Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001).   On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful."   Anderson v. Creighton, 483 U.S. 635, 640 (1987).   "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the

---

On the flip side, treating large cases like they are large cases can create an appearance problem to the public and to the litigants -- that only big cases deserve the Court's attention.   A trial judge can overwork a "large" case.   It is better to treat even "large" cases like every other case; large cases and their litigants need to know and appreciate that they are not the only case on the court's docket, and realize that the scarcity of judicial resources applies to them too.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d at 1222 n.35.

time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202).  A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d at 1298.

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 131 S. Ct. at 2083.  "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 131 S. Ct. at 2083).  "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639.  "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 131 S. Ct. at 2084.  The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law.  Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit held in Kerns v. Bader that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly

established where "a distinction <u>might</u> make a constitutional difference."  663 F.3d at 1188 (emphasis in original).  In <u>Kerns v. Bader</u>, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was <u>beyond debate</u> in 2005 that the officers' entry and search lacked legal justification."  663 F.3d at 1183 (emphasis added).  Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined, applied a sliding scale to determine when the law is clearly established.  <u>See</u> <u>Casey v. City of Fed. Heights</u>, 509 F.3d 1278, 1284 (10th Cir. 2007)("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.").  "[W]hen an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a second decision with greater specificity to clearly establish the law."  <u>Casey v. City of Fed. Heights</u>, 509 F.3d at 1284.  Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning . . . ."  <u>Hope v. Pelzer</u>, 536 U.S. at 741.

In <u>Rivera v. Bates</u>, No. CIV 12-0473 JB/RHS, 2014 WL 3421050 (D.N.M. June 21, 2014)(Browning, J.), the Court used the <u>Kerns v. Bader</u> qualified-immunity framework to determine if it was clearly established that arresting a suspect in his underwear and failing to retrieve his clothing to cover him up while he is transported from his house to a patrol car makes the arrest unreasonable.  <u>See</u> 2014 WL 3421050, at *54.  The Court stated:

> Even if the Court could, on the record before it, conclude, as a matter of law, that the manner in which Hernandez effectuated the arrest was [un]reasonable, the Court finds that the law was not clearly established such that a reasonable officer in Hernandez' position would have recognized that he needed to retrieve clothing for S. Rivera rather than escort him directly to the police vehicle.  As the Tenth Circuit has emphasized, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction *might* make a constitutional difference."  <u>Kerns v. Bader</u>, 663 F.3d at 1188 (emphasis in original).  In <u>Kerns v. Bader,</u>, dealing with the search of a home, the Tenth Circuit explained that the relevant question

"wasn't whether we all have some general privacy interest in our home," but "whether it was *beyond debate* in 2005 that the officers' entry and search lacked legal justification."  663 F.3d at 1183 (emphasis added).  Here, S. Rivera has relied on <u>Cortez v. McCauley</u> to establish that his clearly established rights were violated, but the Tenth Circuit in that case stated that it had "little difficulty concluding that a small amount of force, like grabbing Rick Cortez and placing him in the patrol car, is permissible in effecting an arrest under the Fourth Amendment."  663 F.3d at 1128.  The Tenth Circuit only made one comment regarding Cortez' clothing during the arrest:

> Although the dignity aspects of this arrest are troubling, specifically hauling Rick Cortez (clad only in his shorts) into the patrol car in the middle of the night without any explanation, the police were investigating a serious felony and claimed a need for quick action to separate the accused from any other children that might be in the home.

478 F.3d at 1128-29.  The Tenth Circuit did not explain what would have to be different about the "dignity aspects" for the arrest to violate the Fourth Amendment.  More importantly, the Court emphasizes that Hernandez did not participate in any of the alleged wrongdoing inside S. Rivera's house, nor did he refuse to allow S. Rivera to get dressed; instead, Hernandez was involved in the arrest only after S. Rivera was outside the house.  S. Rivera has not pointed to, nor has the Court been able to identify, any cases that demand that an officer delay taking the arrestee to a police vehicle so the officer can enter the arrestee's home to search for clothing or otherwise find some covering for an arrestee on the way to the police vehicle.  The Court will thus grant the MSJ on S. Rivera's excessive and unreasonable force claim against Hernandez.

<u>Rivera v. Bates</u>, 2014 WL 3421050, at *54 (emphasis in original).

## ANALYSIS

The Court will grant the MTD.  The Individual DOH Defendants violated A.M.'s Thirteenth Amendment right to be free from the involuntary servitude.  Under M. Evans' care, A.M. was physically coerced to perform uncompensated work that had no therapeutic value. The Individual DOH Defendants knew or should have known that transferring a thirty-two-year-old woman to reside in a private group home for the elderly, and failing to oversee M. Evans' care of A.M., would result in a deprivation of A.M.'s constitutional rights.  The Individual DOH Defendants are immune from this claim, however, because it was not clearly established in 1979

that the proximate causation standard for § 1983 claims can apply to Thirteenth Amendment cases. Consequently, the Court will dismiss A.M.'s Thirteenth Amendment claim.

I.    **A.M. PLAUSIBLY ALLEGES THAT THE WORK THAT M. EVANS FORCED HER TO PERFORM CONSTITUTED INVOLUNTARY SERVITUDE IN VIOLATION OF THE THIRTEENTH AMENDMENT.**

A.M. plausibly alleges that the uncompensated and compulsory work that she performed for M. Evans at the Homestead House amounted to involuntary servitude in violation of the Thirteenth Amendment. A.M. plausibly alleges that she had no alternative but to work for M. Evans after the Individual DOH Defendants transferred her across the state to the Homestead House, and that she was physically coerced to perform the work through M. Evans' verbal abuse and A.M.'s perception that she could not leave the Homestead House. A.M. also demonstrates that the work that M. Evans' required her to perform had no therapeutic value. M. Evans was not a state actor in her oversight of A.M., but that does not preclude the Court's finding that A.M. plausibly alleged a Thirteenth Amendment violation, because a Thirteenth Amendment violation can stem from private conduct.

A.    **A.M. WAS PHYSICALLY COERCED TO PERFORM WORK FOR M. EVANS AT THE HOMESTEAD HOUSE.**

The work that A.M. performed for M. Evans at the Homestead House constituted involuntary servitude in violation of the Thirteenth Amendment, because A.M. sufficiently alleges that it the work was physically coerced. A.M. plausibly alleges that she had no choice but to work for M. Evans at the Homestead House. Furthermore, the exceptions to the Thirteenth Amendment that allow for compulsory work to be required of convicted criminals or individuals directed to perform certain civic duties do not apply in this case, because A.M. was never convicted of a crime, and because the Homestead House was a private facility.

In United States v. Kozminski, the Supreme Court defined involuntary servitude as requiring either physical or legal coercion, while psychological coercion is insufficient. See 487 U.S. at 948. That case involved criminal involuntary-servitude charges against Michigan dairy farmers -- Ike Kozminski, his wife, Margarethe Kozminski, and their son, John Kozminski -- who forced two developmentally disabled men to live and work on the Kozminskis' farm earning little pay, and, later, no pay at all. See 487 U.S. at 934-35. The Kozminskis physically abused the workers when they failed to do their work and threatened at least one of them that he would be returned to a state mental health facility if he did not comply with the Kozminskis' orders. See 487 U.S. at 935. Furthermore, the two workers were isolated from other farm workers, received inadequate medical care, and repeatedly were brought back to the farm when they tried to leave. See 487 U.S. at 935. In an opinion that the Honorable Sandra Day O'Connor, then-Associate Justice of the Supreme Court, authored, the Supreme Court held that the threats of beatings constituted the requisite physical coercion for involuntary servitude, and the threats of being returned to a state mental health facility were sufficient to establish legal coercion for involuntary servitude. See 487 U.S. at 953. Although the Supreme Court noted that there was sufficient evidence for a jury to find both physical and legal coercion, it held that only one category of coercion is necessary to support an involuntary servitude claim. See 487 U.S. at 952.

United States v. Kozminski involved criminal charges filed under 18 U.S.C. §§ 241 and 1584, but the standard that the Supreme Court created in that case -- requiring that an involuntary servitude claim must include physical or legal coercion -- applies to all Thirteenth Amendment involuntary servitude claims. See 487 U.S. at 944-45. The Supreme Court explained:

> The pivotal phrase [in the criminal statutes], 'involuntary servitude,' clearly was
> borrowed from the Thirteenth Amendment. Congress' use of the constitutional

> language in a statute enacted pursuant to its constitutional authority to enforce the
> Thirteenth Amendment guarantee makes the conclusion that Congress intended
> the phrase to have the same meaning in both places logical, if not inevitable.  In
> absence of any contrary indications, we therefore give effort to congressional
> intent by construing "involuntary servitude" in a way consistent with the
> understanding of the Thirteenth Amendment that prevailed at the time of § 1584's
> enactment.

