## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

A.M., through her Guardian ad Litem,
JOLEEN YOUNGERS,

       Plaintiff,

vs.                                   No. CIV 13-0692 JB/WPL

NEW MEXICO DEPARTMENT OF HEALTH;
LOS LUNAS CENTER FOR PERSONS WITH
DEVELOPMENT DISABILITIES;
ROGER ADAMS, individually and in his capacity
as an agent for the New Mexico Department of Health;
BETH SCHAEFER, individually and in her capacity
as an agent for the New Mexico Department of Health;
DAN SANDOVAL, individually and in his capacity
as an agent for the New Mexico Department of Health;
JOSEPH MATEJU, individually and in his capacity
as an agent for the New Mexico Department of Health;
NEW MEXICO AGING AND LONG-TERM SERVICES
DEPARTMENT; and THE ADULT PROTECTIVE
SERVICES DIVISION OF NEW MEXICO AGING
AND LONG-TERM SERVICES DEPARTMENT,

       Defendants.

## **MEMORANDUM OPINION**[1]

**THIS MATTER** comes before the Court on the Individual DOH Defendants' Motion to

Dismiss Plaintiff's First and Fourth Amendment Claims on the Basis of Qualified Immunity,

filed March 6, 2014 (Doc. 24)("MTD"). The Court held a hearing on October 23, 2014. The

primary issues are: (i) whether Defendants Dan Sandoval, Roger Adams, Joseph Mateju, and

---

[1]On March 12, 2015, the Court entered an order granting the Individual DOH Defendants' Motion to Dismiss Plaintiff's First Amendment and Fourth Amendment Claims on the Basis of Qualified Immunity, filed March 6, 2014 (Doc. 24). See Order, filed March 12, 2015 (Doc. 78)("Order"). In the Order, the Court stated that it would "at a later date issue a memorandum opinion more fully detailing its rationale for this decision." Order at 1 n. 1. This Memorandum Opinion is the promised opinion.

Beth Schaefer (collectively, the "Individual DOH Defendants")[2] violated Plaintiff A.M.'s right of expressive association under the First Amendment to the Constitution of the United States of America; and (ii) whether the Individual DOH Defendants violated A.M's right to be free from unlawful seizures under the Fourth Amendment to the Constitution.  First, the Court concludes that, although the First Amendment right of expressive association was clearly established in 1979, A.M.'s expressive-association claim fails, because she does not allege that the Individual DOH Defendants prevented her from associating with others for expressive purposes.  Second, the Court concludes that the Individual DOH Defendants did not violate A.M.'s Fourth Amendment right to be free from unlawful seizure when they transferred her from the Fort Stanton Training School, Fort Stanton, New Mexico, to the Homestead House, an unlicensed group shelter in Silver City, New Mexico, on November 12, 1979.  Third, the Court concludes that, even if the Individual DOH Defendants unlawfully seized A.M. when they transferred her, that right was not clearly established in 1979.  Accordingly, the Court will grant the MTD.

## FACTUAL BACKGROUND

The Court takes its facts from the Original Complaint for Damages, filed July 26, 2013, (Doc. 2)("Complaint"), as it must when considering a motion to dismiss for failure to state a claim under rule 12(b)(6) of the Federal Rules of Civil Procedure.  The Court has reorganized the factual material in the Complaint to explain the facts more clearly.

### 1.    The Parties.

A.M. is a sixty-six year old woman who has been diagnosed with various developmental disabilities.  See Complaint ¶ 66, at 18.  A.M. was involuntarily committed to the New Mexico Department of Health ("DOH") by court order on May 8, 1963, when she was sixteen years old,

---

[2] The Court will use the abbreviation "DOH" to refer to the New Mexico Department of Health.

because her developmental disabilities rendered her unable to care for herself.  <u>See</u> Complaint ¶¶ 67-69, at 18-19.  Because of her disabilities, A.M. brings this action through her guardian ad litem, Joleen Youngers.  <u>See</u> Complaint ¶ 66, at 18.

The DOH operates all of the facilities that house and treat people with developmental disabilities in the State of New Mexico.  <u>See</u> Complaint ¶ 8, at 4.  One of these facilities is the Los Lunas Center for Persons with Developmental Disabilities -- formerly known as the Los Lunas Hospital and Training School ("Los Lunas Hospital").  Complaint ¶ 8, at 4.  Fort Stanton was another DOH facility for individuals with developmental disabilities and was a subsidiary of the Los Lunas Hospital.  Complaint ¶¶ 8-9, at 4.  Because the Complaint refers to the Los Lunas Hospital and Fort Stanton collectively as the "Training School," the Court will do so throughout this Memorandum Opinion ("MO").  Complaint ¶ 1, at 1-2; <u>id.</u> ¶ 11, at 4-5.  Moreover, because the Complaint refers to the DOH and the Training School collectively as "the DOH Defendants," the Court will do so throughout this MO.  Complaint ¶ 11, at 4

Before 1992, the New Mexico Human Services Department ("HSD") was responsible for operating Adult Protective Services ("APS")[3] in New Mexico.  Complaint ¶ 22, at 8.  APS is responsible for protecting adults with developmental disabilities from exploitation, abuse, and neglect.  <u>See</u> Complaint ¶ 22, at 8.  APS must also ensure that those adults receive the treatment and social services that they need.  <u>See</u> Complaint ¶ 22, at 8.  From 1992 to 2005, the New Mexico Children Youth and Families Department ("CYFD") inherited HSD's responsibilities for all protective services in the state, including APS.  Complaint ¶ 23, at 8.  CYFD was responsible for: (i) coordinating and supervising APS; (ii) adopting rules and regulations necessary to

---

[3]Because the Complaint refers to the Adult Protective Services Division of New Mexico Aging and Long-Term Services Department, the Adult Protective Services Division of the New Mexico Children Youth and Families Department, and the Adult Protective Services of the New Mexico Human Services Department, collectively as "APS," the Court will do so as well. Complaint ¶ 26, at 9.

implement and operate APS; and (iii) evaluating APS' effectiveness.  See Complaint ¶ 23, at 8.
In 2005, the New Mexico Aging and Long-Term Services Department ("ALTSD") inherited
APS from CYFD and has since then operated APS.   Complaint ¶ 24, at 8-9.   Like its
predecessors, the ALTSD is responsible for: (i) coordinating and supervising APS; (ii) adopting
rules and regulations necessary to implement and operate APS; and (iii) evaluating APS'
effectiveness.  See Complaint ¶ 25, at 9.  Because the Complaint refers to the ALTSD, APS, and
the DOH Defendants as the "State Agency Defendants," the Court will do so throughout this
MO.  Complaint ¶ 27, at 9.

        Schaefer was an attorney for the DOH and the Training School from September 13, 1976,
to December 31, 2001.  See Complaint ¶ 14, at 5.  Sandoval was the Director of Resident Living
for the Training School between 1979 and 1985.  See Complaint ¶ 16, at 5.  As Director of
Resident Living, Sandoval was in charge of social services and the Training School's social
workers.  See Complaint ¶ 45, at 12.  Sandoval was also a member of the Training School's
Screening Committee on Admissions and Releases ("SCAR") and, at times, its chairman.
Complaint ¶ 16, at 6.

        Adams was the Training School's Deputy Administrator or Acting Administrator "during
the relevant time period."[4]  Complaint ¶ 18, at 6.  Adams made hundreds of decisions regarding
the placement and treatment of Training School residents -- including the Training School's
placement and discharge decisions relating to A.M.  See Complaint ¶ 18, at 6.  Adams chaired
SCAR, attended most SCAR meetings, and approved A.M.'s discharge from aftercare without
taking any steps to ascertain whether she would be safe or have her medical and other needs met.
See Complaint ¶ 18, at 6.

---

        [4]The Complaint does explain in any further detail when either Adams or Mateju served in
their respective positions at the Training School.

Mateju was the Training School Administrator "during the relevant time period." Complaint ¶ 20, at 7.  As Administrator, he made the final decisions regarding the placement and treatment of Training School residents, and all placement and discharge decisions relating to A.M.  See Complaint ¶ 20, at 7.  He also had the authority to unilaterally accept and remove individuals from the Training School.  See Complaint ¶ 20, at 7.  Mateju was responsible for the placement of many residents -- including A.M. -- into third-party homes, boarding homes, and other outside facilities.  See Complaint ¶ 20, at 7.  Mateju had responsibility for ensuring that appropriate measures were taken to: (i) provide for A.M.'s health, safety, and well-being; (ii) ensure that she received appropriate services; and (iii) ensure that A.M. continued to receive those services in any third-party placements.  See Complaint ¶ 20, at 7-8.

      **2.**       **The Aftercare Program.**

Over a period of two decades -- through the 1970s and 1980s -- the DOH Defendants systematically transferred hundreds of developmentally disabled individuals from state institutions to various private third parties throughout New Mexico.  See Complaint ¶ 2, at 2; id. ¶ 37, at 10.  These private third parties ranged from boarding homes to private residences and commercial enterprises.  See Complaint ¶ 2, at 2.  The Defendants called this program "aftercare"; the developmentally disabled individuals placed with third parties through the aftercare program were called "aftercare residents."  Complaint ¶ 2, at 2; id. ¶ 38, at 11.  Mateju personally attended SCAR meetings during which A.M. was discussed, and he personally approved decisions regarding her discharge, including "from aftercare," without taking any steps to ascertain whether she would be safe or have serious medical and other needs addressed.  Complaint ¶ 20, at 7.

The Defendants placed aftercare residents with private third parties "without anyone's informed consent, without the appointment of guardians or any other legally-authorized surrogate decision-makers, without permission from the courts that committed them to the state institutions . . . , and without due process of law . . . ."  Complaint ¶ 3, at 2.  In some cases, the Defendants contacted ex parte the judicial authorities that had committed aftercare residents to the Training School and "provided misleading information to them concerning the status of individuals discharged from the Training School."  Complaint ¶ 3, at 2-3.  In other cases, the Defendants did not communicate with the judicial authorities who committed individuals to the Training School at all before transferring those individuals to private third parties.  See Complaint ¶ 3, at 2-3.

After transferring aftercare residents to their third-party placements, the DOH and the Individual DOH Defendants "abandoned" them.  Complaint ¶ 3, at 2.  The DOH and the Individual DOH Defendants neither provided them with the services that they needed, nor protected them from abuse, neglect, or exploitation.  See Complaint ¶ 3, at 2.  When the events that the Complaint alleges occurred, approximately eight social workers at the Training School oversaw 431 aftercare residents, "while also performing social work duties for hundreds of people still residing" at the Training School.  Complaint ¶ 48, at 13.  Although Training School policies required Training School personnel to oversee and conduct periodic visits of aftercare residents, the DOH Defendants "did not use any system to ensure that residents in aftercare would be safe or that they would receive minimally adequate services."  Complaint ¶ 43, at 12.

Sandoval, despite being responsible for overseeing the Training School's social workers, "did not know of any guidelines on how residents in aftercare placements would be cared for, did not know of a system to follow up with those residents, and did not know of a system . . . to

know how many residents were placed in private third-party placements . . . ."  Complaint ¶ 49, at 13.  Sandoval did not know "what the conditions of the residents w[ere]" or "what services they needed."  Complaint ¶ 49, at 13.

Training School administrators -- including the Individual DOH Defendants -- were aware that the social workers assigned to oversee aftercare placements often did not visit aftercare residents in their third-party placements.  See Complaint ¶ 47, at 12.  They were aware that the social workers -- when they checked on the aftercare residents at all -- usually relied on telephone calls to the private third parties who administered the placements rather than an in-person contact.  See Complaint ¶ 47, at 12-13.  Training School administrators -- including Adams, Mateju, and Shaefer -- had frequent conversations about the problem of social workers' failure to make their required visits or to contact aftercare residents.  See Complaint ¶ 51, at 13-14.  The DOH Defendants and the Individual DOH Defendants were "well aware of the dangers residents faced due to the way in which the aftercare program was operated, but they proceeded anyway."  Complaint ¶ 52, at 14.

The "well-known failure" of the Training School's social workers to provide oversight for aftercare residents drove the DOH Defendants and the Individual DOH Defendants to "discharge"[5] Training School residents from aftercare "whenever and however possible."

---

[5]The Complaint never explicitly defines "discharge," but uses it to describe: (i) the process of transferring a Training School resident to a private third party; and (ii) the process of removing an aftercare resident -- i.e., a former Training School resident who has already been placed with a private third party -- from "the rolls of Training School clients."  Complaint ¶ 65, at 18.  Moreover, the Complaint does not clarify what it means for an aftercare resident to be removed from "the rolls of Training School clients."  Complaint ¶ 65, at 18.  The Complaint implies that the Defendants believed the Training School had no legal responsibility to oversee aftercare residents who had been removed from the Training School's rolls or to provide them with any services or therapy.  See, e.g., Complaint ¶ 61, at 17 ("Once there was a piece of paper in the file, residents could be . . . 'cut loose' from the Training School, without consideration of extant judicial orders, the health and safety of former residents, or the residents' need for services."); Complaint ¶ 63, at 17 ("Defendant Sandoval has admitted that he wouldn't know

Complaint ¶ 53, at 14.   Schaefer oversaw the changes to the Training School's discharge procedures in the late 1970s and early 1980s.   See Complaint ¶ 55, at 14.   Specifically, Schaefer told Training School administrators that "there were too many residents on aftercare" and recommended that the Training School discharge residents from aftercare.   Complaint ¶ 54, at 14.  Sometime between September 1978 and the end of 1980, Schaefer began advising that all aftercare residents should be discharged from the Training School "without judicial review and without any due-process protections whatsoever."  Complaint ¶ 57, at 15.

