## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

A.M., through her Guardian ad Litem,
JOLEEN YOUNGERS,

       Plaintiff,

vs.                                      No. CIV 13-0692 JB/WPL

NEW MEXICO DEPARTMENT OF HEALTH;
LOS LUNAS CENTER FOR PERSONS WITH
DEVELOPMENT DISABILITIES;
ROGER ADAMS, individually and in his capacity
as an agent for the New Mexico Department of Health;
BETH SCHAEFER, individually and in her capacity
as an agent for the New Mexico Department of Health;
DAN SANDOVAL, individually and in his capacity
as an agent for the New Mexico Department of Health;
JOSEPH MATEJU, individually and in his capacity
as an agent for the New Mexico Department of Health;
NEW MEXICO AGING AND LONG-TERM SERVICES
DEPARTMENT; and THE ADULT PROTECTIVE
SERVICES DIVISION OF NEW MEXICO AGING
AND LONG-TERM SERVICES DEPARTMENT,

       Defendants.

## MEMORANDUM OPINION[1]

**THIS MATTER** comes before the Court on the Individual DOH Defendants' Motion

and Memorandum to Dismiss Plaintiff's Court Access Claims Under the First and Fourteenth

Amendments on the Basis of Qualified Immunity, filed May 23, 2014 (Doc. 45)("MTD").  The

Court held a hearing on October 23, 2014.  The primary issues are: (i) whether Defendants Dan

---

[1]On March 12, 2015, the Court entered an order granting the request in the Individual DOH Defendants' Motion and Memorandum to Dismiss Plaintiff's Court Access Claims Under the First and Fourteenth Amendments on the Basis of Qualified Immunity, filed May 23, 2014 (Doc. 45).  See Order, filed March 12, 2015 (Doc. 80)("Order").  In the Order, the Court stated that it "will . . . at a later date issue a memorandum opinion more fully detailing its rationale for this decision."  Order at 1.  This Memorandum Opinion ("MO") is the promised opinion.

Sandoval, Roger Adams, Joseph Mateju, and Beth Schaefer (collectively "Individual DOH Defendants") violated Plaintiff A.M.'s right to court access under the First and Fourteenth Amendments to the Constitution of the United States of America when they discharged A.M. in 1979 without opportunity to object and when they, during her subsequent confinement, did not ensure A.M.'s access to the judicial system; and (ii) whether qualified immunity protects the Individual DOH Defendants because the law was not clearly established.  The Court will grant the MTD, because the Individual DOH Defendants are entitled to qualified immunity.  The Court concludes that: (i) A.M. was denied meaningful access to the courts in violation of the First and Fourteenth Amendments; (ii) the Individual DOH Defendants proximately caused Mary Evan's -- the owner of the Homestead House -- violation of A.M.'s First and Fourteenth Amendment right to access the courts; and (iii) the Individual DOH Defendants are entitled to qualified immunity, because proximate causation for First and Fourteenth Amendment court access violations was not clearly established in 1979, and is not clearly established today.  The Court therefore grants the MTD.

## **FACTUAL BACKGROUND**

The Court takes its facts from the Complaint, as it must when considering a motion to dismiss for failure to state a claim under rule 12(b)(6) of the Federal Rules of Civil Procedure. The Court has reorganized the factual material in the Complaint, however, to explain the facts more clearly.

### 1.    **The Parties.**

A.M. is a sixty-six-year-old woman who has been diagnosed with various developmental disabilities.  See Amended Original Complaint for Damages ¶ 66, at 18, filed June 14, 2013 in the state court, filed July 26, 2013 in the district court (Doc. 1-2)("Complaint").  A.M. was

involuntarily committed to the New Mexico Department of Health ("DOH") by court order on May 8, 1963, when she was sixteen years old, because her developmental disabilities rendered her unable to care for herself. See Complaint ¶¶ 67-69, at 18-19. Because of her disabilities, A.M. brings this action through her guardian ad litem, Joleen Youngers. See Complaint ¶ 66, at 18.

The DOH operates all of the state facilities that house and treat people with developmental disabilities in the State of New Mexico. See Complaint ¶ 8, at 4. One of these facilities is the Los Lunas Center for Persons with Developmental Disabilities -- formerly known as the Los Lunas Hospital and Training School ("Los Lunas Hospital"). Complaint ¶ 8, at 4. The Fort Stanton Hospital and Training School ("Fort Stanton") was another DOH facility for individuals with developmental disabilities, and was an affiliate of the Los Lunas Hospital. Complaint ¶¶ 8-9, at 4. Because the Complaint refers to the Los Lunas Hospital and Fort Stanton collectively as the "Training School," the Court will do so throughout this Memorandum Opinion ("MO"). Complaint ¶ 1, at 1-2; id. ¶ 11, at 4-5. Moreover, because the Complaint refers to the DOH and the Training School collectively as "the DOH Defendants," the Court will do so throughout this MO. Complaint ¶ 11, at 4

Before 1992, the New Mexico Human Services Department ("HSD") was responsible for operating Adult Protective Services ("APS")[2] in New Mexico. Complaint ¶ 22, at 8. APS is responsible for protecting adults with developmental disabilities from exploitation, abuse, and neglect. See Complaint ¶ 22, at 8. APS must also ensure that those adults receive the treatment

---

[2]Because the Complaint refers to the Adult Protective Services Division of New Mexico Aging and Long-Term Services Department, the Adult Protective Services Division of the New Mexico Children Youth and Families Department, and the Adult Protective Services of the New Mexico Human Services Department, collectively, as "APS," the Court will do so throughout this MO. Complaint ¶ 26, at 9.

and social services that they need.  See Complaint ¶ 22, at 8.  From 1992 to 2005, the New Mexico Children Youth and Families Department ("CYFD") inherited HSD's responsibilities for all protective services in the state, including APS.  Complaint ¶ 23, at 8.  CYFD was responsible for the continuing coordination and supervision of APS, for adopting rules and regulations necessary to implement and operate APS, and for evaluating APS' effectiveness.  See Complaint ¶ 23, at 8.  In 2005, the New Mexico Aging and Long-Term Services Department ("ALTSD") inherited APS from CYFD and has since then operated APS.  Complaint ¶ 24, at 8-9.  Similar to its predecessors, the ALTSD is responsible for the continuing coordination and supervision of APS, for adopting rules and regulations necessary to implement and operate APS, and for evaluating APS' effectiveness.  See Complaint ¶ 25, at 9.  Because the Complaint refers to the ALTSD, APS, and the DOH Defendants as the "State Agency Defendants," the Court will do so throughout this MO.  Complaint ¶ 27, at 9.

Schaefer was an attorney for the DOH and the Training School from September 13, 1976, to December 31, 2001.  See Complaint ¶ 14, at 5.  Sandoval was the Director of Resident Living for the Training School between 1979 and 1985.  See Complaint ¶ 16, at 5.  As Director of Resident Living, Sandoval was in charge of social services and the Training School's social workers.  See Complaint ¶ 45, at 12.  Sandoval was also a member of the Training School's Screening Committee on Admissions and Releases ("SCAR") and, at times, its chairman.  Complaint ¶ 16, at 6.

Defendant Roger Adams was the Training School's Deputy Administrator or Acting Administrator "during the relevant time period."[3]  Complaint ¶ 18, at 6.  Adams made hundreds

---

[3]The Complaint does not explain in any further detail when Adams served in his position at the Training School.

of decisions regarding the placement and treatment of Training School residents -- including the Training School's placement and discharge decisions relating to A.M.  See Complaint ¶ 18, at 6. Adams chaired SCAR, attended most SCAR meetings, and approved A.M.'s discharge from aftercare without taking any steps to ascertain whether she would be safe or have her medical and other needs met.  See Complaint ¶ 18, at 6.

Defendant Joseph Mateju was the Training School Administrator "during the relevant time period."[4]  Complaint ¶ 20, at 7.  As Administrator, he made the final decisions regarding the placement and treatment of Training School residents, and all placement and discharge decisions relating to A.M.  See Complaint ¶ 20, at 7.  He also had the authority to unilaterally accept and remove individuals from the Training School.  See Complaint ¶ 20, at 7.  Mateju was responsible for the placement of many residents -- including A.M. -- into third-party homes, boarding homes, and other outside facilities.  See Complaint ¶ 20, at 7.  Mateju personally attended SCAR meetings during which A.M. was discussed, and he personally approved decisions regarding her discharge from DOH treatment without taking any steps to ascertain whether she would be safe, or have serious medical and other needs addressed.  See Complaint ¶ 20, at 7.  Mateju had responsibility for ensuring that appropriate measures were taken to: (i) provide for A.M.'s health, safety, and well-being; (ii) ensure that she received appropriate services; and (iii) ensure that A.M. continued to receive those services in any third-party placements.  See Complaint ¶ 20, at 7-8.

### 2.    **The Aftercare Program**.

Over a period of two decades -- through the 1970s and 1980s -- the DOH Defendants systematically transferred hundreds of developmentally disabled individuals from state

---

[4]The Complaint does not explain in any further detail when Mateju served in his position at the Training School.

institutions to various private third parties throughout New Mexico.  See Complaint ¶ 2, at 2; id. ¶ 37, at 10.  These private third parties ranged from boarding homes to private residences and commercial enterprises.  See Complaint ¶ 2, at 2.  The Defendants called this program "aftercare"; the developmentally disabled individuals placed with third parties through the aftercare program were called "aftercare residents."  Complaint ¶ 2, at 2; id. ¶ 38, at 11.

The Defendants placed aftercare residents with private third parties "without anyone's informed consent, without the appointment of guardians or any other legally-authorized surrogate decision-makers, without permission from the courts that committed them to the state institutions . . . , and without due process of law."  Complaint ¶ 3, at 2.  In some cases, the Defendants contacted ex parte the judicial authorities that had committed aftercare residents to the Training School and "provided misleading information to them concerning the status of individuals discharged from the Training School."  Complaint ¶ 3, at 2-3.  In other cases, the Defendants did not communicate with the judicial authorities that committed individuals to the Training School before transferring those individuals to private third parties.  See Complaint ¶ 3, at 2-3.

After transferring aftercare residents to their third-party placements, the DOH and the Individual DOH Defendants "abandoned" them.  Complaint ¶ 3, at 2.  The DOH and the Individual DOH Defendants neither provided them with the services that they needed, nor protected them from abuse, neglect, or exploitation.  See Complaint ¶ 3, at 2.  When the events alleged in the Complaint occurred, approximately eight social workers at the Training School oversaw 431 aftercare residents, "while also performing social work duties for hundreds of people still residing" at the Training School.  Complaint ¶ 48, at 13.  Although Training School policies required Training School personnel to oversee and conduct periodic visits of aftercare

residents, the DOH Defendants "did not use any system to ensure that residents in aftercare would be safe or that they would receive minimally adequate services."  Complaint ¶ 43, at 12.

Sandoval, despite being charged with overseeing the Training School's social workers, "did not know of any guidelines on how residents in aftercare placements would be cared for, did not know of a system to follow up with those residents, and did not know of a system . . . to know how many residents were placed in private third-party placements."  Complaint ¶ 49, at 13. Sandoval did not know "what the conditions of the residents was" or "what services they needed."  Complaint ¶ 49, at 13.

Training School administrators -- including the Individual DOH Defendants -- were aware that the social workers assigned to oversee aftercare placements often did not visit aftercare residents in their third-party placements.  See Complaint ¶ 47, at 12.  They were aware that the social workers -- when they checked on the aftercare residents at all -- usually relied on telephone calls to the private third parties who administered the placements rather than an in-person contact.  See Complaint ¶ 47, at 12-13.  Training School administrators -- including Adams, Mateju, and Schaefer -- had frequent conversations about the problem of social workers' failure to make their required visits or to contact aftercare residents.  See Complaint ¶ 51, at 13-14.  The DOH Defendants and the Individual DOH Defendants were "well aware of the dangers residents faced due to the way in which the aftercare program was operated, but they proceeded anyway."  Complaint ¶ 52, at 14.

The "well-known failure" of the Training School's social workers to provide oversight for aftercare residents drove the DOH Defendants and the Individual DOH Defendants to

"discharge"[5] Training School residents from aftercare "whenever and however possible." Complaint ¶ 53, at 14.   Schaefer supervised changes to the Training School's discharge procedures in the late 1970s and early 1980s.  See Complaint ¶ 55, at 14.  Specifically, Schaefer told Training School administrators that "there were too many residents on aftercare" and recommended that the Training School discharge residents from aftercare.   Complaint ¶ 54, at 14.  Sometime between September 1978 and the end of 1980, Schaefer began advising that all aftercare residents should be discharged from the Training School "without judicial review and without any due process protections whatsoever."  Complaint ¶ 57, at 15.

Schaefer told Training School administrators that "the state institutions' custody of people committed to the institution by court order automatically lapsed" on the New Mexico Mental Health Code's effective date of July 1, 1977, despite judicial orders of commitment for

---

[5]The Complaint does not explicitly define "discharge," but uses the word to describe: (i) the process of transferring a Training School resident to a private third party; and (ii) the process of removing an aftercare resident -- i.e., a former Training School resident who has already been placed with a private third party -- from "the rolls of Training School clients." Complaint ¶ 65, at 18.  Moreover, the Complaint does not clarify what it means for an aftercare resident to be removed from "the rolls of Training School clients."  Complaint ¶ 65, at 18.  The Complaint implies that the Defendants believed the Training School had no legal responsibility to oversee aftercare residents who had been removed from the Training School's rolls, or to provide them with any services or therapy.  See, e.g., Complaint ¶ 61, at 17 ("Once there was a piece of paper in the file, residents could be . . . 'cut loose' from the Training School, without consideration of extant judicial orders, the health and safety of former residents, or the residents' need for services."); Complaint ¶ 63, at 17 ("Defendant Sandoval has admitted that he wouldn't know whether somebody was going to be taken care of after discharge from aftercare.")(internal quotation marks omitted).  The Complaint also states, however, that "discharge from aftercare was not a complete separation of responsibility for residents . . . .  Even after residents were discharged from aftercare, the Training School at times took action to respond to allegations of abuse then they came to their attention."  Complaint ¶¶ 63-64, at 17-18 (internal quotation marks omitted).  Consequently, where it is clear in the Complaint how A.M. is using the word "discharge," the Court will explain which form of "discharge" A.M. is using.  Where it is unclear, the Court will quote directly from the Complaint to ensure that it is accurately portraying the facts as the Complaint alleges them.  Where it is necessary to the Court's resolution of the MTD, the Court will resolve these ambiguities in its analysis.

an indeterminate period.   Complaint ¶ 56, at 15.   Schaefer advised Training School administrators that a change in the Mental Health Code meant that the court orders committing aftercare residents to State custody were void -- regardless whether the residents' original placements with private third parties had been judicially reviewed.  See Complaint ¶ 56, at 15. Schaefer explained to Training School administrators and staff that "it's different now and you don't need a discharge order signed by a judge."  Complaint ¶ 61, at 17 (internal quotation marks omitted).

According to Schaefer, Training School administrators were "reluctant to proceed without a paper trail, so [she] instructed Defendant Adams to 'just put a note in . . . the file that says . . . [that the aftercare resident] was discharged.'"   Complaint ¶ 61, at 17 (alterations in Complaint).  Once there was a "piece of paper in the file," residents could be, in Schaefer's words, "cut loose" from the Training School without consideration of judicial orders, the residents' health and safety, or the residents' need for services.  Complaint ¶ 61, at 17.  Schaefer neither conducted legal research nor consulted legal experts in developing these new discharge policies.  See Complaint ¶ 56, at 15.

Schaefer acknowledged that former Training School residents were particularly vulnerable, and in danger of abuse and exploitation, once they were no longer under the Training School's supervision.  See Complaint ¶ 60, at 16-17.  Schaefer was aware when she designed and directed the new aftercare discharge policy that Training School personnel had not done any discharge planning for aftercare residents, and had failed to make contact with residents before or after their discharge, to assure their health and safety, and to assure that they were not being abused or exploited.  See Complaint ¶ 59, at 16.  Schaefer considered the fallout from the danger

that such a policy posed to aftercare residents "to be merely a public relations issue, not a legal obstacle." Complaint ¶ 61, at 17 (internal quotation marks omitted).

Under Schaefer's direction, Training School administrators "deliberately decided not to appoint surrogate decision-makers for its residents or to otherwise provide procedural due process" before removing residents' names from the Training School's rolls. Complaint ¶ 57, at 15. "Training School residents were not even informed that they were no longer clients of the Training School." Complaint ¶ 57, at 15. Aftercare residents "were routinely removed from the rolls of Training School clients" based solely on letters that Mateju sent to the district attorney in the county where each resident was originally committed. Complaint ¶ 65, at 18. These letters did not "supply[] the background information necessary for discharge, including the circumstances of residents and whether the resident or a responsible adult consented to discharge." Complaint ¶ 65, at 18. Instead, judicial authorities were "misled into believing that residents consented to and were happy in their placements." Complaint ¶ 65, at 18.

In Sandoval's view, "discharge from aftercare was not a complete separation of the Training School's responsibility for residents." Complaint ¶ 63, at 17-18. "Even after residents were discharged from aftercare, the Training School at times took action to respond to allegations of abuse when they came to their attention." Complaint ¶ 64, at 18. DOH Defendants and Individual DOH Defendants, however, "failed to establish any system permitting residents to complain about their treatment, or any system permitting the Training School to provide oversight at third-party placements." Complaint ¶ 64, at 18. The DOH Defendants and Individual DOH Defendants decided that discharging residents from aftercare eliminated the need for social worker visits. See Complaint ¶ 51, at 13-14. Sandoval has admitted that he "wouldn't know whether somebody was going to be taken care of after discharge from aftercare,

- 10 -

and it never crossed his mind to be concerned that residents discharged from aftercare might be abused or neglected." Complaint ¶ 63, at 17 (internal quotation marks omitted)(brackets omitted).

### 3.   **A.M.**

A court order committed A.M. to Fort Stanton or to another state institution on May 8, 1963, when she was sixteen years old. See Complaint ¶ 66, at 18. By 1967, either through transfer or continuing placement, A.M. was a Fort Stanton resident. See Complaint ¶ 66, at 18. On November 12, 1979, the Defendants transferred A.M. to the Homestead House and "abandoned" her there as part of the aftercare program. Complaint ¶ 73, at 20. The Homestead House was a private, unlicensed group shelter for elderly people that Mary Evans ("M. Evans") owned. See Complaint ¶ 73, at 20. A.M. did not know M. Evans before she was transferred to the Homestead House. See Complaint ¶ 73, at 20. The DOH Defendants' and the Individual DOH Defendants' transfer of A.M. from Fort Stanton to the Homestead House "was without legal authority." Complaint ¶ 78, at 20. A.M. was still in the DOH Defendants' and Individual DOH Defendants' legal custody after she was placed with M. Evans at the Homestead House. See Complaint ¶ 12, at 5.

The Defendants allege, however, that A.M. was transferred to the Homestead House "pursuant to State District Court Order No. 1/387-388 filed on October 17, 1979 in Case No. CV-SQ-0095-79, Twelfth Judicial District, County of Lincoln" ("Oct. 17, 1979, Order"). MTD 1 at 2. The Oct. 17, 1979, Order reads, in pertinent part:

1.   Respondent has a developmental disability which is so greatly disabling that residential habilitation[6] is in her best interest;

---

[6] Under New Mexico's Mental Health and Developmental Disabilities Code, habilitation is defined as:

2.     Respondent's habilitation at Fort Stanton Hospital and Training School is not consistent with the least drastic means principle as respondent could benefit from a less restrictive setting such as a community based group home;

3.     Placement in a community based program for persons with developmental disabilities is not presently available for respondent.

IT IS ORDERED

That respondent be and hereby is committed to Fort Stanton Hospital and Training School for residential habilitation for a period not to exceed six months;

IT IS FURTHER ORDERED

That during the period of extended residential habilitation petitioner shall make application to less restrictive programs on behalf of respondent and shall make every effort to transfer respondent to a less restrictive setting.   At the expiration of this order petitioner shall report to this Court concerning its progress toward releasing respondent if further confinement at Fort Stanton Hospital is sought.

Oct. 17, 1979, Order. [7]

---

the process by which professional persons and their staff assist a client with a developmental disability in acquiring and maintaining those skills and behaviors that enable the person to cope more effectively with the demands of the person's self and environment and to raise the level of the person's physical, mental and social efficiency.  "Habilitation" includes but is not limited to programs of formal, structured education and treatment.

N.M. Stat. Ann. § 43-1-3(L) (1977, as amended).

[7]The Court will consider the Oct. 17, 1979, Order in analyzing the MTD.  The United States Court of Appeals for the Tenth Circuit has explained that a district court's "function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  Sutton v. Utah State Sch. for the Deaf & Blind, 173 F.3d 1226, 1236 (10th Cir. 1999).  There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322.  Because the Complaint does not refer to the Oct. 17, 1979, Order, neither of the first two exceptions apply.

Neither the Homestead House nor M. Evans was a licensed service provider for people with developmental disabilities.  See Complaint ¶ 73, at 20.  Neither M. Evans nor any Homestead House employee had the necessary training or experience to properly care for A.M., and M. Evans had no legal right to hold A.M.  See Complaint ¶¶ 76, 78, at 20.

A.M. lived with M. Evans for over thirty years.  See Complaint ¶ 85, at 23.  Although the Defendants retained legal control over A.M. after placing her at the Homestead House, neither the Defendants nor any of their agents checked on A.M. in any fashion.  See Complaint ¶¶ 77, at 21; id. ¶ 80, at 22.  Instead, the Defendants "cloak[ed] the Homestead House and M. Evans with untoward authority and absolute control over Plaintiff, who was entirely dependent on this third-party placement for her day-to-day existence."  Complaint ¶ 77, at 21.

At the Homestead House, A.M. was "put to work."  Complaint ¶ 93, at 24-25 (internal quotation marks omitted).  Although A.M. performed housekeeping and other services at the Homestead House, M. Evans never compensated A.M. for her work.  See Complaint ¶ 93, at 24-25.  M. Evans threatened A.M. if she did not work, emotionally abused A.M., and

---

The Court must, therefore, determine whether the third exception -- permitting courts to consider "matters of which a court may take judicial notice" -- applies.  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322.

A court may take judicial notice of an adjudicative fact that is both "not subject to reasonable dispute," and either: (i) "generally known within the territorial jurisdiction of the trial court"; or (ii) "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  Courts have taken judicial notice of state court orders' contents.  See Gary Alan Green & Broadway Sound & Video, Inc. v. Jackson, 36 F. App'x 663, 669-70 (2d Cir. 2002)(taking judicial notice of New York state court orders in an appeal from dismissal of claims pursuant to rule 12(b)(6)).  The Court determines that the accuracy of orders from the Twelfth Judicial District for the County of Lincoln "cannot reasonably be questioned" and the contents of the Oct. 17, 1979, Order are "not subject to reasonable dispute."  Fed. R. Evid. 201(b).  Consequently, the Court will take judicial notice only of the Oct. 17, 1979, Order's contents without determining whether the Order authorized A.M.'s transfer to the Homestead House -- a point upon which the parties disagree.  In taking judicial notice of this fact, the Court notes that it does not affect the Court's resolution of the MTD.

neglected her medical needs.  See Complaint ¶ 91, at 24; id. ¶ 96, at 25.  While in M. Evans' custody, A.M. did not receive social services; Medicaid and social security benefits; adequate medical, dental and psychological care; rehabilitative, educational and vocational services; or day habilitation and therapy.  See Complaint ¶ 85, at 23.  M. Evans stole A.M.'s social security checks for her own use and did not spend the funds for A.M.'s benefit.  See Complaint ¶ 94, at 25.  The Defendants facilitated the transfer of A.M.'s social security checks to M. Evans with deliberate indifference to whether M. Evans was using or intended to use the social security funds for A.M.'s benefit.  See Complaint ¶ 83, at 22.  The Individual DOH Defendants "were aware that M. Evans intended to keep" A.M.'s federal benefits, "and force her to work in return for a place to live, and approved the arrangement."  Complaint ¶ 95, at 25.  While at the Homestead House, A.M. was socially isolated and rarely allowed to leave.  See Complaint ¶ 87, at 23.

The DOH transferred J.P., another developmentally disabled woman, to the Homestead House on the same day as A.M.'s transfer.  See Complaint ¶ 88, at 24.  While at the Homestead House, J.P. attempted to leave to find her children, from whom she had been separated.  See Complaint ¶ 88, at 24.  J.P. climbed over the wall and wandered the streets calling out for her children, and eventually either returned or was brought back to the Homestead House.  See Complaint ¶ 88, at 24.  After this incident, Evans took J.P.'s shoes and planted cacti at the place where J.P. had climbed the wall to prevent her from escaping.  See Complaint ¶ 88, at 24.  J.P. continued to try to escape.  See Complaint ¶ 88, at 24.  At one point, J.P. jumped over the wall and landed in the cactus.  See Complaint ¶ 88, at 24.  Through punishing J.P. for escaping, M. Evans made it clear to A.M. that she could prevent A.M. from leaving the Homestead House. See Complaint ¶ 88, at 24.

The State eventually shut down the Homestead House.  See Complaint ¶ 97, at 24.  When that occurred, A.M. was transferred to M. Evans' private residence -- also an unlicensed group shelter.  See Complaint ¶ 98, at 25.  A.M.'s transfer from the Homestead House was without either A.M.'s consent or, most likely, judicial authority.  See Complaint ¶ 98, at 25-26.  If judicial authority was obtained for A.M.'s transfer, "the presiding judge was misled by DOH Defendants and the individual Defendants concerning the circumstances of Plaintiff's removal to M. Evans' private residence."  Complaint ¶ 98, at 26.

In October, 1999, APS investigated allegations that M. Evans was physically neglecting A.M.  See Complaint ¶ 99, at 26.  APS found the allegations unsubstantiated.  See Complaint ¶ 99, at 26.  APS did not determine, however, whether M. Evans was paying A.M. for her labor, whether M. Evans was properly accounting for A.M.'s federal benefits, why A.M. was not receiving any therapeutic services or medical or dental care, or why A.M. was kept isolated without any opportunity to socialize with others.  See Complaint ¶ 99, at 26.  APS' investigation consisted solely of interviews with M. Evans and/or other non-disabled persons, "rather than engaging in any meaningful conversation with [A.M.] concerning her condition or circumstances."  Complaint ¶ 99, at 26.

In or about October, 2004, APS received allegations that M. Evans and John Evans -- M. Evans' husband -- were physically abusing and exploiting A.M.  See Complaint ¶ 100, at 26.  APS received a report that M. Evans and J. Evans "were taking Plaintiff's social security money but were not caring for her, and that Plaintiff was emotionally abused."  Complaint ¶ 100, at 26.  The reports also alleged that the Evanses were abusing J.P.  See Complaint ¶ 100, at 26.  APS concluded that the Evanses had emotionally abused A.M., and stated that its report would be forwarded to the DOH and to law enforcement.  See Complaint ¶ 100, at 26.  The case remained

open for eighteen months, but was ultimately closed as unsubstantiated, because APS found the report to be "malicious."   Complaint ¶ 101, at 26-27.   Again, APS did not engage in any meaningful conversation with A.M. before it closed its investigation.   See Complaint ¶ 101, at 27.

