# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

A.M., through her Guardian ad Litem,
JOLEEN YOUNGERS,

      Plaintiff,

vs.                                                                      No. CIV 13-0692 JB/WPL

NEW MEXICO DEPARTMENT OF HEALTH;
LOS LUNAS CENTER FOR PERSONS WITH
DEVELOPMENT DISABILITIES;
ROGER ADAMS, individually and in his capacity
as an agent for the New Mexico Department of Health;
BETH SCHAEFER, individually and in her capacity
as an agent for the New Mexico Department of Health;
DAN SANDOVAL, individually and in his capacity
as an agent for the New Mexico Department of Health;
JOSEPH MATEJU, individually and in his capacity
as an agent for the New Mexico Department of Health;
NEW MEXICO AGING AND LONG-TERM SERVICES
DEPARTMENT; and THE ADULT PROTECTIVE
SERVICES DIVISION OF NEW MEXICO AGING
AND LONG-TERM SERVICES DEPARTMENT,

      Defendants.

## <u>MEMORANDUM OPINION</u>[1]

**THIS MATTER** comes before the Court on the Individual DOH Defendants' Motion to

Dismiss Plaintiff's Procedural Due Process Claim on the Basis of Qualified Immunity, filed

October 1, 2014 (Doc. 57)("MTD"). The Court held a hearing on November 25, 2014. The

primary issues are: (i) whether Defendants Dan Sandoval, Roger Adams, Joseph Mateju, and

---

[1]On September 24, 2015, the Court entered an order granting in part and denying in part
the Individual DOH Defendants' Motion to Dismiss Plaintiff's Procedural Due Process Claims
on the Basis of Qualified Immunity, filed October 1, 2014 (Doc. 57). <u>See</u> Order, filed September
24, 2015 (Doc. 115)("Order"). In the Order, the Court stated that it would "at a later date issue a
Memorandum Opinion more fully detailing its rationale for this decision." Order at 1. n.1. This
Memorandum Opinion is the promised opinion.

Beth Schaefer (collectively "Individual DOH Defendants") violated Plaintiff A.M.'s procedural due process rights under the Fourteenth Amendment to the Constitution of the United States of America when they transferred A.M. to the Homestead House, a private unlicensed group shelter for elderly people; and (ii) whether qualified immunity protects the Individual DOH Defendants. The Court will deny the MTD in part and grant it in part.  The Court concludes that the Individual DOH Defendants violated A.M.'s Fourteenth Amendment procedural due-process rights.  Through her transfer to the Homestead House and later under M. Evans' care, A.M. was deprived of various constitutionally protected liberty and property interests.   A.M. has sufficiently alleged that the Individual DOH Defendants deprived her of her protected liberty interests in adequate medical care, dental care, and conditions of reasonable care and safety, and reasonably nonrestrictive confinement conditions, without adequate due process of law, beginning on April 11, 1983.    Second, in 1979, the Individual DOH Defendants unconstitutionally deprived A.M. of entitlements to education, training, and habilitation services, under § 43-1-8 of the New Mexico Mental Health and Disabilities Act, when they stripped her of her status as a "resident client" under the Act without due process of law and transferred her out of the Training School to the Homestead House.  Finally, the Individual DOH Defendants proximately caused the violation of A.M.'s procedural due-process rights as to the deprivation of her SSI benefits, Medicaid benefits, Medicare benefits, and the value of her labor beginning on April 11, 1983.

## **FACTUAL BACKGROUND**

The Court takes its facts from the Complaint, as it must when considering a motion to dismiss for failure to state a claim under rule 12(b)(6) of the Federal Rules of Civil Procedure.

The Court has reorganized the factual material in the Complaint, however, to explain the facts more clearly.

1.     **The Parties.**

A.M. is a sixty-six-year-old woman who has been diagnosed with various developmental disabilities.  See Amended Original Complaint for Damages ¶ 66, at 18, filed June 14, 2013 in the state court, filed July 26, 2013 in the district court (Doc. 1-2)("Complaint").  A.M. was involuntarily committed to the New Mexico Department of Health ("DOH") by court order on May 8, 1963, when she was sixteen years old, because her developmental disabilities rendered her unable to care for herself.  See Complaint ¶¶ 67-69, at 18-19.  Because of her disabilities, A.M. brings this action through her guardian ad litem, Joleen Youngers.  See Complaint ¶ 66, at 18.

The DOH operates all of the facilities that house and treat people with developmental disabilities in the State of New Mexico.  See Complaint ¶ 8, at 4.  One of these facilities is the Los Lunas Center for Persons with Developmental Disabilities -- formerly known as the Los Lunas Hospital and Training School ("Los Lunas Hospital").  See Complaint ¶ 8, at 4.  The Fort Stanton Hospital and Training School ("Fort Stanton") was another DOH facility for individuals with developmental disabilities, and was an affiliate of the Los Lunas Hospital.  Complaint ¶¶ 8-9, at 4.  Because the Complaint refers to the Los Lunas Hospital and Fort Stanton collectively as the "Training School," the Court will do so throughout this Memorandum Opinion ("MO").  Complaint ¶ 1, at 1-2; id. ¶ 11, at 4-5.  Moreover, because the Complaint refers to the DOH and the Training School collectively as "the DOH Defendants," the Court will do so throughout this MO.  Complaint ¶ 11, at 4.

Before 1992, the New Mexico Human Services Department ("HSD") was responsible for operating Adult Protective Services ("APS")[2] in New Mexico.  Complaint ¶ 22, at 8.  APS is responsible for protecting adults with developmental disabilities from exploitation, abuse, and neglect.  See Complaint ¶ 22, at 8.  APS must also ensure that those adults receive necessary treatment and social services.  See Complaint ¶ 22, at 8.  From 1992 to 2005, the New Mexico Children Youth and Families Department ("CYFD") inherited HSD's responsibilities for all protective services in the state, including APS.  See Complaint ¶ 23, at 8.  CYFD was responsible for the continuing coordination and supervision of APS, for adopting rules and regulations necessary to implement and operate APS, and for evaluating APS' effectiveness.  See Complaint ¶ 23, at 8.  In 2005, the New Mexico Aging and Long-Term Services Department ("ALTSD") inherited APS from CYFD, and has since then operated APS.  See Complaint ¶ 24, at 8-9.  Similar to its predecessors, the ALTSD is responsible for the continuing coordination and supervision of APS, for adopting rules and regulations necessary to implement and operate APS, and for evaluating APS' effectiveness.  See Complaint ¶ 25, at 9.  Because the Complaint refers to the ALTSD, APS, and the DOH Defendants as the "State Agency Defendants," the Court will do so throughout this MO.  Complaint ¶ 27, at 9.

Schaefer was an attorney for the DOH and the Training School from September 13, 1976, to December 31, 2001.  See Complaint ¶ 14, at 5.  Defendant Sandoval was the Director of Resident Living for the Training School between 1979 and 1985.  See Complaint ¶ 16, at 5.  As Director of Resident Living, Sandoval was in charge of social services and the Training School's

---

[2]Because the Complaint refers to: (i) the Adult Protective Services Division of New Mexico Aging and Long-Term Services Department, (ii) the Adult Protective Services Division of the New Mexico Children Youth and Families Department, and (iii) the Adult Protective Services of the New Mexico Human Services Department collectively, as "APS," the Court will do so throughout this MO.  Complaint ¶ 26, at 9.

social workers.  See Complaint ¶ 45, at 12.  Sandoval was also a member of the Training School's Screening Committee on Admissions and Releases ("SCAR") and, at times, its chairman.  See Complaint ¶ 16, at 6.

Adams was the Training School's Deputy Administrator or Acting Administrator "during the relevant time period."[3]  Complaint ¶ 18, at 6.  Adams made hundreds of decisions regarding the placement and treatment of Training School residents -- including the Training School's placement and discharge decisions relating to A.M.  See Complaint ¶ 18, at 6.  Adams chaired SCAR, attended most SCAR meetings, and approved A.M.'s discharge from aftercare without taking any steps to ascertain whether she would be safe or have her medical and other needs met. See Complaint ¶ 18, at 6.

Mateju was the Training School Administrator "during the relevant time period."[4] Complaint ¶ 20, at 7.  As Administrator, he made the final decisions regarding the placement and treatment of Training School residents, and all placement and discharge decisions relating to A.M.  See Complaint ¶ 20, at 7.  He also had the authority to unilaterally accept and remove individuals from the Training School.  See Complaint ¶ 20, at 7.  Mateju was responsible for the placement of many residents -- including A.M. -- into third-party homes, boarding homes, and other outside facilities.  See Complaint ¶ 20, at 7.  Mateju personally attended SCAR meetings during which A.M. was discussed, and he personally approved decisions regarding her discharge from DOH treatment without taking any steps to ascertain whether she would be safe, or have serious medical and other needs addressed.  See Complaint ¶ 20, at 7.  Mateju had responsibility for ensuring that appropriate measures were taken to: (i) provide for A.M.'s health, safety, and

---

[3]The Complaint does not explain in any further detail when Adams served in his position at the Training School.

[4]The Complaint does not explain in any further detail when Mateju served in his position at the Training School.

well-being; (ii) ensure that she received appropriate services; and (iii) ensure that A.M. continued to receive those services in any third-party placements.  See Complaint ¶ 20, at 7-8.

   2.   **The Aftercare Program.**

Over a period of two decades -- through the 1970s and 1980s -- the DOH Defendants systematically transferred hundreds of developmentally disabled individuals from state institutions to various private third parties throughout New Mexico.  See Complaint ¶ 2, at 2; id. ¶ 37, at 10.  These private third parties ranged from boarding homes to private residences and commercial enterprises.   See Complaint ¶ 2, at 2.   The Defendants called this program "aftercare;" the developmentally disabled individuals placed with third parties through the aftercare program were called "aftercare residents."  Complaint ¶ 2, at 2; id. ¶ 38, at 11.

The Defendants placed aftercare residents with private third parties "without anyone's informed consent, without the appointment of guardians or any other legally-authorized surrogate decision-makers, without permission from the courts that committed them to the state institutions . . . , and without due process of law. "  Complaint ¶ 3, at 2.  In some cases, the Defendants contacted ex parte the judicial authorities that had committed aftercare residents to the Training School and "provided misleading information to them concerning the status of individuals discharged from the Training School."  Complaint ¶ 3, at 2-3.  In other cases, the Defendants did not communicate with the judicial authorities who had committed individuals to the Training School before transferring them to private third parties.  See Complaint ¶ 3, at 2-3.

After transferring aftercare residents to their third-party placements, the DOH and the Individual DOH Defendants "abandoned [them] without even minimally-adequate discharge planning, monitoring, or the services that [they] required, and with no protections against abuse, neglect or exploitation."  Complaint ¶ 3, at 2.  When the events alleged in the Complaint

occurred, approximately eight social workers at the Training School oversaw 431 aftercare residents, "while also performing social work duties for hundreds of people still residing" at the Training School.  Complaint ¶ 48, at 13.  Although Training School policies required Training School personnel to oversee and conduct periodic visits of aftercare residents, the DOH Defendants "did not use any system to ensure that residents in aftercare would be safe or that they would receive minimally adequate services."  Complaint ¶ 43, at 12.

Sandoval, despite being charged with overseeing the Training School's social workers, "did not know of any guidelines on how residents in aftercare placements would be cared for, did not know of a system to follow up with those residents, and did not know of a system . . . to know how many residents were placed in private third-party placements."  Complaint ¶ 49, at 13.  Sandoval did not know "what the conditions of the residents was" or "what services they needed."  Complaint ¶ 49, at 13.  According to Sandoval, there was "no formalized system or procedures or policy in place" to ensure follow-up with aftercare residents.  Complaint ¶ 49, at 13.

Training School administrators -- including the Individual DOH Defendants -- were aware that the social workers assigned to oversee aftercare placements often did not visit aftercare residents in their third-party placements.  See Complaint ¶ 47, at 12.  They were aware that the social workers -- when they checked on aftercare residents at all -- usually relied on telephone calls to the private third parties who administered the placements rather than on in-person contact.  See Complaint ¶ 47, at 12-13.  Training School administrators -- including Adams, Mateju, and Schaefer -- had frequent conversations about the problem of social workers' failure to make their required visits or to contact aftercare residents.  See Complaint ¶ 51, at 13-14.  The DOH Defendants and the Individual DOH Defendants were "well aware of the

dangers residents faced due to the way in which the aftercare program was operated, but they proceeded anyway." Complaint ¶ 52, at 14.

The "well-known failure" of the Training School's social workers to provide oversight for aftercare residents drove the DOH Defendants and the Individual DOH Defendants to "discharge"[5] Training School residents from aftercare "whenever and however possible." Complaint ¶ 53, at 14. Schaefer supervised changes to the Training School's discharge procedures in the late 1970s and early 1980s. See Complaint ¶ 55, at 14. Specifically, Schaefer told Training School administrators that "there were too many residents on aftercare" and recommended that the Training School discharge residents from aftercare. Complaint ¶ 54, at 14. Sometime between September, 1978, and the end of 1980, Schaefer began advising that all

---

[5]The Complaint does not explicitly define "discharge," but uses the word to describe: (i) the process of transferring a Training School resident to a private third party; and (ii) the process of removing an aftercare resident -- i.e., a former Training School resident who has already been placed with a private third party -- from "the rolls of Training School clients." Complaint ¶ 65, at 18. Moreover, the Complaint does not clarify what it means for an aftercare resident to be removed from "the rolls of Training School clients." Complaint ¶ 65, at 18. The Complaint implies that the Defendants believed the Training School had no legal responsibility to oversee aftercare residents who had been removed from the Training School's rolls, or to provide them with any services or therapy. See, e.g., Complaint ¶ 61, at 17 ("Once there was a piece of paper in the file, residents could be . . . 'cut loose' from the Training School, without consideration of extant judicial orders, the health and safety of former residents, or the residents' need for services."); Complaint ¶ 63, at 17 ("Defendant Sandoval has admitted that he wouldn't know whether somebody was going to be taken care of after discharge from aftercare.")(internal quotation marks omitted). The Complaint also states, however, that "discharge from aftercare was not a complete separation of responsibility for residents . . . . Even after residents were discharged from aftercare, the Training School at times took action to respond to allegations of abuse when they came to their attention." Complaint ¶¶ 63-64, at 17-18 (internal quotation marks omitted). Consequently, where it is clear in the Complaint how A.M. is using the word "discharge," the Court will explain which form of "discharge" A.M. is using. Where it is unclear, the Court will quote directly from the Complaint to ensure that it is accurately portraying the facts as the Complaint alleges them. Where it is necessary to the Court's resolution of the MTD, the Court will resolve these ambiguities in its analysis.

aftercare residents should be discharged from the Training School "without judicial review and without any due process protections whatsoever."  Complaint ¶ 57, at 15.

Schaefer told Training School administrators that "the state institutions' custody of people committed to the institution by court order automatically lapsed" on the New Mexico Mental Health Code's[6] effective date of July 1, 1977, despite judicial orders of commitment for an indeterminate period.   Complaint ¶ 56, at 15.   Schaefer advised Training School administrators that a change in the Mental Health Code meant that the court orders committing aftercare residents to State custody were void -- regardless whether the residents' original placements with private third parties had been judicially reviewed.  See Complaint ¶ 56, at 15. Schaefer explained to Training School administrators and staff that "it's different now and you don't need a discharge order signed by a judge."  Complaint ¶ 61, at 17 (internal quotation marks omitted).

According to Schaefer, Training School administrators were "reluctant to proceed without a paper trail, so [she] instructed Defendant Adams to 'just put a note in . . . the file that says . . . [that the aftercare resident] was discharged.'"  Complaint ¶ 61, at 17 (alterations in Complaint).  Once there was a "piece of paper in the file," residents could be, in Schaefer's words, "cut loose" from the Training School without consideration of judicial orders, the aftercare residents' health and safety, or their need for services.  Complaint ¶ 61, at 17.  Schaefer neither conducted legal research nor consulted legal experts in developing these new discharge policies.  See Complaint ¶ 56, at 15.

Schaefer acknowledged under oath that former Training School residents were particularly vulnerable, and in danger of abuse and exploitation, once they were no longer under

---

[6]N.M.S.A. 1978, § 43-1-12.

the Training School's supervision.  See Complaint ¶ 60, at 16-17.  Schaefer was aware when she designed and directed the new aftercare discharge policy that Training School personnel had not done any discharge planning for aftercare residents, and had failed to make contact with residents before or after their discharge, to assure their health and safety, and to assure that they were not being abused or exploited.  See Complaint ¶ 59, at 16.  Schaefer considered the fallout from the danger that such a policy posed to aftercare residents "to be merely a public relations issue, not a legal obstacle."  Complaint ¶ 61, at 17 (internal quotation marks omitted).

Under Schaefer's direction, Training School administrators "deliberately decided not to appoint surrogate decision-makers for its residents or to otherwise provide procedural due process" before removing residents' names from the Training School's rolls.  Complaint ¶ 57, at 15.  "Training School residents were not even informed that they were no longer clients of the Training School."  Complaint ¶ 57, at 15.  Aftercare residents "were routinely removed from the rolls of Training School clients without any procedural due process," based solely on letters that Mateju sent to the district attorney in the county where each resident was originally committed.  Complaint ¶ 65, at 18.  These letters did not "supply[] the background information necessary for discharge, including the circumstances of residents and whether the resident or a responsible adult consented to discharge."  Complaint ¶ 65, at 18.  Instead, judicial authorities were "misled into believing that residents consented to and were happy in their placements."  Complaint ¶ 65, at 18.

In Sandoval's view, "discharge from aftercare was not a complete separation of the Training School's responsibility for residents."  Complaint ¶ 63, at 17-18.  "Even after residents were discharged from aftercare, the Training School at times took action to respond to allegations of abuse when they came to their attention."  Complaint ¶ 64, at 18.  DOH

Defendants and Individual DOH Defendants, however, "failed to establish any system permitting residents to complain about their treatment, or any system permitting the Training School to provide oversight at third-party placements."  Complaint ¶ 64, at 18.  The DOH Defendants and Individual DOH Defendants decided that discharging residents from aftercare eliminated the need for social worker visits.  See Complaint ¶ 51, at 13-14.  Sandoval has admitted that he "wouldn't know whether somebody was going to be taken care of after discharge from aftercare, and it never crossed his mind to be concerned that residents discharged from aftercare might be abused or neglected."  Complaint ¶ 63, at 17 (internal quotation marks omitted)(brackets omitted).

### 3.    A.M.

A court order committed A.M. to Fort Stanton or to another state institution on May 8, 1963, when she was sixteen years old.  See Complaint ¶ 66, at 18.  By 1967, either through transfer or continuing placement, A.M. was a Fort Stanton resident.  See Complaint ¶ 66, at 18. On November 12, 1979, the Defendants transferred A.M., now thirty-two years old, to the Homestead House and "abandoned" her there as part of the aftercare program.  Complaint ¶ 73, at 20.  The Homestead House was a private, unlicensed group shelter for elderly people that Mary Evans owned.  See Complaint ¶ 73, at 20.  A.M. did not know M. Evans before she was transferred to the Homestead House.  See Complaint ¶ 73, at 20.  The DOH Defendants' and the Individual DOH Defendants' transfer of A.M. from Fort Stanton to the Homestead House "was without legal authority."  Complaint ¶ 78, at 20.  A.M. alleges that she was still in the DOH Defendants' and Individual DOH Defendants' legal custody after she was placed with M. Evans at the Homestead House.  See Complaint ¶ 12, at 5.

The Individual DOH Defendants allege, however, that A.M. was "judicially discharged in 1979 and placed at Homestead House." MTD at 13. The MTD states:

> In 1979, New Mexico statutory law was clear that court-ordered commitment to the Training School could not exceed six months and that at the "expiration of the commitment order," the Training School had no legal authority to detain an individual unless the court entered "a new order for commitment not to exceed six months." NMSA 1978 § 43-1-12(E)(1977). The 1977 Developmental Disabilities Code[7] provided that "[n]o developmental disabilities treatment or habilitation facility is required to detain, treat or provide services to a client when the client does not appear to require such detention, treatment or habilitation." Section 43-1-12(I)(1977).
>
> Plaintiff's order of commitment to the Training School lapsed by operation of law after six months unless a new court order was entered. NMSA 1978, § 43-1-12 (E) (1977). Plaintiff has failed to allege in her Amended Complaint [Doc. 1-2] that a new order was entered. Therefore, the Training School had no further legal authority to detain Plaintiff and did not have legal custody of her once her order of commitment to the Training School lapsed by operation of law. . . . Accordingly, once Plaintiff was discharged from state custody, Plaintiff was no longer entitled to any due process.

MTD at 11-12. When the Individual DOH Defendants refer to "[p]laintiff's order of commitment to the Training School," it is unclear whether they are referring to the May 8, 1963, Order, which originally committed A.M. to Fort Stanton, or to the October 17, 1979, Order No. 1/387-388 in In the matter of A.M., Case No. CV-SQ-0095-79 (Twelfth Judicial District, County of Lincoln, State of New Mexico)(Doc. 70)("Oct. 17, 1979, Order"). The October 17, 1979, Order reads, in pertinent part:

1.    Respondent has a developmental disability which is so greatly disabling that residential habilitation[8] is in her best interest;

---

[7]N.M.S.A. § 43-1-1 to -25 (1977, as amended).

[8]Under New Mexico's Mental Health and Developmental Disabilities Code, habilitation is defined as:

> the process by which professional persons and their staff assist a client with a developmental disability in acquiring and maintaining those skills and behaviors that enable the person to cope more effectively with the demands of the person's self and environment and to raise the level of the person's physical, mental and

2.      Respondent's habilitation at Fort Stanton Hospital and Training School is not consistent with the least drastic means principle as respondent could benefit from a less restrictive setting such as a community based group home;

3.      Placement in a community based program for persons with developmental disabilities is not presently available for respondent.

IT IS ORDERED

That respondent be and hereby is committed to Fort Stanton Hospital and Training School for residential habilitation for a period not to exceed six months;

IT IS FURTHER ORDERED

That during the period of extended residential habilitation petitioner shall make application to less restrictive programs on behalf of respondent and shall make every effort to transfer respondent to a less restrictive setting.   At the expiration of this order petitioner shall report to this Court concerning its progress toward releasing respondent if further confinement at Fort Stanton Hospital is sought.

Oct. 17, 1979, Order. [9]

---

social efficiency.  "Habilitation" includes but is not limited to programs of formal, structured education and treatment.

N.M.S.A. § 43-1-3(L) (1977, as amended).

[9]The Court will consider the Oct. 17, 1979, Order in analyzing the MTD.  The United States Court of Appeals for the Tenth Circuit has explained that a district court's "function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."   Sutton v. Utah State Sch. for the Deaf & Blind, 173 F.3d 1226, 1236 (10th Cir. 1999).  There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322.  Because the Complaint does not refer to the Oct. 17, 1979, Order, neither of the first two exceptions apply. The Court must, therefore, determine whether the third exception -- permitting courts to consider "matters of which a court may take judicial notice" -- applies.  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322.

Neither the Homestead House nor M. Evans were licensed service providers for people with developmental disabilities.  <u>See</u> Complaint ¶ 73, at 20.  Neither M. Evans nor any Homestead House employee had the necessary training or experience to properly care for A.M., and M. Evans had no legal right to hold A.M.  <u>See</u> Complaint ¶¶ 76, 78, at 20.

A.M. lived with M. Evans for over thirty years.  <u>See</u> Complaint ¶ 85, at 23.  Although the Defendants retained legal control over A.M. after placing her at the Homestead House, neither the Defendants nor any of their agents checked on A.M. in any fashion.  <u>See</u> Complaint ¶ 77, at 21; <u>id.</u> ¶ 80, at 22.  Instead, the Defendants "cloak[ed] the Homestead House and Mary Evans with untoward authority and absolute control over Plaintiff, who was entirely dependent on this third-party placement for her day-to-day existence."  Complaint ¶ 77, at 21.

At the Homestead House, A.M. was "put to work."  Complaint ¶ 93, at 24-25 (internal quotation marks omitted).  Although A.M. performed housekeeping and other services at the Homestead House, M. Evans never compensated her for her work.  <u>See</u> Complaint ¶ 93, at 24-25.  M. Evans threatened A.M. if she did not work, emotionally abused A.M., and neglected her medical needs.  <u>See</u> Complaint ¶ 91, at 24; <u>id.</u> ¶ 96, at 25.  While in M. Evans' custody, A.M. did not receive social services; Medicaid and social security benefits; adequate

_____

A court may take judicial notice of an adjudicative fact that is both "not subject to reasonable dispute," and either: (i) "generally known within the territorial jurisdiction of the trial court;" or (ii) "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  Courts have taken judicial notice of state court orders' contents.  <u>See</u> <u>Gary Alan Green & Broadway Sound & Video, Inc. v. Jackson</u>, 36 F. App'x 663, 669-70 (2d Cir. 2002)(taking judicial notice of New York state court orders in an appeal from dismissal of claims pursuant to rule 12(b)(6)).  The Court determines that the accuracy of orders from the Twelfth Judicial District for the County of Lincoln "cannot reasonably be questioned" and that the contents of the Oct. 17, 1979, Order are "not subject to reasonable dispute." Fed. R. Evid. 201(b).  Consequently, the Court will take judicial notice only of the Oct. 17, 1979, Order's contents without determining whether the Order authorized A.M.'s transfer to the Homestead House -- a point upon which the parties disagree.  In taking judicial notice of this fact, the Court notes that it does not affect the Court's resolution of the MTD.

medical, dental and psychological care; rehabilitative, educational and vocational services; or day habilitation and therapy.  See Complaint ¶ 85, at 23.  M. Evans stole A.M.'s social security checks for her own use and did not spend the funds for A.M.'s benefit.  See Complaint ¶ 94, at 25.  The Defendants facilitated the transfer of A.M.'s social security checks to M. Evans "without having Mary Evans appointed as [A.M.'s] conservator, and with deliberate indifference to whether Mary Evans was using or intended to use the social security funds for the benefit of A.M."  See Complaint ¶ 82, at 22.  "[T]he transfer of these social security funds to Mary Evans was without judicial oversight, or DOH Defendants and the Individual Defendants misled the court regarding the future use of these social security funds."  Complaint ¶ 83, at 22.  The Individual DOH Defendants "were aware that Mary Evans intended to keep" A.M.'s federal benefits "and force her to work in return for a place to live, and approved the arrangement." Complaint ¶ 95, at 25.  While at the Homestead House, A.M. was socially isolated and rarely allowed to leave.  See Complaint ¶ 87, at 23.

The DOH transferred J.P., another developmentally disabled woman, to the Homestead House on the same day as A.M.'s transfer.  See Complaint ¶ 13, at 5.  While at the Homestead House, J.P. attempted to leave to find her children, from whom she had been separated.  See Complaint ¶ 89, at 24.  J.P. climbed over the wall and wandered the streets calling out for her children, and eventually either returned or was brought back to the Homestead House.  See Complaint ¶ 89, at 24.  After this incident, M. Evans took J.P.'s shoes and planted cacti at the place where J.P. had climbed the wall to prevent her from escaping.  See Complaint ¶ 89, at 24. J.P. continued to try to escape.  See Complaint ¶ 89, at 24.  At one point, J.P. jumped over the wall and landed in the cactus.  See Complaint ¶ 89, at 24.  Through punishing J.P. for escaping,

M. Evans made it clear to A.M. that she could prevent A.M. from leaving the Homestead House. See Complaint ¶ 89, at 24.

The State of New Mexico eventually shut down the Homestead House.  See Complaint ¶ 97, at 24.  When that occurred, A.M. was transferred to M. Evans' private residence -- also an unlicensed group shelter.  See Complaint ¶ 98, at 25.  A.M.'s transfer from the Homestead House was without either A.M.'s consent or, most likely, judicial authority.  See Complaint ¶ 98, at 25-26.  If judicial authority was obtained for A.M.'s transfer, "the presiding judge was misled by DOH Defendants and the individual Defendants concerning the circumstances of Plaintiff's removal to Mary Evans' private residence."  Complaint ¶ 98, at 26.