United States v. Kozminski, 487 U.S. at 944-45.  The Supreme Court added that an individual's

"special vulnerabilities" are relevant when determining whether the degree of physical or legal

coercion was sufficient to compel that individual to perform work against his or her will.  487

U.S. at 952.

The Tenth Circuit has recognized that, in light of United States v. Kozminski's special

vulnerabilities consideration, a lesser degree of coercion is necessary to compel a

developmentally disabled individual into involuntary servitude.  See United States v. Kaufman,

546 F.3d 1242, 1265 (2008).  United States v. Kaufman involved criminal involuntary servitude

charges against Arlan Dean Kaufman and his wife, Linda Kaufman, the operators of a group

home for developmentally disabled individuals in Kansas.  See 546 F.3d at 1246.  The Kaufmans

allegedly coerced individuals in their care to perform labor on their nearby farm.  See 546 F.3d

at 1246.  In an opinion that the Honorable Robert H. Henry, then-Chief Judge of the Tenth

Circuit, authored, and Judges Brorby and McConnell joined, the Tenth Circuit focused on the

coercion allegations of one of the developmentally disabled farm workers, "Kevin."  546 F.3d at

1263-64.  Although law enforcement officers discovered Kevin performing farm work naked,

Kevin testified at trial that he enjoyed the labor and performed it by choice.  See 546 F.3d at

1264.  Chief Judge Henry took note of evidence that A. Kaufman strongly influenced Kevin and

that A. Kaufman had instructed Kevin to perform the farm work while nude, because

A. Kaufman said it would be therapeutic for Kevin's mental health condition.  See 546 F.3d at

- 76 -

1264.  Moreover, Kevin said that he was verbally ridiculed when he did not perform the work.

See 546 F.3d at 1264.  Chief Judge Henry also noted that Kevin had witnessed A. Kaufman

forcefully restrain a co-resident after she used offensive language, and Kevin overheard A.

Kaufman threaten to send that same co-resident to a state mental hospital.  See 546 F.3d at 1265.

While evidence of verbal ridicule alone would have been insufficient to prove coercion, Chief

Judge Henry held that, in the aggregate, the evidence of A. Kaufman's influence on Kevin, and

Kevin's perception of A. Kaufman's treatment of similarly situated co-residents, was sufficient:

> We agree . . . that such ridicule, standing alone, might not satisfy the requirement
> of compulsion of services by the use or threatened use of physical or legal
> coercion. . . .   However, the record contains ample evidence that Kevin and the
> other Kaufman House residents suffered far more than ridicule in the course of the
> Kaufmans' efforts to compel them to perform labor and services.

United States v. Kaufman, 546 F.3d at 1265 (internal quotations omitted).  The Tenth Circuit held

that, in light of the special vulnerabilities of the developmentally disabled residents who

performed farm work for the Kaufmans, the aggregate evidence amounted to coercion: "Here, it

was undisputed that Kevin suffered from a serious mental illness that made him highly

susceptible to the Kaufmans' directives.  In light of that evidence, a jury could reasonably find

that the farm work Kevin performed was compelled 'by the use or threatened use of physical or

legal coercion.'"   United States v. Kaufman, 546 F.3d at 1265 (quoting United States v.

Kozminski, 487 U.S. at 948).  Chief Judge Henry, thus, affirmed the Kaufmans' involuntary

servitude conviction.  See 546 F.3d at 1265.

A.M. plausibly alleges that M. Evans physically coerced her into involuntary servitude at

the Homestead House.  Like the victims in United States v. Kozminski and United States v.

Kaufman, where involuntary servitude was established because the victims were compelled to

perform farm work, A.M. was "put to work" at the Homestead House by M. Evans, and forced to

- 77 -

perform housekeeping and "other services" without compensation.  Complaint ¶ 93, at 24-25.
Similar to the victims in United States v. Kozminski, A.M. alleges that she was socially isolated
while living and working at M. Evans' facility.  See Complaint ¶ 87, at 23.  When A.M. did not
complete the work, M. Evans "threatened" A.M., like the victim in United States v. Kaufman, in
addition to being "subjected . . . to emotional abuse and physical and emotional neglect."
Complaint ¶ 96, at 25.

Moreover, the Complaint alleges that A.M. was "rarely allowed to leave" the Homestead
House.  Complaint ¶ 85, at 23; id. ¶ 89, at 24.  A.M.'s developmentally disabled co-resident, J.P.,
suffered repercussions for her attempts to leave the Homestead House.  See Complaint ¶ 89,
at 24.  On one occasion, J.P. tried to escape the Homestead House by climbing over a wall,
prompting M. Evans to bring her back, take away her shoes, and plant cactus at the spot where
she had climbed over the wall, in an effort to keep J.P. on the property in the future.  See
Complaint ¶ 89, at 24.  J.P.'s later escape attempt resulted in her landing in the newly planted
cactus.  See Complaint ¶ 89, at 24.  M. Evans "thus made clear to [A.M.] that she possessed the
authority to prevent all individuals 'discharged' to her care from leaving the confinement of the
Homestead House."  Complaint ¶ 89, at 24.

Considered independently, none of the incidents that A.M. alleged would rise to the level
of the physical coercion that the Supreme Court established in United States v. Kozminski for
involuntary servitude.  Evaluating the allegations in the aggregate, however, as the Tenth Circuit
did in United States v. Kaufman, paints a clearer picture of A.M.'s living and working conditions
under M. Evans' watch.  A.M., after being sent to a group for the elderly, was directed to perform
work that went beyond personal chores or cleaning up after herself.  See Complaint ¶ 93,

at 24-25.  When A.M. failed to do her work, M. Evans subjected her to "emotional abuse and physical . . . neglect."  Complaint ¶ 96, at 25.

In light of these alleged facts, and the inferences drawn therefrom, A.M. reasonably believed that she could not leave the Homestead House.  That belief found support in her experience seeing her co-resident returned to the house when she attempted  to leave, seeing her co-resident's shoes taken away, and seeing her co-resident risk injury by cactus plants strategically placed to cause injury to a bare-footed woman attempting to leave the property.  See Complaint ¶ 89, at 24.  Considering A.M.'s allegations in sum, A.M. "suffered far more" than any single verbal abuse in the course of M. Evans' "efforts to compel" A.M. to perform labor at the Homestead House.  United States v. Kaufman, 546 F.3d at 1265.  M. Evans' efforts to control A.M. and keep her at the Homestead House thus amounted to physical coercion.

Such conditions likely are insufficient to cause an individual of average mental capacity or competency to believe that she or he is physically compelled to perform work against her or his will.  A.M., however, like the victims in both United States v. Kozminski and United States v. Kaufman, is developmentally disabled, and her condition warrants the Court's unique consideration.  A.M.'s mental condition means that she viewed the threat of injury or emotional abuse at M. Evans' hands differently than someone with an average cognitive capacity.  That "special vulnerability" meant that the fear of losing her shoes if she attempted to escape like her co-resident, or the fear of being verbally abused, was sufficient to put A.M. "in fear of such physical restraint or injury" to conclude that working for M. Evans was her only choice.  United States v. Kozminski, 487 U.S. at 952.

**B.   THE WORK THAT A.M. PERFORMED AT THE HOMESTEAD HOUSE WAS NOT THERAPEUTIC.**

The coerced work that A.M. performed for M. Evans at the Homestead House was neither therapeutic nor beneficial to her mental health treatment program, and therefore violated the Thirteenth Amendment.  The Second Circuit has narrowed its application of the Thirteenth Amendment in cases that involve developmentally disabled individuals receiving mental health treatment.  See Jobson v. Henne, 355 F.2d 129.  In Jobson v. Henne, the Second Circuit held that developmentally disabled individuals participating in a treatment program can be required to perform work that either: (i) serves a therapeutic purpose or (ii) amounts to "normal housekeeping" chores.  355 F.2d at 131-32.

Jobson v. Henne involved a developmentally disabled plaintiff -- Warren Jobson -- who was required to work nights in the boiler room of the New Jersey state mental health facility where he was receiving mental health treatment.  See 355 F.2d at 130.  Jobson brought a § 1983 action against mental health facility officials, alleging that his work in the institution's boiler house eight hours a night, six nights a week, earning one cent per hour, amounted to involuntary servitude in violation of the Thirteenth Amendment.  See 355 F.2d at 132 & n.5.  The Second Circuit held that it was not a Thirteenth Amendment violation for treatment providers to require individuals in their care to either perform personally related chores and housekeeping, or other work that serves a therapeutic purpose.  See 355 F.2d at 131-32.  Upholding Jobson's § 1983 claim, Judge Waterman said: "[I]t would seem that the Thirteenth Amendment may be violated if a mental institution requires inmates to perform chores which have no therapeutic purpose or are not personally related, but are required to be performed solely in order to assist in the defraying of institutional costs."  355 F.2d at 132 n.3.