Schaefer told Training School administrators that "the state institutions' custody of people committed to the institution by court order automatically lapsed" on the New Mexico Mental Health Code's effective date of July 1, 1977, despite judicial orders of commitment for an indeterminate period.  Complaint ¶ 56, at 15.  Shaefer advised Training School administrators that a change in the Mental Health Code meant that the court orders committing aftercare residents to State custody were void -- regardless whether the residents' original placements with private third parties had been judicially reviewed.   See Complaint ¶ 56, at 15.   Schaefer explained to Training School administrators and staff that "it's different now and you don't need a discharge order signed by a judge."  Complaint ¶ 61, at 17 (internal quotation marks omitted).

According to Schaefer, Training School administrators were "reluctant to proceed without a paper trail, so [she] instructed Defendant Adams to 'just put a note in . . . the file that

_____

whether somebody was going to be taken care of after discharge from aftercare.")(internal quotation marks omitted).  The Complaint also states, however, that "discharge from aftercare was not a complete separation of responsibility for residents . . . .  Even after residents were discharged from aftercare, the Training School at times took action to respond to allegations of abuse then they came to their attention."  Complaint ¶¶ 63-64, at 17-18 (internal quotation marks omitted).  Consequently, where it is clear in the Complaint how A.M. is using the word "discharge," the Court will explain which form of "discharge" A.M. is using.  Where it is unclear, the Court will quote directly from the Complaint to ensure that it is accurately portraying the facts as the Complaint is alleging them.  Where it is necessary to the Court's resolution of the motions to dismiss, the Court will resolve these ambiguities in its analysis.

says . . . [that the aftercare resident] was discharged.'"   Complaint ¶ 61, at 17 (alterations in Complaint).   Once there was a "piece of paper in the file," residents could be, in Schaefer's words, "cut loose" from the Training School without consideration of judicial orders, the residents' health and safety, or the residents' need for services.   Complaint ¶ 61, at 17.   Schaefer neither conducted legal research nor consulted legal experts in developing these new discharge policies.   See Complaint ¶ 56, at 15.

Schaefer acknowledged that former Training School residents were particularly vulnerable, and in danger of abuse and exploitation, once they were no longer under the Training School's supervision.   See Complaint ¶ 60, at 16-17.   Schaefer was aware when she designed and directed the new aftercare discharge policy that Training School personnel had not done any discharge planning for aftercare residents, and had failed to make contact with residents before or after their discharge, to assure their health and safety, and to assure that they were not being abused or exploited.   See Complaint ¶ 59, at 16.   Schaefer considered the fallout from the danger that such a policy posed to aftercare residents "to be merely a public relations issue, not a legal obstacle."   Complaint ¶ 61, at 17 (internal quotation marks omitted).

Under Schaefer's direction, Training School administrators "deliberately decided not to appoint surrogate decision-makers for its residents or to otherwise provide procedural due process" before removing residents' names from the Training School's rolls.   Complaint ¶ 57, at 15.   "Training School residents were not even informed that they were no longer clients of the Training School."   Complaint ¶ 57, at 15.   Aftercare residents "were routinely removed from the rolls of Training School clients" based solely on letters that Mateju sent to the district attorney in the county where each resident was originally committed.   Complaint ¶ 65, at 18.   These letters did not "supply[] the background information necessary for discharge, including the

circumstances of residents and whether the resident or a responsible adult consented to discharge."  Complaint ¶ 65, at 18.  Instead, judicial authorities were "misled into believing that residents consented to and were happy in their placements."  Complaint ¶ 65, at 18.

In Sandoval's view, "discharge from aftercare was not a complete separation of the Training School's responsibility for residents."  Complaint ¶ 63, at 17-18.  "Even after residents were discharged from aftercare, the Training School at times took action to respond to allegations of abuse when they came to their attention . . . ."  Complaint ¶ 64, at 18.  The DOH Defendants and Individual DOH Defendants, however, "failed to establish any system permitting residents to complain about their treatment, or any system permitting the Training School to provide oversight at third-party placements."  Complaint ¶ 64, at 18.  The DOH Defendants and Individual DOH Defendants decided that discharging residents from aftercare eliminated the need for social worker visits.  See Complaint ¶ 51, at 13-14.  Sandoval has admitted that he "wouldn't know whether somebody was going to be taken care of after discharge from aftercare, and it never crossed his mind to be concerned that residents discharged from aftercare might be abused or neglected."  Complaint ¶ 63, at 17 (internal quotation marks omitted)(brackets omitted).

### 3.    **A.M.**

A court order committed A.M. to Fort Stanton or to another state institution on May 8, 1963, when she was sixteen years old.  See Complaint ¶ 66, at 18.  By 1967, either through transfer or continuing placement, A.M. was a Fort Stanton resident.  See Complaint ¶ 66, at 18.  On November 12, 1979, the Defendants transferred A.M. to the Homestead House and "abandoned" her there as part of the aftercare program.  Complaint ¶ 73, at 20.  The DOH Defendants' and the Individual DOH Defendants' transfer of A.M. from Fort Stanton to the

Homestead House "was without legal authority." Complaint ¶ 78, at 20.  A.M. was still in the DOH Defendants' and Individual DOH Defendants' legal custody after she was placed with Mary Evans.  See Complaint ¶ 12, at 5.

The Defendants allege, however, that A.M. was transferred to the Homestead House "pursuant to State District Court Order No. 1/387-388 filed on October 17, 1979 in Case No. CV-SQ-0095-79, Twelfth Judicial District, County of Lincoln" ("Oct. 17, 1979, Order").  MTD at 2.  The Homestead House is a private, unlicensed group shelter for elderly people that M. Evans owned.  See Complaint ¶ 73, at 20.  The Oct. 17, 1979, Order reads, in pertinent part:

1.    Respondent has a developmental disability which is so greatly disabling that residential habilitation is in her best interest;

2.    Respondent's habilitation at Fort Stanton Hospital and Training School is not consistent with the least drastic means principle as respondent could benefit from a less restrictive setting such as a community based group home;

3.    Placement in a community based program for persons with developmental disabilities is not presently available for respondent.

IT IS ORDERED

That respondent be and hereby is committed to Fort Stanton Hospital and Training School for residential habilitation for a period not to exceed six months;

IT IS FURTHER ORDERED

That during the period of extended residential habilitation petitioner shall make application to less restrictive programs on behalf of respondent and shall make every effort to transfer respondent to a less restrictive setting.  At the expiration of this order petitioner shall report to this Court concerning its progress toward releasing respondent if further confinement at Fort Stanton Hospital is sought.

Oct. 17, 1979, Order. [6]

_____

[6]The Court will consider the Oct. 17, 1979, Order in analyzing the MTD.  The United States Court of Appeals for the Tenth Circuit has explained that a district court's "function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but

A.M. did not know M. Evans before she was transferred to the Homestead House.  See Complaint ¶ 73, at 20.  Neither the Homestead House nor M. Evans was a licensed service provider for people with developmental disabilities.  See Complaint ¶ 73, at 20.  Neither M. Evans nor any Homestead House employee had the necessary training or experience to properly care for A.M., and M. Evans had no legal right to hold A.M.  See Complaint ¶¶ 76, 78, at 20.

A.M. lived with M. Evans for over thirty years.  See Complaint ¶ 85, at 23.  Although the Defendants retained legal control over A.M. after placing her at the Homestead House, neither the Defendants nor any of their agents checked on A.M. in any fashion.  See Complaint ¶¶ 77, at 21; id. ¶ 80, at 22.  Instead, the Defendants "cloak[ed] the Homestead House and Mary Evans

---

to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  Sutton v. Utah State Sch. for the Deaf & Blind, 173 F.3d 1226, 1236 (10th Cir. 1999).  There are three narrow exceptions to this general rule: (i) documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322; (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322.  Because the Complaint does not refer to the Oct. 17, 1979, Order, neither of the first two exceptions apply.  The Court must, therefore, determine whether the third exception -- permitting courts to consider "matters of which a court may take judicial notice" -- applies.  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322.
     A court may take judicial notice of an adjudicative fact that is both "not subject to reasonable dispute" and either: (i) "generally known within the territorial jurisdiction of the trial court"; or (ii) "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  Courts have taken judicial notice of state court orders' contents.  See Gary Alan Green & Broadway Sound & Video, Inc. v. Jackson, 36 F. App'x 663, 669-70 (2d Cir. 2002)(unpublished)(taking judicial notice of New York state court orders in an appeal from dismissal of claims pursuant to Rule 12(b)(6)).  The Court determines that the accuracy of orders from the Twelfth Judicial District for the County of Lincoln "cannot reasonably be questioned" and the contents of the Oct. 17, 1979, Order are "not subject to reasonable dispute."  Fed. R. Evid. 201(b).  Consequently, the Court will take judicial notice only of the Oct. 17, 1979, Order's contents without determining whether the Order authorized A.M.'s transfer to the Homestead House -- a point upon which the parties disagree.  In taking judicial notice of this fact, the Court notes that it does not affect the Court's resolution of the MTD.

with untoward authority and absolute control over Plaintiff, who was entirely dependent on this third-party placement for her day-to-day existence."  Complaint ¶ 77, at 21.

At the Homestead House, A.M. was "put to work."  Complaint ¶ 93, at 24-25 (internal quotation marks omitted).  Although A.M. performed housekeeping and other services at the Homestead House, M. Evans never compensated her for her work.  See Complaint ¶ 93, at 24-25.  M. Evans threatened A.M. if she did not work, emotionally abused A.M., and neglected her medical needs.  See Complaint ¶ 91, at 24; id. ¶ 96, at 25.  While in M. Evans' custody, A.M. did not receive social services; Medicaid and social security benefits; adequate medical, dental, and psychological care; rehabilitative, educational, and vocational services; or day habilitation[7] and therapy.  See Complaint ¶ 85, at 23.  M. Evans stole A.M.'s social security checks for her own use and did not spend the funds for A.M.'s benefit.  See Complaint ¶ 94, at 25.  The Defendants facilitated the transfer of A.M.'s social security checks to M. Evans with deliberate indifference to whether M. Evans was using or intended to use the social security funds for A.M.'s benefit.  See Complaint ¶ 83, at 22.  While at the Homestead House, A.M. was socially isolated and was rarely allowed to leave.  See Complaint ¶ 87, at 23.

The DOH transferred J.P., another developmentally disabled woman, to the Homestead House on the same day as A.M.'s transfer.  See Complaint ¶ 88, at 24.  While at the Homestead House, J.P. attempted to leave to find her children, from whom she had been separated.  See id. J.P. climbed over the wall and wandered the streets calling out for her children and eventually either returned or was brought back to the Homestead House.  See Complaint ¶ 88, at 24.  After

_____

[7]In Youngberg v. Romeo, 457 U.S. 307 (1982), the Honorable Lewis F. Powell, Jr., then-Associate Justice of the Supreme Court of the United States, noted that the American Psychiatric Association defines "habilitation" as "programs for the mentally-retarded because mental retardation is . . . a learning disability and training impairment rather than an illness. [T]he principal focus of habilitation is upon training and development of needed skills."  457 U.S. at 309 n.1 (alterations in Youngberg. v. Romeo)(citations omitted)(internal quotation marks omitted).

this incident, Evans took J.P.'s shoes and planted cacti at the place where J.P. had climbed the wall to prevent her from escaping.  See id.  J.P. continued to try to escape.  See id.  At one point, J.P. jumped over the wall and landed in the cacti.  See id.  Through punishing J.P. for escaping, M. Evans made it clear to A.M. that she could prevent A.M. from leaving the Homestead House. See id.

The State of New Mexico eventually shut down the Homestead House.  See Complaint ¶ 97, at 24.  When that occurred, A.M. was transferred to M. Evans' private residence -- also an unlicensed group shelter.  See Complaint ¶ 98, at 25.  A.M.'s transfer from the Homestead House was without A.M.'s consent or judicial authority.  See Complaint ¶ 98, at 25-26.  If judicial authority was obtained for A.M.'s transfer, "the presiding judge was misled by DOH Defendants and the individual Defendants concerning the circumstances of Plaintiff's removal to Mary Evans' private residence."  Complaint ¶ 98, at 26.

In October, 1999, APS investigated allegations that M. Evans was physically neglecting A.M.  See Complaint ¶ 99, at 26.  APS found the allegations unsubstantiated.  See Complaint ¶ 99, at 26.  APS did not determine, however, whether M. Evans was paying A.M. for her labor, whether M. Evans was properly accounting for A.M.'s federal benefits, why A.M. was not receiving any therapeutic services or medical or dental care, or why A.M. was kept isolated without any opportunity to socialize with others.  See Complaint ¶ 99, at 26.  APS' investigation consisted solely of interviews with M. Evans and/or other non-disabled persons, "rather than engaging in any meaningful conversation with [A.M.] concerning her condition or circumstances . . . ."  Complaint ¶ 99, at 26.

In or about October, 2004, APS received allegations that M. Evans and John Evans -- M. Evans' husband -- were physically abusing and exploiting A.M.  See Complaint ¶ 100, at 26.

APS received a report that M. Evans and J. Evans "were taking Plaintiff's social security money but were not caring for her, and that Plaintiff was emotionally abused." Complaint ¶ 100, at 26. The allegations also included abuse against J.P. See Complaint ¶ 100, at 26. APS concluded that M. Evans and J. Evans had emotionally abused A.M., and stated that its report would be forwarded to the DOH and to law enforcement. See Complaint ¶ 100, at 26. The case remained open for eighteen months, but was ultimately closed as unsubstantiated, because APS found the report to be "malicious." Complaint ¶ 101, at 26-27. Again, APS did not engage in any meaningful conversation with A.M. before it closed its investigation. See Complaint ¶ 101, at 27.