In 2006 or 2007, "the Governor's investigation[8 identified AM and JP as two of the former Training School resident [sic] who had been illegally discharged from the Training School."  Complaint ¶ 102, at 27.   In March, 2008, "more than four years after DOH learned of the plight of former Training School residents, the DOH investigated Plaintiff's circumstances" as part of the Governor's investigation.   Complaint ¶ 106, at 28.   The DOH limited its investigation, however, to an interview of M. Evans -- it did not take into account the prior allegations of abuse, interview A.M., or conduct an independent investigation of A.M.'s circumstances.   See Complaint ¶ 106, at 28.   That same month, APS in Grant County, New Mexico, also investigated A.M.'s circumstances after a caseworker at Fort Baynard[9] reported that M. Evans was physically and emotionally abusing A.M.   See Complaint ¶ 106, at 28.   APS acknowledged that: (i) A.M. was developmentally disabled; (ii) A.M. had expressed fear of M. Evans; (iii) a psychiatrist had recommended that a guardian be appointed for A.M.; (iv) M. Evans' residence was an unlicensed facility; (v) A.M. had not seen a primary care physician in at least five years; and (vi) M. Evans never applied for disability benefits for A.M.   See Complaint ¶ 108, at 28.   Nonetheless, APS found the report unsubstantiated, declined to pursue a guardianship for A.M., and closed the report.   See Complaint ¶ 108, at 28.   The DOH did not, as

---

[8]The Complaint does not give any details about "the Governor's investigation." Complaint ¶ 102, at 27.

[9]The Complaint only identifies "Fort Bayard" as the place where A.M. "was admitted for rehabilitation" in January, 2008, after she fell in M. Evans' home.  Complaint ¶ 105, at 27.

part of its investigation, engage in meaningful conversation with A.M. concerning her condition or circumstances.  See Complaint ¶ 108, at 28.

In December, 2008, the DOH began a new investigation or re-opened its prior investigation into A.M.'s circumstances.  See Complaint ¶ 110, at 29.  The DOH referred to M. Evans as A.M.'s "guardian," despite clear indications in A.M.'s file that M. Evans was never appointed her guardian.  Complaint ¶ 110, at 29.  The DOH continued to "interact exclusively or primarily with M. Evans" during its investigation.  Complaint ¶ 110, at 29.  The DOH did not consider the prior allegations of abuse, interview A.M., or independently investigate A.M.'s circumstances.  See Complaint ¶ 110, at 29.  The DOH's policy and practice of deferring to caregivers rather than interacting with the disabled individuals themselves or otherwise independently investigating aftercare residents' circumstances continued into 2009.  See Complaint ¶ 110, at 29.

In June, 2009, Tom Roach, an ALTSD employee, prepared a report for the ALTSD and the DOH regarding A.M. and J.P.  See Complaint ¶ 111, at 29.  Roach stated that M. Evans was managing A.M.'s and J.P.'s care in exchange for payments for room and board.  See Complaint ¶ 111, at 29-30.  Roach stated that M. Evans had legal authority to make decisions for A.M.  See Complaint ¶ 111, at 30.  Roach reported that A.M. was "happy in her home" and was "getting all the care she needs from Ms. Evans."  Complaint ¶ 111, at 30 (internal quotation marks omitted). He also noted that "one recent APS referral for exploitation (04/06) was found to be malicious and unsubstantiated."  Complaint ¶ 111, at 30 (internal quotation marks omitted).  Roach limited his investigation to an interview of M. Evans -- he did not take into account prior allegations of abuse, interview A.M. or J.P., or independently investigate J.P.'s or A.M.'s circumstances.  See Complaint ¶ 112, at 30.  The State Agency Defendants "did nothing to assist AM or JP."

Complaint ¶ 113, at 30.  The State Agency Defendants never sought a guardian, conservator, or representative payee for A.M., nor arranged for her to receive therapeutic services.   See Complaint ¶ 113, at 30.

## PROCEDURAL BACKGROUND

A.M. filed her original complaint in state court on June 13, 2013, see Original Complaint for Damages, filed June 13, 2013 in the state court, filed July 26, 2013 in the federal district court (Doc. 2), and an amended complaint on June 14, 2013, see Complaint at 1.  The DOH Defendants and the Individual DOH Defendants removed the case to federal court on July 26, 2013.  See Notice of Removal, filed June 26, 2013 (Doc. 1-2)("Notice of Removal").  A.M. alleges seven claims in her Complaint: (i) a claim under the Fourteenth Amendment against the Individual DOH Defendants for violating her substantive and procedural due-process rights, Complaint ¶¶ 126-40, at 32-36; (ii) a claim under the First Amendment against the Individual DOH Defendants for violating her rights to freedom of association and court access, see Complaint ¶¶ 141-48, at 36-37; (iii) a claim under the Fourth Amendment to the Constitution of the United States of America against the Individual DOH Defendants for violating her right to be free from unlawful seizures, see Complaint ¶¶ 149-155, at 37-28; (iv) a claim under the Thirteenth Amendment to the Constitution of the United States of America against the Individual DOH Defendants for violating her right to be free from involuntary servitude, see Complaint ¶¶ 156-64, at 38-39; (v) a claim against the DOH Defendants for violating § 504 of the Rehabilitation Act, 29 U.S.C. § 794, see Complaint ¶¶ 165-71, at 49-40; (vi) a claim against the DOH Defendants for violating the Medicaid Act, 42 U.S.C. §§ 1396-1396p, see Complaint ¶¶ 172-80, at 41-43; and (vii) claims against the ALTSD and the APS for violating § 504 of the Rehabilitation Act and Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-34

("ADA"), and the regulations promulgated thereunder, 28 C.F.R. Ch. 1, pt. 35, Complaint ¶¶ 181-87, at 43-45.

Regarding A.M.'s claim that the Individual DOH Defendants violated her right to court access under the First and Fourteenth Amendments, A.M contends that she has and had a constitutionally protected liberty interest to have her views and interests regarding placement, and the violation of her fundamental rights while confined, redressed in court.  See Complaint ¶ 128, at 32-33.  With respect to the Fourteenth Amendment, A.M. contends:

> As a person with developmental disabilities who was involuntarily deprived of her liberties and placed in the custody and control of the State, Plaintiff has a right to adequate, effective and meaningful access to the judicial system to litigate violations of her fundamental constitutional rights. The right of access to the judicial system imposes affirmative obligations upon the Individual DOH Defendants to ensure that committed persons with severe developmental disabilities like Plaintiff may effectively exercise this right.

> The individual Defendants did not obtain, nor take steps to enable Plaintiff to obtain, the appointment of guardians, guardians ad litem, conservators or attorneys who could serve and protect the interests of Plaintiff and thereby denied her access to the judicial system. Thus Plaintiff was deprived of any effective mechanism by which she could challenge the legality of conditions of her placement and services.

Complaint ¶¶ 135-36, at 34-35.  Moreover, A.M. asserts that, as a proximate result of the Individual DOH Defendants' failure to provide A.M. with any of the "services, rights and protections to which she is and was entitled" under the Fourteenth Amendment, she suffered significant damages for which she seeks a remedy.  Complaint ¶ 138, at 35.

With respect to A.M.'s court access claim under the First Amendment, she contends that the Individual DOH Defendants violated her right to seek redress of her grievances by the government when she was denied an opportunity to object to the illegal transfer either "through channels or in court."  Complaint ¶ 145, at 36.  A.M. asserts that, "as a proximate result of the Individual DOH Defendants' violation of Plaintiff's clearly established First Amendment rights,

she has suffered significant damages, for which she seeks damages against the Individual

Defendants in their individual capacities."  Complaint ¶ 146, at 36.  A.M. further asserts that the

Individual DOH Defendants "knowingly, intentionally, deliberately, recklessly, maliciously and

wrongly" violated the First and Fourteenth Amendments such that punitive damages should be

awarded for punishment and deterrence.  Complaint ¶ 139, at 35 and ¶ 147, at 36.

> ### 1.      The MTD.

The Individual DOH Defendants filed the MTD on May 23, 2014.  See MTD at 1.  In the

MTD, the Individual DOH Defendants ask the Court to dismiss A.M.'s court access claims under

the First and Fourteenth Amendments on the basis of qualified immunity.  See MTD at 1.

The Individual DOH Defendants point out that qualified immunity shields state officials

from liability for civil damages if they violate a plaintiff's federally protected right, "so long as

the state officials did not violate clearly established law."  MTD at 2 (citations omitted).  The

Individual DOH Defendants cite to the United States Court of Appeals for the Tenth Circuit's

decision in Gomes v. Wood, 451 F.3d 1112 (10th Cir. 2006), in support of their qualified

immunity argument.  See MTD at 3.  According to the Individual DOH Defendants, Gomes v.

Wood established that "[t]he law is clearly established if a reasonable official in the defendant's

circumstances would understand that her conduct violated the plaintiff's constitutional right. . . .

If the law is not clearly established, we do not require officials to anticipate its future

developments."  MTD at 3 (quoting Gomes v. Wood, 451 F.3d at 1134)(internal quotation marks

omitted).  The Individual DOH Defendants contend that a law is clearly established if there is a

Supreme Court of the United States of America or Tenth Circuit decision on point, "or if the

clearly established weight of authority from other courts sufficiently defines the right."  MTD at

4 (citing Farmer v. Perrill, 288 F.3d 1254, 1259 (10th Cir. 2002)).  Further, the Individual DOH

Defendants assert that it is A.M.'s burden to point to Supreme Court or Tenth Circuit precedent to establish that the Individual DOH Defendants violated clearly established law that is "indisputable" and "unquestioned."  MTD at 4 (quoting Zweibon v. Mitchell, 720 F.2d 162, 172 (D.C. Cir. 1983))(internal quotation marks excluded)(citing Pearson v. Callahan, 555 U.S. 223, 236 (2009)).

The Individual DOH Defendants argue that, to maintain a First Amendment court access claim, there must be actual injury.  See MTD at 6 (citing Ali v. District of Columbia, 278 F.3d 1, 8 (D.C. Cir. 2002)).  The Individual DOH Defendants note that actual injury means an actionable claim that was lost or rejected, or the presentation of which is currently being prevented.  See MTD at 6 (citing Ali v. District of Columbia, 278 F.3d at 8).  They contend that the Supreme Court has held that a claim for a denial of access may be brought in two circumstances: (i) where systematic official action "frustrates a plaintiff in preparing and filing suits, such as denial of access to a law library;" or (ii) where official action precludes a claim "resulting in the loss or inadequate settlement of a meritorious case or the loss of the opportunity to bring suit."  MTD at 6 (quoting Christopher v. Harbury, 536 U.S. 403, 412-14 (2002)).  The Individual DOH Defendants state that the Tenth Circuit has characterized actual injury as a showing that any denial or delay of access to court prejudiced the plaintiff in pursuing litigation.  See MTD at 6 (citing Trujillo v. Williams, 465 F.3d 1210, 1226 (10th Cir. 2006)).

The Individual DOH Defendants maintain that the cases cited in Plaintiff's Response to the Individual DOH Defendants' Motion to Dismiss Plaintiff's First Amendment and Fourth Amendment Claims on the Basis of Qualified Immunity (Doc. 37) are not First Amendment cases.  See MTD at 6.  The Individual DOH Defendants assert that Ward v. Kort, 762 F.2d 856 (10th Cir. 1985), and Silver v. Cormier, 529 F.2d 161 (10th Cir. 1976), are Fifth and Fourteenth

Amendment cases. The Individual DOH Defendants contend that none of the cases which A.M. cites in her Response are pertinent to First Amendment analysis and that it remains A.M.'s burden to identify binding precedent establishing a right to court access under the First Amendment in 1979. See MTD at 7. In sum, the Individual DOH Defendants assert that Plaintiff has not shown that there was a clearly established First Amendment right to court access in 1979 when A.M. was allegedly discharged. See MTD at 7.

The Individual DOH Defendants also assert they are entitled to qualified immunity on A.M.'s court access claim brought under the Fourteenth Amendment. See MTD at 7. The Individual DOH Defendants contend that A.M. had "no clearly established, constitutionally protected, property interest in court access at the time of her alleged discharge and/or placement with M. Evans at the Homestead House in 1979." MTD at 7. The Individual DOH Defendants argue that an "access to the courts" claim under the Fourteenth Amendment remained undecided until 2002 in the Supreme Court and 2004 in the Tenth Circuit. MTD at 8 (relying on Jennings v. City of Stillwater, 383 F.3d 1199, 1208-09 (10th Cir. 2004) and Christopher v. Harbury, 536 U.S. 403, 413-14 (2002)). The Individual DOH Defendants therefore assert that, at the time of A.M.'s alleged discharge and/or placement with M. Evans at the Homestead House in 1979, there was no clearly established right of access to the courts. See MTD at 8.

The Individual DOH Defendants contend that the circumstances under which a plaintiff can succeed on such a claim are limited, assuming that a court access right exists. See MTD at 8. According to the Individual DOH Defendants, the Tenth Circuit adopted the two categories of court access claims that the Supreme Court created in Christopher v. Harbury, 536 U.S. 403 (2002): (i) "forward looking claims," in which "official action frustrates a plaintiff's ability to bring suit at the present time," and (ii) "backwards looking claims," in which a plaintiff "alleges

- 22 -

that a specific claim cannot be tried because past official action caused the loss or inadequate settlement of a meritorious case."   MTD at 8 (citing Jennings v. City of Stillwater, 383 F.3d at 1208).   The Individual DOH Defendants argue that A.M.'s court access claims are neither forward nor backward looking, and therefore do not fit into either category that the Tenth Circuit established.  See MTD at 8.  According to the Individual DOH Defendants, classic "backwards looking claims" include denials of law library privileges to prisoners.  MTD at 9.  They maintain that an element of any "backwards looking claim" requires the plaintiff "to identify a remedy that would not otherwise be available in a lawsuit that could be brought."   MTD at 9 (citing Jennings v. City of Stillwater, 383 F.3d at 1209).   The Individual DOH Defendants assert that A.M. has not alleged any remedies that are not otherwise available through other claims brought in this lawsuit.  See MTD at 9.   According to the Individual DOH Defendants, litigating facts constituting denial of access would be a waste of time and money, because A.M. could end up "just as well off" by litigating a "simpler" case.  MTD at 9.  The Individual DOH Defendants contend that A.M. ignored the actual-damages requirement, and that, even assuming a court access claim under the Fourteenth Amendment exists, A.M. cannot overcome qualified immunity "based only on the existence of such a right [and] without allegations of actual damages."  MTD at 9.

The Individual DOH Defendants next argue that the cases A.M. cites in her Response to the Individual DOH Defendants' Motion to Dismiss Plaintiff's First Amendment and Fourth Amendment Claims on the Basis of Qualified Immunity, filed May 9, 2014 (Doc. 37), involve either a prisoner's right of access to courts while incarcerated, or are not analogous to the facts alleged in this case.  See MTD at 9-10.  Further, the Individual DOH Defendants assert that the cases on which A.M. relies involve court access rights that were allegedly violated either "during

confinement or during proceedings to involuntary confine the plaintiff."   MTD at 11.   The Individual DOH Defendants argue that, even if a right to court access had been clearly established in 1979, "decisions involving court access during or preceding a transfer would not have placed a reasonable official on notice as to court access rights *upon release* from confinement."   MTD at 11 (emphasis in original).   The Individual DOH Defendants conclude that the lack of a clearly established Fourteenth Amendment right of access to the courts upon release from a state institution in 1979 and A.M.'s failure to allege actual injury entitle them to qualified immunity.   See MTD at 11.   The Individual DOH Defendants, therefore, request that the Court dismiss with prejudice A.M.'s court access claims brought under the First and Fourteenth Amendments.   See MTD at 11-12.

> ### 2.      **The Response.**

A.M. filed her response to the MTD on June 18, 2014.   See Plaintiff's Response to Individual DOH Defendants' Motion and Memorandum to Dismiss Plaintiff's Court Access Claims Under the First and Fourteenth Amendments, filed June 18, 2014 (Doc. 52)("Response"). In her Response, A.M. argues that the Individual DOH Defendants failed to obtain informed consent when they placed and abandoned A.M. at a third-party location.   See Response at 8. A.M. further asserts that the Individual DOH Defendants never filed a motion to terminate A.M.'s "involuntary commitment" to the Training School in the state court that committed her to its custody, which denied A.M.'s access to court.   See Response at 8.   A.M. contends that she was deprived of the assistance of guardians, a guardian ad litem, a conservator, an attorney, or any other competent adult to assist her in the initiation of any court actions regarding her wrongful placement in an unfamiliar locality, or the "neglect and exploitation inflicted upon her in Silver City."   Response at 8.   A.M. also asserts that she was deprived of assistance with

managing her affairs while she was institutionalized, when being transferred to community placement, and after being placed there as a result of the Individual DOH Defendants' decisions to "not seek appointment of a guardian, guardian ad litem, conservator, or attorney."  Response at 8.  Finally, A.M. states that her "neglect and exploitation" in Silver City caused her serious medical and emotional harm, in addition to economic exploitation.  Response at 8.

A.M. next contends that it is undisputed that she was denied any opportunity for court access to challenge her alleged discharge.  See Response at 8.  According to A.M., the Individual DOH Defendants did not seek judicial authority for A.M.'s final discharge, thus denying her right of access to the courts.  See Response at 8 (citing Ward v. Kort, 762 F.2d 856, 858 (10th Cir. 1985)).  A.M. asserts that in, Ward v. Kort, the court could discern "no logic in holding that persons under mental commitments [. . .] are on a lower plane than convicted inmates and are not entitled to protection of the basic constitutional guarantee of access to the courts."  Response at 9 (quoting Ward v. Kort, 762 F.2d at 858).  A.M. contends that the court access right of a person who is "civilly confined" helps ensure they are appropriately transitioned to community placement and guarantees judicial oversight of the person's future circumstances.  Response at 9.  According to A.M., this right of access to courts for civilly confined persons arises from analogous convicted prisoner cases that the Supreme Court decided in 1977 and the Tenth Circuit decided in 1976.  See Response at 9 (citing Ward v. Kort, 762 F.2d at 858).  Thus, A.M. argues that the Individual DOH Defendants cannot maintain that, at the time of A.M.'s purported discharge from the Training School on November 12, 1979, "the law was not clearly established that [A.M.] was entitled to access to the courts."  Response at 9-10.

In response to the Individual DOH Defendant's argument that A.M.'s reliance on Fifth and Fourteenth Amendment cases is fatal to her First Amendment court access claim, A.M.

identifies three problems.  See Response at 10.  First, A.M. argues that her purported final discharge from Fort Stanton and her subsequent transfer to a private business, "for use as free labor" without the consultation of a court, "clearly blocked Plaintiff's ability to seek redress from the government," regardless whether the same egregious facts had ever been presented to a federal court in the Tenth Circuit.  Response at 10.  A.M. contends that the Individual DOH Defendants knew that A.M. was developmentally disabled, and had represented to the committing court and to the Twelfth Judicial District Court "that she could not even function independently outside the institution."  Response at 10.  A.M. maintains that the Individual DOH Defendants proceeded to send A.M. to a boarding home for the elderly where she was "put to work," contrary to the Twelfth Judicial District Court's specific instructions to send A.M. to a community placement for developmentally disabled adults.  Response at 10.  A.M. asserts that the Individual DOH Defendants failed to seek a judicial order from the committing court or the Twelfth Judicial District Court authorizing her discharge from the Training School.  See Response at 10.  A.M. argues that the reasonable inference from these facts, and from the administration of the aftercare program in general, is that the Individual DOH Defendants intentionally blocked A.M.'s access to the courts and to an advocate.  See Response at 10.  A.M. concludes that state actors were "prohibited from deliberately blocking a citizen's access to the judicial process" in 1979 and that the lack of a fully analogous 1970's First Amendment case is not fatal to her court access claims.  Response at 11.

Second, A.M. asserts that the right of civilly confined persons' court access "traces back to the 1970s at the latest" and that, "to be clear, the violations of [her] First and Fourteenth Amendment rights continued past the 1970s at the latest."  Response at 11.  A.M. emphasizes that she does not claim that the State's custody ended with A.M.'s discharge in 1979, nor that the

constitutional violations began and ended in 1979. <u>See</u> Response at 11. A.M. instead argues that the Individual DOH Defendants' conduct should be viewed according to the timing set forth in A.M.'s allegations. <u>See</u> Response at 11 (citing <u>Moore v. Guthrie</u>, 438 F.3d 1036, 1039 (10th Cir. 2006)). According to A.M., her right of court access claims are included in the First and Second Causes of Action, as well as in the preceding factual paragraphs, where she clearly states that she was never properly discharged and that her alleged discharge is a fiction. <u>See</u> Response at 12 (citing Complaint, ¶¶ 126, 141). A.M. states that, because all non-judicial discharges and <u>ex parte</u> purported discharges are ineffective, A.M. remained in the custody of the Individual DOH Defendants during her placement with Homestead House and presently with her current placement.[10] <u>See</u> Response at 12. A.M. asserts that, because she has remained in the Individual DOH Defendants' custody, they were responsible for her when she was at the Homestead House up to and after A.M. sued the Individual DOH Defendants in 2013. <u>See</u> Response at 12. Moreover, according to A.M., the ongoing violations of A.M.'s First and Fourteenth Amendment rights continued until each Individual DOH Defendant left his or her employment with the State. <u>See</u> Response at 12.

Finally, A.M. does not agree with the Individual DOH Defendants that her court access right was not clearly established in 1979. <u>See</u> Response at 12. A.M. contends, that in the 1970s, it was clearly established law "that the State could not involuntarily deny its citizens -- even its developmentally disabled citizens -- their Fourteenth Amendment right of access to the court." Response at 13. A.M. adds that, with respect to the cases providing a Fifth Amendment right of

---

[10]As the Court determined in its Memorandum Opinion and Order on A.M.'s substantive due-process claims, filed December 5, 2014, "A.M. was, and remains, involuntarily committed to state custody." A.M. ex rel. Youngers v. New Mexico Dept. of Health, 65 F. Supp. 3d 1206, 1252 (D. N.M. 2014).

court access, the right is incorporated into the Fourteenth Amendment.  See Response at 13.

A.M. concludes that she should be permitted to litigate her court access claims as part of her

First Cause of Action.  See Response at 13.

A.M. next defines right of access to the legal system as requiring meaningful access, and

explains that meaningful access for her required periodic judicial reviews and the appointment of

a legal guardian.  See Response at 13.  A.M. contends that, as a result of receiving no access or

insufficient access to court, she did not receive judicial review of her involuntary civil

commitment.  See Response at 13.  A.M. argues that it has been clearly established since 1972

that "civil commitments must serve a particular and legitimate purpose and cannot simply

subject people to indefinite periods of commitment."  Response at 13.  A.M. cites to Jackson v.

Indiana, 406 U.S. 715 (1972), where the Supreme Court invalidated a state statute allowing

criminal defendants incompetent to stand trial to be committed indefinitely.  See Response at 13.

According to A.M., in that case, the Supreme Court found that the indefinite commitment

violated due process, holding that a person can be held no more than a "reasonable period of time

necessary to determine whether there is a substantial probability that he will attain the capacity to

stand trial in the future," and that due process "requires that the nature and duration of

commitment bear some relation to the purpose for which the individual is committed."  Response

at 13 (quoting Jackson v. Indiana, 406 U.S. at 738)(internal quotations omitted).  As further

support, A.M. relies on two cases: (i) O'Conner v Donaldson, 422 U.S. 563 (1975), in which the

Supreme Court held that an individual who poses no danger to the community or himself cannot

be held by the state based only on his or her mental illness; and (ii) Clark v. Cohen, 613 F. Supp.

684 (E.D. Pa. 1985)(Huyett, J.), aff'd, 749 F.2d 79, 86 (3rd Cir. 1986), in which the United

States District Court for the Eastern District of Pennsylvania held that a plaintiff's "procedural

due process rights were violated when she was held in a training school for people with developmental disabilities." Response at 14.

A.M. asserts that meaningful access, by definition, includes access to "practical assistance" in petitioning the court, and goes beyond merely informing the committing court or informing the subject of proceedings. See Response at 14. A.M. cites to Heryford v. Parker, 396 F.2d 393, 396 (10th Cir. 1968), which involved a mentally deficient minor who was committed to a state training school, and who was denied his rights to counsel and confrontation. See Response at 15. According to A.M., the Tenth Circuit held that "Fourteenth Amendment due process requires that the infirm person, or one acting in his behalf, be fully advised of his rights and accorded each of them unless knowingly and understandingly waived." Response at 15 (quoting Heryford v. Parker, 396 F.2d at 396). A.M. contends that she was deprived of counsel to represent her interests in proceedings to permanently transfer her from the Training School to another setting. See Response at 15-16. A.M. argues that her cognitive impairments prevented her from independently seeking judicial redress, either in the Training School or within the third-party placement, and that she could not contest the conditions of her confinement. See Response at 16. A.M. asserts that the Individual DOH Defendants failed to arrange for counsel or any other assistance, which prevented her from asserting her interests regarding her civil commitment, her confinement conditions, and her placement in a third-party setting. See Response at 16.

As support for her argument, A.M. alleges that the right to assistance to access judicial authorities in the civil context "is not limited to persons detained by the State." Response at 16. A.M. points to Boddie v. Connecticut, in which the Supreme Court signaled that civil parties are entitled to the State's assistance when seeking judicial remedies, holding that "a state could not

deny the opportunity to secure a divorce to individuals who were unable to initiate a divorce proceeding."  Response at 16 (citing Boddie v. Connecticut, 401 U.S. 371 (1971)).  A.M. notes that the standard to determine whether a state is fulfilling its duty to afford court access is "whether the method it has chosen provides meaningful access to the courts."  Response at 16. A.M. argues that she never received assistance in accessing the court, that the committing court was never informed of what was occurring, and, thus, that the Individual DOH Defendants violated her clearly established First and Fourteenth Amendment rights.  See Response at 16-17.

Finally, A.M. asserts that her right of court access required the state to affirmatively assist her with any and all claims implicating violations of her constitutional rights.  See Response at 17.  A.M. contends that her right to court access required the Individual DOH Defendants to appoint someone who could assist her in challenging her placement, confinement conditions, and her medical treatment and services, or lack thereof.  See Response at 17.  A.M. cites to Ahern v. Veterans Administration, 537 F.2d 1098, 1101 (10th Cir. 1976), in which the Tenth Circuit held that a patient must give informed consent to any medical treatment.  See Response at 17 (citing Ahern v. Veterans Admin., 537 F.2d at 1101).  A.M. also cites to Woods v. Brumlop, 1962-NMSC-133, ¶ 25, 377 P.2d 520, 524, where the Supreme Court of New Mexico articulated the same rule.  See Response at 17.  A.M. argues that the Individual DOH Defendants' involuntary transportation of A.M. to a different city, with her subsequent loss of treatment and services provided at the Training School, occurred without anyone's informed consent in violation of her court access right.  See Response at 17.

### 3.    The Reply.

The Individual DOH Defendants filed their reply to the Response on July 14, 2014.  See Reply Supporting Individual DOH Defendants' Motion and Memorandum to Dismiss Plaintiff's

Court Access Claims Under the First and Fourteenth Amendments on the Basis of Qualified Immunity, filed May 20, 2014 (Doc. 54)("Reply").  The Individual DOH Defendants contend that A.M. fails to cite to a case in her Response that establishes a First Amendment court access right at the time of the alleged conduct and that, accordingly, the Individual DOH Defendants are entitled to qualified immunity.  See Reply at 1.  The Individual DOH Defendants next assert that the right to court access under the Fourteenth Amendment was not recognized at the time of the challenged conduct or after.  See Reply at 2.  The Individual DOH Defendants state that the cases A.M. cites in her Response do not involve analogous factual situations, involving a court access right upon discharge, "as opposed to a right of court access upon involuntary or continued confinement."  Reply at 2.  Moreover, the Individual DOH Defendants argue that A.M. fails to state a court access claim under the Fourteenth Amendment, because she does not allege the inability to file suit or the loss of a claim, as required to bring a court access claim under the Fourteenth Amendment.  See Reply at 2.