In October, 1999, APS investigated allegations that M. Evans was physically neglecting A.M.  See Complaint ¶ 99, at 26.  APS found the allegations unsubstantiated.  See Complaint ¶ 99, at 26.  APS did not determine, however, whether M. Evans was paying A.M. for her labor, whether M. Evans was properly accounting for A.M.'s federal benefits, why A.M. was not receiving any therapeutic services or medical or dental care, or why A.M. was kept isolated without any opportunity to socialize with others.  See Complaint ¶ 99, at 26.  APS' investigation consisted solely of interviews with M. Evans and/or other non-disabled persons, "rather than engaging in any meaningful conversation with Plaintiff concerning her condition or circumstances."  Complaint ¶ 99, at 26.

In or about October, 2004, APS received allegations that M. Evans and her husband were physically abusing and exploiting A.M.  See Complaint ¶ 100, at 26.  APS received a report that they "were taking Plaintiff's social security money but were not caring for her, and that Plaintiff was emotionally abused."  Complaint ¶ 100, at 26.  The reports also alleged that the Evanses were abusing J.P.  See Complaint ¶ 100, at 26.  APS concluded that the Evanses had emotionally

abused A.M., and stated that its report would be forwarded to the DOH and to law enforcement. See Complaint ¶ 100, at 26. The case remained open for eighteen months, but was ultimately closed as unsubstantiated, because APS found the report to be "malicious." Complaint ¶ 101, at 26-27. Again, APS did not engage in any meaningful conversation with A.M. before it closed its investigation. See Complaint ¶ 101, at 27.

In 2006 or 2007, "the Governor's investigation[10] identified AM and JP as two of the former Training School resident [sic] who had been illegally discharged from the Training School." Complaint ¶ 102, at 27. In March, 2008, "more than four years after DOH learned of the plight of former Training School residents, the DOH investigated Plaintiff's circumstances" as part of the Governor's investigation. Complaint ¶ 106, at 28. The DOH limited its investigation, however, to an interview of M. Evans -- it did not take into account the prior allegations of abuse, interview A.M., or conduct an independent investigation of A.M.'s circumstances. See Complaint ¶ 106, at 28. That same month, APS in Grant County, New Mexico, also investigated A.M.'s circumstances after a caseworker at Fort Baynard[11] reported that M. Evans was physically and emotionally abusing A.M. See Complaint ¶ 106, at 28. APS acknowledged that: (i) A.M. was developmentally disabled; (ii) A.M. had expressed fear of M. Evans; (iii) a psychiatrist had recommended that a guardian be appointed for A.M.; (iv) M. Evans' residence was an unlicensed facility; (v) A.M. had not seen a primary care physician in at least five years; and (vi) M. Evans never applied for disability benefits for A.M. See Complaint ¶ 108, at 28. Nonetheless, APS found the report unsubstantiated, declined to pursue a

---

[10]The Complaint does include any details about "the Governor's investigation." Complaint ¶ 102, at 27.

[11]The Complaint only identifies "Fort Bayard" as the place where A.M. "was admitted for rehabilitation" in January, 2008, after she fell in M. Evans' home. Complaint ¶ 105, at 27.

guardianship for A.M., and closed the report.  See Complaint ¶ 108, at 28.  The DOH did not, as part of its investigation, engage in meaningful conversation with A.M. concerning her condition or circumstances.  See Complaint ¶ 108, at 28.

In December, 2008, the DOH began a new investigation or re-opened its prior investigation into A.M.'s circumstances.  See Complaint ¶ 110, at 29.  The DOH referred to M. Evans as A.M.'s "guardian," despite clear indications in A.M.'s file that M. Evans was never appointed her guardian.  Complaint ¶ 110, at 29.  The DOH continued to "interact exclusively or primarily with Mary Evans" during its investigation.  Complaint ¶ 110, at 29.  The DOH did not consider the prior allegations of abuse, interview A.M., or independently investigate A.M.'s circumstances.  See Complaint ¶ 110, at 29.  The DOH's policy and practice of deferring to caregivers, rather than interacting with the disabled individuals themselves or otherwise independently investigating aftercare residents' circumstances, continued into 2009.  See Complaint ¶ 110, at 29.

In June, 2009, Tom Roach, an ALTSD employee, prepared a report for the ALTSD and the DOH regarding A.M. and J.P.  See Complaint ¶ 111, at 29.  Roach stated that M. Evans was managing A.M.'s and J.P.'s care in exchange for payments for room and board.  See Complaint ¶ 111, at 29-30.  Roach stated that M. Evans had legal authority to make decisions for A.M.  See Complaint ¶ 111, at 30.  Roach reported that A.M. was "happy in her home" and was "getting all the care she needs from Ms. Evans."  Complaint ¶ 111, at 30 (internal quotation marks omitted).  He also noted that "one recent APS referral for exploitation (04/06) was found to be malicious and unsubstantiated."  Complaint ¶ 111, at 30 (internal quotation marks omitted).  Roach limited his investigation to an interview of M. Evans -- he did not take into account prior allegations of abuse, interview A.M. or J.P., or independently investigate J.P.'s or A.M.'s circumstances.  See

Complaint ¶ 112, at 30.   The State Agency Defendants "did nothing to assist AM or JP." Complaint ¶ 113, at 30.  The State Agency Defendants never sought a guardian, conservator, or representative payee for A.M., nor arranged for her to receive therapeutic services.   See Complaint ¶ 113, at 30.

## PROCEDURAL BACKGROUND

A.M. filed her original complaint in state court on June 13, 2013, see Original Complaint for Damages, filed June 13, 2013 in the state court, filed July 26, 2013 in the federal district court (Doc. 2), and an amended complaint on June 14, 2013, see Complaint at 1.  The DOH Defendants and the Individual DOH Defendants removed the case to federal court on July 26, 2013.  See Notice of Removal, filed June 26, 2013 (Doc. 1-2)("Notice of Removal").  A.M. alleges seven claims in her Complaint: (i) a claim under the Fourteenth Amendment to the Constitution of the United States against the Individual DOH Defendants for violating her substantive and procedural due-process rights, see Complaint ¶¶ 126-40, at 32-36; (ii) a claim under the First Amendment to the Constitution of the United States against the Individual DOH Defendants for violating her rights to freedom of association and court access, see Complaint ¶¶ 141-48, at 36-37; (iii) a claim under the Fourth Amendment to the Constitution of the United States against the Individual DOH Defendants for violating her right to be free from unlawful seizures, see Complaint ¶¶ 149-155, at 37-28; (iv) a claim under the Thirteenth Amendment to the Constitution of the United States against the Individual DOH Defendants for violating her right to be free from involuntary servitude, see Complaint ¶¶ 156-64, at 38-39; (v) a claim against the DOH Defendants for violating § 504 of the Rehabilitation Act, 29 U.S.C. § 794, see Complaint ¶¶ 165-71, at 49-40; (vi) a claim against the DOH Defendants for violating the Medicaid Act, 42 U.S.C. §§ 1396-1396w, see Complaint ¶¶ 172-80, at 41-43; and (vii) claims

against the ALTSD and the APS for violating § 504 of the Rehabilitation Act and Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-34 ("ADA"), and the regulations promulgated thereunder, 28 C.F.R. Ch. 1, pt. 35, see Complaint ¶¶ 181-87, at 43-45.

Regarding A.M.'s claim that the Individual DOH Defendants violated her Fourteenth Amendment rights to procedural due-process, A.M. alleges that, when she was placed with M. Evans at the Homestead House, she suffered and was deprived of various constitutionally protected liberty and property interests.   A.M. argues that she has and had protected liberty interests:

> [To] rehabilitative, educational and vocational services, day habilitation and therapy.
>
> To her own safety, to be free from harm, to adequate food, clothing and shelter . . . and to freedom from undue restraint, including the right to receive treatment and services in the least restrictive appropriate placement . . .
>
> [T]o have her views and interests regarding placement represented and redressed in court [and to have] adequate, effective and meaningful access to the judicial system to litigate violations of her fundamental constitutional rights[, and to] appointment of guardians, guardians ad litem, conservators or attorneys[.] . . .
>
> [T]o socialize with her peers [or] to associate with persons of her own choosing.

Complaint ¶ 128, at 32-33; id. ¶ 85, at 23; id. ¶ 129, at 33; id. ¶¶ 135-36, at 34-35; id. ¶ 144, at 36.  Further, A.M. asserts that she has and had constitutionally protected property interests in

> the value of her labor, in a variety of government programs and payments, including Supplemental Security Income (SSI) from the Social Security Administration, Medicaid, and Medicare payments, and in receiving all other medical, dental and mental health care, Developmental Disabilities Waiver services and other government-funded treatment and services. . . . These services include state-funding of habilitation services.

Complaint ¶ 129, at 33.  According to A.M., by placing her at the Homestead House under M. Evans -- where she was deprived of these "clearly established liberty and property rights and interests . . .  without due process of law" -- the Individual DOH Defendants violated her

procedural due-process rights under the Fourteenth Amendment.  See Complaint ¶ 130, at 33; id. ¶ 134-30, at 35-36.

1.      **The Motion to Dismiss.**

The Individual DOH Defendants filed the MTD on October 1, 2014.  See MTD at 1.  In the MTD, the Individual DOH Defendants ask the Court to dismiss A.M.'s procedural due-process claims.  See MTD at 1.  The Individual DOH Defendants advance essentially a four-step argument: (i) the Individual DOH Defendants are entitled to qualified immunity because A.M. does not allege any "liberty or property" interests that were clearly established in 1979, MTD at 7-11; (ii) A.M. was discharged from state custody in 1979, as New Mexico statute requires, which "did not implicate any liberty or property interests" for "there is no constitutional right to be committed to state custody or to remain in state custody," MTD at 12; (iii) once A.M. was discharged from state custody, she was "no longer entitled to any due process," MTD at 12; and (iv) even if there were liberty or property interests at stake that were clearly established in 1979 and due-process analysis were applicable, the process due would not require the Individual DOH Defendants to conduct a "formal, quasi-formal, or judicial-type hearing" to place A.M. with M. Evans at the Homestead House, MTD at 12-13.

First, the Individual DOH Defendants contend that, to receive procedural due-process protections, "a person must have a protected interest in either life, liberty, or property,"  Chavez-Rodriguez v. City of Santa Fe, No. CIV 07-0633, 2008 WL 5992271, at *6 (D.N.M. Oct. 9, 2008)(Browning, J.), and they assert that "[t]he liberty and property interests as alleged by [A.M.] were not clearly established in 1979,"  MTD at 7.  The Individual DOH Defendants first analyze A.M's alleged liberty interests, and, second, her alleged property interests.  Regarding A.M.'s alleged liberty interest in "safety" and "freedom from undue restraint," the Individual

DOH Defendants acknowledge that the Supreme Court of the United States, in <u>Youngberg v. Romeo</u>, 457 U.S. 307 (1982), noted that "such liberty interests [in safety and freedom from undue restraint] were recognized in the 1977 decision [of] <u>Ingraham [v. Wright, 430 U.S. 651 (1977)]</u>."  MTD at 7 (citing <u>Youngberg v. Romeo</u>, 457 U.S. 307, 314 (1982)).

The Individual DOH Defendants also recognize that, in the 1982 decision of <u>Youngberg v. Romeo</u>, the Supreme Court "addressed the more 'troubling claim' of whether there is a liberty interest to minimally adequate habilitation[12]," concluding that "liberty interests require the State to provide [to involuntarily committed individuals] <u>minimally adequate or reasonable training</u> to ensure safety and freedom from undue restraint."  MTD at 8 (citing <u>Youngberg v. Romeo</u>, 457 U.S. at 319)(emphasis added).  The Individual DOH Defendants maintain, however, that because the Supreme Court did not decide <u>Youngberg v. Romeo</u> until 1982, "it was not clearly established in 1979, that [A.M.] even had a liberty interest to 'minimally adequate or reasonable training to ensure safety and freedom from undue restraint.'"  MTD at 8.  Further, the Individual DOH Defendants assert that it was similarly "not clearly established in 1979 that [A.M.] possessed a protected liberty interest to:  minimally adequate treatment, rehabilitative and habilitation services to help develop her abilities[.]"   MTD at 8.   The Individual DOH Defendants explain:

> As the Court in *Youngberg* acknowledged, that case did not "present the difficult question of whether a mentally retarded person, involuntarily committed to a state institution, has some general constitutional right to training *per se*, even when no type or amount of training would lead to freedom."  *Id.*, 457 U.S. at 318, 102 S. Ct. at 2459; *see also Phillips v. Thompson*, 715 F.2d 365, 368 (7th Cir. 1983)(*Youngberg* teaches that at most, committed individuals are entitled to "minimally adequate training as is reasonable in light of their interest in freedom of movement"); *Society for the Goodwill to Retarded Children, Inc. v. Cuomo*,

---

[12]The Individual DOH Defendants state that "[t]he term 'habilitation' referred at that time to 'training and development of needed skills.'"  MTD at 8 (citing <u>Youngberg v. Ohio</u>, 457 at 316).

737 F.2d 1239, 1250 (2d Cir.)(1984)(no "due process right to specific type of treatment or training beyond that geared toward safeguarding basic liberty interests").

Finally, the Individual DOH Defendants maintain that A.M.'s remaining asserted liberty interests were not clearly established in 1979, stating:

> It was not clearly established in 1979 that [A.M.] possessed a protected liberty interest to placement in the least restrictive setting; to family relationships and the opportunity to associate with family or peers; or to have her views and interests regarding placement represented in court and to have adequate, effective, and meaningful access to the judicial system to litigate violations of her fundamental constitutional rights and to appointment of guardians or other surrogate decision makers. *Society for Good Will*, 737 F.2d 1239, 1248 (2d Cir. 1984)(no right to "lease restrictive environment" under Constitution); *Sanchez v. New Mexico*, 396 U.S. 276 (1970), "dismissed for want of federal question"; *Troxel v. Granville*, 530 U.S. 57, 88 (2000)(Court has not yet had occasion to elucidate on nature of child's liberty interests in preserving established familial or family-like bonds); *Bounds v. Smith*, 430 U.S. 817, 822 (1977)(only prisoners' right of access to courts established beyond doubt; requires adequate law libraries in prisons or adequate assistance from legally trained individuals).

MTD at 9. The Court notes that the Individual DOH Defendants do not appear, however, to argue that A.M. did not have a clearly established and constitutionally protected liberty interest in 1979 in "adequate food, clothing and shelter." Complaint ¶ 128, at 32-33.

The Individual DOH Defendants next turn to A.M.'s allegation that she had a constitutionally protected property interest in a "variety of government programs and payments." Complaint ¶ 129, at 33. The Individual DOH Defendants begin by explaining that "[p]roperty interests . . . are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." MTD at 10 (quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972)).

- 23 -

The Individual DOH Defendants point out that "[w]hether a person has a protected property interest is usually a matter of state law" and that, to have a property interest, one must have a legitimate claim of entitlement to it and not a mere unilateral expectation of it.  MTD at 10 (citing Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577).   The Individual DOH Defendants state:

> [A.M.] fails to allege any facts to show that as of the time of her discharge in 1979 she had a legitimate claim of entitlement to any specific state programs and payments, habilitation services, or to receiving medical, dental or mental health care.  Moreover, [A.M.] fails to allege the existence of any state statute, rule, or understanding promulgated and fostered by state officials that could otherwise support a legitimate claim of entitlement, and fails to allege an entitlement grounded in state law that cannot be removed except for cause.  Instead, [A.M.] asserts a generalized, conclusory claim to property rights without alleging any facts whatsoever demonstrating how she possessed a legitimate claim of entitlement to any specific state programs and payments or habilitation services in 1979 upon her discharge.

MTD at 11 (citations omitted).

Second, the Individual DOH Defendants assert that A.M. was legally "discharged in 1979 and . . . terminat[ed] [from] state custody" as New Mexico statutory law, in effect at the time, required:

> In 1979, New Mexico statutory was clear that court-ordered commitment to the Training School could not exceed six months and that at the "expiration of the commitment order," the Training School had no legal authority to detain an individual unless the court entered a "new order for the commitment not to exceed six months."  NMSA 1978, § 43-1-12(E)(1977).  The 1977 Developmental Disabilities Code provided that "[n]o developmental disabilities treatment or habilitation facility is required to detain, treat, or provide services to a client when the client does not appear to require such detention, treatment, or habilitation."

MTD at 11-12.  The Individual DOH Defendants maintain that A.M.'s legal dismissal "did not implicate any liberty or property interests" for "there is no constitutional right to be committed to state custody or to remain in state custody."  MTD at 12.  Third, once this "discharge" took place in 1979, A.M. was no longer in "state custody" and, therefore, was "no longer entitled to any due

process." MTD at 12.  Finally, the Individual DOH Defendants assert that, even if A.M. had

clearly established constitutionally protected liberty or property interests in 1979 which her

placement at the Homestead House implicated -- thus triggering due-process analysis -- these

interests would not require them to conduct a "formal, quasi-formal, or judicial-type hearing."

MTD at 12-13 (citing Parham v. J.R., 442 U.S. 584, 587-607 (1979)).

**2.    A.M. Responds to the MTD.**

A.M. responded to the MTD on November 7, 2014.  See Plaintiff's Response to DOH

Defendants' Motion and Memorandum in Support to Dismiss Plaintiff's Procedural Due Process

Claims on the Basis of Qualified Immunity, filed November 7, 2014 (Doc. 67)("Response").

Broadly speaking, A.M. responds to the Individual DOH Defendants on two fronts.  See

Response at 8-14.  First, she counters their argument that she did not possess protected liberty

interests in safety and freedom from harm, and protected property interests in the value of her

labor and in a variety of government programs and payments.  See Response at 8-11.  Second,

A.M. asserts that, assuming that she had protected liberty and property interests in a variety of

government benefits, education, training, and habilitation services among other things -- which

were stripped from her when she was transferred from the Training School to the Homestead --

the process afforded to her violated her procedural due process rights under the Fourteenth

Amendment.  See Response at 11-14.

A.M. first re-asserts her allegation that she:

not only had a protected property interest in safety and freedom from harm, but
also protected property interests in the value of her labor and:

in a variety of government programs, and payments, including
Supplemental Security Income (SSI) from the Social Security
Administration, Medicaid, and Medicare payments, and in
receiving all other medical, dental and mental health care,
Developmental Disabilities Waiver services and other government-

> funded treatment and services, which [the individual] Defendants .
> . . deprive[d] them of without due process of law.

Response at 8.  According to A.M., she "asserts a liberty and/or property interest in a variety of

benefits and services, of which Defendants deprived [her] by shipping her off to the Homestead

House and Mary Evans."  Response at 8.  Concerning the "education, training, and habilitation"

claims -- whether seen as liberty or property interests -- A.M. asserts that it was clearly

established in the 1970s that the civilly committed mentally retarded had a constitutional right to

habilitation and reasonable treatment to improve their condition.  A.M. maintains that the

Supreme Court merely concurred with that view in Youngberg v. Romeo.  See Response at 9

(citing Youngberg v. Romeo, 457 U.S. 307, 313-22 (1982)).

> Further, A.M. argues that her property interests in
>
> education and training which entitled her to procedural due process rest on an
> even older and more clearly established principle -- that once the benefits of
> education, training, and habilitation have been extended by state or federal law,
> the state cannot whisk them away without affording the beneficiaries at least the
> rudiments of due process.

Response at 9.  The Response explains:

> United States Supreme Court precedents antedating [A.M.'s] discharge in 1979
> had made it clear that public welfare benefits furnishing "essential food, clothing,
> housing, and medical care" were property rights that could not be cut off without
> notice and an opportunity to be heard.  *Goldberg v. Kelly*, 397 U.S. 254, 264
> (1970).  Thus, for example, if "the Government pays for certain medical services"
> for nursing home residents, "[t]he Government cannot withdraw these . . . benefits
> without giving the patients notice and an opportunity for a hearing on the issue of
> their eligibility for benefits."  *O'Bannon v. Town Ct. Nursing Ctr.*, 447 773, 786-
> 87 (1980); *see id.* at 787 n.19 (citing *Goldberg v. Kelly*).  Variations on this theme
> reverberated in the Tenth Circuit throughout the 1970s.  *See, e.g., Hatch v.
> Goerke*, 502 F.2d 1189, 1195 (10th Cir. 1974)(reasoning that "the opportunity to
> receive an education" is a "protected interest" of which a public school student
> cannot be deprived without due process; *Martinez v. Richardson*, 472 F.2d 1121
> (10th Cir. 1973)(finding protected property interest in continued receipt of home
> health care services).  The governing constitutional precepts, requiring
> Defendants to afford Plaintiff procedural due process before terminating the
> services offered at the Training School were clearly established prior to

Defendants' placement of Plaintiff outside the Training School.  Defendants were bound to abide by them, even in "novel factual circumstances."  *Gomes v. Wood*, 451 F.3d 1122, 1134 (10th Cir. 2006)(quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

Response at 10-11.

A.M. also identifies two New Mexico statutes that, in her view, counter the Individual DOH Defendants' assertion that A.M. has not alleged "the existence of any state statute, rule, or understanding promulgated and fostered by state officials that could otherwise support a legitimate claim of entitlement" to education and training in 1979, when she was discharged. Response at 9-10.  First, A.M. asserts that she was originally committed to the Training School under N.M.S.A. 1953, § 34-3-2 (1968)(superseded), which provides for "the care, custody, employment, education and training of mental defectives."  Response at 9.  According to A.M., these state statutes also conditioned A.M.'s and others' release from the Training School on a showing that dischargees were able to "'adjust [themselves] satisfactorily to the normal life of the community' (unless they would be 'so cared for by others as to not require institutional care or treatment')."  Response at 9.  Second, A.M. identifies the Mental Health and Development Disabilities Code, which the New Mexico Legislature enacted in 1977.  See Response at 9-10. According to A.M., "[t]he Code provided, among other things, that '[e]ach resident . . . receiving developmental disabilities services [would] have the right to prompt habilitation services pursuant to an individualized habilitation plan,' N.M.S.A. 1978, § 43-1-8 (1977) -- a plan that would include 'criteria for discharge' from state custody, *id.* § 43-1-9(C)(6)(1993; originally enacted in 1977)."  Response at 10 (emphasis in Response).  In support of this proposition, A.M. cites to LaBalbo v. Hymes, 1993-NMCA-010, 850 P.2d 1017.  See Response at 10.  In that case, the Court of Appeals of New Mexico observed that these provisions "'create[d] a protected interest in receiving state-funded habilitation services,' of which Training School residents could

not constitutionally be deprived 'without appropriate procedural safeguards." Response at 10 (quoting LaBalbo v. Hymans, 1993 NMCA-010, ¶¶ 14-17 nn.2-3, 850 P.2d at 1022-23 nn.2-3). Later, A.M. also re-asserts that "she was consigned to the custody of a private employer who regarded her as a source of free labor -- yet another violation of clearly established constitutional law."  Response at 13 (citing United States v. Lanier, 520 U.S. 259, 271 (1997)).

A.M. spends the remainder of her Response contending that the process which the Individual DOH Defendants afforded to her violated her procedural due-process rights under the Fourteenth Amendment.  See Response at 11-14.  A.M. asserts that "the procedures followed by Defendants violated the very 'essence of due process[, which] is the requirement that 'a person in jeopardy of serious loss be given notice of the case against him and opportunity to meet it.'" Response at 11 (quoting Mathews v. Eldridge, 424 U.S. 319, 348 (1976)).  Here, according to A.M., "neither [A.M.], nor any surrogate decision-maker acting on behalf of [her], was ever provided notice of the change in placement or an opportunity to be heard."  Response at 11. A.M. cites to Heryford v. Parker, 396 F.2d 393, 396 (10th Cir. 1968), in which, according to A.M., the United States Court of Appeals for the Tenth Circuit stated that "Fourteenth Amendment due process requires that the infirm person, or one acting in his behalf be fully advised of his rights and accorded each of them unless knowingly and understandingly waived." Response at 12 (quoting Heryford v. Parker, 396 F.2d at 396).  A.M. argues that, in this case, however, she was "neither accorded nor advised of any of her clearly established rights." Response at 12.  She contends that she was never provided with counsel and that she was not "involve[d] in any fashion in the judicial proceedings that accomplished [her] discharge[] from the training school[.]"  Response at 12 n.2.

Finally, A.M. notes that this matter is very similar to the facts and issues in another District of New Mexico case, J.M. v. N.M. Dep't of Health, No. CIV 07-0604 RB/ACT, Memorandum Opinion and Order, filed March 4, 2009 (Doc. 224)("Judge Brack MOO"), in which the Honorable Robert C. Brack, United States District Judge, denied the Defendants' motion to dismiss the plaintiff's procedural due-process claims on the basis of qualified immunity. Response at 13-14. A.M. states that Judge Brack wrote:

> In determining whether Ms. Schaefer is entitled to qualified immunity in this case, the Court must first identify the legal contours of due process during the late 1970s. *Harlow [v. Fitzgerald]*, 457 U.S. [800,] 818 [(1982)]. The Court will first address the legal contours of the doctrine of procedural due process in the late 1970s. JM's liberty interests in safe conditions of confinement and freedom from economic exploitation were clearly established in the late 1970s. *See Ingraham v. Wright*, 430 U.S. 651, 673-74 (1977); *Hutto v. Finney*, 437 U.S. 678, 685-87 (1978); *Youngsberg*, 457 U.S. at 324. The Court also concludes that JM's property interests in the educational benefits, care, and treatment which she was entitled to receive at the Training School, during the period of time she was committed to state custody, was also clearly established in the late 1970s. *See Goss [v. Lopez]*, 419 U.S. [565,] 573 [(1975)]. It is unnecessary for the Court to determine what process was due in the context of JM's transfer from the Training School to unlicensed private third party settings, during the period of time in which she was in state custody, because Plaintiffs allege JM received no process whatsoever. At least some modicum of process was due to minimize the risk of error in placing JM in a setting in which she was allegedly economically exploited and deprived of the care and treatment to which she was entitled while in state custody. *See Mathews*, 424 U.S. at 334-35. Because Ms. Schaefer had fair warning that JM was entitled to some level of process in connection with her transfer from the Training School to unlicensed third party businesses, during the period of time in which JM was in state custody, the Court determines that Ms. Schaefer is not entitled to qualified immunity on this procedural due process claim. *See Lanier*, 520 U.S. at 270.

Response at 13-14 (quoting Judge Brack MOO at 12). In sum, A.M. asserts in her Response that: (i) she has and had various constitutionally protected liberty and property interests; (ii) the Individual DOH Defendants deprived her of these interests when they transferred her from the Training School to the Homestead House; and (iii) they deprived her of these interests without due process of law in violation of the Fourteenth Amendment.

3.      **The Individual DOH Defendants' Reply**.

The Individual DOH Defendants replied to A.M.'s response on November 21, 2014.  See Individual DOH Defendants' Reply in Support of their Motion and Memorandum to Dismiss Plaintiff's Procedural Due Process Claims on the Basis of Qualified Immunity, filed November 21, 2014 (Doc. 70)("Reply").   They first argue that A.M. was legally discharged from the Training School in 1979, after which she did not remain in state custody.  See Reply at 2-4.  The Individual DOH Defendants contend that discharge pursuant to New Mexico law in effect in 1979 did not require a court order or judicial authorization.  See Reply at 2.  Rather, according to the Individual DOH Defendants, discharge was "effectuated by operation of law and pursuant to the specific requirements of the New Mexico state statutes in effect in 1979."  Reply at 2-3.  They assert that A.M. was committed to the Training School in 1967.  See Reply at 3.  The Individual DOH Defendants contend that the New Mexico Legislature repealed the statute under which she was committed, however, on July 1, 1977, when New Mexico's Mental Health and Disabilities Code came into effect.  See Reply at 3.   According to the Individual DOH Defendants, the new statute provided that

> "residential placement" at the training school "shall be for a period not to exceed six months," at the expiration of which individuals **"may be detained only after a new commitment hearing, unless waived after consultation with the client's attorney, and entry of a new order for commitment not to exceed six months."**

Reply at 3 (citing N.M.S.A. 1978, § 43-1-12)(emphasis in original).  They assert, thus, that on July 1, 1977, the indefinite commitment of A.M. expired by operation of law.  See Reply at 3-4.  Further,

> [p]ursuant to the Lincoln County State District Judge's Order entered in 1979, the Court found that while [A.M.] "**could** benefit from a less restrictive setting such as a community based group home", **nowhere did he order that [A.M.] must be** placed specifically in a "community based group home". [sic]  Instead, the state

> district judge ordered only that an "effort" be made "to transfer respondent to a less restrictive setting."  Also, any further "report" by the State of New Mexico to the Court was required only if "further confinement at Fort Stanton Hospital is sought."