In <u>Weidenfeller v. Kidulis</u>, the plaintiffs were two developmentally disabled individuals whom the Wisconsin Department of Health permanently discharged to private entities "for custodial care and treatment."  380 F. Supp. at 447.  One of the plaintiffs -- Weidenfeller -- was forced to move grass, clean patients' rooms, and wash dishes without compensation.  <u>See</u> 380 F. Supp. at 447.  The other -- Kryszewski -- was forced to unload various materials, clean toilets and sinks, and scrub the kitchen floor without compensation.  <u>See</u> 380 F. Supp. at 447.  The plaintiffs alleged that the work requirements amounted to involuntary servitude in violation of the Thirteenth Amendment.  <u>See</u> 380 F. Supp. at 450-51.  Judge Reynolds noted that, at later stages of the lawsuit, "the plaintiffs here will carry a heavy burden in demonstrating that any given task is not therapeutic," but Judge Reynolds ruled that the plaintiffs sufficiently alleged in their complaint that their work was non-therapeutic and denied the treatment provider's motion to dismiss.  380 F. Supp. at 451.

The therapeutic-labor and personal-chores exceptions to Thirteenth Amendment claims that the Second Circuit created in <u>Jobson v. Henne</u> are not binding on the Court.  The Second Circuit's holding, however, is the only one to address the unique challenge of balancing mental health treatment with some degree of work assignment.  That approach has drawn support from at least one legal scholar, who argues that it allows more flexible treatment options for mental health patients in the state's custody.  "The <u>Jobson</u> court's analysis seems correct. . . .  If certain types of labor are, in fact, beneficial for a particular patient, it would be permissible for a court to authorize such therapy and for the institution to coerce such labor."  <u>Civil Commitment of the Mentally Ill</u>, 87 Harv. L. Rev. 1190, 1374 (1974).  Other scholars have discussed the <u>Jobson v. Henne</u> ruling without endorsing or criticizing it.  <u>See, e.g.</u>, Lauren J. Kares, <u>The Unlucky Thirteenth: A Constitutional Amendment in Search of a Doctrine</u>, 80 Cornell L. Rev. 372, 395

(1995); Paul R. Friedman, <u>The Mentally Handicapped Citizen and Institutional Labor</u>, 87 Harv. L. Rev. 567, 582 n.88 (1974).  The Court has been unable to find any scholar who has criticized the holding.  Other courts also have adopted the Second Circuit's therapeutic labor and personal chores exceptions.  <u>See</u>, <u>e.g.</u>, <u>Weidenfeller v. Kidulis</u>, 380 F. Supp. at 450; <u>Davis v. Balson</u>, 461 F. Supp. 842, 852 (N.D. Ohio 1978).  No court has criticized the standard, and no court has offered an alternative.

The Court will adopt the <u>Jobson v. Henne</u> therapeutic labor and personal chores exceptions.  The Court has also not thought of a better test.  Exempting "personally related" housekeeping chores, <u>Jobson v. Henne</u>, 355 F.2d at 132 n.3, and other therapeutic work from constituting involuntary servitude ensures that health care providers tasked with teaching developmentally disabled patients to better care for themselves will not face legal claims for insisting that capable patients perform tasks like brushing their own teeth, making their beds, or helping to clean up after themselves.  Considering the unique challenges of providing mental health treatment, the Court finds the <u>Jobson v. Henne</u> exceptions to be persuasive.

The Individual DOH Defendants argue that A.M. fails to allege that the work that M. Evans coerced her to perform was not therapeutic, and, therefore the <u>Jobson v. Henne</u> exceptions apply.  <u>See</u> MTD at 6; Reply at 3.  The Court disagrees.  The work that A.M. performed for M. Evans was neither therapeutic nor limited to personal chores.  First, the Homestead House, which was intended to care for elderly patients, was not licensed to provide care to developmentally disabled individuals.  <u>See</u> Complaint ¶ 85, at 23.  The lack of professional licensure means that M. Evans did not have any certifiable knowledge of A.M.'s condition or what activities might have entailed a "therapeutic" treatment program.  The Homestead House provided "no programs, treatment or services" to A.M.  Complaint ¶ 90, at 24.

Without the availability to treatment programs or trained staff at the Homestead House, any work that A.M. performed was "devoid of therapeutic purpose." Jobson v. Henne, 355 F.2d at 132.

A.M. was "put to work" by M. Evans to "provide[] labor in the form of housekeeping and other services" at the Homestead House, and that work was uncompensated,  Complaint ¶ 93, at 24-25, indicating that A.M. was expected to do more than perform her own chores.  A reasonable jury could draw the inference from A.M.'s Complaint that her work entailed helping to maintain the Homestead House facility.  For M. Evans, having A.M. to help with chores around the Homestead House meant not paying a capable employee -- who would have demanded a fair wage -- to do that same work at the Homestead House.  Like the plaintiffs in Jobson v. Henne and Weidenfeller v. Kidulis, A.M. alleges that she provided work for the benefit of the facility that provided her care, rather than for her own good.  A.M.'s work, based on the allegations in the Complaint, was not as "ruthless" as the work required of the plaintiff in Jobson v. Henne -- who was required to work nights in the facility boiler room -- but it nonetheless fell short of the self-help standard that the Second Circuit court described as being exempt from the Thirteenth Amendment.  See Jobson v. Henne, 355 F.2d at 132.  Therefore, the Second Circuit's therapeutic-labor exception does not apply to M. Evans' conduct.

## II.   THE INDIVIDUAL DOH DEFENDANTS PROXIMATELY CAUSED M. EVANS' VIOLATION OF A.M.'S THIRTEENTH AMENDMENT RIGHT TO BE FREE FROM INVOLUNTARY SERVITUDE.

The Individual DOH Defendants should have known that their transfer of A.M. to the Homestead House, and their failure to properly supervise M. Evans after the transfer was completed, would result in M. Evans' deprivation of A.M.'s Thirteenth Amendment right.

 Section 1983 attaches liability for a state actor who "subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges or immunities secured by the

Constitution." 42 U.S.C. § 1983. That language means that the Individual DOH Defendants can be held liable for third parties' acts that they did not personally commit, such as M. Evans' subjecting A.M. to involuntary servitude. The courts have identified that indirect liability under § 1983 as proximate causation. See, e.g., Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978)("Anyone who 'causes' any citizen to be subjected to a constitutional deprivation is also liable. The requisite causal connection can be established . . . by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury."); Trask v. Franco, 446 F.3d at 1046("Thus, Defendants are liable for the harm proximately caused by their conduct.").

The Tenth Circuit's analysis of proximate causation for § 1983 liability has established three elements. First, the state agent must have "set in motion" the series of events that resulted in a constitutional violation. Trask v. Franco, 446 F.3d at 1046. Second, the state agent must have known, or reasonably should have known, that the events he or she set in motion would result in a constitutional deprivation. See Trask v. Franco, 446 F.3d at 1046. Finally, no unforeseeable intervening and superseding act could have occurred between the events that the state agent set into motion and the ultimate constitutional violation. See Trask v. Franco, 446 F.3d at 1046 (quoting Restatement (Second) of Torts § 442 (1965)).

The Tenth Circuit has decided a broad scope of cases that detail the contours of § 1983 proximate causation liability. In Martinez v. Carson, 697 F.3d 1252 (10th Cir. 2012), two New Mexico Department of Corrections officers, who worked as adjuncts on a task force with the Rio Rancho Department of Public Safety, were held liable for Fourth Amendment violations that Rio Rancho officers committed against detainees that the corrections officers initially detained and transferred. See 697 F.3d at 1255. The corrections officers unlawfully detained the plaintiffs for

fewer than three minutes before transferring them to the Rio Rancho officers' custody for further investigation.  See 697 F.3d at 1254.  The Rio Rancho officers subsequently arrested and booked the plaintiffs.  See 697 F.3d at 1254.  The Rio Rancho officers unlawfully held one plaintiff for twelve hours, and the other for five hours.  See 697 F.3d at 1254.  In an opinion that the Honorable Monroe G. McKay, United States Circuit Judge for the Tenth Circuit, authored, and Judges Lucero and Gorsuch joined, the Tenth Circuit held that the corrections officers were liable for the Rio Rancho officers' Fourth Amendment violation, because their initial unlawful seizure of the plaintiffs "set in motion a series of events" that the corrections officers "knew or reasonably should have known" would result in others depriving the plaintiffs of their constitutional rights.  697 F.3d at 1255 (quoting Trask v. Franco, 446 F.3d at 1046).  Judge McKay wrote:

> Plaintiffs' arrests and prolonged detentions would not have occurred had Defendants not seized them and transferred them to the custody of Rio Rancho officers. . . .  Although Defendants may not have foreseen the full extent of the detention, a jury could certainly find that they foresaw at least some additional period of detention while, for instance, the Rio Rancho officers conducted an investigation into probable cause.