In 2006 or 2007, "the Governor's investigation[8] identified AM and JP as two of the former Training School resident[s] who had been illegally discharged from the Training School." Complaint ¶ 102, at 27. In March, 2008, "more than four years after DOH learned of the plight of former Training School residents, the DOH investigated Plaintiff's circumstances" as part of the Governor's investigation. Complaint ¶ 106, at 28. The DOH limited its investigation, however, to an interview of M. Evans -- it did not take into account the prior allegations of abuse, interview A.M., or conduct an independent investigation of A.M.'s circumstances. See Complaint ¶ 106, at 28. That same month, APS in Grant County, New Mexico, also investigated A.M.'s circumstances after a caseworker at Fort Bayard[9] reported that M. Evans was physically and emotionally abusing A.M. See Complaint ¶ 106, at 28. APS acknowledged that: (i) A.M. was developmentally disabled; (ii) A.M. had expressed fear of M. Evans; (iii) a psychiatrist had recommended that a guardian be appointed for A.M.; (iv) M. Evans' residence was an unlicensed

_____

[8]The Complaint does not give any details about "the Governor's investigation." Complaint ¶ 102, at 27.

[9]The Complaint only identifies "Fort Bayard" as the place where A.M. "was admitted for rehabilitation" in January, 2008, after she fell in M. Evans' home. Complaint ¶ 105, at 27.

facility; (v) A.M. had not seen a primary care physician in at least five years; and (vi) M. Evans never applied for disability benefits for A.M.  See Complaint ¶ 108, at 28.  Nonetheless, APS found the report unsubstantiated, declined to pursue a guardianship for A.M., and closed the report.  See Complaint ¶ 108, at 28.  The DOH did not, as part of its investigation, engage in meaningful conversation with A.M. concerning her condition or circumstances.  See Complaint ¶ 108, at 28.

In December, 2008, the DOH began a new investigation or re-opened its prior investigation into A.M.'s circumstances.  See Complaint ¶ 110, at 29.  The DOH referred to M. Evans as A.M.'s "guardian" despite clear indications in A.M.'s file that M. Evans was never appointed her guardian.  Complaint ¶ 110, at 29.  The DOH continued to "interact exclusively or primarily with Mary Evans" during its investigation.  Complaint ¶ 110, at 29.  The DOH did not consider the prior allegations of abuse, interview A.M., or independently investigate A.M.'s circumstances.  See Complaint ¶ 110, at 29.  The DOH's policy and practice of deferring to caregivers rather than interacting with the disabled individuals themselves or otherwise independently investigating aftercare residents' circumstances continued into 2009.  See Complaint ¶ 110, at 29.

In June, 2009, Tom Roach, an ALTSD employee, prepared a report for the ALTSD and the DOH regarding A.M. and J.P.  See Complaint ¶ 111, at 29.  Roach stated that M. Evans was managing A.M.'s and J.P.'s care in exchange for payments for room and board.  See Complaint ¶ 111, at 29-30.  Roach stated that M. Evans had legal authority to make decisions for A.M.  See Complaint ¶ 111, at 30.  Roach reported that A.M. was "happy in her home" and was "getting all the care she needs from Ms. Evans."  Complaint ¶ 111, at 30 (internal quotation marks omitted).  He also noted that "one recent APS referral for exploitation (04/06) was found to be malicious

and unsubstantiated."  Complaint ¶ 111, at 30 (internal quotation marks omitted).  Roach limited

his investigation to an interview of M. Evans -- he did not take into account prior allegations of

abuse, interview A.M. or J.P., or independently investigate J.P.'s or A.M.'s circumstances.  See

Complaint ¶ 112, at 30.  The State Agency Defendants "did nothing to assist AM or JP."

Complaint ¶ 113, at 30.  The State Agency Defendants never sought a guardian, conservator, or

representative payee for A.M., nor arranged for her to receive therapeutic services.  See

Complaint ¶ 113, at 30.

## PROCEDURAL BACKGROUND

A.M. alleges seven claims in her Complaint: (i) a Fourteenth Amendment claim against

the Individual DOH Defendants for violating her substantive and procedural due-process rights,

see Complaint ¶¶ 126-40, at 32-36; (ii) a First Amendment claim against the Individual DOH

Defendants for violating her rights to freedom of association and court access, see Complaint

¶¶ 141-48, at 36-37; (iii) a Fourth Amendment claim against the Individual DOH Defendants for

violating her right to be free from unlawful seizures, see Complaint ¶¶ 149-155, at 37-38; (iv) a

Thirteenth Amendment claim against the Individual DOH Defendants for violating her right to

be free from involuntary servitude, see Complaint ¶¶ 156-64, at 38-39; (v) a claim against the

DOH Defendants for violating § 504 of the Rehabilitation Act, 29 U.S.C. § 794, see Complaint

¶¶165-71, at 39-40; (vi) a claim against the DOH Defendants for violating the Medicaid Act, 42

U.S.C. § 1396, see Complaint ¶¶ 172-80, at 41-43; and (vii) claims against the ALTSD and the

APS for violating § 504 of the Rehabilitation Act and Title II of the Americans with Disabilities

Act, 42 U.S.C. §§ 12131-34 ("ADA"), and the regulations promulgated thereunder, 28 C.F.R.

Ch. 1, pt. 35, Complaint ¶¶ 181-87, at 43-45.

As a basis for her First Amendment claims, A.M. argues that she has constitutionally protected rights to associate with persons of her own choosing and to seek redress of her grievances.  See Complaint ¶¶ 142, 145, at 36.  A.M. asserts that the Individual DOH Defendants knowingly, intentionally, deliberately, recklessly, maliciously, and wrongly violated her rights to freedom of association and court access by illegally transferring her to an isolated third-party setting in a different city and by denying her any opportunity to object to her illegal transfer.  See Complaint ¶¶ 144, 145, 147, at 36.

As a basis for her Fourth Amendment claim, A.M. states that she has a clearly established right to control her own body and to self-determination.  See Complaint ¶150, at 337.  A.M. argues that the individual DOH Defendants knowingly, intentionally, deliberately, recklessly, maliciously, and wrongly violated her Fourth Amendment right to be free from unlawful seizures by physically removing her from the Training School and by empowering M. Evans to move A.M., without consulting A.M or an appropriate judicial authority.  See Complaint ¶¶ 152, 154, at 37.

### 1.      The MTD.

The Individual DOH Defendants filed the MTD on March 6, 2014.  See MTD at 1.  In the MTD, the Individual DOH Defendants ask the Court to dismiss A.M.'s First and Fourth Amendment claims under rule 12(b)(6) of the Federal Rules of Civil Procedure on the basis that they are entitled to qualified immunity.  See MTD at 1.  The Individual DOH Defendants argue that the United States Court of Appeals for the Tenth Circuit established a three-part test for qualified immunity in Gomes v. Wood, 451 F.3d 1122, 1134 (10th Cir. 2006), which asks: (i) whether the plaintiff's allegations, if true, establish a constitutional violation; (ii) whether the law was clearly established when the alleged violations occurred; and (iii) whether

"extraordinary circumstances -- such as reliance on the advice of counsel or on a statute -- so prevented [the official] from knowing that [her] actions were unconstitutional that [she] should not be imputed with knowledge of a clearly established right."  MTD at 4-5 (quoting <u>Gomes v. Wood</u>, 451 F.3d at 1134)(alterations in MTD, but not quoted source)(internal quotation marks omitted).  The Individual DOH Defendants also point out that a court has discretion to decide which of the three prongs of the qualified immunity analysis to tackle first.  <u>See</u> MTD at 5 (citing <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009)).

In addressing A.M.'s First Amendment claim, the Individual DOH Defendants begin by differentiating the First Amendment right to expressive association from the Fourteenth Amendment right to familial association.[10]  <u>See</u> MTD at 7.  The Individual DOH Defendants contend that, under the Tenth Circuit's holding in <u>Griffin v. Strong</u>, 983 F.2d 1544, 1547 (10th Cir. 1993), only the Fourteenth Amendment recognizes the right to familial association, and there is no right to familial association under the First Amendment.  <u>See</u> MTD at 7.  Next, the Individual DOH Defendants argue that A.M. failed to allege enough facts to support a First Amendment claim based on a deprivation of her right to expressive association.  <u>See</u> MTD at 7.  Specifically, the Individual DOH Defendants fault A.M. for not alleging facts that demonstrate "that she was somehow deprived of her right to association based on the pursuit of speech or

_____

[10]Although A.M. uses the terms "familial association" and "intimate association" interchangeably, the Court will use the term "familial association" to refer to the associational right that the Fourteenth and First Amendments protect -- <u>i.e.</u>, "the constitutional right to maintain a family relationship."  <u>Hernandez ex rel Estate of Medrano v. Frias</u>, No. CIV 10-0351 JB/LAM, 2011 WL 1127882, at *21 (D.N.M. Mar. 15, 2011)(Browning, J.).  The Court will use "expressive association" to refer to the associational right that the First Amendment protects. The Court has previously said that the First Amendment "protects associational rights in two distinct ways: (i) it protects against unjustified government interference with an individual's choice to enter into and maintain certain intimate or private relationships; and (ii) it ensures the freedom of individuals to associate for the purpose of engaging in protected speech or religious activities."  <u>Jones v. Lincoln Cnty. Comm'rs</u>, No. CIV 06-0951 JB/LCS, 2007 WL 5239190, at *8 (D.N.M. July 10, 20117)(Browning, J.).

advocacy of political, social, economic, educational, religious or cultural values," based on their understanding of the First Amendment protections that the Supreme Court of the United States set forth in <u>Roberts v. United States Jaycees</u>, 468 U.S. 609, 620 (1984).  <u>See</u> MTD at 7-8.

The Individual DOH Defendants argue that the Court should dismiss A.M.'s Fourth Amendment claim, because there was no clearly established law in 1979 -- or in the present day -- that would have alerted the Individual DOH Defendants that Fourth Amendment protections attached to A.M.'s discharge from the Training School.  <u>See</u> MTD at 8-9.  The Individual DOH Defendants concede that, in <u>Pino v. Higgs</u>, 75 F.3d 1461, 1468 (10th Cir. 1996), the Tenth Circuit held that "the Fourth Amendment applies whenever the government takes a person into custody against her will," but argue that being taken into state custody against one's will is distinguishable from being discharged pursuant to a state district court order.  MTD at 9 (quoting <u>Pino v. Higgs</u>, 75 F.3d at 1467)(internal quotation marks omitted).  The Individual DOH Defendants insist that, because there was no clearly established law to violate, they are entitled to qualified immunity on A.M.'s First Amendment and Fourth Amendment claims. <u>See</u> MTD at 9.

### 2.    **The Response**.

A.M. responded to the MTD on May 9, 2014.  <u>See</u> Plaintiff's Response to Individual Department of Hea[l]th Defendants' Motion to Dismiss Plaintiff's First and Fourth Amendment Claims on the Basis of Qualified Immunity, filed May 9, 2014 (Doc. 37)("Response").  A.M. argues that the Court should not dismiss her First Amendment claim for two reasons: (i) she properly pled the denial of her First Amendment right of access to the courts; and (ii) the rights to expressive and familial association were clearly established when she was discharged from the Training School in 1979.  Response at 3-4.  A.M. also contends that the Court should not dismiss

her Fourth Amendment claim, because "high level administrators would necessarily know that clearly established Fourth Amendment law prohibited the forcible and physical removal" of A.M. to the Homestead House.  Response at 26.

First, A.M. argues that she properly pled the Individual DOH Defendants' denial of her First Amendment right of access to the courts.  See Response at 3-4.  A.M. contends that she had a right to contest the ongoing justification for her civil confinement based on the Supreme Court's reasoning in O'Connor v. Donaldson, 422 U.S. 563, 574-75 (1975)("[I]nvoluntary confinement . . . could not constitutionally continue after [the constitutionally adequate] basis no longer existed."), and a right to counsel throughout her judicial proceedings based on the Tenth Circuit's reasoning in Heryford v. Parker, 396 F.2d 393, 396 (10th Cir. 1968)("[A] subject of an involuntary commitment proceedings is afforded the opportunity to the guiding hand of legal counsel at every step of the proceedings.").  See Response at 11-12.  A.M. argues that the Individual DOH Defendants denied her both of these rights by placing her at the Homestead House.  See Response at 8.  A.M. states, moreover, that she properly pled these allegations throughout the Complaint.  See Response at 7.

Next, A.M. argues that the Tenth Circuit recognized the right of familial association before 1985.  See Response at 17-18.  A.M. contends that the right of familial association "is one of those fundamental, inherent rights of every individual that predates both the federal Constitution and the state laws."  Response at 17 (quoting Wise v. Bravo, 666 F.2d 1328, 1336 (10th Cir. 1982)(Seymour, J., concurring))(internal quotation marks omitted).  A.M. also relies on Walters v. Western State Hospital, 864 F.2d 695, 695 (10th Cir. 1988), "where the Court held that the right of an institutionalized person not to be isolated from intimate associates was clearly established by 1981 at the latest."  Response at 18.  Furthermore, A.M. argues that she has a right

of familial association under both the First Amendment and the Fourteenth Amendment, and asks the Court to preserve her familial-association claim by merging it into her other Fourteenth Amendment claims, if necessary.  <u>See</u> Response at 4, 17.

A.M. defines the right to expressive association as "the right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." Response at 19 (quoting <u>Roberts v. U.S. Jaycees</u>, 468 U.S. 609, 622 (1984))(internal quotation marks omitted).  A.M. asks the Court to allow this claim to go forward, because "she was living as a member of a defined group in the Training School, in an educational and community setting," and because the Federal Rules of Civil Procedure require the Court to consider all of the Complaint's allegations in the light most favorable to the non-moving party when ruling on a rule 12(b)(6) motion.  Response at 20.