The Individual DOH Defendants first elaborate on their argument that they are entitled to qualified immunity with respect to A.M.'s First Amendment court access claim.  See Reply at 2. They assert that A.M. does not clearly address their argument that there must be a First Amendment case establishing the right to court access.  See Reply at 2.  The Individual DOH Defendants assert that A.M. instead relies on Fourteenth Amendment due-process cases and other "non-First Amendment cases" in her Response.  Reply at 3.  The Individual DOH Defendants argue that the MTD distinguishes the majority of A.M.'s "non-First Amendment" cases, and that the rest are factually distinguishable.  See Reply at 3.  According to the Individual DOH Defendants, A.M. cites to Baldwin v. Hale, 68 U.S. 223 (1864), which involved the question "whether the insolvency laws of one state could discharge the contracts of citizens of

other states absent notice," and to <u>Windsor v. McVeigh</u>, 93 U.S. 275 (1976), where the Supreme Court held that a Confederate Army officer was not allowed to defend himself in a confiscation action.   Reply at 3.   Further, the Individual DOH Defendants state that <u>Ahern v. Veterans Administration</u>, 537 F.2d 1098, was a medical malpractice case.   <u>See</u> Reply at 3.   The Individual DOH Defendants assert that none of the cases cited in A.M.'s Response are First Amendment cases and that they do not support A.M.'s claim, because they either involve a prisoner's court access right while incarcerated or are not factually analogous to A.M.'s present case.   <u>See</u> Reply at 3.   In conclusion, the Individual DOH Defendants argue that A.M. failed to meet her burden of pointing to a First Amendment case that establishes a court access right by 1979 and that the Individual DOH Defendants are thus entitled to qualified immunity on any First Amendment court access claims. <u>See</u> Reply at 3.

The Individual DOH Defendants next argue that they are entitled to qualified immunity on A.M.'s Fourteenth Amendment court access claim.   <u>See</u> Reply at 3.   They contend that A.M.'s reliance on cases that were decided after the alleged conduct occurred is misplaced, and point to <u>Jennings v. City of Stillwater</u> and <u>Christopher v. Harbury</u> to support their argument that a right to court access under the Fourteenth Amendment remained undecided in the Supreme Court until 2002 and in the Tenth Circuit until 2004.   <u>See</u> Reply at 4 (citing <u>Jennings v. City of Stillwater</u>, 383 F.3d at 1208-09, and <u>Christopher v. Harbury</u>, 536 U.S. 403, 413-14 (2002)).   The Individual DOH Defendants explain that these cases discuss the existence of a court access right under the Fourteenth Amendment, without endorsing the validity of such a right.   <u>See</u> Reply at 4. The Individual DOH Defendants contend that A.M. fails to acknowledge <u>Jennings v. City of Stillwater</u> and in <u>Christopher v. Harbury</u>, but instead cites to the same cases that the MTD distinguished.   <u>See</u> Reply at 4.   The Individual DOH Defendants argue that the cases A.M. cites

do not involve issues of court access, and that the ones which do "address only whether a right to court access was violated either *during confinement* or *during proceedings to confine* a plaintiff." Reply at 4 (emphasis in original). The Individual DOH Defendants argue that, at the time of A.M.'s discharge, the decisions involving court access and confinement would not have placed a reasonable officer on notice that their conduct was unconstitutional. See Reply at 5. According to the Individual DOH Defendants, at the time of discharge, there were no statutory or other requirements under New Mexico law "to petition the court with regard to [A.M.'s] discharge." Reply at 5. The Individual DOH Defendants conclude that A.M. fails to satisfy her burden in showing that a court access right "in the context of a discharge from confinement" was clearly established in 1979 and that the Individual DOH Defendants are entitled to qualified immunity with respect to A.M.'s Fourteenth Amendment court access claim. Reply at 5.

Finally, the Individual DOH Defendants argue that A.M. has failed to state a Fourteenth Amendment court access claim, because in her Complaint she did not allege that she was unable to bring a lawsuit "to vindicate her alleged claims or that any claim had been lost." Reply at 5. The Individual DOH Defendants note that A.M. does not dispute in her Response that the circumstances in which she can succeed in a court access claim are limited or that there are only two categories of court access claims. See Reply at 5. According to the Individual DOH Defendants, the two categories, as the MTD describes, are (i) "forward looking claims" and (ii) "backward looking claims." Reply at 5. The Individual DOH Defendants contend that A.M.'s Response also fails to dispute that her claim is not forward looking. See Reply at 6. The Individual DOH Defendants state that A.M. does not contest that her claim is not backwards looking. See Reply at 6 (noting that examples of backwards looking claims are cases where prisoners are denied law library privileges). The Individual DOH Defendants reiterate that a

backward-looking claim requires a plaintiff "to identify a remedy that would not otherwise be available in a lawsuit that could be brought."  Reply at 6 (citing Jennings v. City of Stillwater, 383 F.3d at 1209).  The Individual DOH Defendants conclude that, because A.M. fails to allege that her inability to bring suit "vindicate[d] her rights or the loss of a claim," she fails to state a claim even if a court access right existed in 1979.  Reply at 6.

### 4.      The October 23, 2014 Hearing.

The Court held a hearing on the MTD on October 23, 2014.  See Transcript of Hearing (taken Oct. 23, 2014)("Tr.").[11]  At the hearing, both sides largely repeated the arguments from their briefing.  See Tr. at 131:9-146:25 (Constantaras, Court, Simmons).  The Individual DOH Defendants argued that A.M. fails to state a Fourteenth Amendment court access claim, because she did not allege in her Complaint that she was "unable to bring a lawsuit to vindicate her alleged claims or that any claim has been lost."  Tr. at 131:17-21 (Constantaras).  The Individual DOH Defendants argued that the present lawsuit supports their position, because A.M. is presently bringing the "very type of lawsuit that she's claiming she could not have brought."  Tr. at 131:21-132:1 (Constantaras).  Further, the Individual DOH Defendants asserted that A.M. had legal representation with respect to the Order in 1979.  See Tr. at 132:1-3 (Constantaras).  The Individual DOH Defendants argued that the Fourteenth Amendment "forbids a state to deprive individuals of life, liberty or property without due process of law," but does not protect against deprivations by private third-parties.  Tr. at 132:4-16 (Constantaras).  They cited to DeShaney v. Winnebago County Dep't of Social Services, 489 U.S. 189 (1989), as support that "the extent of governmental obligation in the latter area [is left to] the democratic political process."  Tr. at

---

[11]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final version may contain slightly different page and/or line numbers.

132:17-22 (Constantaras). The Individual DOH Defendants argued that there is no affirmative right to governmental aid where such aid might be necessary to secure life, liberty or property interests of which the government itself may not deprive the individual. See Tr. at 132:24-133:4 (Constantaras).

The Individual DOH Defendants pointed again to DeShaney v. Winnebago, 489 U.S. at 197, noting that a state's failure to protect an individual against private violence is not a constitutional violation. See Tr. at 133:5-15 (Constantaras). Although the court in DeShaney v. Winnebago was referring to the Due Process Clause, the Individual DOH Defendants argue that the principle applies to the Fourteenth Amendment generally. See Tr. at 133:5-15 (Constantaras). The Individual DOH Defendants argued A.M. is bypassing the existing system of liability to hold states and its officials accountable for their failure to act in a reasonable manner or for negligent conduct by attempting to bring state tort claims disguised as violations of substantive or procedural due process. See Tr. at 133:15-134:6 (Constantaras).

The Individual DOH Defendants next argued that there must be actual injury in a court access claim, meaning "an actionable claim that a person desired to bring was lost or rejected or [. . .] prevented." Tr. at 134:6-10 (Constantaras). According to the Individual DOH Defendants, because A.M. was at the present hearing with legal representation, an actionable claim that was lost, rejected or prevented does not exist. See Tr. at 134:10-13 (Constantaras). The Individual DOH Defendants contend that the Tenth Circuit required plaintiffs to show that the denial or delay of court access prejudiced their pursuit of litigation. See Tr. at 134:13-16 (Constantaras). According to the Individual DOH Defendants, in this case, A.M. is pursuing litigation, and it is disingenuous for A.M. to contend that she has been denied access to the courts. See Tr. at 134:16-22 (Constantaras).

The Individual DOH Defendants reiterated their arguments that court access claims remained undecided in the Supreme Court until 2002 and in the Tenth Circuit until 2004, meaning that there was no clearly established court access right in 1979. See Tr. at 134:23-135:5 (Constantaras). The Individual DOH Defendants reminded the court that there are two categories of court access claims: forward-looking claims, in which official action frustrates a plaintiff's ability to bring suit presently, and backward-looking claims, in which a plaintiff "alleges that a claim cannot be tried because past official action caused the loss or inadequate settlement of a meritorious case." Tr. at 135:6-15 (Constantaras)(citing Jennings v. City of Stillwater, 383 F.3d at 1208). The Individual DOH Defendants argued at the hearing that neither category applies in this present case. See Tr. at 135:15-16 (Constantaras).

Additionally, the Individual DOH Defendants asserted that A.M. ignored the requirement of actual damages and that, even assuming a court access right existed in 1979, A.M. cannot overcome qualified immunity "based only on the existence of such a right without allegations of actual damages." Tr. at 135:17-25 (Constantaras). The Court then established that the parties immediate arguments were limited to the court access claim, and A.M. answered affirmatively. See Tr. at 136:4-9 (Court, Simmons). The Court asked what was being argued under the Fourteenth Amendment, and A.M. responded that procedural due-process violations under the Fourteenth Amendment would be argued in the separate procedural due-process motion. See Tr. at 136:14-23 (Simmons). The Court then confirmed that the MTD involved the First Amendment, and A.M. proceeded to her argument. See Tr. at 136:24-25 (Court).

A.M. began by acknowledging that she has excellent and adequate representation and that she has access to the court in her present claim, but that her present situation is not what her court access claim addresses. See Tr. at 137:1-10 (Simmons). A.M. asserted that the Fifth

Judicial District Court instructed the Individual DOH Defendants to have A.M. placed with a community placement for developmentally disabled adults and instructed the Individual DOH Defendants to return to the Court to discuss any questions that may arise.  See Tr. at 137:10-20 (Simmons).  According to A.M., she should have been kept at Fort Stanton, where she was safe, or an appropriate placement should have been found while she was still under a Court commitment.  See Tr. at 137:20-24.  A.M. asserted that she was not "free as a bird" in 1979 and that the Order that is still in place, which gives custody to the State of New Mexico, continues to restrict her liberty.  Tr. at 137:25-138:3 (Simmons).

A.M. argued that she was told that she had to go to Silver City with M. Evans and that she was obligated to comply, because she remained in the custody of the State of New Mexico.  See Tr. at 138:3-8 (Simmons).  A.M. observed that the guardian ad litem that she had at the time was not informed of the transfer and that, instead, a note was placed in her file; she further stated that this caused disagreement among the Individual DOH Defendants.  See Tr. at 138:8-21 (Simmons).  Additionally, according to A.M., there was no periodic judicial review of her confinement conditions.  See Tr. at 138:11-12 (Simmons).  A.M. maintains that, because of the Individual DOH Defendants' actions, her guardian ad litem and the Court had no way of knowing that she was being transferred.  See Tr. at 139:4-18 (Simmons).  A.M. contends that the law regarding a right to court access was clearly established in 1979, as demonstrated by Jackson v. Indiana, 406 U.S. 715 (1972), involving mentally ill criminal defendants, and by O'Connor v. Donaldson, 422 U.S. 563 (1975), a civil case applying the court access right.  See Tr. at 139:19-25 (Simmons).  The Individual DOH Defendants' decision to forego judicial oversight, A.M. argued, blocked her access to court.  See Tr. at 139:25-140:6 (Simmons).  A.M. asserted that her access to court had to be through the court itself or through her guardian ad litem, and that the

Individual DOH Defendants blocked both; according to A.M., now that she finally has legal representation, she is able to access the courts.  See Tr. at 140:8-18 (Simmons).

On rebuttal, the Individual DOH Defendants asserted that, in 1979, an attorney represented A.M., and that, had she remained at Fort Stanton, she would likely be bringing the same claims.  See Tr. at 140:21-141:6 (Constantaras).  The Individual DOH Defendants argued that the Court must consider the reasonableness of each Individual DOH Defendant, and that the Order from 1979 expires by operation of law and has some temporal limit.  See Tr. at 141:6-12 (Constantaras).  The Individual DOH Defendants argued, therefore, that A.M. does not presently remain in the State of New Mexico's custody.  See Tr. at 141:12-19 (Constantaras).  The Individual DOH Defendants corrected their prior reference to DeShaney v. Winnebago, 489 U.S. at 195, stating that the case involved substantive, not procedural, due process.  See Tr. at 141:20-142:4 (Constantaras).  Here, the Individual DOH Defendants stated, substantive due process is in question, but A.M. was not deprived of life, liberty or property, because the Fourteenth Amendment does not extend to actions of non-governmental, private third-parties.  See Tr. at 142:7-17 (Constantaras).  The Individual DOH Defendants noted that there is no historical support for an expansive reading of Constitutional text and that the Supreme Court has been clear with respect to the Fourteenth Amendment's application to government actors.  See Tr. at 142:18-143:5 (Constantaras).  The Individual DOH Defendants argued that a state cannot be held liable for failing to provide its citizens with protections the Fourteenth Amendment does not afford.  See Tr. at 143:14-22 (Constantaras).  The Individual DOH Defendants concluded that, even if A.M. were to amend the Complaint to assert "actual physical private violence," the claims would be futile under a Fourteenth Amendment analysis.  Tr. at 143:22-144:2 (Constantaras).

A.M. asked the Court to allow her to state two additional points, and the Court agreed. See Tr. at 144:5-7 (Simmons).  First, A.M. stated that, if she had remained at Fort Stanton, as the Individual DOH Defendants suggested, she would have been entitled to periodic judicial review of her confinement conditions.  See Tr. at 144:8-11 (Simmons).  A.M. argued that the State of New Mexico and the Individual DOH Defendants blocked periodic judicial review of her placement by transferring her to M. Evans.  See Tr. at 144:17-20 (Simmons).  A.M. stated that, as a ward of the State of New Mexico, the State of New Mexico and not M. Evans restricted her liberty; she was unable to leave M. Evans' Homestead House because the State of New Mexico had placed her there.  See Tr. at 144:21-145:1 (Simmons).  A.M. argued that she was entitled to periodic judicial review of her conditions of confinement during her placement at the Homestead House and that, had periodic judicial review occurred, A.M. could have been placed in a "decent and friendly" rehabilitation facility.  Tr. at 145:1-9 (Simmons).  Vulnerable people are subject to exploitation if oversight is not provided, A.M. stated; periodic judicial review helps prevent exploitation.  See Tr. at 145:11-12 (Simmons).

Second, A.M. addressed the Individual DOH Defendants' contention that A.M. was not a ward of the State of New Mexico because of the Order's expiration.  See Tr. at 145:25-146:3 (Simmons). A.M. stated that, to her knowledge, court orders do not expire by their own terms; one must go to court to have the order vacated or set aside.  See Tr. at 146:4-8 (Simmons).  A.M. concluded that the Order remains in effect today and that she remains in the State of New Mexico's custody.[12]  See Tr. at 146:8-12 (Simmons).

## LAW REGARDING RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon

---

[12]As the Court determined in its Memorandum Opinion and Order on A.M.'s substantive due-process claims, filed December 5, 2014, "A.M. was, and remains, involuntarily committed to state custody."  A.M. ex rel. Youngers v. New Mexico Dept. of Health, 65 F.Supp.3d at 1252.

which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion

tests the sufficiency of the allegations within the four corners of the complaint after taking those

allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).  The sufficiency

of a complaint is a question of law, and, when considering a rule 12(b)(6) motion, a court must

accept as true all well-pled factual allegations in the complaint, view those allegations in the light

most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's

favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a

reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would

the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098

(10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all

well-pled factual allegations in a complaint and view these allegations in the light most favorable

to the plaintiff."  (citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)).

 A complaint need not set forth detailed factual allegations, yet a "pleading that offers

labels and conclusions or a formulaic recitation of the elements of a cause of action" is

insufficient.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550

U.S. 544, 555 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by

mere conclusory statements, do not suffice."   Ashcroft v. Iqbal, 556 U.S. at 678.  "Factual

allegations must be enough to raise a right to relief above the speculative level, on the

assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl.

Corp v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that,

if assumed to be true, state a claim to relief that is plausible on its face.  See Bell Atl. Corp. v.

Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010).  "A claim has

facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556).  "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."  Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted).  The Tenth Circuit stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible."  The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(citations omitted).

Although affirmative defenses must generally be pled in the defendant's answer, not argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions: (i) where the defendant asserts an immunity defense -- the courts handle these cases differently than other motions to dismiss, see Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M. 2012)(Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009); Robbins v. Oklahoma, 519 F.3d 1242 (10th Cir. 2008)); and (ii) where the facts establishing the affirmative defense are apparent on the face of the complaint, see Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim.  If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule.").  The defense of limitations is the affirmative defense most likely to be established by the uncontroverted facts in the complaint.

See 5 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1277 (3d ed. 2014).

If the complaint sets forth dates that appear, in the first instance, to fall outside of the statutory

limitations period, then the defendant may move for dismissal under rule 12(b)(6).  See Rohner

v. Union Pac. R.R. Co., 225 F.2d 272, 273-75 (10th Cir. 1955); Gossard v. Gossard, 149 F.2d

111, 113 (10th Cir. 1945); Andrew v. Schlumberger Tech. Co., 808 F. Supp. 2d 1288, 1292

(D.N.M. 2011)(Browning, J.).   The plaintiff may counter this motion with an assertion that a

different statute of limitations or an equitable tolling doctrine applies to bring the suit within the

statute; the Tenth Circuit has not clarified whether this assertion must be pled with supporting

facts in the complaint or may be merely argued in response to the motion.  Cf. Kincheloe v.

Farmer, 214 F.2d 604 (7th Cir. 1954)(holding that, once a plaintiff has pled facts in the complaint

indicating that the statute of limitations is a complete or partial bar to an action, it is incumbent

upon the plaintiff to plead, either in the complaint or in amendments to it, facts establishing an

exception to the affirmative defense).   It appears, from case law in several circuits, that the

plaintiff may avoid this problem altogether -- at least at the motion-to-dismiss stage -- by simply

refraining from pleading specific or identifiable dates, see Goodman v. Praxair, Inc., 494 F.3d

458, 465-66 (4th Cir. 2007); Hollander v. Brown, 457 F.3d 688, 691 n.1 (7th Cir. 2006); Harris v.

New York, 186 F.3d 243, 251 (2d Cir. 1999); Honeycutt v. Mitchell, 2008 WL 3833472 (W.D.

Okla. Aug. 15, 2008)(West, J.), and, although the Tenth Circuit has not squarely addressed this

practice, the Court has permitted this avoidance practice, see Anderson Living Trust v. WPX

Energy Prod., LLC, 27 F.Supp.3d 1188, 1208–09, 1234–38 (D.N.M.2014) (Browning, J.).

## LAW REGARDING LIABILITY FOR CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983

Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988).  Individual, non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)("The requisite causal connection is satisfied if [the defendants] set in motion a series of events that [the defendants] knew or reasonably should have known would cause others to deprive [the plaintiffs] of [their] constitutional rights.")(quoting Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006)).  The Supreme Court has made clear that there is no respondeat superior liability under 42 U.S.C. § 1983.  See Ashcroft v. Iqbal, 556 U.S. at 675 ("Because vicarious liability is inapplicable to Bivens[13] and § 1983 suits, a plaintiff must plead that each Government-official defendant,

_____

[13]In Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), the Supreme Court held that a violation of the Fourth Amendment to the Constitution of the United States "by

through the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997). "An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor." Garcia v. Casaus, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 689 (1978)). Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts. See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

### 1.    Color of State Law.

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'" Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995). The under-color-of-state-law requirement is a "jurisdictional requisite for a § 1983 action, which . . . furthers the fundamental goals of preserving an area of individual freedom by limiting the reach of federal law . . . and avoiding imposing on the state, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed." Jojola v. Chavez, 55 F.3d 488, 492 (10th Cir. 1995). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" West v. Atkins, 487 U.S. at 49 (quoting United States v. Classic, 313 U.S. 299, 326 (1941)). "The authority with which the defendant is allegedly 'clothed' may be either actual or apparent." Jojola v. Chavez, 55 F.3d at 493. Accordingly, at a base level, to find that an action was taken under color of state law, the court must find that "'the conduct allegedly causing the deprivation of a federal right'

_____

a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct." 403 U.S. at 389.

must be 'fairly attributable to the State.'"  Gallagher v. Neil Young Freedom Concert, 49 F.3d at

1447 (quoting Lugar v. Edmonson Oil Co., 457 U.S. 922, 937 (1982)).

In the context of a public employee, the Tenth Circuit has directed that, while "'state

employment is generally sufficient to render the defendant a state actor . . . [,]' at the same time,

it is 'well settled that an otherwise private tort is not committed under color of law simply

because the tortfeasor is an employee of the state.'"  Jojola v. Chavez, 55 F.3d at 493 (quoting

Lugar v. Edmonson Oil Co., 457 U.S. at 935-36 n.18; Mark v. Borough of Hatboro, 51 F.3d

1137, 1150 (3d Cir. 1995)).  Thus, "before conduct may be fairly attributed to the state because it

constitutes action 'under color of state law,' there must be 'a real nexus' between the employee's

use or misuse of their authority as a public employee, and the violation allegedly committed by

the defendant."  Jojola v. Chavez, 55 F.3d at 493.  What constitutes the required real nexus,

however, is not completely clear.  As the Tenth Circuit has stated, whether there is a real nexus in

a particular case depends on the circumstances:

> The under color of law determination rarely depends on a single, easily
> identifiable fact, such as the officer's attire, the location of the act, or whether or
> not the officer acts in accordance with his or her duty.  Instead one must examine
> "the nature and circumstances of the officer's conduct and the relationship of that
> conduct to the performance of his official duties."

David v. City & Cnty. of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996)(citations

omitted)(quoting Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995)).

## 2.    **Individual Liability.**

Government actors may be liable for the constitutional violations that another committed,

if the actors "set in motion a series of events that the defendant knew or reasonably should have

known would cause others to deprive the plaintiff of her constitutional rights," thus establishing

the "requisite causal connection" between the government actor's conduct and a plaintiff's

constitutional deprivations.  Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006).  The Tenth Circuit has explained that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'"  Martinez v. Carson, 697 F.3d at 1255 (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961), overruled in part by Monell v. Dep't of Soc. Servs., 436 U.S. at 663).  "Thus, Defendants are liable for the harm proximately caused by their conduct."  Martinez v. Carson, 697 F.3d at 1255 (citing Trask v. Franco, 446 F.3d at 1046).  As the Court has previously concluded, "a plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations. The recovery should be guided by common-law tort principles -- including principles of causation . . . ."  Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009)(Browning, J.).[14]

The Tenth Circuit has found liability for those defendants who proximately caused an injury alleged under § 1983 and stated that the fact that the "conduct of other people may have concurrently caused the harm does not change the outcome as to [the defendant]," so long as there was not a superseding-intervening cause of a plaintiff's harm.  Lippoldt v. Cole, 468 F.3d 1204, 1220 (10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the officers only "would be liable for the harm 'proximately' or 'legally' caused by their tortious conduct."  Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995). "They would not, however, necessarily be liable for all of the harm caused in the 'philosophic' or but-for sense by the illegal entry."  Id.  In civil rights cases, a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability.  See, e.g., Warner v. Orange Cnty. Dep't of Prob., 115 F.3d

---

[14]The Court clarified in Herrera v. Santa Fe Public Schools, 41 F. Supp. 3d 1188 (D.N.M. Aug. 29, 2014)(Browning, J.), that common-law causation standards do not necessarily hold in the municipal-liability context, and, in fact, "the causation standard for municipal liability cases is unclear in the Tenth Circuit."  41 F. Supp. 3d at 1273.

1068, 1071 (2d Cir. 1997); <u>Springer v. Seaman</u>, 821 F.2d 871, 877 (1st Cir. 1987), <u>abrogated on other grounds by</u> <u>Jett v. Dallas Indep. Sch. Dist.</u>, 491 U.S. 701 . . . (1989).

<u>Trask v. Franco</u>, 446 F.3d at 1046.  Thus, in the context of a claim under the Fourth Amendment, the Tenth Circuit has held that government actors "may be held liable if the further unlawful detention and arrest would not have occurred but for their conduct and if there were no unforeseeable intervening acts superseding their liability."  <u>Martinez v. Carson</u>, 697 F.3d at 1255. The Tenth Circuit gave an example of a superseding intervening cause, quoting the Honorable Samuel J. Alito, then-United States Circuit Judge for the United States Court of Appeals for the Third Circuit, now-Associate Justice for the Supreme Court:

> Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking and announcing their presence.  Once inside, they encounter the suspect, identify themselves, show him the warrant, and tell him that they are placing him under arrest.  The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in the process injures him.  Is the third officer necessarily liable for the harm caused to the suspect on the theory that the illegal entry without knocking and announcing rendered any subsequent use of force unlawful?  The obvious answer is "no."  The suspect's conduct would constitute a "superseding" cause, <u>see</u> <u>Restatement (Second) of Torts</u> § 442 (1965), that would limit the officer's liability.  <u>See</u> <u>id.</u> § 440.

<u>Trask v. Franco</u>, 446 F.3d at 1046 (quoting <u>Bodine v. Warwick</u>, 72 F.3d at 400)(citations in original).  Additionally, "[f]oreseeable intervening forces are within the scope of the original risk, and . . . will not supersede the defendant's responsibility."  <u>Trask v. Franco</u>, 446 F.3d at 1047 (quoting William Lloyd Prosser et al., <u>Prosser and Keeton on Torts</u> § 44, at 303-04 (5th ed. 1984)).  If

> the reasonable foreseeability of an intervening act's occurrence is a factor in determining whether the intervening act relieves the actor from liability for his antecedent wrongful act, and under the undisputed facts there is room for reasonable difference of opinion as to whether such act was wrongful or foreseeable, the question should be left for the jury.

Trask v. Franco, 446 F.3d at 1047 (citing RESTATEMENT (SECOND) OF TORTS § 453 cmt. b (1965)).

###### 3. **Supervisory Liability.**

The Tenth Circuit has held that supervisors are not liable under § 1983 unless there is "'an affirmative link . . . between the constitutional deprivation and either the supervisor's personal participation, . . . exercise of control or direction, or . . . failure to supervise.'" Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009)(quoting Green v. Branson, 108 F.3d 1296, 1302 (10th Cir. 1997))(alterations omitted). Because supervisors can be held liable only for their own constitutional or illegal policies, and not for the torts that their employees commit, supervisory liability requires a showing that such policies were a "deliberate or conscious choice." Barney v. Pulsipher, 143 F.3d at 1307-08 (citations omitted)(internal quotation marks omitted). Cf. Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404 ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." (emphasis in original)).

The Tenth Circuit has recognized that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations. See Garcia v. Casaus, 2011 WL 7444745, at *25-26 (citing Dodds v. Richardson, 614 F.3d 1185 (10th Cir. 2010)). The language that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is as follows: "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. at 676. The Tenth Circuit in Dodds v. Richardson held:

> Whatever else can be said about Iqbal, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

614 F.3d at 1199. The Tenth Circuit noted that Ashcroft v. Iqbal "does not purport to overrule existing Supreme Court precedent," but stated that "Iqbal may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case." Dodds v. Richardson, 614 F.3d at 1200. It concluded that Ashcroft v. Iqbal did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis." Dodds v. Richardson, 614 F.3d at 1200. The Tenth Circuit, based on this conclusion, set forth a test for supervisory liability under § 1983 after Ashcroft v. Iqbal:

> A plaintiff may . . . succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.