Reply at 3 (citations omitted)(emphasis in original).   According to the Individual DOH Defendants, therefore, A.M. was legally discharged from state custody in 1979, after which she no longer remained in state custody.  See Reply at 2-4.

Second, the Individual DOH Defendants argue that A.M. "failed to show that she had a clearly established constitutional liberty interest in 1979 to be committed to state custody, to remain in state custody, or to be placed in a less restrictive setting."  Reply at 4-5.  They contend that, to assert a procedural due-process claim under the Fourteenth Amendment, A.M. must first show that her termination of commitment in 1979 implicated protected liberty interests.  See Reply at 4.  The Individual DOH Defendants assert that A.M. does not contest that she "had no constitutional right to be committed to state custody or to remain in state custody," and "no constitutional right to remain institutionalized."  Reply at 4.  They argue, therefore that, once A.M. was "discharge[d] from state custody, [she] was not entitled to any due process whatsoever unless [she] [could] show that her institutionalization implicated some other protected liberty interest" that was recognized in 1979.  Reply at 4-5.  In their view, "she has not done so."  Reply at 5.  The Individual DOH Defendants maintain that, although they once provided A.M. with care and shelter at the Training School, they were not obliged to forever provide her with food, shelter, clothing, medical care and safety once she was no longer "institutionalized at the Training School."  Reply at 5.  Further, they contend that A.M. did not have a protected liberty interest in placement in the least restrictive setting and that, "[i]n any event, such an alleged right was not clearly established in 1979."  Reply at 5.

Third, the Individual DOH Defendants argue that A.M.'s "discharge" from the Training School in 1979 did not implicate a constitutionally protected liberty interest in "rehabilitative and habilitation services, vocational training, physical education, recreation, music, or programs to improve social skills," Response at 5-7, for five reasons: (i) the right to receive habilitation while civilly committed, if it exists at all, ceases upon "discharge from the institution;" (ii) A.M. has not demonstrated that the right to habilitation services was clearly established at any time before "discharge from the Training School"; (iii) A.M.'s citation to Welsch v. Likins, 550 F.2d 1122 (8th Cir. 1977)(Henley, J.), is unavailing, for that case merely notes that "'the course of relevant decisions was trending toward the view' that institutionalized retarded individuals had a right to reasonable treatment for their conditions" -- not that such a right was clearly established before A.M.'s "discharge"; (iv) other decisions in the 1970s and 1980s held that there was "no protected interest in habilitation, music or vocational skills," and, if judges "cannot agree on the existence of such a right, a reasonable official in the individual DOH Defendants' circumstances could not have understood that such a right existed"; and (v) the Supreme Court did not rule until after her "discharge," in 1982 in Youngberg v. Romeo, 457 U.S. 307 (1982), that a civilly committed individual's "liberty interest require [sic] the State to provide minimally adequate or reasonable training to ensure safety and freedom from undue restraint."   Reply at 5-7.   In sum, the Individual DOH Defendants contend that A.M. has not met her burden of showing that, before her discharge, "the law was clearly established that she had a right to minimally adequate treatment, rehabilitative and habilitation services, to vocational training, physical education, recreation, music or any program to enhance social skills."   Reply at 7.

Fourth, the Individual DOH Defendants argue that A.M.'s "discharge from the Training School did not implicate a constitutionally protected liberty interest in family or peer

relationships."  Reply at 7.  They contend that A.M. fails to cite any Tenth Circuit case law regarding her claims of protected liberty interests in family or peer relationships; therefore, according to the Individual DOH Defendants, "her claims for deprivation of due process of such alleged liberty interest fail as a matter of law."  Reply at 7.

Fifth, the Individual DOH Defendants argue that A.M.'s discharge from the Training School did not, as she contends, "implicate a protected liberty interest in the appointment of guardians or other surrogate decision-makers or access to the courts or counsel."  Reply at 8. They assert that A.M. cites no legal authority for the proposition that there was a clearly established liberty interest in the appointment of guardians or other surrogate decision makers at the time of her "discharge" in 1979.  Reply at 8.  Regarding A.M.'s assertion that she was deprived of meaningful access to the courts, the Individual DOH Defendants first maintain that, according to the 1979 state court order, A.M. "appear[ed] in person and by Marianne Bennett, **her attorney**."  Reply at 8 (emphasis in original).  They further contend that, even if, pursuant to the Tenth Circuit's 1985 decision in Ward v. Kort, 762 F.2d 856 (10th Cir. 1985)(Holloway, J.), mental patients have a right to meaningful access to court, that right was not clearly established at the time A.M. was "discharged" in 1979.  Reply at 8.

Sixth, the Individual DOH Defendants argue that A.M. has failed to demonstrate that she had clearly established and constitutionally protected property interests to which the procedural due-process protections of the Fourteenth Amendment applied.  See Reply at 8-11.  They re-assert, from their MTD, that, unlike liberty interests, the Constitution does not create property interests, for property interests stem from an independent source such as state law.  See Reply at 8.  The Individual DOH Defendants first contend that, regarding habilitation services, including, vocational training and physical education, A.M. cannot show that the right to habilitation

services was clearly established before her discharge in 1979.  See Reply at 9.  A.M. identified several New Mexico state statutes in her Response, which she contended provided her with property rights in habilitation, including employment, education, and training, and the Individual DOH Defendants provide arguments in opposition to each one.  See Reply at 10-11.

The Individual DOH Defendants argue that N.M.S.A. 1955, § 34-3-2 does not provide A.M. with a protected property interest in the benefits of employment, education, and training; rather, the statute provides merely for the "establishment of an institution for the purpose of providing care, custody, employment, education and training of mental defectives."  Reply at 10. They maintain:

> This statute does not provide for the creation of a right to specific benefits.  Nor does this statute define the standards of eligibility for the receipt of specific benefits as required by *Roth*.  Furthermore, once [A.M.'s] indeterminate commitment to the Training School lapsed pursuant to the repeal of that statute on July 1, 1977, the individual DOH Defendants had no further obligations to detain [A.M.].

Reply at 10-11.

Further, the Individual DOH Defendants argue that A.M. does not -- as she asserts -- have protected property interests in education and training under the Developmental Disabilities Code, which took effect on July 1, 1977.  That statute provides that "each resident client receiving developmental disabilities services shall have the right to prompt habilitation services pursuant to an individualized plan. . . ."  Reply at 11 (quoting N.M.S.A. 1978, § 43-1-8 (1977).  The Individual DOH Defendants contend that A.M. cannot rely on this statute, because she has not provided any allegations in her Complaint sufficient to show that this provision applies to her. See Reply at 11.  They argue that, because A.M. never alleges that she was ever a "resident client" under N.M.S.A. 1978, § 43-1-8, with a legitimate claim of entitlement to benefits under the statute, she has failed to show that she had a constitutionally protected property right to

"prompt habilitation services pursuant to an individualized plan."  Reply at 11.  A.M. cited the Court of Appeals of New Mexico decision in LaBalbo v. Hymes, 1993 NMCA-010, 850 P.2d 1017, as support for her contention that N.M.S.A. 1978, § 43-1-8 creates a property interest in "the right to prompt habilitation services pursuant to an individualized habilitation plan." Response at 10.  The Individual DOH Defendants, however, assert that LaBalbo v. Hymes, decided in 1993, does not show that A.M. had such property rights at the time she was "discharged."  Reply at 11.

Regarding the other asserted property interests, the Individual DOH Defendants maintain that A.M. fails to "demonstrate both the existence of constitutionally cognizable protected property interests and that she was actually *deprived of* such interests."  Reply at 9 (emphasis in original).  They contend that the Complaint does not contain any allegations that A.M.'s "discharge" from the Training School resulted in the termination of SSI, Medicaid benefits, Medicare payments, the receipt of Developmental Disabilities Waiver services, or habilitation services.  Reply at 9.  The Individual DOH Defendants maintain that the "allegations are that [A.M.'s] social security benefits continued after discharge."  Reply at 9.  Further, they assert that the Complaint alleges that it was M. Evans and not the Individual DOH Defendants who deprived A.M. of "social security and other federal benefits which [she] was continuing to receive."  Reply at 9.  The Individual DOH Defendants state that "there are no allegations in the Amended Complaint that the Individual DOH Defendants themselves deprived [A.M.] of any Supplemental Security Income (SSI) benefits, Medicaid or Medicare benefits, or of the receipt of Developmental Disabilities Waiver benefits."  Reply at 9-10.  In sum, they maintain: (i) that A.M. did not have a protected property in these interests; and (ii) that she has not sufficiently

alleged that the Individual DOH Defendants deprived her of or terminated these benefits.  See Reply at 9-10.

Seventh, the Individual DOH Defendants argue that A.M. has not presented any cases or persuasive authority to demonstrate that the Individual DOH Defendants violated clearly established law.  See Reply at 12-13.  The Individual DOH Defendants state:

> A.M.'s remaining arguments fail to show that the law was clearly established that A.M. had either protected liberty or property interests such that she was entitled to any procedural due process or that her due process rights were violated by the Individual DOH Defendants.  None of the cases relied upon by [A.M.] support her claims.  *See O'Bannon v. Town Court Nursing Center*, 447 U.S. 100 S. Ct. (1980)(nursing home residents entitled to Medicare or Medicaid benefits have no constitutional right to participate in revocation proceedings brought against nursing home); *Goldberg v. Kelly*, 397 U.S. 254, 262, 90 S. Ct. 1011, 1017 (1970)(welfare benefits are matter of statutory entitlement for persons qualified to receive them); *Hatch v. Goerke*, 502 F.2d 1189 (10th Cir. 1974)(right to informal hearing prior to expulsion or lengthy suspension where state statute required school attendance); *Martinez v. Richardson*, 472 F.2d 1121, 1123 (10th Cir. 1973)(Medicare benefits based upon eligibility rules set forth in Act); *Heyford v. Parker*, 396 F.2d 393 (10th Cir. 1968)(mentally infirm individuals entitled to due process protections *prior to* commitment).

Reply at 12 (emphasis in original).  Further, without giving any explanation why, the Individual DOH Defendants contend that A.M.'s reliance on the Judge Brack MOO, "does not provide substance to [her] claim that she possessed a protected liberty or property interests that were clearly established at the time of her discharge or that the Individual DOH Defendants' conduct in any way deprived [A.M.] of rights secured by the Fourteenth Amendment."  Reply at 12.

**4.      The November 25, 2014, Hearing.**

The Court held a hearing on the MTD on November 25, 2014.  See Transcript of Hearing (taken November 25, 2014)("Tr.").[13]  When the Court and the parties took up the Motion, the

---

[13]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final version may contain slightly different page and/or line numbers.

DOH Defendants reiterated their arguments from their briefing.  They first argued that it was not clearly established in 1979 that A.M.'s asserted liberty interests were constitutionally protected. See Tr. at 20:19-22:14 (Constantares).   According to the Individual DOH Defendants, these include: the right to safety, to be free from harm, to adequate food, clothing, and shelter, to freedom from undue restraint including the right to receive treatment and services in the least restrictive appropriate placement, to minimally adequate medical, dental, mental health care, to have her views and interests regarding placement meaningfully represented in court, to have her a guardian or other surrogate decision-maker appointed, to association with family or peers, and to rehabilitative and habilitation services, vocational training, physical education, recreation, music or other types of programs to enhance specifically social skills.  See Tr. at 20:19-22:14 (Constantares).

Second, the Individual DOH Defendants argued that A.M. has not sufficiently alleged the existence of any constitutionally protected property interest providing her with a legitimate claim of entitlement to Supplemental Security Income from the Social Security Administration, Medicaid and Medicare payments, developmental disabilities waiver services, or the right to receive habilitation services including vocational training and physical education, See Tr. at 38:12-42:18 (Constantares); and that even if she has, it was M. Evans, and not the Individual DOH Defendants, who deprived A.M. of those interests.  See Tr. at 37:3-38:5 (Constantares). The Individual DOH Defendants also reiterated that under their qualified immunity defense there is a three-part inquiry:

> Number one, of course, whether the plaintiff has alleged a constitutional violation, number two, whether the law was clearly established at the time the individual defendants acted, but finally, even if the law was clearly established, the Court still needs to proceed to the third part of the inquiry which is -- and I'm quoting directly from the Gomes case -- we ask whether in spite of the fact that the law was clearly established, quote extraordinary circumstances such as reliance on the

> advice of counsel or on a statute so prevented the official from knowing that her
> actions or his actions were unconstitutional, that he/she [sic] should not be
> imputed with knowledge of a clearly established right.

Tr. at 23:15-24:4 (Constantares).  The Individual DOH Defendants next analyzed each asserted liberty and property interest, explaining why it was not clearly established in 1979.  See Tr. at 24:8-41:20 (Constantares).

A.M. began by addressing the relationship between her substantive due process and procedural due process claims, contending that even if the Court were to rule that A.M. remained in state custody for purposes of substantive due process analysis, she would still have a procedural due process claim.  See Tr. at 44:15-54:25 (Simmons).  A.M. admits that she needs to identify a constitutionally protected liberty or property interest, but contends that she has met this requirement.  See Tr. at 44:1-20 (Simmons).  A.M. then discussed Goldberg v. Kelly and its progeny.  See Tr. at 44:20-46:17 (Simmons).  According to A.M., the Goldberg v. Kelly line of cases does not stand for the proposition that one has a constitutionally protected property interest in welfare benefits.  See Tr. at 44:20-45:5 (Simmons).  Rather, Goldberg v. Kelly says that

> the State creates the interest by saying, here's an entitlement.  You get welfare
> benefits if you meet A, B, C, and D.  You get same thing with SSI benefits.  Ms.
> Adella was not getting welfare benefits, she was getting SSI benefits, that's the
> federal government giving it to you, and sort of the state, there's a state overlap,
> but the government, the state, says you get SSI benefits if you meet these criteria.
> ABCD.  And then you have an interest that the state can't take away.

See Tr. at 45:6-17 (Simmons).  Based on this line of cases, A.M. asserted that there were state created property interests from 1968 to 1977, "in care, custody, employment, education and training," and beginning in 1977, an entitlement to a habilation plan under the New Mexico Mental Health and Developmental Disabilities Code.  See Tr. at 45:23-46:11 (Simmons).  A.M. further reiterated that she had a state-created interest in SSI money benefits, whether conceived of as a property or liberty interest.  See Tr. at 46:12-17 (Simmons).

A.M. maintained that once the Individual DOH Defendants transferred her to the Homestead House, she remained in state custody, and was entitled to a residential habilitation plan, along with all these other services that she was supposed to receive.  According to A.M., therefore, even if Youngberg was not decided until 1982, A.M. was entitled to these other state-created interests that went back to 1968.  A.M. explained that in terms of personal participation, she is not alleging that the Individual DOH Defendants "personally stole her SSI check, but that they set in motion an overall plan."  See Tr. at 49:13-20 (Simmons).  She states that:

> If I'm an administrator of Los Lunas and I set in motion a plan that everybody's SSI benefits [are] going to go to their new caregivers, these aftercare caregivers, and I set in motion a plan that we don't need to go to court, we'll just put a note in the file, then what happens after that in terms of the denial of procedural due process that's inherent in that, you don't have to personally steal her SSI check.  There was a bit of a tell, as in poker, when defendants were arguing this, because they said, well, she didn't lose her check.  It went to Mary Evans.
>
> Well, that's the whole point.  The state took her check and gave it to Mary Evans.  Made her the representative payee, and Mary Evans was a stranger.  She's never been Adella's guardian, ever.  She was running a beehive home, as Your Honor said at the last hearing, a boarding home for the elderly, she took Adella to use her for free labor and wouldn't let her leave.

See Tr. at 49:20-50:14 (Simmons).  A.M. further explained her theory of liability for procedural due process violations:

> So I mean, basically, Your Honor, what we are relying on in terms of procedural due process is that the state created interest existed at the time, back to 1968, and that Goldberg, which said you can't take away these interests, existed in 1970, it was very clear you can't take away these interests, existed in 1970, it was very clear you can't take something from one person and give it to another, you can't take something from one person and keep it if you're the state, so that to the extent the state owed her the state created interest and sent her away and didn't give them to her, that's a procedural due process violation.  To the extent we're relying on liberty interests that stem from -- that arise from her commitment, then Your Honor is absolutely correct that your ruling, the court's proposed ruling, in terms of Youngberg and when that started, that would apply, but Adella remained committed at the time and so she's still there, they still owe her the procedural due process protections. . . . so that when Youngberg came out, she was still court committed, still committed to Fort Stanton, still under their custody, and still not getting the benefits and services to which she was entitled

- 39 -

> pursuant to Youngberg. But no, our procedural due process claim is not entirely
> dependent on Youngberg. It also depends on just these plain old state created
> liberty and property interests that come out of the state statutes.

See Tr. at 51:2-52:7 (Simmons). The Court said that it would study the parties' arguments, and

later rule on the Motion.

## LAW REGARDING RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon

which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion

tests the sufficiency of the allegations within the four corners of the complaint after taking those

allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994). The sufficiency

of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must

accept as true all well-pled factual allegations in the complaint, view those allegations in the light

most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's

favor. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a

reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would

the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098

(10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all

well-pled factual allegations in a complaint and view these allegations in the light most favorable

to the plaintiff." (citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006))).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers

labels and conclusions or a formulaic recitation of the elements of a cause of action" is

insufficient. Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544,

555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations

must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face.  See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556).  "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."  Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted).  The Tenth Circuit stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible."  The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(citations omitted).

Although affirmative defenses must generally be pled in the defendant's answer, not argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions where: (i) the defendant asserts an immunity defense -- the courts handle these cases differently than other motions to dismiss, see Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M. 2012)(Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009); Robbins v. Oklahoma, 519

F.3d at 1242); and (ii) where the facts establishing the affirmative defense are apparent on the face of the complaint, see Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim.  If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule.").   The defense of limitations is the affirmative defense most likely to be established by the uncontroverted facts in the complaint.  See 5 Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus & Adam N. Steinman, Federal Practice & Procedure: Civil § 1277 (3d ed. 2014).  If the complaint sets forth dates that appear, in the first instance, to fall outside of the statutory limitations period, then the defendant may move for dismissal under rule 12(b)(6).  See Rohner v. Union Pac. R.R. Co., 225 F.2d 272, 273-75 (10th Cir. 1955); Gossard v. Gossard, 149 F.2d 111, 113 (10th Cir. 1945); Andrew v. Schlumberger Tech. Co., 808 F. Supp. 2d 1288, 1292 (D.N.M. 2011)(Browning, J.).  The plaintiff may counter this motion with an assertion that a different statute of limitations or an equitable tolling doctrine applies to bring the suit within the statute; the Tenth Circuit has not clarified whether this assertion must be pled with supporting facts in the complaint or may be merely argued in response to the motion.  Cf. Kincheloe v. Farmer, 214 F.2d 604 (7th Cir. 1954)(holding that, once a plaintiff has pled facts in the complaint indicating that the statute of limitations is a complete or partial bar to an action, it is incumbent upon the plaintiff to plead, either in the complaint or in amendments to it, facts establishing an exception to the affirmative defense).  It appears, from case law in several circuits, that the plaintiff may avoid this problem altogether -- at least at the motion-to-dismiss stage -- by simply refraining from pleading specific or identifiable dates, see Goodman v. Praxair, Inc., 494 F.3d 458, 465-66 (4th Cir. 2007); Hollander v. Brown, 457 F.3d 688, 691 n.1 (7th Cir. 2006); Harris v. New York, 186 F.3d 243, 251 (2d Cir. 1999); Honeycutt v.

Mitchell, 2008 WL 3833472 (W.D. Okla. Aug. 15, 2008)(West, J.), although the Tenth Circuit

has not squarely addressed this practice.

## LAW REGARDING LIABILITY FOR CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right

secured by the Constitution and laws of the United States, and must show that the alleged

deprivation was committed by a person acting under color of state law."  West v. Atkins, 487

U.S. 42, 48 (1988).   Individual, non-supervisory defendants may be liable if they knew or

reasonably should have known that their conduct would lead to the deprivation of a plaintiff's

constitutional rights by others, and an unforeseeable intervening act has not terminated their

liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)("The requisite causal

connection is satisfied if [the defendants] set in motion a series of events that [the defendants]

knew or reasonably should have known would cause others to deprive [the plaintiffs] of [their]

constitutional rights.")(quoting Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006)).   The

Supreme Court has made clear that there is no respondeat superior liability under 42 U.S.C.

§ 1983.   See Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)("Because vicarious liability is

inapplicable to Bivens[14] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  "An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor." Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 689 (1978)). Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts.  See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

### 1.      Color of State Law.

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'" Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995).  The under-color-of-state-law requirement is a "jurisdictional requisite for a § 1983 action, which . . . furthers the fundamental goals of preserving an area of individual freedom by limiting the reach of federal law . . . and avoiding imposing on the state, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed."  Jojola v. Chavez, 55 F.3d 488, 492 (10th Cir. 1995).  "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  West v. Atkins, 487 U.S. at 49 (quoting United States v. Classic, 313 U.S. 299, 326 (1941)).  "The authority with which the defendant is allegedly 'clothed' may be either actual or apparent."  Jojola v. Chavez, 55 F.3d at 493.  Accordingly, at a base level, to find that an action was taken under color of state law, the

---

[14]In Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), the Supreme Court held that a violation of the Fourth Amendment "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct."  403 U.S. at 389.

court must find that "'the conduct allegedly causing the deprivation of a federal right' must be 'fairly attributable to the State.'"   Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447 (quoting Lugar v. Edmonson Oil Co., 457 U.S. 922, 937 (1982)).

In the context of a public employee, the Tenth Circuit has directed that, while "'state employment is generally sufficient to render the defendant a state actor . . . [,]' at the same time, it is 'well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state.'"   Jojola v. Chavez, 55 F.3d at 493 (quoting Lugar v. Edmonson Oil Co., 457 U.S. at 935-36 n.18; Mark v. Borough of Hatboro, 51 F.3d 1137, 1150 (3d Cir. 1995)).   Thus, "before conduct may be fairly attributed to the state because it constitutes action 'under color of state law,' there must be 'a real nexus' between the employee's use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant."   Jojola v. Chavez, 55 F.3d at 493.   What constitutes the required real nexus, however, is not completely clear.   As the Tenth Circuit has stated, whether there is a real nexus in a particular case depends on the circumstances:

> The under color of law determination rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or not the officer acts in accordance with his or her duty.   Instead one must examine "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties."

David v. City & Cnty. of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996)(internal citations omitted)(quoting Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995)).

**2.      Individual Liability.**

Government actors may be liable for the constitutional violations that another committed, if the actors "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights," thus establishing

the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations.  Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006).  The Tenth Circuit has explained that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'"  Martinez v. Carson, 697 F.3d at 1255 (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961), overruled in part by Monell v. Dep't of Soc. Servs., 436 U.S. at 663).  "Thus, Defendants are liable for the harm proximately caused by their conduct."  Martinez v. Carson, 697 F.3d at 1255 (citing Trask v. Franco, 446 F.3d at 1046).  As the Court has previously concluded, "a plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations. The recovery should be guided by common-law tort principles -- including principles of causation . . . ."  Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009)(Browning, J.).

The Tenth Circuit has found liability for those defendants who proximately caused an injury alleged under § 1983 and stated that the fact that the "conduct of other people may have concurrently caused the harm does not change the outcome as to [the defendant]," so long as there was not a superseding-intervening cause of a plaintiff's harm.  Lippoldt v. Cole, 468 F.3d 1204, 1220 (10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the officers only "would be liable for the harm 'proximately' or 'legally' caused by their tortious conduct."  Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995). "They would not, however, necessarily be liable for all of the harm caused in the 'philosophic' or but-for sense by the illegal entry."  Id.  In civil rights cases, a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability.  See, e.g., Warner v. Orange Cnty. Dep't of Prob., 115 F.3d 1068, 1071 (2d Cir. 1997); Springer v. Seaman, 821 F.2d 871, 877 (1st Cir. 1987), abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 . . . (1989).

Trask v. Franco, 446 F.3d at 1046.  Thus, in the context of a claim under the Fourth Amendment,

the Tenth Circuit has held that government actors "may be held liable if the further unlawful

detention and arrest would not have occurred but for their conduct and if there were no

unforeseeable intervening acts superseding their liability."  Martinez v. Carson, 697 F.3d at

1255.  The Tenth Circuit gave an example of a superseding-intervening cause, quoting the

Honorable Samuel J. Alito, then-United States Circuit Judge for the United States Court of

Appeals for the Third Circuit, now-Associate Justice for the Supreme Court:

> Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking and announcing their presence.  Once inside, they encounter the suspect, identify themselves, show him the warrant, and tell him that they are placing him under arrest. The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in the process injures him.  Is the third officer necessarily liable for the harm caused to the suspect on the theory that the illegal entry without knocking and announcing rendered any subsequent use of force unlawful?  The obvious answer is "no." The suspect's conduct would constitute a "superseding" cause, see Restatement (Second) of Torts § 442 (1965), that would limit the officer's liability. See id. § 440.

Trask v. Franco, 446 F.3d at 1046 (quoting Bodine v. Warwick, 72 F.3d at 400).  Additionally,

"[f]oreseeable intervening forces are within the scope of the original risk, and . . . will not

supersede the defendant's responsibility."  Trask v. Franco, 446 F.3d at 1047 (quoting William

Lloyd Prosser et al., Prosser and Keeton on Torts § 44, at 303-04 (5th ed. 1984)).  If

> the reasonable foreseeability of an intervening act's occurrence is a factor in determining whether the intervening act relieves the actor from liability for his antecedent wrongful act, and under the undisputed facts there is room for reasonable difference of opinion as to whether such act was wrongful or foreseeable, the question should be left for the jury.

Trask v. Franco, 446 F.3d at 1047 (citing Restatement (Second) of Torts § 453 cmt. b

(1965)).

3.      **Supervisory Liability**.

The Tenth Circuit has held that supervisors are not liable under 42 U.S.C. § 1983 unless there is "'an affirmative link . . . between the constitutional deprivation and either the supervisor's personal participation, . . . exercise of control or direction, or . . . failure to supervise.'"   Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009)(quoting Green v. Branson, 108 F.3d 1296, 1302 (10th Cir. 1997)(internal alterations omitted)).   Because supervisors can be held liable only for their own constitutional or illegal policies, and not for the torts that their employees commit, supervisory liability requires a showing that such policies were a "deliberate or conscious choice."   Barney v. Pulsipher, 143 F.3d at 1307-08 (citations omitted)(internal quotation marks omitted).   Cf. Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404 ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.   The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." (emphasis in original)).

The Tenth Circuit has recognized that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations.   See Garcia v. Casuas, 2011 WL 7444745, at *25-26 (citing Dodds v. Richardson, 614 F.3d 1185 (10th Cir. 2010)).   The language that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is as follows: "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."   Ashcroft v. Iqbal, 556 U.S. at 676.   The Tenth Circuit in Dodds v. Richardson held:

> Whatever else can be said about Iqbal, and certainly much can be said, we
> conclude the following basis of § 1983 liability survived it and ultimately resolves
> this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor
> who creates, promulgates, implements, or in some other way possesses

> responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

614 F.3d at 1199.  The Tenth Circuit noted that Ashcroft v. Iqbal "does not purport to overrule existing Supreme Court precedent," but stated that "Iqbal may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case." Dodds v. Richardson, 614 F.3d at 1200.  It concluded that Ashcroft v. Iqbal did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis." Dodds v. Richardson, 614 F.3d at 1200.  The Tenth Circuit, based on this conclusion, set forth a test for supervisory liability under § 1983 after Ashcroft v. Iqbal:

> A plaintiff may . . . succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.

Dodds v. Richardson, 614 F.3d at 1199-1200 (citing Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)).  The Tenth Circuit noted, however: "We do not mean to imply that these are distinct analytical prongs, never to be intertwined." Dodds v. Richardson, 614 F.3d at 1200 n.8.  Relying on the Supreme Court's opinion in Board of County Commissioners v. Brown, the Tenth Circuit reasoned that two of the prongs often, if not always, are sufficient proof that the third prong has been met also:

> Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward.  Section 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right. In any § 1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation.  Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably.  Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also

determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

Dodds v. Richardson, 614 F.3d at 1200 n.8 (quoting Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404-05)(internal quotation marks omitted).  The Tenth Circuit noted that "[w]e think the same logic applies when the plaintiff sues a defendant-supervisor who promulgated, created, implemented or possessed responsibility for the continued operation of a policy that itself violates federal law."  Dodds v. Richardson, 614 F.3d at 1200 n.8.  Thus, the Tenth Circuit reduced the test to what can be seen as a two-part test for supervisor liability, requiring the plaintiff to prove "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'"  Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

### 4.    **Municipal Liability.**

A municipality will not be held liable under § 1983 solely because its officers inflicted injury.  See Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006).  Rather, to establish municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link between the policy or custom, and the injury alleged.  See Graves v. Thomas, 450 F.3d at 1218.  When a claim is brought against a municipality for failing to train its officers adequately, the plaintiff must show that the municipality's inaction was the result of deliberate indifference to the rights of its inhabitants.  See Graves v. Thomas, 450 F.3d at 1218.