Martinez v. Carson, 697 F.3d at 1255-56.  The Tenth Circuit remanded the case to the district court to allow a jury to determine the extent of the corrections officers' liability for the constitutional violation that the Rio Rancho officers committed by allowing the jury to consider evidence presented on the foreseeability of the extended detention.  See 697 F.3d at 1256.

The proximate causation standard under § 1983 also extends beyond the scope of Fourth Amendment violations.  The Tenth Circuit has recognized proximate causation liability for First, Eighth, and Fourteenth Amendment violations.  Northington v. Marin, 102 F.3d 1564 (10th Cir. 1996),  involved an Eighth Amendment claim for prison guards' failure to protect an inmate from other prisoners' abuses after prison guards spread rumors among the inmates that the

plaintiff was a "snitch."  102 F.3d at 1567.  In an opinion that the Honorable Mary B. Briscoe,

now Chief United States Circuit Judge for the Tenth Circuit, authored, and Judges Baldock and

Logan joined, the Tenth Circuit held that the guards' act of spreading a rumor about the plaintiff

was the proximate cause of his beatings and a constitutional violation recognized under § 1983.

See 102 F.3d at 1569.  The Tenth Circuit said that the guards' defense, contending that their

intent in spreading the rumor was to protect other inmates from harm through association with

the plaintiff rather than to cause harm to the plaintiff, fails, because the defendants "knew the

probable result would be that [plaintiff] would be beaten."  102 F.3d at 1568.

Lippoldt v. Cole, 468 F.3d 1204 (10th Cir. 2006), involved First Amendment violations

that occurred when the Wichita, Kansas, police chief denied numerous applications for public

parade permits for a group of abortion protesters.  See 468 F.3d at 1209-10.  In an opinion that

Judge Briscoe authored, and Judges McWilliams and Ebel joined, the Tenth Circuit held that

other city officials who did not directly deny the permit requests but played a role in the

applications' consideration proximately caused the First Amendment violation.  See 468 F.3d

at 1220.  The Tenth Circuit found that a city official who researched legal standards upon which

the police chief relied to deny the parade permits, and a deputy police chief who signed at least

one of the permit denials on the police chief's behalf, had set in motion the First Amendment

violation.  See 468 F.3d at 1219-20.  Judge Briscoe reasoned that the city officials who

proximately caused the First Amendment violations were held liable under §1983, because

"[t]hat conduct of other people may have concurrently caused the harm does not change the

outcome as to [plaintiffs]."  468 F.3d at 1220.

Miller v. City of Mission, 705 F.2d 368 (10th Cir. 1983), involved a § 1983 claim that

members of the Mission, Kansas, city council violated the city police chief's Fourteenth

Amendment procedural due-process rights when they encouraged the mayor to fire him without a termination hearing.  See 705 F.2d at 371-72.  In an opinion that the Honorable Stephanie K. Seymour, United States Circuit Judge for the Tenth Circuit authored, and Judge McWilliams joined, the Tenth Circuit said: "Ample evidence supports the jury's inference that the mayor would not have dismissed [the police chief] without a hearing absent the support and encouragement of defendant council members."  705 F.2d at 376.  The Tenth Circuit held that the city council members' advice to the mayor proximately caused the procedural due-process violation.  See 705 F.2d at 375-76.  The Tenth Circuit explained that, at a minimum, the city council members "set into motion a series of events by others which they reasonably should have known would have resulted in [the police chief's] dismissal without a hearing."  705 F.2d at 375.

A.M. plausibly alleges that the Individual DOH Defendants proximately caused M. Evans' violation of A.M.'s Thirteenth Amendment right, because their collective transfer of A.M. to the Homestead House "set in motion," Martinez v. Carson, 697 F.3d at 1255, the series of events that "cause[d] [A.M.] to be subjected," 42 U.S.C. § 1983, to involuntary servitude at M. Evans' hands.

The Complaint alleges that the Individual DOH Defendants collectively "abandoned" A.M. when they transferred her from a state care facility to the Homestead House, where A.M. was deprived of adequate safety, social services, government benefits, medical and rehabilitative care, and "her basic human rights."  Complaint ¶ 85, at 23.  In particular, Schaefer, the lawyer for the New Mexico Department of Health and the Training School, "participated in deciding" to place A.M. at the Homestead House.  Complaint ¶ 58, at 15-16.  Sandoval, the director of resident living at the Training School, was personally "responsible for determining the suitability of placements" for A.M., and responsible for "supervising and monitoring" A.M. after her

transfer.  Complaint ¶ 16, at 6.  Adams, the deputy administrator for the Training School, personally participated in the decision to transfer A.M. to the Homestead House "without taking any steps to ascertain whether she would be safe."  Complaint ¶ 18, at 6.  Mateju, the Training School administrator, made the "final decisions" on "all placement and discharge decisions" for A.M.  Complaint ¶ 20, at 7.

A.M. alleges that the Individual DOH Defendants, collectively, did not conduct a home visit at the Homestead House before A.M.'s transfer, see Complaint ¶ 62, at 17, and "were deliberately indifferent to the need to investigate the Homestead House prior to placing" A.M. there, Complaint ¶ 75, at 20.  The Individual DOH Defendants approved of the arrangement with the Homestead House that allowed M. Evans to keep A.M.'s federal benefits, but still "force her to work in return for a place to live."  Complaint ¶ 95, at 25.  The Individual DOH Defendants failed to establish any system "to provide oversight" to third-party placements like the Homestead House.  Complaint ¶ 64, at 18.  The Individual DOH Defendants "were deliberately indifferent to the likelihood that Plaintiff . . . would lose federal and constitutional rights." Complaint ¶ 95, at 25.  State agency officials later shut down the unlicensed Homestead House, but the Individual DOH Defendants were indifferent to the need to find A.M. a new care facility. See Complaint ¶ 97, at 25.  Instead, the Individual DOH Defendants allowed A.M. to be transferred to M. Evans' private residence.  See Complaint ¶ 98, at 25-26.

The Individual DOH Defendants repeatedly remind the Court that they did not personally direct A.M. to perform work at the Homestead House or physically coerce her to complete the work.  See MTD at 7; Reply at 3; Tr. at 13:11-16.  They argue that the constitutional violation committed by M. Evans, a private third party, was not "under color of state law," and, therefore § 1983 does not cover M. Evans' conduct.  MTD at 7.  The Court disagrees.  The Individual DOH

Defendants do not address A.M.'s allegation that placing her in M. Evans' care and failing to oversee that care caused A.M. to be subjected to a third party's involuntary servitude.  The Individual DOH Defendants, acting under color of state law, should have foreseen that transferring a thirty-two-year-old, developmentally disabled woman to live at an unlicensed group home for the elderly, without arrangements for funding from the State of New Mexico to pay for her care,[19] would result in A.M. being forced to work to cover her expenses at the Homestead House.  See Complaint ¶ 64, at 18; id. ¶ 95, at 25.

The Individual DOH Defendants' transfer of A.M. to the Homestead House under the alleged circumstances was more egregious than the transfer of custody in Martinez v. Carson, where the Tenth Circuit held that corrections officers should have foreseen the unconstitutional prolonged detention that Rio Rancho police officers committed after the corrections offers initiated an unlawful stop of the plaintiffs and transferred them to the officers' custody.  See 697 F.3d at 1256.  Like the unconstitutional detention in that case, the violation of A.M.'s Thirteenth Amendment right "would not have occurred but for their conduct" of arranging the opportunity for M. Evans to exploit A.M. at the Homestead House.  Martinez v. Carson, 697 F.3d at 1255.  See Complaint ¶ 64, at 18; id. ¶ 95, at 25.  "The requisite causal connection is satisfied if [the Defendants] set in motion a series of events that [the Defendants] knew or reasonably should have known would cause others to deprive [A.M.] of [her] constitutional rights."  Martinez v. Carson, 697 F.3d at 1255 (quoting Trask v. Franco, 446 F.3d at 1046).

---

[19]The Complaint alleges that the arrangement between the New Mexico Department of Health and the Homestead House authorized M. Evans to keep A.M.'s Social Security checks for herself, while expecting A.M. would work "in return for a place to live."  Complaint ¶ 95, at 25.  The Individual DOH Defendants might be alleging that assigning A.M.'s Social Security funds to M. Evans was sufficient to pay for A.M.'s food, shelter and care.  Setting aside whether such a transfer of an individual's Social Security funds was legal, the State of New Mexico and its Department of Health -- which remain legally responsible for A.M. -- were paying nothing from their coffers to ensure that the Homestead House was meeting A.M.'s basic needs.