Regarding her Fourth Amendment claim, A.M. argues, first, that plaintiffs can prove that a law is clearly established without citing a prior decision with "strict factual similarity." Response at 21 (quoting <u>Wood v. Ostrander</u>, 879 F.2d 583, 592 (9th Cir. 1989))(internal quotation marks omitted).  Instead, A.M. contends, plaintiffs can prove that a right is clearly established if the right has "sufficiently clear contours" that a reasonable official would understand his or her actions as a violation of that right.  Response at 21 (citing <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987)).

A.M. argues that her right "not to be picked up by State officials and transported to a different city, without her consent," was clearly established by 1979, if not at "the time of the Bill of Rights."  <u>See</u> Response at 23.  More specifically, A.M. contends that the Supreme Court applied Fourth Amendment protections to searches and seizures outside of the law-enforcement context as early as 1967 in <u>Camara v. Municipal Court of City and County of San Francisco</u>, 387

U.S. 523, 530 (1967).   See Response at 24.   A.M. also argues that Fourth Amendment protections apply "whenever the government takes a person into custody against her will," Response at 25 (quoting In re Barnard, 455 F.2d 1279, 1373-74 (D.C. Cir. 1971))(internal quotation marks omitted), and that the probable cause required for civil seizures "dates back to 1971," Response at 25 (quoting Anaya v. Crossroads Managed Care Sys., Inc., 195 F.3d 584, 595 (10th Cir. 1999)).

A.M. further argues that her transfer to the Homestead House constituted an unjustified "seizure" that the Individual DOH Defendants affected "exclusive.ly for purposes of [their] administrative convenience."   Response at 25.   "At best," A.M. asserts, the Individual DOH Defendants "had judicial authority to place [A.M.], with the consent of A.M. and her surrogates, in a therapeutic community setting, subject to periodic judicial review."   Response at 25-26. Ultimately, A.M. concludes that "high level administrators would necessarily know that clearly established Fourth Amendment law prohibited the forcible and physical removal" of A.M. to the Homestead House.  Response at 26.

### 3.   **The Reply**.

The Individual DOH Defendants replied to the Response on May 23, 2014.  See Reply Supporting Individual DOH Defendants' Motion to Dismiss Plaintiff's First Amendment and Fourth Amendment Claims on the Basis of Qualified Immunity [Doc. 24], filed May 23, 2014 (Doc. 46)("Reply").   First, the Individual DOH Defendants reassert that the Tenth Circuit concluded in Griffin v. Strong that the freedom of familial association can only be recognized under the Fourteenth Amendment and not, as A.M. argues, under the First Amendment.   See Reply at 2.  The Individual DOH Defendants contend, however, that they are still entitled to qualified immunity under the Fourteenth Amendment, because of the Tenth Circuit's "express

finding" in Griffin v. Strong that the right of familial association was "first recognized . . . in Trujillo v. Board of County Commissioners, 768 F.2d 1186, 1188-89 (10th Cir. 1985)."  Reply at 2 (quoting Griffin v. Strong, 983 F.2d at 1547)(internal quotation marks omitted).  The Individual DOH Defendants also argue that A.M.'s reliance on Wise v. Bravo is misplaced, because that case concerned visitation rights between divorced parents and was decided in 1982, three years after A.M.'s alleged transfer to the Homestead House.  See Reply at 2-3.  The Individual DOH Defendants similarly argue that Walters v. Western State Hospital is inapplicable, because it only addressed "the issue of whether the right to minimally adequate care encompassed rights of visitation," and that Roberts v. U.S. Jaycees is inapposite, because: (i) the facts in that case have "no application to the instant case"; and (ii) A.M. did not allege a deprivation of her right to expressive association.  Reply at 3-4.

Second, the Individual DOH Defendants argue that they are entitled to qualified immunity on A.M.'s court-access claim, because the right to court access under the First Amendment was not clearly established in 1979, and because A.M. has not alleged a denial or delay of access to court that "prejudiced [her] in pursuing litigation," as the Tenth Circuit requires.  See Reply at 4 (quoting Trujillo v. Williams, 465 F.3d 1210, 1226 (10th Cir. 2006))(alterations in Reply)(internal quotation marks omitted).  The Individual DOH Defendants contend that there was no Supreme Court or Tenth Circuit precedent establishing a First Amendment right to court access in 1979, and that "none of these cases on which [A.M.] relies" -- like Heryford v. Parker and Mullane v. Central Hanover Bank and Trust, 339 U.S. 306 (1950) -- are "pertinent to a First Amendment analysis."  Reply at 5-6.  Furthermore, according to the Individual DOH Defendants, the Tenth Circuit has divided court-access claims into "forward looking" and "backwards looking" claims.  Reply at 5.   The Individual DOH

Defendants argue that A.M.'s claim is "unquestionably" not a forward-looking claim, and it is also not "backwards looking," because A.M. has not identified a remedy "that would not otherwise be available to her."  Reply at 5.

Third, the Individual DOH Defendants argue that the Court should dismiss A.M.'s Fourth Amendment claim, because "a discharge from a state operated institution does not constitute a Fourth Amendment 'seizure' as a matter of law or common sense."  Reply at 8.  The Individual DOH Defendants contend that the logic of <u>Camara v. Municipal Court of City and County of San Francisco</u>, -- which applied Fourth Amendment protections to a "civil, administrative search," where the plaintiff's refusal to comply constituted a criminal offense -- does not apply to this case, because A.M. "has never alleged any threat of criminal punishment or criminal prosecution against her."  Reply at 7-8.  <u>Pino v. Higgs</u> also does not apply, according to the Individual DOH Defendants, because a discharge from a state institution into a private home is fundamentally different from "when a person is taken into [state] custody."  Reply at 9.

4.      **The October 23, 2014 Hearing.**

The Court held a hearing on the MTD on October 23, 2014.  <u>See</u> Transcript of Hearing (taken Oct. 23, 2014)("Tr.").[11]  At the hearing, A.M. admitted that her familial-association claim should not be a First Amendment claim, but a Fourteenth Amendment claim.   <u>See</u> Tr. at 82:20-83:17 (Constantaras, Court, Simmons).  Although she previously asserted claims to both the right to familial association and the right to expressive association, A.M. clarified at the hearing that she had conflated the two rights and would only assert a familial-association claim:

> I apologize. I confused the right [to] familial association; I thought of that as a First Amendment issue.  I think the defendants are correct that that's a liberty interest, and it would be protected by procedural due process, and we do have a

_____

[11]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final version may contain slightly different page and/or line numbers.

claim for procedural due process.  That's one of the motions that we've set aside
for [another] day.

Tr. at 83:11-17 (Simmons).  Having set aside the familial-association claim as a Fourteenth

Amendment issue, the Court asked A.M. whether any other First Amendment claims remained.

See Tr. at 83:7-9 (Court).  A.M. indicated that only her court-access claim remained viable under

the First Amendment, and the parties agreed to discuss that issue at a later juncture, as the

Individual DOH Defendants had filed a separate motion to dismiss on the court-access claim.

See Tr. at 83:18-84:11 (Court, Simmons, Constantaras).

With respect to A.M.'s Fourth Amendment claim, the Individual DOH Defendants

largely repeated the arguments made in the Reply.  See Tr. at 84:13-87:23 (Constantaras).  A.M.

conceded, though, that her Fourth Amendment claim constituted an alternative theory of

recovery, and that her main contentions involved due-process issues, but argued that she "should

be allowed to proceed under both [the Fourth Amendment and substantive and procedural

due-process claims] and see which one applies."  Tr. at 88:7-91:22 (Simmons, Court).  The Court

and A.M. then had the following exchange:

COURT:              Well this is a good place for me to ask this question . . .
                    you've got a lot of claims here.  At what point am I [willing
                    to] gut . . . your case and at what point . . . well, that is my
                    question.  At what point do I gut your case? . . . . Sounds
                    like [I dismiss] the Fourth Amendment, and [you] get [to
                    keep] your substantive due-process and [Thirteenth
                    Amendment claims]; you're not going to be unhappy.

SIMMONS:            No, Your Honor.

COURT:              Is that your main claim, . . .  is the substantive due process,
                    Thirteenth Amendment, those claims?

SIMMONS:            And procedural due process, which is not at issue today.
                    My working theory of this case is that the state had legal
                    custody of [A.M.], had the right to control who had

physical control of her . . . .  They had all the authority over her [and] they had a special relationship.  As part of that, they transferred her to Mary Evans' home -- knowing that it was dangerous for her to be transferred into a private enterprise to perform free labor -- and then washed their hands of her, and that's a substantive due-process violation.  It's a procedural due-process violation.  And it violates the Thirteenth Amendment. . . .  [T]hat's the guts of my case.

COURT:            All   right.      So   substantive   due-process,   Thirteenth Amendment, and then the procedural due-process claim?

SIMMONS:          Yes, Judge.

Tr. at 92:5-93-2 (Court, Simmons).

## LAW REGARDING RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).  The sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.   See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." (quoting Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)(internal quotation marks omitted)).

- 27 -

A complaint need not set forth detailed factual allegations, but a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010)("To determine whether a motion to dismiss was properly granted, we apply a plausibility standard to ascertain whether the complaint includes enough facts that, if assumed to be true, state a claim to relief that is plausible on its face."). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007).

The Tenth Circuit has held that "Iqbal establishes the importance of context to a plausibility determination." Gee v. Pacheco, 627 F.3d 1178, 1185 (10th Cir. 2010).

> "[P]lausibility" in th[e general pleading] context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide

swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(citations omitted).

## LAW REGARDING THE FIRST AMENDMENT RIGHT TO EXPRESSIVE ASSOCIATION

The First Amendment provides that "Congress shall make no law . . . prohibiting . . . the right of the people peaceably to assemble, and petition the Government for a redress of grievances." U.S. Const. amend. I. Included among the protections the First Amendment guarantees, the Supreme Court has recognized "a First Amendment right to associate for the purpose of speaking, which [it has] termed a 'right of expressive association.'" Rumsfeld v. Forum for Academic & Institutional Rights, Inc., 547 U.S. 47, 126 (quoting Boy Scouts of Am. v. Dale, 530 U.S. 640, 644, (2000)). See Grace United Methodist Church v. City of Cheyenne, 451 F.3d 643, 658 (10th Cir. 2006)("In addition to freedom of speech, the First Amendment also implicitly protects the corresponding freedom to expressive association."). The First Amendment protects associational rights in two distinct ways: (i) it "protects against unjustified government interference with an individual's choice to enter into and maintain certain intimate or private relationships"; and (ii) it ensures "the freedom of individuals to associate for the purpose of engaging in protected speech or religious activities." Bd. of Dirs. v. Rotary Club of Duarte, 481 U.S. 537, 544, (1987). See Grace United Methodist Church v. City of Cheyenne, 451 F.3d at 658.

The First Amendment freedom of expressive association developed out of the realization that "[a]n individual's freedom to speak, to worship, and to petition the government for the

redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." Roberts v. U.S. Jaycees, 468 U.S. at 622.  The freedom of expressive association typically operates, then, as a means of securing a separate First Amendment right.  See Roberts v. U.S. Jaycees, 468 U.S. at 622 ("[W]e have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.").  In Citizens Against Rent Control v. City of Berkeley, for example, the Supreme Court recognized political committees' right to raise funds and "make their voices heard on public issues." 454 U.S. 290, 295 (1981).  Similarly, in Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston, 515 U.S. 557 (1995), the Supreme Court held that freedom of expressive association allowed the organizers of the annual South Boston St. Patrick's Day Parade to control the content of their parade by excluding certain groups.  See 515 U.S. at 559.

"The right to associate for expressive purposes is not, however, absolute," and the Supreme Court has cautioned that "[i]nfringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." Roberts v. U.S. Jaycees, 468 U.S. at 623.  See Nat'l Commodity & Barter Ass'n v. Archer, 31 F.3d 1521, 1531 (10th Cir. 1994)(quoting Roberts v. U.S. Jaycees, 468 U.S. at 623).   Indeed, there is no independent First Amendment right of expressive association; the First Amendment protects the freedom of association only in certain circumstances.  See City of Dallas v. Stanglin, 490 U.S. 19, 23 (1989)("While the First Amendment does not in terms protect a 'right of association,' our cases have recognized that it embraces such a right in certain circumstances.").  Although an

opportunity "might be described as 'associational' in the common parlance," it does not necessarily follow that it involves "the sort of expressive association that the First Amendment has been held to protect." City of Dallas v. Stanglin, 490 U.S. at 24. Although "[i]t is possible to find some kernel of expression in almost every activity a person undertakes . . . such a kernel is not sufficient to bring the activity within the protection of the First Amendment." City of Dallas v. Stanglin, 490 U.S. at 25. In City of Dallas v. Stanglin, the Supreme Court declared that a municipal ordinance creating age-restricted dance halls did not violate a "generalized [First Amendment] right of 'social association'" because such a right does not exist. 490 U.S. at 25. The Supreme Court declined to extend First Amendment protection to dance hall encounters, because "they simply do not involve the sort of expressive association that the First Amendment has been held to protect" and "there [was] no suggestion that these patrons 'take positions on public questions.'" City of Dallas v. Stanglin, 490 U.S. at 24-25 (quoting Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte, 481 U.S. at 548).

Moreover, "[e]ven protected speech is not equally permissible in all places and at all times." Frisby v. Schultz, 487 U.S. 474, 479 (1988)(quoting Cornelius v. NAACP Legal Def. & Educ. Fund. Inc., 473 U.S. 788, 799 (1985)). With respect to activities on government property, the Constitution does not require "the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. at 799-800.

Consistent with this understanding, the Supreme Court "has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its

intended purpose outweighs the interest of those wishing to use the property for other purposes." United States v. Kokinda, 497 U.S. 720, 726 (1990).

> Regulation of speech activity on governmental property that has been traditionally open to the public for expressive activity, such as public streets and parks, is examined under strict scrutiny.   Regulation of speech on property that the Government has expressly dedicated to speech activity is also examined under strict scrutiny.   But regulation of speech activity where the Government has not dedicated its property to First Amendment activity is examined only for reasonableness.