Dodds v. Richardson, 614 F.3d at 1199-1200 (citing Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)). The Tenth Circuit noted, however: "We do not mean to imply that these are distinct analytical prongs, never to be intertwined." Dodds v. Richardson, 614 F.3d at 1200 n.8. Relying on the Supreme Court's opinion in Board of County Commissioners v. Brown, 520 U.S. 397 (1997), the Tenth Circuit reasoned that two of the prongs often, if not always, are sufficient proof that the third prong has been met also:

> Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward. Section 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right. In any § 1983 suit, however, the plaintiff must establish the state of mind required

to prove the underlying violation. Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably. Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

Dodds v. Richardson, 614 F.3d at 1200 n.8 (quoting Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404-05)(internal quotation marks omitted). The Tenth Circuit noted that "[w]e think the same logic applies when the plaintiff sues a defendant-supervisor who promulgated, created, implemented or possessed responsibility for the continued operation of a policy that itself violates federal law." Dodds v. Richardson, 614 F.3d at 1200 n.8. Thus, the Tenth Circuit reduced the test to what can be seen as a two-part test for supervisor liability, requiring the plaintiff to prove "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'" Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

### 4.   **Municipal Liability.**

A municipality will not be held liable under § 1983 solely because its officers inflicted injury. See Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006). Rather, to establish municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link between the policy or custom, and the injury alleged. See Graves v. Thomas, 450 F.3d at 1218. When a claim is brought against a municipality for failing to train its officers adequately, the plaintiff must show that the municipality's inaction was the result of deliberate indifference to its inhabitants' rights. See Graves v. Thomas, 450 F.3d at 1218.

## LAW REGARDING THE RIGHT TO COURT ACCESS

State constitutions mentioned open courts as early as the eighteenth century. The Delaware Declaration of Rights of 1776, for example, provided that "every freeman for every injury done him in his goods, lands or person, by any other person, ought to have remedy by the course of the law of the land." Del. Declaration of Rights of 1776, art. 12. Delaware's 1792 Constitution added that "[a]ll courts shall be open." Del. Const. of 1792, art. 1 § 9. Other state constitutions drafted in the late eighteenth century contained similar language.[15] Pennsylvania's 1776 Constitution states that "all courts shall be open, and justice shall be impartially administered without corruption or unnecessary delay." Pa. Const. of 1776, § 26. The Supreme Court explained in Chambers v. Baltimore & Ohio Railroad, 207 U.S. 142 (1907):

> The right to sue and defend in the courts is the alternative of force. In an organized society it is the right conservative of all other rights, and lies at the foundation of orderly government. It is one of the highest and most essential privileges of citizenship, and must be allowed by each state to the citizens of all other states to the precise extent that it is allowed to its own citizens. Equality of treatment in this respect is not left to depend upon comity between the states, but is granted and protected by the Federal Constitution.

207 U.S. at 148. The right of access to the courts, however, did not fully develop in the case law until the mid-to late-twentieth century. Moreover, courts have recognized the right of access to the courts as being rooted in the Due Process Clause of the Fourteenth Amendment, the Due Process Clause of the Fifth Amendment, the Equal Protection Clause of the Fourteenth Amendment, the privileges and immunities provisions of Article IV and the Fourteenth Amendment, and the Petition Clause of the First Amendment. See Christopher v. Harbury, 536 U.S. 403, 415 & n.12 (2002); Smith v. Maschner, 899 F.2d 940, 947 (10th Cir. 1990); Ryland v.

---

[15]See Judith Resnik, Diffusing Disputes: The Public in the Private of Arbitration, the Private in Courts, and the Erasure of Rights, 124 YALE L.J. 2804, 2819 (2015)(discussing the historical context of open court access).

Shapiro, 708 F. 2d 967, 971-72 (5th Cir. 1983); U.S. Const. amend. XIV; U.S. Const. amend. I; U.S. Const. amend. V; U.S. Const. art. IV, § 2, cl. 1.

1.      **The Right to Court Access in the Prisoner Context.**

The right of access to the courts emerged primarily in the prisoners' rights context.  The Supreme Court first examined a prisoner's right to access the courts in Ex parte Hull, 312 U.S. 546 (1941).  See Bounds v. Smith, 430 U.S. 817, 822 (1977)(noting that the Supreme Court first recognized prisoners' right to court access in Ex parte Hull).  In Ex parte Hull, a prisoner sought judicial relief for the actions of prison officials in preventing his filing of a writ of habeas corpus. See 312 U.S. at 548.  The prisoner had been convicted of a statutory sex offense and had twice attempted to file a petition for writ of habeas corpus without success.  See 312 U.S. at 547-48. Prison officials blocked both attempts: first, a prison official refused to notarize the documents, and, second, the prison guards confiscated documents that the prisoner had attempted to mail to his father for filing.  See 312 U.S. at 547-48.  The Supreme Court issued an order to show cause why the petition for writ of habeas corpus should not be granted.  See 312 U.S. at 548.  In response, the prison ward stated that, in November, 1940, he had published a regulation stating that all prisoner documents and petitions had to be submitted first to the institutional welfare office and then, upon approval, to the Parole Board's legal investigator.  See 312 U.S. at 548. The prisoner subsequently challenged the validity of the regulation, alleging that he had been denied his procedural due process.  See 312 U.S. at 549.   The Supreme Court held that the prison's regulation was invalid, and that the state and its officers "may not abridge or impair [a] petitioner's right to apply to a federal court for a writ of habeas corpus."  312 U.S. at 549. Whether a petition for habeas corpus addressed to a federal court is valid and proper "are questions for that court alone to determine," the Supreme Court stated.  312 U.S. at 549.  While

Ex parte Hull was the first Supreme Court case recognizing a prisoner's right of court access, the Supreme Court did not discuss the roots and origins of the right.

A series of prisoner court access cases followed Ex parte Hull, which involved indigent prisoners who could not afford appellate docket fees, or who could not obtain trial transcripts and counsel. See Griffin v. Illinois, 351 U.S. 12, 18-19 (1956)(holding that the state must provide trial records for indigent prisoners on appeal, and noting that "at all stages of the proceedings the Due Process and Equal Protection Clauses protect persons like petitioners from invidious discriminations"); Burns v. Ohio, 360 U.S. 252 (1959)(holding that it was a violation of due process and equal protection for a state to require an indigent prisoner pay a filing fee before filing a motion for leave to appeal); Smith v. Bennett, 365 U.S. 708 (1961)(holding that an indigent's inability to file a petition for writ of habeas corpus, because of his inability to pay the filing fee, violated the Equal Protection Clause of the Fourteenth Amendment); Douglas v. California, 372 U.S. 353 (1963)(holding that a state must provide indigent prisoners with counsel for direct appeal to comply with the Equal Protection Clause of the Fourteenth Amendment); Williams v. Oklahoma City, 395 U.S. 458, 459 (1969)(stating that avenues of appellate review "must be kept free of unreasoned distinctions that can only impede open and equal access to courts," and holding that indigents are entitled to receive free transcripts of a petty offense trial under equal protection principles); Gardner v. California, 393 U.S. 367 (1969)(holding that an indigent prisoner must receive habeas corpus proceeding transcripts under the Equal Protection Clause of the Fourteenth Amendment); Mayer v. Chicago, 404 U.S. 189 (1971)(holding that refusing to provide indigent defendants with transcripts of non-felony trials was a violation of equal protection).

The Supreme Court expanded beyond the indigent prisoner category in <u>Johnson v. Avery</u>, 393 U.S. 483 (1969), holding that it was unconstitutional to prevent prison inmates from assisting one another in the preparation of petitions for post-conviction relief, unless an alternative form of aid was provided. <u>See</u> 393 U.S. at 490.  In that case, a prisoner was serving a life sentence at the Tennessee State Penitentiary and had been transferred to a maximum security building for violation of a prison regulation prohibiting writ preparation assistance between inmates. <u>See</u> 393 U.S. at 484.  The prison's regulation stated that "[n]o inmate will advise, assist or otherwise contract to aid another, either with or without a fee, to prepare Writs or other legal matters." 393 U.S. at 484.  The prisoner challenged the regulation, and on appeal, the Supreme Court found it invalid. <u>See</u> 393 U.S. at 485-90.  The Supreme Court first noted the importance of the writ of habeas corpus, insisting that "there is no higher duty than to maintain it unimpaired." 393 U.S. at 485.  The Supreme Court held that Tennessee's adoption and enforcement of a rule which, in effect, prohibited illiterate or poorly educated prisoners from filing habeas corpus petitions was unconstitutional. <u>See</u> 393 U.S. at 487, 490.  The Supreme Court noted that, while there was no general obligation of state or federal courts to appoint counsel for prisoners expressing a will to seek post-conviction relief, without some form of aid, the prisoner is denied access to the courts. <u>See</u> 393 U.S. at 488.  Justice Douglas' concurring opinion observed that the Due Process Clause of the Fourteenth Amendment secures the right of "reasonable access to the courts." 393 U.S. at 498 n.24 (Douglas, J., concurring).

Two years later, the Supreme Court affirmed a district court decision requiring "basic codes and references" in a prison's law library. <u>Younger v. Gilmore</u>, 404 U.S. 15, 15 (1971).  In <u>Wolff v. McDonnell</u>, 418 U.S. 539 (1974), the Supreme Court then expanded the principles of prisoner habeas court access under the Fourteenth Amendment to prisoner civil rights actions,

noting that the required assistance in an inmate's initial preparation of petitions extended to actions arising under the Civil Rights Act of 1871.  See 418 U.S. at 579.  In that case, a prisoner filed a complaint under 42 U.S.C. §1983, on behalf of himself and other prisoners, alleging, among other things, that the inmate legal assistance program did not comply with constitutional standards.  See 418 U.S. at 542-43.  The relevant prison regulation stated: "No other offender than the legal advisor is permitted to assist you in the preparation of legal documents unless with the specific written permission of the Warden."  418 U.S. at 577-78.   The Supreme Court applied the habeas corpus inmate assistance principles of Johnson v. Avery, 393 U.S. at 485-90, and held that inmates can assist one another in the preparation of civil rights actions, see Wolff v. McDonnell, 418 U.S. at 580.  The Supreme Court explained that "[b]oth … [petitions for habeas corpus and civil rights actions] serve to protect basic constitutional rights," concluding that a lack of assistance with civil rights actions also deprives prisoners of their right to court access.  See 418 U.S. at 579.  The case was remanded to the district court for an evaluation Johnson v. Avery of the constitutional sufficiency of the "legal advisor" that the prison's regulation provided.  418 U.S. at 580.

By 1977, the Supreme Court recognized in Bounds v. Smith that "it is now established beyond a doubt that prisoners have a constitutional right of access to the courts [. . .] and that such access must be adequate, effective and meaningful."  430 U.S. at 821-22.  In that case, prisoners in North Carolina filed actions under 42 U.S.C. § 1983 alleging violations of their Fourteenth Amendment right of access to the courts because of the state's "failure to provide legal research facilities."  430 U.S. at 818.  The Supreme Court first discussed at length the inmate court access right and its development in the case law, without directly discussing its constitutional origin. See 430 U.S. at 821-826 (citing primarily Ex parte Hull, 312 U.S. at 549;

Burns v. Ohio, 360 U.S. at 252; Griffin v. Illinois, 351 U.S. at 20; Johnson v. Avery, 393 U.S. at 489; and Wolff v. McDonnell, 418 U.S. at 577-80).   The Supreme Court noted that "[m]eaningful access is the touchstone" of the inmate right to court access.   430 U.S. at 823.   It held that all states have "affirmative obligations to assure all prisoners meaningful access to the courts."   430 U.S. at 824.   The Supreme Court explained that law libraries were "one constitutionally acceptable method" of providing meaningful access to the courts.   430 U.S. at 830.   The Supreme Court suggested training inmates as paralegals to work under attorney supervision, the use of volunteer law students, paraprofessionals, volunteer attorneys, and staff attorneys, and the hiring of attorneys on a part-time compensation basis, as non-exhaustive alternatives.   430 U.S. at 831 (encouraging "local experimentation").   Finally, the Supreme Court articulated that all remedial plans are subject to evaluation for compliance with constitutional standards.   See 430 U.S. at 832 (citing Stevenson v. Reed, 530 F.2d 1207 (5th Cir. 1976)).   The Supreme Court later interpreted Bounds v. Smith as "suggest[ing] that the State must enable the prisoner to *discover* grievances, and to *litigate effectively* once in court."   Lewis v. Casey, 518 U.S. 343, 354 (1996)(emphasis in original)(citing Bounds v. Smith, 430 U.S. at 825-26 & n.14).

Prison regulations that infringe on an inmate's constitutional rights are valid if they are "reasonably related to legitimate penological interests."   Gee v. Pacheco, 627 F.3d 1178, 1187 (10th Cir. 2010)(citing Turner v. Safley, 482 U.S. 78, 89 (1987)).   Prisoners bringing civil rights claims have to plead "sufficient factual allegations to raise relief above the speculative level."   Gee v. Pacheco, 627 F.3d at 1187 (internal quotation marks omitted).   A prisoner must demonstrate actual injury from the interference with his or her access to the courts; this principle derives from the doctrine of standing.   See Lewis v. Casey, 518 U.S. at 349. In other words, the alleged shortcomings of the state must have "hindered [the prisoner's] efforts to pursue a legal

claim."  Lewis v. Casey, 518 U.S. at 351.  See Harmon v. Keith, 383 F. App'x 770, 771 (10th Cir. 2010)("An inmate lacks standing to raise a right-of-access claim unless he is able to demonstrate actual injury.").  The prisoner must show that "any denial or delay of access to the court prejudiced him in pursuing litigation."  Treff v. Galekta, 74 F.3d 191, 194 (10th Cir. 1996). A prisoner must exhaust all available administrative remedies before filing an action under 42 U.S.C § 1983.  See Jones v. Bock, 549 U.S. 199, 211 (2007).  See also 42 U.S.C. § 1997e(a).

### 2.       The Right to Court Access in the Civil Context.

The Fourteenth Amendment right to court access began to develop beyond the prisoner setting in the early 1970's, particularly in the context of civil indigents' inability to pay court fees.  In Boddie v. Connecticut, 401 U.S. 371 (1971), the Supreme Court held that the Fourteenth Amendment's Due Process Clause "prohibit[s] a State from denying, solely because of inability to pay, access to its courts to individuals who seek judicial dissolution of their marriages."  401 U.S. at 374.  In that case, the indigent plaintiffs brought an action challenging Connecticut procedures that required a filing fee for the initiation of a divorce.  See 401 U.S. at 372.  The plaintiffs alleged that, because of their inability to pay the necessary filing fees, their access to the courts had been restricted.  See 401 U.S. at 372.  The Supreme Court recognized that the possibility of a due process court access claim in the civil context was novel, and noted the importance of court access when a judicial proceeding is the only available remedy.  See 401 U.S. at 375-76.  The Supreme Court found it proper to engage in a due-process analysis, because marriage "involves interests of basic importance in our society" and because the dissolution of a marriage requires a resort to state courts.  See 401 U.S. at 376-77.  The Supreme Court explained that two important principles were embedded in due-process jurisprudence: (i) due process requires, at minimum, a "meaningful opportunity to be heard" for persons whose claims must be

- 57 -

settled through the judicial process; and (ii) a statute or a rule may be held constitutionally invalid "when it operates to deprive an individual of a protected right."  401 U.S. at 377-79.  The Supreme Court concluded that Connecticut's refusal to admit the plaintiffs to its courts, because of their inability to comply with the filing fee requirements, "must be regarded as the equivalent of denying them an opportunity to be heard upon their claimed right to a dissolution of their marriages, and, in the absence of a sufficient countervailing justification for the State's action, a denial of due process."  401 U.S. at 380-81.  Moreover, the Supreme Court recognized that the state's interest in the required fee did not justify the denial of access and that the Due Process Clause protects the right of court access only in circumstances where resorting to the judicial process is the only available remedy.  See 401 U.S. at 382-83.

Two subsequent civil indigent filing fee cases, however, limited the right of court access in the civil context to issues of "constitutional significance."  Ortwein v. Shwab, 410 U.S. 656, 659 (1973)(holding that obtaining discharge of one's debts in bankruptcy was not a fundamental right, and thus the filing fee did not deny the plaintiff court access); United States v. Kras, 409 U.S. 434, 446 (1973)(holding that plaintiffs seeking an increase in welfare payments did not have an interest that rose to the constitutional significance as that of the plaintiffs in Boddie v. Connecticut; therefore, the filing fee did not violate the plaintiffs' right to court access). According to the Supreme Court, while "resort[ing] to state courts was the only avenue to dissolution of marriages," bankruptcy and welfare payment disputes could be handled by other means.  United States v. Kras, 409 U.S. at 443-44.  See Ortwein v. Shwab, 401 U.S. at 659.  The claims in Ortwein v. Shwab and United States v. Kras, therefore, did not rise to the constitutional level of the claims in Boddie v. Connecticut and thus did not fall within the scope of the right to court access.  See United States v. Kras, 409 U.S. at 443-44; Ortwein v. Shwab, 401 U.S. at 659.

Welfare payment and bankruptcy disputes, unlike marriage dissolution, were not recognized as "fundamental . . . demand[ing] the lofty requirement of a compelling governmental interest before they may be significantly regulated.".  United States v. Kras, 409 U.S. at 446.  See Ortwein v. Shwab, 401 U.S. at 659.

While much of the case law focused on a right to court access under the Fourteenth Amendment, a separate strand of jurisprudence recognized a right to court access rooted in the First Amendment's "right to petition" language.  U.S. Const. amend. I.  The First Amendment right to court access, however, initially developed narrowly in the antitrust context.  With respect to the Sherman Act, 15 U.S.C. §§ 1 et seq., the Supreme Court noted in 1961 that "[t]he right to petition is one of the freedoms protected by the Bill of Rights, and we cannot [. . .] lightly impute to Congress an intent to invade these freedoms."  E. R. R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 138 (1961).  Subsequently in California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508 (1982), the Supreme Court recognized that "the right of access to courts is indeed but one aspect of the right to petition," concluding:

> [I]t would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests vis-a-vis their competitors.

404 U.S. at 510-11.

It was not until 1983 that the Supreme Court expanded the First Amendment right to access the courts outside of the antitrust context.  See Bill Johnson's Rests., Inc. v. N.L.R.B., 461 U.S. 731 (1983).  Bill Johnson's Rests., Inc. v. N.L.R.B. affirmed the Supreme Court's acknowledgement in California Motor Transport Co. v. Trucking Unlimited that the right of court access is an aspect of the First Amendment right to petition and applied it to a labor

dispute.  See 461 U.S. at 741.  Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. at 733, involved a labor dispute between a restaurant and its waitresses, who had complained of unfair labor practices and picketed the restaurant site in protest.  See 461 U.S. at 733.  The restaurant filed a complaint against the waitresses in state court, alleging that the waitresses had engaged in mass picketing, harassment of customers, and blockage of the restaurant's entrance and exit areas of the restaurant, and had created a threat to the public.  See 461 U.S. at 734.  Upon review of the dispute, the National Labor Relations Board ordered, among other things, that the restaurant withdraw its state court complaint.  See 461 U.S. at 737.  The primary issue before the Supreme Court was whether the National Labor Relations Board could issue a cease-and-desist order to halt an allegedly retaliatory lawsuit that the restaurant filed in a state court.   See 461 U.S. at 737.  The Supreme Court identified the right to court access as deriving from the First Amendment's "right to petition the Government for redress of grievances."  461 U.S. at 741. The Supreme Court concluded that an employer's well-founded lawsuit "may not be enjoined as an unfair labor practice" and that the restaurant's lawsuit should be allowed to proceed under the First Amendment principle of a right to access the courts.  See 461 U.S. at 742-43.

### 3.    Court Access for the Developmentally Disabled.

Various courts and jurisdictions have identified mentally disabled, institutionalized patients as a group with specific needs who possess a right of access to the courts similar to that of prisoners in the state's custody.  The right of court access "is guaranteed to people who are involuntarily committed to a mental institution," and this right "is not limited to people who are committed following criminal proceedings." Cornett v. Donovan, 51 F.3d 894, 897-98 (9th Cir. 1995)(citing King v. Atiyeh, 814 F.2d 565, 568 n.2 (9th Cir. 1987)). "[I]nvoluntary mental commitment to a mental treatment facility implicates an important, constitutionally-protected

liberty interest of the person committed."  Doe v. Gallinot, 657 F.2d 1017, 1021 (9th Cir. 1981).

Commitment to a mental hospital is a "massive curtailment of liberty" and is "more than a loss

of freedom from confinement," and thus requires due-process protection.  Doe v. Gallinot, 657

F.2d at 1021 (quoting Humphrey v. Cady, 405 U.S. 504, 509 (1972), and Addington v. Texas,

441 U.S. 418, 425-26 (1979)).  With respect to a state's involvement in the commitment of the

mentally ill, the Supreme Court has noted:

> The state has a legitimate interest under its parens patriae powers in providing care to its citizens who are unable because of emotional disorders to care for themselves; the state also has authority under its police power to protect the community from the dangerous tendencies of some who are mentally ill.

Addington v. Texas, 441 U.S. at 426 (evaluating the proper standard for civil commitment

proceedings for the mentally ill).  Indeed, "[p]ersons who have been involuntarily committed are

entitled to more considerate treatment and conditions of confinement than criminals whose

conditions of confinement are designed to punish."  Youngberg v. Romeo, 457 U.S. 307, 321-22

(1982).  While the specific court access rights of a developmentally disabled, involuntarily

committed person have not been comprehensively articulated, a few pivotal cases provide

guidance.

      One of the earliest and most cited cases to identify a developmentally disabled,

involuntarily committed persons' right to judicial process is Doe v. Gallinot, 657 F.2d at 1019-

21.  In that case, the United States Court of Appeals for the Ninth Circuit evaluated the

constitutionality of California's Lanterman-Petris-Short Act ("LPS"), Cal. Welf. & Inst. Code,

§§ 5000 et seq..  Under the LPS Act, a person judged to be "gravely disabled" because of mental

illness could be committed to a mental institute for "72 hours on an emergency basis, and up to

14 more days for involuntary treatment, with no requirement that the state initiate a hearing

before an independent tribunal to determine whether adequate cause for commitment exists."

Doe v. Gallinot, 657 F.2d at 1019.   See Cal. Welf. & Inst. Code §§ 5000-5466.   In Doe v. Gallinot, police officers found the plaintiff in a hospital parking lot "acting apprehensively" and transported him to a nearby mental health facility.   657 F.2d at 1020.   At the facility, a psychiatric nurse examined the plaintiff and determined him to be "gravely disabled."   657 F.2d at 1020.   On the nurse's certification pursuant to the LPS Act, the plaintiff was committed to a state hospital for 72 hours.   See 657 F.2d at 1020.   The plaintiff received medications, and physician certification committed the plaintiff to the additional fourteen days of involuntary commitment.   See 657 F.2d at 1020.   The plaintiff was informed of his right to judicial review and subsequently requested review.   See 657 F.2d at 1020.   After appearing in court, the plaintiff was released, but was later confined pursuant to the LPS Act on six additional occasions before filing suit for declaratory, injunctive, and monetary relief in 1976.   See 657 F.2d at 1020-21.   The Ninth Circuit evaluated the procedural aspects of the LPS Act and held that "a mandatory hearing must be afforded every individual in connection with a certification for 14-day intensive treatment under the LPS Act, at which a neutral decisionmaker will verify that sufficient cause for such confinement exists."   657 F.2d at 1024.   The Ninth Circuit concluded that due process requires a hearing after the seventy-two-hour period.   See 657 F.2d at 1025.   While the Ninth Circuit did not specifically mention a right of court access, it discussed the Fourteenth Amendment's Due Process Clause as it relates to mentally disabled persons and their involuntary confinement.   See 657 F.2d at 1025 (affirming the district court ruling that "due process requires a probable cause hearing after the 72-hour emergency detention period for persons alleged to be gravely disabled").

The Tenth Circuit had previously recognized the right to court access for prisoners, consistent with Supreme Court precedent. In 1985, however, the Tenth Circuit extended the

general principles of a prisoner's right of court access to an institutionalized, mentally ill patient who was found not guilty of an offense reason of insanity.  See Ward v. Kort, 762 F2d at 856-57.  The Colorado State Hospital, where the plaintiff had been admitted, had a contract with a law firm for patient counseling, and the attorneys typically provided services "such as making wills, helping draft contracts and legal pleadings, handling disputes with the patients and the Colorado State Hospital."  762 F.2d at 857.  The plaintiff met with an attorney under contract to discuss legal issues, but the attorney told the plaintiff that he could not file an action on his behalf.  See 762 F.2d at 857.  The plaintiff did not pursue the action further and he did not request that the attorney do any research.  See 762 F.2d at 857.  The plaintiff ultimately filed a civil rights complaint consisting of three claims, including one for denial of access to the courts, alleging that the Colorado State Hospital had failed to provide him with adequate access to legal and research materials.  See 762 F.2d at 857.  Further, the plaintiff alleged that the hospital's attorney contract: (i)"provide[d] too little an allocation of counsel's time to fulfill the needs to the patient;" (ii) did not provide for any representation; and (iii) did "not provide for adequate research on behalf of the patients."  762 F.2d at 858.  On appeal, the plaintiff contended that "a right of access to the courts should be recognized for inmates confined under a civil commitment, as he is, to afford those patients a reasonable opportunity to identify their fundamental rights, to recognize violations of those rights, and to bring such violations before the courts for relief."  762 F.2d at 858.

The Tenth Circuit held that "plaintiff, as a person under mental commitment, is entitled to protection of his right of access to the courts," noting that there was "no logic in holding that persons under mental commitments like plaintiff are on a lower plane than convicted inmates and are not entitled to protection of the basic constitutional guarantee of access to the courts."  762

F.2d at 858.  "Access to the courts of the United States," the Tenth Circuit explained, "is a constitutional right guaranteed by the due process clauses of the fifth and fourteenth amendments.  This right of access to the courts cannot be infringed upon or burdened."  762 F.2d at 858 (quoting Silver v. Cormier, 529 F.2d 161, 163 (10th Cir. 1976)).  The Tenth Circuit relied on Wolff v. McDonnell, Johnson v. Avery, and Bounds v. Smith, among others, for the principles and scope of a prisoner's right of access to the courts.  See Ward v. Kort, 762 F.2d at 858.  The Tenth Circuit affirmed that the "right of access to the courts requires prison authorities to assist inmates in the preparation and filling of meaningful legal papers."  762 F.2d at 858 (quoting Bounds v. Smith, 430 U.S. at 828).

Moreover, the Tenth Circuit adhered to the long-standing holding that "there is no constitutional right to representation by counsel in habeas proceedings in the federal courts" and that legal representation for an indigent party is not mandatory in civil rights actions but remains "within the discretion of the federal court."  Ward v. Kort, 762 F.2d at 860.  The Tenth Circuit concluded that the Colorado State Hospital's present arrangement infringed on the plaintiff's right of access to the courts and that a modification of the hospital's contractual agreement for patient legal counseling was required to protect the right.  See 762 F.2d at 860.  The contract's modification was to be such that the plaintiff would "have assistance of counsel through the completion of a federal habeas or civil rights complaint, including necessary research and consideration of the facts and the law."  762 F.2d at 860-861.  Finally, the Tenth Circuit stated that "such protection of plaintiff's rights will follow the Supreme Court's teaching that 'meaningful access to the courts is the touchstone.'"  762 F.2d at 861 (citing Bounds v. Smith, 430 U.S. at 823).