### **LAW REGARDING PROCEDURAL DUE PROCESS**

The Fourteenth Amendment states: "No State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  The Due Process Clause

encompasses two distinct forms of protection: (i) procedural due process, which requires a state to employ fair procedures when depriving a person of a protected interest; and (ii) substantive due process, which guarantees that a state cannot deprive a person of a protected interest for certain reasons.  See Reid v. Paulter, 36 F. Supp. 3d 1067, 1136 (D.N.M. 2014)(Browning, J.)(citing Cnty. of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998)).  "Under either form of protection, however, a person must have a protected interest in either life, liberty, or property." Chavez-Rodriguez v. City of Santa Fe, No. CIV 07-0633, 2008 WL 5992271, at *6 (D.N.M. Oct. 9, 2008)(Browning, J.).  The Tenth Circuit prescribes a two-step inquiry in determining whether an individual's procedural due-process rights were violated: (i) "Did the individual possess a protected property [or liberty] interest to which due process protection was applicable?"; and (ii) "Was the individual afforded an appropriate level of process?"  Camuglia v. City of Albuquerque, 448 F.3d 1214, 1219 (10th Cir. 2006)(quoting Clark v. City of Draper, 168 F.3d 1185, 1189 (10th Cir. 1999)(internal quotation marks omitted)).

"[T]o determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 570-71.  "'Liberty' and 'property' are broad and majestic terms.  They are among the '(g)reat (constitutional) concepts . . purposely left to gather meaning from experience." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571.  The Supreme Court has "made clear that the property interests protected by the procedural due process clause extend well beyond actual ownership of real estate, chattels, or money.  By the same token, the Court has required due process protection for deprivations of liberty beyond the sort of formal constraints imposed by the criminal process." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-72.  "Yet, while the Court has eschewed rigid or formalistic limitations on the protection of

procedural due process, it has at the same time observed certain boundaries" for "the words 'liberty' and 'property' in the Due Process Clause of the Fourteenth Amendment must be given some meaning." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572.

Regarding the meaning of the "liberty" guaranteed by the Fourteenth Amendment, the Supreme Court has stated the following:

> Without a doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, to establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness of free men.  In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572 (citations omitted).

"The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576.  These property interests, as already explained, clearly can include "real estate, chattels, or money," but they "may take many forms."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-76.

> Thus, the Court has held that a person receiving welfare benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process. Goldberg v. Kelly, 397 U.S. 254 (1970).  See Flemming v. Nestor, 363 U.S. 603, 611 (1960).  Similarly, in the area of employment, the Court has held that a public college professor dismissed from an office held under tenure provisions, Slochower v. Bd. of Education, 350 U.S. 551 (1956), and college professors and staff members dismissed during the terms of their contracts, Wieman v. Updegraff, 344 U.S. 183 (1952), have interests in continued employment that are safeguarded by due process.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576-66.

Based upon these decisions, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral

expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577.  "Such an interest arises not from the Due Process Clause of the Constitution itself, but is created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract."  Teigen v. Renfrow, 511 F.3d 1072, 1079 (10th Cir. 2007).  See Paul v. Davis, 424 U.S. 693, 710 (1976)("[Liberty and property] interests attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law.").

> Property interests, of course, are not created by the Constitution.  Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577.  See Farthing v. City of Shawnee, Kan., 39 F.3d at 1135 ("Rather, property interests, which are the subject of the present litigation, 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" (quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577)).

"[O]nce it is determined that the Due Process Clause applies, the question remains what process is due."  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)(citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972)).  "An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case."  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542 (citation omitted).  "[D]ue process is flexible and calls for such procedural protections as the particular situation demands."  Mathews v. Eldridge, 424 U.S. at 334.  The Supreme Court has explained that

the root requirement of the Due Process Clause as being that an individual be given an opportunity for a hearing before he is deprived of any significant property interest.  This principle requires some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment.

. . . .

[T]he pretermination hearing, though necessary, need not be elaborate. We have pointed out that [t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings.  In general, something less than a full evidentiary hearing is sufficient prior to adverse administrative action.

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542, 545 (footnote omitted)(citations omitted)(internal quotation marks omitted).

The United States Court of Appeals for the Second Circuit has stated:

The Supreme Court . . . explained that procedural due process is a flexible standard that can vary in different circumstances depending on "'the private interest that will be affected by the official action'" as compared to "the Government's asserted interest, 'including the function involved' and the burdens the Government would face in providing greater process." Hamdi v. Rumsfeld, 542 U.S. 507, [529] (2004)(quoting Mathews v. Eldridge, 424 U.S. at 335).  A court must carefully balance these competing concerns, analyzing "'the risk of an erroneous deprivation' of the private interest if the process were reduced and the 'probable value, if any, of additional or substitute safeguards.'"  Id. (quoting Mathews v. Eldridge, 424 U.S. at 335).

United States v. Abuhamra, 389 F.3d 309, 318 (2d Cir. 2004).  The hearing required depends on: (i) the nature of the private interest at stake; (ii) the risk of erroneous deprivation given the procedures already guaranteed, and whether additional procedural safeguards would prove valuable; and (iii) the government's interest and the burdens that additional procedures might impose.  See Mathews v. Eldridge, 424 U.S. at 335.  For example, "[w]here . . . the state must act quickly, a meaningful postdeprivation hearing is adequate."  Clark v. City of Draper, 168 F.3d at 1189.  See Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir. 1989)(removal of a child from parents' custody requires predeprivation hearing "except for extraordinary situations where

some valid governmental interest is at stake that justifies postponing the hearing until after the event.").

## LAW REGARDING STATE ACTION AND CIVIL-RIGHTS CLAIMS

The Supreme Court has stated that it is a judicial obligation to not only

> preserve an area of individual freedom by limiting the reach of federal law and avoid the imposition of responsibility on a State for conduct it could not control, but also to assure that constitutional standards are invoked when it can be said that the State is responsible for the specific conduct of which the plaintiff complains.

Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n, 531 U.S. 288, 295 (2001)(internal quotations omitted)(citations omitted).  Most rights under the Constitution secure protection only against infringement through state action.  See, e.g., Flagg Bros., Inc. v. Brooks, 436 U.S. 149 (1978)("[M]ost rights secured by the Constitution are protected only against infringement by governments.").  Under some circumstances, however, private parties' conduct may be deemed to be state action when the "conduct allegedly causing the deprivation of a federal right may be fairly attributable to the State."  Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 937 (1982). Whether the conduct may in fact be "fairly attributed" to the state requires a two-part inquiry. "First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible."  Lugar v. Edmondson Oil Co., Inc., 457 U.S. at 937.  "Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor."  Lugar v. Edmondson Oil Co., Inc., 457 U.S. at 937.  See West v. Atkins, 487 U.S. at 48 (explaining that, to state a claim under § 1983, the plaintiff must show: (i) deprivation of a right that the federal Constitution or federal laws secure; and (ii) that a person acting under color of state law caused the deprivation).

The Supreme Court in <u>Lugar v. Edmondson Oil Co., Inc.</u> explained that the two prongs merge when the claim is "directed against a party whose official character is such as to lend the weight of the State to his decisions," whereas they remain distinct when analyzing private parties' conduct.  457 U.S. at 937.  The first prong of the test in <u>Lugar v. Edmondson Oil Co., Inc.</u> -- that the deprivation of a right is attributable to the state -- is satisfied when "the authority of state officials . . . put the weight of the State behind [the d]efendant's private decision[.]"  457 U.S. at 940.  The second prong, identification of a defendant as a state actor, is met where the defendant "is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the state."  457 U.S. at 937.  The Supreme Court applied these prongs and determined that the plaintiff's allegation that private unlawful conduct deprived him of his property without due process failed to state a claim under § 1983.  <u>See</u> 457 U.S. at 940.  The Supreme Court also held that the plaintiff's claim, which alleged that the private parties had invoked a state statute maliciously or without valid grounds, did not give rise to state action.  <u>See</u> 457 U.S. at 940.  Instead, that claim amounted to nothing more than the private misuse or abuse of a state statute.  <u>See</u> 457 U.S. at 940-41.

For a private individual to act under color of state law, the deprivation of a federal right "must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible," and the defendant accused of a constitutional deprivation "must be a person who may fairly be said to be a state actor . . . because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State."  <u>Lugar v. Edmondson Oil Co.</u>, 457 U.S. at 937.

> Congress did not, in using the term "under the color of state law," intend to subject private citizens, acting as private citizens, to a federal lawsuit whenever

they seek to initiate a prosecution or seek a remedy involving the judicial system. To hold otherwise would significantly disregard one purpose of the state action requirement, which is to "preserve[ ] an area of individual freedom by limiting the reach of federal law and federal judicial power." Lugar, 457 U.S. at 936. Instead, in enacting § 1983, Congress intended to provide a federal cause of action primarily when the actions of private individuals are undertaken with state authority. See id. at 934. Thus, absent more, causing the state, or an arm of the state, to initiate a prosecution or serve process is insufficient to give rise to state action.

How v. City of Baxter Springs, 217 F. App'x 787, 793 (10th Cir. 2007)(unpublished).[15]

### 1.   Whether There Is State Action by Private Actors is a Legal Determination.

The Tenth Circuit has described the determination of state action as "particularly fact-sensitive, so the circumstances must be examined in their totality." Marcus v. McCollum, 394 F.3d 813, 819 (10th Cir. 2004). According to the Tenth Circuit, "[t]he Supreme Court has counseled us that the state action inquiry, although a legal determination to be made by the court, requires the sifting [of] facts and weighing [of] evidence." Phelps v. Wichita Eagle-Beacon, 886 F.2d 1262, 1271 (10th Cir. 1989)(quoting Burton v. Wilmington Parking Auth., 365 U.S. 715, 722 (1961)). In Gilmore v. City of Montgomery, 417 U.S. 556, 570 (1974), the Supreme Court said that, although it was the Supreme Court's role to determine whether the use of zoos,

---

[15]How v. City of Baxter Springs is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court finds How v. City of Baxter Springs and Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707 (10th Cir. 2011)(unpublished), have persuasive value with respect to material issues, and will assist the Court in its disposition of this Memorandum Opinion.

museums, parks, and other recreational facilities by private school groups and private non-school organizations "involved government so directly in the actions of those users as to warrant court intervention on constitutional grounds," the factual record before the Supreme Court "[did] not contain sufficient facts upon which to predicate legal judgments of this kind." 417 U.S. at 570.

On the other hand, leaving the determination of state action to the jury has shown to be ill-advised.  The cases in which the acts of private entities have been held to constitute state action or to be under color of law, and cases in which they have not, tend to be distinguished "by fine shadings in the sometimes complex interrelationships that develop between the state and private bodies."   Adams v. Vandemark, 787 F.2d 588, 1986 WL 16606, at *2 (6th Cir. 1986)(unpublished).   In Adams v. Vandemark, the United States Court of Appeals for the Sixth Circuit reviewed a jury instruction on state action from the United States District Court for the Eastern District of Michigan.  1986 WL 16606, at *1.  The Sixth Circuit in a per curium opinion in which Judges Martin, Jones and Wellford joined, found that the few words that were given to the jury on when to find state action "gave the jury little to guide it in making its determination on this crucial element of the claim for relief."  1986 WL 16606, at *2.  The Sixth Circuit noted that the application of the symbiotic-relationship test and the joint-relationship test are "very difficult and complex questions," and, "[t]o the extent a jury is to decide upon the proper factual predicates for this essentially legal determination, it must be given instructions that are clear, precise and informative as to the factors involved and the factual issues to be determined."  1986 WL 16606, at *2.  The Sixth Circuit found that the defendants were entitled to a new trial, because the jury was given no direction that could have enabled it to make the necessary underlying factual determination regarding state action.  1986 WL 16606, at *2-3.  The Court on multiple occasions has ruled on dispositive motions that required a determination

as a matter of law whether a private party was a state actor.  See, e.g., Herrera v. Santa Fe Public Schools, 41 F. Supp. 3d 1027 (D. N.M. 2014)(Browning, J.)(holding that private company providing security for school prom was a state actor); Archuleta v. City of Roswell, 898 F. Supp. 2d 1240 (D.N.M. 2012)(Browning, J.)(holding that private attorney was not a state actor engaged in a conspiracy against his client with prosecutors).

### 2.      The Tests for Determining State Action by a Private Party.

The Supreme Court has articulated four different tests for courts to use in determining whether conduct by an otherwise private party is state action: (i) the public-function test; (ii) the nexus test; (iii) the symbiotic-relationship test; and (iv) the joint-action test.  See Johnson v. Rodrigues (Orozco), 293 F.3d 1196, 1202-03 (10th Cir. 2002)(reviewing the various tests); Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447 (noting that "[a]pplication of the state action doctrine has been characterized as one of the more slippery and troublesome areas of civil rights litigation."  (internal quotation marks omitted)).

### a.      The Public-Function Test.

Under the public-function test, a court determines whether a private party has exercised "powers traditionally exclusively reserved to the State."  Jackson v. Metro. Edison Co., 419 U.S. 345, 352 (1974).  The public-function test is difficult to satisfy, because, while many functions may be traditionally governmental, few are "exclusively" governmental functions, as the test requires.  Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1456.  The courts have found exclusive government functions to include holding elections, performing necessary municipal functions, and running nursing facilities.  See Johnson v. Rodrigues (Orozco), 293 F.3d at 1203.

### b.       The Nexus Test.

Under the nexus test, state action is present if the state has ordered the private conduct, or "exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." Blum v. Yaretsky, 457 U.S. 991, 993 (1982). A court determines under the nexus test whether there is a sufficiently close nexus between the state and the challenged conduct, such that the conduct "may be fairly treated as that of the state itself." Jackson v. Metro. Edison Co., 419 U.S. at 351. "Private use of state-sanctioned private remedies or procedures does not rise to the level of state action. . . . But when private parties make use of state procedures with the overt, significant assistance of state officials, state action may be found." Tulsa Prof'l Collection Servs., Inc. v. Pope, 485 U.S. 478, 486 (1988)(citations omitted).

### c.       The Symbiotic-Relationship Test.

Under the symbiotic-relationship test, state action is present if the state "has so far insinuated itself into a position of interdependence" with a private party that "it must be recognized as a joint participant in the challenged activity." Burton v. Wilmington Parking Auth., 365 U.S. 715, 725 (1961). "[E]xtensive regulation, receipt of substantial state funds, and the performance of important public functions do not necessarily establish the kind of symbiotic relationship between the [state] and a private [party] that is required for state action." Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1451.

> The applicable decisions clearly establish no bright-line rule for determining whether a symbiotic relationship exists between a government agency and a private entity. Questions as to how far the state has insinuated itself into the operations of a particular private entity and when, if ever, the operations of a private entity become indispensable to the state are matters of degree.

Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1452.

### d.     The Joint-Action Test.

State action exists under the joint-action test if the private party is a "willful participant in joint action with the State or its agents." Dennis v. Sparks, 449 U.S. 24, 27 (1980).  Courts look to "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1453.  "[I]f there is a substantial degree of cooperative action between state and private officials . . . or if there is overt and significant state participation, in carrying out the deprivation of the plaintiff's constitutional rights, state action is present." Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1454 (citations omitted)(internal quotation marks omitted).  Joint participation can also take the form of a conspiracy between public and private actors; in such cases, the plaintiff must show that the public and private actors shared a common, unconstitutional goal.  See Sigmon v. CommunityCare HMO, Inc., 234 F.3d 1121, 1126 (10th Cir. 2000).  Even a conspiracy claim requires a sufficient level of state involvement to constitute joint participation in the unconstitutional actions.  See Soldal v. Cook County, 506 U.S. 56, 60 n.6 (1992).  The Tenth Circuit has previously dismissed constitutional claims against a private individual where the plaintiff did not give specific facts showing a conspiracy evidencing state action.  See Martinez v. Winner, 771 F.2d 424, 445 (10th Cir. 1985)("Beyond the bare conclusory allegation that [the defendant], a private citizen, conspired with the other defendants to deprive plaintiff of his constitutional and civil rights, no facts are stated indicating that [the defendant] did anything.").

In Gallagher v. Neil Young Freedom Concert, the Tenth Circuit, in an opinion that the Honorable Robert H. Henry, United States Circuit Judge for the Tenth Circuit, authored, and Judges Seymour and Daugherty joined, surveyed several instances in which courts have found

- 61 -

action "under color of state law" where governmental and private parties have acted together in joint-action:

> We have applied the joint action test in several cases involving allegations that private citizens acted in concert with police officers in making arrests.  In both Carey v. Continental Airlines Inc., 823 F.2d 1402 (10th Cir. 1987), and Lee v. Town of Estes Park, 820 F.2d 1112 (10th Cir. 1987), we held that citizens who made complaints to police officers that resulted in arrests were not state actors. We found nothing in the record in either case from which we could infer that the allegedly unconstitutional arrests "resulted from any concerted action, whether conspiracy, prearranged plan, customary procedure, or policy that substituted the judgment of a private party for that of the police or allowed a private party to exercise state power."   Carey, 823 F.2d at 1404.  In both cases, the record indicated that the police officers had made an independent decision to make the challenged arrest.  In contrast, in Lusby v. T.G. & Y. Stores, Inc., 749 F.2d 1423, 1429 (10th Cir. 1984), cert. denied, 474 U.S. 818 (1985), we concluded that a store security guard who reported a suspected shoplifter to the police was a state actor.  We noted that the officer that made the arrest did not make an independent investigation but relied on the judgment of the security guard.  In Coleman v. Turpen, 697 F.2d 1341 (10th Cir. 1982)(per curiam), we applied the joint action test by focusing on the manner in which the alleged constitutional deprivation was carried out.  There, the plaintiff challenged the seizure and sale of his property and named as defendants not only state officials but also the wrecking company that towed his truck and subsequently sold it.  We found the company to be a state actor because it had "jointly participated in seizing the truck by towing it away" and because the company's sale of the plaintiff's property was "an integral part of the deprivation."

49 F.3d at 1453-56.  The Tenth Circuit noted that, "just as with the other tests for state action, the mere acquiescence of a state official in the actions of a private party is not sufficient."  49 F.3d at 1453.  The Tenth Circuit found that the joint-action test can be satisfied where police are involved in cooperative action with a private party when "the police have substantially assisted in the allegedly wrongful conduct."  49 F.3d at 1455.  Joint participation typically arises when the authorities agree to facilitate through affirmative action a private party's unconstitutional acts.  See Soldal v. Cook County, 506 U.S. 56, 60 n.4 (1992).

### 3.     The Influence of Police Involvement on Transforming Private Action into State Action.

The Tenth Circuit has found that the involvement of the police does not necessarily convert a defendant's abuse of state law into conduct attributable to the state for purposes of § 1983 liability.  See Yanaki v. Iomed, Inc., 415 F.3d 1204, 1210 (10th Cir. 2005)(citing Winterland Concessions Co. v. Trela, 735 F.2d 257, 262 (7th Cir. 1984); Taylor v. Gilmartin, 686 F.2d 1346, 1348-49, 1355 n.3 (10th Cir. 1982); Torres v. First State Bank of Sierra Co., 588 F.2d 1322, 1327 (10th Cir. 1978)).  In Yanaki v. Iomed, Inc., the plaintiffs argued that the involvement of police acting in concert with the defendants in the search of the plaintiffs' residence converted the defendants' actions into conduct attributable to the state for the purposes of § 1983 liability.  See 415 F.3d at 1209-10.  The Tenth Circuit held that the plaintiffs "fail[ed] to satisfy the first part of the [Lugar v. Edmondson Oil Co., Inc.] color of law test because the conduct that Plaintiffs complain deprived them of their constitutional rights was caused by and [could] only be attributed to the private Defendants."  415 F.3d at 1210.  The Tenth Circuit, therefore, found it unnecessary to address whether the private defendants were state actors.  See 415 F.3d at 1210.  Additionally, merely following a procedure established by state law does not transform a private party's activity into state action.  See Scott v. Hern, 216 F.3d 897, 906-07 (10th Cir. 2000); Kirksey v. Theilig, 351 F. Supp. 727, 733 (D. Colo. 1972)(holding that self-help repossession of an automobile by a private party is not action under color of state law).

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority."  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted

demands customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City

of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. Apr. 28,

2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  The Supreme Court

deems it "untenable to draw a distinction for purposes of immunity law between suits brought

against state officials under § 1983 and suits brought directly under the Constitution against

federal officials."  Butz v. Economou, 438 U.S. 478, 504 (1978).   "The qualified immunity

analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil

War Civil Rights Acts."  Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled

on other grounds as recognized in Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

> Under § 1983 (invoked in this case) and Bivens v. Six Unknown Fed. Narcotics
> Agents, 403 U.S. 388 . . . (1971), a plaintiff may seek money damages from
> government officials who have violated her constitutional or statutory rights.  But
> to ensure that fear of liability will not "unduly inhibit officials in the discharge of
> their duties," Anderson v. Creighton, 483 U.S. 635, 638 . . . (1987), the officials
> may claim qualified immunity; so long as they have not violated a "clearly
> established" right, they are shielded from personal liability, Harlow v. Fitzgerald,
> 457 U.S. 800, 818 . . . (1982).  That means a court can often avoid ruling on the
> plaintiff's claim that a particular right exists.  If prior case law has not clearly
> settled the right, and so given officials fair notice of it, the court can simply
> dismiss the claim for money damages.  The court need never decide whether the
> plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Green, 131 S. Ct. 2020, 2030-31 (2011).

Issues of qualified immunity are best resolved at the "earliest possible stage in litigation."

Pearson v. Callahan, 555 U.S. 223, 232 (2009)(quoting Hunter v. Bryant, 502 U.S. 224, 227

(1991)(per curiam)).   "If qualified immunity is to mean anything, it must mean that public

employees who are just doing their jobs are generally immune from suit."  Lewis v. Tripp, 604

F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does

not violate clearly established statutory or constitutional rights of which a reasonable person

would have known." Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818).  Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. at 205.  When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct.  See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

## 1.    Procedural Approach to Qualified Immunity.

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified immunity defense.  In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." 555 U.S. at 236.  The Supreme Court also noted that, while no longer mandatory, the protocol outlined in Saucier v. Katz -- by which a court first decides if the defendant's actions violated the constitution, and then the court determines if the right violated was clearly established -- will often be beneficial.  See Pearson v. Callahan 555 U.S. at 241.  In rejecting the prior mandatory approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district court and courts of appeals with "what may seem to be an essentially academic exercise."  555 U.S. at 237.  The Supreme Court also recognized that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable."  555 U.S. at 241

(alterations omitted)(internal quotation marks omitted).  See Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior case law "comports with our usual reluctance to decide constitutional questions unnecessarily").  Once the plaintiff establishes an inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense generally fails.  See Cannon v. City & Cnty. of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

The Supreme Court recognizes seven circumstances where district courts should proceed directly to and "should address only" the clearly established prong of the qualified immunity analysis: when (i) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right."  Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(quoting Pearson v. Callahan, 555 U.S. at 236-42).  Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where

guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely only to face challenges in the qualified immunity context. Camreta v. Greene, 131 S. Ct. at 2031-32. See Kerns v. Bader, 663 F.3d at 1181.[16] "Courts should think carefully before

---

[16]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer. 663 F.3d at 1183. In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question. And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84. The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)." 663 F.3d at 1187 n.5. On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations. A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations. See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972). In Mitchum v. Foster, the Supreme Court explained:
>
>> Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." . . . The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.
>
> 407 U.S. at 238-39. Congress did not say it would remedy only violations of "clearly established" law, but that
>
>> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any

_____

> citizen of the United States or other person within the jurisdiction thereof to <u>the deprivation of any rights, privileges, or immunities secured by the Constitution and laws</u>, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (emphasis added).  The Supreme Court established the qualified immunity defense in <u>Pierson v. Ray</u>, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional.  <u>See</u> E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010).  The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith."  <u>Wood v. Strickland</u>, 420 U.S. 308, 322 (1975).  In <u>Harlow v. Fitzgerald</u>, when the Supreme Court moved to an objective test, the clearly-established prong became a part of the qualified immunity test.  <u>See</u> 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.").  It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy.  Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983.  J. Marceau, <u>The Fourth Amendment at a Three-Way Stop</u>, 62 Ala. L. Rev. 687, 687 (2011).  Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations.  <u>See</u> Christopher Slobogin, <u>Why Liberals Should Chuck the Exclusionary Rule</u>, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . .  These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, <u>Constitutional Alternatives to the Exclusionary Rule</u>, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives).  In <u>Hudson v. Michigan</u>,

expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'"   Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011)(quoting Pearson v. Callahan, 555 U.S. 223, 236-37 (2009)).   See Camreta v. Greene, 131 S. Ct. at 2032 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones.").[17]   The Tenth Circuit will

---

547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering.  See 547 U.S. at 596-97.   Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress.   It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights.   It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized in Ysasi v. Brown, No. CIV 13-0183 JB/CG, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.).   See Richard E. Myers, Fourth Amendment Small Claims Court, 10 OHIO ST. J. CRIM. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations and award monetary judgments).

[17]In Kerns v. Board of Commissioners, the Court expressed concern with Justice Elena Kagan's comments about "large" and "small" cases:

While the Court is, of course, obligated to follow faithfully the Supreme Court's decisions and opinions, the Court has always been unenlightened and even troubled by Justice Elena Kagan's comments in Camreta v. Greene about "large" and "small" cases.   131 S. Ct. at 2032.   As a trial judge, the Court has tried assiduously to avoid thinking about or categorizing some cases as "large" and some as "small."   It usually is not mentally healthy for a judge to put all his or her energy into "large" cases and slight "small cases"; to the litigants, their case is the most important case on the Court's docket, and it is usually wise for the judge to treat each case on which he or she is working -- at that moment -- as the most important case at that moment.   Getting the decision "right," i.e. getting the law and facts correct and accurate, is obviously important, but getting it right is only one-half of a judge's task, particularly a trial judge's job.   The other half of

dispensing justice is the appearance of justice -- did the Court listen to the litigant's arguments, wrestle with those arguments, and deal with them in an intellectually honest way.  Americans are pretty good about accepting a judicial decision -- even an adverse one -- and cease obsessing over an issue, if they are convinced that an authority figure has dressed up, taken them seriously, listened patiently and politely, wrestled with the arguments, addressed them, and accurately stated the facts.  The Court believes that, if it starts looking at some cases before it as "large" and some as "small," it begins a slippery slope that does not accomplish both halves of the task of dispensing justice.  The justice system depends so much on the nation respecting and accepting the courts' proceedings and decisions, because courts have very little "power" that does not depend on that acceptance.  Thus, Justice Kagan's comments are not only not self-defining, but they are disturbing.

If, perhaps, a "large" case is a Supreme Court case or one that comes from the East Coast or California, rather than one in a district court in New Mexico, then it helps to look at what cases the Supreme Court has decided for the plaintiff.  The three most recent qualified immunity cases, the Supreme Court dealt with are: (i) Reichle v. Howards, 132 S. Ct. 2088 (2012); (ii) Filarksy v. Delia, 132 S. Ct. 1657 (2012); and (iii) Messerschmidt v. Millender, 132 S. Ct. 1235 (2012).  In Reichle v. Howards, the Supreme Court determined that secret service agents were entitled to qualified immunity for arresting a protestor who touched the Vice President and held that it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation.  See 132 S. Ct. at 2092, 2097.  In Filarsky v. Delia, the Supreme Court held that a private individual that the government hires to do its work, an internal affairs review, is entitled to seek qualified immunity for Fourth and Fourteenth Amendment violations.  See 132 S. Ct. at 1660, 1668.  In Messerschmidt v. Millender, the Supreme Court held that police officers in Los Angeles, California were entitled to qualified immunity when they relied on an invalid warrant to search a home, because a reasonable officer would not have realized the error.  See 132 S. Ct. at 1241, 1250.  The Supreme Court has not denied qualified immunity since 2004 in Groh v. Ramirez, 540 U.S. 551 (2004), where it held that an officer unreasonably relied on a deficient warrant.  See 540 U.S. at 565. The Court does not think those presumably "large" cases (they are Supreme Court cases, after all) are any different -- substantively, legally, or factually -- than this case involving the search of a citizen's home after someone shot down a police helicopter and then detained that suspect for nine months until the United States realized that J. Kerns could not have shot down the helicopter.