Also, like the transfer of police custody in Martinez v. Carson, there was no unforeseeable intervening and superseding act that could precluded the Individual DOH Defendants' proximate causation of A.M.'s constitutional violation, because the Individual DOH Defendants' transfer of A.M. to the Homestead House's care played out as they "approved." Complaint ¶ 95, at 25. See Martinez v. Carson, 697 F.3d at 1255.

The Individual DOH Defendants argue that they cannot be held liable for the conduct of M. Evans, a private third-party, because the Individual DOH Defendants were not the direct cause of M. Evans' violation of A.M.'s Thirteenth Amendment right. See MTD at 7; Reply at 3; Tr. at 13:11-16. Again, the Court disagrees. That M. Evans was not a state actor does not shield the Individual DOH Defendants from proximate causation liability under § 1983. The Tenth Circuit recognized in Northington v. Marin that state actors can be held liable for proximately causing constitutional violations that private third parties committed, if the state actor set into motion the harm. See 102 F.3d at 1569. The Individual DOH Defendants' direction for M. Evans, as a private party, to provide for A.M. without state funding, see Complaint ¶ 95, at 25, was similar to the other prison inmates in Northington v. Marin, to whom prison guards warned that the plaintiff inmate was a snitch. See 102 F.3d at 1569. State actors did not direct M. Evans, or the inmates who ultimately beat the plaintiff in Northington v. Marin, to cause a constitutional violation. The actions that the Individual DOH Defendants took, however, by allegedly transferring A.M. to an unlicensed facility for the elderly without arranged state funding or a system for monitoring A.M.'s care, made the possibility that A.M. could be put to work at the Homestead House just as foreseeable as the inmates' beating when tipped off by prison guards that there was a snitch in their ranks. See Complaint ¶ 64, at 18; id. ¶ 95, at 25. See Northington v. Marin, 102 F.3d at 1568-69. Like the prison guards who knew that labeling

- 90 -

an inmate a snitch would likely result in beatings, the Individual DOH Defendants were aware that M. Evans "intended to keep [A.M.]'s federal benefits and force her to work in return for a place to live, and approved the arrangement."  Complaint ¶ 95, at 25.

Similar to the city workers in Lippoldt v. Cole and Miller v. City of Mission, who provided advice or clerical work on decisions that ultimately resulted in constitutional violations, each of the Individual DOH Defendants who personally contributed to the decision-making process to transfer A.M. to the Homestead House without an adequate system to monitor A.M.'s care proximately caused M. Evans' violation of A.M.'s Thirteenth Amendment right.  See Complaint ¶ 64, at 18; id. ¶ 95, at 25.  As the Tenth Circuit said in Lippoldt v. Cole, "[t]hat conduct of other people may have concurrently caused the harm does not change the outcome as to [A.M.]."  468 F.3d at 1220.  The Tenth Circuit's holding in Lippoldt v. Cole stands for two interpretations of proximate causation liability under § 1983 that apply to this case.  First, that M. Evans violated A.M.'s Thirteenth Amendment right does not insulate the Individual DOH Defendants from liability under §1983 for laying the groundwork for those constitutional violations to occur.   Second, that Mateju made the "final decisions" on A.M.'s transfer, Complaint ¶ 20, at 7, does not shield Schaefer, Sandoval, and Adams from liability, because A.M. sufficiently alleges that they each personally contributed in some way to the decision-making process of transferring A.M. to the Homestead House.  See Complaint ¶  16, at 6; id. ¶ 18, at 6; id. ¶ 58 at 15-16.

A.M. has therefore plausibly alleged that the Individual DOH Defendants proximately caused A.M.'s involuntary servitude and that they may be liable under § 1983 for that constitutional violation, because the Individual DOH Defendants should have known -- collectively and individually -- that their transfer of A.M. to the Homestead House without state

funding arrangements, see Complaint ¶ 95, at 25, and their failure to oversee M. Evans

thereafter, see Complaint ¶ 64, at 18, would result in the deprivation of A.M.'s Thirteenth

Amendment right.[20]

---

[20]The Individual DOH Defendants argued at the hearing that the Court should apply the legal analyses used in substantive due-process claims to establish state actors' liability for the acts of non-governmental third parties -- the special-relationship doctrine and the danger-creation exception -- to A.M.'s Thirteenth Amendment claim.  The Court will not apply those substantive due-process tests to this Thirteenth Amendment claim for three reasons.  First, to apply substantive due-process exceptions to the Thirteenth Amendment is unprecedented -- the Individual DOH Defendants have not identified, and the Court cannot find, any case where the court applies the substantive due-process special-relationship doctrine or danger-creation exception outside of the Fourteenth Amendment context.  Second, substantive due-process tests should not apply in cases where a narrower constitutional test is available.  Here, the Thirteenth Amendment case law provides a more tailored approach to considering the underlying constitutional violation that A.M. alleged.  See J.H. ex rel. J.P. v. Nation, No. CIV 12-0128 JB/WDS, 2015 WL 403734, at *20 (D.N.M. Jan. 14, 2015)(Browning, J.)("[W]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.")(quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 842 (1997)).  This holding does not affect the Court's prior ruling that A.M.'s substantive due-process rights were violated, because the earlier analysis evaluated different conduct, specifically that the Individual DOH Defendants allegedly failed to protect A.M.'s right to safety and treatment.  See A.M. ex rel. Youngers v. N.M. Dep't of Health, No. CIV 13-0692 JB/WPL, 2014 WL 6969684, at *36 (D.N.M. Dec. 5, 2014).  The Thirteenth Amendment claim evaluates the work that M. Evans allegedly required A.M. to perform.  Finally, the special-relationship doctrine and the danger-creation exception are established to hold state actors liable for conduct where there is no causation, a tool unnecessary here because the Individual DOH Defendants proximately caused M. Evans' violation of A.M.'s Thirteenth Amendment right.

Even if these doctrines apply in Thirteenth Amendment cases generally, they do not dictate a different result in this case, in particular, because the Court previously established that the Individual DOH Defendants' legal custody of A.M. created a special relationship.  See A.M. ex rel. Youngers v. N.M. Dep't of Health, No. CIV 13-0692 JB/WPL, 2014 WL 6969684, at *37-45 (D.N.M. Dec. 5, 2014)(Browning, J.)(concluding that the special relationship doctrine applies to the Individual DOH Defendants' responsibility for A.M., the danger creation exception does not apply to the Individual DOH Defendants' conduct, and denying, in part, the Individual DOH Defendants MTD for A.M.'s substantive due-process claim).  In other words, the Court's earlier findings that the Individual DOH Defendants had a special relationship with A.M. means that relationship would have been sufficient to hold them liable for M. Evans' violation of A.M.'s Thirteenth Amendment right if proximate causation was not established, because the special relationship doctrine operates in place of the causation element, rather than establishing the underlying constitutional violation.

III.     **A.M. DID NOT STATE A CLAIM FOR A § 1983 CONSPIRACY.**

A.M. did not allege a claim for conspiracy under § 1983.  If she had, it would fail to directly connect the conduct of the Individual DOH Defendants to M. Evans' violation of A.M.'s Thirteenth Amendment right.  In Tonkovich v. Kansas Board of Regents, 159 F.3d 504 (10th Cir. 1998), the Tenth Circuit said that a valid conspiracy claim under § 1983 "must allege specific facts showing an agreement and concerted action amongst the defendants" to violate the plaintiff's constitutional rights.  159 F.3d at 533.  In Hunt v. Bennett, 17 F.3d 1263(10th Cir. 1989), the Tenth Circuit defined an agreement for a § 1983 conspiracy as a "meeting of the minds" between all parties.  17 F.3d 1268.  Moreover, the Tenth Circuit has said that "[c]onclusory allegations of conspiracy are insufficient to state a valid § 1983 claim." Tonkovich v. Kansas Bd. of Regents, 159 F.3d 533 (quoting Hunt v. Bennett, 17 F.3d at 1266).