United States v. Kokinda, 497 U.S. at 726-27 (citing Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45-46 (1983))(internal quotation marks omitted).  This tripartite framework is necessary, because "[t]he First Amendment does not guarantee access to property simply because it is owned or controlled by the government."  Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. at 803.  The Supreme Court has explained that "the State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated."  Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. at 46 (quoting U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114 (1981)).

Federal courts have held that government office buildings that have not traditionally been opened to the public for expressive activity are non-public fora.  See Mainstream Loudoun v. Bd. of Trs. of Loudoun Cnty. Library, 24 F. Supp. 2d 552, 562 (E.D. Va. 1998)(categorizing a government office building as a non-public forum, and distinguishing the office building from such fora as school board meeting places and municipal theaters).  This designation stems from the recognition that the government workplace, "like any place of employment, exists to accomplish the business of the employer."  Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. at 805.  When acting in its capacity as an employer, the government "must have wide discretion and control over the management of its personnel and internal affairs."  Arnett v.

Kennedy, 416 U.S. 134, 168 (1974)(Powell, J., concurring in part and concurring in the result in part).  Consequently, "[i]t follows that the Government has the right to exercise control over access to the . . . workplace in order to avoid interruptions to the performance of the duties of its employees." Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. at 805-06.  Finally, the question whether a polling place on election day is a "traditional public forum" is not settled under Supreme Court precedent.  Burson v. Freeman, 504 U.S. 191, 216 (1992)(Scalia, J., concurring in judgment)(disagreeing with plurality opinion and asserting that "the environs of a polling place, on election day, are simply not a 'traditional public forum' -- which means that they are subject to speech restrictions that are reasonable and viewpoint neutral")(quoting Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. at 46).  Cf. Marlin v. D.C. Bd. of Elections & Ethics, 236 F.3d 716, 719 (D.C. Cir. 2001)(deciding that the interior of a polling place was not a traditional public forum nor a government-designated one, because it is not available for general public discourse, and "[t]he only expressive activity involved is each voter's communication of his own elective choice and this has long been carried out privately -- by secret ballot in a restricted space").

## LAW REGARDING THE FOURTEENTH AMENDMENT RIGHT TO FAMILIAL ASSOCIATION

The Supreme Court has declared that "certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme." Roberts v. U.S. Jaycees, 468 U.S. at 618.  "Included in that category are '[f]amily relationships, [which] by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctly personal aspects of one's life.'" Trujillo v. Bd. of Cnty. Comm'rs, 768 F.2d

at 1188 (quoting Roberts v. U.S. Jaycees, 468 U.S. at 619-620)(alterations in Trujillo v. Bd. of Cnty. Comm'rs).   The Tenth Circuit has recognized the right of familial association between siblings, and between parents and their children, but has cautioned that these relationships "do not form the outer limits of protected intimate relationships." Trujillo v. Bd. of Cnty. Comm'rs, 768 F.2d at 1189 n.5.   Instead, courts must make "a careful assessment" of a relationship's "degree of selectivity in decisions to begin and maintain the affiliation and seclusion from others in critical aspects of the relationship," to determine whether it will qualify as "protected." Roberts v. U.S. Jaycees, 468 U.S. at 620.   See Trujillo v. Bd. of Cnty. Comm'rs, 768 F.2d at 1189 n.5.

The right of familial association is a substantive due-process right the Fourteenth Amendment protects.   See Griffin v. Strong, 983 F.2d at 1547 (citing Shondel v. McDermott, 775 F.2d 859, 865-66 (7th Cir. 1985)).   "This substantive right is consonant with the right of privacy." Griffin v. Strong, 983 F.2d at 1547.   See Hodgson v. Minnesota, 497 U.S. 417, 446 (1990)(recognizing a privacy interest in the "intimacies of the marital relationship"). "Evaluation of a party's Fourteenth Amendment substantive due-process rights requires a balancing of the party's liberty interests against the relevant state interests." J.B. v. Washington Cnty., 127 F.3d 919, 927 (10th Cir. 1997)(quoting Youngberg v. Romeo, 457 U.S. at 321)(internal quotation marks omitted).   The Tenth Circuit also requires "an allegation of intent to interfere with a particular relationship protected by the freedom of familial association . . . to state a claim under [42 U.S.C. § 1983]." Lowery v. Cnty. of Riley, 522 F. 3d 1086, 1092 (10th Cir. 2008)(quoting Trujillo v. Bd. of Cnty. Comm'rs, 768 F.2d at 1189)(internal quotation marks omitted)(alterations in Trujillo v. Bd. of Cnty. Comm'rs).   To succeed on a claim for a violation of the right to familial association, therefore, a plaintiff must

prove two elements: (i) that the defendant intended to deprive the plaintiff of a protected relationship; and (ii) that plaintiff's interest in her protected relationship outweighs the state's interest in an unwarranted intrusion into that relationship.  See Thomas v. Kaven, 765 F.3d 1183, 1196 (10th Cir. 2014).  "In conducting this balancing, the court will consider, among other things, the severity of the infringement on the protected relationship, the need for defendants' conduct, and possible alternative courses of action."  Thomas v. Kaven, 765 F.3d at 1196.

## LAW REGARDING THE FOURTH AMENDMENT

The Fourth Amendment "protects '[t]he right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures.'"  United States v. Thompson, 524 F.3d 1126, 1132 (10th Cir. 2008)(quoting U.S. Const. amend. IV).  It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.   "The security of one's privacy against arbitrary intrusion by the police -- which is at the core of the Fourth Amendment -- is basic to a free society."  Wolf v. Colorado, 338 U.S. 25, 27 (1949), overruled on other grounds by Mapp v. Ohio, 367 U.S. 643 (1961).

For purposes of analyzing Fourth Amendment seizures, the Tenth Circuit has divided interactions between police and citizens into three categories: (i) consensual encounters; (ii) investigative stops; and (iii) arrests.  See Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000).  A consensual encounter occurs when a police officer approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and to end the encounter.  See Oliver v. Woods, 209 F.3d at 1186.  For example, officers generally may "go to a person's home to interview him," United States v. Daoust, 916 F.2d 757,

758 (1st Cir. 1990), because "[i]t is not improper for a police officer to call at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business," 1 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(b), at 475 (3d ed. 1996). Such encounters generally "are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing." Oliver v. Woods, 209 F.3d at 1186.

In United States v. Reeves, 524 F.3d 1161 (10th Cir. 2008), the Tenth Circuit established that "[o]pening the door to one's home is not voluntary if ordered to do so under color of authority." 524 F.3d at 1167. The Tenth Circuit has repeatedly held that, absent exigent circumstances, officials acting under the color of authority and without a warrant may not seize a person inside their home, or effect a seizure by ordering a person inside a home to come to the door. See United States v. Maez, 872 F.2d 1444, 1446 (10th Cir. 1989)(recognizing a seizure in violation of the Fourth Amendment when police surrounded an individual's house for three hours and ordered the individual out of his home under drawn firearms); United States v. Flowers, 336 F.3d 1222, 1225-27 (10th Cir. 2003)(holding that police orders to open the door, which led to an arrest inside the home, represented an unconstitutional seizure). In United States v. Reeves, police officers suspected an individual of unlawfully carrying weapons. See 524 F.3d at 1163. Without an arrest or search warrant, officers convened at the suspect's motel and made several calls from the front office to the motel room, which were unanswered. See 524 F.3d at 1163. After assessing the situation, officers proceeded to knock on the suspect's door and windows. See 524 F.3d at 1164. After nearly twenty-five minutes, the suspect met the officers at the door and was promptly arrested. See United States v. Reeves, 524 F.3d at 1164. The Tenth Circuit held that the presence of police, the telephone calls, and the knocking at door

constituted a seizure inside the home, because the suspect would not likely have thought that he was free to ignore the officers knocking and yelling into the room.  See 524 F.3d at 1168. Although it recognized that the officers in United States v. Reeves did not issue any direct commands for the suspect to open the door or come out of his home, the Tenth Circuit reasoned:

> [T]he officers' actions were effectively a command to open the door. The record demonstrates that three officers pounded on Reeves' door and window while yelling and loudly identifying themselves as police officers. They continued this conduct consistently for at least twenty minutes. This encounter began between 2:30 and 3:00 in the morning, a time which must be taken into consideration when analyzing the coerciveness of the encounter.

United States v. Reeves, 524 F.3d at 1168-69.

The Court, in Smith v. Kenny, 678 F. Supp. 2d 1124 (D.N.M. 2009)(Browning, J.), held that citizens could be seized when an officer issues a command, via cellular telephone, to someone to leave his or her home, and to surrender to officers waiting outside.  See 678 F. Supp. 2d at 1173 (holding that a seizure could occur under these facts, but not deciding whether a seizure occurred because of factual disputes).  The Court determined that the late hour in addition to the direct order to exit the home and surrender to police custody "is a seizure because a reasonable person would not feel free to ignore the order."  678 F. Supp. 2d at 1173.  The Court found that the means of communication are not the focus of the Fourth Amendment analysis and that it is the arrested person's location that determines whether an arrest occurs in a home.  See 678 F. Supp. 2d at 1174.

In United States v. Reeves, the Tenth Circuit cited with approval a case from the United States Court of Appeals for the Ninth Circuit.  In that case, United States v. Al-Azzawy, 784 F.2d 890 (9th Cir. 1985), the Ninth Circuit held that a defendant was seized inside his home for purposes of the Fourth Amendment when officers surrounded his trailer, and used a bullhorn to order the suspect to exit his home and drop to his knees.  See United States v. Al-Azzawy, 784

F.2d at 893.  The Ninth Circuit had found that the defendant/appellee "was not free to leave, his freedom of movement was totally restricted, and the officers' show of force and authority was overwhelming.  Any reasonable person would have believed he was under arrest in these circumstances."  United States v. Al-Azzawy, 784 F.2d at 893.

The Tenth Circuit in United States v. Reeves also cited with approval United States v. Morgan, 743 F.2d 1158 (6th Cir. 1984).  In United States v. Morgan, the United States Court of Appeals for the Sixth Circuit held that a seizure occurred when police surrounded a defendant's home and demanded that he come outside:

> [T]he record provides ample proof that, as a practical matter, Morgan was under arrest as soon as the police surrounded the Morgan home, and therefore, the arrest violated Payton[v. New York, 445 U.S. 573 (1980),] because no warrant had been secured.  The police show of force and authority was such that a reasonable person would have believed he was not free to leave.

743 F.2d at 1163-64.

In United States v. Johnson, 626 F.2d 753 (9th Cir. 1980), federal agents approached the home of a suspect to investigate the theft of a treasury check.  See 626 F.2d at 755.  The suspect's seizure occurred when the suspect was inside the house and the officers were outside with guns drawn.  See United States v. Johnson, 626 F.2d at 757.  The Ninth Circuit held that this arrest was unconstitutional, because "it is the location of the arrested person and not the arresting agents that determines whether an arrest occurs within a home."  United States v. Johnson, 626 F.2d at 757.  The Ninth Circuit reasoned that to hold otherwise would allow officers to "avoid illegal 'entry' into a home simply by remaining outside the doorway and controlling the movements of suspects within through the use of weapons that greatly extend the 'reach' of the arresting officers."  626 F.2d at 757.

The Supreme Court has found "a person has been seized within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554 (1980). However, "in situations where the individual could not or would not want to leave, even absent police presence, the appropriate inquiry is whether a reasonable person would feel free to decline the officer's requests." Florida v. Bostick, 501 U.S. 429, 436 (1991). Regarding circumstances where police officers, without a warrant or exigent circumstances, and acting under the color of authority, order the occupants of a residence to the door to be seized, the Tenth Circuit has stated:

> In situations where the individual could not or would not wish to leave, even absent the police presence, "the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." Florida v. Bostick, 501 U.S. 429, 436 . . . (1991). Circumstances that indicate a seizure include: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." [United States v. ]Mendenhall, 446 U.S. [544,] 554 . . . [(1980)]; [United States v.] Maez, 872 F.2d [1444,] 1450 [(1989)].

United States v. Reeves, 524 F.3d at 1167.

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982). "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)). The Supreme Court

- 39 -

deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." Butz v. Economou, 438 U.S. 478, 504 (1978). "The qualified immunity analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil War Civil Rights Acts." Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled on other grounds as recognized in Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

> Under § 1983 (invoked in this case) and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 . . . (1971), a plaintiff may seek money damages from government officials who have violated her constitutional or statutory rights. But to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. 635, 638 . . . (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, they are shielded from personal liability, Harlow v. Fitzgerald, 457 U.S. 800, 818 . . . (1982). That means a court can often avoid ruling on the plaintiff's claim that a particular right exists. If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Green, 131 S. Ct. 2020, 2030-31 (2011).

Issues of qualified immunity are best resolved at the "earliest possible stage in litigation." Pearson v. Callahan, 555 U.S. at 232 (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)(per curiam)). "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit." Lewis v. Tripp, 604 F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818). Qualified immunity also shields officers who have "reasonable, but mistaken beliefs" and operates to protect officers from the law's sometimes "hazy border[s]." Saucier v.