Although Ward v. Kort involved a criminally-charged person, federal district court decisions involving non-criminally charged, mentally disabled plaintiffs held in state institutions have cited the case.  See Armstead v. Pingree, 629 F. Supp. 273, 277 (M.D. Fla. 1986)(Melton, J.)(holding that the state's withholding of medical records belonging to involuntarily confined, mentally ill patients, from counsel was a violation of the right to court access under the Fourteenth Amendment); Holly v. Anderson, No. 04-CV-1489 JMR/FLN, 2008 WL 1773093, at *7 (D. Minn. Apr. 15, 2008)(Rosenbaum, J.)(stating that the application of prisoner court access principles to civilly committed mental patients is appropriate and noting that the plaintiff did not have a claim for court access violations, because he did not show that an inability to access a lawyer or legal materials prevented him from filing a claim); Robbins v. Budke, 739 F. Supp. 1479 (D.N.M. 1990)(Mechem, J.).  Cases involving criminal defendants have also cited to Ward v. Kort for the proposition that prisoner court access principles can extend beyond the prisoner context.  See John L. v. Adams, 750 F. Supp. 288, 291 (M.D. Tenn. 1990)(Sandidge, J.)(stating that "[c]ourts also recognize that people in involuntary institutionalized settings other than penal institutions are entitled to an affirmative right of access to the courts" and noting that Ward v. Kort held "that Bounds applies to individuals who are under involuntary civil commitment to a mental hospital"), aff'd in part, rev'd in part, 969 F.2d 228 (6th Cir. 1992).

In 1990, the Honorable Edwin Leard Mechem, Senior District Judge of the United States District Court for the District of New Mexico, evaluated whether psychiatric patients at the Las Vegas Medical Center ("LVMC") in Las Vegas, New Mexico, had been deprived of their right of access to the courts.  See Robbins v. Budke, 739 F. Supp. at 1479.  The Protection and Advocacy System of New Mexico ("P & A"), P & A's executive director, and LVMC's patients brought a claim against the state officials and LVMC administrators, alleging that the "policies

and procedures of LVMC that govern P & A's access to patients and records violate the patients' constitutional right of access to the courts as guaranteed by the due process clause of the Fourteenth Amendment and the Protection and Advocacy for Mentally Ill Individuals of 1986, 42 U.S.C. § 10801 *et seq.*" Robbins v. Budke, 739 F. Supp. at 1481.   Further, the plaintiffs alleged that the defendants violated P & A's "constitutional right of access to LVMC patients, facilities, and records as guaranteed under the First Amendment and the Act[.]"   Robbins v. Budke, 739 F. Supp. at 1481.   Judge Mechem began by acknowledging the history of "abhorrent" LMVC conditions, some of which contributed to Congress's passing of the P & A Act in 1986 to address "conditions and instances of gross abuse and neglect" of the mentally ill. Robbins v. Budke, 739 F. Supp. at 1481.   Judge Mechem noted that the purpose of the P & A Act was to "assure that the constitutional and statutory rights of the mentally ill are protected and to assure investigation of abuse and neglect."   Robbins v. Budke, 739 F. Supp. at 1481.   P & A had begun visiting patients at LMVC in 1986; at the time, they were granted unlimited twenty-four-hour access to patient living units and staff.   See Robbins v. Budke, 739 F. Supp. at 1481.

After P & A submitted a negative report to the Joint Commission on Accreditation of Health Care Organizations ("JCAHO") about the LVMC's conditions, the LVMC reevaluated its previous policies for P & A's access to patients and their records.   See Robbins v. Budke, 739 F. Supp. at 1481-82.   It passed new regulations that severely limited P & A's access to patients. See Robbins v. Budke, 739 F. Supp. at 1482.   P & A's access to the LVMC's mentally ill or developmentally disabled patients, which accounted for five out of 150 patients, was also severely limited.   See 739 F. Supp. at 1483.   Restrictions for all patients included, among other things, that a patient had to request a P & A visit, that the hospital had to be informed of that patient's identity and unit, that a LVMC employee had to schedule an appointment, that a staff

member had to escort a patient to the meeting, and that private patient questions were not permitted during P & A's presentations for the mentally ill.  See 739 F. Supp. at 1482-83. Additionally, with respect to the mentally ill and developmentally disabled, P & A could inspect the facilities only "upon request, during regularly scheduled visiting hours, [. . .] with advance notice," and accompanied by the LVMC director.  739 F. Supp. at 1483.  Judge Mechem noted that conditions at the LVMC had improved significantly since 1985, but that "complaints of abuse and neglect continue[d] and require[d] investigation."  739 F. Supp. at 1483.

Relying on Ward v. Kort, Judge Mechem began his analysis by acknowledging that "residents institutionalized at LVMC have a constitutional right of meaningful access to the courts."  Robbins v. Budke, 739 F. Supp. at 1485.  Judge Mechem observed that "no minimum requirements have been established which a state must meet in order to provide adequate access;" instead, a court "should focus on whether the individual plaintiffs before it have been denied meaningful access."  739 F. Supp. at 1485 (citing King v. Atiyeh, 814 F.2d at 568). Judge Mechem stated that, to determine whether access is adequate, effective, and meaningful, the defendants' "policies and practices must be viewed in light of the characteristics and needs of the patients, including their need for a therapeutic environment and treatment of their illnesses." Robbins v. Budke, 739 F. Supp. at 1485.  While the LVMC defendants had a right to impose "reasonable restrictions" on all visitors, regulations and practices that "unjustifiably obstruct the availability of representation or other aspects of the right of access to the courts are invalid."  739 F. Supp. at 1485-86 (citing Procunier v. Martinez, 416 U.S. 396, 419 (1974); Mississippi Prot. & Advocacy Sys., Inc. v. Cotten, No. CIV. A. J87-0503(L), 1989 WL 224953, at *2 (S.D. Miss. Aug. 7, 1989)(Lee, J.) aff'd sub nom Mississippi Prot. & Advocacy Sys., Inc. v. Cotten, 929 F.2d 1054 (5th Cir. 1991)).

Judge Mechem stated that the mentally ill are vulnerable to abuse and neglect, "because many mentally ill individuals have difficulty recognizing the concept that they have rights and will not necessarily identify even the most egregious abuse as a violation of their rights."  739 F. Supp. at 1486.  Judge Mechem observed that mentally ill patients have difficulty assessing whether their rights have been violated or what remedies exist; in addition, they struggle to form trusting relationships and may fear asking about their rights in front of their caregivers.  See 739 F. Supp. at 1486.  Judge Mechem stated that, as a constitutional matter, states can choose among several methods of providing adequate court access, but that institutionalized mentally ill individuals warrant "special considerations" because of their general characteristics, and their inability to recognize rights violations and resources.  See 739 F. Supp. at 1487 (citing Doe v. Gallinot, 657 F.2d at 1022-23 n.7).  Judge Mechem held that many of the LVMC's new restrictions on P & A were impermissible, and that P & A also has a right of access to patients and records that both the Constitution and statutes protect.  See 739 F. Supp. at 1487.

In 1995, the Ninth Circuit again addressed the rights of involuntarily confined, mentally disabled persons.  See Cornett v. Donovan, 51 F.3d 894, 897 (9th Cir. 1995).  In that case, involuntarily committed patients at the Idaho State Hospital South ("SHS") filed a lawsuit alleging a violation of the right of access to the courts.  See 51 F.3d at 896.  Specifically, the plaintiffs alleged that SHS' failure to provide a law library or legal assistance to handle matters beyond the initial preparation of a habeas corpus petition or civil rights action violated their right of access to the courts.  See 51 F.3d at 896.  The plaintiffs contended that institutionalized mental patients have a right of court access which extends beyond the pleading stage, because they "have difficulty prosecuting their claims."  51 F.3d at 898.  The primary issue on appeal was the scope of the plaintiffs' right to court access, and whether the state was constitutionally required

to provide legal assistance to an institutionalized person "only at the pleading stage or through a later stage, conceivably even through final disposition of a cause of action."  51 F.3d at 897. First, the Ninth Court stated that there were three requirements to establish standing: "the plaintiffs must show 1) injury in fact, 2) that the injury is traceable to the challenged action, and 3) that it is likely the injury will be redressed by the relief requested."  51 F.3d at 897.  Because one of the plaintiffs was no longer institutionalized at the time of the lawsuit, he failed to meet the third standing requirement; the remaining plaintiffs were found to have standing to pursue the action.  See 51 F.3d at 897.

In discussing the right of access to the courts, the Ninth Circuit began with an evaluation of the right to court access in the prisoner context and stated that the right of court access also applies to "people who are involuntarily committed to a mental institution."  51 F.3d at 897-98. The Ninth Circuit noted that the right of access "helps ensure that the unlawfully detained obtain their freedom [. . .] and that the lawfully detained have recourse for violation of fundamental constitutional rights."  51 F.3d at 898 (citing Johnson v. Avery, 393 U.S. at 485, and Wolff v. McDonnell, 418 U.S. at 579).  Relying on the well-developed federal case law on prisoner court access, the Ninth Circuit found that precedent did not support a right of access that extends beyond the pleading stage.  See Cornett v. Donovan, 51 F.3d at 899.  The Ninth Circuit noted that the pleading stage encompasses a complaint, an answer, and counter claims or cross-claims, which "enables the inmate to rebut the State's arguments."  See 51 F.3d at 899.  Further, the Ninth Circuit noted the distinction between the right of access to the courts and the right to counsel.  51 F.3d at 899 ("The right of access is a right of 'access' and not of 'representation.'").  The Ninth Circuit concluded that the right of access "requires the state to provide assistance through the pleading stage, including preparation of a reply to an answer, cross-claim or

counterclaim." 51 F.3d at 900 (noting the consistency of its holding with other U.S. Courts of Appeals, including the Tenth Circuit).

The Supreme Court evaluated the right of court access for disabled citizens in Tennessee v. Lane, 541 U.S. 509 (2004). There, paraplegics alleged that they had been denied physical access to Tennessee's courthouses in violation of the Americans with Disabilities Act of 1990 ("ADA"). Tennessee v. Lane, 541 U.S. at 513-14. The ADA provided that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation or denied the benefits of the services, programs or activities of a public entity." Tennessee v. Lane, 541 U.S. at 513. See 42 U.S.C. § 12132. The question presented in Tennessee v. Lane was whether Title II of the ADA exceeded Congress' power under Section 5 of the Fourteenth Amendment. See Tennessee v. Lane, 541 U.S. at 513. While the Supreme Court had previously held that Eleventh Amendment Immunity barred private ADA Title I suits for monetary compensation, the question whether the Eleventh Amendment permitted suits for money damages under Title II remained an open question. See Tennessee v. Lane, 541 U.S. at 514; Bd. of Tr. of Univ. of Ala. v. Garrett, 531 U.S. 356, 360 (2001).

The Supreme Court held that Title II of the ADA was a valid exercise of Congress' Section 5 powers and discussed the Fourteenth Amendment due process right to court access as it applies to disabled persons. See Tennessee v. Lane 541 U.S. at 523, 533. The Supreme Court observed that the respondent was a criminal defendant, and that the Due Process Clause and the Sixth Amendment Confrontation Clause afford court access , but also explained that the Due Process Clause "requires the States to afford certain civil litigants a 'meaningful opportunity to be heard' by removing obstacles to their full participation in judicial proceedings." Tennessee v. Lane, 541 U.S. at 523 (citing Boddie v. Connecticut, 401 U.S. at 379). The Supreme Court

emphasized that the ADA's Title II does not require States to employ "any and all means to make judicial services accessible to persons with disabilities," nor to "compromise their essential eligibility criteria for public programs."  Tennessee v. Lane, 541 U.S. at 531-32.   Instead, according to the Supreme Court, Title II requires "reasonable modifications" and a variety of possible measures.  541 U.S. at 532.  "The duty to accommodate," the Supreme Court explained, "is perfectly consistent with the well-established due process principle that 'within the limits of practicability, a State must afford to all individuals a meaningful opportunity to be heard' in its courts."  541 U.S. at 532 (citing Boddie v. Connecticut, 401 U.S. at 379).  The Supreme Court concluded that Title II validly imposed an "affirmative obligation [on the state of Tennessee] to accommodate persons with disabilities in the administration of justice."  Tennessee v. Lane, 541 U.S. at 533.

### 4.      Procedural Requirements for a Court Access Claim.

The Supreme Court has recognized that the basis for the constitutional right of court access is "unsettled," but has identified the Privileges and Immunities Clause of Article IV, the First Amendment Petition Clause, the Fifth Amendment Due Process Clause, and the Fourteenth Amendment Equal Protection and Due Process Clauses as sources.  See Christopher v. Harbury, 536 U.S. at 415 & n.12.  In Lewis v. Casey, 518 U.S. 343 (1996), the Honorable Clarence Thomas, Associate Justice of the Supreme Court, expressed his concern as to the vague constitutional roots of the right to court access. See 518 U.S. at 365-85 (Thomas, J., concurring).  Justice Thomas noted the Supreme Court's "inability . . . to agree upon the constitutional source of the supposed right" and stated that "in no instance . . . [has the Supreme Court] engaged in rigorous constitutional analysis of the basis for the asserted right."  518 U.S. at 367 (Thomas, J., concurring).   Despite the uncertainties of the right's constitutional roots, the present framework for the analysis of a court access claim is grounded in decades of case law in the prisoner and civil context.  The Honorable Stephanie K. Seymour, now Senior Judge for the Tenth Circuit, has

noted that the right of court access is "basic to our system of government" and that it is well established as a fundamental right that the Constitution protects.   Smith v. Maschner, 899 F.2d at 947 (quoting Nordgren v. Milliken, 762 F.2d 851, 853 (10th Cir. 1985)).   The elements of a court access claim, under any source, appear to be uniform.   See Christopher v. Harbury, 536 U.S. at 413-16 (discussing the various roots of the right to court access and the general elements of a court access claim).   "Interference with the right of access to the courts gives rise to a claim for relief under section 1983."   Ryland v. Shapiro, 708 F.2d 967, 972 (5th Cir. 1983).   See McKay v. Hammock, 730 F.2d 1367, 1375 (10th Cir.1984).

The Fourteenth Amendment mandates that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law."   U.S. Const. amend. XIV, § 1.   The right of court access under the Fourteenth Amendment's due-process right is substantive rather than procedural; "[i]ts exercise can be shaped and guided by the state, but cannot be obstructed, regardless of the procedural means applied."   Morello v. James, 810 F.2d 344, 346 (2nd Cir. 1987)(citing Bounds v. Smith, 430 U.S. 817, 823-824 (1977)).   The First Amendment mandates that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peacefully to assemble, and to petition the Government for a redress of grievances."   U.S. Const. amend. I.   It has long been established that the First Amendment rights of free speech, free assembly, and freedom to petition for redress of grievances are "protected by the Fourteenth Amendment from invasion by the States."   Edwards v. South Carolina, 372 U.S. 229, 235 (1963).

The Supreme Court has divided court access claims into two categories: "forward looking claims" and "backwards looking claims."  Jennings v. City of Stillwater, 383 F.3d at 1208 (citing Christopher v. Harbury, 536 U.S. 403, 413 (2002)).  Forward looking claims involve official action that "frustrates a plaintiff's ability to bring a suit at the present time," and backwards looking claims "arise when plaintiffs allege that a specific claim cannot be tried [. . .] because past official action causes the loss or inadequate settlement of a meritorious claim."  Jennings v. City of Stillwater, 383 F.3d at 1208 (quoting Christopher v. Harbury, 536 U.S. at 413-414)(internal quotations omitted).  When a court access claim looks backwards, it must "identify a remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought."  Christopher v. Harbury, 536 U.S. at 404.  To give a defendant fair notice, a complaint must address the underlying cause of action and its lost remedy.  See 536 U.S. at 404.

A prisoner court access claim seeking relief through a law library or through legal assistance, because official action "is presently denying an opportunity to litigate for a [future] class of potential plaintiffs," is an example of a forward-looking court access claim.  536 U.S. at 413 (citing Bounds v. Smith, 430 U.S. at 828, and Lewis v. Casey, 513 U.S. at 346-48).  In cases challenging filing fees as a denial of court access, "the object is an order requiring waiver of a fee to open the courthouse door for [future] desired litigation."  Christopher v. Harbury, 536 U.S. at 413 (citing Boddie v. Connecticut, 410 U.S. at 372, and M.L.B. v. S.L.J., 519 U.S. 102, 106-07 (1996)).  In forward-looking claims, "the opportunity has not been lost for all time;" rather, it has been lost in the short term.  Christopher v. Harbury, 536 U.S. at 413.  The objective of a forward-looking claim is to "place the plaintiff in a position to pursue a separate claim for relief once the frustrating condition has been removed."  Christopher v. Harbury, 536 U.S. at 413.  In contrast, backward-looking claims "cannot now be tried (or tried with all material evidence), no matter

what official action may be in the future." Christopher v. Harbury, 536 U.S. at 413-14. Examples of backward-looking claims include police cover-ups over a period of time that resulted in a plaintiff's inability to seek redress. See Christopher v. Harbury, 536 U.S. at 414 (citing Foster v. Lake Johnson, 28 F.3d 425, 429 (5th Cir. 1994), and Swekel v. River Rouge, 119 F.3d 1259, 1261 (6th Cir. 1997)). The ultimate objective of a backward-looking claim is "not the judgment in a further lawsuit, but simply the judgment in the access claim itself, in providing relief obtainable in no other suit in the future." Christopher v. Harbury, 536 U.S. at 414.

Whether a claim turns on "a litigating opportunity yet to be gained or an opportunity already lost," the purpose of recognizing a court access claim "is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong." Christopher v. Harbury, 536 U.S. at 414-15. "However unsettled the basis of the constitutional right of access to courts," court access cases "rest on the recognition that the right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." Christopher v. Harbury, 536 U.S. at 415. A plaintiff bringing a court access claim, whether forward- or backward-looking, must identify a "nonfrivolous, arguable underlying claim." Christopher v. Harbury, 536 U.S. at 415 (internal quotation marks omitted). See Lewis v. Casey, 513 U.S. at 353 & n.3. The plaintiff's complaint must describe the underlying cause of action, "whether anticipated or lost," and the official action which frustrated the litigation. Christopher v. Harbury, 536 U.S. at 415. If the plaintiff has a backward-looking claim, the complaint "must identify a remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought." Christopher v. Harbury, 536 U.S. at 415. All elements in a court access claim must be "addressed by allegations in the complaint sufficient to

give fair notice to a defendant." Christopher v. Harbury, 536 U.S. at 416 (citing Swierkiewicz v. Sorema N.A., 534 U.S. 506, 513–515 (2002)).

Backward-looking claims inherently pose a "particular risk" and require careful examination, because the actions underlying this claim "will not be tried independently, a fact that enhances the natural temptation on the part of plaintiffs to claim too much, by alleging more than might be shown in a full trial focused solely on the details of the predicate action." Christopher v. Harbury, 536 U.S. at 416. Therefore, the application of the "nonfrivolous" test and the claim's "arguable" nature are of particular importance. Christopher v. Harbury, 536 U.S. at 416. In Christopher v. Harbury, the plaintiff brought a backward-looking claim alleging that government officials' deliberate concealment of information that military officers in Guatemala detained, tortured and killed her husband, was a violation of court access. See 536 U.S. at 405. The Supreme Court held that the plaintiff's complaint failed to identify "an underlying cause of action for relief that the plaintiff would have raised had it not been for the deception alleged." 536 U.S. at 405, 418. The Supreme Court noted that the plaintiff's request for relief was "nearly unintelligible," because the plaintiff failed to show that the Government official's action had compromised an underlying action. 536 U.S. at 418 ("The District Court and the defendants were left to guess at the unstated cause of action supposed to have been lost."). In Jennings v. Stillwater, the Tenth Circuit applied the backward- and forward-looking categories to a case alleging that destruction of a rape kit, and police officers' investigative omissions and irregularities, violated the plaintiff's right to court access. See 383 F.3d at 1200. The Tenth Circuit rejected the plaintiff's backward-looking claim, noting that any remedy "that could conceivably be awarded to Plaintiff as a result of the alleged police misconduct" had already been sought and obtained in a suit against Oklahoma State University and the four football

players that had allegedly raped her.  383 F.3d at 1209.  Notably, the Tenth Circuit stated that, unlike other Courts of Appeals, the Tenth Circuit "has not recognized a constitutional cause of action based on denial of access to the courts under [the] circumstances [of police cover-ups]." 383 F.3d at 1208-09.

Recently, in Lynch v. Barrett, 703 F.3d 1153 (10th Cir. 2013), cert. denied, 133 S. Ct. 2352 (2013), the Tenth Circuit evaluated a backward-looking claim in the civil rights context. The plaintiff brought a § 1983 civil rights action alleging violation of his right to court access against police officers who had allegedly refused to disclose "who [had] exercised excessive force against [the plaintiff] in the course of an arrest."  703 F.3d at 1155.  In addition, the plaintiff alleged that the City of Denver violated his right of access to the courts by "adopting a policy and practice that precipitated the 'conspiracy of silence' waged against him."  703 F.3d at 1155. The plaintiff had already litigated the underlying claim of excessive force unsuccessfully, and had thus lost his opportunity to recover.  See 703 F.3d at 1157.  The defendants argued that qualified immunity barred plaintiff's suit.  See 703 F.3d at 1158.  The Tenth Circuit found that the plaintiff had an actionable backward-looking denial-of-access claim.  See 703 F.3d at 1157. In the subsequent analysis of qualified immunity, the Tenth Circuit stated that, "while the precise source of the constitutional right to court access remains ambiguous, the existence of such right, generally speaking, is quite clear."  703 F.3d at 1161.  The Tenth Circuit stated that in Christopher v. Harbury, 536 U.S. at 414 n.9, the Supreme Court "was careful not to endorse the validity of . . . backwards looking [right-of-access] claims."  703 F.3d at 1161 (citing Jennings v. Stillwater, 383 F.3d at 1209).  Because the question "whether an evidentiary cover-up by police officials may violate an individual's constitutional right to court access was not clearly established at the time of the alleged violation," the Tenth Circuit concluded that the defendants

were entitled to qualified immunity.  703 F.3d at 1162.  "[T]hat we are 'morally outraged' by the

alleged conduct,'" the Tenth Circuit concluded, "does not mean necessarily that the offic[ers]

should have realized that [they] violated a constitutional right of access."  703 F.3d at 1163

(citing Foster v. City of Jackson, 28 F.3d 425, 430 (5th Cir. 1994)).

Under a § 1983 court access claim, therefore, the second prong of a qualified immunity

analysis requires that the contours of the right "be sufficiently clear that a reasonable official

would understand that what he was doing violates that right."  Lynch v. Barrett, 703 F.3d at 1161.

To overcome a defendant's claim of qualified immunity, a plaintiff must show that the scope of

his or her court access right "was sufficiently clear" such that a reasonable state actor would have

understood that his or her actions against the plaintiff "were not merely ill-advised, but violate

that right."  703 F.3d at 1161.  To simply say that "the Constitution recognizes a right to court

access casts too high a level of generality over our inquiry."  Lynch v. Barrett, 703 F.3d at 1161.

For a plaintiff to show that his or her right to court access was "clearly established in the proper

sense," the plaintiff "should identify cases of controlling authority . . . at the time of the incident .

. . [or] a consensus of cases of persuasive authority clearly establishing the scope of the right

encompasses the facts presented, such that a reasonable officer could not have believed that his

actions were [consistent with that right]."  703 F.3d at 1161 (citing Wilson v. Layne, 526 U.S.

603, 617 (1999))(internal quotations omitted).

## LAW REGARDING STATE ACTION AND CIVIL-RIGHTS CLAIMS

The Supreme Court has stated that it is a judicial obligation to not only

preserve an area of individual freedom by limiting the reach of federal law and
avoid the imposition of responsibility on a State for conduct it could not control,
but also to assure that constitutional standards are invoked when it can be said that
the State is responsible for the specific conduct of which the plaintiff complains.

Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n, 531 U.S. 288, 295 (2001)(internal

quotations omitted)(citations omitted).  Most rights under the Constitution secure protection only against infringement through state action.  See, e.g., Flagg Bros., Inc. v. Brooks, 436 U.S. 149 (1978)("[M]ost rights secured by the Constitution are protected only against infringement by governments.").  Under some circumstances, however, private parties' conduct may be deemed to be state action when the "conduct allegedly causing the deprivation of a federal right may be fairly attributable to the State." Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 937 (1982).  Whether the conduct may in fact be "fairly attributed" to the state requires a two-part inquiry.  "First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible." Lugar v. Edmondson Oil Co., Inc., 457 U.S. at 937.  "Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor." Lugar v. Edmondson Oil Co., Inc., 457 U.S. at 937.  See West v. Atkins, 487 U.S. at 48 (explaining that, to state a claim under § 1983, the plaintiff must show: (i) deprivation of a right that the federal Constitution or federal laws secure; and (ii) that a person acting under color of state law caused the deprivation).

The Supreme Court in Lugar v. Edmondson Oil Co., Inc. explained that the two prongs merge when the claim is "directed against a party whose official character is such as to lend the weight of the State to his decisions," whereas they remain distinct when analyzing private parties' conduct.  457 U.S. at 937.  The first prong of the test in Lugar v. Edmondson Oil Co., Inc. -- that the deprivation of a right is attributable to the state -- is satisfied when "the authority of state officials . . . put the weight of the State behind [the d]efendant's private decision[.]" 457 U.S. at 940.  The second prong, identification of a defendant as a state actor, is met where the defendant "is a state official, because he has acted together with or has obtained significant aid

from state officials, or because his conduct is otherwise chargeable to the state."  457 U.S. at 937.  The Supreme Court applied these prongs and determined that the plaintiff's allegation that private unlawful conduct deprived him of his property without due process failed to state a claim under § 1983.  See 457 U.S. at 940.  The Supreme Court also held that the plaintiff's claim, which alleged that the private parties had invoked a state statute maliciously or without valid grounds, did not give rise to state action.  See 457 U.S. at 940.  Instead, that claim amounted to nothing more than the private misuse or abuse of a state statute.  See 457 U.S. at 940-41.

For a private individual to act under color of state law, the deprivation of a federal right "must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible," and the defendant accused of a constitutional deprivation "must be a person who may fairly be said to be a state actor . . . because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State."  Lugar v. Edmondson Oil Co., 457 U.S. at 937.

> Congress did not, in using the term "under the color of state law," intend to subject private citizens, acting as private citizens, to a federal lawsuit whenever they seek to initiate a prosecution or seek a remedy involving the judicial system. To hold otherwise would significantly disregard one purpose of the state action requirement, which is to "preserve[ ] an area of individual freedom by limiting the reach of federal law and federal judicial power."  Lugar, 457 U.S. at 936.  Instead, in enacting § 1983, Congress intended to provide a federal cause of action primarily when the actions of private individuals are undertaken with state authority.  See id. at 934.  Thus, absent more, causing the state, or an arm of the state, to initiate a prosecution or serve process is insufficient to give rise to state action.

How v. City of Baxter Springs, 217 F. App'x 787, 793 (10th Cir. 2007)(unpublished).[16]

_____

[16]How v. City of Baxter Springs is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

### 1.        __Whether There Is State Action by Private Actors is a Legal Determination__.

The Tenth Circuit has described the determination of state action as "particularly fact-sensitive, so the circumstances must be examined in their totality."  Marcus v. McCollum, 394 F.3d 813, 819 (10th Cir. 2004).  According to the Tenth Circuit, "[t]he Supreme Court has counseled us that the state action inquiry, although a legal determination to be made by the court, requires the sifting [of] facts and weighing [of] evidence."  Phelps v. Wichita Eagle-Beacon, 886 F.2d 1262, 1271 (10th Cir. 1989)(quoting Burton v. Wilmington Parking Auth., 365 U.S. 715, 722 (1961)).  In Gilmore v. City of Montgomery, 417 U.S. 556, 570 (1974), the Supreme Court said that, although it was the Supreme Court's role to determine whether the use of zoos, museums, parks, and other recreational facilities by private school groups and private non-school organizations "involved government so directly in the actions of those users as to warrant court intervention on constitutional grounds," the factual record before the Supreme Court "[did] not contain sufficient facts upon which to predicate legal judgments of this kind." 417 U.S. at 570.