On the flip side, treating large cases like they are large cases can create an appearance problem to the public and to the litigants -- that only big cases deserve the Court's attention.  A trial judge can overwork a "large" case.  It is better to treat even "large" cases like every other case; large cases and their litigants need to know and appreciate that they are not the only case on the court's docket, and realize that the scarcity of judicial resources applies to them too.

remand a case to the district court for further consideration when the district court has given cursory treatment to the clearly established prong of the qualified immunity analysis.  See Kerns v. Bader, 663 F.3d at 1182.

### 2.      Clearly Established Rights in the Qualified Immunity Analysis.

To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001).  On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (alteration in original)(quoting Saucier v. Katz,

---

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d at 1222 n.35.

533 U.S. at 202).  A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts."  Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  Ashcroft v. al-Kidd, 131 S. Ct. at 2083.  "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'"  Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 131 S. Ct. at 2083).  "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified."  Anderson v. Creighton, 483 U.S. at 639.  "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established."  Ashcroft v. al-Kidd, 131 S. Ct. at 2084.  The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law.  Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit held in Kerns v. Bader that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference."  663 F.3d at 1188 (emphasis in original).  In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in

- 72 -

our home," but "whether it was <u>beyond debate</u> in 2005 that the officers' entry and search lacked legal justification."   663 F.3d at 1183 (emphasis added).   Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined, applied a sliding scale to determine when the law is clearly established.   See <u>Casey v. City of Fed. Heights</u>, 509 F.3d 1278, 1284 (10th Cir. 2007)("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation."). "[W]hen an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a second decision with greater specificity to clearly establish the law."   <u>Casey v. City of Fed. Heights</u>, 509 F.3d at 1284.   Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning . . . ."   <u>Hope v. Pelzer</u>, 536 U.S. at 741.

## ANALYSIS

The Court will grant in part and deny in part the MTD.   The Individual DOH Defendants violated A.M.'s Fourteenth Amendment procedural due-process rights.   Through her transfer to the Homestead House and later under M. Evans' care, A.M. was deprived of various constitutionally protected liberty and property interests.   First, A.M. has sufficiently alleged that the Individual DOH Defendants deprived her of her protected liberty interests in adequate medical care, dental care, and conditions of reasonable care and safety, and reasonably nonrestrictive confinement conditions, without adequate due process of law, beginning on April 11, 1983, when the Tenth Circuit clearly established proximate causation liability for § 1983 procedural due-process claims in <u>Miller v. City of Mission</u>.   Second, in 1979, the Individual DOH Defendants directly and unconstitutionally deprived A.M. of entitlements to education, training, and habilitation services, under § 43-1-8 of the New Mexico Mental Health and Disabilities Act, when they stripped her of her status as a "resident client" under the Act without due process of law and transferred her out of the Training School to the Homestead House.   The

Individual DOH Defendants remain liable for this deprivation, because it was clearly established in 1979 that, once the government provides an entitlement, it cannot take it away without due process of law.  Finally, the Individual DOH Defendants proximately caused the violation of A.M.'s procedural due-process rights as to the deprivation of her SSI benefits, Medicaid benefits, Medicare benefits, and the value of her labor.  Because the Tenth Circuit did not clearly establish proximate causation liability for § 1983 procedural due-process claims until April 11, 1983, when it issued <u>Miller v. City of Mission</u>, however, qualified immunity shields the Individual DOH Defendants from liability for M. Evans' deprivation of A.M.'s SSI, Medicaid benefits, Medicare benefits, and the value of her labor between 1979 and April 11, 1983.  The Individual DOH Defendants remain liable, however, for M. Evans' deprivation of A.M.'s SSI, Medicaid benefits, Medicare benefits, and the value of her labor beginning on April 11, 1983.

**I.     A.M. HAS SUFFICIENTLY ALLEGED THAT THE INDIVIDUAL DOH DEFENDANTS VIOLATED HER PROCEDURAL DUE-PROCESS RIGHTS BY DEPRIVING HER OF PROTECTED LIBERTY INTERESTS WITHOUT DUE <u>PROCESS OF LAW</u>.**

The Individual DOH Defendants violated A.M.'s liberty-based procedural due process rights.  First, while all of A.M.'s asserted liberty interests are not properly alleged, A.M. has identified several constitutionally protected liberty interests: adequate medical, dental, and mental health care, and conditions of reasonable care and safety, and reasonably nonrestrictive confinement conditions.  Second, A.M. has sufficiently alleged that she was deprived of these constitutionally protected liberty interests without due process of law, and that the Individual DOH Defendants directly and proximately caused the deprivations.  Finally, the Court concludes that A.M. has sufficiently alleged that the Individual DOH Defendants are liable for the violation of her liberty-based procedural due-process rights beginning on April 11, 1983, when the Tenth Circuit clearly established proximate causation liability for § 1983 procedural due-process claims

in <u>Miller v. City of Mission</u>.

### A. THE INDIVIDUAL DOH DEFENDANTS VIOLATED A.M.'S PROCEDURAL DUE-PROCESS RIGHTS.

To establish a procedural due-process violation, A.M. must demonstrate that: (i) she has a protected liberty or property interest at stake; and (ii) that she was deprived of that interest without due process of law.  <u>See</u> <u>Camuglia v. City of Albuquerque</u>, 448 F.3d at 1219.  The Court concludes that A.M. has sufficiently alleged that she was unconstitutionally deprived of adequate medical care, dental care, and mental health care, and conditions of reasonable care and safety, and reasonably nonrestrictive confinement conditions, without adequate due process of law, in violation of the Fourteenth Amendment.

### 1. <u>A.M. has Identified Several Constitutionally Protected Liberty Interests.</u>

To establish a procedural due-process violation, A.M. must first identify a protected liberty or property interest at stake.  <u>See</u> <u>Camuglia v. City of Albuquerque</u>, 448 F.3d at 1219. The Court concludes that A.M. has sufficiently identified constitutionally protected liberty interests in adequate medical care, dental care, and mental health care, and conditions of reasonable care and safety, and reasonably nonrestrictive confinement conditions.  A.M. therefore has satisfied the first requirement of her procedural due process claim: identification of protectable liberty interests.

> ### a.  A.M. has Sufficiently Identified a Constitutionally Protected Liberty Interest in Medical Care, Dental Care, and Mental Health Care, but not in Food, Shelter, and Clothing.[18]

The Court concludes that A.M. has sufficiently identified a constitutionally protected liberty interest in receiving adequate medical care, dental care, and mental health care.  In Youngberg v. Romeo, the Supreme Court indicated that the State is obliged under the Fourteenth Amendment to provide involuntarily committed mental patients with "adequate food, shelter, clothing, and medical care."  457 U.S. at 324.  Specifically, the Supreme Court stated: "We repeat that the State concedes a duty to provide adequate food, shelter, clothing, and medical care.  These are the essentials of the care that the State must provide."  457 U.S. at 324.  Seven years later, in DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189 (1989)("DeShaney"), the Supreme Court clarified the scope of Youngberg v. Romeo, and confirmed that, under the Fourteenth Amendment, the state has a duty to provide for involuntarily committed individuals' basic needs, including food, clothing, shelter, medical care, and reasonable safety.  In an opinion that the Honorable William H. Rehnquist, then-Chief Justice of the Supreme Court, authored, the Supreme Court explained:

> The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs -- _e.g.,_ food, clothing, shelter, medical care, and reasonable safety -- it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

DeShaney, 489 U.S. at 200 (footnotes omitted)(citations omitted).

---

[18]In the briefing, A.M. identifies medical care, dental care, mental health care, food, shelter, and clothing alternatively as either property interests or liberty interests.  The Court concludes that in light of the Supreme Court's decision in Youngberg v. Romeo, these interests are more accurately classified as liberty interests, and will analyze them accordingly.

The Court concludes that A.M. has sufficiently identified a constitutionally protected liberty interest in receiving adequate medical, dental, and mental health care under Youngberg v. Romeo and its progeny.  In A.M.'s Complaint, under the First Cause of Action for violations of the Fourteenth Amendment, A.M. alleges that she was deprived of her liberty interest in "adequate food, clothing, and shelter . . . and in receiving all other medical, dental and mental health care . . ."  Complaint ¶¶ 128-30, at 32-33.  Further, in the General Allegations section of her Complaint, A.M. alleges: "Despite her disabilities, DOH Defendants and individual Defendants abandoned Plaintiff in 1979, in an unlicensed group shelter.  During the over thirty-year period after DOH Defendants and the individual Defendants placed Plaintiff with Mary Evans and then abandoned her, Plaintiff were deprived of . . . medical, dental and psychological care . . . ."  Complaint ¶ 85, at 23.  Finally, A.M. alleges that an APS investigation into her circumstances revealed that A.M. had not seen a primary care physician in at least five years.  See Complaint ¶ 108, at 28.  The Court concludes that A.M.'s allegations regarding her medical care sufficiently identify a constitutionally protected liberty interest, which the Supreme Court recognized in Youngberg v. Romeo.  See 457 U.S. at 324.  The Court is also persuaded that dental care and mental health or psychological care also fall under the category of "medical care."  A person could live for thirty years without medical, dental, and psychological care.  While more facts might be useful, the pled facts are sufficient because of the nature of the asserted liberty interests.  Given the other facts alleged, the Court can reasonably infer and envision that M. Evans did not provide A.M. with much medical care, dental care, or mental health or psychological care.  M. Evans was unlikely, running a nursing home for elderly people, to be in a position to provide mental health or psychological care.

Regarding A.M.'s allegation that she was deprived of her liberty interest in "adequate food, clothing, and shelter," Complaint ¶ 128, at 32, the Court concludes, however, that A.M.'s general factual allegations are insufficient.  A.M. does not explain how, when, or under what circumstances she was deprived of adequate food, shelter, or clothing.  More detail is required, because A.M. would not be alive if she did not eat for thirty years.  There is no allegation that she slept outside.  It is unlikely that she was naked for thirty years.  If A.M. is going to plead a deprivation of these liberty interests, more is required under Iqbal and Twombly to properly plead these losses of liberty interests.  The Court requires more than is presently set forth in A.M.'s complaint regarding these liberty interests.

> **b.      A.M. has Sufficiently Identified Protected Liberty Interests in Conditions of Reasonable Care and Safety, and Reasonably Nonrestrictive Confinement Conditions.**

A.M. also alleges that she has and had constitutionally protects liberty interests in conditions of reasonable care and safety, and reasonably nonrestrictive confinement conditions.  See Complaint ¶¶ 85, 87, 89-93, 96, 128-140, at 23-25, 32-36.  The Court agrees with A.M., and concludes that, under Youngberg v. Romeo and its progeny, A.M. has sufficiently identified constitutionally protected liberty interests in conditions of reasonable care and safety, and reasonably nonrestrictive confinement conditions.  See, e.g., Youngberg v. Romeo, 457 U.S. at 324.  Youngberg v. Romeo involved a thirty-three year old developmentally disabled individual -- Nicholas Romeo -- who was involuntarily committed to a state institution.  See 457 U.S. at 309.  While at that institution, Romeo suffered numerous injuries -- some self-inflicted and some that the other residents caused.  See 457 U.S. at 310.  After objecting multiple times to the state's failure to care for her son properly, Romeo's mother brought a § 1983 action, alleging, among

other things, that state officials had violated her son's substantive due-process rights to reasonable care and safety.  See 457 U.S. at 310.

On a writ of certiorari to the Supreme Court, the defendants conceded that Romeo had "a right to adequate food, shelter, clothing, and medical care," but disputed his right to "safety, freedom of movement, and training."  457 U.S. at 314.  In an opinion that Justice Powell authored, the Supreme Court began its analysis by noting that, "[a]s a general matter, a State is under no constitutional duty to provide substantive services for those within its border."  457 U.S. at 317 (citations omitted).  Justice Powell stated, however, that, "[w]hen a person is institutionalized -- and wholly dependent on the State -- . . . a duty to provide certain services and care does exist . . . ."  457 U.S. at 317.  Having previously held that it was cruel and unusual punishment to hold convicted criminals in unsafe conditions, Justice Powell reasoned that it must, therefore, also "be unconstitutional to confine the involuntarily committed -- who may not be punished at all -- in unsafe conditions."  457 U.S. at 316.  Justice Powell concluded that developmentally disabled individuals involuntarily committed to the state have "constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests."  457 U.S. at 324.  The Court concludes that in light of Youngberg v. Romeo, A.M. has sufficiently identified constitutionally protects liberty interests in conditions of reasonable care and safety, and reasonably nonrestrictive confinement conditions.  See Complaint ¶¶ 85, 87, 89-93, 96, 128-140, at 23-25, 32-36.

The Plaintiff alleges that the DOH transferred J.P., another developmentally disabled woman, to the Homestead House on the same day as A.M.'s transfer.  See Complaint ¶ 13, at 5.  While at the Homestead House, J.P. attempted to leave to find her children, from whom she had

been separated.  See Complaint ¶ 89, at 24.  J.P. climbed over the wall and wandered the streets

calling out for her children, and eventually either returned or was brought back to the Homestead

House.  See Complaint ¶ 89, at 24.  After this incident, M. Evans took J.P.'s shoes and planted

cacti at the place where J.P. had climbed the wall to prevent her from escaping.  See Complaint ¶

89, at 24.  J.P. continued to try to escape.  See Complaint ¶ 89, at 24.  At one point, J.P. jumped

over the wall and landed in the cacti.  See Complaint ¶ 89, at 24.  While A.M. was not injured by

the cacti, they do not suggest reasonable care and safety.   Further, A.M.'s placement at the

Homestead House -- surrounded by cacti -- does not sound like reasonably nonrestrictive

confinement conditions.  Again, while more facts might have been helpful, the Court concludes

that the Plaintiffs have pushed these liberty interests across the plausibility line.

### c.  A.M. has not Sufficiently Identified Protected Liberty Interests in Minimum Habilitation or Training.

A.M. alleges that she has and had a constitutionally protected liberty interest in

minimally adequate care, treatment, training, and habilitation.  The Court concludes that, while

minimum habilitation or training[19] is a recognized constitutionally protected liberty interest,

A.M. has not sufficiently alleged in her Complaint what required training or habilitation she did

not receive, if any, while under M. Evans' care. It is true that, in Youngberg v. Romeo, the

Supreme Court recognized that involuntarily committed developmentally disabled individuals

have a constitutionally protected liberty interest in receiving minimum habilitation or training.

Indeed, the Supreme Court explained:

> Chief Judge Seitz [of the Third Circuit, who wrote a concurring opinion at the
> Court of Appeals level], in language apparently adopted by respondent, observed:

---

[19]The term "treatment" is synonymous with training or habilitation.  See Youngberg v. Romeo, 457 U.S. at 319 n.24.

> "I believe that the plaintiff has a constitutional right to minimally adequate care and treatment.   The existence of a constitutional right to care and treatment is no longer a novel legal proposition.

Chief Judge Seitz did not identify or otherwise define -- beyond the right to reasonable safety and freedom from physical restraint -- the "minimally adequate care and treatment" that appropriately may be required for this respondent.  In the circumstances presented by this case, and on the basis of the record developed to date, we agree with his view and conclude that respondent's liberty interests require the State to provide minimally adequate or reasonable training to ensure safety and freedom from undue restraint.  In view of the kinds of treatment sought by respondent and the evidence of record, we need go no further in this case.

457 U.S. at 318-19.  Youngberg v. Romeo, however, dealt "exclusively with training related to physical restraints; the Court expressly stated that it was neither considering nor ruling on any broader right to habilitation." Clark v. Cohen, 794 F.2d 79, 95 (3d Cir. 1986)(citing Youngberg v. Romeo, 457 U.S. at 316 and 316 n.19).  Justice Blackmun filed a concurrence, which Justices Brennan and O'Connor joined, agreeing that the Supreme Court need not address whether any broader or general right to habilitation exists.  See 457 U.S. at 326-27 (Blackmun, J., concurring).  The Third Circuit has explained:

> He suggested, however, than an involuntarily civilly committed person might have a due process right to such training as is necessary to preserve his or her self-care skills, *i.e.*, to prevent them from deteriorating during the person's commitment.

>> If a person could demonstrate that he entered a state institution with minimal self-care skills, but lost those skills after commitment because of the State's unreasonable refusal to provide him training, then, it seems to me, he has alleged a loss of liberty quite distinct from -- and as serious as -- the loss of safety and freedom from unreasonable restraints.  For many mentally retarded people, the difference between the capacity to do things for themselves within an institution and total dependence on the institution for all of their needs is as much liberty as they will ever know.

> *Id.* at 327, 102 S. Ct. at 2464 (Blackmun, J., concurring).

Clark v. Cohen, 794 F.2d at 96.  The Third Circuit has referred to "this as the non-deterioration principle."   Clark v. Cohen, 794 F.2d at 96.   Although Justice Blackmun suggested that involuntarily committed persons have a broader right to such training only as is necessary to preserve his or her self-care skills, other federal courts have endorsed the principle.  See, e.g., Clark v. Cohen, 794 F.2d at 95; Society for the Goodwill to Retarded Children, Inc. v. Cuomo, 737 F.2d at 1250 ("Justice Blackmun's concurrence . . . suggested that the state may be required to provide training necessary to preserve basic self-care skills (such as dressing or toileting oneself) that an individual possessed when he or she entered a facility for the mentally retarded. . . . We agree with the result suggested by Justice Blackmun's concurrence . . ."); Association for Retarded Citizens of North Dakota v. Olson, 561 F. Supp. 473, 487 (D.N.D. 1982)(J., Sickle); Lelsz v. Kavanaugh, 629 F. Supp. 1487, 1496 (N.D. Tex. 1986)(J., Sanders).

While A.M. alleges that she was deprived of social services including "day habilitation and therapy" while under M. Evans' care, there is no general constitutional right to habilitation or training.  See Complaint ¶ 85, at 23.  Rather, Youngberg v. Romeo dealt "exclusively with training related to physical restraints; the Court expressly stated that it was neither considering nor ruling on any broader right to habilitation."   Clark v. Cohen, 794 F.2d at 95 (citing Youngberg v. Romeo, 457 U.S. at 316 and n.19).   In other words, Youngberg v. Romeo established that involuntarily committed developmentally disabled individuals have liberty interests in receiving training or habilitation such that they would not need to be physically restrained.  Here, however, A.M. does not expressly allege that she was physically restrained. Justice Blackmun's concurrence in Youngberg v. Romeo suggested that the state may be required to provide training necessary to preserve basic self-care skills, such as dressing or toileting oneself, that an individual possessed when he or she entered a facility for the mentally

retarded, and various federal courts have endorsed this principle.  In any case, A.M. has not alleged that she possessed basic self-care skills when she entered the Homestead House, which were not preserved because of a lack of training under M. Evans' care.  The Court thus concludes, based on the allegations set forth in the Complaint, that A.M. has not sufficiently identified a constitutionally protected liberty interest in training, habilitation, or treatment under the facts of this case.

> ### d.   The Opportunity to Associate With Family is a Protected Liberty Interest, but A.M. has not Alleged Facts Sufficient for the Court to Find That such an Interest is at Stake in this Case.

A.M. alleges in her Complaint that, while under M. Evans' care at the Homestead House, she was deprived of "any opportunity to socialize with her peers," Complaint at ¶ 85, at 23; id. ¶ 99, at 26 ("Plaintiff was kept isolated without any opportunity to socialize."), and that she was denied the right to "associate with persons of her own choosing," Complaint ¶ 144, at 36.  The Court agrees with the Individual DOH Defendants that A.M. does not cite any case law recognizing a constitutionally protected liberty interest in associating with one's peer or family relationships.  Further, the Court has been unable to find any support for a constitutionally protected liberty interest in peer relationships.  Moreover, A.M.'s Complaint does not ever use the word "family."  Rather, A.M. references "peers," Complaint ¶ 85, at 23, and "persons of her own choosing," Complaint ¶ 144, at 36.  The Court will, however, construe the Complaint in the manner most favorable to the Plaintiff, and interpret A.M.'s Complaint as asserting constitutionally protected liberty interests in her family relationships and in associating with her family.

The Court agrees that there is a constitutionally protected liberty interest in family relationships and the opportunity to associate with one's family, but nonetheless concludes that

A.M.'s Complaint does not allege facts sufficient for the Court to find that she has identified such a liberty interest at stake in this case. The Supreme Court has long recognized the right to associate with family as deeply rooted in the Constitution. In Meyer v. Nebraska, 262 U.S. 390 (1923), and Pierce v. Society of Sisters, 268 U.S. 510 (1928), the Supreme Court held that "the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition. It is through the family that we inculcate and pass down many of our most cherished values, moral and cultural." Moore v. City of East Cleveland, Ohio, 431 U.S. 494, 503-04 (1977). Later, in Loving v. Virginia, 388 U.S. 1 (1967), the Supreme Court explained:

> The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men.
>
> Marriage is one of the "basic civil rights of man," fundamental to our very existence and survival. To deny this fundamental freedom on so unsupportable a basis as the racial classifications embodied in these statutes, classifications so directly subversive of the principle of equality at the heart of the Fourteenth Amendment, is surely to deprive all the State's citizens of liberty without due process of law. The Fourteenth Amendment requires that the freedom of choice to marry not be restricted by invidious racial discriminations. Under our Constitution, the freedom to marry or not marry, a person of another race resides with the individual and cannot be infringed by the State.

388 U.S. at 12 (citations omitted). The Supreme Court has also indicated that the protected liberty interest in living together as a family is not limited to the biological, nuclear family. See Smith v. Organization of Foster Families for Equality and Reform, 431 U.S. 816, 842-47 (1977). In Smith v. Organization of Foster Families for Equality and Reform, the Supreme Court articulated that the concept of "family" might extend to foster families, although the Supreme Court acknowledged that such claims "raise[] complex and novel questions," 431 U.S. at 847, and that liberty interests may be limited, particularly where "the proposed removal of a child from the foster family is to return the child to his natural parents," 431 U.S. at 846-47.

Most relevant to the rights of the involuntary committed to associate with family, is the Supreme Court's decision in Troxel v. Granville.  See 530 U.S. at 57.  There, the Supreme Court evaluated whether a Washington state law that allowed "any person [to] petition the court for visitation rights at any time . . . when visitation may serve the best interests of the child."  530 U.S. at 61.  Under the statute, a court awarded a child's grandparents more visitation with the child than a sole surviving parent desired.  See 530 U.S. at 61.  The Supreme Court ultimately reversed this decision, recognizing the "fundamental rights of parents to make decisions concerning the care, custody and control of their children," and concluding that the Washington state law unconstitutionally infringed on that fundamental parental right.  530 U.S. at 66-67.  The Supreme Court explained, however, that it had "not yet had occasion to elucidate the nature of a child's liberty interests in preserving established familial or family-like bonds."  530 U.S. at 88.

Given the sacred role of the family in our nation's history and in light of the Supreme Court's decisions in Smith v. Organization of Foster Families for Equality and Reform and Troxel v. Granville, the Court concludes that involuntarily committed developmentally disabled persons have a constitutionally protected liberty interest to associate with their biological family members.  The Court would not extend that right to peers or persons of A.M.'s own choosing.  If the state can deprive her of her liberty interests by institutionalizing her, she loses these choices or privileges.  That reality is why depriving a person of his or her liberty interests must be done carefully and with adequate due process.  With these basic rules in mind, A.M.'s Complaint does not, however, allege facts sufficient for the Court to find that she has identified a constitutionally protected liberty interest at stake in this case, for she does not anywhere specifically identify any particular family member with whom she was not able to associate or to whom she was denied access.

2.   **A.M. has Sufficiently Alleged that She was Deprived of Constitutionally Protected Liberty Interests Without Due Process of Law.**

The Court has concluded that A.M. has sufficiently identified several constitutionally protected liberty interests that are at stake in this case: her right to receive adequate medical care, dental care, and mental health care, and in conditions of reasonable care and safety, and reasonably nonrestrictive confinement conditions.   A.M. therefore has satisfied the first requirement of her procedural due process claim: identification of protectable liberty interests that trigger federal due-process guarantees.   See, e.g., Dunham v. Wadley, 195 F.3d 1007, 1009 (8th Cir. 1999)("The analysis of a procedural due process claim must begin with examination of the interest allegedly violated.").   The Court therefore must move to the second part of the analysis.   Where a plaintiff has a protected liberty or property interest, she must demonstrate that she was deprived of that interest without due process of law.   See, e.g., Camuglia v. City of Albuquerque, 448 F.3d at 1219; Hopkins v. Saunders, 199 F.3d 968, 975 (8th Cir. 1999)("To establish a procedural due process violation, a plaintiff must demonstrate . . . that he was deprived of that interest without due process of law.").

As described above, the Court concludes that A.M. has sufficiently alleged that she was deprived of adequate medical, dental, and mental health care, and conditions of reasonable care and safety, and reasonably nonrestrictive confinement conditions while under M. Evans' care at Homestead House.   The Court must analyze whether A.M. received the process which she was due to protect these liberty interests.   "[D]ue process is flexible and calls for such procedural protections as the particular situation demands."   Mathews v. Eldridge, 424 U.S. at 334.   The Supreme Court has explained that

> the root requirement of the Due Process Clause as being that an individual be
> given an opportunity for a hearing before he is deprived of any significant

property interest.  This principle requires some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment.

. . . .

[T]he pretermination hearing, though necessary, need not be elaborate. We have pointed out that [t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings.  In general, something less than a full evidentiary hearing is sufficient prior to adverse administrative action.

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 545.

The United States Court of Appeals for the Second Circuit has stated:

The Supreme Court . . . explained that procedural due process is a flexible standard that can vary in different circumstances depending on "'the private interest that will be affected by the official action'" as compared to "the Government's asserted interest, 'including the function involved' and the burdens the Government would face in providing greater process." Hamdi v. Rumsfeld, 542 U.S. 507, [529] (2004)(quoting Mathews v. Eldridge, 424 U.S. at 335).  A court must carefully balance these competing concerns, analyzing "'the risk of an erroneous deprivation' of the private interest if the process were reduced and the 'probable value, if any, of additional or substitute safeguards.'" Id. (quoting Mathews v. Eldridge, 424 U.S. at 335).

United States v. Abuhamra, 389 F.3d at 318.  The hearing required depends on: (i) the nature of the private interest at stake; (ii) the risk of erroneous deprivation given the procedures already guaranteed, and whether additional procedural safeguards would prove valuable; and (iii) the government's interest and the burdens that additional procedures might impose.  See Mathews v. Eldridge, 424 U.S. at 335.  Because A.M. has alleged that she did not receive any process whatsoever before being deprived of her protected liberty interests in adequate medical, dental, and mental health care, and conditions of reasonable care and safety, and reasonably nonrestrictive confinement conditions, the Court concludes that the due process A.M. received was inadequate under Mathews v. Eldridge and that A.M. has sufficiently demonstrated that her procedural due process rights were violated.

### 3. The Individual DOH Defendants Directly and Proximately Caused the Violation of A.M.'s Fourteenth Amendment Procedural Due-Process Rights.

The Individual DOH Defendants directly and proximately violated A.M.'s procedural due process rights when they transferred her to the Homestead House without an opportunity to object. Further, the Individual DOH Defendants should have known that their transfer of A.M. to the Homestead House, and their failure to properly supervise M. Evans after the transfer was completed, would result in M. Evans' deprivation of A.M.'s procedural due-process rights.

Section 1983 attaches liability for a state actor who "subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges or immunities secured by the Constitution." 42 U.S.C. § 1983. See, e.g., Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978)("Anyone who 'causes' any citizen to be subjected to a constitutional deprivation is also liable. The requisite causal connection can be established . . . by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury."); Trask v. Franco, 446 F.3d at 1046 ("Thus, Defendants are liable for the harm proximately caused by their conduct.").