In Snell v. Tunnell, 920 F.2d 673 (10th Cir. 1990), the Tenth Circuit said that the plaintiff sufficiently stated a claim for a §1983 conspiracy by alleging a series of facts that, in the aggregate, demonstrated an agreement between the defendants to act in concert to violate the plaintiff's constitutional rights.   See 920 F.2d at 701-02.   Snell v. Tunnell involved the proprietors of an emergency shelter for children whose home was raided by police based upon a false tip from state DHS officials.   See 920 F.2d at 683-87.   The Tenth Circuit noted that the allegations of "repeated attempts to harass and gain entry into the Snell's home" provided

---

Had the Court concluded that the danger-creation exception applied to the Individual DOH Defendant's transfer of A.M., the Court would still have granted the Individual DOH Defendants' qualified immunity defense.  Because no court has applied danger creation to Thirteenth Amendment law, the Court could not soundly find that the Individual DOH Defendants violated clearly established law.  They therefore would retain qualified immunity, even if the Court applied the danger creation exception.

multiple examples of the defendants' agreement to act in concert to violate the plaintiff's Fourth Amendment rights, and therefore demonstrated a plausible claim for a §1983 conspiracy.   920 F.2d at 702

A.M.'s allegations related to conspiracy, however, are not as complete as <u>Snell v. Tunnell</u>'s.   A.M. does not allege that the Individual DOH Defendants expressly agreed with M. Evans to carry out a common goal of violating A.M.'s Thirteenth Amendment right.   Instead, A.M. alleges merely that the Individual DOH Defendants "approved of the arrangement" for M. Evans to violate A.M.'s Thirteenth Amendment right.   Complaint ¶ 95, at 25.   A.M., however, provides no facts in her Complaint to support the conclusion that M. Evans and the Individual DOH Defendants acted in concert or conspired to do so.   The tacit approval in this case falls short of the "meeting of the minds" standard for agreement to a § 1983 conspiracy that <u>Hunt v. Bennett</u> set out.   17 F.3d 1268.   Moreover, other allegations about the Individual DOH Defendants' degree of involvement in M. Evans' care of A.M. undercut any conspiracy claim. A.M. alleges, for example, that the state was "deliberately indifferent" to M. Evans' treatment of A.M. Complaint ¶ 95, at 25.   In sum, A.M.'s allegations relating to a potential conspiracy between M. Evans and the Individual DOH Defendants are not plausible.   Applying the Tenth Circuit's standard in <u>Tonkovich v. Kansas Board of Regents</u>, A.M.'s "[c]onclusory allegations of conspiracy are insufficient to state a valid § 1983 claim." 159 F.3d at 533.

Even if A.M. could establish a § 1983 conspiracy between the Individual DOH Defendants and M. Evans, the Individual DOH Defendants would retain qualified immunity, because a cause of action for a § 1983 conspiracy to violate an individual's Thirteenth Amendment right was not clearly established in 1979.   Indeed, before 1979, no court had ruled on a conspiracy claim brought under § 1983.   Without a case on point, the Court cannot find that

- 94 -

the law was clearly established when a "distinction <u>might</u> make a constitutional difference."

<u>Kerns v. Bader</u>, 663 F.3d at 1187 (emphasis in original).   In this case, applying conspiracy to an

uncharted area of constitutional law creates that distinction.[21]

_____

[21]M. Evans was not a state actor.  The state-action doctrine allows plaintiffs to bring § 1983 actions against private parties for constitutional violations caused "under color" of state law.   42 U.S.C. § 1983.   The Court addresses the state actor analysis, nonetheless, as a component of a potential § 1983 conspiracy claim.   That analysis demonstrates that M. Evans falls short on each of Supreme Court's four tests used to determine whether conduct of a private party makes them a state actor.

Private parties may be deemed state actors when their "conduct allegedly causing the deprivation of a federal right may be fairly attributable to the State."  <u>Lugar v. Edmondson Oil Co., Inc.</u>, 457 U.S. at 937.  Whether the conduct may in fact be "fairly attributed" to the state requires a two-part inquiry.  "First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible."  <u>Lugar v. Edmondson Oil Co., Inc.</u>, 457 U.S. at 937.  "Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor."  <u>Lugar v. Edmondson Oil Co., Inc.</u>, 457 U.S. at 937.

A.M. sufficiently alleges that the Individual DOH Defendants satisfied the first prong of the <u>Lugar v. Edmondson Oil Co., Inc.</u> inquiry by transferring A.M. to the Homestead House and "cloaking the Homestead House and Mary Evans with untoward authority and absolute control over the life of [A.M.]."  Complaint ¶ 77, at 21.  Thus, the Court must address the second prong of the <u>Lugar v. Edmondson Oil Co., Inc.</u> inquiry to conclude whether the conduct made M. Evans a state actor.  To determine that question, the Supreme Court has articulated four different tests for courts to apply: (i) the public-function test; (ii) the nexus test; (iii) the symbiotic-relationship test; and (iv) the joint-action test.  <u>See</u> <u>Johnson v. Rodrigues (Orozco)</u>, 293 F.3d at 1202-03.  The Court will apply each test in order.

The public-function test applies when a private party invokes "powers traditionally exclusively reserved to the State."  <u>Jackson v. Metro. Edison Co.</u>, 419 U.S. 345, 352 (1974).  In <u>Johnson v. Rodrigues (Orozco)</u>, the Tenth Circuit explained that the public-function tests applies to situations like private parties holding elections, performing necessary municipal functions, or running state nursing facilities.  <u>See</u> 293 F.3d at 1203.  <u>Johnson v. Rodrigues (Orozco)</u> involved a claim that a private adoption facility violated the plaintiff's due-process rights by putting his child up for adoption.  <u>See</u> 293 F.3d at 1198-99.  The Tenth Circuit held that the private adoption facility failed the public-function test, because it was not the "exclusive means to adopt a child" in the state.  293 F.3d at 1203.

A.M. cannot demonstrate that M. Evans was a state actor under the public-function test.  The public-function test does not apply, because, like the adoption center in <u>Johnson v. Rodrigues (Orozco)</u>, the Homestead House was not the sole provider of aftercare services for the Department of Health.  <u>See</u> ¶ 37, at 10.  Rather, M. Evans was one of many care providers to whom the state transferred mental health patients as part of its aftercare program.  Meanwhile, the Department of Health continued operating its Training School facilities to care for other developmentally disabled patients in state custody who were not transferred.  <u>See</u> Complaint

- 95 -

¶ 48, at 13 ("[H]undreds of people [were] still residing on the grounds at the Training School."). Because the Homestead House was not the exclusive provider of mental health services in New Mexico, M. Evans was not a state actor under the public-function test.

The second test, the nexus test, recognizes that state action is present if the state has ordered the private conduct or "exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." Blum v. Yaretsky, 457 U.S. 991, 993 (1982). The nexus test evaluates whether there is a sufficiently close nexus between the state and the challenged conduct, such that the conduct "may be fairly treated as that of the state itself." Jackson v. Metro. Edison Co., 419 U.S. at 351.

In Gallagher v. Neil Young Freedom Concert, the Tenth Circuit held that a private security company failed the nexus test, and was not a state actor capable of Fourth Amendment violations, after the company decided to conduct pat-down searches outside a concert which a state university hosted. See 49 F.3d at 1450. The Court held that the plaintiff failed to establish that the unconstitutional pat-downs were university policy rather than the private security company's policy. See 49 F.3d at 1450. Judge Henry said: "To be sure, if the appellants could demonstrate that the pat-down searches directly resulted from the University's policies then the required nexus would be established. However, evidence of such a specific causal connection is lacking." 49 F.3d at 1450.

M. Evans is not a state actor under the nexus test. A.M. does not allege that the Individual DOH Defendants either coerced or "provided such significant encouragement," Blum v. Yaretsky, 457 U.S. at 1004, for M. Evans to subject A.M. to forced labor. As the Tenth Circuit concluded that "[m]ere approval of or acquiescence" was insufficient to establish a nexus between a state actor and a private party's unconstitutional pat-downs in Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1448 (quoting Blum v. Yaretsky, 457 U.S. at 1004-05), the Individual DOH Defendants' tacit approval of M. Evans' conduct is insufficient to transform her into a state actor.

The third test for attributing private parties' conduct to state action is the symbiotic-relationship test. Under the symbiotic-relationship test, state action is present if the state "has so far insinuated itself into a position of interdependence" with a private party that "it must be recognized as a joint participant in the challenged activity." Burton v. Wilmington Parking Authority, 365 U.S. at 725. The Tenth Circuit has clarified that "extensive regulation, receipt of substantial state funds, and the performance of important public functions do not necessarily establish the kind of symbiotic relationship between the [state] and a private [party] that is required for state action." Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1451.

The Supreme Court has rejected the argument that state funding and state licensing alone convert a private party into a state actor. See Blum v. Yaretsky, 457 U.S. at 1010-11. Blum v. Yaretsky involved allegations that Medicare residents of an independent nursing home had their due-process rights violated when the nursing home decided to transfer them to a lower-level of care without notice, a change that resulted in the state reducing patients' Medicare benefits. See 457 U.S. at 993-95. Although the state licensed the nursing home, subsidized its operating and capital expenses, and paid medical expenses for about ninety percent of the nursing home's patients, that degree of support was insufficient to meet the symbiotic-relationship test, because the state had no input on the nursing home's ultimate decision to transfer patients to lower-level treatment. See 457 U.S. at 1010-11.