Katz, 533 U.S. at 205.   When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct.   See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

   **1.  Procedural Approach to Qualified Immunity.**

   In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." 555 U.S. at 236.   The Supreme Court also noted that, while no longer mandatory, the protocol outlined in Saucier v. Katz -- by which a court first decides if the defendant's actions violated the Constitution, and then the court determines if the right violated was clearly established -- will often be beneficial.   See Pearson v. Callahan, 555 U.S. at 241.   In rejecting the prior mandatory approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district court and courts of appeals with "what may seem to be an essentially academic exercise."   555 U.S. at 237.   The Supreme Court also recognized that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable."   555 U.S. at 241 (alterations omitted)(internal quotation marks omitted).   See Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior case law "comports with our usual reluctance to decide constitutional questions unnecessarily").   Once the plaintiff establishes

an inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense generally fails.  See Cannon v. City & Cnty. of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

The Supreme Court recognizes seven circumstances where district courts should proceed directly to and "should address only" the clearly established prong of the qualified immunity analysis: when (i) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right."   Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(quoting Pearson v. Callahan, 555 U.S. at 236-42)[12](internal quotation marks

---

[12]As former-Tenth Circuit judge, and now Stanford Law School professor, Michael McConnell, has noted, much of what lower courts do is read the implicit, unwritten signs that the superior courts send them through their opinions.  See Michael W. McConnell, Address at the Oliver Seth American Inn of Court: How Does the Supreme Court Communicate Its Intentions to the Lower Courts: Holdings, Hints and Missed Signals (Dec. 17, 2014).  This practice is good for the nation's judicial system to achieve uniformity in a nation of 319 million people.  See, e.g., Michigan v. Long, 463 U.S. 1032, 1040 (1983)(stating that "there is an important need for uniformity in federal law").  But see Amanda Frost, Overvaluing Uniformity, 94 Va. L. Rev. 1567 (2008)(criticizing courts' focus on uniformity of the law).  If a district court in New Mexico is trying -- as it does diligently and faithfully -- to receive and read the unwritten signals of its superior courts, it would appear that Justice Alito in Pearson v. Callahan and Judge Gorsuch in Kerns v. Bader are trying to suggest that district courts should, whenever possible,

omitted).  Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely only to face challenges in the qualified immunity context.  Camreta v. Greene, 131 S. Ct. at 2031-32.  See Kerns v. Bader, 663 F.3d at 1181.[13]

_____

decide qualified immunity on the clearly established prong.  For example, Justice Alito and Judge Gorsuch gave seven situations when the Court should decide a case solely on the clearly established element and not "avoid avoidance."  Kerns v. Bader, 663 F.3d at 1180-81.  Even the phrase "avoid avoidance" suggests that the district court is to generally avoid, not decide, the constitutional issue.

        The Court is concerned about this push to not decide constitutional issues, for a number of reasons.  The Court set forth some of these in Kerns v. Board of Education, which the Court quotes in note 48.  See infra note 48.  Additionally, there is a practical problem.  Sometimes, for a district court to really know whether a right is clearly established, it has to do the first analysis, and thoroughly explore whether there is a right and whether it has been violated.  If it jumps to the mushy, hazy area of clearly established without knowing what the right is, the analysis lacks any precision.  While appellate courts may think that jumping to the clearly established prong saves district courts a lot of trouble, in the Court's experience, the old rule -- in Saucier v. Katz -- made more sense and, practically, is the way the Court still has to go in many cases.

[13]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer.  663 F.3d at 1183.  In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question.  And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84.  The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)."  663 F.3d at 1187 n.5.  On remand, the Court stated:

While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations.  A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations.  See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972).  In Mitchum v. Foster, the Supreme Court explained:

> Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." . . .  The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.

407 U.S. at 238-39.  Congress did not say it would remedy only violations of "clearly established" law, but that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (emphasis added).  The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional.  See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010).  The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith."  Wood v. Strickland, 420 U.S. 308, 322 (1975).  In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly-established prong became a part of the qualified immunity test.  See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or

"Courts should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011)(quoting Pearson v. Callahan, 555 U.S. at 236-37). See Camreta v. Greene, 131 S. Ct. at 2032 ("In general, courts

> constitutional rights."). It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983. J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011). Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations. See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . . These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives). In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering. See 547 U.S. at 596-97. Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress. It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights. It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized in Ysasi v. Brown, No. CIV 13-0183 JB/CG, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.). See Fourth Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations).

should think hard, and then think hard again, before turning small cases into large ones."[14])  The

Tenth Circuit will remand a case to the district court for further consideration when the district

---

[14]In Kerns v. Board of Commissioners, the Court expressed concern with Justice Elena Kagan's comments about "large" and "small" cases:

> While the Court is, of course, obligated to follow faithfully the Supreme Court's decisions and opinions, the Court has always been unenlightened and even troubled by Justice Elena Kagan's comments in Camreta v. Greene about "large" and "small" cases.  131 S. Ct. at 2032.  As a trial judge, the Court has tried assiduously to avoid thinking about or categorizing some cases as "large" and some as "small."  It usually is not mentally healthy for a judge to put all his or her energy into "large" cases and slight "small cases"; to the litigants, their case is the most important case on the Court's docket, and it is usually wise for the judge to treat each case on which he or she is working -- at that moment -- as the most important case at that moment.  Getting the decision "right," i.e. getting the law and facts correct and accurate, is obviously important, but getting it right is only one-half of a judge's task, particularly a trial judge's job.  The other half of dispensing justice is the appearance of justice -- did the Court listen to the litigant's arguments, wrestle with those arguments, and deal with them in an intellectually honest way.  Americans are pretty good about accepting a judicial decision -- even an adverse one -- and cease obsessing over an issue, if they are convinced that an authority figure has dressed up, taken them seriously, listened patiently and politely, wrestled with the arguments, addressed them, and accurately stated the facts.  The Court believes that, if it starts looking at some cases before it as "large" and some as "small," it begins a slippery slope that does not accomplish both halves of the task of dispensing justice.  The justice system depends so much on the nation respecting and accepting the courts' proceedings and decisions, because courts have very little "power" that does not depend on that acceptance.  Thus, Justice Kagan's comments are not only not self-defining, but they are disturbing.
>
> If, perhaps, a "large" case is a Supreme Court case or one that comes from the East Coast or California, rather than one in a district court in New Mexico, then it helps to look at what cases the Supreme Court has decided for the plaintiff.  The three most recent qualified immunity cases the Supreme Court dealt with are: (i) Reichle v. Howards, 132 S. Ct. 2088 (2012); (ii) Filarsky v. Delia, 132 S. Ct. 1657 (2012); and (iii) Messerschmidt v. Millender, 132 S. Ct. 1235 (2012).  In Reichle v. Howards, the Supreme Court determined that secret service agents were entitled to qualified immunity for arresting a protestor who touched the Vice President and held that it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation.  See 132 S. Ct. at 2092, 2097.  In Filarsky v. Delia, the Supreme Court held that a private individual that the government hires to do its work, an internal affairs review, is entitled to seek qualified immunity for Fourth and Fourteenth Amendment violations.  See 132 S. Ct. at 1660, 1668.  In Messerschmidt v. Millender, the Supreme Court

court has given cursory treatment to the clearly established prong of the qualified immunity analysis.  See Kerns v. Bader, 663 F.3d at 1182.

### 2.    Clearly Established Rights in the Qualified Immunity Analysis.

To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)[15](quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

---

held that police officers in Los Angeles, California were entitled to qualified immunity when they relied on an invalid warrant to search a home, because a reasonable officer would not have realized the error.  See 132 S. Ct. at 1241, 1250.  The Supreme Court has not denied qualified immunity since 2004 in Groh v. Ramirez, 540 U.S. 551 (2004), where it held that an officer unreasonably relied on a deficient warrant.  See 540 U.S. at 565. The Court does not think those presumably "large" cases (they are Supreme Court cases, after all) are any different -- substantively, legally, or factually -- than this case involving the search of a citizen's home after someone shot down a police helicopter and then detained that suspect for nine months until the United States realized that J. Kerns could not have shot down the helicopter.

On the flip side, treating large cases like they are large cases can create an appearance problem to the public and to the litigants -- that only big cases deserve the Court's attention.  A trial judge can overwork a "large" case.  It is better to treat even "large" cases like every other case; large cases and their litigants need to know and appreciate that they are not the only case on the court's docket, and realize that the scarcity of judicial resources applies to them too.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d at 1222 n.35.

[15]Lobozzo v. Colorado Department of Corrections is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001).  On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful."  Anderson v. Creighton, 483 U.S. at 640.   "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202).   A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts."  Pierce v. Gilchrist, 359 F.3d at 1298.

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff:  "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are

---

case before it.  See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that Lobozzo v. Colorado Department of Corrections and Dillon v. Twin Peaks, 406 F. App'x 253 (10th Cir. 2010)(unpublished), have persuasive value with respect to material issues and will assist the Court in its preparation of this MO.

sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 131 S. Ct. at 2083. "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 131 S. Ct. at 2083). "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639. "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 131 S. Ct. at 2084. The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officers from the law's sometimes "hazy border[s]." Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit held in Kerns v. Bader that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference." 663 F.3d at 1188 (emphasis in original). In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification." 663 F.3d at 1183 (emphasis added). Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined, applied a sliding scale to determine when the law is clearly established. See Casey v. City of Fed. Heights, 509 F.3d at 1284 ("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation."). "[W]hen an

- 49 -

officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a second

decision with greater specificity to clearly establish the law." Casey v. City of Fed. Heights, 509

F.3d at 1284.  Furthermore, "general statements of the law are not inherently incapable of giving

fair and clear warning . . . ." Hope v. Pelzer, 536 U.S. at 741.

In Rivera v. Bates, No. CIV 12-0473 JB/RHS, 2014 WL 3421050 (D.N.M. June 21,

2014)(Browning, J.), the Court used the Kerns v. Bader qualified-immunity framework to

determine if it was clearly established that arresting a suspect in his underwear and failing to

retrieve his clothing to cover him up while he is transported from his house to a patrol car makes

the arrest unreasonable.  See 2014 WL 3421050, at *54.  The Court stated:

> Even if the Court could, on the record before it, conclude, as a matter of law, that
> the manner in which Hernandez effectuated the arrest was [un]reasonable, the
> Court finds that the law was not clearly established such that a reasonable officer
> in Hernandez' position would have recognized that he needed to retrieve clothing
> for S. Rivera rather than escort him directly to the police vehicle.  As the Tenth
> Circuit has emphasized, although "a case on point isn't required if the impropriety
> of the defendant's conduct is clear from existing case law," the law is not clearly
> established where "a distinction *might* make a constitutional difference." Kerns v.
> Bader, 663 F.3d at 1188 (emphasis in original).  In Kerns v. Bader, dealing with
> the search of a home, the Tenth Circuit explained that the relevant question
> "wasn't whether we all have some general privacy interest in our home," but
> "whether it was *beyond debate* in 2005 that the officers' entry and search lacked
> legal justification."  663 F.3d at 1183 (emphasis added).  Here, S. Rivera has
> relied on Cortez v. McCauley to establish that his clearly established rights were
> violated, but the Tenth Circuit in that case stated that it had "little difficulty
> concluding that a small amount of force, like grabbing Rick Cortez and placing
> him in the patrol car, is permissible in effecting an arrest under the Fourth
> Amendment."  663 F.3d at 1128.  The Tenth Circuit only made one comment
> regarding Cortez' clothing during the arrest:
>
>> Although the dignity aspects of this arrest are troubling,
>> specifically hauling Rick Cortez (clad only in his shorts) into the
>> patrol car in the middle of the night without any explanation, the
>> police were investigating a serious felony and claimed a need for
>> quick action to separate the accused from any other children that
>> might be in the home.

478 F.3d at 1128-29.  The Tenth Circuit did not explain what would have to be different about the "dignity aspects" for the arrest to violate the Fourth Amendment.  More importantly, the Court emphasizes that Hernandez did not participate in any of the alleged wrongdoing inside S. Rivera's house, nor did he refuse to allow S. Rivera to get dressed; instead, Hernandez was involved in the arrest only after S. Rivera was outside the house.  S. Rivera has not pointed to, nor has the Court been able to identify, any cases that demand that an officer delay taking the arrestee to a police vehicle so the officer can enter the arrestee's home to search for clothing or otherwise find some covering for an arrestee on the way to the police vehicle.  The Court will thus grant the MSJ on S. Rivera's excessive and unreasonable force claim against Hernandez.

Rivera v. Bates, 2014 WL 3421050, at *54 (emphasis in original).

## ANALYSIS

The Court will dismiss A.M.'s First Amendment expressive-association claim and her Fourth Amendment unlawful-seizure claim.  Although the First Amendment right to expressive association was clearly established in 1979, A.M.'s expressive-association claim fails, because she does not allege that the Individual DOH Defendants prevented her from associating with others for expressive purposes.  A.M.'s unlawful seizure claim also fails, because the Fourth Amendment does not prohibit state actors from transferring civilly committed individuals from one facility to another.  Further, even if the Individual DOH Defendant violated the Fourth Amendment when they transferred A.M. from Fort Stanton to the Homestead House, qualified immunity protects the Individual DOH Defendants, because A.M.'s right to be free from unlawful seizures while in state custody was not clearly established in 1979.  Accordingly, the Court will grant the MTD.

## I.   THE INDIVIDUAL DOH DEFENDANTS DID NOT VIOLATE A.M.'S FIRST AMENDMENT RIGHT TO EXPRESSIVE ASSOCIATION.

A.M. alleges that the Individual DOH Defendants "deprived [her] of her First Amendment right to associate with persons of her own choosing" by "illegally transferring" her to the Homestead House.  Complaint ¶ 144, at 36.  A.M. characterizes this transfer as a violation

of her First Amendment right to expressive association.[16]  See Response at 4.  The Individual

DOH Defendants argue that A.M.'s expressive-association claim must fail, because A.M. did not

properly allege "that she has been deprived of her right to association based on the pursuit of

speech or advocacy of political, social, economic, religious, or cultural values."  Reply at 3-4.