On the other hand, leaving the determination of state action to the jury has shown to be ill-advised.  The cases in which the acts of private entities have been held to constitute state action or to be under color of law, and cases in which they have not, tend to be distinguished "by fine shadings in the sometimes complex interrelationships that develop between the state and

---

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored.  However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds How v. City of Baxter Springs and Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707 (10th Cir. 2011)(unpublished), have persuasive value with respect to material issues, and will assist the Court in its disposition of this Memorandum Opinion.

private bodies." Adams v. Vandemark, 787 F.2d 588, 1986 WL 16606, at *2 (6th Cir. 1986)(unpublished). In Adams v. Vandemark, the United States Court of Appeals for the Sixth Circuit reviewed a jury instruction on state action from the United States District Court for the Eastern District of Michigan. 1986 WL 16606, at *1. The Sixth Circuit in a per curium opinion in which Judges Martin, Jones and Wellford joined, found that the few words that were given to the jury on when to find state action "gave the jury little to guide it in making its determination on this crucial element of the claim for relief." 1986 WL 16606, at *2. The Sixth Circuit noted that the application of the symbiotic-relationship test and the joint-relationship test are "very difficult and complex questions," and, "[t]o the extent a jury is to decide upon the proper factual predicates for this essentially legal determination, it must be given instructions that are clear, precise and informative as to the factors involved and the factual issues to be determined." 1986 WL 16606, at *2. The Sixth Circuit found that the defendants were entitled to a new trial, because the jury was given no direction that could have enabled it to make the necessary underlying factual determination regarding state action. 1986 WL 16606, at *2-3. The Court on multiple occasions has ruled on dispositive motions that required a determination as a matter of law whether a private party was a state actor. See, e.g., Herrera v. Santa Fe Public Schools, 41 F. Supp. 3d 1027 (D. N.M. 2014)(Browning, J.)(holding that private company providing security for school prom was a state actor); Archuleta v. City of Roswell, 898 F. Supp. 2d 1240 (D.N.M. 2012)(Browning, J.)(holding that private attorney was not a state actor engaged in a conspiracy against his client with prosecutors).

> **2.**      **The Tests for Determining State Action by a Private Party.**

The Supreme Court has articulated four different tests for courts to use in determining whether conduct by an otherwise private party is state action: (i) the public-function test; (ii) the

nexus test; (iii) the symbiotic-relationship test; and (iv) the joint-action test.  See Johnson v. Rodrigues (Orozco), 293 F.3d 1196, 1202-03 (10th Cir. 2002)(reviewing the various tests); Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447 (noting that "[a]pplication of the state action doctrine has been characterized as one of the more slippery and troublesome areas of civil rights litigation." (internal quotation marks omitted)).

### a.       The Public-Function Test.

Under the public-function test, a court determines whether a private party has exercised "powers traditionally exclusively reserved to the State." Jackson v. Metro. Edison Co., 419 U.S. 345, 352 (1974).  The public-function test is difficult to satisfy, because, while many functions may be traditionally governmental, few are "exclusively" governmental functions, as the test requires.  Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1456.  The courts have found exclusive government functions to include holding elections, performing necessary municipal functions, and running nursing facilities.  See Johnson v. Rodrigues (Orozco), 293 F.3d at 1203.

### b.       The Nexus Test.

Under the nexus test, state action is present if the state has ordered the private conduct, or "exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." Blum v. Yaretsky, 457 U.S. 991, 993 (1982).  A court determines under the nexus test whether there is a sufficiently close nexus between the state and the challenged conduct, such that the conduct "may be fairly treated as that of the state itself." Jackson v. Metro. Edison Co., 419 U.S. at 351.  "Private use of state-sanctioned private remedies or procedures does not rise to the level of state action. . . . But when private parties make use of state procedures with the overt, significant assistance of state

officials, state action may be found." Tulsa Prof'l Collection Servs., Inc. v. Pope, 485 U.S. 478, 486 (1988)(citations omitted).

### c.     The Symbiotic-Relationship Test.

Under the symbiotic-relationship test, state action is present if the state "has so far insinuated itself into a position of interdependence" with a private party that "it must be recognized as a joint participant in the challenged activity." Burton v. Wilmington Parking Auth., 365 U.S. 715, 725 (1961). "[E]xtensive regulation, receipt of substantial state funds, and the performance of important public functions do not necessarily establish the kind of symbiotic relationship between the [state] and a private [party] that is required for state action." Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1451.

> The applicable decisions clearly establish no bright-line rule for determining whether a symbiotic relationship exists between a government agency and a private entity. Questions as to how far the state has insinuated itself into the operations of a particular private entity and when, if ever, the operations of a private entity become indispensable to the state are matters of degree.

Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1452.

### d.     The Joint-Action Test.

State action exists under the joint-action test if the private party is a "willful participant in joint action with the State or its agents." Dennis v. Sparks, 449 U.S. 24, 27 (1980). Courts look to "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1453. "[I]f there is a substantial degree of cooperative action between state and private officials . . . or if there is overt and significant state participation, in carrying out the deprivation of the plaintiff's constitutional rights, state action is present." Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1454 (citations omitted)(internal quotation marks omitted).     Joint

participation can also take the form of a conspiracy between public and private actors; in such cases, the plaintiff must show that the public and private actors shared a common, unconstitutional goal.  See Sigmon v. CommunityCare HMO, Inc., 234 F.3d 1121, 1126 (10th Cir. 2000).  Even a conspiracy claim requires a sufficient level of state involvement to constitute joint participation in the unconstitutional actions.  See Soldal v. Cook County, 506 U.S. 56, 60 n.6 (1992).  The Tenth Circuit has previously dismissed constitutional claims against a private individual where the plaintiff did not give specific facts showing a conspiracy evidencing state action.  See Martinez v. Winner, 771 F.2d 424, 445 (10th Cir. 1985)("Beyond the bare conclusory allegation that [the defendant], a private citizen, conspired with the other defendants to deprive plaintiff of his constitutional and civil rights, no facts are stated indicating that [the defendant] did anything.").

In Gallagher v. Neil Young Freedom Concert, the Tenth Circuit, in an opinion that the Honorable Robert H. Henry, United States Circuit Judge for the Tenth Circuit, authored, and Judges Seymour and Daugherty joined, surveyed several instances in which courts have found action "under color of state law" where governmental and private parties have acted together in joint-action:

> We have applied the joint action test in several cases involving allegations that private citizens acted in concert with police officers in making arrests.  In both Carey v. Continental Airlines Inc., 823 F.2d 1402 (10th Cir. 1987), and Lee v. Town of Estes Park, 820 F.2d 1112 (10th Cir. 1987), we held that citizens who made complaints to police officers that resulted in arrests were not state actors. We found nothing in the record in either case from which we could infer that the allegedly unconstitutional arrests "resulted from any concerted action, whether conspiracy, prearranged plan, customary procedure, or policy that substituted the judgment of a private party for that of the police or allowed a private party to exercise state power."  Carey, 823 F.2d at 1404.  In both cases, the record indicated that the police officers had made an independent decision to make the challenged arrest.  In contrast, in Lusby v. T.G. & Y. Stores, Inc., 749 F.2d 1423, 1429 (10th Cir. 1984), cert. denied, 474 U.S. 818 (1985), we concluded that a

- 84 -

store security guard who reported a suspected shoplifter to the police was a state actor.  We noted that the officer that made the arrest did not make an independent investigation but relied on the judgment of the security guard.  In <u>Coleman v. Turpen</u>, 697 F.2d 1341 (10th Cir. 1982)(per curiam), we applied the joint action test by focusing on the manner in which the alleged constitutional deprivation was carried out.  There, the plaintiff challenged the seizure and sale of his property and named as defendants not only state officials but also the wrecking company that towed his truck and subsequently sold it.  We found the company to be a state actor because it had "jointly participated in seizing the truck by towing it away" and because the company's sale of the plaintiff's property was "an integral part of the deprivation."

49 F.3d at 1453-56.  The Tenth Circuit noted that, "just as with the other tests for state action, the mere acquiescence of a state official in the actions of a private party is not sufficient."  49 F.3d at 1453.  The Tenth Circuit found that the joint-action test can be satisfied where police are involved in cooperative action with a private party when "the police have substantially assisted in the allegedly wrongful conduct."  49 F.3d at 1455.  Joint participation typically arises when the authorities agree to facilitate through affirmative action a private party's unconstitutional acts.  <u>See</u> <u>Soldal v. Cook County</u>, 506 U.S. 56, 60 n.4 (1992).

### 3.    **The Influence of Police Involvement on Transforming Private Action into State Action.**

The Tenth Circuit has found that the involvement of the police does not necessarily convert a defendant's abuse of state law into conduct attributable to the state for purposes of § 1983 liability.  <u>See</u> <u>Yanaki v. Iomed, Inc.</u>, 415 F.3d 1204, 1210 (10th Cir. 2005)(citing <u>Winterland Concessions Co. v. Trela</u>, 735 F.2d 257, 262 (7th Cir. 1984); <u>Taylor v. Gilmartin</u>, 686 F.2d 1346, 1348-49, 1355 n.3 (10th Cir. 1982); <u>Torres v. First State Bank of Sierra Co.</u>, 588 F.2d 1322, 1327 (10th Cir. 1978)).  In <u>Yanaki v. Iomed, Inc.</u>, the plaintiffs argued that the involvement of police acting in concert with the defendants in the search of the plaintiffs' residence converted the defendants' actions into conduct attributable to the state for the purposes

- 85 -

of § 1983 liability.  See 415 F.3d at 1209-10.  The Tenth Circuit held that the plaintiffs "fail[ed] to satisfy the first part of the [Lugar v. Edmondson Oil Co., Inc.] color of law test because the conduct that Plaintiffs complain deprived them of their constitutional rights was caused by and [could] only be attributed to the private Defendants."  415 F.3d at 1210.  The Tenth Circuit, therefore, found it unnecessary to address whether the private defendants were state actors.  See 415 F.3d at 1210.  Additionally, merely following a procedure established by state law does not transform a private party's activity into state action.  See Scott v. Hern, 216 F.3d 897, 906-07 (10th Cir. 2000); Kirksey v. Theilig, 351 F. Supp. 727, 733 (D. Colo. 1972)(holding that self-help repossession of an automobile by a private party is not action under color of state law).

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority."  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'"  Roybal v. City of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials."  Butz v. Economou, 438 U.S. 478, 504 (1978).  "The qualified immunity analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil War Civil Rights Acts."  Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled on other grounds as recognized in Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

> Under § 1983 (invoked in this case) and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 . . . (1971), a plaintiff may seek money damages from government officials who have violated her constitutional or statutory rights.  But to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. 635, 638 . . . (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, they are shielded from personal liability, Harlow v. Fitzgerald, 457 U.S. 800, 818 . . . (1982).  That means a court can often avoid ruling on the plaintiff's claim that a particular right exists.  If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages.  The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Green, 131 S. Ct. 2020, 2030-31 (2011).

Issues of qualified immunity are best resolved at the "earliest possible stage in litigation."

Pearson v. Callahan, 555 U.S. 223, 232 (2009)(quoting Hunter v. Bryant, 502 U.S. 224, 227

(1991)(per curiam)).  "If qualified immunity is to mean anything, it must mean that public

employees who are just doing their jobs are generally immune from suit."  Lewis v. Tripp, 604

F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does

not violate clearly established statutory or constitutional rights of which a reasonable person

would have known."  Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457

U.S. at 818).  Qualified immunity also shields officers who have "reasonable, but mistaken

beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law.

Saucier v. Katz, 533 U.S. at 205.  When a defendant asserts qualified immunity, the plaintiff

must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory

rights; and (ii) that the right was clearly established at the time of the alleged misconduct.  See

Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

1.      **Procedural Approach to Qualified Immunity.**

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified immunity defense.  In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  555 U.S. at 236.  The Supreme Court also noted that, while no longer mandatory, the protocol outlined in Saucier v. Katz -- by which a court first decides if the defendant's actions violated the constitution, and then the court determines if the right violated was clearly established -- will often be beneficial.  See Pearson v. Callahan 555 U.S. at 241.  In rejecting the prior mandatory approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district court and courts of appeals with "what may seem to be an essentially academic exercise."  555 U.S. at 237.  The Supreme Court also recognized that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable."   555 U.S. at 241 (alterations omitted)(internal quotation marks omitted).  See Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior case law "comports with our usual reluctance to decide constitutional questions unnecessarily").  Once the plaintiff establishes an inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense generally fails.  See Cannon v. City & Cnty. of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

The Supreme Court recognizes seven circumstances where district courts should proceed directly to and "should address only" the clearly established prong of the qualified immunity analysis: when (i) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(quoting Pearson v. Callahan, 555 U.S. at 236-42).  Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely only to face challenges in the qualified immunity context.  Camreta v. Greene, 131 S. Ct. at 2031-32.  See Kerns v. Bader, 663 F.3d at 1181.[17]  "Courts should think carefully before

---

[17]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer.  663 F.3d at 1183.  In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation)

> question.   And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84.   The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)."  663 F.3d at 1187 n.5.  On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations.   A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations.  See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972).  In Mitchum v. Foster, the Supreme Court explained:
>
>> Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." . . .   The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.
>
> 407 U.S. at 238-39.  Congress did not say it would remedy only violations of "clearly established" law, but that
>
>> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.
>
> 42 U.S.C. § 1983 (emphasis added).  The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials

were not liable for constitutional violations where they reasonably believed that their conduct was constitutional.  See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010).  The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith."  Wood v. Strickland, 420 U.S. 308, 322 (1975).  In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly-established prong became a part of the qualified immunity test. See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.").  It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983.  J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011).  Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations.  See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . .  These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives).  In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering.  See 547 U.S. at 596-97.  Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress.  It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights.  It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'"  Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011)(quoting Pearson v. Callahan, 555 U.S. 223, 236-37 (2009)).  See Camreta v. Greene, 131 S. Ct. at 2032 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones.").[18]  The Tenth Circuit will

_____

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized in Ysasi v. Brown, No. CIV 13-0183 JB/CG, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.).  See Richard E. Myers, Fourth Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations and award monetary judgments).

[18]In Kerns v. Board of Commissioners, the Court expressed concern with Justice Elena Kagan's comments about "large" and "small" cases:

> While the Court is, of course, obligated to follow faithfully the Supreme Court's decisions and opinions, the Court has always been unenlightened and even troubled by Justice Elena Kagan's comments in Camreta v. Greene about "large" and "small" cases.  131 S. Ct. at 2032.  As a trial judge, the Court has tried assiduously to avoid thinking about or categorizing some cases as "large" and some as "small."  It usually is not mentally healthy for a judge to put all his or her energy into "large" cases and slight "small cases"; to the litigants, their case is the most important case on the Court's docket, and it is usually wise for the judge to treat each case on which he or she is working -- at that moment -- as the most important case at that moment.  Getting the decision "right," i.e. getting the law and facts correct and accurate, is obviously important, but getting it right is only one-half of a judge's task, particularly a trial judge's job.  The other half of dispensing justice is the appearance of justice -- did the Court listen to the litigant's arguments, wrestle with those arguments, and deal with them in an intellectually honest way.  Americans are pretty good about accepting a judicial decision -- even an adverse one -- and cease obsessing over an issue, if they are convinced that an authority figure has dressed up, taken them seriously, listened patiently and politely, wrestled with the arguments, addressed them, and accurately stated the facts.  The Court believes that, if it starts looking at some cases before it as "large" and some as "small," it begins a slippery slope that does not accomplish both halves of the task of dispensing justice.  The justice system depends so much on the nation respecting and accepting the courts' proceedings and decisions, because courts have very little "power" that does not depend on that acceptance.  Thus, Justice Kagan's comments are not only not self-defining, but they are disturbing.

remand a case to the district court for further consideration when the district court has given cursory treatment to the clearly established prong of the qualified immunity analysis.  See Kerns v. Bader, 663 F.3d at 1182.

### 2.     Clearly Established Rights in the Qualified Immunity Analysis.

To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes

---

If, perhaps, a "large" case is a Supreme Court case or one that comes from the East Coast or California, rather than one in a district court in New Mexico, then it helps to look at what cases the Supreme Court has decided for the plaintiff. The three most recent qualified immunity cases, the Supreme Court dealt with are: (i) Reichle v. Howards, 132 S. Ct. 2088 (2012); (ii) Filarksy v. Delia, 132 S. Ct. 1657 (2012); and (iii) Messerschmidt v. Millender, 132 S. Ct. 1235 (2012).  In Reichle v. Howards, the Supreme Court determined that secret service agents were entitled to qualified immunity for arresting a protestor who touched the Vice President and held that it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation.  See 132 S. Ct. at 2092, 2097.  In Filarsky v. Delia, the Supreme Court held that a private individual that the government hires to do its work, an internal affairs review, is entitled to seek qualified immunity for Fourth and Fourteenth Amendment violations. See 132 S. Ct. at 1660, 1668.  In Messerschmidt v. Millender, the Supreme Court held that police officers in Los Angeles, California were entitled to qualified immunity when they relied on an invalid warrant to search a home, because a reasonable officer would not have realized the error.  See 132 S. Ct. at 1241, 1250.  The Supreme Court has not denied qualified immunity since 2004 in Groh v. Ramirez, 540 U.S. 551 (2004), where it held that an officer unreasonably relied on a deficient warrant.  See 540 U.S. at 565. The Court does not think those presumably "large" cases (they are Supreme Court cases, after all) are any different -- substantively, legally, or factually -- than this case involving the search of a citizen's home after someone shot down a police helicopter and then detained that suspect for nine months until the United States realized that J. Kerns could not have shot down the helicopter.
On the flip side, treating large cases like they are large cases can create an appearance problem to the public and to the litigants -- that only big cases deserve the Court's attention.  A trial judge can overwork a "large" case.  It is better to treat even "large" cases like every other case; large cases and their litigants need to know and appreciate that they are not the only case on the court's docket, and realize that the scarcity of judicial resources applies to them too.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d at 1222 n.35.

would understand that what he or she did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001).  On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202).  A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts."  Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing

violates that right." Ashcroft v. al-Kidd, 131 S. Ct. at 2083. "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 131 S. Ct. at 2083). "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639. "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 131 S. Ct. at 2084. The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit held in Kerns v. Bader that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference." 663 F.3d at 1188 (emphasis in original). In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification." 663 F.3d at 1183 (emphasis added). Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined, applied a sliding scale to determine when the law is clearly established. See Casey v. City of Fed. Heights, 509 F.3d 1278, 1284 (10th Cir. 2007)("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation."). "[W]hen an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a

second decision with greater specificity to clearly establish the law." Casey v. City of Fed. Heights, 509 F.3d at 1284.   Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning . . . ." Hope v. Pelzer, 536 U.S. at 741.

## ANALYSIS

The Court will grant the MTD.  The Individual DOH Defendants violated A.M.'s First and Fourteenth Amendment right of access to the courts.   During her initial transfer to the Homestead House and later under M. Evans' care, A.M. was deprived of meaningful, effective, and adequate access to the courts.  The Individual DOH Defendants knew or should have known that transferring a thirty-two-year-old woman to a private group home for the elderly, and failing to oversee M. Evans' care of A.M., would result in a deprivation of A.M.'s constitutional rights. The Individual DOH Defendants are immune from this claim, however, because it was not clearly established in 1979, and it is not clearly established today, that the proximate causation standard for § 1983 claims can apply to First and Fourteenth Amendment court access cases. Consequently, the Court will dismiss A.M.'s First and Fourteenth Amendment court access claims.

**I.     A.M. PLAUSIBLY ALLEGES THAT THE INDIVIDUAL DOH DEFENDANTS DENIED HER MEANINGFUL ACCESS TO THE COURTS IN VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS.**

A.M. plausibly alleges that the Individual DOH Defendants denied her adequate, effective, and meaningful access to the courts in violation of the First and Fourteenth Amendments.   A.M. plausibly alleges that the Individual DOH Defendants denied her the opportunity to legally object to her transfer to a third-party setting, and to seek redress for the conditions of her confinement at the Homestead House because of a lack of periodic judicial review, or of an appointed guardian ad litem, conservator, or attorney who could protect her

interests.   A.M. also demonstrates that she has suffered actual injury and has a plausible backward-looking court access claim.   Although M. Evans was not a state actor in her oversight of A.M., that fact does not preclude the Court's conclusion that A.M. plausibly alleges a violation of her First and Fourteenth Amendment rights to court access, because First and Fourteenth Amendment violations can stem from private conduct.

### A.   AS A DEVELOPMENTALLY DISABLED, INVOLUNTARILY CONFINED PERSON, A.M. POSSESSES A RIGHT OF ACCESS TO THE COURTS.

A.M. has been diagnosed with various developmental disabilities and has been in the State of New Mexico's custody of the since May 8, 1963, when a court order committed her to a state institution.   See Complaint ¶¶ 66-67, at 18.   A.M. remains in the State of New Mexico's legal custody.[19]   Throughout her commitment, the State of New Mexico involuntarily held A.M. in custody.   See Complaint ¶ 68, at 19.   As a result of her developmental disabilities, A.M. was and remains "incapable of making fully-informed decisions about her own care and welfare" without assistance from "competent surrogate decision makers."   Complaint ¶ 68, at 19.   As such, A.M. would have needed assistance from a legally appointed guardian throughout her commitment to bring any legal claims and to seek redress from any harm.   See Complaint ¶ 68, at 19.

As discussed above, the right of access to the courts developed primarily in the prisoner context, and ultimately extended to the civil context in the 1970s.   The extension of the right of access to the courts to the civil context occurred principally in the context of civil indigent

---

[19]As the Court determined in its Memorandum Opinion and Order on A.M.'s substantive due-process claims, filed December 5, 2014, "A.M. was, and remains, involuntarily committed to state custody."   A.M. ex rel. Youngers v. New Mexico Dept. of Health, 65 F. Supp. 3d at 1252.

plaintiffs who had underlying fundamental interests and whose only possible remedy was through the judicial process.  In 1985, the Tenth Circuit extended the principles of the prisoner court access right to a criminally charged defendant who was unfit to stand trial and who had been committed to a state mental institution.  See Ward v. Kort, 762 F.2d at 858 ("We hold that plaintiff, as a person under mental commitment, is entitled to protection of his right of access to the courts."). The Court concludes that there is not a meaningful distinction between a criminally charged, mentally ill person committed to state custody and a non-criminally charged, mentally ill person committed to state custody.   While the Court is extremely mindful of Judge Gorsuch's statement in Kerns v. Bader that a law is not clearly established if "a distinction might make a constitutional difference," the Court cannot think of a factual distinction that makes a constitutional difference here.   Kerns v. Bader, 663 F.3d at 1186-87 (emphasis in original). Accordingly, the Court concludes that this right, as the Tenth Circuit identified in Ward v. Kort, extends to non-criminal, mentally ill persons in state custody.

Indeed, a number of federal district courts, including the District of New Mexico, have found that Ward v. Kort indicates an expansion of the prisoner right of access to the courts to persons under civil commitment.  In Robbins v. Budke, 739 F. Supp. at 1485, for example, Judge Mechem of the District Court of New Mexico held that "residents institutionalized at [a state mental hospital] have a constitutional right of meaningful access to the courts," and cited Ward v. Kort as the principal support for its finding.  739 F. Supp. at 1485.  Judge Mechem recognized that, under Ward v. Kort, the mentally ill patients institutionalized at the Las Vegas Medical Center had a right of meaningful access to the courts.  See 739 F. Supp. at 1485.  The Ninth Circuit cited to Ward v. Kort in King v. Atiyeh, noting that the plaintiffs, like the plaintiff in Ward v. Kort, were criminally charged, involuntarily committed patients, and that "[l]ike inmates

confined in prisons, they have a constitutional right to meaningful access to the courts." King v. Atiyeh, 814 F.2d at 568 n.2.   The Ninth Circuit later cited King v. Atiyeh to support the proposition that "the right of access is guaranteed to people who are involuntarily committed to a mental institution." Cornet v. Donovan, 51 F.3d at 897-98.   The patients in Cornet v. Donovan were mentally ill and involuntarily committed to the Idaho State Hospital South, much like the patients in Robbin v. Budke, and were also held to possess a right of access to the courts.   See Cornet v. Donovan, 51 F.3d at 897-98

The Middle District of Florida similarly cited to Ward v. Kort in 1986 for the proposition that "a person under mental commitment is entitled to protection of his right to access to the courts." Armstead v. Pingree, 629 F. Supp. at 277.   That case involved mentally retarded persons, committed to a state hospital, who brought claims alleging violations of their constitutional right of access to the courts.   See 629 F. Supp. at 275.   The District Court stated that "[r]ights [sic] of access to the courts is a constitutional right guaranteed by the due process clause which assures that no person will be denied the opportunity to present his or her claim to the judiciary regarding constitutional violations."   629 F. Supp. at 277.   It rejected the defendants' argument that the plaintiffs' court access claim had failed to allege a federal question.   See 629 F. Supp. at 277.   Citing to Ward v. Kort, the District Court of Minnesota has likewise concluded that the application of prisoner court access principles to civilly committed mental patients is appropriate.   See Holly v. Anderson, 2008 WL 1773093.   The District Court explained: "A number of courts have applied to civilly committed patients, the rule developed by the Supreme Court in connection with a prisoner's right to access the courts."   Holly v. Anderson, 2008 WL 1773093, at *7.   The Middle District of Tennessee has similarly stated that "[c]ourts also recognize that people in involuntary institutionalized settings other than penal

institutions are entitled to an affirmative right of access to the courts," and that Ward v. Kort held "that Bounds applies to individuals who are under involuntary civil commitment to a mental hospital." John L. v. Adams, 750 F. Supp. at 291.

In sum, A.M. has a right of access to the courts as a mentally ill, involuntarily committed person under Ward v. Kort. Like the patients in Robbins v. Budke, A.M. is a patient in the custody of the state who is mentally ill, may have "difficulty developing trusting relationships," and "may not be willing to ask questions about [her] rights." Robbins v. Budke, 739 F. Supp. at 1486. Additionally, because of her disabilities, A.M. is "vulnerable to abuse and neglect because many mentally ill individuals have difficulty recognizing the concept that they have rights and will not necessarily identify even the most egregious abuse as a violation of [her] rights." Robbins v. Budke, 739 F. Supp. at 1486. Moreover, Ward v. Kort's language is straightforward and broad enough to encompass the right of court access for a mentally ill, civilly committed person who has not been criminally charged: "We hold that plaintiff, as a person under a mental commitment, is entitled to protection of his right of access to the courts." 762 F.2d at 858. The Court concludes that, in 2015, mentally ill, civilly confined persons have a right of access to the courts.

### B.   A.M. HAS AN ACTIONABLE BACKWARD-LOOKING COURT ACCESS CLAIM.

To have an actionable backward-looking court access claim, a plaintiff must meet the necessary elements. The Supreme Court has recognized that the basis for the constitutional right of court access is "unsettled" and has listed various constitutional sources. Christopher v. Harbury, 536 U.S. at 415 n.12 (identifying the Article IV Privileges and Immunities Clause, the First Amendment Petition Clause, the Fifth Amendment Due Process Clause, and the Fourteenth Amendment Equal Protection and Due Process clauses as sources). The Tenth Circuit has also

recognized several sources for the right of access to the courts.  See Smith v. Maschner, 899 F.2d at 947; Jennings v. Stillwater, 383 F.3d at 1208-09 (relying primarily on Christopher v. Harbury for a discussion of the court access right, without further discussion of the right's roots); Lynch v. Barrett, 703 F.3d at 1157 (relying primarily on Christopher v. Harbury for a discussion of the court access right, without further discussion of the right's roots).  Contrary to the Individual DOH Defendants contention that the backward- and forward-looking court access claim categories exist only under a Fourteenth Amendment court access analysis, the categories and their corresponding elements are not associated with a particular constitutional source.  Indeed, the Supreme Court and the Tenth Circuit have both recognized that the elements that are necessary for backward-looking court access claims apply to the right of court access in general and have not been tied to a specific constitutional source.  See Christopher v. Harbury, 536 U.S. at 413-15; Jennings v. Stillwater, 383 F.3d at 1208-09;  Lynch v. Barrett, 703 F.3d at 1157.