The Tenth Circuit's analysis of proximate causation for § 1983 liability has established three elements. First, the state agent must have "set in motion" the series of events that resulted in a constitutional violation. Trask v. Franco, 446 F.3d at 1046. Second, the state agent must have known, or reasonably should have known, that the events he or she set in motion would result in a constitutional deprivation. See Trask v. Franco, 446 F.3d at 1046. Finally, no unforeseeable intervening and superseding act could have occurred between the events that the state agent set into motion and the ultimate constitutional violation. See Trask v. Franco, 446 F.3d at 1046 (citing RESTATEMENT (SECOND) OF TORTS § 442 (1965)).

The Tenth Circuit has decided a broad array of cases that detail the contours of § 1983 proximate causation liability.  In Martinez v. Carson, 697 F.3d 1252 (10th Cir. 2012), the Tenth Circuit held liable two New Mexico Department of Corrections officers, who worked as adjuncts on a task force with the Rio Rancho Department of Public Safety in Rio Rancho, New Mexico, for Fourth Amendment violations that Rio Rancho officers committed against detainees whom the corrections officers initially detained and transferred.  See 697 F.3d at 1255.  The corrections officers unlawfully detained the plaintiffs for fewer than three minutes before transferring them to the Rio Rancho officers' custody for further investigation.  See 697 F.3d at 1254.  The Rio Rancho officers subsequently arrested and booked the plaintiffs.  See 697 F.3d at 1254.  The Rio Rancho officers unlawfully held one plaintiff for twelve hours and the other for five hours.  See 697 F.3d at 1254.  In an opinion that the Honorable Monroe G. McKay, United States Circuit Judge for the Tenth Circuit, authored, and Judges Lucero and Gorsuch joined, the Tenth Circuit held that the corrections officers were liable for the Rio Rancho officers' Fourth Amendment violation, because their initial unlawful seizure of the plaintiffs "set in motion a series of events" that the corrections officers "knew or reasonably should have known" would result in others depriving the plaintiffs of their constitutional rights.  697 F.3d at 1255 (quoting Trask v. Franco, 446 F.3d at 1046).  Judge McKay wrote:

> Plaintiffs' arrests and prolonged detentions would not have occurred had Defendants not seized them and transferred them to the custody of Rio Rancho officers. . . .  Although Defendants may not have foreseen the full extent of the detention, a jury could certainly find that they foresaw at least some additional period of detention while, for instance, the Rio Rancho officers conducted an investigation into probable cause.

Martinez v. Carson, 697 F.3d at 1255-56.  The Tenth Circuit remanded the case to the district court to allow a jury to determine the extent of the corrections officers' liability for the

constitutional violation that the Rio Rancho officers committed by allowing the jury to consider evidence presented on the foreseeability of the extended detention.  See 697 F.3d at 1256.

The proximate causation standard under § 1983, however, extends beyond the scope of Fourth Amendment violations.  The Tenth Circuit has recognized proximate causation liability for First, Eighth, and Fourteenth Amendment violations.  Northington v. Marin, 102 F.3d 1564 (10th Cir. 1996),  involved an Eighth Amendment claim for the prison guards' failure to protect an inmate from other prisoners' abuses after prison guards spread rumors among the inmates that the plaintiff was a "snitch."   102 F.3d at 1567.   In an opinion that the Honorable Mary B. Briscoe, United States Circuit Judge for the Tenth Circuit, authored, and Judges Baldock and Logan joined, the Tenth Circuit held that the guards' act of spreading a rumor about the plaintiff was the proximate cause of his beatings and of a constitutional violation that § 1983 law recognizes.  See 102 F.3d at 1569.  The Tenth Circuit stated that the guards' defense, that their intent in spreading the rumor was to protect other inmates from harm through association with the plaintiff rather than to cause harm to the plaintiff, failed, because the defendants "knew the probable result would be that [the plaintiff] would be beaten."  102 F.3d at 1568.

Lippoldt v. Cole, 468 F.3d at 1204, involved First Amendment violations that occurred when the Wichita, Kansas, police chief denied numerous applications for public parade permits for a group of abortion protesters.  See 468 F.3d at 1209-10.  In an opinion that Judge Briscoe authored, and Judges McWilliams and Ebel joined, the Tenth Circuit held that other city officials who did not directly deny the permit requests, but played a role in the applications' consideration, proximately caused the First Amendment violation.  See 468 F.3d at 1220.  The Tenth Circuit found that a city official who researched legal standards upon which the police chief relied to deny the parade permits, and a deputy police chief who signed at least one of the

permit denials on the police chief's behalf, had set in motion the First Amendment violation.  See 468 F.3d at 1219-20.  Judge Briscoe reasoned that the city officials who proximately caused the First Amendment violations were held liable under §1983, because "[t]hat conduct of other people may have concurrently caused the harm does not change the outcome as to [the plaintiffs]."  468 F.3d at 1220.

Directly applicable here, Miller v. City of Mission, 705 F.2d 368 (10th Cir. 1983), involved a § 1983 claim that members of the Mission, Kansas, city council violated the city police chief's Fourteenth Amendment procedural due-process rights when they encouraged the mayor to fire him without a termination hearing.  See 705 F.2d at 371-72.  In an opinion that the Honorable Stephanie K. Seymour, United States Circuit Judge for the Tenth Circuit authored, and Judge McWilliams joined, the Tenth Circuit said: "Ample evidence supports the jury's inference that the mayor would not have dismissed [the police chief] without a hearing absent the support and encouragement of defendant council members."  705 F.2d at 376.  The Tenth Circuit held that the city council members' advice to the mayor proximately caused the procedural due-process violation.  See 705 F.2d at 375-76.  The Tenth Circuit explained that, at a minimum, the city council members "set into motion a series of events by others which they reasonably should have known would have resulted in [the police chief's] dismissal without a hearing."  705 F.2d at 375.

A.M. plausibly alleges that the Individual DOH Defendants proximately caused M. Evans' violation of A.M.'s procedural due-process rights, because their collective transfer of A.M. to the Homestead House "set in motion," Martinez v. Carson, 697 F.3d at 1255, the series of events that "cause[d] [A.M.] to be subjected," 42 U.S.C. § 1983, to a denial of procedural due process at M. Evans' hands.  The Complaint alleges that the Individual DOH Defendants

collectively "abandoned" A.M. when they transferred her from a state care facility to the Homestead House, where A.M. was deprived of adequate safety, social services, government benefits, medical and rehabilitative care, and "her basic human rights."  Complaint ¶ 85, at 23. In particular, Schaefer, the lawyer for the New Mexico Department of Health and the Training School, "participated in deciding" to place A.M. at the Homestead House.  Complaint ¶ 58, at 15-16.  Sandoval, the Director of Resident Living at the Training School, was personally "responsible for determining the suitability of placements" for A.M., and responsible for "supervising and monitoring" A.M. after her transfer.  Complaint ¶ 16, at 5-6.  Adams, the deputy administrator for the Training School, personally participated in the decision to transfer A.M. to the Homestead House "without taking any steps to ascertain whether she would be safe." Complaint ¶ 18, at 6.  Mateju, the Training School administrator, made the "final decisions" on "all placement and discharge decisions" for A.M.  Complaint ¶ 20, at 7.

A.M. alleges that the Individual DOH Defendants, collectively, did not conduct a home visit at the Homestead House before A.M.'s transfer, see Complaint ¶ 62, at 17, and "were deliberately indifferent to the need to investigate the Homestead House [before placing]" her there, Complaint ¶ 75, at 20.  The Individual DOH Defendants approved the arrangement with the Homestead House that allowed M. Evans to keep A.M.'s federal benefits, but still "force her to work in return for a place to live."  Complaint ¶ 95, at 25.  Further, the Individual DOH Defendants did not establish any system "to provide oversight" for third-party placements like to the Homestead House.  Complaint ¶ 64, at 18.  The Individual DOH Defendants "were deliberately indifferent to the likelihood that Plaintiff . . . would lose federal and constitutional rights."  Complaint ¶ 95, at 25.  State agency officials later shut down the unlicensed Homestead House, but the Individual DOH Defendants were indifferent to the need to find A.M. a new care

facility.  See Complaint ¶ 97, at 25.  Instead, the Individual DOH Defendants allowed A.M. to be transferred to M. Evans' private residence.  See Complaint ¶ 98, at 25-26.

The Individual DOH Defendants do not address A.M.'s allegation that placing her in M. Evans' care and failing to oversee that care caused A.M. to be subjected to a third party's violation of procedural due-process rights.  Instead, the Individual DOH Defendants argue that A.M. was no longer in state custody after 1979, an assertion with which this Court disagrees. The Individual DOH Defendants, acting under color of state law, should have foreseen that transferring a thirty-two-year-old, developmentally disabled woman to live at an unlicensed group home for the elderly, without arrangements for funding from the State of New Mexico to pay for her care,[20] would result in A.M. being denied her Fourteenth Amendment procedural due-process rights.  See Complaint ¶ 64, at 18; id. ¶ 95, at 25.

The Individual DOH Defendants' transfer of A.M. to the Homestead House under the alleged circumstances was more egregious than the transfer of custody in Martinez v. Carson, where the Tenth Circuit held that corrections officers should have foreseen the unconstitutional prolonged detention that Rio Rancho police officers committed after the corrections officers initiated an unlawful stop of the plaintiffs and transferred them to the officers' custody.  See 697 F.3d at 1256.  Like the unconstitutional detention in Martinez v. Carson, the violation of A.M.'s procedural due-process rights "would not have occurred but for their conduct" of arranging the opportunity for M. Evans to isolate A.M. at the Homestead House.  Martinez v. Carson, 697 F.3d

---

[20]The Complaint alleges that the arrangement between the New Mexico Department of Health and the Homestead House authorized M. Evans to keep A.M.'s Social Security checks for herself, while expecting A.M. would work "in return for a place to live."  Complaint ¶ 95, at 25. The Individual DOH Defendants might be alleging that assigning A.M.'s Social Security funds to M. Evans was sufficient to pay for A.M.'s food, shelter and care.  Setting aside whether such a transfer of an individual's Social Security funds was legal, the State of New Mexico and its Department of Health -- which remain legally responsible for A.M. -- were paying nothing from their coffers to ensure that the Homestead House was meeting A.M.'s basic needs.

at 1255.  See Complaint ¶ 64, at 18; id. ¶ 95, at 25.  "The requisite causal connection is satisfied if [the Individual DOH Defendants] set in motion a series of events that [the Individual DOH Defendants] knew or reasonably should have known would cause others to deprive [A.M.] of [her] constitutional rights."  Martinez v. Carson, 697 F.3d at 1255 (quoting Trask v. Franco, 446 F.3d at 1046).  Also, like the transfer of police custody in Martinez v. Carson, there is no unforeseeable intervening and superseding act that precludes the Individual DOH Defendants' proximate causation of A.M.'s constitutional violation, because the Individual DOH Defendants' transfer of A.M. to the Homestead House's care played out as they "approved."  Complaint ¶ 95, at 25.  See Martinez v. Carson, 697 F.3d at 1255.

That M. Evans was not a state actor does not shield the Individual DOH Defendants from proximate causation liability under § 1983.  The Tenth Circuit recognized in Northington v. Marin that state actors can be held liable for proximately causing constitutional violations that private third parties committed, if the state actor set the harm into motion.  See 102 F.3d at 1569. The Individual DOH Defendants' direction for M. Evans, as a private party, to provide for A.M. without state funding, see Complaint ¶ 95, at 25, was similar to the prison guards in Northington v. Marin, see 102 F.3d at 1569, warning that the plaintiff inmate in that case was a snitch.  State actors did not direct M. Evans, or the inmates who ultimately beat the plaintiff in Northington v. Marin, to cause a constitutional violation.  The actions that the Individual DOH Defendants took, however, by allegedly transferring A.M. to an unlicensed facility for the elderly without arranged state funding or a system for monitoring A.M.'s care, made the possibility that A.M. would be denied her procedural due-process rights at the Homestead House just as foreseeable as the inmates' beating when prison guards tipped off that there was a snitch in their ranks.  See Complaint ¶ 64, at 18; id. ¶ 86, at 23; Northington v. Marin, 102 F.3d at 1568-69.  Like the

prison guards who knew that labeling an inmate a snitch would likely result in beatings, the Individual DOH Defendants were aware of the ongoing violation of A.M.'s constitutional rights. See Complaint ¶ 91, at 24.

Similar to the city workers in Lippoldt v. Cole and Miller v. City of Mission, who provided advice or clerical work on decisions that ultimately resulted in constitutional violations, each of the Individual DOH Defendants who personally contributed to the decision-making process to transfer A.M. to the Homestead House without an adequate system to monitor her care proximately caused M. Evans' violation of A.M.'s procedural due process rights. See Complaint ¶ 64, at 18; id. ¶ 95, at 25. As the Tenth Circuit stated in Lippoldt v. Cole, "[t]hat conduct of other people may have concurrently caused the harm does not change the outcome as to [A.M.]." 468 F.3d at 1220. The Tenth Circuit's holding in Lippoldt v. Cole stands for two interpretations of proximate causation liability under § 1983 that apply to this case. First, that M. Evans violated A.M.'s procedural due-process rights does not insulate the Individual DOH Defendants from liability under §1983 because they laid the groundwork for those constitutional violations to occur. Second, that Mateju made the "final decisions" on A.M.'s transfer, Complaint ¶ 20, at 7, does not shield Schaefer, Sandoval, and Adams from liability, because A.M. sufficiently alleges that they each personally contributed in some way to the decision making process of transferring A.M. to the Homestead House. See Complaint ¶ 16, at 6; id. ¶ 18, at 6; id. ¶ 58 at 15-16.

A.M. therefore plausibly alleges that the Individual DOH Defendants proximately caused the violation of A.M.'s procedural due-process rights and that they may be liable under § 1983 for that constitutional violation, because the Individual DOH Defendants should have known -- collectively and individually -- that their transfer of A.M. to the Homestead House without state

funding arrangements, see Complaint ¶ 95, at 25, and their failure to oversee M. Evans thereafter, see Complaint ¶ 64, at 18, would result in the deprivation of A.M.'s procedural due-process rights under the Fourteenth Amendment.[21]

### B. THE INDIVIDUAL DOH DEFENDANTS ARE LIABLE FOR THE VIOLATION OF MOST OF A.M.'S LIBERTY-BASED PROCEDURAL DUE-PROCESS RIGHTS BEGINNING IN 1983.

The Individual DOH Defendants are entitled to qualified immunity from A.M.'s discharge in 1979 to June 18, 1982, when the Supreme Court issued its decision in Youngberg v. Romeo. Additionally, the Individual DOH Defendants are entitled to qualified immunity from A.M.'s discharge in 1979 to April 11, 1983, when the Tenth Circuit clearly established proximate causation liability for § 1983 Procedural Due Process Claims in Miller v. City of

---

[21]The Individual DOH Defendants argued at the Thirteenth Amendment claim hearing that the Court should apply the legal analyses used in substantive due-process claims to establish state actors' liability for the acts of non-governmental third parties -- the special-relationship doctrine and the danger-creation exception -- to A.M.'s Thirteenth Amendment claim. The Court did not apply those substantive due-process tests to the Thirteenth Amendment claim, and will not apply them to the procedural due-process claim, for three reasons. First, to apply substantive due-process exceptions to procedural due process is unprecedented -- the Court cannot find any case where the court applies the substantive due-process special-relationship doctrine or danger-creation exception to a procedural due-process claim. Second, substantive due-process tests should not apply in cases where a narrower constitutional test is available. Finally, the special-relationship doctrine and the danger-creation exception are established to hold state actors liable for conduct where there is no causation, a tool unnecessary here, because the Individual DOH Defendants proximately caused M. Evans' violation of A.M.'s procedural due process rights.

Even if these doctrines apply in procedural due process cases generally, they do not dictate a different result in this case because the Court previously established that the Individual DOH Defendants' legal custody of A.M. created a special relationship. See A.M. ex rel. Youngers v. N.M. Dep't of Health, No. CIV 13-0692 JB/WPL, 2014 WL 6969684, at *37-45 (D.N.M. Dec. 5, 2014)(Browning, J.)(concluding that the special-relationship doctrine applies to the Individual DOH Defendants' responsibility for A.M., the danger-creation exception does not apply to the Individual DOH Defendants' conduct, and denying, in part, the Individual DOH Defendants MTD for A.M.'s substantive due-process claim). In other words, the Court's earlier conclusion that the Individual DOH Defendants had a special relationship with A.M. means that relationship would have been sufficient to hold them liable for M. Evans' violation of A.M.'s procedural due-process rights if proximate causation was not established, because the special-relationship doctrine operates in place of the causation element, rather than establishing the underlying constitutional violation.

Mission.  The Court concludes that A.M., as a person under mental commitment, was entitled to due-process protections for deprivations of medical care -- including dental care – and conditions of reasonable care and safety, and reasonably nonrestrictive confinement conditions, beginning on April 11, 1983, and the Individual DOH Defendants proximately caused A.M.'s procedural due process rights to be violated by M. Evans beginning on April 11, 1983.

**1.** **The Individual DOH Defendants are Entitled to Qualified Immunity from A.M's Discharge in 1979 to June 18, 1982, when the Supreme Court Issued its Decision in Youngberg v. Romeo.**

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818).  Qualified immunity also shields state actors who have "reasonable, but mistaken beliefs," and operates to protect state actors from the law's sometimes "hazy border." Saucier v. Katz, 533 U.S. at 205.   When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct. See Saucier v. Katz, 533 U.S. at 205.

"A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'" Lobozzo v. Colo. Dep't of Corr., 429 F. App'x at 710 (quoting Zweibon v. Mitchell, 720 F.2d at 172-73).  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d at 923.  See Medina v. City & Cnty. of Denver, 960 F.2d at 1498.  "In

determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that [the proposed conduct] . . . violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (quoting Saucier v. Katz, 533 U.S. at 202). Moreover, public officials are not expected to tailor their conduct to account for future changes in the law. See Gomes v. Wood, 451 F.3d at 1134. "If the law is not clearly established, we do not require officials to anticipate its future developments." Gomes v. Wood, 451 F.3d at 1134 (internal quotation marks omitted).

The Supreme Court has clarified that the clearly established prong of the qualified-immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 131 S. Ct. at 2083. While a case directly on point is not required, the Supreme Court has held that "existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 131 S. Ct. at 2083. "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639. "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the volatile nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 131 S. Ct. at 2083. The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs," as to the application of law to facts and operates to protect officers from the law's sometimes "hazy border." Saucier v. Katz, 533 U.S. at 205. Without a

prior case on point to demonstrate clearly established law, the Tenth Circuit will not recognize any constitutional right as clearly established if "a distinction [from prior cases] might make a constitutional difference." Kerns v. Bader, 663 F.3d at 1186-87 (emphasis in original).

The Individual DOH Defendants' acts directly, during the 1979 discharge, and proximately, during the subsequent commitment where she was deprived of protected liberty interests without due process of law, violated A.M.'s Fourteen Amendment procedural due-process rights, satisfying the first step of the Saucier v. Katz analysis. See Riggins v. Goodman, 572 F.3d at 1107. A.M. fails, however, on the second Saucier v. Katz step for the period of time spanning from 1979, when she was discharged, to June 18, 1982, when the Supreme Court decided Youngberg v. Romeo. Moreover, A.M. cannot demonstrate that it was clearly established at the time of her transfer to the Homestead House in 1979, nor through her commitment until June 18, 1982, that involuntarily committed, developmentally disabled persons had constitutionally protected liberty interests in adequate medical, dental, and mental health care, and conditions of reasonable care and safety, and reasonably nonrestrictive confinement conditions.

Qualified immunity shields the Individual DOH Defendants with respect to the violation of A.M.'s procedural due-process rights that occurred during A.M.'s discharge in 1979 and through her commitment until June 18, 1982. A.M. has not identified "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts . . ." Currier v. Doran, 242 F.3d at 923, establishing that, before 1982, involuntarily committed, developmentally disabled persons had constitutionally protected liberty interests in adequate medical care, dental care, and mental health care, and conditions of reasonable care and safety, and reasonably nonrestrictive confinement conditions. Moreover, the Supreme Court first

addressed whether such a right exists in <u>Youngberg v. Romeo</u>.  As previously explained, that case involved a thirty-three year old developmentally disabled individual -- Nicholas Romeo -- who was involuntarily committed to a state institution.  <u>See</u> 457 U.S. at 309.  While at that institution, Romeo suffered numerous injuries -- some self-inflicted and some that the other residents caused.  <u>See</u> 457 U.S. at 310.  After objecting multiple times to the state's failure to care for her son properly, Romeo's mother brought a § 1983 action, alleging, among other things, that state officials had violated her son's substantive due-process rights to reasonable care and safety.  <u>See</u> 457 U.S. at 310.

At the Supreme Court, the defendants conceded that Romeo had "a right to adequate food, shelter, clothing, and medical care," but disputed his right to "safety, freedom of movement, and training."  457 U.S. at 314.  In an opinion that Justice Powell authored, the Supreme Court began its analysis by noting that, "[a]s a general matter, a State is under no constitutional duty to provide substantive services for those within its border."  457 U.S. at 317 (citations omitted).  Justice Powell stated, however, that "[w]hen a person is institutionalized -- and wholly dependent on the State -- . . . a duty to provide certain services and care does exist . . . ."  457 U.S. at 317.  Having previously held that it was cruel and unusual punishment to hold convicted criminals in unsafe conditions, Justice Powell reasoned that it must, therefore, also "be unconstitutional to confine the involuntarily committed -- who may not be punished at all -- in unsafe conditions."  457 U.S. at 316.  Justice Powell concluded that developmentally disabled individuals involuntarily committed to the state have "constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests."  457 U.S. at 324.  The Court concludes that, in light of <u>Youngberg v. Romeo</u>, A.M. has sufficiently identified constitutionally protected

liberty interests in conditions of reasonable care and safety, and reasonably nonrestrictive confinement conditions.  Complaint ¶¶ 85, 87, 89-93, 96, 128-140.

To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d at 1327.  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d at 923.  The Tenth Circuit held in Kerns v. Bader that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference."  663 F.3d at 1188 (emphasis in original).  Supreme Court precedent binds the Court, and the Court concludes that the language in Youngberg v. Romeo established that persons who are developmentally disabled and civilly committed possessed protected liberty interests in "adequate food, shelter, clothing, and medical care," and "reasonable care, safety, and reasonably nonrestrictive confinement conditions."   457 U.S. at 324.  Because these protected liberty interests were not clearly established until 1982, the Court grants qualified immunity to the Individual DOH Defendants for the violations of A.M.'s procedural due process rights that occurred before June 18, 1982 when the Supreme Court issued Youngberg v. Romeo.  In sum, A.M., as a person under mental commitment, was entitled to due process protections for

deprivations of medical care and conditions of reasonable care and safety, and reasonably nonrestrictive confinement conditions, beginning in 1982.[22]

> ### 2. The Individual DOH Defendants are Entitled to Qualified Immunity for the Violation of A.M.'s Liberty-Based Procedural Due-Process Rights Until April 11, 1983, When the Tenth Circuit Clearly Established Proximate Causation Liability for § 1983 Procedural Due Process Claims in Miller v. City of Mission.

As discussed, the Individual DOH Defendants' acts directly, during the 1979 discharge, and proximately, during the subsequent commitment, violated A.M.'s procedural due-process rights, satisfying the first step of the Saucier v. Katz analysis.  See Riggins v. Goodman, 572 F.3d at 1107.  A.M. fails, however, on the second Saucier v. Katz step for violations occurring up until April 11, 1983, despite the Youngberg v. Romeo decision in 1982, because she cannot demonstrate that proximate causation of a procedural due-process violation was clearly established before April 11, 1983.  See Riggins v. Goodman, 572 F.3d at 1107.

Qualified immunity shields the Individual DOH Defendants with respect to the proximately caused violations that occurred during A.M.'s confinement with M. Evans until April 11, 1983, when the Tenth Circuit decided Miller v. City of Mission.  See 705 F.2d at 375. There, the Tenth Circuit clearly established the § 1983 proximate causation standard and held that government officials can be held liable under § 1983 if they "set in motion a series of events by others which they reasonably should have known would result" in a procedural due-process

---

[22]Regarding A.M.'s assertion that she was deprived of the right to associate with her family, the Court found that she did not provide sufficient facts to find that such a liberty interest is at stake in this case.  As the Court stated, A.M. has not specifically identified any particular family member with whom she was prevented from communicating while she was under M. Evans' care.  The Court also found that there is not a constitutionally protected right to associate with peers.  Moreover, even if A.M. had sufficiently alleged that, for example, M. Evans prevented her from meeting or communicating with her parents, siblings, or other blood-relatives, the Court would find that, even today, it is not clearly established that involuntary committed, developmentally disabled persons, have a constitutionally protected liberty interest in associating with their family.

constitutional violation.  705 F.2d at 375.  <u>Miller v. City of Mission</u> involved a § 1983 claim that

members of the Mission, Kansas, city council violated the city police chief's Fourteenth

Amendment procedural due-process rights when they encouraged the mayor to fire him without

a termination hearing.  <u>See</u> 705 F.2d at 371-72.  The Tenth Circuit said: "Ample evidence

supports the jury's inference that the mayor would not have dismissed [the police chief] without

a hearing absent the support and encouragement of defendant council members."  705 F.2d at

376.  The Tenth Circuit held that the city council members' advice to the mayor proximately

caused the procedural due-process violation.  <u>See</u> 705 F.2d at 375-76.  The Tenth Circuit

explained that, at a minimum, the city council members "set into motion a series of events by

others which they reasonably should have known would have resulted in [the police chief's]

dismissal without a hearing."  705 F.2d at 375.  In sum, the Individual DOH Defendants are

entitled to qualified immunity from 1979 until April 11, 1983.  Even though the Supreme Court

recognized new liberty interests for involuntarily committed, developmentally disabled persons

in <u>Youngberg v. Romeo</u> in 1982, the Tenth Circuit did not clearly establish proximate causation

liability for § 1983 procedural due process claims until April 11, 1983, when it issued <u>Miller v.

City of Mission</u>.

> **3.**     **<u>The Individual DOH Defendants are Liable for the Violation of</u><br>
> <u>A.M.'s Procedural Due-Process Rights Beginning on April 11, 1983,</u><br>
> <u>When the Tenth Circuit Clearly Established Proximate Causation</u><br>
> <u>Liability for § 1983 Procedural Due Process Claims in</u> Miller v. City<br>
> of Mission.**

Qualified immunity does not shield the Individual DOH Defendants with respect to the

violation of A.M.'s procedural due-process rights that occurred beginning on April 11, 1983,

when the Tenth Circuit decided <u>Miller v. City of Mission</u>.  <u>See</u> 705 F.2d at 375.  Moreover, as

previously explained, in 1982, <u>Youngberg v. Romeo</u> established that involuntarily committed,

developmentally disabled persons have constitutionally protected liberty interests in adequate medical care, dental care, and reasonable care and safety, and reasonably nonrestrictive confinement conditions.  See 457 U.S. at 314-24.  At the Supreme Court, in Youngberg v. Romeo, the defendants conceded that Romeo had "a right to adequate food, shelter, clothing, and medical care," but disputed his right to "safety, freedom of movement, and training."  457 U.S. at 314.  In an opinion that Justice Powell authored, the Supreme Court reasoned that it must "be unconstitutional to confine the involuntarily committed -- who may not be punished at all -- in unsafe conditions."  457 U.S. at 316.  Justice Powell concluded that developmentally disabled individuals involuntarily committed to the state have "constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests."  457 U.S. at 324.  The Court concludes that, in light of Youngberg v. Romeo, A.M. has sufficiently identified constitutionally protected liberty interests in conditions of reasonable care and safety, and reasonably nonrestrictive confinement conditions.  See Complaint ¶¶ 85, 87, 89-93, 96, 128-140, at 23-25, 32-36.  About one year later, the Tenth Circuit decided Miller v. City of Mission.  There, the Tenth Circuit said: "Ample evidence supports the jury's inference that the mayor would not have dismissed [the police chief] without a hearing absent the support and encouragement of defendant council members."  705 F.2d at 376.  The Tenth Circuit held that the city council members' advice to a mayor proximately caused a procedural due-process violation.  See 705 F.2d at 375-76.  The Tenth Circuit explained that, at a minimum, the city council members "set into motion a series of events by others which they reasonably should have known would have resulted in [the police chief's] dismissal without a hearing."  705 F.2d at 375.