A.M. does not allege that the state and M. Evans were interdependent on M. Evans' decision to put A.M. to work at the Homestead House, or that the Individual DOH Defendants were a joint participant in M. Evans' violation of A.M.'s Thirteenth Amendment right. Rather, A.M. alleges that the state was "deliberately indifferent" to M. Evans' treatment of A.M., Complaint ¶ 95, at 25, suggesting that the state had nothing to gain from M. Evans' violation of A.M.'s Thirteenth Amendment right. Like <u>Blum v. Yaretsky</u>, which held that a symbiotic relationship did not exist between the state and a private nursing home where the state had no say on the patients' level of care, the Individual DOH Defendants had no direct input on M. Evans' care for A.M. A.M. alleges that the Individual DOH Defendants failed to supervise the Homestead House after A.M.'s transfer was completed, <u>see</u> Complaint ¶ 77, at 21, suggesting that an ongoing relationship between the Individual DOH Defendants and the Homestead House did not occur. Moreover, the state did not license the Homestead House to provide mental health care services, <u>see</u> Complaint ¶ 73, at 20, and did not pay M. Evans any state money to provide A.M.'s care, <u>see</u> Complaint ¶ 95, at 25. Even if the Homestead House were licensed and the state paid for A.M.'s care, applying <u>Blum v. Yaretsky</u>, those facts would be insufficient to establish that M. Evans and the state shared a symbiotic relationship.

The final test that the Supreme Court applies to find state action is the joint-action test. State action exists under the joint-action test if the private party is a "willful participant in joint action with the State or its agents." <u>Dennis v. Sparks</u>, 449 U.S. 24, 27 (1980). The Tenth Circuit has said that, "if there is a substantial degree of cooperative action between state and private officials . . . or if there is overt and significant state participation, in carrying out the deprivation of the plaintiff's constitutional rights, state action is present." <u>Gallagher v. Neil Young Freedom Concert</u>, 49 F.3d at 1454 (citations omitted)(internal quotation marks omitted). Other courts have found that "cooperative action and overt participation" establishes state action in a variety of circumstances. <u>See, e.g.</u>, <u>Howerton v. Gabica</u>, 708 F.2d 380, 385 (9th Cir. 1983)(finding state action based on police intervention at "every step" of eviction); <u>Jackson v. Pantazes</u>, 810 F.2d 426, 429 (4th Cir. 1987)(finding bail bondsman to be a state actor, because he obtained "significant aid" from a police officer in arresting the plaintiff); <u>Murray v. Wal-Mart, Inc.</u>, 874 F.2d 555, 559 (8th Cir. 1989)(finding state action when police officer relied on store manager's investigation in making arrest instead of conducting an independent investigation); <u>Sims v. Jefferson Downs Racing Ass'n, Inc.</u>, 778 F.2d 1068, 1079 (5th Cir. 1985)(finding state action when state racing officials issued order denying racing privileges in response to request of private party). For the joint-action test to apply, the public and private actors must share a common, unconstitutional goal. <u>See</u> <u>Sigmon v. CommunityCare HMO, Inc.</u>, 234 F.3d at 1126; <u>Gallagher v. Neil Young Freedom Concert</u>, 49 F.3d at 1454. Similar to the nexus test, a state entity's mere acquiescence to a private party's constitutional violation is insufficient to find joint action. <u>See</u> <u>Gallagher v. Neil Young Freedom Concert</u>, 49 F.3d at 1453.

In <u>Gallagher v. Neil Young Freedom Concert</u>, the Tenth Circuit held that the relationship between a private security company and a state university failed the joint-action test, because the university did not expressly direct the company's unconstitutional pat-downs, or any other specific security procedure. <u>See</u> 49 F.3d at 1455. Moreover, the Tenth Circuit said that the plaintiff failed to establish that the unconstitutional pat-downs were a common, unconstitutional goal shared by the university and the private security company, because there was "no evidence in the record from which a jury could reasonably conclude that University officials jointly participated in the pat-down searches." 49 F.3d at 1456. The university, instead, was "silent as

IV.   **THE INDIVIDUAL DOH DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY, BECAUSE §1983 PROXIMATE CAUSATION OF THIRTEENTH AMENDMENT VIOLATIONS WAS NOT CLEARLY ESTABLISHED IN 1979.**

The Individual DOH Defendants, in their Motion to Dismiss, assert that they are entitled to qualified immunity from A.M.'s claims, because "[q]ualified immunity shields state officials from liability for civil damages if they violate a plaintiff's federally protected rights so long as the state officials did not violate clearly established law."   MTD at 3 (citing Anderson v. Creighton, 483 U.S. at 638-39).   The Court agrees that the Individual DOH Defendants cannot properly be held liable for proximately causing the violation of A.M.'s Thirteenth Amendment right that M. Evans committed, because it was not clearly established in 1979 when the Individual DOH Defendants transferred A.M. to the Homestead House -- and is not clearly established today -- that a state actor can proximately cause a Thirteenth Amendment violation.

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person

---

to the kind of security" that it expected the private security company to provide.   49 F.3d at 1455.   The Tenth Circuit said that, at worst, that "silence establishes no more than the University's acquiescence in the practices of the parties that leased the [university facility] and is insufficient to establish state action under the joint action test."   49 F.3d at 1455.

Like Gallagher v. Neil Young Freedom Concert, where the Tenth Circuit held that the joint-action test failed without express direction for the security company to perform unconstitutional pat-downs, see 49 F.3d at 1455, A.M. cannot show that the Individual DOH Defendants expressly directed M. Evans to carry out a common goal of violating A.M.'s Thirteenth Amendment right.   A.M. alleges that the Individual DOH Defendants "approved of the arrangement" for M. Evans to "force [A.M.] to work."   Complaint ¶ 95, at 25.   That allegation, however, demonstrates "mere acquiescence," 49 F.3d at 1453, and falls short of the Tenth Circuit's holding that joint-action requires a "common, unconstitutional goal,"  49 F.3d at 1453-54.   Moreover, A.M. alleges that the state was "deliberately indifferent" to M. Evans' treatment of A.M., Complaint ¶ 95, at 25, further demonstrating that the Individual DOH Defendants, at worst, acquiesced to M. Evans' conduct.   A.M. provides no facts in her Complaint to support her conclusion that M. Evans and the Individual DOH Defendants acted in concert or conspiracy to violate A.M.'s Thirteenth Amendment right.

would have known." Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818). Qualified immunity also shields state actors who have "reasonable, but mistaken beliefs," and operates to protect state actors from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. at 205. When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct. See 533 U.S. at 205.

"A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'" Lobozzo v. Colo. Dep't of Corr., 429 F. App'x at 710 (quoting Zweibon v. Mitchell, 720 F.2d at 172-73). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d at 923. See Medina v. City & Cnty. of Denver, 960 F.2d at 1498. "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that [the proposed conduct] . . . violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (quoting Saucier v. Katz, 533 U.S. at 202). Moreover, public officials are not expected to tailor their conduct to account for future changes in the law. See Gomes v. Wood, 451 F.3d at 1134. "If the law is not clearly established, we do not require officials to anticipate its future developments." Gomes v. Wood, 451 F.3d at 1134 (internal quotation marks omitted).

The Supreme Court has clarified that the clearly established prong of the qualified- immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 131 S. Ct. at 2083. While a case directly on point is not required, the Supreme Court has held that "existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 131 S. Ct. at 2083. "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639. "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the volatile nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 131 S. Ct. at 2083. The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs," as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. at 205. Without a prior case on point to demonstrate clearly established law, the Tenth Circuit will not recognize any constitutional right as clearly established if "a distinction [from prior cases] might make a constitutional difference." Kerns v. Bader, 663 F.3d at 1186-87 (emphasis in original).

The Individual DOH Defendants' acts proximately violated A.M.'s Thirteenth Amendment right, satisfying the first step of the Saucier v. Katz analysis. See 572 F.3d at 1107. A.M. fails, however, on the second Saucier v. Katz step, because she cannot demonstrate that proximate causation of a Thirteenth Amendment violation was clearly established when the

Individual DOH Defendants transferred A.M. to the Homestead House in 1979.  See 572 F.3d at 1107.

A.M. has not identified, and the Court could not find, another case where the § 1983 proximate causation standard imparted liability in a Thirteenth Amendment claim against a state actor for conduct that a private third party committed.  Responding to the Individual DOH Defendants' assertion of a qualified immunity defense, A.M. argues that "her allegations . . . support[] a claim that Defendants' plan to give her to a private business violated her right against involuntary servitude, a right that was clearly established immediately after the Civil War." Reply at 11.  Supporting that assertion, A.M. cites J.M. v. New Mexico Department of Health, which held that Thirteenth Amendment protections were clearly established more than one-hundred and fifty years earlier by the Slaughter-House Cases, 83 U.S. at 36.  See March 4, 2009, MOO.

A.M.'s claim that her Thirteenth Amendment right in this case was clearly established addresses only half of the analysis.  She addresses the underlying Thirteenth Amendment violation, but fails to mention the § 1983 proximate causation standard required to impart liability on the Individual DOH Defendants for M. Evans' constitutional violations.