       The First Amendment protects political expression manifested through conduct as well as

through speech.  See Texas v. Johnson, 491 U.S. 397, 406 (1989)(holding that the burning of an

American flag is conduct "sufficiently imbued with elements of communication to implicate the

First Amendment")(citation omitted)(internal quotation marks omitted).  "The right to associate

for expressive purposes is not, however, absolute."  Roberts v. U.S. Jaycees, 468 U.S. at 622.

Although an opportunity "might be described as 'associational' in the common parlance," it does

not necessarily follow that it involves "the sort of expressive association that the First

---

[16]The First Amendment protects:  (i) the right of expressive association, see Boy Scouts
of Am. v. Dale, 530 U.S. at 648; (ii) the right of access to courts, see Poole v. Cnty of Otero, 271
F. 3d 955, 961 (10th Cir. 2001); and (iii) the right of intimate or familial association, see Grace
United Methodist Church v. City of Cheyenne, 451 F.3d at 658 ("The First Amendment protects
. . . against unjustified government interference with an individual's choice to enter into and
maintain certain intimate or private relationships."  (quoting Bd. of Dirs. v. Rotary Club of
Duarte, 481 U.S. at 544)(internal quotation marks omitted)); Wirsching v. Colorado, 360 F.3d
1191, 1198 (10th Cir. 2004)(discussing the First Amendment right to familial association).
       A.M. asserts two First Amendment claims.  First, she alleges that the Individual DOH
Defendants violated her First Amendment right of access to courts.  See Complaint ¶ 145, at 36.
Second, she contends that the Individual DOH Defendants violated her First Amendment right to
expressive association.  See Reply at 4.  Although her familial association claim could have also
proceeded under the First Amendment, A.M. conceded in her briefing and at oral argument that
she is only asserting a familial-association claim under the Fourteenth Amendment.  See Reply
at 17 ("Defendants are correct that the substantive Due Process Clause of the Fourteenth
Amendment, rather than the First Amendment, most securely safeguards an individual's
fundamental right of familial and intimate association."); Tr. at 83:7-84:9 (Court, Simmons,
Constantaras).  The Court will therefore recognize A.M.'s familial association claim under the
Fourteenth Amendment, instead of the First Amendment.  Furthermore, because the Individual
DOH Defendants filed a separate motion to dismiss A.M.'s access-to-court claim, see Individual
DOH Defendants' Motion and Memorandum to Dismiss Plaintiff's Court Access Claims Under
the First and Fourteenth Amendments on the Basis of Qualified Immunity, filed May 23, 2014
(Doc. 45), the Court will consider A.M.'s First Amendment access-to-court claim in a separate
opinion.  Accordingly, the only First Amendment issue that this MO addresses is A.M.'s
expressive-association claim.

Amendment has been held to protect." City of Dallas v. Stanglin, 490 U.S. at 24.  Because "there is no generalized right of free association," courts only "recognize[] a right to associate for the purpose of engaging in those activities protected by the First Amendment -- speech, assembly, petition for the redress of grievances, and the exercise of religion." Roberts v. U.S. Jaycees, 468 U.S. at 618.

In Roberts v. U.S. Jaycees, the Supreme Court extended First Amendment protection to the United States Jaycees, a civic organization, because it engaged in "the advocacy of political and public causes." Roberts v. U.S. Jaycees, 468 U.S. at 622.  The Boy Scouts of America similarly qualified for First Amendment protection, because the organization "engaged in instilling its system of values in young people." Boy Scouts of Am. v. Dale, 530 U.S. at 643.  In addition to civic or political causes, courts also often recognize the freedom of expressive association for organizations that "associate for the purpose of engaging in . . . religious activities." See Grace United Methodist Church v. City of Cheyenne, 451 F.3d at 658 (quoting Bd. of Dirs. v. Rotary Club of Duarte, 481 U.S. at 544).

Courts generally refuse to extend First Amendment protection to individuals or organizations that assert the freedom of association in a context that does not include the assertion of a separate First Amendment right.  See City of Dallas v. Stanglin, 490 U.S. at 24.  In City of Dallas v. Stanglin, the Supreme Court declined to recognize a First Amendment right of association for dance-hall patrons seeking to overturn a municipal regulation creating age-restricted dance halls.  See 490 U.S. at 24.  The Supreme Court listed four reasons that "chance encounters in dance halls" do not involve "the sort of expressive association that the First Amendment has been held to protect": (i) the dance hall patrons were not "members of any organized association"; (ii) "most [were] strangers to one another"; (iii) the dance hall admitted

all who paid the admission fee; and (iv) "[t]here [was] no suggestion that these patrons take positions on public questions." City of Dallas v. Stanglin, 490 U.S. at 24-25.

The Tenth Circuit followed this approach in Dillon v. Twin Peaks, when it limited the freedom of expressive association to "situations involving intimate relationships or furthering another right under the constitution, such as free speech." 406 F. App'x at 259 (citing City of Dallas v. Stanglin, 490 U.S. at 24). In that case, the Tenth Circuit upheld the district court's jury instructions, which stated that the plaintiff "had to show that the [defendant's] restriction on association intruded on another constitutional right." 406 F. App'x at 259-60.

Even accepting the Complaint's allegations as true and viewing those allegations in the light most favorable to A.M., A.M. fails to state a plausible expressive-association claim. See Mink v. Knox, 613 F.3d at 1000. A.M. alleges that her transfer to the Homestead House "deprived [her] of her First Amendment right to associate with persons of her own choosing," Complaint ¶ 144, at 36, but this statement alone is insufficient to maintain an expressive-association claim, because there is no "generalized [First Amendment] right of 'social association,'" City of Dallas v. Stanglin, 490 U.S. at 25. To establish First Amendment protection over her expressive association claim, A.M. must allege that the Individual DOH Defendants prevented her from associating with others for expressive purposes. Boy Scouts of Am. v. Dale, 530 U.S. at 648.

> To determine whether a group is protected by the First Amendment's expressive associational right, we must determine whether the group engages in 'expressive association.' The First Amendment's protection of expressive association is not reserved for advocacy groups. But to come within its ambit, a group must engage in some form of expression, whether it be public or private.

Because A.M. does not allege that the Individual DOH Defendants restricted her ability to associate for an expressive purpose -- like voting, protesting, or otherwise organizing for

political, educational, economic, civic, or religious functions -- she has failed to state a plausible claim. Cf. Healy v. James, 408 U.S. 169, 181 (1972)(recognizing a right to organize campus political group); NAACP v. Claiborne Hardware Co., 458 U.S. 886, 907(1982)(upholding a right to organize a boycott); In re Primus, 436 U.S. 412, 426 (1978)(upholding the ACLU's right to solicit prospective litigants); Smith v. Ark. State Highway Emp., 463, 464 (1979)(recognizing employees' right to unionize); Roberts v. U.S. Jaycees, 468 U.S. at 622 (recognizing a "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends").   In this sense, A.M.'s claim resembles that of the dance hall patrons in City of Dallas v. Stanglin, who could not establish that they were entitled to First Amendment protection, because there was no suggestion "that [they] [took] positions on public questions." City of Dallas v. Stanglin, 490 U.S. at 25.

A.M. argues that she "was living as a member of a defined group in the Training School," and that "the State could not involuntarily cut [her] off . . . from her home, her family and her close friends."   Response at 20.   A.M.'s assertion is insufficient to support an expressive-association claim, because it fails to allege that the Individual DOH Defendants prevented A.M. from associating "for the advancement of beliefs and ideas." NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 460 (1958).  Without more, A.M. has not stated a plausible expressive-association claim.   See Ashcroft v. Iqbal, 556 U.S. at 678 ("[M]ere conclusory statements[] do not suffice.").

In addition to failing to plausibly allege an expressive-association claim, A.M. also conceded her expressive-association claim at the October 23, 2014 hearing.  See Tr. at 83:7-84:9 (Court, Simmons, Constantaras).  When the Court asked her twice whether her First Amendment

claims included issues other than familial association and court access, A.M. responded in the negative:

| | |
|---|---|
| COURT: | Is there anything left to your First Amendment claim, Ms. Simmons if the familial-association one goes out? |
| SIMMONS: | No, Your Honor . . . . |
| COURT: | So I can dismiss the First Amendment claims and then just deal with the familial association -- |
| SIMMONS: | . . . [W]e do also have an access to courts claim, which I think would be a First Amendment claim . . . . |
| COURT: | Is there anything else then [to the] First Amendment other than those two? |
| SIMMONS: | That's it, Judge. |

Tr. at 83:7-84:9 (Court, Simmons).

In rejecting A.M.'s expressive-association claim, the Court refuses to "accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." United States v. O'Brien, 391 U.S. 367, 376 (1968).  In an attempt to limit the "apparently limitless variety" of conduct that is actionable under the First Amendment, courts regularly reject frivolous expressive-association claims.  United States v. O'Brien, 391 U.S. at 376.  See Goodpaster v. City of Indianapolis, 736 F.3d 1060, 1073 (7th Cir. 2013)("[T]he First Amendment does not protect coming together at a local bar to smoke."); Cabrol v. Town of Youngsville, 106 F.3d 101,109 (5th Cir. 1997)(holding that raising chickens is not "an expressive act for the purposes of the First Amendment"); Swank v. Smart, 898 F. 2d 1247, 1251 (7th Cir. 1990)(holding that conversation between motorcycle passengers was "too remote" from the "marketplace of ideas to activate the guarantees of the First Amendment").  Indeed, "[i]t is possible to find some kernel of expression in almost every

activity a person undertakes -- for example, walking down the street or meeting one's friends at a shopping mall -- but such a kernel is not sufficient to bring the activity within the protection of the First Amendment." City of Dallas v. Stanglin, 490 U.S. at 25.  A.M. has not provided -- and the Court has not found -- a sound reason to extend the First Amendment's protections to her day-to-day activities.   Accordingly, the Court concludes that A.M. has not alleged that the Individual DOH Defendants violated her First Amendment right to expressive association.

## II.     THE FIRST AMENDMENT RIGHT TO FREEDOM OF ASSOCIATION WAS CLEARLY ESTABLISHED BEFORE 1979.

Although A.M. fails to properly state a First Amendment expressive-association claim, the Court finds that the First Amendment right of expressive association was clearly established before 1979.   To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right. See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d at 1327.  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"   Lobozzo v. Colo. Dep't of Corr., 429 F. App'x at 710 (quoting Zweibon v. Mitchell, 720 F.2d at 172-73).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d at 923.  On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful."  Anderson v. Creighton, 483 U.S. at  640.  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation

and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202). A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d at 1298.

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 131 S. Ct. at 2083. "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 131 S. Ct. at 2083). "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639. "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 131 S. Ct. at 2084. The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officers from the law's sometimes "hazy border[s]." Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit held in Kerns v. Bader that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly

established where "a distinction <u>might</u> make a constitutional difference."  663 F.3d at 1188 (emphasis in original).  In <u>Kerns v. Bader</u>, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was <u>beyond debate</u> in 2005 that the officers' entry and search lacked legal justification."  663 F.3d at 1183 (emphasis added).

Although it did not use the term "expressive association" until 1984, <u>Roberts v. U.S. Jaycees</u>, at 468 U.S. at 618 (coining the phrase "expressive association" in 1984), the Supreme Court recognized a First Amendment right to association well before 1979.  See <u>NAACP v. Alabama ex rel. Patterson</u>, 357 U.S. at 460 (pronouncing, in 1958, "the freedom of individuals to associate for the collective advocacy of ideas").  Indeed, the Supreme Court set forth a First Amendment "right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances" as early as 1875.  <u>United States v. Cruikshank</u>, 92 U.S. 542, 552 (1875).  For many years, the Supreme Court's definition of the freedom of association adhered to the literal text of the First Amendment -- "right of the people to peacefully assemble, and to petition the government for a redress of grievances" -- and encompassed only a right to gather to express political ideas.  U.S. Const. amend. I.  <u>See</u> <u>DeJonge v. Oregon</u>, 299 U.S. 353, 365 (1937)("The holding of meetings for peaceable political action cannot be proscribed.").  In 1958, however, the Supreme Court referred to the "right of association" as an "indispensable libert[y]," and stated that it was "immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters."  <u>NAACP v. Alabama ex rel. Patterson</u>, 357 U.S. at 460-61.  <u>See</u> Thomas I. Emerson, <u>Freedom of Association and Freedom of Expression</u>, 74 Yale L.J. 1, 1 (1964)(discussing the emergence of "a new constitutional doctrine known as 'the right of association'").  This

expanded notion of the freedom of association steadily took root.  See <u>Abood v. Detroit Bd. of Ed.</u>, 431 U.S. 209, 231 (1977).  In 1977, two years before A.M.'s "discharge" from the Training School, the Supreme Court stated:

> It is no doubt true that a central purpose of the First Amendment was to protect the free discussion of governmental affairs . . . .  But our cases have never suggested that expression about philosophical, social, artistic, economic, literary, or ethical matters to take a nonexhaustive list of labels is not entitled to full First Amendment protection.

<u>Abood v. Detroit Bd. of Ed.</u>, 431 U.S. at 231 (quoting <u>Buckley v. Valeo</u>, 424 U.S. 1, 14 (1976))(internal quotation marks omitted).  Therefore, although the Supreme Court did not officially adopt the term "expressive association" until 1984, and although A.M. did not state a plausible expressive-association claim, the line of Supreme Court decisions beginning with <u>NAACP v. Alabama ex rel. Patterson</u> and culminating in <u>Abood v. Detroit Board of Education</u> clearly established the freedom of expressive association by the time of A.M.'s transfer to the Homestead House in 1979.   A.M. does not, however, adequately allege a claim for expressive-association.