In Christopher v. Harbury, the plaintiff brought an action alleging a violation of her right to court access, in the civil context, under the First and Fifth Amendments, but the Supreme Court identified additional sources for the right.  See 536 U.S. at 409, 415 & n.12.  On the basis that the right to court access has unsettled roots, the Supreme Court identified the elements that must be met for either backward- or forward-looking court access claims.  See 536 U.S. at 415-17.  Specifically, the Supreme Court divided court access claims into two categories: backward- and forward-looking categories.  See 536 U.S. at 413.  According to the Supreme Court, forward-looking claims involve "systemic official action" that is presently frustrating a plaintiff's ability to file suit, and backward-looking claims involve cases that "cannot now be tried (or be tried with all the evidence), no matter what official action may be in the future."  536 U.S. at 413-14.  Examples of forward-looking court access claims include prison-litigation cases

where a prisoner seeks relief in the form of a law library or legal assistance, so that a prisoner may bring an action in the future.  See Christopher v. Harbury, 536 U.S. at 413.  Examples of backward looking claims include police cover ups and involve official acts that caused the "loss or inadequate settlement of a meritorious case, . . . the loss of an opportunity to sue, . . . or the loss of an opportunity to seek some particular order of relief."  Christopher v. Harbury, 536 U.S. at 414 (citing Foster v. Lake Jackson, 28 F.3d 425, 429 (5th Cir. 1994); Bell v. Milwaukee, 746 F.2d 1205, 1261 (7th Cir. 1984); Swekel v. River Rouge, 119 F.3d 1259, 1261 (6th Cir. 1997)).  Backward-looking court access cases "do not look forward to a class of future litigation, but backward to a time when specific litigation ended poorly, or could not have commenced, or could have produced a remedy subsequently unobtainable."  Christopher v. Harbury, 536 U.S. at 414.  "The ultimate object [of backward-looking court access claims] is not the judgment in a further lawsuit, but simply the judgment in the access claim itself, in providing relief obtainable in no other suit in the future."  Christopher v. Harbury, 536 U.S. at 414.

The purpose for recognizing a court access claim, whether backward- or forward-looking, "is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong."  Christopher v. Harbury, 536 U.S. at 414-15.  The right of access to the courts "is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of the court."  Christopher v. Harbury, 536 U.S. at 415.  Accordingly, the plaintiff must identify a "nonfrivolous, arguable underlying claim," whether the court access claim is backward- or forward-looking.  Christopher v. Harbury, 536 U.S. at 415 (citing Lewis v. Casey, 518 U.S. at 353)(internal quotations omitted).  The underlying cause of action must be described in the complaint and the allegations "must describe the official acts frustrating the litigation."  Christopher v. Harbury, 536 U.S. at 415.  The Supreme Court in Lewis v. Casey articulated the

requirement of a "nonfrivolous" underlying action as a showing of actual injury. 518 U.S. at 351-53. Actual injury "derives from the doctrine of standing," but the injury requirement "is not satisfied by just any type of frustrated legal claim." Lewis v. Casey, 518 U.S. at 349, 354. The plaintiff must demonstrate that "the alleged shortcomings . . . hindered [the plaintiff's] efforts to pursue a legal claim." Lewis v. Casey, 518 U.S. at 351. For example, the plaintiff could show "that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by the inadequacies . . . that he was unable even to file a complaint." Lewis v. Casey, 518 U.S. at 351. When the court access claim looks backward, "the complaint must identify a remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought." Christopher v. Harbury, 536 U.S. at 413. "The underlying cause of action and its lost remedy must be addressed by allegations in the complaint sufficient to give fair notice to a defendant." Christopher v. Harbury, 536 U.S. at 416.

Here, A.M. demonstrates actual injury and an identifiable remedy. Accordingly, A.M. presents an actionable backward-looking court access claim. In her Complaint, A.M.'s court access claim is presented in conjunction with the underlying claims of constitutional violations under the First, Fourth, Thirteenth and Fourteenth Amendments. A.M. alleges that, had she possessed adequate, effective and meaningful access to the courts during her transfer and during her commitment at the Homestead House, she would have been able to: (i) object to her transfer; and (ii) object to the violations of her constitutional rights that occurred while at the Homestead House. See Complaint ¶¶ 135-36, at 34-35; id. ¶¶ 145, at 36. A.M. plausibly alleges that, as a proximate result of the Individual DOH Defendants' actions, she suffered "significant damages." Complaint ¶ 138, at 35; id. ¶ 145, at 36.

As the Supreme Court articulated in <u>Lewis v. Casey</u>, to show actual injury, A.M. must demonstrate that the Individual DOH Defendants' alleged "shortcomings" hindered her ability to pursue a legal claim.   518 U.S. at 351.   A.M. plausibly describes the Individual DOH Defendants' actions that hindered her ability to pursue a legal claim.   In her Complaint, A.M. states:

> The individual DOH Defendants did not obtain, nor take steps to enable Plaintiff to obtain, the appointment of guardians, guardians ad litem, conservators or attorneys who could serve and protect the interests of Plaintiff, and thereby denied her access to the judicial system. Thus, Plaintiff was deprived of any effective mechanism by which she could challenge the legality of conditions of her placement, treatment and services.

Complaint ¶ 136, at 35.   Additionally, A.M. asserts that, by denying her "any opportunity to object to her illegal transfer [to the Homestead House, run by M. Evans], either through channels or in court, the individual [DOH] Defendants deprived Plaintiff of her First Amendment right to seek redress of her grievances by the government."   Complaint ¶ 145, at 36.   A.M. describes with significant detail the roles and actions of the Individual DOH Defendants, in their individual capacities, as they relate to A.M.'s case and to other, similarly situated, patients.   <u>See</u> Complaint ¶¶ 1-125, at 1-32.   A.M. contends that the Individual DOH Defendants "failed to provide surrogate decision-makers for Plaintiff, failed to provide notice to Plaintiff, and failed to provide Plaintiff with counsel or with any other opportunity to be heard."   Complaint ¶ 79, at 21.   A.M. maintains that, after her placement with a third-party in 1979, she was never given "any periodic judicial review to determine whether her placement was appropriate or whether her needs were being addressed."   Complaint ¶ 81, at 22.

As required under <u>Christopher v. Harbury</u>, A.M. has "nonfrivolous" and "arguable" underlying claims.   536 U.S. at 415.   In her Complaint, A.M. articulates that she was "abandoned" with M. Evans at the Homestead House, and that she was subsequently "deprived

of social services, any opportunity to socialize with her peers, Medicaid benefits, social security benefits, adequate safety, medical, dental and psychological care, rehabilitative, educational and vocational services, day habilitation and therapy, and her basic human rights, all of which she was entitled under clearly established law."   Complaint ¶ 85, at 23.   A.M. outlines the constitutional and statutory sources for the Individual DOH Defendants' violations, alleging violations under the First, Fourth, Thirteenth, and Fourteenth Amendments, as well as under the Rehabilitation Act, and the Medicaid Act.   See Complaint ¶¶ 126-80, at 32-43.   A.M.'s Complaint plausibly addressed the underlying causes of action and the lost remedies "sufficient to give notice" to the Individual DOH Defendants.   Christopher v. Harbury, 536 U.S. at 416. A.M. demonstrates that, had she been able to dispute her transfer in 1979, she could have been appropriately placed in a facility where her fundamental rights would be guarded rather than violated.   A.M.'s ability to object to her transfer would have resulted in a representation of her interests, which could have resulted in a transfer to a facility better suited to her specific needs. As A.M. observes, she was entitled to periodic judicial review of her confinement and of her conditions of confinement; her transfer in 1979 was to a home for the elderly not suited for developmentally disabled persons, and the transfer resulted in an alleged complete lack of oversight that lasted many years.

A.M.'s claim thus falls into the backward-looking claim category, and meets its elements of actual injury and identifiable remedy.   A.M.'s claim is not a forward-looking claim, because official action is not presently denying her the opportunity to litigate a future action.   A.M. presently has legal representatives and is presently bringing causes of action for multiple constitutional violations.   Like the plaintiffs in Christopher v. Harbury, Jennings v. Stillwater and Lynch v. Barrett, A.M.'s claim fits into the backward-looking category.

The Supreme Court's decision in Christopher v. Harbury is instructive. There, the plaintiff alleged that "the deceptive statements and omissions of the State Department and [other defendants] had unconstitutionally impeded her access to courts" under the First and Fifth Amendments. 536 U.S. at 409. The Supreme Court characterized her claim as backward-looking. See 536 U.S. at 409. Specifically, the plaintiff alleged that government officials "intentionally deceived her in concealing information that her husband, a foreign dissident, was being detained and tortured in his own country by military officers of his government." 536 U.S. at 405. In addition to her court access claim, the plaintiff also asserted a violation of her constitutional rights of familial association, free speech, and access to government, and a violation of her deceased husband's due-process rights. See 536 U.S. at 410. The Supreme Court concluded that the plaintiff's complaint did not state a constitutional claim for denial of court access upon which relief could be granted. See 536 U.S. at 418. The Supreme Court explained that the plaintiff's complaint "failed to identify a cause of action that the alleged deception had compromised." 536 U.S. at 418. At oral argument, the plaintiff's counsel added "intentional infliction of emotional distress" as an underlying action that plaintiff would have brought had she been able to access the courts. See 536 U.S. at 419. The Supreme Court concluded that, even taking the additional cause of action into account, the plaintiff had not identified a remedy that could not be obtained through one of her existing claims. See 536 U.S. at 420-21. The Supreme Court stated that, if such a claim could be maintained, the plaintiff could presently obtain relief for a claim of intentional infliction of emotional distress. See 536 U.S. at 421. Additionally, the Supreme Court stated that the plaintiff could not presently obtain the order that she had sought before her husband's death. See 536 U.S. at 421. The Supreme

Court concluded the plaintiff's backward-looking claim was not actionable for failure to satisfy the remedy requirement.  See 536 U.S. at 422.

The Tenth Circuit addressed the court access remedy requirement in Jennings v. Stillwater.  There, a former student of Oklahoma State University in Stillwater, Oklahoma, brought a § 1983 action against the Oklahoma Police Department, alleging that it had violated her constitutional rights by "failing to adequately investigate an alleged rape and by discouraging her from pursuing prosecutions of the alleged assailants."  383 F.3d at 1200.  The plaintiff alleged that she had been raped by four members of the Oklahoma State University's football team.  See 383 F.3d at 1200.  She subsequently brought claims for violations of her procedural due-process, right of access to the courts, and equal-protection rights.  See 383 F.3d at 1205.  With respect to the court access claim, the Tenth Circuit stated that other Courts of Appeals had recognized a cause of action "for police cover-up," but the Tenth Circuit had not endorsed the cause of action.  383 F.3d at 1208.  As the Supreme Court had done in Christopher v. Harbury, 536 U.S. at 422, the Tenth Circuit concluded in Jennings v. Stillwater that the plaintiff had failed to identify a remedy.  See Jennings v. Stillwater, 383 F.3d at 1209.  The plaintiff had previously sought and obtained damages against the football players and Oklahoma State University in a civil tort action; thus, the Tenth Circuit determined that the only damages she could obtain through a backward-looking court access action were damages that had already successfully been awarded.  See 383 F.3d at 1209.  Accordingly, the plaintiff's backward-looking court access claim failed.  See 383 F.3d at 1209.

In Lynch v. Barrett, a plaintiff brought a § 1983 action against the City of Denver, Colorado and its police officers, alleging violations of his right to court access for failing to disclose information, and for the adoption of a policy and practice "that precipitated the

'conspiracy of silence' waged against him." 703 F.3d at 1155. The plaintiff had already litigated the underlying claim of excessive force in court and was alleging that the defendants' failure to disclose "who had exercised excessive force against him in the course of an arrest" had resulted in the loss of the case. 703 F.3d at 1155, 1157. The Tenth Circuit stated that the plaintiff's backward-looking court access claim was "ripe for adjudication," because the underlying claim had been unsuccessfully litigated and the plaintiff's opportunity to recover on the underlying claim had thus been lost. 703 F.3d at 1157. Unlike in Jennings v. Stillwater, the Tenth Circuit found that the plaintiff was now seeking relief against the defendants "that is unavailable in his underlying claim for excessive force." 703 F.3d at 1157.

Here, A.M. has not previously litigated the underlying claims against the Individual DOH Defendants, rendering this case factually distinguishable from Lynch v. Barrett, 703 F.3d 1153, and Jennings v. Stillwater, 383 F.3d 1199. Both Lynch v. Barrett and Jennings v. Stillwater had underlying claims that had previously been litigated; in both cases, the finding of an actionable backward-looking court access claim hinged on whether the plaintiff had been able to recover for the previously litigated underlying claim. Having recovered damages against the defendants in a prior suit, the plaintiff in Jennings v. Stillwater could not satisfy the remedy element of a backward-looking claim. A.M.'s court access claim, however, mirrors Christopher v. Harbury, 536 U.S. 403, where the plaintiff had not previously litigated the underlying claims. Like the plaintiff in Christopher v. Harbury, A.M. is bringing causes of action for the underlying claims in conjunction with the court access claim. Unlike the complaint in Christopher v. Harbury, however, which failed to identify an underlying claim, A.M.'s Complaint asserts that the denial of court access caused the loss of her underlying claims. A.M. plausibly identifies that, as a result of being unable to object to her transfer and being unable to object to the conditions of her

- 108 -

subsequent confinement at the Homestead House, she suffered almost three decades of harm and lost the opportunity to be confined in a facility that would: (i) be tailored to her needs as a developmentally disabled person; and (ii) not violate her fundamental rights.

In Christopher v. Harbury, the plaintiff amended her complaint at oral argument to include an underlying claim of intentional infliction of emotional distress, but the Supreme Court found that a remedy for the underlying claim could potentially be recovered through the plaintiff's other pending causes of action. See 536 U.S. at 420-21. Here, however, A.M. cannot recover for the lost opportunities and underlying violations, which she suffered as a result of her denial of court access, from the moment of her transfer in 1979 to 1982. As discussed below, generally, the § 1983 proximate causation standard has been clearly established since at least 1983, when the Tenth Circuit decided Miller v. City of Mission, 705 F.2d 368 (10th Cir. 1983), and held that government officials can be held liable under § 1983 if they "set in motion a series of events by others which they reasonably should have known would result" in a constitutional violation, 705 F.2d at 375. On June 18, 1982, Youngberg v. Romeo, 457 U.S. at 324, put the state and its agents on notice that they had to provide substantive due-process protections to all developmentally disabled individuals involuntarily committed to state custody -- regardless of their physical location. The Court has held that the law pertaining to A.M.'s alleged procedural due-process violations was clearly established as of 1983, and that the law pertaining to A.M.'s alleged substantive due-process violations was clearly established as of 1983.[20]   Accordingly, A.M. will presently be able to recover damages against the Individual DOH Defendants for her substantive due-process cause of action from 1982 onward, and for her procedural due-process

---

[20]See the Court's Memorandum Opinion and Order on A.M.'s substantive due-process claims, filed December 5, 2014, and the Court's Memorandum Opinion and Order on A.M.'s procedural due-process claims, filed December 7, 2015.

cause of action from 1983 onward.[21]  Qualified immunity bars the procedural and substantive due-process claims for violations that occurred between A.M.'s discharge, in 1979, and 1983. Because A.M. cannot otherwise recover for the constitutional violations that occurred between 1979 and 1982, A.M. meets the backward-looking claim remedy element under Christopher v. Harbury.  On a backward-looking court access claim, A.M. can recover damages for the violations that occurred from the time of her discharge in 1979 until 1982.  From 1982 and 1983 onward, A.M. will presently be able to recover damages for the violations of her constitutional rights through her existing substantive and procedural due-process claims.

Had A.M. been able to dispute her transfer in 1979, she could have been placed in a setting suited to her disabilities.  Instead, she was transferred to a home for the elderly without an opportunity to object.  Had A.M. been subject to judicial review or some form of oversight during her commitment with M. Evans, and had she been given the opportunity to meet with a legal representative, she could have brought the underlying claims of abuse and neglect sooner. While A.M. is bringing underlying claims against the Individual DOH Defendants today, and while she may recover on those claims, she cannot -- through the parallel causes of action -- recover for the lost opportunity to be placed with a better facility in 1979 or for the violation of constitutional rights up until 1983, when the substantive and due-process claims become available for recovery.

A.M. also plausibly demonstrates that the Individual DOH Defendants denied her the minimal court access requirements which Ward v. Kort set forth, which are grounded in years of

---

[21]As a general matter, the Court held that A.M. cannot recover for her procedural due-process violations from 1983 onward, but that she can recover for her entitlements under the New Mexico Mental Health and Disabilities Act -- education, training, and habilitation services – which are property rooted constitutional interests.  See Memorandum Opinion and Order on A.M.'s procedural due-process claims, filed December 7, 2015.  A.M., therefore, would not be able to seek recovery for these entitlements through her court access cause of action.

prisoner court access doctrine. In Ward v. Kort, the Tenth Circuit held that the contract for legal representation between the state hospital and a law firm was insufficient to comply with the constitutional requirements of meaningful access to the courts. See 736 F.2d at 860. The assistance provided in that case by attorneys under contract with the Colorado State Hospital did not include preparation of a federal habeas corpus or civil rights complaint, "or close guidance by counsel of hospital inmates through the completion of such complaints for asserting a constitutional claim, with adequate research." 762 F.2d at 860. The Tenth Circuit concluded, therefore, that the means for court access were "clearly inadequate under the constitutional standard" of Bounds v. Smith. Ward v. Kort, 762 F.2d at 860. While committed to the Homestead House, A.M. did not have any access to legal aid or representation. While Bounds v. Smith requires that states adopt either a law library or legal assistance to provide inmates with effective, adequate, and meaningful access to the courts, A.M. was provided with no means for legal aid. Under Ward v. Kort, the alleged level of A.M.'s access to the courts during confinement was "clearly inadequate," 762 F.2d at 860, as her access to the courts was null, and thus, far less than that of the plaintiff in Ward v. Kort. In sum, the Court finds that A.M. has an actionable backward-looking claim. A.M. has identified an actual injury and an identifiable remedy under Christopher v. Harbury's procedural requirements for the violation of her right of access to the courts from 1979 to 1982, except for the education, training and habilitation services that she was denied during that time period.

C.     THE INDIVIDUAL DOH DEFENDANTS DIRECTLY AND PROXIMATELY CAUSED M. EVANS' VIOLATION OF A.M.'S RIGHT OF ACCESS TO THE COURTS.

The Individual DOH Defendants directly violated A.M.'s right of access to the courts when they transferred her to the Homestead House without an opportunity to object. Further, the

Individual DOH Defendants should have known that their transfer of A.M. to the Homestead House, and their failure to properly supervise M. Evans after the transfer was completed, would result in M. Evans' deprivation of A.M.'s right of access to the courts.

Section 1983 attaches liability for a state actor who "subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges or immunities secured by the Constitution."  42 U.S.C. § 1983.  See, e.g., Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978)("Anyone who 'causes' any citizen to be subjected to a constitutional deprivation is also liable.  The requisite causal connection can be established . . . by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury."); Trask v. Franco, 446 F.3d at 1046 ("Thus, Defendants are liable for the harm proximately caused by their conduct.").

The Tenth Circuit's analysis of proximate causation for § 1983 liability has established three elements.  First, the state agent must have "set in motion" the series of events that resulted in a constitutional violation.  Trask v. Franco, 446 F.3d at 1046.  Second, the state agent must have known, or reasonably should have known, that the events he or she set in motion would result in a constitutional deprivation.  See Trask v. Franco, 446 F.3d at 1046.  Finally, no unforeseeable intervening and superseding act occurred between the events that the state agent set into motion and the ultimate constitutional violation.  See Trask v. Franco, 446 F.3d at 1046 (quoting RESTATEMENT (SECOND) OF TORTS § 442 (1965)).

The Tenth Circuit has decided a broad array of cases that detail the contours of § 1983 proximate causation liability.  In Martinez v. Carson, 697 F.3d 1252 (10th Cir. 2012), the Tenth Circuit held liable two New Mexico Department of Corrections officers, who worked as adjuncts on a task force with the Rio Rancho Department of Public Safety in Rio Rancho, New Mexico,

for Fourth Amendment violations that Rio Rancho officers committed against detainees whom the corrections officers initially detained and transferred.  See 697 F.3d at 1255.  The corrections officers unlawfully detained the plaintiffs for fewer than three minutes before transferring them to the Rio Rancho officers' custody for further investigation.  See 697 F.3d at 1254.  The Rio Rancho officers subsequently arrested and booked the plaintiffs.  See 697 F.3d at 1254.  The Rio Rancho officers unlawfully held one plaintiff for twelve hours and the other for five hours.  See 697 F.3d at 1254.  In an opinion that the Honorable Monroe G. McKay, United States Circuit Judge for the Tenth Circuit, authored, and Judges Lucero and Gorsuch joined, the Tenth Circuit held that the corrections officers were liable for the Rio Rancho officers' Fourth Amendment violation, because their initial unlawful seizure of the plaintiffs "set in motion a series of events" that the corrections officers "knew or reasonably should have known" would result in others depriving the plaintiffs of their constitutional rights.  697 F.3d at 1255 (quoting Trask v. Franco, 446 F.3d at 1046).  Judge McKay wrote:

> Plaintiffs' arrests and prolonged detentions would not have occurred had Defendants not seized them and transferred them to the custody of Rio Rancho officers. . . .  Although Defendants may not have foreseen the full extent of the detention, a jury could certainly find that they foresaw at least some additional period of detention while, for instance, the Rio Rancho officers conducted an investigation into probable cause.

Martinez v. Carson, 697 F.3d at 1255-56.  The Tenth Circuit remanded the case to the district court to allow a jury to determine the extent of the corrections officers' liability for the constitutional violation that the Rio Rancho officers committed by allowing the jury to consider evidence presented on the foreseeability of the extended detention.  See 697 F.3d at 1256.

The proximate causation standard under § 1983, however, extends beyond the scope of Fourth Amendment violations.  The Tenth Circuit has recognized proximate causation liability for First, Eighth, and Fourteenth Amendment violations.  Northington v. Marin, 102 F.3d 1564

(10th Cir. 1996), involved an Eighth Amendment claim for the prison guards' failure to protect an inmate from other prisoners' abuses after prison guards spread rumors among the inmates that the plaintiff was a "snitch."   102 F.3d at 1567.   In an opinion that the Honorable Mary B. Briscoe, United States Circuit Judge for the Tenth Circuit, authored, and Judges Baldock and Logan joined, the Tenth Circuit held that the guards' act of spreading a rumor about the plaintiff was the proximate cause of his beatings and of a constitutional violation that § 1983 law recognizes.   See 102 F.3d at 1569.   The Tenth Circuit stated that the guards' defense -- that their intent in spreading the rumor was to protect other inmates from harm through association with the plaintiff rather than to cause harm to the plaintiff -- failed because the defendants "knew the probable result would be that [the plaintiff] would be beaten."   102 F.3d at 1568.

Lippoldt v. Cole, 468 F.3d 1204 (10th Cir. 2006), involved First Amendment violations that occurred when the Wichita, Kansas, police chief denied numerous applications for public parade permits for a group of abortion protesters.   See 468 F.3d at 1209-10.   In an opinion that Judge Briscoe authored, and Judges McWilliams and Ebel joined, the Tenth Circuit held that other city officials who did not directly deny the permit requests, but played a role in the applications' consideration, proximately caused the First Amendment violation.   See 468 F.3d at 1220.   The Tenth Circuit found that a city official who researched legal standards upon which the police chief relied to deny the parade permits, and a deputy police chief who signed at least one of the permit denials on the police chief's behalf, had set in motion the First Amendment violation.   See 468 F.3d at 1219-20.   Judge Briscoe reasoned that the city officials who proximately caused the First Amendment violations were held liable under §1983, because the fact "[t]hat conduct of other people may have concurrently caused the harm does not change the outcome as to [the plaintiffs]."   468 F.3d at 1220.

Miller v. City of Mission involved a § 1983 claim that members of the Mission, Kansas, city council violated the city police chief's Fourteenth Amendment procedural due-process rights when they encouraged the mayor to fire him without a termination hearing.  See Miller v. City of Mission, 705 F.2d at 371-72.  In an opinion that the Honorable Stephanie K. Seymour, United States Circuit Judge for the Tenth Circuit authored, and Judge McWilliams joined, the Tenth Circuit said: "Ample evidence supports the jury's inference that the mayor would not have dismissed [the police chief] without a hearing absent the support and encouragement of defendant council members."  705 F.2d at 376.  The Tenth Circuit held that the city council members' advice to the mayor proximately caused the procedural due-process violation.  See 705 F.2d at 375-76.  The Tenth Circuit explained that, at a minimum, the city council members "set into motion a series of events by others which they reasonably should have known would have resulted in [the police chief's] dismissal without a hearing."  705 F.2d at 375.

A.M. plausibly alleges that the Individual DOH Defendants proximately caused M. Evans' violation of A.M.'s right of access to the courts, because their collective transfer of A.M. to the Homestead House "set in motion," Martinez v. Carson, 697 F.3d at 1255, the series of events that "cause[d] [A.M.] to be subjected," 42 U.S.C. § 1983, to a denial of court access at M. Evans' hands.   The Complaint alleges that the Individual DOH Defendants collectively "abandoned" A.M. when they transferred her from a state care facility to the Homestead House, where A.M. was deprived of adequate safety, social services, government benefits, medical and rehabilitative care, and "her basic human rights."  Complaint ¶ 85, at 23.  In particular, Schaefer, the lawyer for the New Mexico Department of Health and the Training School, "participated in deciding" to place A.M. at the Homestead House.  Complaint ¶ 58, at 15-16.  Sandoval, the Director of Resident Living at the Training School, was personally "responsible for determining

the suitability of placements" for A.M., and was responsible for "supervising and monitoring" A.M. after her transfer.  Complaint ¶ 16, at 5-6.  Adams, the Deputy Administrator for the Training School, personally participated in the decision to transfer A.M. to the Homestead House "without taking any steps to ascertain whether she would be safe."  Complaint ¶ 18, at 6. Mateju, the Training School Administrator, made the "final decisions" on "all placement and discharge decisions" for A.M.  Complaint ¶ 20, at 7.

A.M. alleges that the Individual DOH Defendants, collectively, did not conduct a home visit at the Homestead House before A.M.'s transfer, see Complaint ¶ 62, at 17, and "were deliberately indifferent to the need to investigate the Homestead House prior to placing" her there, Complaint ¶ 75, at 20.  The Individual DOH Defendants approved the arrangement with the Homestead House that allowed M. Evans to keep A.M.'s federal benefits, but still "force her to work in return for a place to live."  Complaint ¶ 95, at 25.  Further, Individual DOH Defendants failed to establish any system "to provide oversight" to third-party placements like the Homestead House.  Complaint ¶ 64, at 18.  The Individual DOH Defendants "were deliberately indifferent to the likelihood that Plaintiff . . . would lose federal and constitutional rights."  Complaint ¶ 95, at 25.  State agency officials later shut down the unlicensed Homestead House, but the Individual DOH Defendants were indifferent to the need to find A.M. a new care facility.  See Complaint ¶ 97, at 25.  Instead, the Individual DOH Defendants allowed A.M. to be transferred to M. Evans' private residence.  See Complaint ¶ 98, at 25-26.