To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d at 1327.  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d at 923.  The Tenth Circuit held in Kerns v. Bader that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference."  663 F.3d at 1188 (emphasis in original).  Supreme Court and Tenth Circuit precedent binds the Court, and the Court concludes that the Supreme Court's language in Youngberg v. Romeo and the Tenth Circuit's language in Miller v. City of Mission together established by April 11, 1983, that: (i) persons who are developmentally disabled and civilly committed possess protected liberty interests in "adequate food, shelter, clothing, and medical care," and "reasonable care, safety, and reasonably nonrestrictive confinement conditions;" and (ii) that government officials can be held liable for proximately causing third-party procedural due-process violations by setting "into motion a series of events by others which they reasonably should have known would have resulted" in a procedural due-process constitutional violation.  Miller v. City of Mission, 705 F.2d at 375.

In sum, the Individual DOH Defendants are entitled to qualified immunity from 1979 until April 11, 1983.  Even though the Supreme Court recognized a variety of new liberty interests for involuntarily committed, developmentally disabled persons in Youngberg v. Romeo in 1982, the Tenth Circuit did not clearly establish proximate causation liability for § 1983

procedural due-process claims until April 11, 1983, when it issued <u>Miller v. City of Mission</u>. A.M., as a person under mental commitment, was entitled to due-process protections for deprivations of medical care -- including dental care -- and conditions of reasonable care and safety, and reasonably nonrestrictive confinement conditions, beginning in 1982, and the Individual DOH Defendants proximately caused A.M.'s procedural due process rights to be violated by M. Evans beginning on April 11, 1983.  Finally, although the Court found that A.M. has a constitutionally protected liberty interest in receiving adequate mental health care, the Court does not think that such a liberty interest is clearly established today.  The Individual DOH Defendants are thus entitled to qualified immunity for any deprivations of A.M.'s right to mental health care without due process of law.

## II.   A.M. HAS SUFFICIENTLY ALLEGED THAT THE INDIVIDUAL DOH DEFENDANTS VIOLATED HER PROCEDURAL DUE-PROCESS RIGHTS BY DEPRIVING HER OF PROTECTED PROPERTY INTERESTS WITHOUT DUE PROCESS OF LAW.

A.M. has sufficiently alleged constitutional violations of her property-based procedural due-process rights.  A.M. has sufficiently alleged that she possessed constitutionally protected property interests in her supplemental security income, Medicare benefits, Medicaid benefits, in the value of her labor, and in receiving education, training, and habilitation services, of which she was deprived without due process of law.  The Individual DOH Defendants directly and unconstitutionally deprived A.M. of entitlements to education, training, and habilitation services, under § 43-1-8 of the New Mexico Mental Health and Disabilities Act, when they stripped her of her status as a "resident client" under the Act without due process of law and transferred her out of the Training School to the Homestead House in 1979.  The Individual DOH Defendants remain liable for this deprivation, because it was clearly established in 1979 that, once the government provides an entitlement, it cannot take it away without due process of law.  The

Individual DOH Defendants also proximately caused the violation of A.M.'s procedural due-process rights as to the deprivation of her SSI benefits, Medicaid benefits, Medicare benefits, and the value of her labor.  Because the Tenth Circuit did not clearly establish proximate causation liability for § 1983 procedural due-process claims until April 11, 1983, when it issued Miller v. City of Mission, however, qualified immunity shields the Individual DOH Defendants from liability for M. Evans' deprivation of A.M.'s SSI, Medicaid benefits, Medicare benefits, and the value of her labor between 1979 and April 11, 1983.  Moreover, the Individual DOH Defendants remain liable for the unconstitutional deprivation of A.M.'s SSI, Medicaid benefits, and Medicare benefits beginning on April 11, 1983.

## A.   THE   INDIVIDUAL   DOH   DEFENDANTS   VIOLATED   A.M.'S PROPERTY-BASED PROCEDURAL DUE-PROCESS RIGHTS.

To establish a procedural due-process violation, A.M. must demonstrate that: (i) she has a protected liberty or property interest at stake; and (ii) that she was deprived of that interest without due process of law.  See Camuglia v. City of Albuquerque, 448 F.3d at 1219.  The Court concludes that A.M. has sufficiently alleged that she was unconstitutionally deprived of her supplemental security income, Medicare benefits, Medicaid benefits, the value of her labor, and in receiving education, training, and habilitation services, without adequate due process of law. She has therefore sufficiently alleged a Fourteenth Amendment violation.

### 1.   A.M. has Identified Several Constitutionally Protected Property Interests.

To establish a procedural due-process violation, A.M. must first identify a protected liberty or property interest at stake.  See Camuglia v. City of Albuquerque, 448 F.3d at 1219. The Court concludes that A.M. has sufficiently identified constitutionally protected property interests in supplemental security income, Medicare benefits, Medicaid benefits, the value of per

labor, and in receiving education, training, and habilitation services.  A.M. therefore has satisfied the first requirement of her procedural due process claim.

>    **a.**     **A.M. has Sufficiently Identified a Constitutionally Protected Property Interest in her Supplemental Security Income, <u>Medicare Benefits, and Medicaid Benefits.</u>**

A.M. asserts that she has and had a constitutionally protected interest in Supplemental Security Income ("SSI")[23] from the Social Security Administration, Medicare benefits, and Medicaid benefits.  Complaint ¶ 129, at 33.  The Supreme Court has "made clear that the property interests protected by the procedural due process clause extend well beyond actual ownership of real estate, chattels, or money."  <u>Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. at

---

[23]In her Complaint, A.M. alternates between using the phrase "Supplemental Security Income (SSI)," Complaint ¶ 129, at 33, "social security benefits," ¶ 85, at 23, and "social security funds," ¶¶ 82-83, at 22.  The Social Security Administration has explained:

> There is often confusion about Social Security and Supplemental Security Income (SSI) because you apply for both programs with the Social Security Administration.  **But, the programs are different.**  The Social Security benefit programs are "entitlement" programs.  This means that workers, employers and the self-employed pay for the benefits with their Social Security taxes.  The taxes that are collected are put into special trust funds.  You qualify for these benefits based on your work history (or your spouse or parent).  The amount of the benefit is based on these earnings.

> SSI is a needs-based program for people with limited income and resources.  Resources are assets or things that you own.  The program is paid for by general tax revenues -- not from the Social Security trust funds.  The benefit amount is based on Federal and State laws which take into account where you live, who lives with you and what income you receive.

SOCIAL SECURITY ADMINISTRATION, FACT SHEET: SOCIAL SECURITY AND SUPPLEMENTAL SECURITY INCOME (SSI): WHAT'S THE DIFFERENCE? 1 (2009), *available at* http://www.ssa.gov/sf/FactSheets/aianssavsssifinalrev.pdf (last visited: Sept. 21, 2015)(emphasis in original).  "The SSI program provides subsistence allowance to needy aged, blind, and disabled persons." <u>Vineyard v. Massey</u>, 586 F. Supp. 3, 4 (W.D. Mo. 1984)(Wright, J.)(citing 42 U.S.C. § 1381).  The Court has not identified any constitutional distinction between social security benefits and SSI.  The Court will, therefore, throughout this MO, refer to them as "SSI" or, where quoted, leave them in their original form.

571-72.  "The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576.  As previously explained, these property interests include "real estate, chattels, or money," but can take many forms.  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-76.  "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577.  "Such an interest arises not from the Due Process Clause of the Constitution itself, but is created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract."  Teigen v. Renfrow, 511 F.3d at 1079.  "Property interests, of course, are not created by the Constitution.  Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577.

The Individual DOH Defendants correctly point out that A.M. has not specifically identified an "independent source[] such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract," Teigen v. Renfrow, 511 F.3d at 1079, that provides her with a legitimate claim of entitlement to her SSI, Medicare benefits, or Medicaid benefits, see MTD at 10.  Rather, A.M. asserts generally in her Complaint that she has and had a protected property interest in "Supplemental Security Income (SSI) from the Social Security Administration," Complaint ¶ 129, at 33, and that she "has and had a protected property interest in a variety of government programs and payments, including . . . Medicaid and Medicare

payments," Complaint ¶ 129, at 33.   Viewing those allegations, however, in the light most favorable to A.M., the Court concludes that A.M. has and had a constitutionally protected property interest in continuing to receive her SSI, Medicaid payments, and Medicare payments.

Regarding A.M.'s SSI, the Supreme Court has long recognized that a civilly committed patient has constitutionally protected property interests in social security benefits and other income they receive, which is deposited into a patient fund or which their government caretakers otherwise intercept.   See, e.g., Fuentes v. Shevin, 407 U.S. 67, 80-93 (1972); Fayle v. Stapley, 607 F.2d 858, 861 n.2 (9th Cir. 1979)(per curiam)("Fayle's interests in the Patient Deposit Fund and in his disability insurance benefits represent substantial property interests to which due process protection must be afforded.")(citing Fuentes v. Shevin, 407 U.S. at 80-93; Bell v. Burson, 402 U.S. 535, 539 (1971); Goldberg v. Kelly, 397 U.S. at 261-63; Vecchione v. Wohlgemuth, 377 F. Supp. 1361, 1370 (E.D. Penn. 1974)(Becker, J.)("[T]he Social Security benefits or other income patients receive and which defendants have intercepted under §§ 424 and 501 of the Act are a matter of statutory entitlement to plaintiff, and thus are property within the meaning of the Due Process Clause of the [Fourteenth Amendment].")).   See Mathews v. Eldridge, 424 U.S. at 332 (recognizing that, in the context of the Fifth Amendment to the Constitution, "the interest of an individual in continued receipt of [Social Security Disability benefits] is a statutorily created 'property' interest" that is constitutionally protected).

Recent cases follow a similar pattern.   In Simpson v. Brewster, 2015 WL 1012827 (E.D. Cal. March 6, 2015)(Seng, MJ), for example, the United States District Court for the Eastern District of California recognized that Social Security benefits are a protected property interest under the Fourteenth Amendment.   See 2015 WL 1012827, at *3-4.   In that case, the plaintiff was civilly committed as a Mentally Disordered Offender at Coalinga State Hospital.   See 2015

WL 1012827, at *1.  The plaintiff asserted that the Coalinga Hospital's trust account agent had violated his procedural due-process rights under the Fourteenth Amendment by taking and using his Social Security benefits to pay for his care at Coalinga Hospital pursuant to the California Welfare and Institutions Code § 7281.  See 2015 WL 1012827, at *1-2.  Before reaching the more difficult question whether the procedural protections of § 7281 complied with the demands of due process, the court explained that "an involuntarily committed mental patient has 'substantial property interests' in his deposit fund and the benefits deposited therein."  2015 WL 1012827, at *3-4 (citing Fayle v. Stapley, 607 F.2d at 861 n.2).  The Court thus concludes that A.M. has sufficiently alleged that she possessed a constitutionally protected property interest in her SSI and was thus entitled to due process.  See Camuglia v. City of Albuquerque, 448 F.3d at 1219 (quoting Clark v. City of Draper, 168 F.3d at 1189).

Regarding A.M.'s Medicaid and Medicare benefits, a number of federal courts have found that there is a protected property interest in continuing to receive Medicaid and Medicare benefits.  In Goldberg v. Kelly, 397 U.S. at 254, the Supreme Court held that termination of welfare payments without a pretermination hearing was a denial of procedural due process.  The Supreme Court explained that "termination of aid pending resolution of a controversy over eligibility may deprive an eligible recipient of the very means by which to live while he waits." 397 U.S. at 267.  Moreover, the "Supreme Court has indicated that direct financial medicaid benefits cannot be withdrawn without giving the patients notice and an opportunity for a hearing."  Moffitt v. Austin, 600 F. Supp. 295, 297 (W.D. Ky. 1984)(Johnstone, J.)(citing O'Bannon v. Town Court Nursing Center, 447 U.S. 773, 787 (1980)).  Indeed, in O'Bannon v. Town Court Nursing Center, 447 U.S. 773 (1980), the Supreme Court held that Medicare and Medicaid benefits are protected property interests.  See 447 U.S. at 786-87.

> In the Medicare and the Medicaid Programs the government has provided needy patients with both direct benefits and indirect benefits. The direct benefits are essentially financial in character; the Government pays for certain medical services and provides procedures to determine whether and how much money should be paid for patient care. The net effect of these direct benefits is to give the patients an opportunity to obtain medical services from providers of their choice that is comparable, if not exactly equal, to the opportunity available to persons who are financially independent. The Government cannot withdraw these direct benefits without giving the patients notice and an opportunity for a hearing on the issue of their eligibility for benefits.

O'Bannon v. Town Court Nursing Ctr., 447 U.S. at 786-87. The Court thus concludes that A.M. has sufficiently alleged that she possessed a constitutionally protected property interest in her Medicaid and Medicare benefits, to which Fourteenth Amendment due-process protection is applicable. See Camuglia v. City of Albuquerque, 448 F.3d at 1219 (quoting Clark v. City of Draper, 168 F.3d at 1189). In sum, the Court finds that, under Goldberg v. Kelly, A.M. had legitimate claims of entitlement to her SSI, Medicaid benefits, and Medicare benefits, of which she could not be deprived without sufficient due process of law. Moreover, A.M.'s expectancies in continuing to receive her SSI, Medicaid benefits, and Medicare benefits were not "unilateral," Bd. of Regents v. Roth, 408 U.S. at 577, or "too ephemeral and insubstantial," Meachum v. Fano, 427 U.S. 215, 228 (1976). See O'Bannon v. Town Nursing Ctr., 447 U.S. at 796.

### b.   A.M. has not Sufficiently Identified a Constitutionally Protected Property Interest in Receiving Developmental Disabilities Waiver Services.

"Medicaid is a cooperative federal-state program under which participating states obtain federal funds for their programs and must comply with the requirements of the Medicaid Act, 42 U.S.C. §§ 1396 et seq., and its implementing regulations." Lewis v. New Mexico Dep't of Health, 94 F. Supp. 2d 1217, 1222-23 (D.N.M. 2000)(Vazquez, J.). "Moving the disabled out of institutions, and into homes, can save money and improve care." K.W. ex rel. D.W. v. Armstrong, 298 F.R.D. 479, 483 (D. Idaho 2014)(Winmill, J.)(citing Ball v. Rodgers, 492 F.3d

1094, 1098 (9th Cir. 2007)).  The federal government recognized this fact and, in 1981, "[i]n order to support the national trend toward moving people out of long-term care institutions and into the community," it made a change to federal regulations allowing states participating in Medicaid to ask the federal Medicaid agency for permission to waive -- or disregard – certain regulations that allows the state to use Medicaid funds only for institutional or hospital programs. See Developmental Services Waiver Background Info, MASS.GOV, http://goo.gl/15qg48 (last visited December 3, 2015).  The new program, authorized under § 1915(c) of the Social Security Act as the Community-Based Services ("HCBS") Program, PARENTS REACHING OUT, MEDICAID DEVELOPMENTAL DISABILITIES (DD) WAIVER APPLICATION HANDBOOK 2 (1998), allowed states to set up HCBS programs "to allow the disabled to 'waive' their entitlement to institutional care in return for receiving community-based care." K.W. ex rel. D.W. v. Armstrong, 298 F.R.D. at 483.

New Mexico is a participating state that has developed a waiver program that is at issue in this case -- the Developmental Disabilities Home and Community-Based Waiver ("DD Waiver Program") -- to which A.M. refers in the Complaint as "Developmental Disabilities Waiver services."  Complaint ¶ 129, at 33.  The DD Waiver Program in New Mexico was originally approved on July 1, 1988.  See Demonstrations & Waivers, MEDICAID.GOV, http://www.medicaid.gov/medicaid-chip-program-information/by-topics/waivers/waivers_faceted.html, and is administered by the New Mexico Department of Health, Developmental Disabilities Supports Division.  See Chavez ex rel. Chavez v. Bd. of Educ. Of Tularosa Municipal Schools, 2007 WL 709038, at *1 (D.N.M. 2007)(Browning, J.). State administrative procedures set forth in the Developmental Disabilities (DDW) Service Standards govern the DD Waiver program.  See JL ex rel. Thompson v. New Mexico Dep't. of

Health, 2013 WL 4098579, at *5-6 (D.N.M. May 22, 2013)(Vazquez, J.); NEW MEXICO DEPARTMENT OF HEALTH, DEVELOPMENTAL DISABILITIES WAIVER (DDW) SERVICE STANDARDS (2013).

In Goldberg v. Kelley, 397 U.S. at 254, the Supreme Court recognized welfare payments as a constitutionally protected property interest, holding that the termination of welfare payments without a pretermination hearing is a denial of procedural due process. See 397 U.S. at 267. Applying Goldberg v. Kelley, the Court concludes that current enrollees in New Mexico's DD Waiver Program have a protected property interest in continuing to receive such community-based care and other benefits that the program provides to enrollees. Enrollment in the DD Waiver program, and the valuable services and benefits conferred on enrollees, is a property interest within the meaning of the procedural due-process protections of the Fourteenth Amendment. The DD Waiver program was "created and [its] dimensions are defined by . . . rules or understandings that stem from an independent source of law," Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577, specifically, rules and procedures embodied in the DDW Service Standards. And the services offered to participating patients are deemed property under existing Supreme Court precedent. Here, however, A.M. does not allege that she ever enrolled in the DD Waiver Program. The Court finds another District of New Mexico case, Lewis v. New Mexico Department of Health, 94 F. Supp. 2d 1217 (D.N.M. 2000)(Vazquez, J.), instructive. There, the Honorable Martha Vazquez, United States District Judge, denied the defendants' motion to dismiss the plaintiff's procedural due process claims, holding that mere applicants to New Mexico's DD Waiver Program have a constitutionally protected property interest in the DD Waiver services, which can form the basis of a Fourteenth Amendment procedural due-process claim. See 94 F. Supp. 2d at 1236-37.

In <u>Lewis v. New Mexico Department of Health</u>, the plaintiffs argued that, given that New Mexico has "adopted Medicaid waiver services, applicants for waiver services are protected against arbitrary action regarding their access to those benefits." 94 F. Supp. 2d at 1236-37. The plaintiffs had applied to the DD Waiver Program and had been on the waiting lists for nearly seven years, yet they asserted that New Mexico had in a variety of ways deprived them of access. <u>See</u> 94 F. Supp. 2d at 1235. According to the plaintiffs, the New Mexico Department of Health had violated their procedural due process rights by their "arbitrarily and unreasonable policies, practices and funding decisions, their failure to request and allocate sufficient funding for Medicaid waiver service programs," and their failure "to staff DSD and DOH adequately to administer the Medicaid waiver program which have resulted in Plaintiffs' inability to receive waiver services." 94 F. Supp. 2d at 1236. The defendants moved to dismiss, asserting that procedural due process protections apply only to "recognized property or liberty interests," and that plaintiffs had no "protected property interests because they [were] merely applicants for government services." 94 F. Supp. 2d at 1237. The District Court denied the motion to dismiss the procedural due process claims, holding that, as applicants, the plaintiffs possessed constitutionally protected property interests in the DD Waiver Program to which they had applied. <u>See</u> 94 F. Supp. 2d at 1237.

The Court agrees with the result that Judge Vazquez reached in <u>Lewis v. New Mexico Department of Health</u>. This case, however, presents an additional wrinkle, because A.M. does not allege in her Complaint that she ever applied to the DD Waiver Program. Instead, she alleges that she had a constitutionally protected property interest in "Developmental Disabilities Waiver services," Complaint ¶ 129, at 33, of which the Individual DOH Defendants deprived her without due process of law, <u>see</u> Complaint ¶ 130, at 33. The Complaint nowhere states that

A.M. ever applied for DD Waiver services.  In fact, the Complaint states that a March, 2008, APS investigation concluded that "Mary Evans had never applied for DD Waiver benefits for Plaintiff."  Complaint ¶ 108, at 28.  If A.M. alleged that she applied to the DD Waiver Program at some point after it was created in 1989, under the logic of Lewis v. New Mexico Department of Health, the Court would be inclined to find a protected property interest here.  Because neither A.M. nor M. Evans, on her behalf, applied to the DD Waiver Program, the Court is unable to find that A.M. has a property interest in DD Waiver services.  Perhaps M. Evans' failure to apply for DD Waiver services on behalf of A.M. constitutes some other constitutional violation - - such as the right of access to the courts -- but the Court concludes that A.M. does not have a procedural due-process claim.

> ### c.    A.M. has Sufficiently Identified a Constitutionally Protected Property Interest in the Value of her Labor.

A.M. asserts that she had and has a constitutionally protected interest in "the value of her labor."  Complaint at ¶¶ 129-130, at 33.  It is well established that, for procedural due-process purposes, property encompasses "actual ownership of real estate, chattels, or money."  Bd. of Regents of State Colls. v. Roth, 408 U.S. 570-72.  A long-line of cases establishes that officials cannot actually seize funds from a patient's account or cash from the patient's personal possession without due process of law.  See, e.g., Gillihan v. Shillinger, 872 F.2d 935, 938 (10th Cir. 1989)(holding that a plaintiff has a property interest in money received from people outside of prison); Montgomery v. Kaiser, 2000 WL 374279, at *2 (10th Cir. 2000)(Anderson, J.)(holding that an inmate had a property interest in an envelope sent to him inside prison which contained $1,200.00 in cash); Fayle v. Stapley, 607 F.2d at 861 n.2 (holding that civilly committed patients possess property interests in Social Security benefits and other income they receive, which is deposited into their patient fund or which their government caretakers

otherwise intercept).  A.M. does not, however, allege the seizure of any funds from her account or cash from her personal possession.  See Burns v. PA Dep't. of Correction, 544 F.3d 279, 285-86 (3d Cir. 2008)(Smith, J.).  Instead, A.M. argues that she was not provided "compensation or wages" for work she performed at the Homestead House in the form housekeeping and other services.  See Complaint at ¶ 93, at 24-25.

While "money is property, not every claim for a government payment is a property interest protected by procedural due process."  Rosenfield v. Wilkins, 468 F. Supp. 2d 806, 810 (W.D. Va.)(Loken, J.)(analyzing, in the Fifth Amendment procedural due-process context, whether attorneys appointed under the Criminal Justice Act[24] have a property interest in any particular level of payment for their provision of legal services).  "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. . . .  He must, instead, have a legitimate claim of entitlement to it."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577.  "[A] property right cannot emanate from a mere subjective expectancy."  Guerra v. Scruggs, 942 F.2d 270, 278 (4th Cir. 1991)(citing Perry v. Sindermann, 408 U.S. 593, 603 (1972)).  Here, A.M. asserts a property interest to payment of her wages or compensation for the work she provided at the Homestead House.  That alleged interest, however, must "stem not from the Constitution, but from such sources as statutes, regulations, ordinances, and contracts. . . . Whether these sources create a property interest must be decided by reference to state law."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576-77.

Here, A.M. has not identified any independent source -- such as statutes, regulations, ordinances, or contracts -- that give rise to a property interest in wages or compensation.  See Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576-77.  Even if A.M. had a property expectation

---

[24]18 U.S.C. § 3006A.

that she would receive payment for her work, the Fourteenth Amendment does not protect expectations, however reasonable.  The Court will thus determine whether any statutes or other independent sources of law provide involuntarily committed patients with legitimate claims of entitlement for wages or compensation for work completed while committed.  See Daniels v. Crosby, 444 F. Supp. 2d 1220, 1226-27 (N.D. Fla. 2006)(Paul, J.)(looking at Florida state law to determine whether inmate had property interest in wages for his work while incarcerated there); Rosenfield v. Wilkins, 468 F. Supp. at 810 (looking to the Criminal Justice Act to determine whether appointed attorneys have a property interest in any particular level of payment for their provision of legal services).

The Court concludes that the Fair Labor Standards Act, 29 U.S.C. 201 et seq. ("FLSA"), could give rise to a property interest in wages or compensation, providing a basis for A.M.'s claim.  29 U.S.C. § 206 requires the payment of a minimum wage.  See 29 U.S.C. § 206.  "The FLSA's minimum wage standard is one of several provisions enacted to serve the law's purposes of 'providing minimum standards of living for workers' and protecting free market competition." Martin v. Benson, 827 F. Supp. 2d 1022, 1025 (D. Minn. 2011)(quoting McMaster v. Minnesota, 30 F.3d 976, 980 (8th Cir. 1994)).  "Unlike prisoners, mental Health patients working in mental health institutions have been deemed protected by the minimum wage requirements of the FLSA."  Martin v. Benson, 827 F. Supp. 2d at 1026 (citing Weidenfeller v. Kidulis, 380 F. Supp. 445 (E.D. Wis. 1974)(Reynolds, J.); Souder v. Brennan, 367 F. Supp. 808 (D.D.C. 1973)).  The United States District Court for the District of Minnesota explained in Martin v. Benson:

> In applying the economic-reality test, the *Souder* court found that "the reality is that many of the patient-workers perform work for which they are in no way handicapped and from which the institution derives the full economic benefit." *Id.* at 813.  In an effort "to prevent curtailment of opportunities for employment" that resulted from the holding of *Souder*, Congress has amended the FLSA to allow the payment of wages to handicapped workers "whose earning or

productive capacity is impaired by age, physical or mental deficiency, or injury" at rates lower than the minimum wage pursuant to the grant of a special certificate. *See* 29 U.S.C. § 214(c). In addition, the Department of Labor has defined "patient worker" as "a worker with a disability . . . employed by a hospital or institution providing residential care where such worker receives treatment or care," 29 C.F.R. § 525.3, and has promulgated a number of other regulations governing the employment of handicapped workers. 29 C.F.R. § 525.1 *et seq.*

827 F. Supp. 2d at 1027. The Court concludes that A.M., as a developmentally disabled person in the state of New Mexico's custody, should be granted FLSA protection in accord with the cases "holding that [mentally ill and disabled] mental health patients are entitled to minimum wage under the FLSA and the regulations that followed." Martin v. Benson, 827 F. Supp. 2d at 1027. The Court therefore finds that the FLSA applies to A.M., and that it sufficiently constitutes an "independent source[] such as a . . . federal statute," Teigen v. Renfrow, 511 F.3d at 1079, that provides A.M. with a legitimate claim of entitlement to wages or compensation for her work completed at the Homestead House.

        **d.**     **A.M. has Sufficiently Identified Constitutionally Protected Property Interests in Education, Training, and Habilitation.**

In her Complaint, A.M. alleges that she has and had constitutionally protected property interests in "other government-funded treatment and services . . . includ[ing] state-funding of habilitation services," Complaint ¶ 129, at 33, and "educational and vocational services, day habilitation and therapy," Complaint ¶ 85, at 23. In the MTD, the Individual DOH Defendants assert that A.M. has not alleged "the existence of any state statute, rule, or understanding promulgated and fostered by state officials that could otherwise support a legitimate claim of entitlement" to education, training, or habilitation in 1979, when she was discharged. Response at 9-10. In A.M.'s Response, however, she identifies two New Mexico statutes that, she asserts, created constitutionally protected property interests in education, training, and habilitation: N.M.S.A. 1955, § 34-3-2 (1968)(superseded) and § 43-1-8 of the Mental Health and

Development Disabilities Code, N.M.S.A. § 43-1-1 to -25 (1977, as amended).

First, A.M. asserts that she was originally committed to the Training School under N.M.S.A. 1955, § 34-3-2 (1968)(superseded), which provides for "the care, custody, employment, education and training of mental defectives." Response at 9. The Court agrees with the Individual DOH Defendants, however, that N.M.S.A. 1955, § 34-3-2 provides "only for the establishment of an institution for the purpose of providing care, custody, employment, education and training of mental defectives."[25] Reply at 10. She has no property interest in a building for the provision of services, even if the services are for her.