The Court agrees with A.M. that the Thirteenth Amendment right has been clearly established since the late 1800s, when the Supreme Court decided the Slaughter-House Cases, 83 U.S. at 72 ("Undoubtedly while negro slavery alone was in the mind of the Congress which proposed the thirteenth article, it forbids any other kind of slavery, now or hereafter."), and the Civil Rights Cases, 109 U.S. at 20 ("[T]he [Thirteenth] [A]mendment is not a mere prohibition of State laws establishing or upholding slavery, but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States.").  Had the Individual DOH

Defendants personally operated the Homestead House and coerced A.M. into involuntary servitude, the clearly established law that A.M. cites would be sufficient to hold state actors liable for Thirteenth Amendment violations which they personally committed. A.M. does not address, however, that connecting her Thirteenth Amendment violation to the Individual DOH Defendants' indirect act requires a second prong of analysis: showing that proximate causation of Thirteenth Amendment violations also was clearly established in 1979. It was not, and still is not.

Generally, the § 1983 proximate causation standard has been clearly established since at least 1983, when the Tenth Circuit decided <u>Miller v. City of Mission</u>, and held that government officials can be held liable under § 1983 if they "set in motion a series of events by others which they reasonably should have known would result" in a constitutional violation. 705 F.2d at 375. That case did not, however, involve a Thirteenth Amendment violation. <u>See</u> <u>Miller v. City of Mission</u>, 705 F.2d at 370. Instead, <u>Miller v. City of Mission</u> related to constitutional violations under the Fourteenth Amendment. <u>See</u> 705 F.2d at 370. Other cases that the Tenth Circuit has decided since <u>Miller v. City of Mission</u> added constitutional violations under the First, Fourth, and Eighth Amendments to the list of claims where the § 1983 proximate causation standard can be applied. <u>See</u> <u>Snell v. Tunnell</u>, 920 F.2d at 673(holding state social worker liable for illegal search and Fourth Amendment violation committed by police officers to whom the social worker provided inaccurate information); <u>Lippoldt v. Cole</u>, 468 F.3d at 1204 (holding city workers liable for First Amendment violations that the city police chief proximately caused); <u>Northington v. Marin</u>, 102 F.3d at 1564 (holding department of corrections officers liable for Eighth Amendment violations proximately caused by inmates who officers told that plaintiff inmate was a "snitch").

Courts in the Tenth Circuit evaluating qualified immunity defenses rarely have analyzed whether the general § 1983 proximate causation standard was clearly established. Instead, courts typically have addressed only the underlying constitutional violation without discussing whether the proximate causation standard is clearly established in that context. See Snell v. Tunnell, 920 F.2d at 698 ("We need not decide the precise contours of the fourth amendment standard that would apply . . . because the conduct alleged in these cases would violate the most minimal standard of which we can conceive."); Trask v. Franco, 446 F.3d at 1043 (denying qualified immunity, but analyzing only that "the law regarding a warrantless search was clearly established"); Buck v. City of Albuquerque, 549 F.3d 1269, 1286-87 (10th Cir. 2008)(denying qualified immunity, because "issuance of arrest orders, when on notice that probable cause was lacking, was a violation of a clearly established right"). In just one instance, the question whether § 1983 proximate causation was clearly established factored into the qualified immunity analysis in the Tenth Circuit. See Dalcour v. City of Lakewood, No. CIV 08-00747 MSK/KLM, 2009 WL 3162235, at *5 (D. Colo. Sept. 30, 2009)("The Court finds that the right to be free from an unlawful search was clearly established at the time of the alleged violation . . . case law also recognized that a series of events could satisfy the causal connection in a § 1983 claim.")(citing Snell v. Tunnell, 920 F.2d at 700)).

Kerns v. Bader set a new standard when the Tenth Circuit decided the case in 2011, and dramatically limited the extent to which the district courts can recognize any law as clearly established without a precise case on point. The fact that no court -- the Supreme Court, the Tenth Circuit, or any other circuit court -- has applied the § 1983 proximate causation standard to a Thirteenth Amendment claim now requires the Court to rely upon Kerns v. Bader to consider whether the law was clearly established in 1979 when the Individual DOH Defendants

transferred A.M. to the Homestead House.  See 663 F.3d at 1186.  The constitutional violation alleged to be proximately caused under § 1983 is "a distinction [that] might make a constitutional difference," Kerns v. Bader, 663 F.3d at 1187 (emphasis in original), when evaluating whether "the contours of a right [were] sufficiently clear that every reasonable official would have understood that what he is doing violates that right," Ashcroft v. al-Kidd, 131 S. Ct. at 2083.  That Tenth Circuit law means that a general application of § 1983 proximate causation to constitutional violations other than the Thirteenth Amendment is insufficient to show that such a claim was "so thoroughly developed and consistently recognized under the law of the jurisdiction as to be indisputable and unquestioned" in 1979 when the Individual DOH Defendants transferred A.M. to the Homestead House under M. Evans' watch.  Lobozzo v. Colo. Dep't of Corr., 429 F. App'x at 710 (internal quotation marks omitted).  Moreover, in cases where the law was not clearly established at the time of the conduct, the Tenth Circuit does not require officials to "anticipate its future developments," Gomes v. Wood, 451 F.3d at 1134 (internal quotation marks omitted), so the Individual DOH Defendants would have had no reason to assume that an extension of proximate causation liability to Thirteenth Amendment violations was reasonable or imminent in 1979 when they transferred A.M. to the Homestead House.

Judge Brack's ruling that the Thirteenth Amendment right was clearly established in the related case, see J.M. v. New Mexico Department of Health, does not provide for a different result, despite that it was decided before Kerns v. Bader.  That case did not address the question of proximate causation of the Thirteenth Amendment violation that the plaintiff there suffered. See March 4, 2009, MOO.  Moreover, even if Judge Brack addressed proximate causation, the 2009 ruling in J.M. v. New Mexico Department of Health is insufficient to establish that the law

was clearly established in 1979 when A.M. was transferred from Fort Stanton to the Homestead House.

The unfortunate result of Kerns v. Bader is that nuanced factual distinctions can create a near-insurmountable hurdle for plaintiffs attempting to overcome a qualified immunity defense without a precisely analogous precedent. Barring the Court from finding that a constitutional right was clearly established where causation creates "such a distinction [that] might make a constitutional difference," 663 F.3d at 1187 (emphasis in original), means the Court must play along with a legal fiction that Thirteenth Amendment protections were still somehow unsettled more than one-hundred and fifty years after the Supreme Court held that "involuntary servitude shall not exist in any part of the United States," Civil Rights Cases, 109 U.S. at 20.

A secondary consequence of Kerns v. Bader is that constitutional protections are unlikely to develop in the Tenth Circuit beyond where they stood at the time the case was decided. Since 2011, dozens of cases have cited Kerns v. Bader to guide their analysis of clearly established law in light of their factual distinctions with prior cases. See, e.g., Reid v. Pautler, 36 F. Supp. 3d 1067, 1203 (D.N.M. 2014)(Browning, J.)(drawing distinction in Fourth Amendment claim between conduct of probation officer defendant and prior case law involving police officers); Kvech v. New Mexico Dep't of Public Safety, 987 F. Supp. 2d 1162, 1216 (D.N.M. 2013)(Browning, J.)(noting distinction that out-of-state sex offender status might alter constitutional protections in New Mexico); Tanner v. San Juan County Sheriff's Office, 864 F. Supp. 2d 1090, 1152 (D.N.M. 2012)(Browning, J.)(noting distinction that having a second criminal offender on scene changed defendant police officer's obligation to intervene in second officer's use of excessive force). Applying the Kerns v. Bader standard where any distinction that might make a constitutional difference is too significant to find the law clearly established,

courts applying that precedent consistently have sought out nuanced factual distinction with the prior case law and granted qualified immunity for lack of clearly established law.

The Kerns v. Bader standard that the Court is obligated to apply to decide cases where a factual distinction might make a constitutional difference in weighing clearly established law bars a ruling in A.M.'s favor and requires that the Individual DOH Defendants' qualified immunity defense stands.  The Individual DOH Defendants could have recognized that forcing A.M. to work for them and the state -- as the plaintiffs did in Jobson v. Henne -- would violate A.M.'s Thirteenth Amendment right.  They did not recognize, however -- and could not reasonably be expected to recognize, considering the lack of clearly establish law -- that allowing M. Evans to put A.M. to work violated her constitutional rights just the same.

**IT IS ORDERED** that the Individual DOH Defendants' Motion to Dismiss Plaintiff's Thirteenth Amendment Claim, filed March 6, 2014 (Doc.  22)("MTD"), is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

John Ford Hall
Kelly K. Waterfall
Law Offices of Peter Cubra
Albuquerque, New Mexico

--and--

Nancy L. Simmons
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

- 106 -

Stephen S. Hamilton
Alexia Constantaras
Montgomery & Andrews, P.A.
Albuquerque, New Mexico

    *Attorneys for the Defendants*