## III.   THE INDIVIDUAL DOH DEFENDANTS DID NOT VIOLATE A.M.'S FOURTH AMENDMENT RIGHTS.

The Fourth Amendment protects an individual's right to be secure against unreasonable searches and seizures.   <u>See</u> U.S. Const. amend. IV.   "A 'seizure' triggering the Fourth Amendment's protections occurs only when government actors have, 'by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen.'"   <u>Graham v. Connor</u>, 490 U.S. 386, 395 n.10 (1989)(quoting <u>Terry v. Ohio</u>, 392 U.S. 1, 19 n.16 (1968)). A.M. argues that the Individual DOH Defendants violated her Fourth Amendment rights when they "seized" her and transported her from Fort Stanton to the Homestead House in November, 1979.  Tr. at 90:9-13 (Simmons).  A.M.'s Fourth Amendment claim fails, because the DOH had

legal custody of her at the time of her relocation to the Homestead House.  See Hunt v. Green, 376 F. Supp. 2d 1043, 1056 (D.N.M. 2005)(Browning, J.)("[T]he Defendants did not violate E.M.'s and L.M's Fourth Amendment rights because CYFD had legal custody at the time the Defendants removed the children.").

The Fourth Amendment "covers constitutional interests in the pre-trial exercise of government control over a person or property."  Becker v. Kroll, 494 F.3d 904, 915 (10th Cir. 2007).  In the criminal context, the Tenth Circuit has specified that Fourth Amendment protections apply to the period "between the formal arrest until the probable-cause hearing." J.H. ex rel. J.P. v. Nation, 61 F. Supp. 3d 1176, 1206 (D.N.M. 2015)(Browning, J.)(citing Austin v. Hamilton, 945 F. 2d at 1160).  The Fourth Amendment often applies, for example, to claims that law enforcement officers have used excessive force in the course of an arrest, investigatory stop, or other "seizure" of a free citizen.  Graham v. Connor, 490 U.S. at 395.  Fourth Amendment rights eventually yield to other rights, however, as a citizen passes through the criminal justice system; the Fourteenth Amendment's Due Process Clause protects pretrial detainees, and the Eighth Amendment "serves as the primary source of substantive protection" after a defendant is convicted. Graham v. Connor, 490 U.S. at 395 n.10.  See Lopez v. Lemaster, 172 F.3d 756,759 n.2 (10th Cir. 1999)("At the time he was assaulted, appellant was not a convicted prisoner; he was a pretrial detainee.  Pretrial detainees are protected under the Due Process Clause rather than the Eighth Amendment.").  Although courts have held that prisoners have a Fourth Amendment right to be free from unlawful searches, see Hayes v. Marriott, 70 F.3d 1144, 1146 (10th Cir. 1995), no court has held that they have a right to be free from unlawful seizures.

The Fourth Amendment applies in a similar manner to civilly committed individuals.  In the context of an emergency mental health evaluation, for example, the Tenth Circuit has held that the Fourth Amendment protects individuals throughout their detention and transportation to mental health facilities.  See Pino v. Higgs, 75 F.3d at 1469 ("Appellant's claim that she was unreasonably detained and transported must be brought under the Fourth Amendment.").  Although courts have held that involuntarily committed persons have a Fourth Amendment right to be free from unlawful searches, see Beaulieu v. Ludeman, 690 F.3d 1017, 1028 (8th Cir. 2012)("[I]nvoluntarily civilly committed persons  retain  the Fourth Amendment right  to  be free from unreasonable searches that is analogous to the right retained by pretrial detainees."), no court has held that civil commitments -- even ones that ultimately turn out, in hindsight, to have been wrongful or unnecessary -- violate the Fourth Amendment right to be free from unlawful seizures.

The Court faced an analogous issue in Hunt v. Green, 376 F. Supp. 2d 1043 (D.N.M. 2005)(Browning, J.).  In that case, the Court found that CYFD did not violate the Fourth Amendment rights of two minor children by transferring them to a different foster home.  Hunt v. Green, 376 F. Supp. 2d at 1056.  Because CYFD already had legal custody of the children, the Court reasoned:  "CYFD ha[d] the ability to respond to changes in physical custody without a court order."  376 F. Supp. 2d at 1057.  The Court also contrasted its case with Roska ex rel. Roska v. Peterson, 328 F.3d 1230 (10th Cir. 2003), a case that involved a similar Fourth Amendment seizure claim.  See Hunt v. Green, 376 F. Supp. 2d at 1057.  In Roska ex. rel Roska v. Peterson, the Tenth Circuit decided that the Utah Division of Child and Family Services ("DCFS") violated a child's Fourth Amendment rights by improperly taking him into protective custody "absent probable cause and a warrant or exigent circumstances."   328 F.3d at 1250

n.23.[17]   The important difference between the two cases, according to the Court in Hunt v. Green, was the question of legal custody: unlike DCFS, CYFD already had legal custody of the children it relocated.  See 376 F. Supp. 2d at 1057.  As a consequence, the Court decided that Roska ex. rel Roska v. Peterson did not suggest that CYFD had violated the plaintiffs' Fourth Amendment rights.  See Hunt v. Green, 376 F. Supp. 2d at 1057.

At the time of her alleged seizure in November 1979, A.M. had been committed to state custody for over sixteen years.  Her situation is therefore analogous to that of the plaintiffs in Hunt v. Green, who resided in protective custody at the time of their contested transfer, and therefore could not sustain a related Fourth Amendment claim.[18]   See Hunt v. Green, 376 F. Supp. 2d at 1057.  Significantly, A.M. has not offered, and the Court has not found, any case suggesting that the Fourth Amendment's protections against unlawful seizures apply to an individual who has been committed to long-term state custody.  Despite the lack of case law discussing the constitutional implications of a state changing the placement of persons in the state's legal custody, there is a substantial amount of cases discussing the constitutional rights of state and federal prisoners.[19]   None of those cases hold, however, that transferring prisoners from one facility to another violates the Fourth Amendment.

---

[17]Although the Tenth Circuit determined that DCFS had violated the child's Fourth Amendment rights, it dismissed the plaintiff's Fourth Amendment claim on the basis of qualified immunity, because it concluded that the plaintiff's Fourth Amendment right was not clearly established on May 28, 1999.  See Roska ex rel. Roska v. Peterson, 328 F.3d at 1251.

[18]A.M.'s situation also resembles that of a prisoner who brought a Fourth Amendment seizure claim in Diaz v. State, Department of Corrections, 239 P. 3d 723 (Alaska 2010).  In that case, the Supreme Court of Alaska determined that the Department of Corrections ("DOC") "[could not] have violated [the prisoner's] Fourth Amendment guarantee against unreasonable seizures" because "she was already in DOC custody when she was 'seized' by DOC officers." 239 P. 3d at 729.

[19]In Meachum v. Fano, 427 U.S. 215 (1976), the Supreme Court for the United States held that

The Court also declines to recognize A.M.'s transfer to the Homestead House as an unlawful Fourth Amendment seizure for two reasons:  (i) New Mexico statutory commitment procedures necessitate a state power to transfer individuals committed to state custody; and (ii) refusing to recognize a Fourth Amendment seizure will limit judicial interference in the state's treatment of developmentally disabled individuals.

The New Mexico legislature has given the DOH the flexibility to move developmentally disabled individuals within its system once it obtains legal custody of them.  New Mexico statutory commitment procedures necessitate a state power to transfer developmentally disabled individuals between facilities in order to honor each client's right to "treatment pursuant to an individualized treatment plan and consistent with the least drastic means principle."  N.M. Stat.

---

> the Due Process Clause in and of itself [does not] protect a duly convicted
> prisoner against transfer from one institution to another within the state prison
> system.  Confinement in any of the State's institutions is within the normal limits
> or range of custody which the conviction has authorized the State to impose.

Meachum v. Fano, 427 U.S. at 225.   Accord Olim v. Wakinekona, 461 U.S. 238, 244 (1983)("Just as an inmate has no justifiable expectation that he will be incarcerated in any particular prison within a State, he has no justifiable expectation that he will be incarcerated in any particular State.").  Most cases discussing prisoners' Fourth Amendment challenges address searches of the prisoner's cell.  See Hudson v. Palmer, 468 U.S. 517, 530 (1984)(holding "that prisoners have no legitimate expectation of privacy and that the Fourth Amendment's prohibition on unreasonable searches does not apply in prison cells); Christopher v. Gomez, 67 F.3d 306 (9th Cir. 1995)(unpublished)(affirming the district court's dismissal of a prisoner's Fourth Amendment claim "because a state prisoner has no reasonable expectation of privacy in his cell entitling him to Fourth Amendment protection against unreasonable searches and seizures").  The Court of Appeals for the Ninth Circuit addressed, however, a prisoner's allegation that his transfer to a different state prison violated his Fourth Amendment rights.  See Rizzo v. Dawson, 778 F.2d 527, 529-30 (9th Cir. 1985).   The Ninth Circuit held that the prisoner's "fourth amendment . . . [claim was] properly dismissed as frivolous because [it] lacked substance in law and fact."  Rizzo v. Dawson, 778 F.2d at 529.

   Although the legal custody of a developmentally disabled individual and of a prisoner contain stark differences, this case law is instructive on the restriction of a person's constitutional rights while in the state's or federal government's legal custody.  Just as a prisoner cannot allege a constitutional violation solely based on the transfer from one prison to another, a developmentally disabled person in the state's legal custody cannot alleged a constitutional violation based on a change in placement.

Ann. § 43-1-7.  The civil commitment statutory framework specifies that each individualized treatment plan shall include "a statement of the least restrictive conditions necessary to achieve the purposes of treatment," and "criteria for release to less restrictive settings."  N.M. Stat. Ann. § 43-1-9C(2), C(6).  Implicit in this framework is a state right to transfer civilly committed individuals.  A "release to less restrictive settings" could not be effectuated without a corresponding ability to transfer individuals into a new setting.  For the Court to require, under the Fourth Amendment, a court order to change a developmentally disabled individual's physical custody "would be to largely erase the distinction between legal and physical custody."  Hunt v. Green, 376 F. Supp. 2d at 1058.

Upholding the state's ability to transfer civilly committed individuals without a court order is not only consistent with statutory law, but also with the ideal of limiting judicial interference in the state's treatment of developmentally disabled individuals.  Developmentally disabled individuals in state custody possess Due Process rights under the Fourteenth Amendment to adequate food, shelter, clothing, medical care, and reasonable safety.  See Youngberg v. Romeo, 457 U.S. at 324.  In an effort to best accommodate each committed individual's rights, "[a] single professional may have to make decisions with respect to a number of residents with widely varying needs and problems in the course of a normal day."  Youngberg v. Romeo, 457 U.S. at 324.  Recognizing the difficult decisions that medical professionals in mental health institutions face, the Tenth Circuit, drawing on the Supreme Court's reasoning in Youngberg v. Romeo, has stated that "the role of the federal courts in this important area" is limited to making sure that the state exercises professional judgment and meets "the constitutional threshold of protection granted to disabled persons by the Due Process Clause." Jackson ex rel. Jackson v. Ft. Stanton Hosp. & Training Sch., 964 F.2d 980, 992 (10th

Cir. 1992).  See Youngberg v. Romeo, 457 U.S. at 322-23 ("There certainly is no reason to think judges or juries are better qualified than appropriate professionals in making [medical] decisions.").

Adhering to its "limited role" in the context of civil commitments and medical decisions, the Court declines to recognize a violation of A.M's Fourth Amendment right to be free from unlawful seizures.  Jackson ex rel. Jackson v. Ft. Stanton Hosp. & Training Sch., 964 F.2d at 992.  To do otherwise would require "administrators, and particularly professional personnel," to "make each decision in the shadow of an action for damages" and improperly enlarge the Court's role in prescribing treatment for developmentally disabled individuals.  Youngberg v. Romeo, 457 U.S. at 324-25.

## IV. A FOURTH AMENDMENT RIGHT FOR CIVILLY COMMITTED INDIVIDUALS NOT TO BE TRANSFERRED BETWEEN FACILITIES HAS NEVER BEEN CLEARLY ESTABLISHED.

The Fourth Amendment right to be free from unreasonable seizures, in a general sense, was clearly established before 1979.  See, e.g., Terry v. Ohio, 392 U.S. at 9.  In 1968, for example, the Supreme Court explained in Terry v. Ohio that "the Fourth Amendment provides that the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  392 U.S. at 9 (quoting U.S. Const. amend. IV)(internal quotation marks omitted).  The Supreme Court also reasoned in that case that the right to be free from unreasonable seizures "must be shaped by the context in which it is asserted.  For what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures."  Terry v. Ohio, 392 U.S. at 9 (quoting Elkins v. United States, 364 U.S. 206, 222 (1960))(internal quotation marks omitted).

Although the generalized Fourth Amendment right to be free from unreasonable seizures was clearly established in November, 1979, no such right has ever been established for transfers of civilly committed persons.  Far from "placing the . . . constitutional question beyond debate," Reichle v. Howards, 132 S. Ct. at 2093 (citation omitted)(internal quotation marks omitted), there is no case law, whatsoever, that would put a reasonable state actor on notice that transferring A.M. from Fort Stanton to the Homestead House would violate the Fourth Amendment.  Consequently, even if the Individual DOH Defendants violated A.M.'s Fourth Amendment right to be free from unlawful seizure when they transferred her to the Homestead House, that right was not clearly established in 1979.  Accordingly, qualified immunity precludes A.M.'s Fourth Amendment claim.

**IT IS ORDERED** that the Individual DOH Defendants' Motion to Dismiss Plaintiff's First and Fourth Amendment Claims on the Basis of Qualified Immunity, filed March 6, 2014 (Doc. 22)("MTD"), is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

John Ford Hall
Kelly K. Waterfall
Law Offices of Peter Cubra
Albuquerque, New Mexico

--and--

Nancy L. Simmons
Law Offices of Nancy L. Simmons, P.C.
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Stephen S. Hamilton
Alexia Constanteras
Montgomery & Andrews, P.A.
Albuquerque, New Mexico

*Attorneys for Defendants*