The Individual DOH Defendants do not address A.M.'s allegation that placing her in M. Evans' care and failing to oversee that care caused A.M. to be subjected to a third party's violation of the right to court access.  Instead, the Individual DOH Defendants argue that A.M. was no longer in state custody after 1979, an assertion with which this Court disagrees.  The

Individual DOH Defendants, acting under color of state law, should have foreseen that transferring a thirty-two-year-old, developmentally disabled woman to live at an unlicensed group home for the elderly, without arrangements for funding from the State of New Mexico to pay for her care,[22] would result in A.M. being denied adequate, effective, and meaningful access to the courts.  See Complaint ¶ 64, at 18; id. ¶ 95, at 25.

The Individual DOH Defendants' transfer of A.M. to the Homestead House under the alleged circumstances was more egregious than the transfer of custody in Martinez v. Carson. See 697 F.3d at 1256.  Like the unconstitutional detention in Martinez v. Carson, the violation of A.M.'s right of access to the courts "would not have occurred but for their conduct" of allowing M. Evans to isolate A.M. at the Homestead House.  Martinez v. Carson, 697 F.3d at 1255.  See Complaint ¶ 64, at 18; id. ¶ 95, at 25.   "The requisite causal connection is satisfied if [the Individual DOH Defendants] set in motion a series of events that [the Individual DOH Defendants] knew or reasonably should have known would cause others to deprive [A.M.] of [her] constitutional rights."  Martinez v. Carson, 697 F.3d at 1255 (quoting Trask v. Franco, 446 F.3d at 1046).

Also, like the transfer of police custody in Martinez v. Carson, there is no unforeseeable intervening and superseding act that precludes the Individual DOH Defendants' proximate causation of A.M.'s constitutional violation, because the Individual DOH Defendants' transfer of

---

[22]The Complaint alleges that the arrangement between the New Mexico Department of Health and the Homestead House authorized M. Evans to keep A.M.'s Social Security checks for herself, while expecting A.M. would work "in return for a place to live."  Complaint ¶ 95, at 25. The Individual DOH Defendants might be alleging that assigning A.M.'s Social Security funds to M. Evans was sufficient to pay for A.M.'s food, shelter and care.  Setting aside whether such a transfer of an individual's Social Security funds was legal, the State of New Mexico and its Department of Health -- which remain legally responsible for A.M. -- were paying nothing from their coffers to ensure that the Homestead House was meeting A.M.'s basic needs.

A.M. to the Homestead House's care played out as they "approved."  Complaint ¶ 95, at 25.  See Martinez v. Carson, 697 F.3d at 1255.

That M. Evans was not a state actor does not shield the Individual DOH Defendants from proximate causation liability under § 1983.  The Tenth Circuit recognized in Northington v. Marin that state actors can be held liable for proximately causing constitutional violations that private third parties committed, if the state actor set the harm into motion.  See 102 F.3d at 1569.  The Individual DOH Defendants' direction for M. Evans, as a private party, to provide for A.M. without state funding, see Complaint ¶ 95, at 25, was similar to the other prison inmates in Northington v. Marin, to whom prison guards warned that the plaintiff inmate was a snitch, see 102 F.3d at 1569.  State actors did not direct M. Evans, or the inmates who ultimately beat the plaintiff in Northington v. Marin, to cause a constitutional violation.  The actions that the Individual DOH Defendants took, however, by allegedly transferring A.M. to an unlicensed facility for the elderly without arranged state funding or a system for monitoring A.M.'s care, made the possibility that A.M. would be denied court access at the Homestead House just as foreseeable as the inmates' beating when prison guards tipped off that there was a snitch in their ranks.  See Complaint ¶ 64, at 18; id. ¶ 86, at 23; Northington v. Marin, 102 F.3d at 1568-69.  Like the prison guards who knew that labeling an inmate a snitch would likely result in beatings, the Individual DOH Defendants were aware of the ongoing violation of A.M.'s constitutional rights.  See Complaint ¶ 91, at 24.

Similar to the city workers in Lippoldt v. Cole and Miller v. City of Mission, who provided advice or clerical work on decisions that ultimately resulted in constitutional violations, each of the Individual DOH Defendants who personally contributed to the decision-making process to transfer A.M. to the Homestead House without an adequate system to monitor her care

proximately caused M. Evans' violation of A.M.'s right of access to the courts.  See Complaint ¶ 64, at 18; id. ¶ 95, at 25.  As the Tenth Circuit stated in Lippoldt v. Cole, "[t]hat conduct of other people may have concurrently caused the harm does not change the outcome as to [A.M.]."  468 F.3d at 1220.  The Tenth Circuit's holding in Lippoldt v. Cole stands for two interpretations of proximate causation liability under § 1983 that apply to this case.  First, that M. Evans violated A.M.'s right of access to the courts does not insulate the Individual DOH Defendants from liability under §1983 for laying the groundwork for those constitutional violations to occur. Second, that Mateju made the "final decisions" on A.M.'s transfer, Complaint ¶ 20, at 7, does not shield Schaefer, Sandoval, and Adams from liability, because A.M. sufficiently alleges that they each personally contributed in some way to the decision making process of transferring A.M. to the Homestead House.  See Complaint ¶ 16, at 6; id. ¶ 18, at 6; id. ¶ 58 at 15-16.

A.M. therefore plausibly alleges that the Individual DOH Defendants proximately caused the violation of A.M.'s right of access to the courts and that they may be liable under § 1983 for that constitutional violation, because the Individual DOH Defendants should have known -- collectively and individually -- that their transfer of A.M. to the Homestead House without state funding arrangements, see Complaint ¶ 95, at 25, and their failure to oversee M. Evans thereafter, see Complaint ¶ 64, at 18, would result in the deprivation of A.M.'s right of access to the courts.[23]

_____

[23]The Individual DOH Defendants argued at the Thirteenth Amendment claim hearing that the Court should apply the legal analyses used in substantive due-process claims to establish state actors' liability for the acts of non-governmental third parties -- the special-relationship doctrine and the danger-creation exception -- to A.M.'s Thirteenth Amendment claim.  The Court did not apply those substantive due-process tests to the Thirteenth Amendment claim, and will not do so with the court access claim, for three reasons.  First, to apply substantive due-process exceptions to the right of access to the courts is unprecedented -- the Court cannot find any case where the court applies the substantive due-process special-relationship doctrine or danger creation exception to a right of access to the courts.  Second, substantive due-process

## II.    ALTHOUGH A.M. HAD A CONSTITUTIONAL RIGHT OF COURT ACCESS BEGINNING IN 1985, QUALIFIED IMMUNITY SHIELDS THE INDIVIDUAL DOH DEFENDANTS FROM LIABILITY.

The Individual DOH Defendants, in their MTD, assert that they are entitled to qualified immunity from A.M.'s claims, because "[q]ualified immunity shields state officials from liability for civil damages if they violate a plaintiff's federally protected rights so long as the state officials did not violate clearly established law."  MTD at 2 (citing Anderson v. Creighton, 483 U.S. at 638-39).  The Court agrees that the Individual DOH Defendants cannot properly be held liable for the violation of A.M.'s right of access to the courts that occurred upon her discharge to the Homestead House in 1979, because the right of access to the courts possessed by involuntarily committed, developmentally disabled persons was not clearly established until 1985.  Additionally, the Court agrees that the Individual DOH Defendants are not liable for

---

tests should not apply in cases where a narrower constitutional test is available.  This holding does not affect the Court's prior ruling that A.M.'s substantive due-process rights were violated, because the earlier analysis evaluated different conduct, specifically that the Individual DOH Defendants allegedly failed to protect A.M.'s right to safety and treatment.  See A.M. ex rel. Youngers v. N.M. Dep't of Health, No. CIV 13-0692 JB/WPL, 2014 WL 6969684, at *36 (D.N.M. Dec. 5, 2014)(Browning, J.).   The court access claim evaluates the court access violations that the Individual DOH Defendants and M. Evans caused.  Finally, the special-relationship doctrine and the danger creation exception are established to hold state actors liable for conduct where there is no causation, an unnecessary tool here because the Individual DOH Defendants proximately caused M. Evans' violation of A.M.'s court access right.

Even if these doctrines apply in court access cases generally, they do not dictate a different result in this case, in particular, because the Court previously established that the Individual DOH Defendants' legal custody of A.M. created a special relationship.  See A.M. ex rel. Youngers v. N.M. Dep't of Health, 2014 WL 6969684, at *37-45 (concluding that the special relationship doctrine applies to the Individual DOH Defendants' responsibility for A.M., that the danger creation exception does not apply to the Individual DOH Defendants' conduct, and denying, in part, the Individual DOH Defendants MTD for A.M.'s substantive due-process claim).  In other words, the Court's earlier findings that the Individual DOH Defendants had a special relationship with A.M. means that relationship would have been sufficient to hold them liable for M. Evans' violation of A.M.'s court access right if proximate causation was not established, because the special relationship doctrine operates in place of the causation element, rather than establishing the underlying constitutional violation.

- 120 -

proximately causing the violation of A.M.'s right of access to the courts that M. Evans committed, beginning in 1985, because it is not clearly established, even today, that a state actor can proximately cause a private person's right-of-access-to-the-courts violation.

### A. THE INDIVIDUAL DOH DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY FROM A.M.'S DISCHARGE IN 1979 TO 1985, WHEN THE RIGHT OF ACCESS TO THE COURTS FOR INVOLUNTARILY COMMITTED PERSONS WAS CLEARLY ESTABLISHED.

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818). Qualified immunity also shields state actors who have "reasonable, but mistaken beliefs," and operates to protect state actors from the sometimes "hazy border" of the law. Saucier v. Katz, 533 U.S. at 205. When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct. See Saucier v. Katz, 533 U.S. at 205.

"A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'" Lobozzo v. Colo. Dep't of Corr., 429 F. App'x at 710 (quoting Zweibon v. Mitchell, 720 F.2d at 172-73). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d at 923. See Medina v. City & Cnty. of Denver, 960 F.2d at 1498. "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of

the right [were] sufficiently clear that a reasonable official would understand that [the proposed conduct] . . . violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (quoting Saucier v. Katz, 533 U.S. at 202). Moreover, public officials are not expected to tailor their conduct to account for future changes in the law. See Gomes v. Wood, 451 F.3d at 1134. "If the law is not clearly established, we do not require officials to anticipate its future developments." Gomes v. Wood, 451 F.3d at 1134 (internal quotation marks omitted).

The Supreme Court has clarified that the clearly established prong of the qualified- immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 131 S. Ct. at 2083. While a case directly on point is not required, the Supreme Court has held that "existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 131 S. Ct. at 2083. "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639. "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the volatile nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 131 S. Ct. at 2083. The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs," as to the application of law to facts and operates to protect officers from the sometimes "hazy border" of the law. Saucier v. Katz, 533 U.S. at 205. Without a prior case on point to demonstrate clearly established law, the Tenth Circuit will not

recognize any constitutional right as clearly established if "a distinction [from prior cases] might make a constitutional difference." Kerns v. Bader, 663 F.3d at 1186-87 (emphasis in original).

The Individual DOH Defendants' acts directly, during the 1979 discharge, and proximately, during the subsequent commitment, violated A.M.'s right of access to the courts, satisfying the first step of the Saucier v. Katz analysis. See 533 U.S. at 205. A.M. fails, however, on the second Saucier v. Katz step, because she cannot demonstrate that the right of court access for an involuntarily committed, developmentally disabled person was clearly established at the time of A.M.'s transfer to the Homestead House in 1979, nor through her commitment until 1985. See 533 U.S. at 205.

Qualified immunity shields the Individual DOH Defendants with respect to the violation of A.M.'s right of access to the courts that occurred during A.M.'s discharge in 1979 and through her commitment until 1985. A.M. has identified prisoner court access cases and civil context court access cases that were decided before 1979. Ex parte Hull, 312 U.S. 546, was decided in 1941 and was the first instance in which the Supreme Court recognized the existence of a right of access to the courts in the prisoner context. The right of court access continued to develop in the prisoner context, and in 1977, the Supreme Court held expressly that "it is now established beyond a doubt that prisoners have a constitutional right of access to the courts [. . .] and that such access must be adequate, effective and meaningful." Bounds v. Smith, 430 U.S. at 821-22.

In the early 1970's, the Supreme Court held that indigent plaintiffs were denied the right of court access for fundamental underlying interests, such as marriage, when filing fees prevented the judicial proceedings. See Boddie v. Connecticut, 401 U.S. at 374 ("Our conclusion is that [. . .] due process does prohibit a State from denying, solely because of inability to pay, access to its courts to individuals who seek judicial dissolution of their

marriages"); United States v. Kras, 409 U.S. at 446 (limiting the scope of the right of court access defined in Boddie v. Connecticut to cases involving interests of constitutional significance); Ortwein v. Shwab, 410 U.S. at 659 (affirming limits outlined in United States v. Kras).  In 1979, when A.M. was discharged to the Homestead House that M. Evans ran, the right of access to the courts had only been clearly established in the prisoner context and in the narrow area of indigent civil plaintiffs with underlying fundamental interests that could be resolved only in court.  The right of access to the courts, as it applies to civilly confined persons or disabled persons, was not clearly established on November 12, 1979.

The Court agrees with A.M. that the right of court access for the civilly-confined arose from the prisoner context.  The Supreme Court has recognized that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." Youngberg v. Romeo, 457 U.S. at 321-22.  While civilly confined persons are not committed for penal purposes, both prisoners and civilly confined persons are under state custody.  This link likely prompted the reliance of the Ninth Circuit, in Cornett v. Donovan, 51 F.3d 894, on well-developed federal prisoner court access case law.  See 51 F.3d at 898 (holding that "people who are involuntarily committed to a mental institution" have a right to court access)(citing Johnson v. Avery, 393 U.S. at 485, and Wolff v. McDonnell, 418 U.S. at 579).  Ward v. Kort involved a person who was found not guilty of an offense by reason of insanity, and who was subsequently civilly committed to state custody because of his mental illness.  See Ward v. Kort, 762 F.2d at 857.  The Tenth Circuit held that "plaintiff, as a person under mental commitment, is entitled to protection of his right of access to the courts," noting that there was "no logic in holding that persons under mental commitments like plaintiff are on a lower plane than convicted inmates and

are not entitled to protection of the basic constitutional guarantee of access to the courts." 762 F.2d at 858. Additionally, the district court cases that have relied on Ward v. Kort cite to its expansion of the right to court access principles from the prisoner context to a mentally ill, civilly committed person. See John L. v. Adams, 750 F. Supp. at 291; Robbins v. Budke, 739 F. Supp. 1479; Armstead v. Pingree, 629 F. Supp. at 277; Holly v. Anderson, No. 2008 WL 1773093, at *7.

The Court disagrees with A.M., however, that the transition of this right from the prisoner context into the context of the civilly confined had occurred by 1979. This transition did not occur in the Tenth Circuit until 1985, with the decision of Ward v. Kort. Accordingly, the right of court access for persons who are mentally ill and civilly committed was clearly established in 1985 in the Tenth Circuit. Because the right of access to the courts for the mentally ill, involuntarily committed persons was not clearly established until 1985, the Court grants qualified immunity to the Individual DOH Defendants for the violations to A.M.'s court access right that occurred before 1985.[24]

To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right. See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d at 1327. "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v.

---

[24]As discussed in the section below, the Individual DOH Defendants are shielded by qualified immunity for violations to A.M.'s right of access to the courts that occurred during the entirety of her confinement with M. Evans, even after 1985, because of a lack of clearly established law that state actors can be held liable for proximately causing a private, non-state person or entity's court access violations against an involuntarily committed person.

<u>Doran</u>, 242 F.3d at 923.  The Tenth Circuit held in <u>Kerns v. Bader</u> that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction <u>might</u> make a constitutional difference."  663 F.3d at 1188 (emphasis in original).

In <u>Ward v. Kort</u>, the Tenth Circuit employed broad, but clear, language: "We hold that plaintiff, as a person under a mental commitment, is entitled to protection of his right of access to the courts."  762 F.2d at 858.  Significantly, the Tenth Circuit did not narrow the language to specify that the plaintiff, as a person found not guilty of an offense by reason of insanity and subsequently committed to a state mental institution, possessed a right of access to the courts. <u>See</u> 762 F.2d at 857-58.  Tenth Circuit precedent binds the Court and the Court concludes that the language in <u>Ward v. Kort</u> encompasses a right of access to the courts that A.M. possesses.  <u>Kerns v. Bader</u> instructs that, where "a distinction might make a constitutional difference," the law is not clearly established.  <u>Kerns v. Bader</u>, 663 F.3d at 1188.  The Court does not consider the distinction between a person found not guilty of a criminal offense by reason of insanity and a person who has not been criminally charged, both involuntarily committed to the state by reason of mental illness or disability, to be a constitutionally significant one.  The plaintiff in <u>Ward v. Kort</u> was a person under civil, mental commitment, like A.M.  The plaintiff in <u>Ward v. Kort</u> was not imprisoned and was subject to the same confinement limitations as A.M.  The Tenth Circuit stated explicitly: "there is no logic in holding that persons under mental commitments like plaintiff are on a lower plane than convicted inmates and are not entitled to protection of the basic constitutional guarantee of access to the courts."  <u>Ward v. Kort</u>, 762 F.2d at 858.

In sum, A.M., as a person under mental commitment, was entitled to the "basic constitutional guarantee of access to the courts," <u>Ward v. Kort</u>, 762 F.2d at 858, since 1985.

Before 1985, neither the Tenth Circuit nor the Supreme Court had applied the right of access to the courts to persons under mental commitment.  The contours of the right of access to the courts were not "sufficiently clear that every reasonable official would have understood that what he is doing violates that right" until 1985.  Ashcroft v. al-Kidd, 131 S. Ct. at 2083.  As such, the Individual DOH Defendants are entitled to qualified immunity for the violations of A.M.'s right of access to the courts from the time of her discharge, in 1979, until the right was clearly established in the Tenth Circuit in 1985 by Ward v. Kort.

**B. THE INDIVIDUAL DOH DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY FOR THE ENTIRETY OF A.M.'S CONFINEMENT WITH M. EVANS, EVEN AFTER 1985, BECAUSE PROXIMATE CAUSATION OF A PRIVATE THIRD PARTY'S VIOLATION OF THE RIGHT OF ACCESS TO THE COURTS HAS NOT BEEN CLEARLY ESTABLISHED.**

As discussed, the Individual DOH Defendants' acts directly, during the 1979 discharge, and proximately, during the subsequent commitment, violated A.M.'s right of access to the courts, satisfying the first step of the Saucier v. Katz analysis.  See Saucier v. Katz, 572 F.3d at 1107.  A.M. fails, however, on the second Saucier v. Katz step for violations occurring during her commitment after 1985, despite Ward v. Kort, because she cannot demonstrate that proximate causation of a court access violation has ever been clearly established.  See Saucier v. Katz, 572 F.3d at 1107.

Qualified immunity shields the Individual DOH Defendants with respect to the proximately caused violations that occurred throughout A.M.'s confinement with M. Evans. A.M. has not identified, and the Court cannot find, another case where the § 1983 proximate causation standard imparted liability in a court access claim against a state actor for conduct that a private third party committed.  A.M. contends that her right of court access was clearly established before her discharge in 1979, see Response at 9, but does not discuss whether the

proximate causation of a third party's court access violation was ever clearly established. Consequently, A.M.'s claim that her court access right in this case was clearly established addresses only half of the analysis. She addresses the underlying court access violation, but does not mention the § 1983 proximate causation standard required to hold the Individual DOH Defendants liable for M. Evans' constitutional violations.

Had the Individual DOH Defendants personally operated the Homestead House and prevented A.M. from accessing the courts, the clearly established law would be sufficient to hold state actors liable for violations of A.M.'s right of access to the courts which they personally committed from 1985 forward. A.M. does not address, however, that connecting her court access violation to the Individual DOH Defendants' indirect act requires a second prong of analysis: showing that proximate causation of court access violations also was clearly established. The law was not clearly established by 1979, and still is not clearly established.

Generally, the § 1983 proximate causation standard has been clearly established since at least 1983, when the Tenth Circuit decided Miller v. City of Mission and held that government officials can be held liable under § 1983 if they "set in motion a series of events by others which they reasonably should have known would result" in a constitutional violation. 705 F.2d at 375. That case did not, however, involve a court access violation. See Miller v. City of Mission, 705 F.2d at 370. Instead, Miller v. City of Mission related to constitutional violations under the Fourteenth Amendment. See 705 F.2d at 370. Other cases that the Tenth Circuit has decided since Miller v. City of Mission added constitutional violations under the First, Fourth, and Eighth Amendments to the list of claims where the § 1983 proximate causation standard can be applied, but none addressed the right of access to the courts. See Snell v. Tunnell, 920 F.2d at 673(holding a state social worker liable for illegal search and Fourth Amendment violation

committed by police officers to whom the social worker provided inaccurate information); Lippoldt v. Cole, 468 F.3d at 1204 (holding city workers liable for First Amendment violations that the city police chief proximately caused); Northington v. Marin, 102 F.3d at 1564 (holding department of corrections officers liable for Eighth Amendment violations proximately caused by inmates who officers told that plaintiff inmate was a "snitch").

Courts within the Tenth Circuit evaluating qualified immunity defenses rarely have analyzed whether the general § 1983 proximate causation standard was clearly established. Instead, courts typically have addressed only the underlying constitutional violation without discussing whether the proximate causation standard is clearly established in that context. See Snell v. Tunnell, 920 F.2d at 698 ("We need not decide the precise contours of the fourth amendment standard that would apply . . . because the conduct alleged in these cases would violate the most minimal standard of which we can conceive."); Trask v. Franco, 446 F.3d at 1043 (denying qualified immunity, but analyzing only that "the law regarding a warrantless search was clearly established"); Buck v. City of Albuquerque, 549 F.3d 1269, 1286-87 (10th Cir. 2008)(denying qualified immunity, because "issuance of arrest orders, when on notice that probable cause was lacking, was a violation of a clearly established right"). In just one instance, the question whether § 1983 proximate causation was clearly established factored into the qualified immunity analysis in the Tenth Circuit. See Dalcour v. City of Lakewood, No. CIV 08-00747 MSK/KLM, 2009 WL 3162235, at *5 (D. Colo. Sept. 30, 2009)("The Court finds that the right to be free from an unlawful search was clearly established at the time of the alleged violation . . . Case law also recognized that a series of events could satisfy the causal connection in a § 1983 claim.")(citing Snell v. Tunnell, 920 F.2d at 700)).

Kerns v. Bader set a rigorous standard limiting the extent to which district courts can recognize any law as clearly established without a case on point.  That no court -- the Supreme Court, the Tenth Circuit, or any other circuit court -- has applied the § 1983 proximate causation standard to a right of access to the courts claim requires the Court to rely upon Kerns v. Bader to consider whether the law was clearly established in 1979 when the Individual DOH Defendants transferred A.M. to the Homestead House, or at any point thereafter.  See 663 F.3d at 1186.  The constitutional violation alleged to be proximately caused under § 1983 is "a distinction [that] might make a constitutional difference," Kerns v. Bader, 663 F.3d at 1187 (emphasis in original), when evaluating whether "the contours of a right [were] sufficiently clear that every reasonable official would have understood that what he is doing violates that right," Ashcroft v. al-Kidd, 131 S. Ct. at 2083.  That Tenth Circuit law means that a general application of § 1983 proximate causation to constitutional violations other than the right of access to the courts is insufficient to show that such a claim was "so thoroughly developed and consistently recognized under the law of the jurisdiction as to be indisputable and unquestioned" in 1979 when the Individual DOH Defendants transferred A.M. to the Homestead House under M. Evans' watch.  Lobozzo v. Colo. Dep't of Corr., 429 F. App'x at 710 (internal quotation marks omitted).  Moreover, in cases where the law was not clearly established at the time of the conduct, the Tenth Circuit does not require officials to "anticipate its future developments," Gomes v. Wood, 451 F.3d at 1134 (internal quotation marks omitted), so the Individual DOH Defendants would have had no reason to assume that an extension of proximate causation liability to court access violations was reasonable or imminent when they transferred A.M. to the Homestead House in 1979.

Judge Mechem's ruling that the mentally ill, civilly confined patients of LVMC's right of access to the courts was clearly established in the related case, see Robbins v. Burke, does not

require a different result, despite that it was decided before Kerns v. Bader.  That case did not

address whether court access violations were proximately caused.  The LVMC patients were

committed to a state hospital in which state officials had direct oversight and ownership.  A.M.

was discharged in 1979 and committed to a third-party placement; despite remaining in the

state's custody, A.M.'s care had been entrusted to a third party.  A.M.'s third-party placement is

a valid constitutional difference.   Moreover, even if Judge Mechem addressed proximate

causation, the 1990 ruling in Robbins v. Burke is insufficient to establish that the law was clearly

established in 1979 when A.M. was transferred from Fort Stanton to the Homestead House.

Similarly, the plaintiff in Ward v. Kort, 762 F.2d at 857, was committed to a state hospital and

not to a third-party placement.  Despite being a binding Tenth Circuit case, Ward v. Kort did not

address the question of proximate causation of the court access violation.

　　　　The hard but clear consequence of Kerns v. Bader is that nuanced factual distinctions can

create an often near-insurmountable hurdle for plaintiffs attempting to overcome a qualified

immunity defense without an analogous precedent.   Barring the Court from finding that a

constitutional right was clearly established where causation creates "such a distinction [that]

might make a constitutional difference," 663 F.3d at 1187 (emphasis in original), means the

Court cannot consider Ward v. Kort, or any of the existing court access cases in the prisoner or

civil context, to have clearly established the proximate causation of A.M.'s constitutional right of

access to the courts.

　　　　A secondary consequence of Kerns v. Bader is that constitutional protections are unlikely

to develop in the Tenth Circuit beyond where they stood at the time the case was decided.  Since

2011, dozens of cases have cited Kerns v. Bader to guide their analysis of clearly established law

in light of their factual distinctions with prior cases.  See, e.g., Reid v. Pautler, 36 F. Supp. 3d

1067, 1203 (D.N.M. 2014)(Browning, J.)(drawing distinction in Fourth Amendment claim between conduct of probation officer defendant and prior case law involving police officers); Kvech v. N.M. Dep't of Pub. Safety, 987 F. Supp. 2d 1162, 1216 (D.N.M. 2013)(Browning, J.)(noting that out-of-state sex offender status might alter constitutional protections in New Mexico); Tanner v. San Juan Cnty. Sheriff's Office, 864 F. Supp. 2d 1090, 1152 (D.N.M. 2012)(Browning, J.)(noting that having a second criminal offender on scene changed defendant police officer's obligation to intervene in second officer's use of excessive force).  Applying the Kerns v. Bader standard where any distinction that might make a constitutional difference is too significant to find the law clearly established, courts applying that precedent consistently have sought out nuanced factual distinction with the prior case law and granted qualified immunity for lack of clearly established law.

The Kerns v. Bader standard bars a ruling in A.M.'s favor and requires that the Individual DOH Defendants' qualified immunity defense stands.  The Individual DOH Defendants could have recognized that barring A.M. from the judicial process -- as occurred in Robbins v. Burke and Cornett v. Donovan -- would violate A.M.'s right of access to the courts.  They could not reasonably have recognized, given the lack of clearly established law, that allowing M. Evans to block A.M.'s access to the courts violated her constitutional rights.

**IT IS ORDERED** that the Individual DOH Defendants' Motion to Dismiss Plaintiff's Court Access Claims Under the First and Fourteenth Amendments, filed June 23, 2014 (Doc. 45)("MTD"), is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

John Ford Hall
Kelly K. Waterfall
Law Offices of Peter Cubra
Albuquerque, New Mexico

--and--

Nancy L. Simmons
Albuquerque, New Mexico

 *Attorneys for the Plaintiff*

Stephen S. Hamilton
Alexia Constantaras
Montgomery & Andrews, P.A.
Albuquerque, New Mexico

 *Attorneys for the Defendants*