Second, A.M. identifies the Mental Health and Development Disabilities Code as creating a property interest in habilitation, education, and training. See Response at 9-10. In 1977, after encountering difficulties in drafting changes to New Mexico's existing mental health laws, the New Mexico legislature chose to enact a completely new Mental Health and Developmental Disabilities Code ("the Code"). N.M.S.A. § 43-1-1 to -25 (1977, as amended). See James W. Ellis, et. al., Treating Children Under the New Mexico Mental Health and Developmental Disabilities Code, 10 NEW. MEX. L. R. 279 (1980). The Code took effect on July 1, 1977, and amendments were enacted in 1978 and 1979. See Ellis supra at 282. A.M. correctly notes that "[t]he Code provided, among other things, that '[e]ach resident . . . receiving developmental disabilities services [would] have the right to prompt habilitation services pursuant to an individualized habilitation plan,' N.M.S.A. 1978, § 43-1-8 (1977) -- a plan that would include 'criteria for discharge' from state custody, id. § 43-1-9(C)(6)(1993; originally enacted in 1977)." Section 43-1-8 satisfies the first Bd. of Regents of State Colls. v. Roth requirement that the "putative property interest stem from 'an independent source such as state

_____

[25]The Court also notes that the New Mexico legislature repealed N.M.S.A. 1955, § 34-3-2 on July 1, 1977, before A.M.'s placement under M. Evans' care.

law.'" Nicoletti v. Brown, 740 F. Supp. 1268, 1283 (N.D. Ohio 1987)(Krenzler, J.)(quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577). See LaBalbo v. Hymes, 1993 NMCA-010, ¶¶ 14-17 nn.2-3, 850 P.2d at 1022-23 nn.2-3 (observing that these provisions "create a protected interest in receiving state-funded habilitation services, of which Training School residents could not constitutionally be deprived 'without appropriate procedural safeguards'")(internal quotation marks omitted).

The Individual DOH Defendants contend, however, that A.M. cannot rely upon the Code's § 43-1-8, because "[t]here are no allegations in Plaintiff's Amended Complaint alleging that Plaintiff was ever a 'resident client' under the Developmental Disabilities Code after July 1, 1977." Reply at 11. According to the Individual DOH Defendants, because A.M. was not a "resident client" with a "legitimate claim of entitlement" to the benefits under the Code, she did not possess a "constitutionally protected [property] right under the Code." Reply at 11. First, the Court stresses that A.M. remained in the legal custody of the state upon her placement with M. Evans in 1979. Second, the Court agrees with the Individual DOH Defendants that, upon A.M.'s purported discharge and placement under M. Evans' care at the Homestead House in 1979, she was no longer as a "resident client" under the Code. The Court concludes that A.M. has nonetheless sufficiently alleged that the Code's § 43-1-8 bestowed upon her a legitimate claim of entitlement to habilitation services education, training, and habilitation services. Had A.M. remained a "resident client" at the Training School in 1979, the Individual DOH Defendants would have been required to provide her with training, education, and habilitation services under § 43-1-8. The Individual DOH Defendants did not avoid those obligations by simply moving A.M. from the Training School to an unlicensed third-party home. The state cannot make a "resident client" a non-resident by putting this client outside. In other words, the

Court concludes that, A.M. has sufficiently alleged that beginning in 1977, she had a legitimate claim of entitlement to education, training, and habilitation under § 43-1-8, and the Individual DOH Defendants deprived her of that entitlement by transferring her to Homestead House, a non-residential facility.  M. Evans did not deprive her of these rights because A.M. was not a "resident client" during the time she was at Homestead House.

### 2.   A.M. has Sufficiently Alleged that She was Deprived of Constitutionally Protected Property Interests Without Due Process of Law.

The Court has concluded that A.M. has sufficiently identified several constitutionally protected property interests that are at stake in this case: SSI benefits, Medicaid benefits, Medicare benefits, the value of her labor under the FLSA, and an entitlement to education, training, and habilitation services under § 43-1-8 of New Mexico's Mental Health and Developmental Disabilities Code.   A.M. therefore has satisfied the first requirement of her procedural due-process claim: identification of protectable liberty interests that trigger federal due-process guarantees.   See, e.g., Dunham v. Wadley, 195 F.3d 1007, 1009 (8th Cir. 1999)("The analysis of a procedural due process claim must begin with examination of the interest allegedly violated.").   The Court must thus move to the second part of the analysis. Where a plaintiff has a protected property interest, she must demonstrate that she was deprived of that interest without due process of law.  See, e.g., Camuglia v. City of Albuquerque, 448 F.3d at 1219; Hopkins v. Saunders, 199 F.3d 968, 975 (8th Cir. 1999)("To establish a procedural due process violation, a plaintiff must demonstrate  . . . that he was deprived of that interest without due process of law.").

As described above, the Court concludes that A.M. has sufficiently alleged that she was deprived of her SSI benefits, Medicaid benefits, Medicare benefits, the value of her labor,

education, training, and habilitation services.  First, A.M. has sufficiently alleged that she was deprived of her property interest in her SSI.  The Complaint alleges that "Evans stole [A.M.'s] social security checks for her own use and did not spend the funds for the benefit of [A.M.]."  Complaint ¶ 94, at 25.  Second, A.M. has sufficiently alleged that she was deprived of her property interest in her Medicaid and Medicare benefits.  The Complaint alleges that, while in M. Evans' custody, A.M. was deprived of Medicaid and Medicare benefits.  Complaint at ¶ 85, at 23; id. at ¶¶ 129-30, at 37.  The Individual DOH Defendants "were aware that Mary Evans intended to keep Plaintiff's federal benefits and force her to work in return for a place to live, and approved the arrangement," and "[i]n the ensuing decades, Plaintiff was held in the physical custody of Mary Evans, who kept her monthly federal disability checks while requiring Plaintiff to work for her without pay."[26]  Complaint at ¶¶ 95-96, at 25.  Third, A.M. has sufficiently alleged that she was deprived of her interest in the value of her labor.  The Complaint alleges that, while at the Homestead House, "Plaintiff was 'put to work.'"  Complaint ¶ 93, at 24-25.  "She provided labor in the form of housekeeping and other services, but she received no compensation or wages."  Complaint at ¶ 93, at 24-25.  A.M. also provides sufficient factual support for a claim that her right to habilitation services, education, and training pursuant to § 43-1-8 was adversely affected by the actions of the Individual DOH defendants, or alternatively, M. Evans at the Homestead House.  A.M has alleged that the Individual DOH defendants transferred her to the Homestead House, where she was deprived of training, education, and habilitation services, which, under all the facts alleged, appears plausible.

---

[26]It is unclear whether, in referring to "federal benefits" and "monthly federal disability checks," A.M. is referring to her Social Security benefits, Medicaid benefits, Medicare benefits, or all three collectively.  Construing the Complaint in the light most favorable to the plaintiff, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322, the Court will construe both phrases as referring to all three sources of income.

The Court must analyze whether A.M. received the process which she was due to protect these constitutionally protected property interests.  "[D]ue process is flexible and calls for such procedural protections as the particular situation demands."  Mathews v. Eldridge, 424 U.S. at 334.  The Supreme Court has explained that

> the root requirement of the Due Process Clause as being that an individual be given an opportunity for a hearing before he is deprived of any significant property interest.  This principle requires some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment.
>
> . . . .
>
> [T]he pretermination hearing, though necessary, need not be elaborate. We have pointed out that [t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings.  In general, something less than a full evidentiary hearing is sufficient prior to adverse administrative action.

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 545.

> The United States Court of Appeals for the Second Circuit has stated:
>
> The Supreme Court . . . explained that procedural due process is a flexible standard that can vary in different circumstances depending on "'the private interest that will be affected by the official action'" as compared to "the Government's asserted interest, 'including the function involved' and the burdens the Government would face in providing greater process."  Hamdi v. Rumsfeld, 542 U.S. 507, [529] (2004)(quoting Mathews v. Eldridge, 424 U.S. at 335).  A court must carefully balance these competing concerns, analyzing "'the risk of an erroneous deprivation' of the private interest if the process were reduced and the 'probable value, if any, of additional or substitute safeguards.'"  Id. (quoting Mathews v. Eldridge, 424 U.S. at 335).

United States v. Abuhamra, 389 F.3d at 318.  The hearing required depends on: (i) the nature of the private interest at stake; (ii) the risk of erroneous deprivation given the procedures already guaranteed, and whether additional procedural safeguards would prove valuable; and (iii) the government's interest and the burdens that additional procedures might impose.  See Mathews v. Eldridge, 424 U.S. at 335.

Because A.M. alleges that she did not receive any process whatsoever before being deprived of these protected property interests, the Court concludes that the due process A.M. received was inadequate under Mathews v. Eldridge and that A.M. has sufficiently demonstrated that her procedural due process rights were violated.  The Due Process Clause requires, at a minimum, something more than no process.  See, e.g., Vaughn v. Ruoff, 253 F.3d 1124, 1129 n.3 (8th Cir. 2001)(holding that due process is violated when "no procedural protections [a]re given").  As the Supreme Court has held for almost two centuries, "'some form of hearing' is required before" an individual "is finally deprived of a protected property interest."  Logan v. Zimmerman Brush Co., 455 U.S. 422, 433 (1982).

> [N]otice to the party to be affected of the claim against him, and an opportunity to be heard upon it, are essential elements of every proceeding in a court of justice which can be said to constitute due process of law or to be in accord with the law of the land.

In re Rosser, 101 F. 562, 568 (8th Cir. 1900).  See, e.g., United States v. James Daniel Good Real Prop., 510 U.S. 43, 48 (1993)("[I]ndividuals must receive notice and an opportunity to be heard before the Government deprives them of property."); Sniadach v. Family Fin. Corp. of Bay View, 395 U.S. 337, 342 (1969)("Where the taking of one's property is so obvious, it needs no extended argument to conclude that absent notice and a prior hearing . . . [the] procedure violates the fundamental principles of due process.").

The Individual DOH Defendants' practice violates this rule.  They developed the Aftercare Program, pursuant to which they transferred A.M. to Homestead House.  A.M. alleges that, as part of this de facto or established policy, the Individual DOH Defendants "were aware that Mary Evans intended to keep Plaintiff's federal benefits and force her to work in return for a place to live, and approved the arrangement."  Complaint ¶ 95, at 25.  "The type of process due depends in part on whether the alleged violation was caused by 'established state procedures' or

by 'random, unauthorized acts by state employees.'" Ford Motor Credit Co. v. N.Y. City Police

Dep't, 394 F. Supp. 2d at 610 (citing Hellenic Am. Neighborhood Action Comm. v. City of New

York, 101 F.3d at 880).  If the deprivation is the result of "established state procedure, rather

than random and unauthorized action," he or she is generally entitled to predeprivation process.

Simpson v. Brewster, 2015 WL 1012827, at *3 (quoting Hudson v. Palmer, 468 U.S. 517, 532

(1984)).  See, e.g., Simpson v. Brewster, 2015 WL 1012827, at *2-3 (examining § 7281 of the

California Welfare and Institutions Code); Vecchione v. Wohlgemuth, 377 F. Supp. at 1363-64

(examining §§ 424 and 501 of the Pennsylvania Mental Health and Mental Retardation Act of

1966).  The Tenth Circuit has explained:

> [W]hen the deprivation is not random and unauthorized, but is pursuant to an
> affirmatively established or *de facto* policy, procedure, or custom, the state has
> the power to control the deprivation and therefore, generally must, in the absence
> of compelling reasons to the contrary, give the plaintiff a predeprivation hearing.
> In such cases, the availability of an adequate state post-deprivation remedy is
> irrelevant and does not bar a § 1983 claim.

Montgomery v. Kaiser, 2000 WL 374279, at *2 (quoting Gillihan v. Shilinger, 872 F.2d 935,

939-40 (10th Cir. 1989)).  Here, the Court concludes that the Individual DOH Defendants, high-

level officials at the Training School, were acting pursuant to de facto policy, procedure, or

custom, as part of the Aftercare program.

### 3.   The Individual DOH Defendants Directly and Proximately Caused the Violation of A.M.'s Fourteenth Amendment Property-Based Procedural Due-Process Rights.

The Individual DOH Defendants proximately violated A.M.'s procedural due-process

rights when they transferred her to the Homestead House without an opportunity to object, and

began giving M. Evans A.M.'s SSI, Medicaid, and Medicare checks.  The Individual DOH

Defendants knew or should have known that their transferring A.M. to the Homestead House,

giving A.M.'s federal benefits to M. Evans, and failing to properly supervise M. Evans after the

transfer was completed, would result in M. Evans' deprivation of A.M.'s procedural due-process rights.

Section 1983 attaches liability for a state actor who "subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges or immunities secured by the Constitution."  42 U.S.C. § 1983.  See, e.g., Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978)("Anyone who 'causes' any citizen to be subjected to a constitutional deprivation is also liable.  The requisite causal connection can be established . . . by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury."); Trask v. Franco, 446 F.3d at 1046 ("Thus, Defendants are liable for the harm proximately caused by their conduct.").

The Tenth Circuit has recognized proximate causation liability for First, Eighth, and Fourteenth Amendment violations.  Directly applicable here, Miller v. City of Mission, 705 F.2d 368 (10th Cir. 1983), involved a § 1983 claim that members of the Mission, Kansas, city council violated the city police chief's Fourteenth Amendment procedural due-process rights when it encouraged the mayor to fire him without a termination hearing.  See 705 F.2d at 371-72.  The Tenth Circuit said: "Ample evidence supports the jury's inference that the mayor would not have dismissed [the police chief] without a hearing absent the support and encouragement of defendant council members."  705 F.2d at 376.  The Tenth Circuit held that the city council members' advice to the mayor proximately caused the procedural due-process violation.  See 705 F.2d at 375-76.  The Tenth Circuit explained that, at a minimum, the city council members "set into motion a series of events by others which they reasonably should have known would have resulted in [the police chief's] dismissal without a hearing."  705 F.2d at 375.

A.M. plausibly alleges that the Individual DOH Defendants proximately caused M. Evans' violation of A.M.'s procedural due-process rights, because their collective transfer of A.M. to the Homestead House "set in motion," Martinez v. Carson, 697 F.3d at 1255, the series of events that "cause[d] [A.M.] to be subjected," 42 U.S.C. § 1983, to a denial of procedural due process at M. Evans' hands.   The Complaint alleges that the Individual DOH Defendants collectively "abandoned" A.M. when they transferred her from a state care facility to the Homestead House, where A.M. was deprived of adequate safety, social services, government benefits, medical and rehabilitative care, and "her basic human rights."   Complaint ¶ 85, at 23. In particular, Schaefer, the lawyer for the New Mexico Department of Health and the Training School, "participated in deciding" to place A.M. at the Homestead House.   Complaint ¶ 58, at 15-16.   Sandoval, the Director of Resident Living at the Training School, was personally "responsible for determining the suitability of placements" for A.M., and responsible for "supervising and monitoring" A.M. after her transfer.   Complaint ¶ 16, at 5-6.   Adams, the deputy administrator for the Training School, personally participated in the decision to transfer A.M. to the Homestead House "without taking any steps to ascertain whether she would be safe." Complaint ¶ 18, at 6.   Mateju, the Training School administrator, made the "final decisions" on "all placement and discharge decisions" for A.M.   Complaint ¶ 20, at 7.

A.M. alleges that the Individual DOH Defendants, collectively, did not conduct a home visit at the Homestead House before A.M.'s transfer, see Complaint ¶ 62, at 17, and "were deliberately indifferent to the need to investigate the Homestead House [before] placing" her there, Complaint ¶ 75, at 20.   The Individual DOH Defendants approved the arrangement with the Homestead House that allowed M. Evans to keep A.M.'s federal benefits, but still "force[d] her to work in return for a place to live."   Complaint ¶ 95, at 25.   Further, the Individual DOH

Defendants did not establish any system "to provide oversight" for third-party placements like to the Homestead House.    Complaint ¶ 64, at 18.    The Individual DOH Defendants "were deliberately indifferent to the likelihood that Plaintiff . . . would lose federal and constitutional rights."  Complaint ¶ 95, at 25.  State agency officials later shut down the unlicensed Homestead House, but the Individual DOH Defendants were indifferent to the need to find A.M. a new care facility.  See Complaint ¶ 97, at 25.  Instead, the Individual DOH Defendants allowed A.M. to be transferred to M. Evans' private residence.  See Complaint ¶ 98, at 25-26.

The Individual DOH Defendants repeatedly remind the Court that it was M. Evans and not the Individual DOH Defendants that deprived A.M. of "social security and other federal benefits which [she] was continuing to receive."   Reply at 9.   They state that there are no allegations in the Amended Complaint that the Individual DOH Defendants themselves deprived A.M. of her supplemental security income, Medicaid, or Medicare benefits.  See Reply at 9-10. They argue that the constitutional violation committed by M. Evans, a private third party, was not "under color of state law," and, therefore, § 1983 does not cover M. Evans' conduct.  MTD at 7.  The Court disagrees.  The Individual DOH Defendants do not address A.M.'s allegation that placing her in M. Evans' care and failing to oversee that care caused A.M. to be subjected to a third party's violation of her procedural due process rights.   Instead, the Individual DOH Defendants argue that A.M. was no longer in state custody after 1979, an assertion with which the Court disagrees.  The Individual DOH Defendants, acting under color of state law, should have foreseen that transferring a thirty-two-year-old, developmentally disabled woman to live at an unlicensed group home for the elderly, without arrangements for funding from the State of New Mexico to pay for her care, would result in A.M. being denied her procedural due-process rights.  See Complaint ¶ 64, at 18; id. ¶ 95, at 25.

That M. Evans was not a state actor does not shield the Individual DOH Defendants from proximate causation liability under § 1983.  The Tenth Circuit recognized in Northington v. Marin that state actors can be held liable for proximately causing constitutional violations that private third parties commit, if the state actor sets the harm into motion.  See 102 F.3d at 1569. The Individual DOH Defendants' direction for M. Evans, as a private party, to provide for A.M. without state funding, see Complaint ¶ 95, at 25, was similar to the actions of other prison inmates in Northington v. Marin, to whom prison guards warned that the plaintiff inmate was a snitch, see 102 F.3d at 1569.  State actors did not direct M. Evans, or the inmates who ultimately beat the plaintiff in Northington v. Marin, to cause a constitutional violation.  The actions that the Individual DOH Defendants took, however, by allegedly transferring A.M. to an unlicensed facility for the elderly without arranged state funding or a system for monitoring A.M.'s care, made the possibility that A.M. would be denied her procedural due-process rights at the Homestead House as foreseeable as the inmates' beating when prison guards tipped off that there was a snitch in their ranks.  See Complaint ¶ 64, at 18; id. ¶ 86, at 23; Northington v. Marin, 102 F.3d at 1568-69.  Like the prison guards who knew that labeling an inmate a snitch would likely result in beatings, the Individual DOH Defendants were aware of the ongoing violation of A.M.'s constitutional rights.  See Complaint ¶ 91, at 24.

Moreover, each of the Individual DOH Defendants who personally contributed to the decision-making process to transfer A.M. to the Homestead House without an adequate system to monitor her care proximately caused M. Evans' violation of A.M.'s procedural due-process rights.  See Complaint ¶ 64, at 18; id. ¶ 95, at 25.  As the Tenth Circuit stated in Lippoldt v. Cole, "[t]hat conduct of other people may have concurrently caused the harm does not change the outcome as to [A.M.]."  468 F.3d at 1220.  The Tenth Circuit's holding in Lippoldt v. Cole

stands for two interpretations of proximate causation liability under § 1983 that apply to this case.  First, that M. Evans violated A.M.'s procedural due-process rights does not insulate the Individual DOH Defendants from liability under §1983 for laying the groundwork for those constitutional violations to occur.  Second, that Mateju made the "final decisions" on A.M.'s transfer, Complaint ¶ 20, at 7, does not shield Schaefer, Sandoval, and Adams from liability, because A.M. sufficiently alleges that they each personally contributed in some way to the decision-making process of transferring A.M. to the Homestead House.  See Complaint ¶ 16, at 6; id. ¶ 18, at 6; id. ¶ 58 at 15-16.

A.M. therefore plausibly alleges that the Individual DOH Defendants proximately caused the violation of A.M.'s procedural due-process rights as to the deprivation of her SSI, Medicaid benefits, Medicare benefits, and the value of her labor, and that they may be liable under § 1983 for that constitutional violation, because the Individual DOH Defendants should have known -- collectively and individually -- that their transfer of A.M. to the Homestead House without state funding arrangements, see Complaint ¶ 95, at 25, their provision of A.M.'s federal benefits to M. Evans, and their failure to oversee M. Evans thereafter, see Complaint ¶ 64, at 18, would result in the deprivation of A.M.'s procedural due-process rights under the Fourteenth Amendment. Regarding A.M.'s entitlements under the New Mexico Mental Health and Disabilities Act -- education, training, and habilitation services -- the Court need not use proximate causation liability, for the Individual DOH Defendants committed this deprivation themselves in 1979 when they stripped her of her status as a "resident client" under the Act without due process of law and transferred her out of the Training School to the Homestead House.  Moreover, because of their actions, A.M. lost training, education, and habilitation services under the Act.

**B.**     **THE INDIVIDUAL DOH DEFENDANTS ARE LIABLE FOR THE VIOLATION OF A.M.'S PROPERTY-BASED PROCEDURAL DUE-PROCESS CLAIMS.**

A.M. has sufficiently alleged constitutional violations of her property-based procedural due-process rights.   First, in 1979, the Individual DOH Defendants directly and unconstitutionally deprived A.M. of entitlements to education, training, and habilitation services, under § 43-1-8 of the New Mexico Mental Health and Disabilities Act, when they stripped her of her status as a "resident client" under the Act without due process of law and transferred her out of the Training School to the Homestead House.   The Individual DOH Defendants are liable for this deprivation, because it was clearly established in 1979 that, once the government provides an entitlement, it cannot take it away without due process of law.   Second, the Individual DOH Defendants proximately caused the violation of A.M.'s procedural due-process rights as to the deprivation of her SSI benefits, Medicaid benefits, Medicare benefits, and the value of her labor. Because the Tenth Circuit did not clearly establish proximate causation liability for § 1983 procedural due-process claims until April 11, 1983, when it issued Miller v. City of Mission, however, qualified immunity shields the Individual DOH Defendants from liability for M. Evans' deprivation of A.M.'s SSI, Medicaid benefits, Medicare benefits, and the value of her labor between 1979 and April 11, 1983.

**1.     The Individual DOH Defendants are Directly Liable for Depriving A.M. of her Constitutionally Protected Property Interests in Entitlements under the New Mexico Mental Health and Disabilities Act without Due Process of Law in 1979.**

The Court has concluded that, in 1979, the Individual DOH Defendants directly deprived A.M. of her entitlements under the New Mexico Mental Health and Disabilities Act -- education, training, and habilitation services -- when they stripped her of her status as a "resident client" under the Act without due process of law and transferred her out of the Training School to the

Homestead House.  The Court concludes that it was clearly established in 1979 that A.M. possessed a protected property interest in education, training, and habilitation services under the New Mexico Mental Health and Disabilities Act.

"Property interests . . . are not created by the Constitution.  Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577. In Goldberg v. Kelly, 397 U.S. at 254, decided in 1970, the Supreme Court held that where a state provides statutory entitlements -- in that case welfare benefits -- it cannot take them away without a notice and some kind of hearing.  The Court reads Goldberg v. Kelly as recognizing a constitutionally protected property interest in statutory-based entitlements, to which due-process protections apply.  Here, the Court recognizes § 43-1-8 of the Mental Health and Development Disabilities Code as creating protected property interests under Goldberg v. Kelly to education, training, and habilitation services, among other things, to which procedural due-process protections apply.  The New Mexico legislature enacted § 43-1-8 of the Mental Health and Development Disabilities Code in 1977, and the Supreme Court decided Goldberg v. Kelly in 1970.  The Court thus concludes that it was clearly established, beginning in 1977, that A.M., as a developmentally and involuntarily committed person, had protected property interests under § 43-1-8, to which due-process protections attached.  Finally, because the Individual DOH Defendants directly deprived A.M. of these state-created property interests in 1979 by transferring her to Homestead House, the Court need not rely upon the Tenth Circuit's 1983 decision in Miller v. City of Mission, which established proximate causation liability for § 1983 procedural due-process claims.

   2.     **The Individual DOH Defendants are Liable for Depriving A.M. of her Constitutionally Protected Property Interests in her SSI, Medicaid Benefits, Medicare Benefits, and the Value of her Labor, Beginning on April 11, 1983, when the Tenth Circuit Clearly Established Proximate Causation Liability for § 1983 Procedural Due-Process Claims in Miller v. City of Mission.**

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818). Qualified immunity also shields state actors who have "reasonable, but mistaken beliefs" and operates to protect state actors from the law's sometimes "hazy border." Saucier v. Katz, 533 U.S. at 205. When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct. See Saucier v. Katz, 533 U.S. at 205.

"A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'" Lobozzo v. Colo. Dep't of Corr., 429 F. App'x at 710 (quoting Zweibon v. Mitchell, 720 F.2d at 172-73). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d at 923. See Medina v. City & Cnty. of Denver, 960 F.2d at 1498. "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that [the proposed conduct] . . . violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186

(quoting Saucier v. Katz, 533 U.S. at 202).  Moreover, public officials are not expected to tailor their conduct to account for future changes in the law.  See Gomes v. Wood, 451 F.3d at 1134. "If the law is not clearly established, we do not require officials to anticipate its future developments."  Gomes v. Wood, 451 F.3d at 1134 (internal quotation marks omitted).

The Supreme Court has clarified that the clearly established prong of the qualified-immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  Ashcroft v. al-Kidd, 131 S. Ct. at 2083.  While a case directly on point is not required, the Supreme Court has held that "existing precedent must have placed the statutory or constitutional question beyond debate."  Ashcroft v. al-Kidd, 131 S. Ct. at 2083. "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified."  Anderson v. Creighton, 483 U.S. at 639. "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the volatile nature of particular conduct is clearly established."  Ashcroft v. al-Kidd, 131 S. Ct. at 2083.  The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs," as to the application of law to facts and operates to protect officers from the law's sometimes "hazy border."  Saucier v. Katz, 533 U.S. at 205.  Without a prior case on point to demonstrate clearly established law, the Tenth Circuit will not recognize any constitutional right as clearly established if "a distinction [from prior cases] might make a constitutional difference."  Kerns v. Bader, 663 F.3d at 1186-87 (emphasis in original).

The Individual DOH Defendants' acts, during A.M.'s subsequent commitment with A.M. where she was deprived of protected property interests without due process of law, proximately violated A.M.'s Fourteen Amendment procedural due-process rights, satisfying the first step of the Saucier v. Katz analysis. See Riggins v. Goodman, 572 F.3d at 1107. A.M. fails, however, on the second Saucier v. Katz step for violations occurring up until April 11, 1983, because she cannot demonstrate that the proximate causation for her procedural due-process violation was clearly established before April 11, 1983. See Saucier v. Katz, 572 F.3d at 1107.

**IT IS ORDERED** that the Individual DOH Defendants' Motion to Dismiss Plaintiff's Procedural Due Process Claim, filed October 1, 2014 (Doc. 57)("MTD"), is granted in part and denied in part. A.M.'s claims that she was deprived of constitutionally protected liberty interests in adequate mental health care, food, shelter, clothing, minimum habilitation or training, and in associating with family or peers, are dismissed. A.M.'s claim that she was entitled to due-process protections for deprivations of medical and dental care, conditions of reasonable care and safety, and reasonably nonrestrictive confinement conditions before April 11, 1983 is dismissed. A.M.'s claim that she was deprived of constitutionally protected property interests in Developmental Disabilities Waiver Services is dismissed. A.M.'s claim that the Individual DOH Defendants violated her procedural due-process rights as to the deprivation of her SSI benefits, Medicaid benefits, Medicare benefits, and the value of her labor before April 11, 1983, is dismissed.

The following claims are not dismissed: (i) that the Individual DOH Defendants deprived A.M. of her protected liberty interests in adequate medical care, dental care, and conditions of reasonable care and safety, and reasonably nonrestrictive confinement conditions, without adequate due process of law, beginning on April 11, 1983; (ii) that the Individual DOH

- 136 -

Defendants unconstitutionally deprived A.M. of entitlements to education, training, and habilitation services, under § 43-1-8 of the New Mexico Mental Health and Disabilities Act in 1979; and (iii) that the Individual DOH Defendants deprived A.M. of her protected property interests in her SSI benefits, Medicaid benefits, Medicare benefits, and the value of her labor, without due process of law beginning on April 11, 1983.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

John Ford Hall
Kelly K. Waterfall
Law Offices of Peter Cubra
Albuquerque, New Mexico

--and--

Nancy L. Simmons
Law Offices of Nancy L. Simmons
Albuquerque, New Mexico

 *Attorneys for the Plaintiff*

Stephen S. Hamilton
Alexia Constantaras
Montgomery & Andrews, P.A.
Albuquerque, New Mexico

 *Attorneys for the Defendants*